

# STATE BAR OF GEORGIA
# GRIEVANCE
# CONFIDENTIAL

IN RE:  **Mr. L. Lin Wood, Jr.**
Address: ███████████████████████████
Bar Number: 774588

The State Disciplinary Board of the State Bar of Georgia has received information concerning the above-named attorney that suggests that said attorney may have violated one or more of the Georgia Rules of Professional Conduct. After having considered the matter, the Board, pursuant to Rule 4-203(2), does hereby on its own motion initiate this Grievance as follows:

The attached information indicates Mr. Wood may have engaged in conduct in violation of Georgia Rules of Professional Conduct 1.1, 1.2, 3.1, 3.3, 4.1 and 4.4, and Bar Rule 4-104.

This 5th day of February, 2021.

STATE DISCIPLINARY BOARD

EXHIBIT "B"

**King et al. v. Whitmer et al., U.S. District Court Eastern District of Michigan, Case No. 2:20-cv-13134** (Lin Wood – Counsel for plaintiffs)

On November 25, 2020, Wood, along with others, filed a challenge to the 2020 General Election in the U.S. District Court, Eastern District of Michigan, Southern Division.  The Complaint alleged the following:

 massive election fraud, multiple violations of the Michigan Election Code, see, e.g., MCL §§ 168.730-738, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution violations that occurred during the 2020 General Election throughout the State of Michigan, as set forth in the affidavits of dozens of eye witnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses. (Complaint, Exhibit A).

On November 29, 2020, the plaintiffs filed an amended complaint. (Amended Complaint, Exhibit B) In the Amended Complaint, plaintiffs described one their experts as "a former U.S. Military Intelligence expert." (Exhibit B ¶ 161). In fact, plaintiffs' expert never completed the training program and was not an intelligence analyst.

The same day plaintiffs filed an emergency motion for relief seeking "de-certification of Michigan's election results or a stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds, as well as seeking the impounding of the voting machines made available and other equitable relief, on an emergency basis, due to the irreparable harm, and impending election voting for the electors, as stated in the Complaint." (Emergency Motion, Exhibit C).

On December 7, 2020, the court entered an order denying plaintiffs' emergency motion. (Order, Exhibit D). In the order, the court determined:
- Plaintiffs' state law claims against the defendants were barred by 11th Amendment immunity.
- The matter was moot because the time had passed to provide most of the relief plaintiffs requested in their amended complaint and plaintiffs did not avail themselves of established remedies.
- Plaintiffs did not exercise diligence in asserting their claims.
- Plaintiffs lacked standing.

Subsequently the City of Detroit and other interested parties filed several motions seeking sanctions, including a Motion for Sanctions, for Disciplinary Action, for Disbarment Referral and for Referral to State Bar Disciplinary Bodies. (Motion for Sanctions, Exhibit E).

On January 14, 2021, the plaintiffs' voluntarily dismissed their complaint without prejudice.

On January 19, 2021, plaintiffs filed a response to the City's motion for sanctions and disciplinary action. (Plaintiff's Opposition to Motion for Sanctions, Exhibit F). In the motion, plaintiffs stated that plaintiffs had submitted "evidence for nearly every paragraph in the

Amended Complaint…" Plaintiffs also asked the court to deny the motion because only plaintiffs' local counsel had signed pleadings and argued that when the attorney's name only appears in typewritten from, sanctions cannot be imposed.

On January 26, 2021, the City of Detroit filed a reply brief in support of its motion for sanctions. (Reply Brief in Support of Motion for Sanctions, Exhibit G). In its reply brief, the City pointed out that plaintiffs made additional misrepresentations to the court in their response to the sanctions motion by falsely claiming that only Michigan attorneys signed the pleadings. (Exhibit G, pp. 3-4). The City also demonstrated that plaintiffs presented case law interpreting the 1983 version of Rule 11 and that in 1993, the Rule was "fundamentally altered in a manner that renders their cited case law wholly inapposite." (Exhibit G, pp. 4-6).


**Pearson et al. v. Kemp et al., 1:20-cv-4809 U.S. District Court Northern District of GA**
(Lin Wood  - Counsel for plaintiffs)

On November 25, 2020, Lin Wood, along with others, filed a complaint for declaratory, emergency and permanent injunctive relief in the U.S. District Court for the Northern District of Georgia, Atlanta Division. (Complaint, Exhibit H).

On November 27, 2020, plaintiffs filed a motion for injunctive relief seeking (1) a temporary restraining order preventing the defendants from erasing or altering forensic data on voting machines, (2) an injunction de-certifying the Presidential election results, or alternatively a stay in the delivery of the certified results to the Electoral College, and (3) an injunction making the voting machines available to the plaintiffs for forensic analysis.

The district court held a hearing on the plaintiffs' motion via Zoom on November 29, 2020. Plaintiffs proposed that the district court order "very limited" relief in "two or three counties." Following the hearing, the court issued a written temporary restraining order on November 29, 2020, that gave the plaintiffs what they said they wanted. That order enjoined the defendants from erasing or altering data on voting machines in Cobb, Gwinnett and Cherokee counties. It also ordered the defendants to produce a copy of the contract between the State of Georgia and Dominion Voting Systems. Two follow-up orders set an expedited evidentiary hearing for the morning of December 4, 2020, on the broader relief requested in the plaintiffs' motion and certified that the Sunday night order contained the elements required for a permissive appeal under 28 U.S.C. § 1292(b).

On December 1, 2020, the plaintiffs filed a notice of appeal as to the district court's November 29, 2020 order. As a result, the district court canceled the hearing on the broader relief the plaintiffs had requested. The defendants filed a conditional cross-appeal. Later, the plaintiffs also requested permission to appeal to the 11th Circuit under 28 U.S.C. § 1292(b). Mr. Wood is listed as counsel of record for the plaintiffs in the 11th Circuit appeal.

On December 4, 2020, the U.S. Court of Appeals for the 11th Circuit issued an order dismissing the appeal for lack of jurisdiction and remanding the case to district court for further proceedings. (Order, Exhibit I). In its December 4 order, the appellate court determined that:

- The district court's order was not appealable under 28 U.S.C. §§ 1291, 1292(a)(1), or 1292(b).
- Even if the order was appealable, the appellate court does not ordinarily have jurisdiction over TRO rulings.
- The case did not meet the requirements for section 1292(b) interlocutory review.
- Because the plaintiffs appealed, the evidentiary hearing was stayed and "the case considerably delayed."
- The district court's order did not deny the plaintiffs the requested relief.

On December 11, 2020, plaintiffs filed an Emergency Petition Under Rule 20 for Extraordinary Writ of Mandamus with the U.S. Supreme Court seeking an emergency order (1) instructing Respondents to de-certify the results of the General Election for the Office of President, and prohibiting Respondents from empaneling the Biden slate of electors to cast their votes in the Electoral College, (2) prohibiting Respondents from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Georgia Election Code, and (3) requesting that the Court direct the District Court to order production of all registration data, ballots, envelopes, etc. required to be maintained by Georgia state and federal law, to refrain from wiping or otherwise tampering with the data on all voting machines used in the November 2020 election, and to produce one such machine from each Georgia county for forensic examination by Petitioners' experts.

On January 19, 2021, the plaintiffs filed a stipulation of dismissal of that Emergency Petition.


**Feehan v. Wisc. Elections Comm'n, 20-cv-1771, U.S. District Court Eastern District of Wisconsin** (Lin Wood-counsel for plaintiffs)

On December 1, 2020, Lin Wood, along with other counsel, filed a complaint on behalf of William Feehan and Derrick Van Orden in the U.S. District Court for the Eastern District of Wisconsin. (Complaint, Exhibit J).

The complaint alleged "massive election fraud" and "multiple violations of the Wisconsin Election Code" during the 2020 General Election in the State of Wisconsin "as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses." (Exhibit J, p. 1).

The complaint identified Van Orden as a resident of Hager City, Wisconsin, and the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the U.S. House of Representatives. The complaint alleged that:

Mr. Van Orden 'lost' by approximately 10,000 votes to the Democrat incumbent," and stated that "[b]ecause of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code.

The complaint was not verified. (Exhibit J).

The same day the complaint was filed at 4:01 pm Derrick Van Orden tweeted the following:



(See, Van Orden tweet: https://mobile.twitter.com/derrickvanorden/status/1333878883238768642?ref_url=https%3a%2f%2fd-1385984482207901300.ampproject.net%2f2101211748002%2fframe.html)

On December 2, 2020, the court entered an order highlighting several deficiencies in the unverified complaint and related papers that Mr. Wood and his co-counsel filed including:

- Failing to include the proposed order in the initial motion that was filed.
- Failing to ask for a hearing in the proposed order attached to the amended motion.
- Filings indicating that they had been forwarded to defense counsel with no address listed.
- Stating documents were filed under seal when they were not.

On December 3, 2020, Wood and co-counsel filed an amended complaint removing Derrick Van Orden as a plaintiff. It differed from the original complaint only in the removal of Van Orden as a plaintiff.

On December 9, 2020, the court entered an order dismissing the case. (Order, Exhibit K) The court determined:

- The plaintiffs brought the case in federal court, though state law governed the election process. (Exhibit K, p. 1).
- The court had no authority to grant plaintiff the relief he requested.
- Plaintiff did not have standing to sue.
- Most of the relief the plaintiff requested was moot.
- Plaintiff sued defendants who were either "not suable under section 1983 or [were] protected by Eleventh Amendment immunity."
- Plaintiff falsely attributed a quote to *Swaffer v. Deininger*. (Exhibit K, pp. 32-33).

**Bowyer v. Ducey, CV-20-02321, U.S. District Court, District of Arizona**
(Lin Wood-counsel for plaintiff)

On December 2, 2020, Lin Wood, along with other counsel, signed the complaint in Bowyer v. Ducey, CV-20-02321, which was filed in the U.S. District Court, District of Arizona. The plaintiffs sought to set aside the results of the 2020 General Election on the basis of alleged fraud and election misconduct. (Complaint, Exhibit L).

Though the complaint alleged that the election process was riddled with fraud and illegality, the plaintiffs presented little to no relevant or reliable evidence in support of their claims.  U.S. District Court Judge Diane Humetewa dismissed the action, concluding:

Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety. (Order, Exhibit M).

**Roslyn La Liberte vs. Joy Reid, 18-CV-5398, U.S. District Court Eastern District of New York** (Lin Wood as co-counsel for plaintiff)

In October 2018, Respondent was admitted *Pro Hac Vice* to the Federal District Court for the Eastern District of New York as co-counsel for Roslyn La Liberte, Plaintiff in a defamation case against Joy Reid (*La Liberte vs. Reid*, 18-CV-5398).  By motion of January 25, 2021, counsel for Defendant requested that the court revoke Respondent's admission *Pro Hac Vice* "because, among other things, he has acted and is acting to subvert the United States Constitution and the rule of law, violated his ethical obligations under the New York Rules of Professional Conduct ("RPC") and the New York Constitution, violated Federal Rule of Civil Procedure 11 and RPC 3.1, falsely attacked the Chief Justice of the United States Supreme Court, has recently been disciplined in another state court, and made misrepresentations to this Court."  (Motion to Revoke Pro Hac Status, Exhibit N).

The first four grounds for the Motion are discussed in other portions of this Memorandum of Grievance.  The final ground, that Respondent made misrepresentations to the Court in the *La Liberte* matter, is based upon statements that Respondent made during a conference with the Court on January 11, 2021. (Transcript, Exhibit O). During the conference, Mr. Wood told the Court:

- "I have never advocated that anyone should break the law. I've advocated for people to follow the law." (Exhibit O, p.15). Mr. Wood encouraged the conduct of individuals who committed federal offenses by breaking into the Capitol to unseat duly elected representatives and prevent the counting of electoral college votes and the peaceful transfer of power.

- "I didn't call for the people to go up there and meet, I didn't call for anybody to go to the Capitol." (Exhibit O, p.9). Mr. Wood did, in fact, "call for" his supporters to storm and occupy the United States Capitol.  On the morning of January 6, Mr. Wood posted to his 1.1 million Twitter followers that "[t]he time ha[d] come . . . to take back our country . . . to fight for our freedom." . He wrote those words alongside an image stating that it was "1776 Again."  During the insurrection, as the mob was storming the Capitol building, Mr. Wood tweeted to his followers that they should follow the advice of Bill White to "enter the US Capitol Building . . . enter both houses . . . fight for us [and] . . . fight for Trump. . . ."

- "So there's been no finding by any court that the evidence of election fraud is lacking. In fact, if they discussed it, they would have to say it was literally conclusive that there was fraud." (Exhibit O, p.11). As set forth elsewhere in this Memorandum of Grievance, several courts have specifically found that there is no factual support for this claim.

## Statements from Lin Wood

- Statements by Wood regarding U.S. Supreme Court Chief Justice John Roberts

  - CJ Roberts knew in advance the date of Associate Justice Antonin Scalia's death; is a "member of a club or cabal requiring minor children as an initiation fee";. arranged, for the purposes of pedophilia, an illegal adoption of children with the help of convicted sex-offender Jeffrey Epstein; who Wood claimed is still alive. (Twitter, Dec. 30, 2020).

  - "Hillary Clinton thought she had rigged the 2016 election. The plan after her election was to kill federal judges so that Hillary could stack the judiciary. US Supreme Court targeted. FBI was complicit…. Justice Scalia learned of

the plan to kill members of the judiciary. He reported it to the White House. Shortly thereafter, Scalia was killed…." (Telegram, Jan. 19, 2021).

- Statements by Wood regarding U.S. Vice President Mike Pence, former Deputy Attorney General Rod Rosenstein, and other U.S. government officials:

  o VP Pence "is a TRAITOR, a Communist Sympathizer & a Child Molester" (said same about "Chuck 'Jeffrey Epstein Buddy' Schumer" and "Mitch 'Cocaine CCP' McConnell") who conspired with former DAG Rosenstein (who directed the murder of DNC employee Seth Rich in 2016) to overthrow the U.S. government and should be arrested and incarcerated for treason (Twitter, Jan. 6-7, 2021).

  o "If Pence is arrested, @SecPompeo will save the election. Pence will be in jail awaiting trial for treason. He will face execution by firing squad." (Twitter, Jan. 1, 2021); "Get the firing squads ready. Pence goes FIRST." (Parler, Jan. 7, 2021).

  o "Pence is on videos captured by FBI. Discussions about murdering judges. [CJ] Roberts was involved. So was Hillary Clinton." VP Pence "used 13, 14, & 15 year old boys for his own self-serving purposes too. A very special place in Hell awaits Pence." (Telegram -Jan. 19, 2021).

- Statements regarding Georgia officials and judges:

  o Wood led a rally in Georgia on Dec. 2, 2020, where he called for the imprisonment of Georgia Governor Brian Kemp and Secretary of State Brad Raffensberger for carrying out their duty of counting Georgia's votes in the presidential election. Wood instructed persons at the rally to go to the Georgia Capitol and "circle it" to force a special session of the Georgia legislature to overturn the results of the election (https://www.youtube.com/watch?v=ep1yCTpMJvc, Video at 3:10).

  o Wood spread a conspiracy theory "that connect purported election fraud to a traffic accident that killed a 20-year-old worker on U.S. Sen. Kelly Loeffler's campaign who dated one of Kemp's daughters." (https://www.ajc.com/news/amid-personal-turmoil-libel-lawyer-lin-wood-goes-on-the-attack-for-trump/UBHBVKB65NGE7PU3RO5YYGTHXE/)

- Statements regarding U.S Capitol violence:

  o "I have eternal life…. I don't believe anyone died yesterday…. I think it was all staged. It was Antifa dressed up as Trump people…. I apply critical thinking and the instincts God gave me [to know this]…. I'm not God…. I'm just a person who understands what's going on and why…. If I am God, I've got one bad memory. I don't remember creating myself, the clouds, the oceans, the stars. But do I try to live like God? This is the second harvest.

God is getting ready to show he's real again…. I'm afraid they're going to put me in jail, but that's where Paul wrote some of his greatest chapters of the Bible." (July 7, 2020 - Statement to New Yorker magazine writer Charles Bethea, "A Trump Holdout in Atlanta," New Yorker, Feb.1, 2021 issue, pp. 2-4/4).

o Wood acknowledged that Ashli Babbitt, who was shot and killed while storming the Capitol, had retweeted Wood's claims regarding VP Pence, DAG Rosenstein and CJ Roberts the morning of the riots, prior to suggesting that Babbitt was still alive and reports of her death were part of a "false flag" operation by the "Deepstate" and Antifa against "Sheeple." (Exhibit G).

**Allegations Taken From Verified Complaint in _Wade, et al. v. Wood_, Fulton Sup. Ct. CAFN 2020CV339937** (Verified Complaint, Exhibit P).

- Beginning in the fall of 2019 and continuing into 2020, Wood began to display "erratic, abusive, and unprofessional behavior," with Wood becoming "increasingly … hostile … and threatening towards Plaintiffs Wade, Grunberg, and Wilson ("Plaintiffs"), his colleagues within his office, and sending "abusive, incoherent phone calls, voicemails, texts, and emails … to [Plaintiffs] in the middle of the night." (Exhibit P, ¶¶ 3, 106-07; 111; 115).

- Wood physically attacked Wilson at Wood's home when Wilson came by out of concern for Wood's welfare. Wood physically attacked Grunberg in an elevator of a hotel during an out of town deposition. Wood later acknowledged and apologized for the attacks, (Verified Complaint ¶ 112), but in subsequent emails threatened to "beat" Taylor with a switch "till [she] couldn't sit down for 20 fucking years" and told Grunberg: "Man oh man, you're glad you're not with me in an elevator with me right now buddy…." (Exhibit P, ¶¶ 142; 143).

- Wood specifically threatened to "destroy" Grunberg and Wilson, saying about Wilson specifically: ""by the time I am through with Taylor Wilson, he's going to wish all I had done was fuck his wife." On March 3, 2020, Wood called and left a voicemail for Wilson's wife professing his love for her and her family. (Exhibit P, ¶¶ 118; 159-60).

- On Feb. 13, 2020, after Plaintiffs agreed to reconsider leaving the firm, Wood hosted a teleconference in which Wood: referred to himself as Almighty; offered to fight the individual Plaintiffs to the death; demanded the Plaintiffs' undying loyalty; threatened to "hurt" the Plaintiffs; offered to have the Plaintiffs stay in the firm; and called Plaintiff Grunberg a "Chilean Jew"; demanded that he admit he does not look like the other lawyers in the firm; stated to Plaintiffs that he "had the power to hurt ya, to hurt your families, to hurt your law careers…." Wood stated: "Now I'm gonna tell you something very surprising, y'all just heard from the Almighty Lin and it sounds powerful and you believe it don't ya? … Almighty Lin just told you what would happen if he thinks you ever, in his opinion, discerns that you're being disrespectful to me by anything other than an accident or mistake, he's gonna throw you out. Ya hear me? … Now Almighty Lin's gonna tell you this … the power that I just had can change your life if I ever decide …

9

even if it's good or bad, I can change your life with the exercise of that power, right? …"
Wood stated: "I'll commit sins. I'll [physically] push you when you piss me off." Wood
stated: "I might make the same mistake then that I made then, I might push you and I
wouldn't mean to hurt you. I wouldn't mean to push you around, especially cause either
one of you would whip my ass or maybe you wouldn't cause you don't have the courage I
have. Maybe I would fight you till you damn die. Or both of us died. Cause I got
courage inside of every bone in my body that you'll never know."
(Exhibit P, ¶ 124).

- Wood declared that he was "doing God's will"; threatened to bring down "the wrath of
God"; and promised that Plaintiffs would be punished "at the discretion of Almighty
God"; said "God Almighty told me to get you back to where you belong. Broke and
essentially homeless…. You all better get on your knees and pray to Almighty God that
He now asks me to show you mercy"; threatened "Unless I change my mind under the
instructions of God, you are in for the roughest ride of your lives. I'm going to teach you
all a lesson that you are going to learn…."; and threatened "I will deliver a fiery
judgment against you on earth. Who the fuck did you think you were dealing with? You
were screwing around me with, but I was someone else in disguise. You in fact have been
screwing around with God Almighty…." (Exhibit P, ¶ 132-34).

- As Wood and Plaintiffs engaged in settlement negotiations, Wood "repeatedly voiced his
concerns about his [above-listed] misconduct being disclosed as he feared it would
interfere with his imminent receipt of the Presidential Medal of Freedom and
appointment as Chief Justice of United States Supreme Court. The latter belief was
based, in part, on (1) a decade-plus old "prophecy" Defendant Wood heard in a YouTube
video, and (2) a conspiracy theory that Chief Justice Roberts would be revealed to be part
of Jeffrey Epstein's sex trafficking ring and was being blackmailed by liberals to rule in
their favor." (Exhibit P, ¶ 164).

# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRCT OF MICHIGAN

| | |
|---|---|
| **TIMOTHY KING,MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,**<br><br>　　　　**Plaintiffs.**<br>**v.**<br><br>**GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OFSTATE CANVASSERS.**<br><br>　　　　**Defendants.** | **CASE NO.** |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

Exhibit A

## NATURE OF THE ACTION

1.    This civil action brings to light a massive election fraud, multiple violations of the Michigan Election Code, *see, e.g.,* MCL §§ 168.730-738, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution violations that occurred during the 2020 General Election throughout the State of Michigan,[1] as set forth in the affidavits of dozens of eye witnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.    The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States. The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. This Complaint details an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State at the direction of Michigan state election officials.

3.    The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or manufacturing, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan, that

---

[1]   The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona and Wisconsin. See Exh. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report").

[2] 50 U.S.C. § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide-pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system. Without an incorruptible audit log, there is no acceptable system.

Exhibit A

constitute a multiple of Biden's purported lead in the State. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to overturn and reverse the election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Michigan's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.

### Dominion Voting Systems Fraud and Manipulation

4.      The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the MichiganBoard of State Canvassers. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

5.      Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.See Exh. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

6.      As set forth in the DominionWhistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change theConstitution of Venezuela to end

Exhibit A

term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

7.     A core requirement of the Smartmatic software design ultimately adopted by Dominion for the Michigan's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez.*Id.* ¶15.

8.     The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  *See* Exh. 107, August 24, 2020 Declaration of HarriHursti, ¶¶45-48).

Exhibit A

9.     Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log.There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence.

10.     In deciding to award Dominion a$25 million, ten-year contract (to a Dominion project team led by Kelly Garrett, former Deputy Director of the Michigan Democratic Party), and then certifying Dominion software, Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2018 because it was deemed vulnerable to undetected and non-auditable manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it and a screwdriver."[3]

11.     Plaintiff's expert witness, Russell James Ramsland, Jr. (Exh. 101, "Ramsland Affidavit"), has concluded that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan, that must be disregarded.  This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below), and thus by itself is grounds to set aside the 2020 General Election and grant the declaratory and injunctive

---

[3]Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

Exhibit A

relief requested herein.

12. In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud and Michigan Election Code violations, supplemented by healthy doses of harassment, intimidation, discrimination, abuse and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity or fairness from the vote counting process.  While this illegal conduct by election workers and state, county and city employees in concert with Dominion, even if considered in isolation,  the following three categories of systematic violations of the Michigan Election Code cast significant doubt on the results of the election and mandate this Court to set aside the 2020 General Election and grant the declaratory and injunctive relief requested herein.

**Fact Witness Testimony of Voting Fraud & Other Illegal Conduct**

13. There were three broad categories of illegal conduct by election workers in collaboration with other employee state, county and/or city employees and Democratic poll watchers and activists.First, to facilitate and cover-up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A. Denied Republican election challengers access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted;

B. Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting and lockedcredentialedchallengersoutofthe counting room so they could not observe the process, during which time tens of thousands of ballots wereprocessed;

C. Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center;

D. Systematically discriminated against Republican poll watchers and favored Democratic poll watchers;

E. Ignored or refused to record Republican challenges to the violations outlined herein;

Exhibit A

F. Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate;

G. Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going over to the voting booths with voters in order to watch them vote and coach them for whom to vote;

H. As a result of the above, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines); and

I. Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.

14. Second, election workers illegally forged, added, removed or otherwise altered

information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A. Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden;

B. Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900;

C. Changing dates on absentee ballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline;

D. Changing Votes for Trump and other Republican candidates; and

E. Added votes to "undervote" ballots and removing votes from "Over-Votes".

15. Third, election workers committed several additional categories of violations of

the Michigan Election Code to enable them to accept and count other illegal, ineligible or

duplicate ballots, or reject Trump or Republican ballots, including:

A. Permitting illegal double voting by persons that had voted by absentee ballot and in person;

B. Counting ineligible ballots – and in many cases – multiple times;

C. Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants;

Exhibit A

D.     Counting "spoiled" ballots;

E.     Systematic violations of ballot secrecy requirements;

F.     Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline, in particular, the tens of thousands of ballots that arrived on November 4, 2020; and

G.     Accepting and counting ballots from deceased voters.

**Expert Witness Testimony Regarding Voting Fraud**

16.     In addition to the above fact witnesses, this Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular: (1) a report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws); (2) a report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots; and (3) a report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes from these precincts.

17.     As explained and demonstrated in the accompanying redacted declaration of a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including

Exhibit A

the most recent US general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

18. Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden. (Ex. 109).

19. These and other "irregularities" provide this Court grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

20. This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

21. This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

22. The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201

Exhibit A

and 2202 and by Rule 57, Fed. R. Civ. P.

23.     This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C.§ 1367.Venueisproperbecausea substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) &(c).

24.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existinglegislation.

## THE PARTIES

25.     Each of the following Plaintiffs are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and,John Earl Haggard, a resident of Charlevoix, Michigan;

26.     Each of these Plaintiffshas standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors).As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020.  The certified results showed a plurality of 154,188

Exhibit A

votes in favor of former Vice-President Joe Biden over President Trump.

27.     Plaintiff James Ritchard is a registered voter residing in Oceana County.  He is the Republican Party Chairman of Oceana County.

28.     Plaintiff James David Hooper is a registered voter residing in Wayne County.  He is the Republican Party Chairman for the Wayne County Eleventh District.

29.     Plaintiff Daren Wade Ribingh is a registered voter residing in Antrim County.  He is the Republican Party Chairman of Antrim County. is

30.     Defendant Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.

31.     Defendant JocelynBenson ("Secretary Benson") isnamed as adefendantinherofficial capacity as Michigan'sSecretaryofState. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. MCL § 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL § 168.31(1)(a)(the"SecretaryofStateshall…issueinstructions andpromulgaterules…fortheconduct of elections and registrations in accordance with the laws of this state"). Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL § 168.31(1)(b). *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020). Secretary Bensonis responsibleforassuringMichigan'slocalelectionofficialsconductelectionsinafair,just, and lawful manner. *See* MCL 168.21; 168.31; 168.32. *See also League of Women Voters of*

Exhibit A

*Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404(Mich.Ct.App.2018),aff'd921N.W.2d247(Mich.2018);*Fitzpatrickv.Secretaryof State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

32.    Defendant Michigan Board of State Canvassers is "responsible for approv[ing] votingequipmentforuseinthestate,certify[ing]theresultofelectionsheldstatewide…." Michigan Election Officials' Manual, p. 4. *See also* MCL 168.841, *etseq.* On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

## STATEMENT OF FACTS

33.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under MCL 168.861, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary under the Michigan Constitution.

34.    The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides.

35.    The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

36.    With respect to the appointment of presidential electors, the Constitution provides: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the

Exhibit A

State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector. U.S. CONST. art. II, § 1 ("Electors Clause"). Under the Michigan Election Code, the Electors of the President and Vice President for the State of Michigan are elected by each political party at their state convention in each Presidential election year. *See* MCL §§ 168.42 & 168.43.

37.     Neither Defendant is a "Legislature" as required under the Elections Clause or Electors Clause. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38.     While the Elections Clause "was not adopted to  diminish  a State's authority to determine its own lawmaking processes," *Ariz.State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

39.     And Plaintiffs bring this action,to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizenshave:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

40.     TheMich.Const.,art.2,sec.4,furtherstates,"Allrightssetforthinthissubsection     shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to

Exhibit A

effectuate its purposes."

41.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election

## I.     LEGAL BACKGROUND:   RELEVANT PROVISIONS OF THE MICHIGAN ELECTION CODE AND ELECTION CANVASSING PROCEDURES.

### A.     Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct of elections.

42.     Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL § 168.730-738.

43.     Michigan requires Secretary of State Benson, local election authorities, and state and county canvassing boards to provide challengers the opportunity to meaningfully participate in, and oversee, the conduct of Michigan elections and the counting of ballots.

44.     Michigan's election code provides that challengers shall have the following rights and responsibilities:

    a.    An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL § 168.733(1).

    b.    An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL § 168.733(1)(a).

    c.    An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL § 168.733(1)(b).

Exhibit A

d.   An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL§ 168.733(1)(c).

e.   An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL§ 168.733(1)(d).

f.   An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL§168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL § 168.733(1)(e).

g.   An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL§168.733(1)(f).

h.   An election challenger may examine each ballot as it is being counted. MCL§ 168.733(1)(g).

i.   An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL §168.733(1)(h).

j.   An election challenger may observe the recording of absent voter ballots on voting machines. MCL§168.733(1)(i).

45.   The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

46.   Michigan values the important role challengers perform in assuring the transparency and integrity of elections. For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

Exhibit A

47. The responsibilities of challengers are established by Michigan statute. MCL § 168.730 states:

> (1)  At an election, a political party or [an organization] interested in preserving   the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.
>
> (2)  A challenger shall be a registered elector of this state ........... A   candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .
>
> (3)  A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

48. Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

**B.  The canvassing process in Michigan.**

49. Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

50. The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL § 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.*  The members of the

Exhibit A

board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers." MCL § 168.809. "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required[to cast an absentee ballot] ... must be carefully preserved*." MCL § 810a and § 168.811 (emphasis added).

51.     After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election. November 5, 2020 is the date for the meeting. MCL 168.821. The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear. Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL168.823(3).

52.     The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.

> *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the

Exhibit A

legalcustodians. The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvasserssshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceip t of the records from the board of county canvassers." MCL168.822(2).

53.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and VicePresident.

54.     The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvasserssshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceipt of the records from the board of county canvassers." MCL168.822(2).

55.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited

Exhibit A

canvass of the returns for the election of electors for President and VicePresident.

56.     The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. §§ 1-18, require Michigan Governor Whitmer to preparea Certificate of Ascertainment by December 14, the date the Electoral Collegemeets.

57.     The United States Code (3 U.S.C. §5) provides that if election results are contestedinanystate,andifthestate,priortoelectionday,hasenactedprocedurestosettle   controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results   have   been   determined   six   days   before   the   electors'   meetings, thentheseresultsareconsideredtobeconclusiveandwillapplyinthecountingofthe   electoral   votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. § 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

58.     The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the BoardChairperson.

59.     More than one hundred credentialed election challengers provided sworn affidavits.Theseaffidavitsstated,amongothermatters,thatthesecredentialedchallengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absentvoterballots, and the general conduct of the election and ballot counting. *See* Exhibit 1 (affidavits of election challengers).

Exhibit A

II.  **FACTUAL ALLEGATIONS AND FACT WITNESS TESTIMONY REGARDING MICHIGAN ELECTION CODE VIOLATIONS AND OTHER UNLAWFUL CONDUCT BY ELECTION WORKERS AND MICHIGAN STATE, WAYNE COUNTY AND/OR CITY OF DETROIT EMPLOYEES.**

60.  Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County. The TCF Center was the only facility within Wayne County authorized to count the ballots.

A.  **Republican Election Challengers Were Denied Opportunity to Meaningfully Observe the Processing and Counting of Ballots.**

61.  There is a difference between a ballot and a vote. A ballot is a piece of paper. A vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a vote and has done so in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day. It is the task of Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make sure that all ballots cast by lawful voters are counted and the election is conducted in accord with Michigan's Election Code uniformly throughout Michigan.

62.  Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.

63.  Wayne County excluded certified challengers from meaningfully observing the conduct of the election in violation of the Michigan Election Code. This allowed a substantial number of ineligible ballots to be counted, as outlined in Section B. below.  These systematic Michigan Election Code violations, and the disparate treatment of Republican vs. Democratic poll challengers, also violated the Equal Protection Clause and other provisions of the U.S. Constitution as detailed herein.  The following affidavits describe the specifics that were

20

Exhibit A

observed. This conduct was pervasive in Wayne County as attested to in the affidavits attached at **EXHIBIT3**.

### 1.   Republican Observers Denied Access to TCF Center

64.   Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election. For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access. Exhibit 3 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Freyaff.¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldyaff.¶¶5,8-9(unlimitedmembersofthemediawerealsoallowedinsideregardless of COVID restrictions while Republican challengers were excluded)).

65.   Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return.  *Id.* (Bomer aff.¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff.,p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5). Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced.

### 2.   Disparate and Discriminatory Treatment of Republican vs. Democratic Challengers.

66.   As a result of Republican challengers not being admitted or re-admitted, while

Exhibit A

Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. *Id.* (Helminen aff. ¶12 (Democratic challengers out- numbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten timesasmanyDemocraticchallengersasRepublican);A.Seelyaff.¶19;Schneideraff.,p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff.¶4).

67.     Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. *Id.* (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6). As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process.

### 3.     Republican Challengers Not Permitted to View Ballot Handling, Processing or Counting.

68.     Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials.*Id*. (A.Seelyaff.¶15;Milleraff.¶¶13-14;Pennalaaff.¶4;Tysonaff.¶¶12- 13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23- 24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5;Shereraff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff.¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

69.     At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. *Id.* (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4). Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers. *Id.* (Sitek aff. ¶4).

Exhibit A

Sitek filed a police complaint. *Id.*

70.     Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table. *Id.* (Montie aff. ¶¶4-7). When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad." *Id.*¶8.

71.     Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process. *Id.* (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff.,p.4;Zimmermanaff.¶10;Krauseaff.¶12;Shereraff.¶22;Johnsonaff.¶7;Poschaff.¶10;Raufaff.¶23 ;Lukeaff.,p.1;M.Seelyaff.¶8;Zelaskoaff.¶8;Ungaraff.¶12;Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff.¶9).

### 4.     Harassment, Intimidation & Removal of Republican Challengers

72.     Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process. *Id.* (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneideraff.,p.1;Piontekaff.¶11;Steffansaff.¶26(intimidationmadeherfeeltooafraid to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooperaff.¶12;Shockaff.¶9;Schmidtaff.¶¶9-10;Duusaff.¶10;M.Seelyaff.¶4;Storm aff. ¶¶5, 7;

Exhibit A

DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13). Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers. *Id.* (Bomer aff. ¶7). Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting. *Id.* (Vaupel aff. ¶4). Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2). Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9).

73. Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process. *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5). Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much. *Id.* (Sherer aff. ¶24). An election worker told challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process." *Id.* (Early aff. ¶11).

74. Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area. *Id.* (Helminen aff. ¶9; Pennala aff. ¶5; Ballew aff. ¶9; Piontek aff. ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p.4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

Exhibit A

### 5. Poll Workers Ignored or Refused to Record Republican Challenges.

75. Unfortunately, this did not happen in Wayne County. Many challengers testified that their challenges to ballots were ignored and disregarded. *Id.* (A.Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettilaaff.,p.3;Valiceaff.¶2;Sawyeraff.¶7;Kerstein aff.¶3;Modlinaff.¶4;Cassin aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

76. As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded. *Id.* (A. Seely aff. ¶4). ArticiaBomer observed that ballots with votes for Trump were separated fromotherballots.*Id.*(Bomeraff.¶5).ArticiaBomerstated,"Iwitnessedelectionworkers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers. I believe some of these ballots may not have been properly counted." *Id.* ¶8. Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded. *Id.* (Giacobazzi aff. ¶10). When Christopher Schornak attempted to challenge the counting of ballots,anelectionofficialtoldhim,"Wearenottalkingtoyou,youcannotchallengethis." *Id.*(Schornakaff.¶15).WhenStephanieKrauseattemptedtochallengeballots,anelection workertoldherthatchallengeswerenolongerbeingacceptedbecausethe"rules'nolonger applied.'" *Id.* (Krause aff.¶13).

### 6. Unlawful Ballot Duplication.

77. If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot. The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicatedby *two election*

Exhibit A

*inspectors who have expressed a preference for different political parties*." Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added). Thus, the ballot-duplicating process must be performed by bipartisan teams of election officials. It must also be performed where it can be observed by challengers.

78.    But Wayne County prevented many challengers from observing the ballot duplicating process. *Id.* (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaum aff. ¶6; Sherer aff. ¶¶16-17; Burton aff. ¶7; Drzewiecki aff. ¶7; Klamer aff. ¶9; Chopjian aff. ¶10; Schmidt aff. ¶7; Champagne aff. ¶12; Shinkle aff., p. 1). Challenger John Miller said he was not allowed to observe election workers duplicating a ballot because the "duplication process was personal like voting." *Id.* (Miller aff. ¶8). Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observe a ballot duplication because "if we make a mistake then you would be all over us." *Id.* (Shinkle aff., p. 1). Another challenger observed election officials making mistakes when duplicating ballots. *Id.* (Piontek aff. ¶9).

79.    Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff., p.1; Wasilewski aff., p.1; Schornak aff. ¶¶18-19; Dixon aff., p.1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

### 7.  Democratic Election Challengers Frequently Outnumbered Republican Poll Watchers 2:1 or Even 2:0.

80.    Dominon contractor Melissa Carrone testified that there were significantly more Democrats than Republicans at the TCF Center, and that as a result there were "over 20 machines [that] had two democrats judging the ballots-resulting in an unfair process." Exh. 5 ¶5.

Exhibit A

Other affiants testified to the fact that Democrats outnumbered Republicans by 2:1 or more *Id.* (Helminon aff. ¶12). Democrats also impersonated Republican poll watchers. *Id.* (Seely aff. ¶19).

### 8. Collaboration Between Election Workers, City/County Employees, and Democratic Party Challengers and Activists.

81.     Affiants testified to systematic and routine collaboration between election workers, Michigan public employees and Democratic election challengers and activists present, in particular to intimidate, harass, distract or remove Republic election watchers. *See, e.g.,* Exh. 1 (Ballow aff. ¶9; Gaicobazzi aff. ¶¶12, 14; Piontek aff. ¶11).

### B. Election Workers Fraudulent Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records

82.     A lawsuit recently filed by the Great Lakes Justice Center ("GLJC") raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* Exhibit 4 (copy of complaint filed in the Circuit Court of Wayne County in *Costantino, et al. v. City of Detroit, et al.*) ("GLJC Complaint"). The allegations and affidavits included in the GLJC Complaint are incorporated by reference in the body of this Complaint.

### 1. Election Workers Fraudulently Added "Tens of Thousands" of New Ballots and New Voters in the Early Morning and Evening November 4.

83.     The most egregious example of election workers fraudulent and illegal behavior concerns two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline.   First, at approximately 4:30 AM on November 4, 2020, poll challenger Andrew Sitto observed "tens of thousands of new ballots" being brought into the counting room, and "[u]nlike the other ballots, these boxes were brought in from the rear of the room." Exh. 4, GLJC Complaint, Exh. C at ¶ 10.  Mr. Sitto heard other Republican challengers state that "several

Exhibit A

vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 a.m. and unloaded boxes of ballots." *Id.* at ¶ 11. "All ballots sampled that I heard and observed were for Joe Biden." *Id.* at ¶ 12.

84.    A second set of new boxes of ballots arrived at the TCF Center around 9:00 PM on November 4, 2020.  According to poll watcher Robert Cushman, contained "several thousand new ballots."   Exh. 4, GLJC Complaint, Exh. D at ¶ 5.  Mr. Cushman noted that "none of the names on the new ballots were on the QVF or the Supplemental Sheets," *id.* at ¶ 7, and he observed "computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system." *Id.* at ¶ 8.  Further, "[e]very ballot was being fraudulently and manually entered into the [QVF], as having been born on January 1, 1990." *Id.* at ¶ 15.   When Mr. Cushman challenged the validity of the votes and the impossibility of each ballot having the same birthday, he "was told that this was the instruction that came down from the Wayne County Clerk's office." *Id.* at ¶ 16.

85.    Perhaps the most probative evidence comes from Melissa Carone, who was "contracted to do IT work at the TCF Center for the November 3, 2020 election." Exh. 5, ¶1. On November 4, Ms. Carrone testified that there were "two vans that pulled into the garage of the counting room, one on day shift and one on night shift." *Id.* ¶8.  She thought that the vans were bring food, however, she "never saw any food coming out of these vans," and noted the coincidence that "Michigan had discovered over 100,000 more ballots – not even two hours after the last van left." *Id.*  Ms. Carrone witnessed this of this illegal vote dump, as well as several other violations outlined below.

### 2.    Election Workers Forged and Fraudulently Added Voters to the Qualified Voter List.

86.    Many challengers reported that when a voter was not in the poll book, the election

Exhibit A

officials would enter a new record for that voter with a birth date of January 1, 1900. Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9). *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17). Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record. *Id.* (Giacobazzi aff.¶10).

87.    The GLJC Complaint alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets." Exh. 3, GLJC Complaintat 3.   The GLJC Complaint provides additional witness affidavits detailing the fraudulent conduct of election workers, in particular, that of Zachary Larsen, who served as a Michigan Assistant Attorney General from 2012 through 2020 and was a certified poll challenger at the TCF Center.   "Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted. An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen." *Id.* at ¶ 16.  Mr. Larsen observed this "practice of assigning names and numbers" to non-eligible voters who did not appear in either the poll book or the supplement poll book. *Id.* at ¶ 17.   Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned. *Id.*

### 3.    Changing Dates on Absentee Ballots.

88.    All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to

29

Exhibit A

have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

89.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County. **EXHIBIT 6**. Jessica Connarn's affidavit describes how an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* ¶1. Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received. *See id.* Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

90.     Plaintiffs have learned of a United States Postal Service ("USPS") worker Whistleblower, on November 4, 2020 told Project Veritas that a supervisor named Johnathan Clarke in Traverse City, Michigan potentially issued a directive to collect ballots and stamp them as received on November 3, 2020, even though there were not received timely, as required by law:  "We were issued a directive this morning to collect any ballots we find in mailboxes, collection boxes, just outgoing mail in general, separate them at the end of the day so that they could hand stamp them with the previous day's date," the whistleblower stated. "Today is November 4th for clarification."[4]   This is currently under IG Investigation at the U.S. Post Office. According to the Postal worker whistleblower, the ballots are in "express bags" so they could be sent to the USPS distribution center.  *Id.*

91.     As set forth in the GLJC Complaint and in the Affidavit of Jessy Jacob, an

---

[4] https://townhall.com/tipsheet/bethbaumann/2020/11/04/usps-whistleblower-in-michigan-claims-higher-ups-were-engaging-in-voter-fraud-n2579501

Exhibit A

employee of the City of Detroit Elections Department, "on November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. I was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. She estimates that this was done to thousands of ballots." Exh. 4, GLJC Complaint, Exh. B at ¶ 17.

### 4. Election Workers Changed Votes for Trump and Other Republican Candidates.

92. Challenger Articia Bomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). In addition to this eyewitness testimony of election workers manually changing votes for Trump to votes for Biden, there is evidence that Dominion Voting Systems did the same thing on a much larger scale with its Dominion Democracy Suite software. *See generally infra* Section IV.D, Paragraphs 123-131.

### 5. Election Officials Added Votes and Removed Votes from "Over-Votes".

93. Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted. Exh. 3 (Zaplitny aff. ¶13). At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate. *Id.* (Tyson aff. ¶17).

### C. Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted.

### 1. Illegal Double Voting.

94. At least one election worker "observed a large number of people who came to the satellite location to vote in-person, but they had

Exhibit A

already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot." Exh. 4, GLJC Complaint (Exh. B) Jacob aff. at ¶ 10. This would permit a person to vote in person and also send in his/her absentee ballot, and thereby vote at least twice.

### 2. Ineligible Ballots Were Counted – Some Multiple Times.

95.     Challengers reported that batches of ballots were repeatedly run through the vote tabulation machines. Exh. 3 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). Articia Bomer further stated that she witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12.   Dominion contractor Melissa Carone observed that this was a routine practice at the TCF Center, where she "witnessed countless workers rescanning the batches without discarding them first" – as required under Michigan rules and Dominion's procedures – "which resulted in ballots being counted 4-5 times" by the "countless" number of election workers.  Carone aff. ¶3.  When she observed that a computer indicated that it had "a number of over 400 ballots scanned – which means one batch [of 50] was counted over 8 times," and complained to her Dominion supervisor, she was informed that "we are here to do assist with IT work, not to run their election."  *Id.* at ¶4.

### 3. Ballots Counted with Ballot Numbers Not Matching Ballot Envelope.

96.     Many challengers stated that the ballot number on the ballot did not match the number on the ballot envelope, but when they raised a challenge, those challenges were    disregarded and    ignored by election   officials,   not   recorded,   and   the   ballots were processed and counted. Exh. 3 (A. Seely aff. ¶15; Wasilewski aff., p.1; Schornak aff. ¶13; Brunell   aff.   ¶¶17,   19;

Exhibit A

Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5). For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting tables she was observing had "a different process than other tables." *Id.* (Helminen aff. ¶5).

### 4. Election Officials Counted Ineligible Ballots with No Signatures or with No Postmark on Ballot Envelope.

97.     At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope. *Id.* (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13). Challenger Anne Vanker observed that "60% or more of [ballot] envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5). Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes. Exhibit 1 (Henderson aff. ¶8). The GLJC Complaint further alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity."

### 5. Election Officials Counted "Spoiled" Ballots.

98.     At least two challengers observed spoiled ballots being counted. *Id.* (Schornak aff. ¶¶6-8; Johnson aff. ¶4). At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center. Exhibit 1 (Cizmar aff. ¶5).

### 6. Systematic Violations of Ballot Secrecy Requirements

99.     Affiant Larsen identified a consistent practice whereby election officials would remove ballots from the "secrecy sleeve" or peek into the envelopes, visually inspect the ballots, and based on this visual inspection of the ballot (and thereby identify the votes cast), determine

Exhibit A

whether to "place the ballot back in its envelope and into a 'problem ballots' box that required additional attention to determine whether they would be processed and counted." Exh. 4, GLJC Complaint, Exh. A at ¶14. Mr. Larsen also observed that some ballots arriving without any secrecy sleeve at all were counted after visual inspection, whereas many ballots without a secrecy sleeve were placed in the "problem ballots" box. *Id.* at ¶¶21-22. "So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as 'problem ballots' based on who the person had voted for rather on any legitimate concern about the ability to count and process the ballot appropriately." *Id.* at ¶24.

### 7. Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline.

100. Poll challengers observed two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline, as detailed in the GLJC Complaint and Paragraphs 79-81above. Affiant Daniel Gustafson further observed that these batches of ballots "were delivered to the TCF Center in what appeared to be mail bins with open tops." Exh. 4, GLJC Complaint, Exh. E at¶4. Mr. Gustafson further observed that these bins and containers "did not have lids, were not sealed, and did not have the capability of having a metal seal," *id.* at ¶5, nor were they "marked or identified in any way to indicated their source of origin." *Id.* at ¶6.

101. An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exh. 3 (Meyers aff. ¶3). This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day. *Id.*¶7.

102. An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after

Exhibit A

8:00 p.m. on Election Day. *Id.* (Meyers aff.¶6).

103.    On November 4, 2020, Affiant Matt Ciantar came forward who, independently witnessed, while walking his dog, a young couple delivered 3-4 large plastic clear bags, that appear to be "express bags", as reflected in photographs taken contemporaneously, to a U.S. Postal vehicle waiting. *See generally* Exh. 7 Matt Ciantar Declaration. The use of clear "express bags" is consistent with the USPS whistleblower Johnathan Clarke in Traverse City, Michigan. *See infra* Paragraph 78.

### 8.    Ballots from Deceased Voters Were Counted.

104.    One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election. Exh. 3 (Chase aff.¶3).

## III.    EXPERT WITNESS TESTIMONY SUPPORTING INDICATING WIDESPREAD VOTING FRAUD AND MANIPULATION

### A.    Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

105.    The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey data of 248 Michigan Republican voters collected by Matt Braynard, which was conducted from November 15-17, 2020 and covered voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin. *See* Exh. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey"). The Braynard Survey sought to identify two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.* Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 139,190

Exhibit A

unreturned mail-in ballots for the State of Michigan.

106. With respect to **Error #1**, Dr. Briggs analysis estimated that **29,611 to 36,529 ballots** out of the total 139,190 unreturned ballots (**21.27% - 26.24%**) were recorded for voters who had **not** requested them. *Id.* With respect to **Error #2**, the numbers are similar with **27,928 to 34,710 ballots** out of 139,190 unreturned ballots (**20.06% - 24.93%**) recorded for voters who **did return their ballots were recorded as being unreturned.** *Id.* Taking the average of the two types of errors together, **62,517 ballots, or 45% of the total, are "troublesome."**

107. These errors are not only conclusive evidence of widespread fraud by the State of Michigan,[5] but they are fully consistent with the fact witness statements above the evidence regarding Dominion presented below insofar as **these purportedly unreturned absentee ballots provide a pool of 60,000-70,000 unassigned and blank ballots that could be filled in by Michigan election workers, Dominion or other third parties to shift the election to Joe Biden**. With respect to Error #1, Dr. Briggs' analysis, combined with the statements of the Michigan voters in the Braynard Survey, demonstrates that approximately **30,000 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter. With respect to Error #2, Dr. Briggs' analysis indicates that approximately **30,000 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.** Accordingly, Dr. Briggs' analysis showing that almost half of purportedly "unreturned

---

[5]The only other possible explanations for the statements of 248 Michigan mail-in voters included in the Braynard Survey data is (a) that the 248 voters (who had no known pre-existing relationship apart from being listed as having unreturned absentee ballots) somehow contrived to collude together to submit false information or (b) that these 248 suffered from amnesia, dementia or some other condition that caused them to falsely claim that they had requested a mail-in ballot or returned a mail-in ballot.

Exhibit A

ballots" suffers from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 31%) – provides further support that these widespread "irregularities" or anomalies was one part of much larger interstate fraudulent scheme to rig the 2020 General Election for Joe Biden.

**B.     Statistical Analysis of Anomalous and Unprecedented Turnout Increases in Specific Precincts Indicate that There Were at Least 40,000 "Excess Voters" in Wayne County and At Least 46,000 in Oakland County.**

108.    The attached affidavit of Eric Quinell, Ph.D. ("Dr. Quinell Report") analyzes the extraordinary increase in turnout from 2016 to 2020 in a relatively small subset of townships and precincts outside of Detroit in Wayne County and Oakland County, and more importantly how nearly 100% or more of all "new" voters from 2016 to 2020 voted for Biden.  *See* Exh. 102. Using publicly available information from Wayne County and Oakland County, Dr. Quinell first found that for the votes received up to the 2016 turnout levels, the 2020 vote Democrat vs. Republican two-ways distributions (i.e., excluding third parties) tracked the 2016 Democrat vs. Republican distribution very closely, which was 55%-45% for Wayne County (outside Detroit) and 54%/46% for Oakland County.  *Id.* at ¶¶18 & 20.

109.    However, after the 2016 turnout levels were reached, the Democrat vs. Republican vote share shifts decisively towards Biden by approximately 15 points, resulting in a 72%/28% D/R split for Oakland County and 70%/30% D/R split for Wayne County (outside of Detroit).  What is even more anomalous – and suspicious – is the fact that nearly all of these "new" votes in excess of 2016 come from a small number of townships/precincts where the increased Biden vote share is nearly 100% or over 100% for Biden.  *Id.*  For example, in the township of Livonia in Wayne County, Biden gained 3.2 voters for every 1 new Trump voter, and Biden receive 97% of all "new" votes over 2016 and 151% of all new voter registrations. *Id.* at ¶6.  In the township of Troy in Oakland County, the vote share shifted from 51%/49% in 2016

Exhibit A

to 80%/20% in 2020 due to Biden receiving 98% of new votes above 2016 and 109% of new voter registrations. *Id.* at ¶20. Looking county-wide, Biden gained 2.32 new voters over 2016 levels to every 1 new Trump voter in Wayne County (outside Detroit) and 2.54 additional new voters per Trump voter for Oakland County. *Id.* ¶5.

110. Based on these statistically anomalous results that occurred in a handful of townships in these two counties, Dr. Quinell's model determined that there were 40,771 anomalous votes in Wayne County (outside Detroit) and 46,125 anomalous votes in Oakland County, for a total of nearly 87,000 anomalous votes or approximately 65% of Biden's purported lead in Michigan.

### C. Over 13,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Michigan.

111. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 12,120 Michigan voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynerd identified 1,170 Michigan voters in the 2020 General Election who subsequently registered to vote in another state, and were therefore ineligible to vote in the 2020 General Election. When duplicates from the two databases are eliminated, the merged number is 13,248 ineligible voters whose votes must be removed from the total for the 2020 General Election.[6]

### D. There Were At Least 289,866 More Ballots Processed in Four Michigan Counties on November 4 Than There Was Processing Capacity.

112. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit"), which is described in greater detail below, identifies an event that occurred in Michigan on November 4 that is "physically impossible" *See* Exh. 104 at ¶14. The "event"

---

[6]Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his posting as Exhibit 103.

Exhibit A

reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb ne and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount is alone in **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.,* approximately 154,180).

## IV.    FACTUAL ALLEGATIONS RE DOMINION VOTING SYSTEMS

### A.    Evidence of Specific Fraud Wayne County used ballot tabulators that were shown to miscount votes cast for President Trump and Vice President Pence and instead count them for the Biden-Harris ticket.

113.    On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump. Antrim County voted 62% in favor of President Trump in 2016. The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were at fault.

114.    However, Malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot." Michigan Manual for Boards of County Canvassers. These vote tabulator failures are a mechanical malfunction that, under MCL 168.831-168.839, requires a "special election" in the precincts affected.

115.    Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent explanation of how

Exhibit A

the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[7]

116. Secretary Benson continued: "*After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county.*"*Id.*What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individuallytested.

117. Wayne County used the same Dominion voting system tabulators as did AntrimCounty,andWayneCountytestedonlyasingleoneofitsvotetabulatingmachines before the election. The Trump campaign asked Wayne County to have an observer physically present to witness the process. *See* Exhibit 4. Wayne County denied the Trump campaigntheopportunitytobephysicallypresent.RepresentativesoftheTrumpcampaign did have opportunity to watch a portion of the test of a single machine by Zoomvideo.

### B. The Pattern Of Incidents Shows An Absence Of Mistake - Always In The Favor Of Biden.

118. Rules of Evidence, 404(b), applicable to civil matters makes clear that,

(b) Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. **It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

119. Tabulator issues and election violations occurred elsewhere in Michigan reflecting a pattern, where multiple incidents occurred. In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when

---

[7] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf (emphasis in original).

Exhibit A

120.    "A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have been sent to us as absentee votes," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[8]

121.    This Oakland County flip of votes is significant not only because it reflects a second systems error wherein both favored the Democrats, precinct votes were sent out to be counted, and they were counted twice as a result until the error was caught on a recount, but precinct votes should never be counted outside of the precinct, instead they are required to be sealed in the precinct.

### C.    Dominion Voting Machines and Forensic Evidence of Wide-Spread Fraud in Defendant Counties

122.    The State of Michigan entered into a contract with Dominion Systems' Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: "dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."

123.    Whereas the same Dominion software in an updated contract with Pennsylvania, unlike in Michigan's contract, sets forth the standard as requiring physical security: *No components of the Democracy Suite 5.5A shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired network configuration in which all connected devices are certified voting system components." Id. at 41 (Condition C).*

124.    The Michigan Contract with Dominion Voting Systems Democracy packages

---

[8] Detroit Free Press, https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/

Exhibit A

include language that describes *Safety and Security*, which in part makes the risks of potential breach clear where keys can be lost despite the fact that they provide full access to the unit, and while it is clear that the electronic access provides control to the unit, and the ability to alter results, combined with the lack of observers, creates a lack of security that becomes part of a pattern of the absence of mistake, or fraud:

> The ImageCast tabulators are unlocked by an iButton security key, which is used to:
> • Authenticate the software version (ensuring it is a certified version that has not been tampered with)
> • Decrypt election files while processing ballots during the election
> • Encrypt results files during the election
> • Provide access control to the unit
> **It is anticipated that the iButton security keys may get lost; therefore, any substitute key created for the same tabulator will allow the unit to work fully.[9]**

125.    In late December of 2019, three Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their '*particularized concerns that secretive & "trouble-plagued companies*"'"have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."

126.    As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a lack of evidence of efficiency and accuracy and

---

[9] See Exh. 8, State of Michigan Enterprise Procurement, Notice of Contract, Contract No. 071B770017 between the State of Michigan and Dominion Voting Systems Inc. at ¶2.6.2 ("Dominion Michigan Contract").

Exhibit A

identified vulnerabilities **to fraud and unauthorized manipulation**.[10]

**D.** **"Red Flags" in Dominion's Michigan Results for 2020 General Election Demonstrate Dominion Manipulated Election Results, and that the Number of Illegal Votes Is Nearly Twice As Great as Biden's Purported Margin of Victory.**

127. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit")[11] analyzes several "red flags" in Dominion's Michigan results for the 2020 election, and flaws in the system architecture more generally, to conclude that Dominion manipulated election results. Dominion's manipulation of election results enabled Defendants to engage in further voting fraud violations above and beyond the litany of violations recited above in Section II.A through Section II.C.

**1.** **Antrim County "Glitch" Was Not "Isolated Error" and May Have Affected Other Counties.**

128. The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount. *See supra* Paragraph 94. The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials. This was not done." Exh. 104, Ramsland Aff. at ¶10. Mr. Ramsland is skeptical because "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system." *Id.* Further, **such a glitch would not be an**

---

[10] See Texas Analysis of February 15, 2019 from the Voting Systems Examiner to the Director of Elections (emphasis added).

[11] As detailed in the Ramsland Affidavit and the CV attached thereto, Mr. Ramsland is a member of the management team Allied Security Operations Group, LLC ("ASOG"), a firm specializing in cybersecurity, OSINT and PEN testing of networks for election security and detecting election fraud through tampering with electronic voting systems.

Exhibit A

"isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed happening in the data (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id.*

2. **Fractional Vote Counts in Raw Data Strongly Indicate Voting Manipulation through "Ranked Choice Voting Algorithm"**

129.    Mr. Ramsland's analysis of the raw data , which provides **votes counts, rather than just vote shares, in decimal form** provides highly probative evidence that, in his professional opinion,  demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting"  algorithm (or what Dominion's user guide refers to as the "RCV Method").  *See id.* at ¶12.[12]  Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below.  *Id.*

| state | timestamp | eevp | trump | biden | TV | BV |
|---|---|---|---|---|---|---|
| michigan | 2020-11-04T06:54:48Z | 64 | 0.534 | 0.448 | 1925865.66 | 1615707.52 |
| michigan | 2020-11-04T06:56:47Z | 64 | 0.534 | 0.448 | 1930247.664 | 1619383.808 |
| michigan | 2020-11-04T06:58:47Z | 64 | 0.534 | 0.448 | 1931413.386 | 1620361.792 |
| michigan | 2020-11-04T07:00:37Z | 64 | 0.533 | 0.45 | 1941758.975 | 1639383.75 |
| michigan | 2020-11-04T07:01:46Z | 64 | 0.533 | 0.45 | 1945297.562 | 1642371.3 |
| michigan | 2020-11-04T07:03:17Z | 65 | 0.533 | 0.45 | 1948885.185 | 1645400.25 |

130.    Mr. Ramsland describes how the RCV algorithm can be implemented, and the significance of the use of fractional vote counts, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

---

[12] *See id.* (*quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

Exhibit A

For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes. The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done. Otherwise, votes would be solely represented as whole numbers. Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals. *Id.*

### 3. StrongEvidence That Dominion Shifted Votes from Trump to Biden.

131. A third red flag identified by Mr. Ramslund is the dramatic shift in votes between the two major party candidates as the tabulation of the turnout increased, and more importantly, the change in voting share before and after 2 AM on November 4, 2020, after Wayne County and other Michigan election officials had supposedly halted counting.

Until the tabulated voter turnout reached approximately 83%, Trump was generally winning between 55% and 60% of every turnout point. **Then, after the counting was closed at 2:00 am, the situation dramatically reversed itself, starting with a series of impossible spikes shortly after counting was supposed to have stopped.** *Id.* at ¶13.

132. Once again the means through which Dominion appears to have implemented this scheme is through the use of blank ballots that were all, or nearly all, cast for Biden.

The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system. A few batches of blank ballots could easily produce a reversal this extreme, a reversal that is almost as statistically difficult to explain as is the impossibility of the votes cast to number of voters described in Paragraph 11 above.*Id.*

### 4. The November 4 Ballot Dumps Wayne County and Other Michigan Counties Was "Physically Impossible" Because There Were More Ballots Than Machines in Those Four Counties Could Have Counted Or Processed.

133. Mr Ramsland and his team analyzed the sudden injection of totaling 384,733 ballots by four Michigan counties (Wayne, Oakland, Macomb, and Kent) in a 2 hour 38 minute period in the early morning of November 4 (which would have included the first ballot dump

Exhibit A

described above in Paragraph 72), and concluded that "**[t]his is an impossibility, given the equipment available at the 4 reference locations (precincts/townships)."** *Id.* at ¶14.

134.    Specifically, Mr. Ramslund calculated that "94,867 ballots as the maximum number of ballots that could be processed" in that time period, and thus that "[t]here were 289,866 more ballots processed in the time available for processing in four precincts/townships, than the capacity of the system allows." *Id.* Mr. Ramsland concludes that "[t]he documented existence of the spikes are strongly indicative of a manual adjustment either by the operator of the system (see paragraph 12 above) or an attack by outside actors." *Id.* The vote totals added for all Michigan counties, including Wayne, Oakland, Macomb and Kent counties, for the period analyzed by Mr. Ramsland are reproduced in the figure below.



Exhibit A

### 5. The Number of Illegal Votes Attributable to Dominion Is Nearly Twice the Biden's Purported Margin in Michigan.

135.    Based on his analysis of the red flags and statistical anomalies discussed below, Mr. Ramsland concludes that:

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded.

Given that Mr. Biden's currently purported margin of victory is approximately 154,000, the number of illegal votes attributable Dominion's fraudulent and illegal conduct is by itself (without considering the tens or hundreds of thousands of illegal votes due to the unlawful conduct described in Section II), is nearly twice Mr. Biden's current purported lead in the State of Michigan. Thus Mr. Ramsland affidavit alone provides this Court more than sufficient basis to grant the relief requested herein.

### E.    Additional Independent Findings of Dominion Flaws.

136.    Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

### 1.    Central Operator Can Remove, Discard or Manipulate Votes.

137.    Plaintiffs have also learned of the connection between Dominion Voting Systems, Smartmatic and the voting systems used in Venuezela and the Phillipines.

    a.  Dominion Voting has also contradicted itself in a rush to denial a pattern of errors that lead to fraud. For example, Dominion Voting Systems machines can read all of these instruments, including Sharpies.https://www.dominionvoting.com/

    b.  but Dominion Voting's Democracy Suite contract with Michigan specifically requires:

Exhibit A

*Black Inc:  Black ink (or toner) must be dense, opaques, light-fast and permanent, with a measured minimum 1.2 reflection density (log) above the paper base.*[13]

138.    An Affiant, who is a network & Information cybersecurities expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that  the information about scanned **ballots can be tracked inside the software system for Dominion:**

> (a)    When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.
> (See Exh.Aff. of Watkins __, at par.11).

139.    The **Affiant further explains that the central operator can remove or discard batches of votes.**   "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "Id. at ¶ 12.

140.    Affiantfurther testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> "*During the voting process, the voter will mark an oval on the ballot using a writing device. During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages"*

---

[13]See Exh. 8, par. 2.6.2 of contract # 071B770017.

Exhibit A

*folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id.* at ¶¶ 13-14.

141.    The Affiant further explains the vulnerabilities in the system when the copy of the

selected ballots that are approved in the Results folder are made to a flash memory card – and

that is connected to a Windows computer stating:

*It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro" operating system. ... The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and is very vulnerable to malicious administrators.*

*Id.* at par. 14 and 15.

### 2.    Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

142.    The Dominion System put in place by its own design violates the intent of Federal

law on the requirement to preserve and retain records – which was clearly requires preservation

of all records requisite to voting in such an election.

F.    **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are

49

voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

143.    A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience.

144.    As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[14]

### 3.    Dominion Vulnerabilities To Hacking.

145.    Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

146.    Plaintiffs can show, through expert and fact witnesses that:

A.    Massive End User Vulnerabilities.

---

[14] *See* Exh. X, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

Exhibit A

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (See Exh.____ For Affiant Watkins).

(2) Affiant witness (name redacted for security reasons[15]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

"I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 14, pars. 6, 9, 10).

147. Specific vulnerabilities of the systems in question that have been documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box

---

[15] The Affiant's name will be produced in camera to the court, with a motion for seal of the information.

Exhibit A

without the possibility of detection." (See Ex. __,) [16]

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. "We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [17]

D. October 6, 2006 – Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. __,).

E. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.

F. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire.

G. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility," ABS-CBN reported.

H. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but

---

[16]Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters, Andrew W. Appel, Richard T. DeMello, University of California, Berkeley, 12/27/2019.

[17]https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials

Exhibit A

rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. (The Business of Voting, Penn Wharton, Caufield, p. 16).

I.  Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified.18

J.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Exh. __, attached copy of Senators' letter).

K.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist." Vice. August 2019.19

148.    The expert witness in pending litigation in the United States District Court of Georgia, _____, Harri Hursti, specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on August 24, 2020, (See Exhibit

---

18LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*
19*https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-*

*have-been-left-exposed-online-despite-official-denials*

Exhibit A

"____" attached hereto) wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." See Paragraph 26 of Hursti Declaration.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

1.    Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." (See Paragraph 49 of Hursti Declaration).

149.    Rather than engaging in an open and transparent process to give credibility to Michigan's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Michigan's Election Code and Federal law.

Exhibit A

150.    Finally, an analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China.  By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  *See* Exh. 105, Spider Declaration.

### 4.    Dominion Connections to Smartmatic and Hostile Foreign Governments and Domestic Groups Such as Antifa.

151.    Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[20]

152.    Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Exh. __, Anna Mercedes Diaz Cardozo).

153.    Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio,

---

*20https://patents.justia.com/assignee/smartmatic-corp*

Exhibit A

Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors after Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA< a domestic terrorist organization where he recorded Eric Coomer representing that "Don't worry Trump won't win the election, we fixed that." – as well as twitter posts with violence threatened against President Trump.  (*See* Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).[21]

154.    In sum, as set forth above, for a host of independent reasons, the Michigan certified election results concluding that Joe Biden received 154,180 more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

155.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

156.    The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art.  II,  §1,  cl.  2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be  prescribed  in each State by *the Legislature* thereof." U.S. Const. art. I, §4, cl. 1 (emphasis added).

157.    The Legislature is "'the representative body which ma[kes] the laws of the

---

*21*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM
0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

Exhibit A

people.'" *Smiley*, 285 U.S. at 193. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

158. Defendantsare not part of the Michigan Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Michigan Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation. Defendants are not the legislature, and their unilateral decision to deviate from the requirements of the Michigan Election Code violates the Electors and Elections Clause of the United States Constitution.

159. Many affiants testified to Defendants' failure to follow the requirements of the Michigan Election Code, as enacted by the Michigan Legislature, MCL §§ 168.730-738, relating to the rights of partisan election challengers to provide transparency and accountability to ensure that all, and only, lawful ballots casts be counted, and that the outcome of the election was honestly and fairly determined by eligible voters casting legal ballots. As detailed in Section II, many of these requirements were either disregarded altogether or applied in a discriminatory manner to Republican poll watchers. Specifically, election officials violated Michigan's Election Code by: (a) disregarding or violating MCL § 168.730 and § 168.733 requiring election challengers to have meaningful access to observe the counting and processing of ballots, *see supra* Paragraphs 59-75; (b) wanton and widespread forgery and alteration, addition or

Exhibit A

removal of votes, voters, or other information from ballots, the QVF or other voting records, *see supra* Paragraphs 76-86; and (c) illegal double voting, counting ineligible ballots, failure to check signatures or postmarks, and several other practices in clear violation of the Michigan Election Code (and in some cases at the express direction of supervisors or Wayne County officials). *See supra* Paragraphs 87-98.

160. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

161. Accordingly, the results for President in the November 3, 2020 election must be set aside.

## COUNT II

### Governor Whitmer, Secretary Benson and Other Defendants Violated TheFourteenth Amendment U.S. Const. Amend. XIV, 42 U.S.C. § 1983

### Denial of Equal Protection

### Invalid Enactment of Regulations Affecting Observation and Monitoring of the Election

162. Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

163. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

Exhibit A

over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

164. The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

165. In statewide and federal elections conducted in the State of Michigan, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

166. Moreover, through its provisions involving watchers and representatives, the Michigan Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.,* MCL § 168.730 & § 168.733(1). Further, the Michigan Election Code provides it is a felony punishable by

Exhibit A

up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other Counties in Michigan.

167. As set forth in Count I above, Defendants failed to comply with the requirements of the Michigan Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Michigan voters and electors in violation of the United States Constitution guarantee of Equal Protection.

168. Specifically, Defendants denied the Trump Campaign equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Michigan Counties by: (a) denying Republican poll challengers access to the TCF Center or physically removing them or locking them out for pretextual reasons; (b) denied Republican poll watchers meaningful access to, or even physically blocking their view of, ballot handling, processing, or counting; (c) engaged in a systematic pattern of harassment, intimidation, verbal insult, and even physical removal of Republican poll challengers; (d) systematically discriminated against Republican poll watchers and in favor of Democratic poll watchers and activists in enforcing rules (in particular, through abuse of "social distancing" requirements); (e) ignored or refused to record Republican challenges to the violations set forth herein; (f) refusing to permit Republican poll watchers to observe ballot duplication or to check if duplication was accurate; (g) unlawfully coached voters to vote for Biden and other democratic candidates, including at voting stations; and (h) colluded with other Michigan State, Wayne County and City of Detroit employees (including police) and

Exhibit A

Democratic poll watchers and activists to engage in the foregoing violations. *See generally supra* Section II.A, Paragraphs 56-75.

169.    Defendants further violated Michigan voters' rights to equal protection insofar as it allowed Wayne County and City of Detroit election workers to process and count ballots in a manner that allowed ineligible ballots to be counted, including: (a) fraudulently adding tens of thousands of new ballots and/or new voters to the QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden; (b) systematically forging voter information and fraudulently adding new voters to the QVF (in particular, where a voter's name could not be found, assigning the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900); (c) fraudulently changing dates on absentee ballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline; (d) changing Votes for Trump and other Republican candidates; (e) adding votes to "undervote" ballots and removing votes from "Over-Votes"; (f) permitting illegal double voting by persons that had voted by absentee ballot and in person; (g) counting ineligible ballots – and in many cases – multiple times;  (h) counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants; (i) counting "spoiled" ballots; (j) systematic violations of ballot secrecy requirements; (k) accepting unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline; (l) accepting and counting ballots from deceased voters; and (m) accepting and counting ballots collected from unattended remote drop

Exhibit A

boxes.  *See generally infra* Section II.B. and II.C, Paragraphs 76-98.

170.    Plaintiffs have obtained direct eyewitness testimony confirming that certain of these unlawful practices were at the express direction of Wayne County election officials.  With respect to (a) and (b), Affiant Cushman testified that election supervisor Miller informed him that the Wayne County Clerk's office had expressly instructed them to manually to enter thousands of ballots arriving around 9 PM on November 4, 2020, from voters not in the QVF, and to manually enter these unregistered voters in the QVF with the birthdate of 1/1/1900.  Exh. 3, GLJC Complaint, Exh. D at¶¶ 14-17. With respect to (c), fraudulently back-dating absentee ballots, City of Detroit election worker Affiant Jacob affirmed that she was instructed by supervisors to "improperly pre-date the absentee ballots receive date … to falsely show that absentee ballots had been received in time to be valid." *Id*. Exh. B at ¶17. With respect to (h) (accepting ballots without signatures or postmarks), affiants testified that election workers did so at the express direction of Wayne County election officials. *See id.* at ¶15.

171.    Other Michigan county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards without the restrictions and discriminatory treatment outline above.Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the

Exhibit A

equal protection of those state laws enjoyed by citizens in other Counties.

172. Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Michigan Constitution, and the Michigan Election Code.

173. Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that the Michigan Counties allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

174. In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Michigan Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

175. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly

Exhibit A

established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Michigan law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

176.    In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the Wayne County and other Michigan Election Boards to invalidate ballots cast by: (1) any voter added to the QVF after the 8:00 PM Election Day deadline; (3) any absentee or mail-in ballot received without a signature or postmark; (4) any ballot cast by a voter who submitted a mail-in ballot and voted in person; (5) any ballot cast by a voter not in the QVF that was assigned the name of a voter in the QVF; (6) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; and (7) all "dead votes". *See generally supra* Section II.A-II.C.

## COUNT III

### Fourteenth Amendment, U.S. Const. Art. I § 4, cl. 1; Art. II, § 1, cl. 2; Amend. XIV, 42 U.S.C. § 1983

### Denial of Due Process On The Right to Vote

177.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

178.    The right of qualified citizens to vote in a state election involving federal

Exhibit A

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases,83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *SeeTwining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See alsoOregon v. Mitchell*,400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

179. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (percuriam).

180. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299,315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

Exhibit A

181.    "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

182.    The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

183.    Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

184.    Section II of this Complaint and the exhibits attached hereto describe widespread and systematic violations of the Michigan Election Code and/or the Equal Protection Clause described, namely: (A) Section II.A, Republican poll challengers were denied the opportunity to meaningfully observe the processing and counting of ballots; (B) Section II.B, election workers forged, added, removed or otherwise altered

Exhibit A

information on ballots, the QFV and other voting records; and (C) Section II.C, several other Michigan Election Code violations that caused or facilitated the counting of tens of thousands of ineligible, illegal or duplicate ballots.

185.    Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that Secretary Benson and Wayne County are enjoined from certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

## COUNT IV

### Wide-SpreadBallot Fraud

186.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

187.    The "glitches" in the Dominion system -- that seem to have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts. *See generally supra* Section IV.

188.    And as evidenced by numerous sworn statements, Defendants egregious misconduct has included ignoring legislative mandates concerning mail-in ballots– including the mandate that mail-in ballots be post-marked on or before Election Day, and critically, preventing Plaintiff's poll watchers from observing the receipt, review, opening, and tabulation of mail-in ballots. Those mail-in ballots are evaluated on an entirely parallel track to those ballots cast in person.

Exhibit A

189.    The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

190.    The disparate treatment of Michigan voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Rice v. McAlister, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

## COUNT V

## MICHIGAN STATUTORY ELECTION LAW VIOLATIONS

191.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein

### Violation of MCL 168.765a.

192.    Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

193.    Per eyewitness accounts described in this Complaint and its attached sworn

Exhibit A

affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were cast. *See generally supra* Section II.A., Paragraphs 56-75.

194.    Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots. Defendants even physically blocked and obstructed election inspectors from the Republican party, including Plaintiff, by adhering large pieces of cardboard to the transparent   glass doors so the counting of absent voter ballots was not viewable.

**Violation of MCL 168.733**

195.    MCL 168.733 requires sets forth the procedures for election challengers and the powers of election inspectors.  *See generally supra* Paragraph 39.

196.    Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud. *See generally supra* Section II.A., Paragraphs 56-75.

197.    Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding

Exhibit A

information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birth dates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

<center>Violation of MCL 168.765(5) and 168.764a</center>

198.    Michigan election law, MCL 168.765(5), requires Defendants to post the specific absentee voting information anytime an election is conducted which involves a state or federal office, in particular, the number of absentee ballots distributed to absent voters.

199.    Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

200.    Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

201.    Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

202.    Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol. *See generally supra* Section II.B.1, Paragraphs 77-78.

<center>Violation of MCL 168.730</center>

203.    MCL 168.730 sets forth the rights and requirements for election challengers. MCL 168.734 provides, among other things:

<center>70</center>

<div align="right">Exhibit A</div>

Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expectedof him,shall,uponconviction,bepunishedbyafinenotexceeding$1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of thecourt.

204.    WayneCounty'sandSecretaryBenson'sdenialofRepublicanchallengers' righttoparticipateandobservetheprocessingofballotsviolatesMichigan'sElectionCodeand resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

205.    Further, Secretary of State Benson and the election officials in Wayne County violatedMCL168.730-168.734bydenyingRepublicanchallengers'rightstomeaningfully observe and participate in the ballot processing and countingprocess.

206.    Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief,including,butnotlimitedto,enjoiningthecertificationoftheelectionresultspendingafull investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy thefraud.

Exhibit A

## PRAYER FOR RELIEF

207.    Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

208.    Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

209.    In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of this Complaint.

210.    Order production of all registration data, ballots, envelopes, etc. required to be maintained by law. When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Michigan and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Michigan cannot reasonably rely on the results of the mail

Exhibit A

vote.Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Michigan should be disqualified from counting toward the 2020 election. Alternatively, the electors of the State of Michigan should be directed to vote for President Donald Trump.

211.    For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.  An order directing Secretary Benson, Governor Whitmer, the Board of State Canvassers and Wayne County to de-certify the election results;

2.  An order enjoining Secretary Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College;

3.  An order requiring Governor Whitmer to transmit certified election results that state that President Donald Trump is the winner of the election;

4.  An immediate order to impound all the voting machines and software in Michigan for expert inspection by the Plaintiffs.

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6.  A declaratory judgment declaring that Michigan's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

Exhibit A

7. A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

8. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9. An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by Plaintiffs' expects;

10. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

11. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

12. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3 and November 4.

13. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Exhibit A

Respectfully submitted, this 25th day of November, 2020.

/s Sidney Powell*                          /s/ Scott Hagerstrom
Sidney Powell PC                           Michigan State Bar No. 57885
                                           222 West Genesee
Texas Bar No. 16209700                     Lansing, MI 48933
                                           (517) 763-7499
                                           Scotthagerstrom @yahoo.com

                                           /s/ Gregory J. Rohl P39185
                                           The Law Offices of Gregory J. Rohl, P.C.
                                           41850 West 11 Mile Road, Suite 110
                                           Novi, MI 48375
                                           248-380-9404
                                           gregoryrohl@yahoo.com

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit A

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER, and DAREN WADE RUBINGH,** | **CASE NO. 20-cv-13134** |
| **Plaintiffs.** | |
| **v.** | |
| **GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS.** | |
| **Defendants.** | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF**

_____

1

Exhibit B

## NATURE OF THE ACTION

1.     This civil action brings to light a massive election fraud, multiple violations of the Michigan Election Code, *see, e.g.,* MCL §§ 168.730-738, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution.  These violations occurred during the 2020 General Election throughout the State of Michigan, as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.     The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to elect Joe Biden as President of the United States. The fraud was executed through a wide-ranging interstate - and international - collaboration involving multiple public and private actors,[1] but at bottom it was a 21st Century adaptation of 19th Century "ballot-stuffing" for the Internet age, amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Michigan.  This Complaint details an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State at the direction of Michigan state election officials in collaboration with Democratic election challengers and activists.

3.     The multifaceted schemes and artifices implemented by Defendants and their

---

[1]  The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona and Wisconsin.  See Ex. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report").

Exhibit B

collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan, that collectively add up to multiples of Biden's purported lead in the State of 154,188 votes. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Michigan's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election. Accordingly, this Court must set aside the results of the 2020 General Election, and grant the declaratory and injunctive relief requested herein.

### Dominion Voting Systems Fraud and Manipulation

4. The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Michigan Board of State Canvassers. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

5. Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

6. As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic
> voting system in a conspiracy between a company known as Smartmatic and the

Exhibit B

leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

7.      A core requirement of the Smartmatic software design ultimately adopted by

Dominion for Michigan's elections was the software's ability to hide its manipulation of votes

from any audit. As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not be tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

8.      The design and features *of* the Dominion software do not permit a simple audit to

reveal its misallocation, redistribution, or deletion of votes. First, the system's central

accumulator does not include a protected real-time audit log that maintains the date and time

stamps of all significant election events. Key components of the system utilize unprotected logs.

Exhibit B

Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people. *See* Ex. 107, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48.

9. Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence.

10. In deciding to award Dominion a $25 million, ten-year contract (to a Dominion project team led by Kelly Garrett, former Deputy Director of the Michigan Democratic Party), and then certifying Dominion software, Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation.[2] An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it a screwdriver."[3]

---

[2] See Ex. 8, State of Michigan Enterprise Procurement, Dept. of Technology, Management and Budget Contract No. 071B7700117, between State of Michigan and Dominion Voting Systems ("Dominion Michigan Contract"). *See also* Ex. 9 (Texas Secretary of State decision).

[3] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

Exhibit B

11.     Plaintiff's expert witness, Russell James Ramsland, Jr. (Exh. 101, "Ramsland Affidavit"), has concluded that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan, that must be disregarded.  This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below), and thus by itself is grounds to set aside the 2020 General Election and grant the declaratory and injunctive relief requested herein.

12.     In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud and Michigan Election Code violations, supplemented by healthy doses of harassment, intimidation, discrimination, abuse and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity or fairness from the vote counting process.  While this illegal conduct by election workers and state, county and city employees in concert with Dominion, even if considered in isolation,  the following three categories of systematic violations of the Michigan Election Code cast significant doubt on the results of the election and mandate this Court to set aside the 2020 General Election and grant the declaratory and injunctive relief requested herein.

**Fact Witness Testimony of Voting Fraud & Other Illegal Conduct**

13.     There were three broad categories of illegal conduct by election workers in collaboration with other employee state, county and/or city employees and Democratic poll watchers and activists.  First, to facilitate and cover-up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.     Denied Republican election challengers access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted;

B.     Denied Republican poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting and locked credentialed challengers out

Exhibit B

of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed;

C.    Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center;

D.    Systematically discriminated against Republican poll watchers and favored Democratic poll watchers;

E.    Ignored or refused to record Republican challenges to the violations outlined herein;

F.    Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate[4];

G.    Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going over to the voting booths with voters in order to watch them vote and coach them for whom to vote;

H.    As a result of the above, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines); and

I.    Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in the above unlawful and discriminatory behavior.

14.    Second, election workers illegally forged, added, removed or otherwise altered

information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A.    Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden;

B.    Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900;

C.    Changing dates on absentee ballots received after 8:00 PM Election Day deadline

---

[4] On October 29, 2020 the State of Michigan in the Court of Claims, Detroit, Hon. Cynthia D. Stephens entered a Stipulated Order that related to guidance for Observers, which made clear that Observers were to be in closer proximity to election workers to have a challenge heard. Otherwise they should remain 6 feet apart.  (See Case No. Case No. 20-000211-MZ)

Exhibit B

to indicate that such ballots were received before the deadline;

D. Changing Votes for Trump and other Republican candidates; and

E. Added votes to "undervote" ballots and removing votes from "Over-Votes".

15. Third, election workers committed several additional categories of violations of the Michigan Election Code to enable them to accept and count other illegal, ineligible or duplicate ballots, or reject Trump or Republican ballots, including:

A. Permitting illegal double voting by persons that had voted by absentee ballot and in person;

B. Counting ineligible ballots – and in many cases – multiple times;

C. Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants;

D. Counting "spoiled" ballots;

E. Systematic violations of ballot secrecy requirements;

F. Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline, in particular, the tens of thousands of ballots that arrived on November 4, 2020; and

G. Accepting and counting ballots from deceased voters.

**Expert Witness Testimony Regarding Voting Fraud**

16. In addition to the above fact witnesses, this Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A. A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (*see* Ex. 104 ¶14);

B. A report from Dr. Louis Bouchard finding to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval

Exhibit B

(11:31:48 on November 4), *see* Ex. 110 at 28);

C.   A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (*See* Ex. 101);

D.   A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (*See* Ex. 102);

E.   A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (*See* Ex. 110);

F.   A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date (*i.e.*, consistent with eyewitness testimony described in Section II below). (*See* Ex. 110);

G.   A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precinct, but that the Democrat advantage (*i.e.*, the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated. (*See* Ex. 110); and

H.   A report by an affiant whose name must be redacted to protect his safety who concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points. Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (*See* Ex. 111 ¶13).

17.   As explained and demonstrated in the accompanying redacted declaration of a

former electronic intelligence analyst with 305th Military Intelligence with experience gathering

Exhibit B

SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

18.     These and other "irregularities" provide this Court grounds to set aside the results of the 2020 General Election and provide the declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

20.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

21.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

22.     This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C. § 1367. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

23.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state

Exhibit B

executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

24.     Each of the following Plaintiffs are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and, John Earl Haggard, a resident of Charlevoix, Michigan;

25.     Each of these Plaintiffs has standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors).  As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Each brings this action to set aside and decertify the election results for the Office of President of the United States that were certified by the Michigan Secretary of State on November 23, 2020.  The certified results showed a plurality of 154,188 votes in favor of former Vice-President Joe Biden over President Trump.

26.     Plaintiff James Ritchard is a registered voter residing in Oceana County.  He is the Republican Party Chairman of Oceana County.

27.     Plaintiff James David Hooper is a registered voter residing in Wayne County.  He is the Republican Party Chairman for the Wayne County Eleventh District.

28.     Plaintiff Daren Wade Ribingh is a registered voter residing in Antrim County.  He

Exhibit B

is the Republican Party Chairman of Antrim County.

29.     Defendant Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.

30.     Defendant Jocelyn Benson ("Secretary Benson") is named as a defendant in her official capacity as Michigan's Secretary of State.  Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. MCL § 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL § 168.31(1)(a) (the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state").  Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL § 168.31(1)(b). *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020).  Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just, and lawful manner. *See* MCL 168.21; 168.31; 168.32. *See also League of Women Voters of Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018), aff'd 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

31.     Defendant Michigan Board of State Canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide …."

Exhibit B

Michigan Election Officials' Manual, p. 4. *See also* MCL 168.841, *et seq*. On November 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

### STATEMENT OF FACTS

32.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under MCL 168.861, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary under the Michigan Constitution.

33.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides.

34.     The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

35.     With respect to the appointment of presidential electors, the Constitution provides: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").  Under the Michigan Election Code, the Electors of the President and Vice President for the State of Michigan are elected by each political party at their state convention in each Presidential election year.  *See* MCL §§ 168.42 & 168.43.

36.     Neither Defendant is a "Legislature" as required under the Elections Clause or

Exhibit B

Electors Clause. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

37.     While the Elections Clause "was not adopted to  diminish  a State's authority to determine its own lawmaking processes," *Ariz.  State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

38.     Plaintiffs bring this action to vindicate their constitutional rights to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

39.     The Mich. Const., art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

40.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

Exhibit B

I.    **LEGAL BACKGROUND:  RELEVANT PROVISIONS OF THE MICHIGAN ELECTION CODE AND ELECTION CANVASSING PROCEDURES.**

   A.    **Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct of elections.**

   41.    Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL § 168.730-738.

   42.    Michigan requires Secretary of State Benson, local election authorities, and state and county canvassing boards to provide challengers the opportunity to meaningfully participate in, and oversee, the conduct of Michigan elections and the counting of ballots.

   43.    Michigan's election code provides that challengers shall have the following rights and responsibilities:

   a.    An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL § 168.733(1).

   b.    An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL § 168.733(1)(a).

   c.    An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL § 168.733(1)(b).

   d.    An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL § 168.733(1)(c).

   e.    An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL § 168.733(1)(d).

   f.    An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the

Exhibit B

polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL§ 168.744; and/or (4) any other violation of election law or other prescribed election procedure.  MCL § 168.733(1)(e).

g. An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL § 168.733(1)(f).

h. An election challenger may examine each ballot as it is being counted. MCL § 168.733(1)(g).

i. An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL § 168.733(1)(h).

j. An election challenger may observe the recording of absent voter ballots on voting machines. MCL §168.733(1)(i).

44. The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

45. Michigan values the important role challengers perform in assuring the transparency and integrity of elections.  For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law.  MCL § 168.734(4).  It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

46. The responsibilities of challengers are established by Michigan statute.  MCL § 168.730 states:

(l) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A

16

Exhibit B

political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2)    A challenger shall be a registered elector of this state…. A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate….

(3)    A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

47.    Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

**B.    The canvassing process in Michigan.**

48.    Michigan has entrusted the conduct of elections to three categories of individuals; a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

49.    The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL § 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.* The members of the board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will then deliver the statement of returns and tally sheet to the "board of county canvassers." MCL § 168.809. "All election returns, including poll lists, statements, tally sheets, *absent voters'*

17

Exhibit B

*return envelopes bearing the statement required [to cast an absentee ballot] … must be carefully preserved*." MCL § 810a and § 168.811 (emphasis added).

50.     After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 AM on the Thursday after" the election. November 5, 2020 is the date for the meeting.  MCL 168.821.  The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear.  Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

51.     The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.

> *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the legal custodians.  The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which is November 17.  MCL 168.822(1).  But, "[i]f the board of county canvassers fails to certify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election.   The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers."  MCL 168.822(2).

Exhibit B

52.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announces its determination of the canvass "not later than the fortieth day after the election." For this general election, that is November 23 and December 13. MCL 168.842. There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and Vice President.

53.     The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which is November 17. MCL 168.822(1). But, "[i]f the board of county canvassers fails to certify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election. The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers." MCL 168.822(2).

54.     The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. §§ 1-18, require Michigan Governor Whitmer to prepare a Certificate of Ascertainment by December 14, the date the Electoral College meets.

55.     The United States Code (3 U.S.C. § 5) provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to settle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, then these results are considered to be conclusive and will apply in the counting of the electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state

Exhibit B

where there was a contest, and in which the contest was decided according to established state

procedures, is required (by 3 U.S.C. § 6) to send a certificate describing the form and manner by

which the determination was made to the Archivist as soon as practicable.

56. The members of the board of state canvassers are Democrat Jeannette Bradshaw,

Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak.

Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of

county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican

William Hartmann, and Democrat Allen Wilson. Monica Palmer is the Board Chairperson.

57. More than one hundred credentialed election challengers provided sworn

affidavits. These affidavits stated, among other matters, that these credentialed challengers were

denied a meaningful opportunity to review election officials in Wayne County handling ballots,

processing absent voter ballots, validating the legitimacy of absent voter ballots, and the general

conduct of the election and ballot counting. *See* Exhibit 1 (affidavits of election challengers).

## II. FACTUAL ALLEGATIONS AND FACT WITNESS TESTIMONY REGARDING MICHIGAN ELECTION CODE VIOLATIONS AND OTHER UNLAWFUL CONDUCT BY ELECTION WORKERS AND MICHIGAN STATE, WAYNE COUNTY AND/OR CITY OF DETROIT EMPLOYEES.

58. Wayne County used the TCF Center in downtown Detroit to consolidate, collect,

and tabulate all of the ballots for the County. The TCF Center was the only facility within Wayne

County authorized to count the ballots.

### A. Republican Election Challengers Were Denied Opportunity to Meaningfully Observe the Processing and Counting of Ballots.

59. There is a difference between a ballot and a vote. A ballot is a piece of paper. A

vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a

vote and has done so in compliance with Michigan election law by, among other things,

verifying their identity and casting the ballot on or before Election Day. It is the task of

Exhibit B

Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make sure that all ballots cast by lawful voters are counted and the election is conducted in accordance with Michigan's Election Code uniformly throughout Michigan.

60.     Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.

61.     Wayne County excluded certified challengers from meaningfully observing the conduct of the election in violation of the Michigan Election Code. This allowed a substantial number of ineligible ballots to be counted, as outlined in Section B. below.  These systematic Michigan Election Code violations, and the disparate treatment of Republican vs. Democratic poll challengers, also violated the Equal Protection Clause and other provisions of the U.S. Constitution as detailed herein.  The following affidavits describe the specifics that were observed. This conduct was pervasive in Wayne County as attested to in the affidavits attached at Ex. 3.

### 1.     Republican Observers Denied Access to TCF Center

62.     Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election.  For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access.  Exhibit 3 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Frey aff. ¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7;

Exhibit B

Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldy aff. ¶¶5, 8-9 (unlimited members of the media were also allowed inside regardless of COVID restrictions while Republican challengers were excluded)).

63.     Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return.  *Id.* (Bomer aff. ¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff., p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5).  Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced.

### 2.     Disparate and Discriminatory Treatment of Republican vs. Democratic Challengers.

64.     As a result of Republican challengers not being admitted or re-admitted, while Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. *Id.* (Helminen aff. ¶12 (Democratic challengers out- numbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten times as many Democratic challengers as Republican); A. Seely aff. ¶19; Schneider aff., p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff. ¶4).

65.     Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. *Id.* (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6).  As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process.

Exhibit B

### 3. Republican Challengers Not Permitted to View Ballot Handling, Processing or Counting.

66. Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials. *Id.* (A. Seely aff. ¶15; Miller aff. ¶¶13-14; Pennala aff. ¶4; Tyson aff. ¶¶12- 13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23- 24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5; Sherer aff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff. ¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

67. At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. *Id.* (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4). Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers. *Id.* (Sitek aff. ¶4). Sitek filed a police complaint. *Id.*

68. Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table. *Id.* (Montie aff. ¶¶4-7). When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad." *Id.* ¶8.

69. Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process. *Id.* (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff., p. 4; Zimmerman aff. ¶10; Krause aff. ¶12; Sherer aff. ¶22; Johnson aff. ¶7; Posch aff. ¶10; Rauf aff. ¶23; Luke aff., p.

Exhibit B

1; M. Seely aff. ¶8; Zelasko aff. ¶8; Ungar aff. ¶12; Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff. ¶9).

### 4.    Harassment, Intimidation & Removal of Republican Challengers

70.    Challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process.  *Id.* (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneider aff., p. 1; Piontek aff. ¶11; Steffans aff. ¶26 (intimidation made her feel too afraid to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooper aff. ¶12; Shock aff. ¶9; Schmidt aff. ¶¶9-10; Duus aff. ¶10; M. Seely aff. ¶4; Storm aff. ¶¶5, 7; DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13).

71.    Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers.  *Id.* (Bomer aff. ¶7).  Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting.  *Id.* (Vaupel aff. ¶4).  Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2).  Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9).

72.    Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process.  *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5).  Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP

Exhibit B

Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much. *Id.* (Sherer aff. ¶24). An election worker told challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process." *Id.* (Early aff. ¶11).

73.     Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area. *Id.* (Helminen aff. ¶9; Pennala aff. ¶5; Ballew aff. ¶9; Piontek aff. ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p. 4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

### 5.     Poll Workers Ignored or Refused to Record Republican Challenges.

74.     Unfortunately, this did not happen in Wayne County. Many challengers testified that their challenges to ballots were ignored and disregarded. *Id.* (A. Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettila aff., p. 3; Valice aff. ¶2; Sawyer aff. ¶7; Kerstein aff. ¶3; Modlin aff. ¶4; Cassin aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

75.     As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded. *Id.* (A. Seely aff. ¶4). Articia Bomer observed that ballots with votes for Trump were separated from other ballots. *Id.* (Bomer aff. ¶5). Articia Bomer stated, "I witnessed election workers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers. I believe

Exhibit B

some of these ballots may not have been properly counted." *Id.* ¶8.  Braden Gaicobazzi

challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his

challenge was ignored and disregarded. *Id.* (Giacobazzi aff. ¶10).  When Christopher Schornak

attempted to challenge the counting of ballots, an election official told him; "We are not talking to

you, you cannot challenge this." *Id.* (Schornak aff. ¶15).   When Stephanie Krause attempted to

challenge ballots, an election worker told her that challenges were no longer being accepted

because the "rules 'no longer applied.'" *Id.* (Krause aff. ¶13).

### 6. Unlawful Ballot Duplication.

76.     If a ballot is rejected by a ballot-tabulator machine and cannot be read by the

machine, the ballot must be duplicated onto a new ballot.  The Michigan Secretary of State has

instructed, "If the rejection is due to a false read the ballot must be duplicated by *two election*

*inspectors who have expressed a preference for different political parties*."  Michigan Election

Officials' Manual, ch. 8, p. 6 (emphasis added).  Thus, the ballot-duplicating process must be

performed by bipartisan teams of election officials. It must also be performed where it can be

observed by challengers.

77.     But Wayne County prevented many challengers from observing the ballot

duplicating process.  *Id.* (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaum aff. ¶6;

Sherer aff. ¶¶16-17; Burton aff. ¶7; Drzewiecki aff. ¶7; Klamer aff. ¶9; Chopjian aff. ¶10;

Schmidt aff. ¶7; Champagne aff. ¶12; Shinkle aff., p. 1).   Challenger John Miller said he was not

allowed to observe election workers duplicating a ballot because the "duplication process was

personal like voting." *Id.* (Miller aff. ¶8).   Challenger Mary Shinkle stated that she was told by

an election worker that she was not allowed to observe a ballot duplication because "if we make a

mistake then you would be all over us." *Id.* (Shinkle aff., p. 1).  Another challenger observed

election officials making mistakes when duplicating ballots. *Id.* (Piontek aff. ¶9).

Exhibit B

78.     Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams.  Exhibit 1 (Pettibone aff. ¶3; Kinney aff., p. 1; Wasilewski aff., p. 1; Schornak aff. ¶¶18-19; Dixon aff., p. 1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

### 7.     Democratic Election Challengers Frequently Outnumbered Republican Poll Watchers 2:1 or Even 2:0.

79.     Dominion contractor Melissa Carrone testified that there were significantly more Democrats than Republicans at the TCF Center, and that as a result there were "over 20 machines [that] had two democrats judging the ballots-resulting in an unfair process." Exh. 5 ¶5. Other affiants testified to the fact that Democrats outnumbered Republicans by 2:1 or more  *Id.* (Helminon aff. ¶12).  Democrats also impersonated Republican poll watchers. *Id.* (Seely aff. ¶19).

### 8.     Collaboration Between Election Workers, City/County Employees, and Democratic Party Challengers and Activists.

80.     Affiants testified to systematic and routine collaboration between election workers, Michigan public employees and Democratic election challengers and activists present, in particular to intimidate, harass, distract or remove Republican election watchers. *See, e.g.,* Exh. 1 (Ballow aff. ¶9; Gaicobazzi aff. ¶¶12, 14; Piontek aff. ¶11).

### B.     Election Workers Fraudulently Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records.

81.     A lawsuit recently filed by the Great Lakes Justice Center ("GLJC") raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* Exhibit 4 (copy of complaint filed in the Circuit Court of Wayne County in *Constantino, et al. v. City of Detroit, et al.*) ("GLJC Complaint").  The allegations and affidavits included in the GLJC Complaint are incorporated by reference in the body of this Complaint.

Exhibit B

1. **Election Workers Fraudulently Added "Tens of Thousands" of New Ballots and New Voters in the Early Morning and Evening of November 4.**

82.     The most egregious example of election workers' fraudulent and illegal behavior concerns two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline.  First, at approximately 4:30 AM on November 4, 2020, poll challenger Andrew Sitto observed "tens of thousands of new ballots" being brought into the counting room, and "[u]nlike the other ballots, these boxes were brought in from the rear of the room."  Exh. 4, GLJC Complaint, Exh. C at ¶ 10.  Mr. Sitto heard other Republican challengers state that "several vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 AM and unloaded boxes of ballots."  *Id.* at ¶ 11.  "All ballots sampled that I heard and observed were for Joe Biden."  *Id.* at ¶ 12.

83.     A second set of new boxes of ballots arrived at the TCF Center around 9:00 PM on November 4, 2020.  According to poll watcher Robert Cushman, these boxes contained "several thousand new ballots."  Exh. 4, GLJC Complaint, Exh. D at ¶ 5.  Mr. Cushman noted that "none of the names on the new ballots were on the QVF or the Supplemental Sheets," *id.* at ¶ 7, and he observed "computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system."  *Id.* at ¶ 8.  Further, "[e]very ballot was being fraudulently and manually entered into the [QVF], as having been born on January 1, 1990."  *Id.* at ¶ 15.  When Mr. Cushman challenged the validity of the votes and the impossibility of each ballot having the same birthday, he "was told that this was the instruction that came down from the Wayne County Clerk's office."  *Id.* at ¶ 16.

84.     Perhaps the most probative evidence comes from Melissa Carone, who was "contracted to do IT work at the TCF Center for the November 3, 2020 election."  Exh. 5, ¶1.  On November 4, Ms. Carrone testified that there were "two vans that pulled into the garage of

Exhibit B

the counting room, one on day shift and one on night shift." *Id.* ¶8.  She thought that the vans were bringing food, however, she "never saw any food coming out of these vans," and noted the coincidence that "Michigan had discovered over 100,000 more ballots – not even two hours after the last van left." *Id.*  Ms. Carrone witnessed this illegal vote dump, as well as several other violations outlined below.

> ### 2.    Election Workers Forged and Fraudulently Added Voters to the Qualified Voter List.

85.    Many challengers reported that when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900.  Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9).  *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17).  Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record. *Id.* (Giacobazzi aff. ¶10).

86.    The GLJC Complaint alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets."  Exh. 4, GLJC Complaint at 3.  The GLJC Complaint provides additional witness affidavits detailing the fraudulent conduct of election workers, in particular, that of Zachary Larsen, who served as a Michigan Assistant Attorney General from 2012 through 2020 and was a certified poll challenger at the TCF Center.  "Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted.  An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side

<div align="center">29</div>

<div align="right">Exhibit B</div>

of the screen." *Id.* at ¶ 16.  Mr. Larsen observed this "practice of assigning names and numbers" to non-eligible voters who did not appear in either the poll book or the supplement poll book.  *Id.* at ¶ 17.  Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned. *Id.*

### 3. Changing Dates on Absentee Ballots.

87.     All absentee ballots that existed were required to be inputted into the QVF system by 9:00 PM on November 3, 2020.  This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 PM on November 3, 2020.  In order to have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

88.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County. Ex. 6.   Jessica Connarn's affidavit describes how an election poll worker told her that he "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* ¶1.  Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received.  *See id.*  Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 PM on Election Day could be counted.

89.     Plaintiffs have learned of a United States Postal Service ("USPS") worker Whistleblower, who on November 4, 2020 told Project Veritas that a supervisor named Johnathan Clarke in Traverse City, Michigan, issued a directive to collect ballots and stamp them as received on November 3, 2020, even though there were not received timely, as required by law:  "We were issued a directive this morning to collect any ballots we find in mailboxes, collection boxes, just outgoing mail in general, separate them at the end of the day so that they

Exhibit B

could hand stamp them with the previous day's date," the whistleblower stated. "Today is November 4th for clarification."[5] This is currently under IG Investigation at the U.S. Post Office. According to the Postal worker whistleblower, the ballots are in "express bags" so they could be sent to the USPS distribution center. *Id.*

90.     As set forth in the GLJC Complaint and in the Affidavit of Jessy Jacob, an employee of the City of Detroit Elections Department, "on November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. I was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. She estimates that this was done to thousands of ballots." Exh. 4, GLJC Complaint, Exh. B at ¶ 17.

### 4.     Election Workers Changed Votes for Trump and Other Republican Candidates.

91.     Challenger Articia Bomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). In addition to this eyewitness testimony of election workers manually changing votes for Trump to votes for Biden, there is evidence that Dominion Voting Systems did the same thing on a much larger scale with its Dominion Democracy Suite software. *See generally infra* Section IV.

### 5.     Election Officials Added Votes and Removed Votes from "Over-Votes".

92.     Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted. Exh. 3 (Zaplitny aff. ¶13). At least one challenger observed poll

---

[5] https://townhall.com/tipsheet/bethbaumann/2020/11/04/usps-whistleblower-in-michigan-claims-higher-ups-were-engaging-in-voter-fraud-n2579501

Exhibit B

workers adding marks to a ballot where there was no mark for any candidate. *Id.* (Tyson aff. ¶17).

**C.    Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted.**

**1.    Illegal Double Voting.**

93.    At least one election worker "observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot.  These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot."  Exh. 4, GLJC Complaint (Exh. B) Jacob aff. at ¶ 10.  This permitted a person to vote in person and also send in his/her absentee ballot, and thereby vote at least twice.

**2.    Ineligible Ballots Were Counted – Some Multiple Times.**

94.    Challengers reported that batches of ballots were repeatedly run through the vote tabulation machines.  Exh. 3 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8).  Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine.  *Id.* (Rose aff. ¶¶4-14).  Articia Bomer further stated that she witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12. Dominion contractor Melissa Carone observed that this was a routine practice at the TCF Center, where she "witnessed countless workers rescanning the batches without discarding them first" – as required under Michigan rules and Dominion's procedures – "which resulted in ballots being counted 4-5 times" by the "countless" number of election workers.  Carone aff. ¶3.  When she observed that a computer indicated that it had "a number of over 400 ballots scanned – which means one batch [of 50] was counted over 8 times," and complained to her Dominion supervisor, she was informed that "we are here to do assist with IT work, not to run their election."  *Id.* at ¶4.

Exhibit B

### 3.   Ballots Counted with Ballot Numbers Not Matching Ballot Envelope.

95.     Many challengers stated that the ballot number on the ballot did not match the number on the ballot envelope, but when they raised a challenge, those challenges were disregarded and ignored by election officials, not recorded, and the ballots were processed and counted.   Exh. 3 (A. Seely aff. ¶15; Wasilewski aff., p. 1; Schornak aff. ¶13; Brunell aff. ¶¶17, 19; Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5).  For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away", and that the counting table she was observing had "a different process than other tables."   *Id.* (Helminen aff. ¶5).

### 4.   Election Officials Counted Ineligible Ballots with No Signatures or No Dates or with No Postmark on Ballot Envelope.

96.     At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope.   *Id.* (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13).   Challenger Anne Vanker observed that "60% or more of [ballot] envelopes [in a batch] bore the same signature on the opened outer envelope."   *Id.* (Vanker aff. ¶5).   Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes.   Exhibit 1 (Henderson aff. ¶8).   The GLJC Complaint further alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity."

97.     Plaintiff Marian Sheridan, who was a poll watcher at TCF Center and is Vice chair of the Michigan Republican Party, led a "team of almost 1200" to review "the voting records of 51,018 registered voters" in Wayne County "who voted for the first time in the

Exhibit B

November 3rd election of 2020." Ex. 20 ¶5.  Her team found that 20,300 of those "did not have a 'ballot requested date' in Wayne County," and that "10,620 absentee ballots show a 'ballot sent date' *40 days before the election*, after August 13th but before September 24." *Id.* ¶¶8 & 11.

### 5. Election Officials Counted "Spoiled" Ballots.

98.     At least two challengers observed spoiled ballots being counted. *Id.* (Schornak aff. ¶¶6-8; Johnson aff. ¶4).  At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center.  Ex. 1  (Cizmar aff. ¶5).

### 6. Systematic Violations of Ballot Secrecy Requirements.

99.     Affiant Larsen identified a consistent practice whereby election officials would remove ballots from the "secrecy sleeve" or peek into the envelopes, visually inspect the ballots, and based on this visual inspection of the ballot (and thereby identify the votes cast), determine whether to "place the ballot back in its envelope and into a 'problem ballots' box that required additional attention to determine whether they would be processed and counted."  Ex. 4, GLJC Complaint, Ex. A at ¶14.  Mr. Larsen also observed that some ballots arriving without any secrecy sleeve at all were counted after visual inspection, whereas many ballots without a secrecy sleeve were placed in the "problem ballots" box.  *Id.* at ¶¶21-22.  "So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as 'problem ballots' based on who the person had voted for rather on any legitimate concern about the ability to count and process the ballot appropriately." *Id.* at ¶24.

### 7. Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline.

100.     Poll challengers observed two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline, as detailed in the GLJC Complaint and Section II.B.1.

Exhibit B

Affiant Daniel Gustafson further observed that these batches of ballots "were delivered to the TCF Center in what appeared to be mail bins with open tops." Ex. 4, GLJC Complaint, Ex. E at ¶4. Mr. Gustafson further observed that these bins and containers "did not have lids, were not sealed, and did not have the capability of having a metal seal," *id.* at ¶5, nor were they "marked or identified in any way to indicated their source of origin." *Id.* at ¶6.

101. An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exh. 3 (Meyers aff. ¶3). This challenger also observed an election worker accepting a ballot after 8:00 PM on Election Day. *Id.* ¶7.

102. An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after 8:00 PM on Election Day. *Id.* (Meyers aff. ¶6).

103. On November 4, 2020, Affiant Matt Ciantar came forward who, independently witnessed, while walking his dog, a young couple deliver 3-4 large plastic clear bags, that appeared to be "express bags", as reflected in photographs taken contemporaneously, to a U.S. Postal vehicle waiting. *See generally* Exh. 7 Matt Ciantar Declaration. The use of clear "express bags" is consistent with the USPS whistleblower Johnathan Clarke in Traverse City, Michigan. *See infra* Paragraph 78.

### 8. Ballots from Deceased Voters Were Counted.

104. Plaintiff Sheridan's team reviewed 51,018 new registered voters in Wayne County, and found that "205 of the voters were deceased, with an additional 1005 unverifiable through" their sources. Ex. 20 ¶6. One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election. Ex. 3 (Chase aff. ¶3).

Exhibit B

**D.  Wayne County Election So Riddled with "Irregularities and Inaccuracies" That Wayne County Board of Canvassers Refused to Certify Results.**

105.    The attached affidavit of Monica Palmer (Ex. 11), Chairperson of the Wayne County Board of Canvassers details the numerous "irregularities and inaccuracies" in Wayne County, both for the August 4, 2020 primary and the November 3, 2020 General Election, which convinced her to refuse to certify the General Election results.  Among other things, her testimony describes Wayne County's long-standing systemic problems with "unbalanced" precincts (*i.e.,* matching the vote count with the actual number of ballots cast).  In the August 4, 2020 Primary election, for example, 72% of Detroit's absentee voting precincts were out of balance."  *Id.* ¶7.  This may have been due to the fact that the "City of Detroit did not scan a single precinct within a batch," which "makes it nearly impossible to re-tabulate a precinct without potentially disrupting a perfectly balanced precinct. *Id.* ¶6 (second bullet).  As a result, "[a]ll Board members express serious concerns about the irregularities and inaccuracies," and "unanimously approved" a joint resolution to request that Secretary Benson institute an investigation and appoint an independent election monitor for the 2020 General Election, *id.* ¶9, which was not done.  Chairperson Palmer determined, based on preliminary results from the 2020 General Election, that once again "more than 70% of Detroit's 134 Absentee Voter Counting Boards (AVCB) did not balance and many had no explanation to why they did not balance."  *Id.* ¶14.

106.    On November 17, 2020, Chairperson Palmer initially voted not to certify the results, but subsequently agreed to certify, subject to the condition that Secretary Benson conduct a "full, independent audit" of the results.  *Id.* ¶21.  When Secretary Benson reneged on the commitment, however, Chairperson Palmer rescinded her prior vote to certify.  *Id.* ¶24.  "The Wayne County election process had serious process flaws which deserve investigation," and

Exhibit B

Chairperson Palmer continues to believe that the results should not be certified pending "an additional 10 days of canvass by the State Board of Canvassers." *Id.* ¶ 26.

107.     Wayne County Board of Canvassers Member William C. Hartmann has also testified to the serious problems with the Wayne County Canvass.  *See* Ex. 12.  Like Chairperson Palmer, he "determined that 71% of Detroit's 134 Absent[ee] Voter Counting Boards (AVCB) were left unbalanced and many *unexplained.*" *Id.* ¶6 (emphasis in original).  Mr. Hartmann joined Chairperson Palmer in initially voting not to certify the results of the 2020 General Election, and the subsequent decision to do so based on a commitment to conduct an independent audit, and then voting again not to certify when Secretary Benson refused to conduct an audit. *Id.* ¶¶ 7, 11, and 18.  In his testimony, Mr. Hartmann identifies a number of questions that must be answered – many of them tracking the concerns raised in Section II.A to II.C above – before the results can be certified.  Of particular concern is the "**use of private monies directing local officials regarding the management of the election, how these funds were used and whether such funds were used to pay election workers.**" *Id.* ¶17.c.  He also raises questions as to" "[w]hy the pollbooks, Qualified Voter Files, and final tallies do not match or balance?"; "were republicans *not* used in signing seals certified at the end of the night … before ballot boxes were documented, closed and locked?"; the absence of logs from Detroit's 134 ACVB; "[h]ow many challenged ballots were counted?"; "[h]ow many voter birthdates were altered in the pollbooks?"; "[w]ere ballots counted in TCF that were not reflected in the electronic pollbook or paper supplemental list?"; and were the "18,000 same-day registrations in Detroit on November 3 … verified as proper voters prior to the tabulation of their ballots?" *Id.* ¶17.  "Until these questions are addressed," Mr. Hartmann "remain[s] opposed to certification of the Wayne County results." *Id.* ¶19.

Exhibit B

III.     **EXPERT WITNESS TESTIMONY INDICATING WIDESPREAD VOTING FRAUD AND MANIPULATION**

    A.     **Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.**

    108.     The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report")

summarizes the multi-state phone survey data of 248 Michigan voters collected by Matt

Braynard, which was conducted from November 15-17, 2020.  (*See* Ex. 101, Dr. Briggs Report

at 1 & Att. 1 thereto ("Braynard Survey")).  Using the Braynard Survey, Dr. Briggs identified

two specific errors involving unreturned mail-in ballots that are indicative of voter fraud,

namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting

them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*,

marked as unreturned)."  *Id.*  Dr. Briggs then conducted a parameter-free predictive model to

estimate, within 95% confidence or prediction intervals, the number of ballots affected by these

errors out of a total of 139,190 unreturned mail-in ballots for the State of Michigan.

    109.     With respect to **Error #1**, Dr. Briggs' analysis estimated that **29,611 to 36,529**

**ballots** out of the total 139,190 unreturned ballots (**21.27% - 26.24%**) were recorded for voters

who had **not** requested them.  *Id.*  With respect to **Error #2**, the numbers are similar with **27,928**

**to 34,710 ballots** out of 139,190 unreturned ballots (**20.06% - 24.93%**) recorded for voters who

**did return their ballots were recorded as being unreturned.**  *Id.*  Taking the average of the

two types of errors together, **62,517 ballots, or 45% of the total, are "troublesome."**

    110.     These errors are not only conclusive evidence of widespread fraud by the State of

Michigan,[6] but they are fully consistent with the fact witness statements above the evidence

---

[6] The only other possible explanations for the statements of 248 Michigan mail-in voters
included in the Braynard Survey data is (a) that the 248 voters (who had no known pre-existing
relationship apart from being listed as having unreturned absentee ballots) somehow contrived to

Exhibit B

regarding Dominion presented below insofar as **these purportedly unreturned absentee ballots provide a pool of 60,000-70,000 unassigned and blank ballots that could be filled in by Michigan election workers, Dominion or other third parties to shift the election to Joe Biden**.

111.    With respect to Error #1, Dr. Briggs' analysis, combined with the statements of the Michigan voters in the Braynard Survey, demonstrates that approximately **30,000 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.

112.    With respect to Error #2, Dr. Briggs' analysis indicates that approximately **30,000 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.**  Accordingly, Dr. Briggs' analysis showing that almost half of purportedly "unreturned ballots" suffers from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 31%) – provides further support that these widespread "irregularities" or anomalies were one part of a much larger interstate fraudulent scheme to rig the 2020 General Election for Joe Biden.

> **B.    Statistical Analysis of Anomalous and Unprecedented Turnout Increases in Specific Precincts Indicate that There Were at Least 40,000 "Excess Voters" in Wayne County and At Least 46,000 in Oakland County.**

113.    The attached affidavit of Eric Quinell, Ph.D. analyzes the extraordinary increase in turnout from 2016 to 2020 in a relatively small subset of townships and precincts outside of

---

collude together to submit false information or (b) that these 248 suffered from amnesia, dementia or some other condition that caused them to falsely claim that they had requested a mail-in ballot or returned a mail-in ballot.

Exhibit B

Detroit in Wayne County and Oakland County, and more importantly how nearly 100% or more of all "new" voters from 2016 to 2020 voted for Biden.  (*See* Ex. 102; *see also* Ex. 110, Chapter 2).  Using publicly available information from Wayne County and Oakland County, Dr. Quinell first found that for the votes received up to the 2016 turnout levels, the 2020 vote Democrat vs. Republican two-ways distributions (i.e., excluding third parties) tracked the 2016 Democrat vs. Republican distribution very closely, which was 55%-45% for Wayne County (outside Detroit) and 54%-46% for Oakland County.  *Id.* at ¶¶18 & 20.

114.    However, after the 2016 turnout levels were reached, the Democrat vs. Republican vote share shifts decisively towards Biden by approximately 15 points, resulting in a 72%/28% D/R split for Oakland County and 70%/30% D/R split for Wayne County (outside of Detroit).  What is even more anomalous – and suspicious – is the fact that nearly all of these "new" votes in excess of 2016 come from a small number of townships/precincts where the increased Biden vote share is nearly 100% or over 100% for Biden.  *Id.*

115.    For example, in the township of Livonia in Wayne County, Biden gained 3.2 voters for every 1 new Trump voter, and Biden received 97% of all "new" votes over 2016 and 151% of all new voter registrations. *Id.* at ¶6.  In the township of Troy in Oakland County, the vote share shifted from 51%/49% in 2016 to 80%/20% in 2020 due to Biden receiving 98% of new votes above 2016 and 109% of new voter registrations. *Id.* at ¶20.  Looking county-wide, Biden gained 2.32 new voters over 2016 levels to every 1 new Trump voter in Wayne County (outside Detroit) and 2.54 additional new voters per Trump voter for Oakland County.  *Id.* ¶5.

116.    Based on these statistically anomalous results that occurred in a handful of townships in these two counties, Dr. Quinell's model determined that there were 40,771 anomalous votes in Wayne County (outside Detroit) and 46,125 anomalous votes in Oakland

Exhibit B

County, for a total of nearly 87,000 anomalous votes or approximately 65% of Biden's purported lead in Michigan.

117.    Dr. Quinell's conclusions are supported by the testimony S. Stanley Young, Ph.D. (*See* Ex. 110, Chapter 1, "Analysis of Michigan County Vote Counts").  Dr. Young examined all Michigan counties for changes in turnout from 2016 to 2020.  In 74 out of 83 Michigan counties, the 2020 vs. 2016 turnout was within +/- 3,000 votes. *Id.* at 5.  The two largest outliers are Oakland County (+54,310), Wayne County (+42,166), representing approximately 96,000 net votes for Biden, with the remaining seven outliers counties (Kent, Washtenaw, Ingham, Kalamazoo, Macomb, Ottawa, and Grand Traverse), which collectively represent an additional 95,000 net votes for Biden (or 191,000 in total). *Id.* at 6.

118.    All or nearly all of the "new" votes were due to increased absentee and mail-in votes.  Dr. Young also analyzes the differences in the distributions of election day in-person voting for Trump and Biden and the distribution for each of absentee mail-in votes.  For Trump, the distributions are nearly identical, whereas the Biden distribution "are *very* different" representing "a serious statistical aberration", that when combined with the turnout anomalies "are all statistically improbable relative to the body of the data."  *Id.* at 7.  Dr. Young's analysis indicates that, when the entire State of Michigan is considered, there were likely over 190,000 "excess" and likely fraudulent Biden votes, which once again is significantly larger than Biden's 154,188 margin in Michigan.

**C.    Over 13,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Michigan.**

119.    Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 12,120 Michigan voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.  Mr. Braynard identified 1,170

Exhibit B

Michigan voters in the 2020 General Election who subsequently registered to vote in another state, and were therefore ineligible to vote in the 2020 General Election. When duplicates from the two databases are eliminated, the merged number is 13,248 ineligible voters whose votes must be removed from the total for the 2020 General Election.[7]

**D.** **Physical Impossibility: There Were At Least 289,866 More Ballots Processed in Four Michigan Counties on November 4 Than There Was Processing Capacity.**

120. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit"), which is described in greater detail below, identifies an event that occurred in Michigan on November 4 that is "physically impossible" *See* Ex. 104 at ¶14. The "event" reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb, and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount alone is **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.,* 154,188).

**E.** **Statistical Impossibility: Biden's Vertical "Jump" of 141,257 Votes at 11:31:48 on November 4, 2020.**

121. Finally, Dr. Louis Bouchard analyzes the widely reported anomalous "jump" in Biden's tally, where 141,257 votes for Biden were recorded during a single time interval: 11:31:48 on November 4, 2020. (*See* Ex. 110, Chapter 7). Before the jump Biden was trailing

---

[7] Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his posting as Exhibit 103.

Exhibit B

Trump by a significant amount, and then Biden's vote tally curve went nearly vertical, making

up the difference and surging past Trump nearly instantaneously as shown in the figure in the

upper left below reproduced from Dr. Bouchard's report. (*See id.* at 28).



122.     Both candidates had "jumps" reflecting the addition of new votes, but this Biden

jump was orders of magnitude than any jump received by Trump in the two States analyzed by

Dr. Boucher (i.e., Florida and Michigan), *id*. at 26, and further that the "statistically anomalous

jumps are all in Biden's favor." *Id*. at 27.  The odds of a jump of 141,257 votes "**is statistically**

**impossible; the odds of this happening are 1 in 10²³."** *Id.*  (Dr. Boucher also found even larger

jumps for Biden in Florida on November 4, one for 435,219 votes and another for 367,539 votes.

*Id*.).

Exhibit B

### F.     Additional Anomalies and Impossibilities for Michigan Mail-In Ballots.

123.     Robert Wilgus finds several additional statistical anomalies, and arguably impossibilities, in the mail-in ballot data.  *See* Ex. 110 (Chapter 3, "Exploring Michigan Main-In Ballots Data").  Most notably, Mr. Wilgus analyzed Michigan mail-in data obtained through a FOIA request, and found the following: (1) 224,525 mail-in ballot applications were sent and received on the same date; (2) 288,783 mail-in ballots were sent and returned on the same date; (3) 78,312 applications were sent and received *and* the ballot sent and received *all on the same date*.  *Id.* at 15.  These number do not include **217,271 ballots with no date at all**, *id.* at 14, which likely would have increased the foregoing numbers, and is fully consistent with the numerous affiants above who testified to observing poll workers processing ballots without envelopes, and of poll workers, USPS personnel changing dates on absentee ballots and the other illegal conduct described in Section II.A and II.B above.

124.     Thomas Davis identifies a different anomaly in the absentee mail-in data, namely, that (1) "the *percentage* of Democratic absentee voters exceeds the *percentage* of Republican absentee voters **in every precinct**," and (2) "[e]ven more remarkable – and unbelievable – these two **independent variables appear to track one another.**"  Ex. 110, Chapter 5 at 17 (emphasis in original).  As shown in Mr. Davis's article, the plots of the Democrat percentage of absentee voters in Ingham, Macomb, and Oakland Counties for 2020 are uniformly higher (i.e., with no intersections or lines crossing) than the Republican precinct, and the D-R percentage are nearly always in the range of +25%-30%; for 2016, by contrast, the plots for these three counties look like random walks with the Democrat and Republican line plots frequently crossing back and forth across one another.  *Id.*  at 17-18.  Mr. Davis concludes that these statistical anomalies are "***very* strong evidence that the absentee voting counts in some counties in Michigan have likely been manipulated by a computer algorithm**," and that at some time after the 2016

44

Exhibit B

election, software was installed that programmed tabulating machines "**to shift a percentage of absentee ballot votes from Trump to Biden.**" *Id.* at 19.

## IV.    FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

### A.    Dominion Undetectably Switched Trump Votes to Biden in Antrim County, which Was Only Discoverable Through Manual Recount.

125.    On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump. Antrim County voted 62% in favor of President Trump in 2016. The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were at fault.

126.    However, malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot."   Michigan Manual for Boards of County Canvassers.  These vote tabulator failures are a mechanical malfunction that, under MCL §§ 168.831-168.839, requires a "special election" in the precincts affected.

127.    Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent explanation of how the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[8]

128.    Secretary Benson continued: "After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct

---

[8]   *See* State of Michigan, Department of State Report, *Isolated User Error in Antrim County Does Not Affect Election Results* (November 7, 2020), *available at:* https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf.

Exhibit B

in the county." *Id*.  What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individually tested.

129.     Wayne County used the same Dominion voting system tabulators as did Antrim County, and Wayne County tested only a single one of its vote tabulating machines before the election. The Trump campaign asked Wayne County to have an observer physically present to witness the process. *See* Exhibit 4. Wayne County denied the Trump campaign the opportunity to be physically present.  Representatives of the Trump campaign did have opportunity to watch a portion of the test of a single machine by Zoom video.

**B.     Eyewitness Testimony That Dominion Voting Machines Were Improperly Connected to the Internet and Used Removable Storage Media and Mass File Transfers.**

130.     Affiant Patrick Colbeck was a Michigan State Senator from 2011 through 2018, is an IT specialist and certified Microsoft Small Business specialist, and served as a poll challenger at the TCF Center on November 3-4, 2020.  In that capacity, Mr. Colbeck inquired whether the Dominion voting machines were connected to the Internet, but was repeatedly told "no" by three different election workers.  *See* Ex. 13, Colbeck Nov. 8 aff ¶¶2,3 & 5.  Mr. Colbeck determined that the voting machines were connected to the Internet, based on his visual inspection of the machines, which displayed the Windows "icon that indicates internet connection on each terminal." *Id.* ¶5.  Mr. Colbeck also took a series of pictures attached to his November 8, 2020 testimony showing the cables connecting the machines to the Internet, as well as screenshots from his phone showing that the Electronic Poll Books were also connected wirelessly to the Internet, *id.* ¶¶5-6, and used this data to create a network topology for the Detroit TCF Center Absentee Ballot Voter Counting Board.  *Id*.  The election workers also repeatedly refused to

Exhibit B

answer Mr. Colbeck's questions as to how the "tabulated results were to be transferred to the County and other parties," despite the fact that the Detroit Elections Manual "specified that the tabulated votes would be copied from the adjudicator computers to a series of flash drives," *id.* ¶5, *i.e.,* rather than through Internet connections.

131.    Mr. Colbeck also "witnessed mass file transfer operations on the monitor of a Local Data Center computer operated by [TCF Center] IT Staff, Detroit Election Officials, and Dominion Voting Systems employees." Ex. 14, Colbeck Nov. 20 aff. ¶7.  Based on his experience as an IT professional, Mr. Colbeck "was curious as to what files would need to be transferred in mass as opposed to the serial process of importing results from each tabulator one at a time **as prescribed in the Detroit Elections Manual**."  *Id.*  This question could be answered by event logs from the Dominion voting tabulators.

### C.    The Pattern of Incidents Shows an Absence of Mistake - Always In The Favor Of Biden.

132.    Rules of Evidence, 404(b), applicable to civil matters makes clear that,

> (b) Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. **It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

133.    Tabulator issues and election violations occurred elsewhere in Michigan reflecting a pattern, where multiple incidents occurred.  In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when: "A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes.  They should only have been sent to us as absentee votes," Joe

Exhibit B

Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[9]

134.    The Oakland County flip of votes becomes significant because it reflects a second systems error, wherein both favored the Democrats, and **precinct votes were sent out to be counted,** and they were counted twice as a result until the error was caught on a recount. Precinct votes should never be counted outside of the precinct, and they are required to be sealed in the precinct.  See generally, MCL § 168.726.

### D.    Dominion Voting Machines and Forensic Evidence of Wide-Spread Fraud in Defendant Counties.

135.    The State of Michigan entered into a ten-year contract with Dominion Systems' Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: "dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."[10]

136.    The Michigan Contract with Dominion Voting Systems Democracy packages include language that describes *Safety and Security*, which in part makes the risks of potential breach clear where keys can be lost despite the fact that they provide full access to the unit, and while it is clear that the electronic access provides control to the unit, and the ability to alter results, combined with the lack of observers, creates a lack of security that becomes part of a pattern of the absence of mistake, or fraud:

---

[9]  Bill Laitner, *Fixed Computer Glitch Turns Losing Republican into a Winner in Oakland County,* Detroit Free Press (Nov. 20, 2020), *available at:* https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/.

[10] See Ex. 8, State of Michigan Enterprise Procurement, Dept. of Technology, Management and Budget Contract No. 071B7700117, between State of Michigan and Dominion Voting Systems ("Dominion Michigan Contract").

Exhibit B

The ImageCast tabulators are unlocked by an iButton security key, which is used to:
• Authenticate the software version (ensuring it is a certified version that has not been tampered with)
• Decrypt election files while processing ballots during the election
• Encrypt results files during the election
• Provide access control to the unit
**It is anticipated that the iButton security keys may get lost; therefore, any substitute key created for the same tabulator will allow the unit to work fully.[11]**

137.    As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[12]

### 1.    Antrim County "Glitch" Was Not "Isolated Error" and May Have Affected Other Counties.

138.    The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount.  *See supra* Paragraph 94.  The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials.  This was not done."  Exh. 104, Ramsland Aff. at ¶10.  Mr. Ramsland points out that "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system."  *Id.*  Further, **such a glitch would not be an "isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we**

---

[11]  See Ex. 8, Dominion Michigan Contract at 122.

[12]  See Ex. 9, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Exhibit B

**also observed happening in the data** (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id.*

E. **Anomalies in Dominion's Michigan Results for 2020 General Election Demonstrate Dominion Manipulated Election Results, and that the Number of Illegal Votes Is Nearly Twice As Great as Biden's Purported Margin of Victory.**

139. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit")[13] analyzes anomalies in Dominion's Michigan results for the 2020 election, and flaws in the system architecture more generally, to conclude that Dominion manipulated election results. Dominion's manipulation of election results enabled Defendants to engage in further voting fraud violations above and beyond the litany of violations recited above in Section II.A through Section II.C.

140. Mr. Ramsland's analysis of the raw data, which provides **votes counts, rather than just vote shares, in decimal form** proves that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting" algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[14] Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below. *Id.*

| state | timestamp | eevp | trump | biden | TV | BV |
|---|---|---|---|---|---|---|
| michigan | 2020-11-04T06:54:48Z | 64 | 0.534 | 0.448 | 1925865.66 | 1615707.52 |

---

[13] As detailed in the Ramsland Affidavit and the CV attached thereto, Mr. Ramsland is a member of the management team Allied Security Operations Group, LLC ("ASOG"), a firm specializing in cybersecurity, OSINT and PEN testing of networks for election security and detecting election fraud through tampering with electronic voting systems.

[14] *See id.* (*quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

Exhibit B

| michigan | 2020-11-04T06:56:47Z | 64 | 0.534 | 0.448 | 1930247.664 | 1619383.808 |
| michigan | 2020-11-04T06:58:47Z | 64 | 0.534 | 0.448 | 1931413.386 | 1620361.792 |
| michigan | 2020-11-04T07:00:37Z | 64 | 0.533 | 0.45 | 1941758.975 | 1639383.75 |
| michigan | 2020-11-04T07:01:46Z | 64 | 0.533 | 0.45 | 1945297.562 | 1642371.3 |
| michigan | 2020-11-04T07:03:17Z | 65 | 0.533 | 0.45 | 1948885.185 | 1645400.25 |

141.    Mr. Ramsland further describes how the RCV algorithm can be implemented, and the significance of the use of fractional vote counts, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

> For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes. The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done. Otherwise, votes would be solely represented as whole numbers. Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals. *Id.*

### 2.    Strong Evidence That Dominion Shifted Votes from Trump to Biden.

142.    Another anomaly identified by Mr. Ramsland is the dramatic shift in votes between the two major party candidates as the tabulation of the turnout increased, and more importantly, the change in voting share before and after 2 AM on November 4, 2020, after Wayne County and other Michigan election officials had supposedly halted counting.

> Until the tabulated voter turnout reached approximately 83%, Trump was generally winning between 55% and 60% of every turnout point. **Then, after the counting was closed at 2:00 am, the situation dramatically reversed itself, starting with a series of impossible spikes shortly after counting was supposed to have stopped.** *Id.* at ¶13.

143.    Once again, the means through which Dominion appears to have implemented this scheme is through the use of blank ballots that were all, or nearly all, cast for Biden.

> The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system. A few batches of blank ballots

Exhibit B

could easily produce a reversal this extreme, a reversal that is almost as statistically difficult to explain as is the impossibility of the votes cast to number of voters described in Paragraph 11 above.  *Id.*

144.    Mr Ramsland and his team analyzed the sudden injection  totaling 384,733 ballots in four Michigan counties (Wayne, Oakland, Macomb, and Kent) in a 2 hour 38 minute period in the early morning of November 4 (which would have included the first ballot dump described above in Paragraph 72), and concluded that "**[t]his is an impossibility, given the equipment available at the 4 reference locations (precincts/townships)."**  *Id.* at ¶14.

145.    Specifically, Mr. Ramsland calculated "94,867 ballots as the maximum number of ballots that could be processed" in that time period, and thus that "[t]here were 289,866 more ballots processed in the time available for processing in four precincts/townships, than the capacity of the system allows."  *Id.*  Mr. Ramsland concludes that "[t]he documented existence of the spikes are strongly indicative of a manual adjustment either by the operator of the system (see paragraph 12 above) or an attack by outside actors."  *Id.*  The vote totals added for all Michigan counties, including Wayne, Oakland, Macomb and Kent counties, for the period analyzed by Mr. Ramsland are reproduced in the figure below.

Exhibit B



### 3. The Number of Illegal Votes Attributable to Dominion Is Nearly Twice Biden's Purported Margin in Michigan.

146. Based on his analysis of the red flags and statistical anomalies discussed below,

Mr. Ramsland concludes that:

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded.

Given that Mr. Biden's currently purported margin of victory is approximately 154,000, the

number of illegal votes attributable Dominion's fraudulent and illegal conduct is by itself

(without considering the tens or hundreds of thousands of illegal votes due to the unlawful

conduct described in Section II), is nearly twice Mr. Biden's current purported lead in the State

of Michigan. Thus Mr. Ramsland affidavit alone provides this Court more than sufficient basis

to grant the relief requested herein.

Exhibit B

### F. Additional Independent Findings of Dominion Flaws.

147.    Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1. Central Operator Can Remove, Discard or Manipulate Votes.

148.    Plaintiffs have also learned of the connection between Dominion Voting Systems, Smartmatic and the voting systems used in Venezuela and the Philippines.

    a.  Dominion Voting has also contradicted itself in a rush to denial a pattern of errors that lead to fraud.  For example, Dominion Voting Systems machines can read all of these instruments, including Sharpies. https://www.dominionvoting.com/

    b.  Dominion Voting's Democracy Suite contract with Michigan specifically requires:

*Black Ink: Black ink (or toner) must be dense, opaques, light-fast and permanent, with a measured minimum 1.2 reflection density (log) above the paper base.*  See Ex. 8 ¶2.6.2.

149.    Affiant Ronald Watkins, who is a network & Information cyber-securities expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that  the information about scanned **ballots can be tracked inside the software system**:

    (a)     When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.  (Ex. 106, Watkins aff. ¶11).

150.    Mr. Watkins further explains **that the central operator can remove or discard batches of votes.**  "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the

Exhibit B

option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " *Id.* ¶8.

151.    Mr. Watkins further testifies that the user manual makes clear that the system

allows for threshold settings to be set to find all ballots get marked as "problem ballots" for

discretionary determinations on where the vote goes stating:

> 9.  During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

> 10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

> 11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶9-11.

152.    Mr. Watkins further explains the vulnerabilities in the system when the copy of

the selected ballots that are approved in the Results folder are made to a flash memory card – and

that is connected to a Windows computer stating:

> The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and is very vulnerable to malicious administrators.   Id. ¶13.

### 2.    Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

153.    The Dominion System put in place by its own design violates the intent of Federal

Exhibit B

law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

> **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation
>
> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

154.     A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."[15]

### 3.     Dominion Vulnerabilities to Hacking.

155.     Plaintiffs have since learned that the "glitches" in the Dominion system --

---

[15]  Penn Wharton Public Policy Initiative, University of Pennsylvania, *The Business of Voting: Market Structure and Innovation in the Election Technology Industry* at 16 (2016) ("Penn Wharton 2016 Study"), *available at:* https://trustthevote.org/wp-content/uploads/2017/03/2017-whartonoset_industryreport.pdf.

Exhibit B

that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

156.    Plaintiffs can show, through expert and fact witnesses that:

A.    Massive End User Vulnerabilities.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers are responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder.  Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication.   (Ex. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power.  Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  (*Id.* ¶¶6, 9, 10).

157.    Specific vulnerabilities of the systems in question that have been documented or reported include:

A.    Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens

Exhibit B

up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Ex. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[16] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[17]

F. Dominion acquired Sequoia Voting Systems as well as Premier Election

---

[16] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

[17] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

Exhibit B

Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[18]

158. The expert witness in pending litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on August 24, 2020, (See Ex. 107) wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered

---

[18] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

Exhibit B

an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

1. Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

159. Rather than engaging in an open and transparent process to give credibility to Michigan's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Michigan's Election Code and Federal law.

160. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related

Exhibit B

disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election. (See Ex. 18 at 1, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

161.     An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and got compromised by rogue actors, including foreign interference by Iran and China. (*See* Ex. 105, Spider Declaration (Affiant's name redacted for security reasons)).

162.     The expert finds an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See *Id.*). Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

163.     Another expert, whose name has been redacted, conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election from November 13, 2020 through November 28, 2020. (*See* Ex. 111). He compares results from Dominion Voting Machines to areas with non-Dominion Voting Machines and he finds that Biden out-performs in the areas with Dominion Voting Machines, and after checking for other potential drivers of bias, finds none. *Id.* ¶¶11-12. He finds the difference to be clearly statistically significant. His review includes data included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee and further concludes  that "*the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six*

Exhibit B

*percentage points.*  **Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400.  However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted."**  *Id.* ¶13.

### 4.  Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

164.    Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[19]

165.    Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Ex. 17, Cardozo Aff. ¶8).

### G.  Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.

166.    Dr. Eric Coomer is listed as the co-inventor for several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[20]  He joined Dominion in 2010, and most recently served as Voting Systems

---

[19] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

[20] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents

Exhibit B

Officer of Strategy and Director of Security for Dominion. Upon information and

belief, Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software

Architect and became Vice President of Engineering before Dominion Voting Systems

acquired Sequoia. Dr. Coomer's patented ballot adjudication technology into Dominion

voting machines sold throughout the United States, including those used in Michigan.

167.    In 2016, Dr. Coomer admitted to the State of Illinois that Dominion

Voting machines can be manipulated remotely.[21] He has also publicly posted videos

explaining how Dominion voting machines can be remotely manipulated.[22]

168.    Dr. Coomer has emerged as Dominion's principal defender, both in

litigation alleging that Dominion rigged elections in Georgia and in the media. An

examination of his previous public statements has revealed that Dr. Coomer is a highly

partisan and even more anti-Trump, precisely the opposite of what would expect from

_____

issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014);  (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[21] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[22] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

Exhibit B

the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history).

169.   Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity.  Below are quotes from some of his greatest President Trump and Trump voter hating hits. (*See* Ex. 19).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW!  I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt. *Id.* (July 21, 2016 Facebook post).[23]

170.   In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I know it is going on a lot."  This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post).

171.   Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that

---

[23]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

Exhibit B

underpins the legitimacy of the United States government:

> And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stocking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.]

172. Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post.) Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

173. Affiant and journalist Joseph Oltmann researched an ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

174. By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or***

Exhibit B

*even propriety*.  It appears that Dominion does not even care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch."

175.    In sum, as set forth above, for a host of independent reasons, the Michigan certified election results concluding that Joe Biden received 154,188 more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

176.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

177.    The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

178.    The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v.*

Exhibit B

*Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

179.     Defendants are not part of the Michigan Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Michigan Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.  Defendants are not the legislature, and their unilateral decision to deviate from the requirements of the Michigan Election Code violates the Electors and Elections Clause of the United States Constitution.

180.     Many affiants testified to Defendants' failure to follow the requirements of the Michigan Election Code, as enacted by the Michigan Legislature, MCL §§ 168.730-738, relating to the rights of partisan election challengers to provide transparency and accountability to ensure that all, and only, lawful ballots casts be counted, and that the outcome of the election was honestly and fairly determined by eligible voters casting legal ballots.  As detailed in Section II, many of these requirements were either disregarded altogether or applied in a discriminatory manner to Republican election challengers.  Specifically, election officials violated Michigan's Election Code by: (a) disregarding or violating MCL § 168.730 and § 168.733 requiring election challengers to have meaningful access to observe the counting and processing of ballots, *see supra* Section II.A; (b) wanton and widespread forgery and alteration, addition or removal of votes, voters, or other information from ballots, the QVF or other voting records, *see supra* Section II.B; and (c) illegal double voting, counting ineligible ballots, failure to check signatures or postmarks, and several other practices in clear violation of

Exhibit B

the Michigan Election Code (and in some cases at the express direction of supervisors or Wayne County officials).  *See supra* Section II.C.

181.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.   Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.  Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Michigan should be enjoined from certifying the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

**Governor Whitmer, Secretary Benson and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983**

**Invalid Enactment of Regulations Affecting Observation and Monitoring of the Election & Disparate Implementation of Michigan Election Code**

182.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

183.    The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's).  *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").  The

Exhibit B

Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

184.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

185.    The disparate treatment of Michigan voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Rice v. McAlister, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

186.    In statewide and federal elections conducted in the State of Michigan, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.  Moreover, through its provisions involving watchers and representatives, the Michigan Election Code ensures that all candidates and political parties in each County, including the Trump Campaign,

Exhibit B

have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.,* MCL § 168.730 & § 168.733(1).

187. Further, the Michigan Election Code provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other Counties in Michigan.

188. As set forth in Count I above, Defendants failed to comply with the requirements of the Michigan Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Michigan voters and electors in violation of the United States Constitution guarantee of Equal Protection.

189. Specifically, Defendants denied the Trump Campaign equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Michigan Counties by: (a) denying Republican poll challengers access to the TCF Center or physically removing them or locking them out for pretextual reasons; (b) denied Republican poll watchers meaningful access to, or even physically blocking their view of, ballot handling, processing, or counting; (c) engaged in a systematic pattern of harassment, intimidation, verbal insult, and even physical removal of Republican poll challengers; (d) systematically discriminated against Republican poll watchers and in favor of Democratic poll watchers and activists in enforcing rules (in particular, through abuse of "social distancing" requirements); (e) ignored or refused to record Republican challenges to the violations set forth herein; (f)

Exhibit B

refused to permit Republican poll watchers to observe ballot duplication or to check if duplication was accurate; (g) unlawfully coached voters to vote for Biden and other democratic candidates, including at voting stations; and (h) colluded with other Michigan State, Wayne County and City of Detroit employees (including police) and Democratic poll watchers and activists to engage in the foregoing violations. *See generally supra* Section II.A.

190. Defendants further violated Michigan voters' rights to equal protection insofar as it allowed Wayne County and City of Detroit election workers to process and count ballots in a manner that allowed ineligible ballots to be counted, including: (a) fraudulently adding tens of thousands of new ballots and/or new voters to the QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden; (b) systematically forging voter information and fraudulently adding new voters to the QVF (in particular, where a voter's name could not be found, assigning the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900); (c) fraudulently changing dates on absentee ballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline; (d) changing votes for Trump and other Republican candidates; (e) adding votes to "undervote" ballots and removing votes from "Over-Votes"; (f) permitting illegal double voting by persons that had voted by absentee ballot and in person; (g) counting ineligible ballots – and in many cases – multiple times; (h) counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants; (i) counting "spoiled" ballots; (j) systematic violations of ballot secrecy

Exhibit B

requirements; (k) accepting unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline; (l) accepting and counting ballots from deceased voters; and (m) accepting and counting ballots collected from unattended remote drop boxes. *See generally infra* Section II.B. and II.C.

191.    Plaintiffs have obtained direct eyewitness testimony confirming that certain of these unlawful practices were at the express direction of Wayne County election officials.  With respect to (a) and (b), Affiant Cushman testified that election supervisor Miller informed him that the Wayne County Clerk's office had expressly instructed them to manually to enter thousands of ballots arriving around 9 PM on November 4, 2020, from voters not in the QVF, and to manually enter these unregistered voters in the QVF with the birthdate of 1/1/1900.  Ex. 4, GLJC Complaint, Ex. D ¶¶ 14-17.  With respect to (c), fraudulently back-dating absentee ballots, City of Detroit election worker Affiant Jacob affirmed that she was instructed by supervisors to "improperly pre-date the absentee ballots receive date … to falsely show that absentee ballots had been received in time to be valid." *Id*. Ex. B ¶17.  With respect to (h) (accepting ballots without signatures or postmarks), affiants testified that election workers did so at the express direction of Wayne County election officials. *See id*. ¶15.

192.    Other Michigan county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards without the restrictions and discriminatory treatment outline above.

Exhibit B

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

193.    Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Michigan Constitution, and the Michigan Election Code.

194.    Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that the Michigan Counties allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

195.    In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Michigan Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

196.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.

Exhibit B

Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Michigan law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

197.     In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the Wayne County and other Michigan Election Boards to invalidate ballots cast by: (1) any voter added to the QVF after the 8:00 PM Election Day deadline; (3) any absentee or mail-in ballot received without a signature or postmark; (4) any ballot cast by a voter who submitted a mail-in ballot and voted in person; (5) any ballot cast by a voter not in the QVF that was assigned the name of a voter in the QVF; (6) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; and (7) all "dead votes". *See generally supra* Section II.A-II.C.

## COUNT III

**Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983**

**Denial of Due Process On The Right to Vote**

198.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

199.     The right of qualified citizens to vote in a state election involving federal

Exhibit B

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

200. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

201. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

Exhibit B

202. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

203. The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

204. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

205. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth

Exhibit B

Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

206. Section II of this Complaint and the exhibits attached hereto describe widespread and systematic violations of the Due Process Clause described, namely: (A) Section II.A, Republican poll challengers were denied the opportunity to meaningfully observe the processing and counting of ballots; (B) Section II.B, election workers forged, added, removed or otherwise altered information on ballots, the QFV and other voting records; and (C) Section II.C, several other Michigan Election Code violations that caused or facilitated the counting of tens of thousands of ineligible, illegal or duplicate ballots.

207. Plaintiffs seek declaratory and injunctive relief requiring that Secretary Benson and Wayne County are enjoined from certifying the results of the General Election, or in the alternative, conduct a recount or recanvass in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Board of State Canvassers and the Michigan county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

Exhibit B

## COUNT IV

**Wide-Spread Ballot Fraud**

**Violations of Michigan Election Code (MCL §§ 168.730-738) &**

**Michigan Constitution, Art. II § 4**

208.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

209.     Plaintiffs contest the results of Michigan's 2020 General Election.  In 2018, the voters of Michigan enacted an amendment to Article II of the Michigan Constitution that conferred a number of rights on Michigan voters, and empowered the Michigan Legislature, to "enact laws … to preserve the purity of elections, … [and] to guard against abuses of the elective franchise …." Mich. Const. Art. II § 4(2).  Standing conferred under the Michigan Constitution, Art. II § 4(1), which provides that "[e]very citizen of the United States who is an elector qualified to vote in Michigan shall have the right," among other things, "to have the results of statewide elections audited, …, to ensure the accuracy and integrity of elections."

210.     Various provisions of the Michigan Election Code also give any citizen the right to bring an election challenge within 30 days of an election where, as here, it appears that a material fraud or error has been committed.  *See, e.g., Hamlin v. Saugatuck Twp.*, 299 Mich. App. 233, 240-241 (2013) (*citing Barrow v. Detroit Mayor*, 290 Mich. App. 530 (2010)); MCL § 168.31a (setting forth election audit requirements); MCL § 168.861 (*quo warranto* remedy for fraudulent or illegal voting).

211.     This Complaint has provided evidence from dozens of eyewitnesses who have detailed dozens of separate violations of the Michigan Election Code by election workers, acting in concert with government employees and Democratic operatives and activists, *see generally* Section II; reinforced by several expert witnesses, each testifying regarding distinct types statistical anomalies that, whether considered in isolation or in

Exhibit B

combination with others, affect a sufficient number of ballots to affect the result of the election, *see generally* Section III; and combined fact and expert testimony regarding Dominion showing that Dominion, whether acting alone or in concert with domestic or foreign actors had the means, motive and opportunity to fraudulently manipulate votes and change the election results.  *See generally* Section IV.

212.    Plaintiffs are not, however, the only ones expressing grave concerns regarding the propriety of the 2020 General Election.  In a concurring opinion issued just a few days ago in *Costantino v. City of Detroit*, 2020 WL 6882586 (Mich. Nov. 23, 2020), Justice Zahra of the Supreme Court of Michigan, in denying as moot a request to enjoin certification by Wayne County (but not the audit or other requested relief), stated that "Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by affiants …, among whom is Ruth Johnson, Michigan's immediate past Secretary of State."  *Id.* at *2 (Zahra, J., concurring).

213.    As here, plaintiffs in *Costantino*, presented "evidence to substantiate their allegations, which include claims of ballots being counted from voters whose names were not contained in the appropriate poll books, instructions being given to disobey election laws and regulations," and several other categories of violations that overlap with those alleged in this Complaint and in affiants' testimony. *Id.*  This opinion further urged the trial court to schedule evidentiary hearing on an expedited basis.  *Id.*

**Violation of MCL 168.765a.**

214.    Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

215.    Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically disallowed election inspectors from the

Exhibit B

Republican Party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican Party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were cast. *See generally supra* Section II.A.

216.    Defendants refused entry to official election inspectors from the Republican Party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots.  Defendants even physically blocked and obstructed election inspectors from the Republican Party, including Plaintiff, by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

**Violation of MCL 168.733**

217.    MCL 168.733 sets forth the procedures for election challengers and the powers of election inspectors.

218.    Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud. *See generally supra* Section II.A.

219.    Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee

Exhibit B

ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

**Violation of MCL 168.765(5) and 168.764a**

220.    Michigan election law, MCL 168.765(5), requires Defendants to post the specific absentee voting information anytime an election is conducted which involves a state or federal office, in particular, the number of absentee ballots distributed to absent voters.

221.    Upon information and belief, Defendants failed to post by 8:00 AM on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 PM the number of absent voters returned before on Election Day.

222.    Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8 PM. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

223.    Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

224.    Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol. *See generally supra* Section II.B.1.

**Violation of MCL 168.730**

225.    MCL 168.730 sets forth the rights and requirements for election challengers. MCL 168.734 provides, among other things:

> Any officer or election board who shall prevent the presence of any such

Exhibit B

challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

226. Wayne County's and Secretary Benson's denial of Republican challengers' right to participate and observe the processing of ballots violates Michigan's Election Code and resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

227. Further, Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734 by denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process.

228. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

Exhibit B

**PRAYER FOR RELIEF**

229.    Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

230.    Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

231.    In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of this Complaint.

232.    Order production of all registration data, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Michigan and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Michigan cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election.

Alternatively, the electors for the State of Michigan should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Michigan should be directed to vote for President Donald Trump.

233.    For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Secretary Benson, Governor Whitmer, the Board of State Canvassers and Wayne County to de-certify the election results;

2. An order enjoining Secretary Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College;

3. An order requiring Governor Whitmer to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate order to impound all the voting machines and software in Michigan for expert inspection by the Plaintiffs.

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6. A declaratory judgment declaring that Michigan's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7. A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

Exhibit B

8.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.  An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by Plaintiffs' experts;

10. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

11. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

12. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3 and November 4.

13. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 29th day of November, 2020.

Exhibit B

/s/ Sidney Powell*
Sidney Powell PC

Texas Bar No. 16209700

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl
Michigan State Bar No. P39185
41850 West 11 Mile Road, Ste 110
Novi, Michigan 48375
(248) 380-9404
gregoryrohl@yahoo.com

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit B

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES DAVID
HOOPER and DAREN WADE RUBINGH,

      **Plaintiffs**

v.

GRETCHEN WHITMER, in her official capacity
as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, the Michigan
BOARD OF STATE CANVASSERS,

      **Defendants.**

**CASE NO.  20-cv-13134**

## PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF

COMES NOW Plaintiffs, Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, by and through their undersigned counsel, and file this Emergency Motion for Injunctive Relief and Memorandum of Law In Support Thereof, respectfully requesting the relief for the following reasons:

### FACTS

The facts relevant to this motion are set forth in the November 29, 2020 amended complaint ("Complaint") filed in the above-captioned proceeding, and its accompanying exhibits, filed concurrently with this motion, all of which are respectfully incorporated herein by reference.  We present only a summary.

1

Exhibit C

After a general election and recount, Joe Biden has been declared the winner of Michigan's General Election for President by a plurality of 154,188 votes. But the vote count certified by defendants on November 23, 2020, is defective. Hundreds of thousands of votes counted toward Mr. Biden's final tally were the product of illegality, fraud and misappropriation. Plaintiffs support this claim in two independent ways.

### i. Counting and/or Creating Fraudulent Ballots

First, as set forth in the affidavit of Russell Ramsland, Jr. (Compl., Ex. 104), at least 289,866 (and likely many more) ballots were fraudulent.

> Something occurred in Michigan that is physically impossible, indicating that the results were manipulated on election night … The event as reflected in the data are the 4 spikes totaling 384,733 ballots allegedly processed in a combined interval of only two hour[s] and 38 minutes. This is physically impossible given the equipment available at the 4 referenced locations (precincts/townships). …. This calculation yields a sum of 94,867 ballots at the maximum number of ballots that could be processed. … [T]here were 289,866 more ballots processed in the time available for processing in four precincts/townships than there was processing capacity. *Id.* ¶14.

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded. *Id.* ¶15.

These fraudulent ballots alone are nearly twice Biden's purported margin of 154,188 ballots.

Separately, evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiffs' expert, Williams M. Briggs, PhD (Compl., Exh. 101), shows, based on a statistically significant sample of 248 Michigan voters, two separate types of error indicative of widespread absentee ballot fraud. Dr. Briggs first estimates that 29,611 to 36,529 ballots were recorded for voters who had not requested them, and second, that 27,928 to 34,710 ballots were recorded for voters who did return their ballots were recorded as being unreturned (*i.e.,* lost or destroyed). *Id.* Taking the average of the two types or errors

Exhibit C

together, Dr. Briggs estimates that 62,517, or 45% of total "unreturned" ballots, are "troublesome" and thus indicative fraud or other illegal conduct. *Id.* Mr. Braynard separately analyzed data from the National Change of Address ("NCOA") data base to identify Michigan voters that had moved out of state, as well as Michigan voters who had registered to vote in another State, before the Michigan election, and identified at least 13,248 out-of-state voters who voted in the Michigan 2020 General Election. *Id.* at 1.

Third, Eric Quinell, Ph.D. (Compl., Ex. 102) analyzed the statistically anomalous voting patterns in Wayne County (outside Detroit) and Oakland County – where there was both an extraordinary turnout surge from 2016 to 2020 and nearly 100% or even more of the "new" 2020 voters voted for Biden – resulting in a 15-point swing in the Democrat vs. Republican two-way vote shares (*i.e.*, shifting from 55/45 in 2016 to 70/30 in 2020 for Wayne County (outside Detroit) and 54/46 in 2016 to 72/28 in 2020 for Oakland County). *Id.* ¶¶ 18&20. Dr. Quinell estimates that there were 40,771 "excess" and likely fraudulent votes in Wayne County (outside Detroit) and 46,125 such votes for Oakland County, for a total of 86,896 fraudulent votes in these two counties. *Id.* ¶5.[1] Taken together, the ineligible or illegal ballots identified Dr. Briggs, Dr. Quinell and Mr. Braynard total 162,661 ballots, which is once again in excess of Biden's 154,188 vote plurality in Michigan, and provides a separate and independent ground from the Ramsland Affidavit to set aside the results of 2020 General Election in Michigan.

---

[1] A report from Dr. Stanley Young (Compl. Ex. 110, Chapter 1) reviewed data from the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat), reinforcing Dr. Quinell's analysis and showing that "excess" and likely fraudulent votes from these counties would alone be sufficient to overcome Biden's margin.

Exhibit C

Fourth, a report from Robert Wilgus (*see* Compl., Ex. 110, Chapter 3) analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date at all. *Id.* at 14-15. No explanation has been provided for how more than two hundred thousand each of applications and ballots could make the roundtrip of being sent to a voter and then returned (i.e., received by Michigan agency) on the same day, much less the nearly 80,000 that made two roundtrips on the same day, and it is hard to conceive of an innocent explanation for how 200,000+ ballots could have no return date at all.

### ii. Foreign Interference and Hacking in Michigan

In addition, the Complaint includes an analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. (*See* Compl., Ex.105). By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.

Another expert, whose name and testimony have been redacted to protect his safety, reviewed vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee and found significant

Exhibit C

evidence of foreign interference and "several 'red flags' concerning the percentage of votes won by candidate Biden in counties using … Dominion Voting Systems." (*See* Compl., Ex. 111 ¶6). Affiant concludes that:

> [T]he results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points. **Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted.** *Id.* ¶13.

In addition, the Federal Bureau of Investigation ("FBI") and the Cybersecurity and Infrastructure Security Agency ("CISA") issued a joint advisory statement on October 30, 2020, warning states of Iranian cyberattacks and interference targeting state election websites and infrastructure. (*See* Compl. Ex. 8 at 1).

The substantial likelihood that hostile foreign governments, with or without active collusion or collaboration with the Defendants, is a separate and independent ground to grant the declaratory and injunctive relief requested in the Complaint and this Motion.

### iii.    Ballot Stuffing and Other Michigan Election Code Violations

The election process for the State of Michigan depended heavily on voting machines, tabulators and software purchased from Dominion Voting Systems Corporation. ("Dominion"), and more or less exclusively in key counties like Wayne County. Computerized vote recording and tabulations are controlled by software programs that were designed to cheat, and which were open to human manipulation.  In 2020, ballot stuffing is not simply counting votes of dead people, illegal aliens or out of state residents – all of which occurred here.  *See generally* Compl., Section II.

Exhibit C

Manipulation of votes was apparent shortly after the polls closed on November 3, 2020.  In particular, several witnesses testified to the delivery, in unmarked vans with out-of-state license plates, to the TCF Center of two shipments of tens of thousands each of "new" ballots that arrived on November 4, 2020, well after the 8:00 PM Election Day deadline.  *See* Compl., Section II.B.1.  Election workers, in collaboration with Michigan State, Wayne County, and City of Detroit employees and Democratic election challengers and activists, engaged in a pattern of illegal conduct to systematically deny Republic election challengers the opportunity to meaningfully supervise or observe ballot handling, counting and processing.  *See* Compl., Section II.A. Without supervision or challengers, election officials could have processed tens or hundreds of thousands of illegal votes from these shipments and other forged, altered, duplicated, or outrighted fabricated votes.  They could also have processed thousands of illegal mail-in ballots that were cast by third-parties, deceased voters, unregistered or out-of-state voters, blank ballots that were counted over and over, and/or double votes from people voting both absentee and in-person.  *See* Compl., Section II.B and II.C.

With only 154,188 votes separating the candidates out of a total of 5,539,302 cast, this pattern of systematic and widespread violations of the Michigan Election Code by election workers to illegally count ineligible, illegal, duplicate or outright fictitious votes is more than sufficient to invalidate the final results.  In the Complaint, Plaintiffs identified dozens of distinct violations of the Michigan Election Code in a single county, all supported by sworn testimony, *see* Compl. Section II.  *See generally* Compl., Section II.  While it may not be possible to precisely quantify the number of illegal votes, the testimony indicates that it was certainly in the tens of thousands (if not hundreds of thousands), *see, e.g.,* Compl., Section

Exhibit C

II.B.1, it is not necessary for Plaintiffs to do so; instead, they merely need to show that "it appears that the irregularity affected the result." *Behrendt v. Wilcox*, 277 Mich. 232, 246 (Mich. 1936) (affirming set aside of election upon showing of numerous irregularities). *Accord Attorney General ex rel. McCall v. Kirby,* 120 Mich. 592, 595 (Mich. 1899) (setting aside election results where election law requirements were "wholly ignored … notwithstanding where everything was done in good faith"); *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) "[p]laintiffs need not show how the [] voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result."). Unless Defendants are enjoined from certifying the election, Plaintiff will be left with no remedy because Michigan's electoral votes for President will not be awarded to the proper candidate.

## DISCUSSION

### Plaintiffs Have Standing

Each of Plaintiffs Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh are registered Michigan voters and are nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan. *See* Compl., "Parties". As such, they each have standing under the 2018 amendments to Article II of the Michigan Constitution, which provides that "[e]very citizen of the United States who is an elector qualified to vote in Michigan shall have the right," among other things, "to have the results of statewide elections audited, …, to ensure the accuracy and integrity of elections." Mich. Const. 1963, art. 2, §4(1)(h). Various provisions of the Michigan Election Code also give any citizen the right to bring an election challenge within 30 days of an election where, as here, it appears that a material fraud or error has been committed.

Exhibit C

*See, e.g., Hamlin v. Saugatuck Twp.*, 299 Mich. App. 233, 240-241 (2013) (*citing Barrow v. Detroit Mayor*, 290 Mich. App. 530 (2010)); MCL § 168.31a (setting forth election audit requirements); MCL § 168.861 (*quo warranto* remedy for fraudulent or illegal voting). In addition, each Plaintiff has standing to bring this action as a candidate for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors), because Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

### Plaintiffs are Entitled to Injunctive Relief

"To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv) whether the public interest would be served by the issuance of the injunction." *Stein v. Thomas*, 222 F.Supp.3d 539, 542 (E.D. Mich. 2016) (*citing Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002)); *see also City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

All elements are met here.

8

Exhibit C

While the U.S. Constitution itself accords no right to vote for presidential electors, "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added). The evidence shows not only that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Defendants committed a scheme and artifice to fraudulently and illegally manipulate the vote count to make certain the election of Joe Biden as President of the United States. Compl., Section I. This conduct violated Plaintiffs' equal protection and due process rights as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

The Michigan Court of Appeals has held that, in a civil action to vindicate Plaintiffs' right "to seek office in a fair election" the burden of proof is a "preponderance of the evidence". *Treasurer of the Committee to Elect Gerald D. Lostracco v. Fox*, 150 Mich.App. 617, 623 (Mich.App. 1986).

### i. Plaintiffs have a substantial likelihood of success.

Through detailed fact and expert testimony including documentary evidence contained in the Complaint and its exhibits, Plaintiffs have made a compelling showing that Defendants' intentional actions jeopardized the rights of Michigan citizens to select their leaders under the process set out by the Michigan Legislature through the commission of election frauds that violated Michigan laws, including multiple provisions of the Michigan Election Code. MCL

Exhibit C

§§ 168.730-738.  These acts also violated the Equal Protection Clause in the United States

Constitution, U.S. Const. Amend XIV.

The tally of ballots certified by Defendants giving Mr. Biden a 154,188 vote plurality

cannot possibly stand in light of the hundreds of thousands of illegal mail-in ballots that were

improperly counted and the vote manipulation caused by the Dominion software.

Plaintiffs' equal protection claim is straightforward.  The right of qualified citizens to

vote in a state election involving federal candidates is recognized as a fundamental right under

the Fourteenth Amendment of the United States Constitution.  *Harper v. Va. State Bd. of*

*Elections*, 383 U.S. 663, 665 (1966).  *See also Reynolds v. Sims,* 377 U.S. 533, 554 (1964) (The

Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as

in federal elections.").   Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the

United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth

Amendment protects certain rights of federal citizenship from state interference, including the

right of citizens to directly elect members of Congress.  *See Twining v. New Jersey*, 211 U.S. 78,

97 (1908) (citing Ex parte Yarbrough, 110 U.S. 651, 663-64 (1884)).  *See also Oregon v.*

*Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our

nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at

562; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463,476 (6th Cir. 2008)

("The right to vote is a fundamental right, preservative of all rights."). Voters have a

"right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v.*

*Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes

Exhibit C

is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974); *see also Baker v. Carr,* 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). States may not, by arbitrary action or

11

Exhibit C

other unreasonable impairment, burden a citizen's right to vote.  *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution").  "Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.  Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment of voters." *Id*. at 106-07; *see also Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972) (providing that each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction").

Additionally, as U.S. citizens qualified to vote in Michigan and as candidates for the electoral office of Presidential Elector, MCL §§ 168.42 & 168.43, Plaintiffs seeks redress under the Michigan Election Code and the Michigan Constitution, to vindicate their constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

The Mich. Const. 1963, art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

The Eleventh Circuit recently addressed a claim in 2018 related to the same Dominion software used in Michigan in the 2020 General Election.  The Court found:

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that

12

Exhibit C

the Secretary's failure to properly maintain a reliable and secure voter registration
system has and will continue to result in the infringement of the rights of the voters
to cast their vote and have their votes counted.

*Common Cause Georgia v. Kemp*, 347 F.Supp.3d 1270, 1294-1295, (11th Cir. 2018).

Based upon all the allegations of fraud, statutory violations, and other misconduct, as

stated herein and in the attached affidavits, it is necessary to enjoin the certification of the

election results, and grant the declaratory, emergency and permanent injunctive relief requested

herein and in the Complaint, pending a full investigation and court hearing, and to order an

independent audit of the November 3, 2020 General Election to ensure the accuracy and integrity

of the election.

### ii.     The Plaintiffs will suffer Irreparable Harm

Plaintiffs will suffer an irreparable harm due to the Defendants' myriad violations of

Plaintiffs' rights under the U.S. and Michigan Constitutions detailed in the Complaint, in

particular, Plaintiffs' fundamental right to vote, equal protection of the laws, due process, and

their specific rights as candidates to electoral office.

When Constitutional rights are threatened or impaired, irreparable injury is
presumed.  A restriction on the fundamental right to vote therefore constitutes an
irreparable injury.

*Obama for America vs. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted).  *See also*

*Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.,* 354 F.3d 438, 445 (6th Cir. 2003)

*aff'd sub nom., McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005)

(where a plaintiff's constitutional rights are at issue, the movant need only show that his rights

are "threatened," from which showing "a finding of irreparable injury is mandated.").

The Michigan count was defective, including defective absentee ballots and out of state

voters, then Michigan's election results are improper and suspect, resulting in Michigan's

electoral college votes going to Democrats, including Joseph R. Biden, contrary to the votes of

Exhibit C

the majority of Michigan's qualified electors.  Plaintiffs will directly be impacted by their roles in the voting for the Presidential election as Electors to the Michigan Legislature.

### iii.    The Balance of Equities

The third fact, whether "the balance of the equities tips in his favor," *Husted*, 697 F.3d at 428 (*quoting Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)), also favors granting the instant motion for injunctive relief.   In balancing the equities, a court considering an election challenge  "must weigh the character and magnitude of the asserted injury" to the constitutional rights that the plaintiff seeks to protect "against 'the precise interests put forward by the State as justifications for the burdens imposed by its rule … .'" *Stein*, 222 F.Supp.3d at 543 (*quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  Here, the balance must tip into Plaintiffs' favor, as the State has presented no justification for its lawless behavior and wanton disregard of the Michigan Election Code.  The only justification Defendants can put forward, were they to say the silent part out loud, is that imperative of ensuring a Biden victory overrides any constraints imposed by the Michigan Election Code.

### iv.    The Public Interest

Finally, the public interest would be served by the grant of the temporary relief requested herein.

> The fundamental right invoked by Plaintiffs—the right to vote, and to have that vote conducted fairly and counted accurately—is the bedrock of our Nation.  Without elections that are conducted fairly—and perceived to be fairly conducted—public confidence in our political institutions will swiftly erode.

*Stein*, 222 F.Supp.3d at 544.  This Court granted the temporary relief requested by Ms. Stein in 2016, despite the fact that the vote margin separating her and President Trump was an order of

Exhibit C

magnitude larger than Biden's margin,[2] her evidence of violations was minimal to non-existent (compared with the two dozen plus violations identified in sworn eyewitness testimony in Section II of the Complaint), and the Michigan election workers in key areas like Wayne County for the 2016 election were much more hostile to President Trump than they ever were to Jill Stein. Accordingly, if this Court found that temporary relief for Jill Stein in 2016 was in the public interest, then it must reach the same conclusion for Plaintiffs given that Trump (unlike Stein) has a realistic chance of winning and Plaintiffs have arguably presented more evidence of more kinds of election fraud than has ever been included in an election challenge to a court in a Michigan (or the United States for that matter). This conclusion is further supported by the 2018 enactment of the amendments to Article II of the Michigan Constitution, which are intended, among other things "to preserve the purity of elections, … [and] to guard against abuses of the electoral franchise …. ." Mich. Const. 1963, art. 4, §2.

### **Plaintiffs Are Entitled to Emergency Injunctive Relief Prior to December 8, 2020**

Under *Bush v. Gore*, 531 U.S. 98 (2000), Plaintiffs are entitled to emergency injunctive relief that must be granted in advance of December 8, 2020, which is the "safe harbor" date for States to submit their slates of electors under 3 U.S.C. § 5. There, the Supreme Court granting an emergency application for stay of Florida recount because there was "no recount procedure in place … that comports with minimal constitutional safeguards," and any recount procedure that could meet constitutional requirements could not be completed by the 3 U.S.C. §5 safe harbor date. Accordingly,

---

[2] In 2016, Jill Stein received 51,463 votes (or slightly over one percent), while the winner she challenged, current President Trump, received 2,279,543 votes and nearly 50 percent of the vote. In 2020, the current margin between President Trump and Biden is 154,188 votes, based on the November 23, 2020 certification, which has not disqualified any of the illegal or ineligible votes discussed in the Complaint.

Exhibit C

this Court must schedule and complete any required hearings, briefings and responses in time to issue a decision before December 8, 2020.

**Relief Requested**

Plaintiffs seek a de-certification of Michigan's election results or a stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds, as well as seeking the impounding of the voting machines made available and other equitable relief, on an emergency basis, due to the irreparable harm, and impending election voting for the electors, as stated in the Complaint. The low costs to Defendants and high potential harm to Plaintiffs make this a case with a substantial net harm that an immediate and emergency injunctive relief can prevent. Therefore, it is respectfully requested that the Court grant Plaintiffs' Motion. A proposed form of Order is attached.


Respectfully submitted, this 29th day of November 2020.

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
forthcoming

*Attorneys for Plaintiffs*

/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee

16

Exhibit C

Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day e-filed the foregoing Plaintiffs' Motion for

Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof

using the CM/ECF system, and that I have delivered the filing to the Defendants by email and

FedEx at the following addresses:

This 29th day of November, 2020.

       Governor Gretchen Whitmer
       P.O. Box 30013
       Lansing, Michigan 48909
       info@gretchenwhitmer.com

       Secretary of State Jocelyn Benson
       Bureau of Elections
       Richard H. Austin Building, 4th Floor
       430 W. Allegan
       Lansing, Michigan 48918
       Elections@Michigan.gov

       Board of State Canvassers
       Bureau of Elections
       Richard H. Austin Building, 1st Floor
       430 W. Allegan
       Lansing, Michigan 48918
       Elections@Michigan.gov

/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

Exhibit C

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com


Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

          Plaintiffs,

v.                                    Civil Case No. 20-13134
                                    Honorable Linda V. Parker

GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

          Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

          Intervenor-Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)

       The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans.  The struggle to achieve the right to vote is

1

Exhibit D

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.    Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

Exhibit D

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id*.)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

December 8, 2020.  Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday.  (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan.  (ECF No. 6 at Pg ID 882.)  They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8).  In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

Exhibit D

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id*.)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.) Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

Exhibit D

In light of the limited time allotted for the Court to resolve Plaintiffs'
emergency motion for injunctive relief—which Plaintiffs assert "must be granted
in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has
disposed of oral argument with respect to their motion pursuant to Eastern District
of Michigan Local Rule 7.1(f).[1]

## II.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be
awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.
Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  The plaintiff
bears the burden of demonstrating entitlement to preliminary injunctive relief.
*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be
granted where "the movant carries his or her burden of proving that the
circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty.
Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Evidence that goes beyond the
unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not
material to the preliminary injunction sought, district courts generally need not
hold an evidentiary hearing.'"  *Nexus Gas Transmission, LLC v. City of Green,
Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration
Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007))
(citation omitted).

6

Exhibit D

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane, Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive relief: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'"  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.   Discussion

The Court begins by discussing those questions that go to matters of subject matter jurisdiction or which counsel against reaching the merits of Plaintiffs' claims.  While the Court finds that any of these issues, alone, indicate that Plaintiffs' motion should be denied, it addresses each to be thorough.

Exhibit D

## A.   Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI.  This immunity extends to suits brought by citizens against their own states.  *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)).  It also extends to suits against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in fact a suit against the State and is barred "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted). "'The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Id.* at 101 n.11 (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

8

Exhibit D

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "The State of Michigan has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers. *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004). Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908). But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

9

> limitation on a federal court's federal-question
> jurisdiction. The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading. Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997). Further, "the theory of *Young* has not been provided an expansive interpretation." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 102. "'In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

    *Ex parte Young* does not apply, however, to *state law* claims against state officials, regardless of the relief sought. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

10

Exhibit D

in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against Defendants. Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law. (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the Michigan Election Code.") Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive." (ECF No. 31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not apply. As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.'"

11

Exhibit D

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id*. at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights). Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2] (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist. (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin. *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

12

Exhibit D

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

## B.    Mootness

This case represents well the phrase: "this ship has sailed." The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court. For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'" *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted). Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]" *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019). This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

13

Exhibit D

Whitmer from transmitting the certified election results to the Electoral College;

(c) order Defendants "to transmit certified election results that state that President

Donald Trump is the winner of the election"; (d) impound all voting machines and

software in Michigan for expert inspection; (e) order that no votes received or

tabulated by machines not certified as required by federal and state law be counted;

and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be

remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg

ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer

available.

Before this lawsuit was filed, all 83 counties in Michigan had finished

canvassing their results for all elections and reported their results for state office

races to the Secretary of State and the Michigan Board of State Canvassers in

accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State

Board had certified the results of the 2020 General Election and Governor

Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines
and software in Michigan for expert inspection and the production of security
camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID
956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining
requests are no longer available.  In other words, the evidence Plaintiffs seek to
gather by inspecting voting machines and software and security camera footage
only would be useful if an avenue remained open for them to challenge the election
results.

Exhibit D

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.)  The time for requesting a special election based on mechanical errors or malfunctions in voting machines had expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for special election based on a defect or mechanical malfunction must be filed "no later than 10 days after the date of the election").  And so had the time for requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so.  Plaintiffs did not avail themselves of the remedies established by the Michigan legislature.  The deadline for them to do so has passed.  Any avenue for this Court to provide meaningful relief has been foreclosed.  As the Eleventh Circuit Court of Appeals recently observed in one of the many other post-election lawsuits brought to specifically overturn the results of the 2020 presidential election:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified.
> *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015).
> And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020).

And as one Justice of the Supreme Court of Pennsylvania advised in another 2020 post-election lawsuit: "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to

Exhibit D

the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is moot.

### C.    Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits because they waited too long to knock on the Court's door.  (ECF No. 31 at Pg ID 2175-79; ECF No. 39 at Pg ID 2844.)  The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) ("A constitutional claim can become time-barred just as any other claim can.").  An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay.  *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

16

Exhibit D

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a right to the detriment of another party."). Courts apply laches in election cases. *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding that the district court did not err in finding plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar. They filed the instant action on November 25—more than 21 days after the 2020 General Election—and served it on Defendants some five days later on December 1. (ECF Nos. 1, 21.) If Plaintiffs had legitimate claims regarding whether the treatment of election challengers complied with state law, they could have brought their claims well in advance of or on Election Day—but they did not. Michigan's 83 Boards of County Canvassers finished canvassing by no later than November 17 and, on November 23, both the Michigan Board of State Canvassers and Governor Whitmer certified the election results. Mich. Comp. Laws §§ 168.822, 168.842.0. If Plaintiffs had legitimate claims regarding the manner by which

Exhibit D

ballots were processed and tabulated on or after Election Day, they could have brought the instant action on Election Day or during the weeks of canvassing that followed—yet they did not. Plaintiffs base the claims related to election machines and software on "expert and fact witness" reports discussing "glitches" and other alleged vulnerabilities that occurred as far back as 2010. (*See e.g.,* ECF No. 6 at Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.) If Plaintiffs had legitimate concerns about the election machines and software, they could have filed this lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to file this suit. Plaintiffs concede that they "would have preferred to file sooner, but [] needed some time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint." (ECF No. 49 at Pg ID 3081.) But according to Plaintiffs themselves, "[m]anipulation of votes was apparent *shortly after the polls closed on November 3, 2020*." (ECF No. 7 at Pg ID 1837 (emphasis added).) Indeed, where there is no reasonable explanation, there can be no true justification. *See Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a stay of an election-related injunction is plaintiff offering "no reasonable explanation for waiting so long to file this action"). Defendants satisfy the first element of their laches defense.

18

Second, Plaintiffs' delay prejudices Defendants. *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak. *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

Exhibit D

### D.  Abstention

As outlined in several filings, when the present lawsuit was filed on November 25, 2020, there already were multiple lawsuits pending in Michigan state courts raising the same or similar claims alleged in Plaintiffs' Amended Complaint.  (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court lawsuits challenging President Trump's defeat in Michigan's November 3, 2020 General Election).)  Defendants and the City of Detroit urge the Court to abstain from deciding Plaintiffs' claims in deference to those proceedings under various abstention doctrines.  (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.) Defendants rely on the abstention doctrine outlined by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The City of Detroit relies on the abstention doctrines outlined in *Colorado River*, as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  The City of Detroit maintains that abstention is particularly appropriate when resolving election disputes in light of the autonomy provided to state courts to initially settle such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings.  *Colorado River*, 424 U.S. at 813, 817.  The exception is found

20

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel. *Id*. at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

21

Exhibit D

31-14), the allegations and claims in the state court proceedings and the pending

matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact

parallelism is not required; it is enough if the two proceedings are substantially

similar." (internal quotation marks and citation omitted)).  A careful balancing of

the factors set forth by the Supreme Court counsel in favor of deferring to the

concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention.  *Id.* (indicating that the

weight is against abstention where no property is at issue and neither forum is

more or less convenient).  While the Supreme Court has stated that "'the presence

of federal law issues must always be a major consideration weighing against

surrender of federal jurisdiction in deference to state proceedings[,]'" *id.* at 342

(quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where

the federal courts' jurisdiction to enforce the statutory rights in question is

concurrent with that of the state courts.'"[4] *Id.* (quoting *Moses H. Cone*, 460 U.S. at

25).  Moreover, the Michigan Election Code seems to dominate even Plaintiffs'

federal claims.  Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical

issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions.  *Felder v. Casey*,
487 U.S. 131, 139 (1988).

Exhibit D

results." *Id.* at 341. The parallel proceedings are premised on similar factual allegations and many of the same federal and state claims. The state court proceedings were filed well before the present matter and at least three of those matters are far more advanced than this case. Lastly, as Congress conferred concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*, 487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the [Michigan] state courts are incapable of safeguarding [the rights protected under this statute]," *Romine*, 160 F.3d at 342.

For these reasons, abstention is appropriate under the *Colorado River* doctrine. The Court finds it unnecessary to decide whether abstention is appropriate under other doctrines.

### E. Standing

Under Article III of the United States Constitution, federal courts can resolve only "cases" and "controversies." U.S. Const. art. III § 2. The case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state in their motion for injunctive relief that Defendants violated their due process rights. (*See* ECF No. 7 at Pg ID 1840, 1844.) Plaintiffs do not pair either statement with anything the Court could construe as a developed argument. (*Id*.) The Court finds it unnecessary, therefore, to further discuss the due process claim.

Exhibit D

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A]
plaintiff must demonstrate standing separately for each form of relief sought.").
To establish standing, a plaintiff must show that: (1) he has suffered an injury in
fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is
"fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is
"likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)
(internal quotation marks and citations omitted).

### 1.    Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among
other things, "destroy," "discard," and "switch" votes for President Trump, thereby
"devalu[ing] Republican votes" and "diluting" the influence of their individual
votes. (ECF No. 49 at Pg ID 3079.) Plaintiffs contend that "the vote dilution
resulting from this systemic and illegal conduct did not affect all Michigan voters
equally; it had the intent and effect of inflating the number of votes for Democratic
candidates and reducing the number of votes for President Trump and Republican
candidates." (ECF No. 49 at Pg ID 3079.) Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").

Exhibit D

injury-in-fact and causation under this theory,[6] their constitutional claim cannot stand because Plaintiffs fall flat when attempting to clear the hurdle of redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court. Plaintiffs ask this Court to de-certify the results of the 2020 General Election in Michigan. But an order de-certifying the votes of approximately 2.8 million people would not reverse the dilution of Plaintiffs' vote. To be sure, standing is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote. Accordingly, Plaintiffs have failed to show that their injury can be redressed by the relief they seek and thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of the standing inquiry.

Exhibit D

### 2. Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. art. I, § 4, cl. 1. "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)." *Bognet*, 2020 WL 6686120, *1. The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …." U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan … is a vote for each Republican elector[], and … illegal conduct aimed at harming candidates for President similarly injures Presidential Electors." (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

26

Exhibit D

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims. *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections
Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting
Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do
not at all distinguish the two clauses in their motion for injunctive relief or reply
brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78). *See also Bognet v. Sec'y
Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13,
2020) (applying same test for standing under both Elections Clause and Electors
Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69
(characterizing Electors Clause as Elections Clauses' "counterpart for the
Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05
(1995) (noting that state's "duty" under Elections Clause "parallels the duty"
described by Electors Clause).

Exhibit D

This is so because the Elections Clause grants rights to "the Legislature" of "each State." U.S. Const. art. I, § 4, cl. 1. The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673. The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority. *See id.* at 2668. Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature. *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020). Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause. (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).) In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057. This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause. Although

28

Minnesota law at times refers to them as "candidates," *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors."). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota

law are similar. (See ECF No. 49 at Pg ID 3076-78.) Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

29

Exhibit D

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

### F.       The Merits of the Request for Injunctive Relief

####           1.       Likelihood of Success on the Merits

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above.  Nevertheless, the Court will proceed to analyze the merits of their claims.

#####                   a.       Violation of the Elections & Electors Clauses

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code.  (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.)  Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses.  In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion.  In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

Exhibit D

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld an Arizona law that transferred redistricting power from the state legislature to an independent commission after concluding that "the Legislature," as used in the Elections Clause, includes any official body with authority to make laws for the state.  576 U.S. 787, 824 (2015).  In each of these cases, federal courts measured enacted state election laws against the federal mandates established in the clauses—they did not measure *violations* of enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review.  Plaintiffs cite to no case— and this Court found none—supporting such an expansive approach.

### b.    Violation of the Equal Protection Clause

Most election laws will "impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]." *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

31

Exhibit D

debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds*, 377 U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates."[9] (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

---

[9] Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots. But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

Exhibit D

Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request. *United States v. O'Connor*, No. 96-2992, 1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F. App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's 'protection' statement actually meant "protection from retaliation. . . . An unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309 F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for testing is not evidence that he was.").[10] The closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and expects to prove some things. Now his belief and expectation may be in good faith; but it has been repeatedly held that suspicion is not proof; and it is equally true that belief and expectation to prove cannot be accepted as a substitute for fact. The complainant carefully refrains from stating that he has any information upon which to found his belief or to justify his expectation; and evidently he has no such information. But belief, without an allegation of fact either upon personal knowledge or upon information reasonably sufficient upon which to base the belief, cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir. 1901).

Exhibit D

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*. (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.) And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11] *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at *12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11.

34

## 2. Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury. Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest. As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

## IV. Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic

35

Exhibit D

process and their trust in our government. Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

<div align="right">

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

</div>

Dated: December 7, 2020

36

<div align="right">

Exhibit D

</div>

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>         Plaintiffs,<br><br>   v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>            Defendants<br>  and<br><br>CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY,<br><br>         Intervenor-Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO STATE BAR DISCIPLINARY BODIES

Intervenor-Defendant City of Detroit (the "City"), by and through counsel,

respectfully moves for sanctions against Plaintiffs and their counsel pursuant to

Exhibit E

Federal Rule of Civil Procedure 11. The City further moves for disciplinary action and referrals to be initiated against counsel.

The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter denied concurrence. Such concurrence was sought on December 15, 2020 and January 5, 2021.

The City also served Plaintiffs with a Motion for Sanctions under Fed. R. Civ. P. 11 on December 15, 2020. Plaintiffs did not withdraw or correct any of the false factual allegations and frivolous legal theories in their pleadings during the 21 day "safe harbor" period.[1] Thus, this Motion is timely.

---

[1] No lawyer for the Plaintiffs responded to the email message forwarding the Rule 11 motion. Instead, at least two of their attorneys made public statements, with military analogies and references to opposing counsel as "the enemy." According to the news website Law and Crime, Plaintiffs' counsel, Sidney Powell, when asked about the proposed Rule 11 motion, "replied cryptically: 'We are clearly over the target.'" Ex. 1. Similarly, Plaintiffs' counsel, L. Lin Wood, posted the following on his Twitter account on December 17, 2020:

> When you get falsely accused by the likes of David Fink & Marc Elias of Perkins Coie (The Hillary Clinton Firm) in a propaganda rag like Law & Crime, you smile because you know you are over the target & the enemy is running scared!

L. Lin Wood (@llinwood), Twitter (Dec. 17, 2020). Perhaps the lack of civility is related to counsels' failure to apply for admission to the Eastern District of Michigan's bar. at least they would have been compelled to review and affirm their commitment to our court's Civility Principles.

Exhibit E

This Motion is supported by the accompanying Brief.

**Sanctions Pursuant to Fed. R. Civ. P. 11(b)(1)**

1.     Sanctions should be imposed under Fed. R. Civ. P. 11(b)(1) when a pleading or other filing is presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

2.     Sanctions pursuant to the sub-rule should be imposed against Plaintiffs and their counsel because they initiated the instant suit for improper purposes, including harassing the City and frivolously undermining "People's faith in the democratic process and their trust in our government." Opinion and Order Denying Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief," ECF No. 62, PageID.3329-30.

3.     Plaintiffs and their counsel understood that the mere filing of a suit (no matter how frivolous) could, without any evidence, raise doubts in the minds of millions of Americans about the legitimacy of the 2020 presidential election. As this Court noted, "Plaintiffs ask th[e] Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters." *Id.* PageID.3330.

4.     The Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in

Exhibit E

Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were devoid of merit and thus could only have been filed for improper purposes.

**Sanctions Pursuant to Fed. R. Civ. P. 11(b)(2)**

5.   Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriately entered where the claims, defenses, and other legal contentions are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

6.   Sanctions pursuant to Rule 11(b)(2) should be imposed against counsel for Plaintiffs because the causes of action asserted in the Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were frivolous and legally deficient under existing law and because Plaintiffs failed to present any non-frivolous arguments to extend, modify, or reverse existing law.

7.   The majority of Plaintiffs' claims were moot. As this Court noted, "[t]he time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court. For these reasons, this matter is moot." ECF No. 62, PageID.3307.

8.   Plaintiffs' claims were also barred by laches because "they waited too long to knock on the Court's door." *Id.* at PageID.3310. Indeed, "Plaintiffs showed

Exhibit E

no diligence in asserting the claims at bar." *Id.* at PageID.3311. This delay prejudiced the City. *Id.* at PageID.3313.

9.      Plaintiffs lacked standing to pursue their claims. *Id.* at PageID.3317-3324.

10.     Plaintiffs' claim for violation of the Elections and Electors Clauses is frivolous. As this Court held, "Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review. Plaintiffs cite to no case – and this Court found none – supporting such an expansive approach." *Id.* at PageID.3325.

11.     Plaintiffs' due process and equal protection clause claims are also baseless. With regard to the due process claim, this Court held that "Plaintiffs do not pair [the due process claim] with anything the Court could construe as a developed argument. The Court finds it unnecessary, therefore, to further discuss the due process claim." *Id.* at PageID.3317. As to the equal protection claim, this Court stated that "[w]ith nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.* at PageID.3328.

12.     For each of Plaintiffs' claims, Plaintiffs did not identify valid legal theories and the controlling law contradicted the claims. The claims were not

Exhibit E

warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

13.    Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7) was without any legal basis because, as described above, the underlying claims are baseless, and the requests for relief were frivolous.

14.    Plaintiffs' Emergency Motion to Seal (ECF No. 8) was without any legal basis because Plaintiffs seek to anonymously file supposed evidence of a broad conspiracy to steal the 2020 presidential election without providing any authority whatsoever to attempt to meet their heavy burden to justify the sealed filing of these documents.

## Sanctions Pursuant to Fed. R. Civ. P. 11(b)(3)

15.    Sanctions can be imposed under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.

16.    Sanctions should be entered against Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11(b)(3) because the factual contentions raised in the complaints and motions were false.

17.    The key "factual" allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been

Exhibit E

debunked. The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center have been rejected by every court which has considered them. If any of the claims in this lawsuit had merit, that would have been demonstrated in those cases. The City refers the Court to its Response to Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief for a detailed debunking of Plaintiffs' baseless factual contentions. ECF No. 39, PageID.2808-2933.

### Disciplinary Proceedings

18.    E. D. Mich. LR 83.22 authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court."

19.    The Rule also authorizes the Court to refer counsel to the Chief Judge of this District for disbarment or suspension proceedings.

20.    And, the Rule authorizes the Court to refer counsel to the Michigan Attorney Discipline Board and to the disciplinary authorities of counsels' home jurisdictions for purposes of disciplinary proceedings.

Exhibit E

WHEREFORE, for the foregoing reasons and the reason stated in the accompanying brief, the City of Detroit respectfully requests that this Court enter an Order:

(a) Imposing monetary sanctions against Plaintiffs and their counsel in an amount determined by this Court to be sufficient to deter future misconduct (such amount should be, at the least, the amount that Plaintiffs' counsel have collected in their fundraising campaigns, directly or through entities they own or control, for their challenges to the 2020 election);

(b) Requiring Plaintiffs and their counsel to pay all costs and attorney fees incurred by the City in relation to this matter (as well as costs and fees incurred by all other Defendants);

(c) Requiring Plaintiffs and/or their counsel to post a bond of $100,000 prior to the filing of any appeal of this action (and to maintain their present appeal);

(d) Requiring Plaintiffs and their counsel to post a bond of $100,000 prior to filing, in any court, an action against the City, or any other governmental entity or their employees, relating to or arising from the facts alleged in this matter;

(e) Requiring Plaintiffs to post a substantial bond, in an amount determined by the Court, prior to filing an action in the Eastern District of Michigan;

(f) Requiring Plaintiffs and their counsel to obtain certification from a magistrate judge that the proposed claims are not frivolous or asserted for an

Exhibit E

improper purpose, before filing an action in the Eastern District of Michigan (and, if the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, requiring the plaintiff[s] to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]);

(g) Requiring Plaintiffs and their counsel to certify, via affidavit, under penalty of perjury, that they have paid all amounts required to fully satisfy any non-appealable orders for sanctions entered by any court, prior to filing an action in the Eastern District of Michigan;

(h) Barring Plaintiffs' counsel from practicing law in the Eastern District of Michigan (after the issuance of a show cause order);

(i) Referring Plaintiffs' counsel to the Chief Judge of this District for initiation of disbarment proceedings;

(j) Referring all Plaintiffs' counsel to the Michigan Attorney Grievance Commission (and also to the disciplinary authorities of their home jurisdictions, including: Sidney Powell to the Michigan Bar and to the Texas bar; L. Lin Wood to the Michigan Bar and to the Georgia bar; Greg Rohl to the Michigan bar; Emily Newman to the Michigan Bar and to the Virginia bar; Julia Haller to the Michigan Bar and to the Washington D.C. bar; Brandon Johnson to the Michigan Bar and to

Exhibit E

the Washington D.C. bar; Scott Hagerstrom to the Michigan bar; Howard

Kleinhendler to the Michigan Bar and to the New York bar); and,

(k) Granting any other relief that the Court deems just or equitable.

January 5, 2021                     Respectfully submitted,

                                    **FINK BRESSACK**

                                    By:    /s/ David H. Fink
                                    David H. Fink (P28235)
                                    Darryl Bressack (P67820)
                                    Nathan J. Fink (P75185)
                                    *Attorneys for City of Detroit*
                                    38500 Woodward Ave., Ste. 350
                                    Bloomfield Hills, MI 48304
                                    Tel: (248) 971-2500
                                    dfink@finkbressack.com
                                    dbressack@finkbressack.com
                                    nfink@finkbressack.com

                                    **CITY OF DETROIT**
                                    **LAW DEPARTMENT**
                                    Lawrence T. Garcia (P54890)
                                    James D. Noseda (P52563)
                                    *Attorneys for City of Detroit*
                                    2 Woodward Ave., 5th Floor
                                    Detroit, MI 48226
                                    Tel: (313) 237-5037
                                    garcial@detroitmi.gov
                                    nosej@detroitmi.gov

x

Exhibit E

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>    Plaintiffs,<br><br> v.<br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>    Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## BRIEF IN SUPPORT OF
## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR <u>REFERRAL TO STATE BAR DISCIPLINARY BODIES</u>

Exhibit E

# TABLE OF CONTENTS

INDEX OF AUTHORITIES........................................................II

STATEMENT OF THE ISSUES PRESENTED....................................... IV

CONTROLLING OR MOST APPROPRIATE AUTHORITIES..........................V

INTRODUCTION ................................................................1

ARGUMENT ....................................................................4

   I.  Rule 11 Standards...................................................4

   II.  The Complaint was Filed for an Improper Purpose .......................5

   III. The Factual Assertions in the Complaint Were Frivolous and Based on
   Assertions Which Had Been Rejected by Michigan Courts.................13

      A.    Allegations Regarding Republican Challengers ....................13

      B.    Allegations of "Pre-Dating"...................................14

      C.    Allegations Regarding Ballots Supposedly Counted More than Once...15

      D.    Allegations Regarding Tabulating Machines.........................16

      E.    The Declarations and Analyses "Supporting" the Complaint Were Full
         of Intentional Lies ............................................18

   IV. Plaintiffs' Legal Theories Were Frivolous................................27

   V.  The Sanctions Which Should be Imposed Pursuant to Rule 11 .................31

   VI. Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief
   Judge for Disbarment..................................................35

CONCLUSION ..................................................................38

Exhibit E

# INDEX OF AUTHORITIES

**Cases**

*Bognet v. Secy Commonwealth of Pennsylvania*,
   980 F.3d 336 (3rd Cir. Nov. 13, 2020)................................................28

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261
   (D. Ariz. Dec. 9, 2020) ........................................................ 2, 3, 18, 19

*Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020) ......13

*Costantino v. Detroit*, Opinion and Order,
   Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)...........13

*DeGeorge v. Warheit*, 276 Mich. App. 587, 741 N.W.2d 384 (2007) ...................37

*Ex parte Young*, 209 U.S. 123 (1908)................................................29

*Feathers v Chevron U.S.A., Inc*., 141 F.3d 26 (6th Cir. 1998)................................33

*Feehan v. Wisconsin Elections Comm'n*,
   No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)...........................2

*Georgia Republican Party v. Secy of State of Georgia*,
   No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) .............................28

*Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996)............................................36

*INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*,
   815 F.2d 391 (6th Cir. 1987) .......................................................... 5, 31

*Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020)...24

*King v. Whitmer*,
   No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020).......................1

*Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)................................... 5, 31

*Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992).....................31

*Ortman v. Thomas*, 99 F.3d 807 (6th Cir. 1996) ......................................................33

*Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020)..................................2

Exhibit E

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................29

*Roberson v. Norfolk Southern Railway Co.*,
 2020 WL 4726937 (E.D. Mich. Aug. 14, 2020) ...................................................32

*SLS v. Detroit Public Schools*,
 No. 08-14615, 2012 WL 3489653 (E.D. Mich. Aug. 15, 2012) .........................32

*Stephenson v. Central Michigan University*,
 No. 12-10261, 2013 WL 306514 (E.D. Mich. Jan. 25, 2013)..............................32

*Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11, 2020) ..9

*Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) .........................36

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) ..........6

**Statutes and Rules**

E. D. Mich. LR 83.20 ...............................................................................................35

E. D. Mich. LR 83.22 ...............................................................................................36

Fed. R. Civ. P. 11(b)(1)....................................................................................... Passim

Fed. R. Civ. P. 11(b)(2)....................................................................................... Passim

Fed. R. Civ. P. 11(b)(3)....................................................................................... Passim

Fed. R. Civ. P. 11(c)(5).............................................................................................4

Exhibit E

## __STATEMENT OF THE ISSUES PRESENTED__

I.      Should the Court sanction Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11?

    The City answers: "Yes."

II.     Should the Court discipline Plaintiffs' counsel, refer them to the Chief Judge of this District for disbarment proceedings and refer them to the Michigan Attorney Grievance Commission and their home state bars for disciplinary proceedings?

    The City answers: "Yes."

Exhibit E

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 11(b)(1)

Fed. R. Civ. P. 11(b)(2)

Fed. R. Civ. P. 11(b)(3)

E. D. Mich. LR 83.22

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020)

*Costantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)

*Ex parte Young*, 209 U.S. 123 (1908)

*King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)

Exhibit E

## **INTRODUCTION**

This Court has already concluded that Plaintiffs present "nothing but speculation and conjecture" and that "this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic process and their trust in our government." *King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198, at *13 (E.D. Mich. Dec. 7, 2020). Now, it is time for Plaintiffs and their counsel to answer for that misconduct.

It is indelibly clear that this lawsuit was filed for an improper purpose, and the failure to dismiss or amend the Complaint after service of a Rule 11 motion warrants the strongest possible sanctions. There are so many objectively false allegations in the Complaint that it is not possible to address all of them in a single brief. This brief will address some of the more extreme examples.

For instance, Plaintiffs claim that their self-proclaimed experts include a military intelligence analyst, but when they accidentally disclosed his name, the "expert" was revealed to have washed out of the training course for military intelligence. Plaintiffs' counsel did not redact the information to "protect" the "informant," they did so to hide their fraud on the court.[2]

---

[2] In addition to this case, Plaintiffs' attorneys filed three other remarkably similar, and similarly frivolous, "release the kraken" lawsuits. The requested relief

Exhibit E

Plaintiffs' "expert" reports are rife with misstatements of Michigan law and election procedures. Those reports lack the simplest foundation of technical expertise, fail to use even elementary statistical methods and reach conclusions that lack any persuasive value. But, those unscientific conclusions, based upon false premises and faulty techniques are presented here as though they embody the uncontroverted truth.

Plaintiffs have no apparent interest in the accuracy of their allegations and there is no innocent explanation for the numerous misrepresentations. They claim that turnout in some jurisdictions in the State exceeded 100%, even up to 781.91%, with turnout for Detroit at 139.29%. *See* Ramsland Aff., ECF No. 6-24, PageID.1574. But they had to know that claim was false; the actual results were readily available at the time Plaintiffs and their "experts" made the claim, and show turnout well below 100%, including in Detroit at 50.88%. Ex. 2.[3]

---

was quickly denied or the case was dismissed for each. *See Feehan v. Wisconsin Elections Comm'n*, No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020); and *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020) (Ex. 3).

[3] Plaintiffs made the same claim about Michigan in the lawsuit they filed in Georgia, but apparently because the "expert" confused the postal code abbreviation for Minnesota with that of Michigan, used Minnesota jurisdictions to make the argument that turnout exceeded 100%. Ex. 4. The fact that Plaintiffs' counsel discovered the error regarding postal abbreviations (after it was widely mocked in the media), but then proceeded to make the same false claim here, substituting Michigan jurisdictions, shows that the point was to make the claim, not to present the truth. As stated by the district court in the Arizona "kraken" lawsuit when

Exhibit E

Meanwhile, President Trump continues to use these lawsuits in his desperate campaign to thwart the will of the voters. On January 2, 2021, during a call with Georgia's Secretary of State, Brad Raffensperger, in which the President is heard attempting to extort Secretary Raffensperger into committing election fraud, Trump trotted out the same hoary canards as the Plaintiffs falsely argue to this Court:

> I mean there's turmoil in Georgia and other places. You're not the only one, I mean, we have other states that I believe will be flipping to us very shortly. And this is something that — you know, as an example, I think it in Detroit, I think there's a section, a good section of your state actually, which we're not sure so we're not going to report it yet. But in Detroit, we had, I think it was, 139 percent of the people voted. That's not too good.

*See* Ex. 5, pp. 3-4 (Transcript of January 2, 2021 Telephone Call, as transcribed for the Washington Post).[4]

The City gave Plaintiffs and their counsel the opportunity to retract their lies and baseless legal claims, and they have refused. The extent of the factual and legal errors in this Complaint would warrant sanctions under any circumstances, but here the Court's processes are being perverted to undermine our democracy and to upset

---

dismissing the claims, and as equally applicable here, "[t]he various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *13 (D. Ariz. Dec. 9, 2020).

[4] President Trump also continues to use this lawsuit (and the suits filed in other swing states which voted for President-Elect Biden) to fundraise. As of early December 2020, Trump had reportedly raised $207.5 million in post-election fundraising. Ex. 6.

Exhibit E

the peaceful transition of power. The Plaintiffs and all of their attorneys deserve the harshest sanctions this Court is empowered to order.

## ARGUMENT

### I.    Rule 11 Standards

Sanctions under Fed. R. Civ. P. 11(b)(1) are appropriate when a pleading or other filing is presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriate where the claims, defenses, and other legal contentions of the offending party are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law. Fed. R. Civ. P. 11(b)(2). Sanctions are appropriate under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.[5]

To determine whether a party's pleading is frivolous or was filed for an improper purpose, courts use an objective standard of reasonableness under the circumstances and then weigh the evidence to determine if the pleadings, motions or

---

[5] Monetary sanctions cannot be imposed against a represented party for violation of Fed. R. Civ. P. 11(b)(2). *See* Fed. R. Civ. P. 11(c)(5). Thus, the City requests non-monetary sanctions, as identified below, against Plaintiffs for violation of 11(b)(2) and monetary and non-monetary sanctions against counsel.

Exhibit E

papers are well-grounded in facts or warranted by existing law. *Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990).[6]

## II. The Complaint was Filed for an Improper Purpose

It is clear that this lawsuit was not filed for any purpose consistent with the Federal Rules of Civil Procedure. This Court has already addressed many of the reasons that the Plaintiffs "are far from likely to succeed in this matter." *King*, 2020 WL 7134198, at *13. The claims are barred by Eleventh Amendment Immunity; the claims are barred by mootness and laches; Plaintiffs lack standing; and, even if Plaintiffs could show a violation of state law, they have not offered a colorable claim under federal statutory or constitutional law. To make matters worse, Plaintiffs were always aware that their Complaint was deficient; no other inference can be drawn from their failure to serve the Defendants before this Court issued its December 1, 2020, text-only order.[7]

---

[6] Moreover, for the purposes of Rule 11 sanctions, a showing of "good faith," is not sufficient to avoid sanctions. *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391 (6th Cir. 1987).

[7] A similar circumstance was noted on January 4, 2021, in a ruling by the United States District Court for the District of Columbia, addressing another groundless Trump election lawsuit:

[Plaintiffs'] failure to make any effort to serve or formally notify any Defendant — even after a reminder by the Court in its Minute Order — renders it difficult to believe that the suit is meant seriously. Courts are not instruments through which parties engage in such gamesmanship or symbolic political gestures. As a result, at the conclusion of this litigation, the Court will determine whether to issue an order to show

Exhibit E

This lawsuit is the quintessential example of a case filed for an improper purpose. As this Court concluded, in denying preliminary relief:

> this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.

*King*, at *13. Plaintiffs' counsel have not hidden their contempt for our courts and for our democracy. Plaintiffs' counsel Sidney Powell claims that courts have rejected the election lawsuits, "because the corruption goes deep and wide."[8] She re-tweets calls to impose martial law, to "suspend the December Electoral College vote," and to "set up Military Tribunals immediately." @sidneypowell1, Twitter (Nov. 30, 2020). Her co-counsel, L. Lin Wood, unabashedly expresses his contempt for our democratic processes and openly promotes a military coup:

> Georgia, Michigan, Arizona, Nevada, Wisconsin, Minnesota & Pennsylvania are states in which martial law should be imposed & machines/ballots seized. 7 states under martial law. 43 states not under martial law. I like those numbers. Do it @realDonaldTrump! Nation supports you. (@llinwood, Twitter (Dec. 20, 2020)).

> Patriots are praying tonight that @realDonaldTrump will impose martial law in disputed states, seize voting machines for forensic

---

cause why this matter should not be referred to its Committee on Grievances for potential discipline of Plaintiffs' counsel.

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) (Ex. 7).
   [8] Quote from video interview of Sidney Powell, promoted on her twitter account at https://twitter.com/AKA_RealDirty/status/1338401580299681793.

6

Exhibit E

examination, & appoint @SidneyPowell as special counsel to investigate election fraud. (Dec. 19, 2020).

When arrests for treason begin, put Chief Justice John Roberts, VP Mike Pence @VP @Mike_Pence, & Mitch McConnell @senatemajldr at top of list. (Jan. 1, 2021).

If Pence is arrested, @SecPompeo will save the election. Pence will be in jail awaiting trial for treason. He will face execution by firing squad. He is a coward & will sing like a bird & confess ALL. (Jan. 1, 2021).[9]

These are the lawyers who are trying to use this Court's processes to validate their conspiracy theories and to support their goal of overturning the will of the people in a free and fair election. They were given an opportunity to dismiss or amend their Complaint, but they chose to continue to use this case to spread their false messages.

Those false messages are not the result of occasional errors or careless editing. Those false messages are deliberately advanced by these attorneys to support their goals of undermining our democracy. Like Sidney Powell, L. Lin Wood, is a QAnon disciple.[10] He recently stated:

This country's going to be shocked when they find the truth about who's been occupying the Oval Office for some periods of years. They're going to be shocked at the level of pedophilia. They are going

---

[9] While Mr. Wood's wrath was initially focused on Democrats, he has shifted to attacking Republican officials (and judges and justices who he views as Republican) for their perceived disloyalty to Trump and refusal to abuse the Constitution.

[10] A judge in Delaware is currently considering revoking Mr. Wood's right to practice in Delaware, where he is currently representing former Trump adviser Carter Page, based on his conduct in suits challenging the results of the general election as a plaintiff in Georgia and as counsel in Wisconsin. Ex. 8.

Exhibit E

to be shocked at what I believe is going to be a revelation in terms of people who are engaged in Satanic worship."[11]

A review of Mr. Wood's Twitter account reveals a dark strain of paranoia—the same strain which infects this lawsuit.

Mr. Wood repeatedly makes false allegations about the 2020 election, the most secure in our country's history.[12] The following is a sampling of his tweets:

> There should be NO Electoral College vote in any state today. Fraud is rampant in all state elections. If U.S. Supreme Court does not have courage to act, I believe our President @realDonaldTrump has the courage. (Dec. 14, 2020).

> We The People must now launch massive campaign to prevent our state electors from EVER casting vote in Electoral College for Joe Biden & Kamala Harris. Unless you want them to vote for Communism. In that event, get out of our country & go enjoy your life in Communist China. (Dec. 20, 2020).

> Joe Biden & Kamala Harris are Communists by either ideology, corruptness or extortion. Still want your state electors to vote for Biden on 1/6? Want Communism & tyranny or a free America where you can enjoy life, liberty & pursuit of happiness? (Dec. 20, 2020).

---

[11]      https://welovetrump.com/2020/11/23/lin-wood-americans-will-be-shocked-at-level-of-pedophilia-satanic-worship-occupying-oval-office-for-years-before-trump/.

[12]  The November 2020 general election was declared by the federal government to be the most secure in the nation's history. *See* Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees ("CISA"), issued Nov 12, 2020 ("The November 3rd election was the most secure in American history.") (Ex. 9). The CISA statement further concluded "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." *Id.* Five days after this statement was released, Chris Krebs, director of CISA, was terminated by presidential tweet.

Exhibit E

When courts refuse to accept his invitation to disregard the fundamental tenets of our democracy, he blames corruption and communism in the judiciary:

> Attempted theft of Presidential election will NOT stand. Not on our watch, Patriots. Communists & Communist sympathizers have infiltrated our judicial system, including lawyers & judges in Georgia. (Dec. 23, 2020).

> Communism has infiltrated ALL levels of our government, including our judiciary. Communism infiltrates by ideology, by corruption/money & by extortion. (Dec. 20, 2020).

> Too many of us have been asleep at switch in the past. … We believed too many of our judges. Many are corrupt & traitors. (Dec. 19, 2020).

> Some state & federal lower court rulings to date are troubling. Courage lacking in some members of judiciary. (Dec. 10, 2020).

> We CANNOT trust courts to save our freedom. They are IGNORING massive evidence of fraud & unlawful election procedures. (Dec. 13, 2020).

> We have had reports of judges & their families being threatened. This would certainly explain some of the bizarre rulings by lower courts that have refused to even mention the overwhelming evidence of fraud in cases filed by @SidneyPowell. (Dec. 14, 2020).

When, the Supreme Court denied *certiorari* in Texas's lawsuit against the "swing states" which voted for Joe Biden,[13] and when the Supreme Court took no action on the nonsensical direct appeal in this case, Mr. Wood displayed his utter contempt for that institution:

> It is time for Chief Justice John Roberts to resign, admit his corruption & ask for forgiveness. Roberts has betrayed his sacred oath office. He

---

[13] *Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11, 2020).

Exhibit E

has betrayed his country. He has betrayed We The People. (Dec. 19, 2020).

I think many are today learning why SCOTUS is rejecting petitions seeking FAIR review. Roberts & Breyer are "anti-Trumpers" They should resign immediately. CJ Roberts has other reasons to resign. He is a disgrace to office & to country. (Dec. 17, 2020).

Corruption & deceit have reached most powerful office in our country - the Chief Justice of U.S. Supreme Court. This is a sad day for our country but a day on which we must wake up & face the truth. Roberts is reason that SCOTUS has not acted on election cases. (Dec. 17, 2020).

Justice John Roberts is corrupt & should resign immediately. Justice Stephen Breyer should also resign immediately. (Dec. 17, 2020).

I am disappointed. I thought Justices Roberts & Breyer would avoid public scandal & simply resign. Only a fool wants their dirty laundry aired in public. Maybe I should consider filing a formal motion for recusal & hang their laundry on the clothesline to be exposed to sunlight? (Jan. 2, 2021).

This is the same L. Lin Wood who appears on the pleadings of this case, but who has apparently chosen not to be sworn into the bar for the Eastern District of Michigan and to affirm our Civility Principles.

Sidney Powell—who President Trump has reportedly considered appointing as "special counsel," who apparently has the ear of the President and who has advocated for martial law—is less prolific on Twitter but shares Mr. Wood's perspective. She has tweeted that "[t]his 'election' was stolen from the voters in a massive fraud." @sidneypowell1, Twitter (Jan. 2, 2021). And, like Mr. Wood, she channels 19502 McCarthy paranoia, seeing communists around every electoral

Exhibit E

corner, stating "[i]t is impossible not to see the fraud here unless one is a communist or part of it or part of the coup." @sidneypowell1, Twitter (Jan. 2, 2021).[14]

As poorly presented as their pleadings were, as careless as they were in vetting their allegations and expert reports, and as detached as their claims are from the law and reality, the Plaintiffs and their counsel were provided 21 days to take corrective action. So, 21 days before filing this motion, the City gave Plaintiffs an opportunity to withdraw or amend their contemptuous pleadings. Rather than withdraw or amend their Complaint, they chose to stand firm with their objectively false claims, ridiculously incompetent expert reports and patently unsupportable arguments.

Why was this Complaint not dismissed or amended? Surely, in light of this Court's December 7, 2020, Opinion and Order, Plaintiffs cannot be expecting to obtain judicial relief. Then, what purpose can this lawsuit serve? The answer to that question goes to the heart of Rule 11. Much can be inferred from Plaintiffs' actions. Initially, this was one of several lawsuits used to support calls for state legislatures to reject the will of the voters, to ignore the statutory process for selecting presidential electors, and to instead elect a slate of Trump electors (six of whom are Plaintiffs in this case). When the Michigan Legislature did not attempt to select a

---

[14] Perhaps her motivation is less paranoid and more venal. The front page of her website, "defendingtherepublic.org," has a prominently placed "contribute here" form, soliciting donations for her "Legal Defense Fund for Defending the American Republic."

Exhibit E

slate of electors inconsistent with the will of the voters, despite the personal demands of the President of the United States, who summoned their leaders to the White House, this lawsuit took on a different meaning. It was then used to support arguments for the United States Congress to reject the Michigan electors on January 6, 2021. On Saturday, January 2, 2021, false claims made by "experts" in this case were cited by Donald Trump in his apparent attempt to extort Georgia Secretary of State Brad Raffensperger. And, most ominously, these claims are referenced and repeated by L. Lin Wood and others in support of martial law.

Irrespective of these attempts to overturn our democratic processes, the continued pendency of this lawsuit accomplishes exactly the harm addressed by this Court in its December 7, 2021, Opinion and Order. By undermining "People's faith in the democratic process and their trust in our government," this lawsuit is being used to delegitimize the presidency of Joe Biden.

While the First Amendment may protect the right of political fanatics to spew their lies and unhinged conspiracy theories, it does not grant anyone a license to abuse our courts for purposes which are antithetical to our democracy and to our judicial system. Plaintiffs and their counsel cannot be allowed to use the court system to undermine the constitutional and statutory process by which we select our leaders.

Exhibit E

### III. The Factual Assertions in the Complaint Were Frivolous and Based on Assertions Which Had Been Rejected by Michigan Courts

The Complaint in this matter relies heavily on affidavits submitted in *Costantino v. Detroit*, Wayne County Circuit Court Case No. 20-014780-AW. The Plaintiffs here either incorporate the affidavits into their allegations or attach them as exhibits to their Complaint.

#### A. Allegations Regarding Republican Challengers

The Complaint repeatedly asserts that Republican challengers were not given "meaningful" access to the ballot processing and tabulation at the Absent Voter Counting Board located in Hall E of the TCF Center. First Amended Complaint ("Compl.") at ¶¶ 13, 42, 47, 57, 59-61. This claim was disproven long before Plaintiffs raised it here. As Judge Kenny concluded in *Costantino*, while six feet of separation was necessary for health reasons, "a large monitor was at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed." *Costantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020) (Ex. 10). This had been proven with photographic evidence. *See, e.g.*, Ex. 11 (Nov. 11, 2020 Affidavit of Christopher Thomas at last page). And, prior to the filing of this case, the Michigan Supreme Court had already rejected the application for appeal from the trial court's ruling, deeming the same claims unworthy of injunctive relief. *See Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020).

13

Exhibit E

Similarly, the Complaint repeats the false claim that Republican challengers were exclusively barred from entering the TCF Center. Compl. ¶¶ 62-63. Judge Kenny rejected this claim, finding that there was a short period of time, where Republican *and* Democratic challengers were "prohibited from reentering the room because the maximum occupancy of the room had taken place." *Costantino* Opinion, at *8. As stated by the court, "[g]iven the COVID-19 concerns, no additional individuals could be allowed into the counting area ... Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding." *Id.*

## B. Allegations of "Pre-Dating"

Plaintiffs' allegations of "pre-dating" were also based on claims initially submitted and rejected in *Costantino*. Compl. ¶¶ 88 and 90.

The claims come from Jessy Jacob, a furloughed City employee, with no known prior election experience, who was assigned to the Department of Elections on a short-term basis. Ex. 12 (Affidavit of Daniel Baxter, ¶ 7). Her claim regarding pre-dating is demonstrably false because all absentee ballots she handled at the TCF Center had been received by 8:00 p.m. on November 3, 2020. For a small number of ballots, election workers at the TCF Center were directed to enter the date the

Exhibit E

ballots were received into the computer system, as stamped on the envelope. Ex. 11. Ms. Jacob was simply marking the date the ballot had been received. *Id*. Thus, as explained by the court in Costantino, "[a]s to the allegation of 'pre-dating' ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process." *Costantino* Opinion, *4. As the court noted, "[t]he entries reflected the date the City received the absentee ballot." *Id.*

### C. Allegations Regarding Ballots Supposedly Counted More than Once

Plaintiffs claim challengers observed ballots repeatedly run through tabulation machines, including "a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine." Compl. ¶ 94. This allegation primarily comes from Melissa Carone, a contractor working for Dominion, who claimed that stacks of 50 ballots were fed through tabulators as many as eight times. Exh. 5 to Compl., ¶¶ 4-5.[15] The allegation was obviously false when it was first raised by Carone in *Costantino*. Whatever Carone and other challengers think they saw, ballots cannot be counted in that manner. If they were correct, hundreds of extra votes would show up in numerous precinct (or absent voter counting boards). This would obviously be

---

[15] The Complaint states that "[p]erhaps the most probative evidence comes from Melissa Carone …." Compl. ¶ 84.

15

caught very quickly on site during the tabulation process or soon thereafter during the County and State canvasses. Ex. 13 (Thomas Dec. 10, 2020 Aff. ¶¶ 18-20).

But, by the time the Plaintiffs here latched onto the absurd allegation, it had already been conclusively disproven by the Wayne County canvass. Detroit had 501 precincts and 134 absent voter counting boards. Less than 36% of the total were out of balance. *Id.* ¶ 12. A counting board is out of balance if there are: (1) more ballots than voters or (2) more voters than ballots. In total 591 voters and ballots account for the imbalances. *Id.* When voters and ballots are separated in Detroit there are 148 more names than ballots—out of 174,384 votes there are 148 more names in the poll books than there are ballots. *Id.* The fact that there were more names than ballots shows that ballots were not counted more than once. The total imbalance was .0008 (eight ten-thousandths of a 1%). *Id.* Of the 94 Detroit out of balance counting boards, there were 87 with an imbalance of 11 or fewer voters/ballots; within those 87 counting boards, 48 were imbalanced by 3 or fewer voters/ballots. *Id.* There were seven counting boards with higher imbalances that range from 13 more ballots to 71 fewer voters. *Id.* This minimal level of imbalance conclusively demonstrated that the allegation was false, weeks before Plaintiffs filed this case.

### D. Allegations Regarding Tabulating Machines

Perhaps the most baseless of Plaintiffs' allegations is a conspiracy theory about Dominion vote tabulators. Plaintiffs in the first election cases initially cited

Exhibit E

two instances of errors—one in Antrim County and one in Oakland County (Rochester Hills) to insinuate that the tabulating system used in many counties was flawed. Certainly understanding the weakness of the initial theory, Plaintiffs here wove in a nonsensical tale that a theoretical software weakness upended Michigan's election results. This Court readily recognized that the claims could not hold up.

The Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States," explaining what happened in Antrim County. Ex. 14. The statement explains that the "error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier." *Id*. Essentially, the County installed an update on certain tabulators, but not others. *Id*. The tabulators worked correctly, but when they communicated back to the County, the discrepancy in the software versions led to a discrepancy in the reporting. *Id*. This was quickly discovered and would certainly have been uncovered in the post-election canvass. *Id*. In fact, the integrity of the vote in Antrim County was conclusively proven by the recent audit of the paper ballots.

The Republican clerk of Rochester County, Tina Barton, discredited the allegations of fraud in that City. Officials realized they had mistakenly counted votes

Exhibit E

from Rochester Hills twice, according to the Michigan Department of State. Oakland County used software from a company called Hart InterCivic, not Dominion, though the software was not at fault. Ms. Barton stated in a video she posted online: "As a Republican, I am disturbed that this is intentionally being mischaracterized to undermine the election process …. This was an isolated mistake that was quickly rectified." Ex. 15.[16] Plaintiffs knew all of this before they filed this lawsuit.[17]

### E. The Declarations and Analyses "Supporting" the Complaint Were Full of Intentional Lies

The Complaint also relies heavily on "expert" declarations and affidavits, many heavily redacted. As the district court held in *Bowyer*, "the 'expert reports'

---

[16] An audit of the paper ballots in Antrim County conclusively demonstrated that the claim was false. The official tally was only off by 11 net votes. Ex. 16.

[17] The Plaintiffs here added in a string of falsehoods about Dominion software. The district court in Bowyer addressed those claims head on: "The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. […] These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020). Just like here, "what is present is a lengthy collection of phrases beginning with the words 'could have, possibly, might,' and 'may have.'" *Id.* Ramsland, similar to his claims here, "asserts there was 'an improbable, and *possibly impossible* spike in processed votes' in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020 … [however, the defendant] points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed." *Id.* "Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards." *Id.*

Exhibit E

reach implausible conclusions, often because they are derived from wholly unreliable sources." *See Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020).

From the outset, the "Michigan 2020 Voting Analysis Report" appended to the Amended Complaint departs from any rational statistical analysis. PageID.1771-1801. Stanley Young identifies nine counties as "outliers," because those counties reported larger increases in Democratic votes for President. PageID.1776. His analysis, however, is based entirely on raw vote totals with no consideration of percentage changes. Not surprisingly, eight of the nine counties he identifies are among the nine counties with the largest voting age population. Much of the remaining analysis by Young and the other experts focuses on these counties, which are allegedly "outliers."

This sloppy analysis is followed by "another anomaly that indicates suspicious results." His "anomaly" is nothing more than the fact that President Trump did not do as well with "mail-in votes" as he did with election day votes. PageID.1777. Of course, that was widely expected and understood, for an election in which President Trump discouraged absentee voting and Democrats promoted it.

Revealing an almost incomprehensible ignorance of Michigan election law for supposed "experts," Dr. Quinnell, together with Dr. Young, offer the finding that in two Michigan counties (Wayne and Oakland) demonstrate "excessive vote in

Exhibit E

favor of Biden often in excess of new Democrat registrations." PageID.1778. Apparently, none of the experts, none of the Plaintiffs and none of the Plaintiffs' attorneys are aware that Michigan does not have party registration.

### 1. Spyder/Spider

Plaintiffs' "experts" rely on the partially redacted declaration of "Spider" or "Spyder," who Plaintiffs identify as "a former US Military Intelligence expert" and a "former electronic intelligence analyst with 305th Military Intelligence" Compl. ¶¶ 17, 161. But this was a lie *by Plaintiffs' counsel*. Plaintiffs did not properly redact the declarant's name when they filed the same affidavit in a different court, and it was publicly disclosed that the declarant's name was Joshua Merritt. While in the Army, Merritt enrolled in a training program at the 305th Military Intelligence Battalion, the unit he cites in his declaration, but he never completed the entry-level training course. A spokeswoman for the U.S. Army Intelligence Center of Excellence, which includes the battalion, stated "[h]e kept washing out of courses … [h]e's not an intelligence analyst." Ex. 17. According to the Washington Post, "Merritt blamed 'clerks' for Powell's legal team, who he said wrote the sentence [and] said he had not read it carefully before he signed his name swearing it was true. *Id*. He stated that "My original paperwork that I sent in didn't say that." *Id*. He later stated that "he had decided to remove himself from the legal effort altogether" (which has not happened). *Id*.

It is a near certainty that if Plaintiffs are compelled to publicly file unredacted declarations and affidavits, as they should be, numerous other redacted names and assertions will reveal that the redactions were made to keep the public from discovering more fraud perpetrated on this Court.

### 2. Russell James Ramsland, Jr.

Plaintiffs' "expert" Russell James Ramsland Jr. extrapolates large vote discrepancies from the Antrim County error in reporting early *unofficial* results. In doing so, he intentionally ignores the Secretary of State's report or simply does not do his homework. Ramsland reports "In Michigan we have seen reports of 6,000 votes in Antrim County that were switched from Donald Trump to Joe Biden *and were only discoverable through a hand counted manual recount*." Ramsland Affidavit ¶10; emphasis added. But, there were no hand recounts in Michigan as of that date.[18] The Secretary of State report is not even discussed. Incredibly, Ramsland has since doubled down on his perjury, after gaining access to a voting machine in Antrim County. He now claims, in support for the request for Certiorari to the Supreme Court in this action, that "[w]e observed an error rate of 68.05%" which

---

[18] Plaintiffs, who include six nominees to be Trump electors, including the Republican County Chair for Antrim County, the Republican County Chair of Oceana County and the Chair of the Wayne County Eleventh Congressional District, as well as their attorneys, should also know that when the expert report was prepared there had been no hand recount in Antrim County. An actual hand recount did occur at a later time, and that recount confirmed the accuracy of the official results, within 11 votes.

Exhibit E

"demonstrated a significant and fatal error in security and election integrity." Although the basis for the percentage is unclear, the Antrim County clerk stated that "the 68% error rate reported by Ramsland may be related to [the] original error updating the ballot information." Ex. 18. The clerk of the Republican-heavy County said: "[t]he equipment is great — it's good equipment … [i]t's just that we didn't know what we needed to do (to properly update ballot information) … [w]e needed to be trained on the equipment that we have." *Id.* The claim was also proven to be false by the hand recount audit of the paper ballots in Antrim County, which added 11 net votes to the tally, not the 15,000 predicted by Ramsland. Ex. 16.

Ramsland makes the claim that turnout throughout the state was statistically improbable; but as discussed above, he bases this on fabricated statistics. He claims turnout of 781.91% in North Muskegon, where the publicly-available official results were known, as of election night, to be approximately 78%. Ex. 2. He claims turnout of 460.51% (or, elsewhere on the same chart, 90.59%) in Zeeland Charter Township, where it was already known to be 80%. *Id*. The *only* result out of 19 (not including the duplicates) that Ramsland got right was for Grand Island Township, with a turnout of 96.77%, comprised of 30 out of the township's 31 registered voters. *Id.*[19]

---

[19] Ramsland also claims it was "suspicious" that Biden's share of the vote increased as absentee ballots were tabulated. But, that suspicion require Ramsland to close his eyes to the incontrovertible fact that for the 2020 general election, absentee ballots favored Biden throughout the country, even in the deep red state of

Exhibit E

President Trump repeated this blatantly false claim in his tape-recorded January 2, 2021 telephone conversation with Brad Raffensperger. Ex. 5.

Similarly, Ramsland relies upon the affidavit of Mellissa Carone in support of his claim that "ballots can be run through again effectively duplicating them." Ramsland Affidavit; Compl. Exh. 24 at ¶13. It is understandable that inexperienced challengers and Ms. Carone (who was a service contractor with no election experience) with conspiratorial mindsets might not understand that there are safeguards in place to prevent double counting of ballots in this way, but that does not excuse Plaintiffs' "experts," who choose to rely on these false claims, even after the official canvass had conclusively disproven the allegations.[20]

### 3. William Briggs/Matt Braynard

Plaintiffs rely on an "analysis" by William M. Briggs of "survey" results apparently posted in a tweet by Matt Braynard. Braynard's survey was submitted in

---

Tennessee. https://tennesseestar.com/2020/11/05/republicans-dominate-the-2020-tennessee-election-cycle/.

[20] Emblematic of Plaintiffs' contempt for facts is another "expert" report that was filed with the original Complaint in this case, but not submitted with the Amended Complaint. Paragraph 18 of the original Complaint introduced "Expert Navid Kashaverez-Nia" and alleged that "[h]e concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden." Notably, the "expert" relied on a finding that in "Edison County, MI, Vice President Biden received more than 100% of the votes…." There is no Edison County in Michigan (or anywhere in the United States). The fabrication was only removed after it was discovered and reported by the news media.

Exhibit E

a different case (*Johnson v. Secy of State*, Michigan Supreme Court Original Case No. 162286),[21] so its underlying falsehoods have been exposed. Braynard misrepresents Michigan election laws, and completely disregards standard analytical procedures to reach his contrived conclusions. He refers to voters who have "indefinitely confined status," something which has never existed in our state. He refers to individuals "who the State's database identifies as applying for *and the State sending an absentee ballot*," when, in Michigan, absentee ballots are never sent by the State. He refers repeatedly to "early voters," when Michigan has absentee voters, but, unlike some other states, has never allowed "early voting." He apparently believes (incorrectly) that every time a voter's residence changes before election day that voter is disenfranchised. Mr. Thomas addresses these factual and legal errors in the attached Affidavit. Ex. 13.

The disturbing inadequacy of Braynard's survey is also explained in the affidavit of Dr. Charles Stewart III, the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology. Dr. Stewart's credentials are impeccable and directly applicable to the subject matter. Ex. 20

---

[21] The "survey" as submitted in *Johnson* is attached here as Ex. 19. The request for relief was denied by the Supreme Court *Johnson*. *See Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020).

Exhibit E

(Affidavit of Charles Stewart II) (originally submitted in *Johnson*).[22] At the request of the City of Detroit, Dr. Stewart reviewed the Braynard survey and came to the unqualified opinion that "Mr. Braynard's conclusions are without merit." (*Id.* ¶10). He explains the basis for his opinion in clear and understandable detail.

Briggs' analysis of Braynard's report estimate that "29,611 to 36,529 ballots out of the total 139,190 unreturned ballots (21.27% - 26.24%) were recorded for voters who had not requested them." Braynard says 834 people agreed to answer the question of whether they requested an absentee ballot. But he does not report how many respondents did not answer. More to the point, he does not explain how he confirms that these respondents understood what it meant for them to "request" an absentee ballot. Some might have gone to their local clerk's office to vote, where they signed a form, received a ballot and voted, without realizing that that form is an absentee ballot "request." Braynard concludes that certain people who failed to return a ballot never requested that ballot. But he does not address the possibility that the very people (139,190 out of more than 3.5 million) who would neglect to return a ballot would likely be those who might forget that they had requested one.

Braynard offers a baffling array of inconsistent numbers. On Page 8 of his report, he refers to "96,771 individuals who the State's database identifies as having

---

[22] Dr. Stewart is uniquely suited to address these issues. He is a member of the Caltech/MIT Voting Technology Project and the founding director of the MIT Election Data and Science Lab.

Exhibit E

not returned an absentee ballot," when for his first two opinions that number is 139,190. On page 8, he reports a percentage of 15.37% not having mailed back their ballots, but on page 5 he identifies that percentage as 22.95%. Then, the actual numbers of individuals answering the question in that manner, described on page 8 (241 out of 740), would establish a percentage of 32.56%. If this were not sloppy enough, at the top of page 9, he reports, with no explanation "Based on these results, 47.52% of our sample of these absentee voters in the State did not request an absentee ballot." Even if his percentages were completely off and inconsistent, the data would be meaningless. Braynard ignores Michigan election procedures when he declares that there is evidence of illegal activity because some voters are identified in the State's database as having not returned an absentee ballot when those voters "did in fact mail back an absentee ballot…." But, when millions of citizens voted absentee, some of those mailed ballots were not received by election day. He also does not consider the possibility of a voter either not remembering accurately or not reporting accurately whether a ballot was mailed.[23]

Braynards' analysis of address changes is equally invalid. He misrepresents how change of address notifications work. It is not at all uncommon for one person

---

[23] A slightly modified version of the Briggs/Braynard analysis was rejected by the *Bowyer* court. *Bowyer*, 2020 WL 7238261, at *14 ("The sheer unreliability of the information underlying Mr. Briggs' 'analysis' of Mr. Braynard's 'data' cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.").

Exhibit E

to move and file a change of address that appears to affect more household members, or a person might file a change of address for convenience during a temporary period away from home, without changing their legal residence. Stewart Aff ¶ 21. Every year, tens of thousands of Michigan voters spend long periods of time in other states (e.g., Florida or Arizona) without changing their permanent residence or voting address. Clerks have procedures in place to address these issues. Even voters who do make a permanent move can vote at their prior residence for sixty days if they do not register to vote at their new address.[24]

## IV. Plaintiffs' Legal Theories Were Frivolous

Rule 11 places the failure to plead colorable legal theories squarely on the attorney making the claim. In addition to pleading false allegations, this lawsuit has always been legally dubious.

---

[24] It is not possible that these experts were simply negligent. They consistently ignore the obvious explanations for their so-called anomalies. For instance, Bouchard intentionally ignores the fact that unofficial results are released on a rolling basis, i.e. in "data dumps" accounting for hours of tabulation, to claim it was somehow anomalous for there to be large increases in the number of votes between data releases. Quinnell ignores the fact that voter turnout and preferences will change between elections based on the identities of the candidates, when he claims it was somehow anomalous for turnout to have increased for the 2020 election and for Biden to have picked up votes in suburban areas (a phenomenon seen throughout the country). He also ignores the well-known fact that urban core precincts in this country are strongholds for the Democratic Party, when he claims there was something anomalous about the fact that such precincts in Detroit strongly favored Biden. Many of these issues are addressed in the responses, and supporting exhibits, to Plaintiffs' Motion for Temporary Restraining Order. ECF Nos. 31, 36 and 39.

Exhibit E

First, even if there had been a semblance of truth to any of Plaintiffs' allegations, the lawsuit would still have been frivolous because the relief requested could, in no way, be supported by the claims. As this Court stated, the relief Plaintiffs seek is to "disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election." *King*, 2020 WL 7134198, at *1. Nothing Plaintiffs allege—or could allege—could lead to the "stunning" and "breathtaking" relief sought. *See*, *e.g.*, *Id.* (Stating Plaintiffs "seek relief that is stunning in its scope and breathtaking in its reach.")

Second, there has never been a colorable basis for Plaintiffs' attorneys to assert that the Plaintiffs had standing. The Complaint does not allege that Plaintiffs were denied the right to vote—an injury which would be particularized to the individual Plaintiffs—it alleges Plaintiffs' votes were diluted. As numerous courts have concluded, a dilution theory does not satisfy the Article III requirements of causation and "injury in fact." *See*, *e.g.*, *Georgia Republican Party v. Secy of State of Georgia*, No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020); *Bognet v. Secy Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. Nov. 13, 2020).

Importantly, as this Court concluded, even if Plaintiffs had met those two elements, the Plaintiffs would still not meet the redressability element, because "an order de-certifying the votes of approximately 2.8 million people would not reverse

Exhibit E

the dilution of Plaintiffs' vote." *King*, 2020 WL 7134198, at *9. Counsel for Plaintiffs knew, or should have known, that their clients did not have Article III standing.

Third, there was never a legitimate basis to believe the lawsuit could proceed in the face Eleventh Amendment immunity. The one possibly applicable exception, *Ex Parte Young*, "does not apply, however, to *state law* claims against state officials, regardless of the relief sought." *King*, at *4 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) and *Ex Parte Young*, 209 U.S. 123 (1908)). As this Court noted, the issue has been long settled by the Supreme Court. *See Pennhurst*, at 106. And, with respect to the § 1983 claim, before this lawsuit was filed "the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist … [therefore] [t]here is no continuing violation to enjoin." *King*, at *5.

Fourth, there was never a basis to believe this case was not moot as of the date it was filed. As this Court stated, "[t]he Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so … Plaintiffs did not avail themselves of the remedies established by the Michigan legislature." *Id.*, at *6. The deadline to pursue any such remedies had passed by the time the Complaint was filed, therefore, "[a]ny avenue for this Court to provide meaningful relief" was foreclosed from the start. *Id.*

Exhibit E

Fifth, there was no reason for Plaintiffs' counsel to believe the case would not be barred by laches. As this Court concluded, the relief sought was barred by laches because "Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes." *Id.*, at *7.

Sixth, there was no reason to believe that alleging violations of the Michigan Election Code could support a claim for violation of the Elections & Electors Clauses. As this Court concluded, "Plaintiffs cite to no case—and this Court found none—supporting such an expansive approach." *Id.*, at *12.

Seventh, there was no basis to believe that the allegations could support an equal protection claim. The equal protection claim "is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden" with "the closest Plaintiffs get" being a statement by one affiant stating "I *believe* some of these workers were changing votes that had been cast for Donald Trump ..." *Id.* (citing to record). Similarly, "[t]he closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible.*" *Id.* (citing to record). It was patently obvious from the day this lawsuit was filed, that "[w]ith nothing but speculation and conjecture that votes for President Trump were

Exhibit E

destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.*, at *13 (citation omitted).

## V. The Sanctions Which Should be Imposed Pursuant to Rule 11

This lawsuit, and the lawsuits filed in the other states, are not just damaging to our democratic experiment, they are also deeply corrosive to the judicial process itself. When determining what sanctions are appropriate, the Court should consider the nature of each violation, the circumstances in which it was committed, the circumstances of the individuals to be sanctioned, the circumstances of the parties who were adversely affected by the sanctionable conduct, and those sanctioning measures that would suffice to deter that individual from similar violations in the future. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992). Moreover, when considering the type of sanctions to impose, the Court should be mindful that the primary purpose of Rule 11 is to deter future, similar actions by the sanctioned party. *Mann,* 900 F.2d at 962.

Accordingly, this Court should impose monetary sanctions against Plaintiffs and their counsel in an amount sufficient to deter future misconduct. *See*, *e.g.*, *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir. 1987) (courts have wide discretion in determining amount of monetary sanctions necessary to deter future conduct). Here, an appropriate sanction amount is, at the least, the amount that Plaintiffs' counsel have collected in their fundraising

Exhibit E

campaign, directly or through entities they own or control, for their challenges to the 2020 election. They should not be allowed to profit from their misconduct.

It is also appropriate for Plaintiffs and their counsel to pay all costs and attorney fees incurred by Defendants. *See*, *e.g.*, *id.*; *see also Roberson v. Norfolk Southern Railway Co.*, 2020 WL 4726937, at *7 (E.D. Mich. Aug. 14, 2020) (awarding costs incurred by Defendant as a sanction against Plaintiff and Plaintiff's counsel for filing frivolous claims unsupported by law). In *Stephenson v. Central Michigan University*, No. 12-10261, 2013 WL 306514, at *14 (E.D. Mich. Jan. 25, 2013), attorney fees and costs were awarded as sanctions after the plaintiff's refusal to withdraw her frivolous claims during the 21-day safe harbor period provided by Rule 11. Sanctions were warranted because the plaintiff "brought a frivolous lawsuit which lacked evidentiary support, and continued to pursue her claims once the lack of support was evident …." *Id*. The same applies here. Plaintiffs' claims were frivolous from the start, yet they refused to withdraw them when provided the opportunity. As a result, Defendants should be reimbursed for their attorney fees and costs.

Plaintiffs should also be required to post a bond of $100,000 to maintain their present (frivolous) appeal and for each additional appeal in this action. *See*, *e.g.*, *SLS v. Detroit Public Schools*, No. 08-14615, 2012 WL 3489653, at *1 (E.D. Mich. Aug. 15, 2012) (requiring the plaintiff to file $300,000.00 security bond).

Exhibit E

To protect against their future filing of frivolous lawsuits in this District, Plaintiffs and their counsel should be required to obtain pre-clearance by a magistrate judge of any proposed lawsuit. If the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, the plaintiff[s] would be required to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]. *See, e.g.*, *Feathers v Chevron U.S.A., Inc.*, 141 F.3d 26, 269 (6th Cir. 1998) ("There is nothing unusual about imposing prefiling restrictions in matters with a history of repetitive or vexatious litigation."); *see also*, *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996) (permanently enjoining plaintiff from filing action based on particular factual or legal claims without first obtaining certification from a United States Magistrate that the claim is not frivolous).

Much of this brief addresses attorney misconduct, but this is the rare case where the Plaintiffs themselves deserve severe sanctions. Each plaintiff in this case is an experienced Michigan politician; each plaintiff was selected as a candidate to serve as a Trump elector; and, each plaintiff had to know that the Complaint is rife with false allegations. None of the Plaintiffs had any legitimate basis to believe any of the factual assertions in the Complaint, yet they signed on. And, indeed, they signed on to claims they had to know were false, including the numerous claims by their supposed experts.

33

Exhibit E

The Plaintiffs know that Michigan does not have party registration. They know that Michigan does not have "early voting." They know that the nine counties identified as "outliers" because of larger raw vote shifts are simply some of the largest counties in the State. They know that the State does not mail ballots to voters. They know that it is common in Michigan for voters to vote absentee by appearing at the clerk's office, signing an application, receiving a ballot and returning it, all on the same day. They know that some absentee ballots are mailed by voters but received too late to be counted. They know that counting fifty ballots eight or ten times (as alleged by Mellissa Carone) would be found and corrected at multiple stages of the tabulation and canvassing process. They know that there could not have been a hand recount in Antrim County before the lawsuit was filed. They know that absentee ballots took longer to tabulate than in-person ballots and that Biden supporters were more likely to vote absentee than Trump supporters. And, these experienced Michigan politicians know that their "experts" based their findings on disregarding all of these facts.

In a case of this magnitude, intended to upend the election of the President of the United States, the Plaintiffs owed this Court the highest degree of due diligence before filing suit. Instead, there are only two possibilities—these six Plaintiffs did not read the Complaint and the expert reports supporting it; or, they did read the Complaint and the faulty expert reports and did not care that false representations

Exhibit E

were being made to this Court. Either way, this case cries out for sanctions to deter this behavior in the future.

## VI. Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief Judge for Disbarment

In addressing attorney misconduct, the most important sanction here is not a Rule 11 sanction, but a disciplinary action pursuant to the Local Rules. The message must be sent that the Eastern District of Michigan does not tolerate frivolous lawsuits. The out of state attorneys appearing on the pleadings for the Plaintiffs never sought admission to the Eastern District of Michigan and never affirmed their acceptance of our Civility Principles. They have demonstrated their unwillingness to be guided by those principles, and they should be barred from returning to our courts.

E. D. Mich. LR 83.20(a)(1) defines "practice in this court," to include: "appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court."[25] "When misconduct or allegations of misconduct that, if substantiated, would warrant

---

[25] The Rule requires that a "person practicing in this court must know these rules, including the provisions for sanctions for violating the rules." Under 83.20(j) an attorney "who practices in this court" is subject to the Michigan Rules of Professional Conduct, "and consents to the jurisdiction of this court and the Michigan Attorney Grievance Commission and Michigan Attorney Discipline Board for purposes of disciplinary proceedings."

Exhibit E

discipline of an attorney" who is a member of the bar or has "practiced in this court" come to the attention of a judicial officer by complaint or otherwise, the judicial officer may refer the matter to: (1) the Michigan Attorney Grievance Commission, (2) another disciplinary authority that has jurisdiction over the attorney, or (3) the chief district judge for institution of disciplinary proceedings ..." LR 83.22.

This case clearly warrants the full imposition of each disciplinary option in the Local Rules. This Court should enter an Order requiring Plaintiffs' to show cause why they should not be disciplined. LR 83.22(d) authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court." In *Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996), this Court levied monetary sanctions and a formal reprimand against counsel for raising frivolous arguments. "Enforcing Rule 11 is the judge's duty, albeit unpleasant. A judge would do a disservice by shying away from administering criticism … where called for." *Id.*, at 253 n. 6 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988)). The conduct of Plaintiffs' counsel in knowingly asserting false and frivolous claims while seeking relief with massive implications for our democracy warrants the strongest possible disciplinary action.

36

Exhibit E

The Court should refer Plaintiffs' counsel to the Chief Judge of this District for disbarment proceedings and to their state bars for disciplinary actions. It appears that only one of the Plaintiffs' attorneys in the case—Greg Rohl—is admitted to practice in this District; he should be barred from further practice in the District.[26] The other attorneys should be prohibited from obtaining admission to this District or practicing in it in any manner, including, where, as here, they do not seek formal admission, but sign the pleadings.

All Plaintiffs' attorneys should also be referred for disciplinary proceedings to the Michigan Attorney Grievance Commission as well as to the disciplinary authorities in their home states (Sidney Powell, Texas; L. Lin Wood, Georgia; Emily

---

[26] Greg Rohl is the one attorney for Plaintiffs currently admitted to the Eastern District of Michigan. He has previously been sanctioned for filing a case which was deemed "frivolous from its inception" and ordered to pay over $200,000 in costs and attorney fees. *See DeGeorge v. Warheit*, 276 Mich. App. 587, 589, 741 N.W.2d 384 (2007). He was then held in criminal contempt and sentenced to jail—affirmed by the Court of Appeals—for attempting to transfer assets to evade payment. *Id.* The Court of Appeals noted that a bankruptcy court had concluded that Rohl "intended to hinder, delay and defraud … and create a sham transaction to prevent [a creditor] from reaching Rohl's interest in his law firm through the appointment of a receiver." *Id.* at 590. Rohl was also suspended by the Michigan Attorney Discipline Board in 2016 based on his convictions for disorderly conduct, in violation of M.C.L. § 750.1671F, "telecommunications service - malicious use, in violation of M.C.L. § 750.540E" and based on his admissions to at least two additional allegations of professional misconduct. Ex. 21. Those prior sanctions and disciplines were insufficient to discourage Mr. Rohl from filing the case at bar, leaving this Court with only one way to stop his behavior—he should be barred from practice in the Eastern District of Michigan.

Exhibit E

Newman, Virginia; Julia Haller, D.C.; Brandon Johnson, D.C.; Howard Kleinhendler, New York). Those authorities can determine the appropriate response.

It is only by responding with the harshest possible discipline that these attorneys and those who would follow in their footsteps will learn to respect the integrity of the court system.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the City of Detroit respectfully requests that this Court enter an Order sanctioning Plaintiffs and their counsel and initiating disciplinary proceedings in the manner identified in the Motion.

January 5, 2021

Respectfully submitted,

**FINK BRESSACK**

By:   /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor

Exhibit E

Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
nosej@detroitmi.gov

Exhibit E

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

<div align="center">

**FINK BRESSACK**

</div>

By:    */s/* Nathan J. Fink
Nathan J. Fink (P75185)
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel.: (248) 971-2500
nfink@finkbressack.com

Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIMOTHY KING, MARIAN
SHERIDAN,
JOHN HAGGARD, CHARLES
RITCHARD,
JAMES HOOPER, DAREN
RUBINGH,

        Plaintiffs,

v.

GRETCHEN WHITMER, in her official
capacity as the Governor of the State of
Michigan, JOCELYN BENSON, in her
official capacity as Michigan Secretary of
State and the Michigan BOARD OF
STATE CANVASSERS,

        Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY,
        Intervenor-Defendants.

        Defendant.

CASE NO. 2:20-cv-13134

Hon. Linda V. Parker

Mag. R. Steven Whalen

**PLAINTIFFS' OPPOSITION TO THE CITY OF DETROIT'S MOTION**
**FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT**
**REFERRAL AND FOR REFERRAL TO STATE BAR DISCIPLINARY**
**BODIES AND TO THE DEFENDANTS WHITMER AND BENSON'S**
**CONCURRENCE IN CITY OF DETROIT'S MOTION FOR SANCTIONS**

Exhibit F

The City of Detroit's Motion for Sanctions, for Disciplinary Action, for Disbarment Referral And for Referral To State Bar Disciplinary Bodies is baseless, procedurally improper, and is an attempt to create a dangerous precedent that could dissuade future civil rights and voting rights plaintiffs from bringing their disputes to court. It should be denied, and the City of Detroit should be ordered to pay Plaintiffs' fees and costs incurred in opposing the motion.

## Issue Presented

Whether Plaintiffs and their' counsel should be sanctioned under Rule 11, Plaintiffs' counsel disbarred or referred to State Bar Disciplinary Bodies: <u>No</u>.

## <u>Controlling Authority</u>

<u>Cases</u>

*Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674 (E.D. Mich. May 20, 2020)

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir.1999)

*FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335 (7th Cir. 2010) (*citing Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005)

*In re Ruben*, 825 F.2d 977 (6th Cir. 1987)

*Jensen v. Phillips Screw Co.*, 546 F.3d 59 (1st Cir. 2008).

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45(2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570(2007).

*Matter of Yagman*, 796 F.2d 1165 (9th Cir. 1986)

*MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicone Corp.*, 420 F.3d 1369 (Fed.Cir.2005)

Exhibit F

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)

*Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997)

*Steinert v. Winn Group, Inc.*, 440 F.3d 1214 (10th Cir.2006)

*Thurmond v. Wayne Cnty. Sheriff Dept.*, 564 F. App'x 823 (6th Cir. 2014)

*United States v. Ross*, 535 F.2d 346

*Young v. Smith*, 269 F. Supp. 3d 251 (3d Cir. 2017)

<u>Statutes & Court Rules</u>

28 U.S.C. § 1927

Fed. R. Civ. P. 54(d)(2)

MCLS § 168.726

## **Introduction**

Defendants do not allege specific deficiencies in pleadings; instead they attack the credibility of evidence attached to the complaint, whether by Declaration or Affidavit – despite the Plaintiffs submitting evidence for nearly every paragraph in the Amended Complaint, with over 200 affidavits and declarations, and never having an evidentiary hearing.

Election integrity should be a non-partisan issue. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "*trouble -plagued companies*"' "*have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software,

Exhibit F

Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (*See* Am. Compl. at p. 59, par. G, citing Ex. 16).

Defendants' Motion reeks of political smear tactic and promotes a one-sided political viewpoint, rather than seeking to uphold any professional standards governing lawyers. Actually, it is the conduct of Defendants and their counsel that violates the code of legal ethics. The City's request for sanctions must be denied, for multiple reasons explained in the Brief in Support below, filed pursuant to Local Rule 7.1(d)(1)(A). The State Defendants' passing request for "sanctions and/or costs and fees" is procedurally improper, as it was not made by motion with a supporting as required under Local Rule 7.1(b) and 7.1(d)(1)(A), and likewise must be denied.

## Procedural background

On January 5, 2021, the City moved for sanctions under Rule 11,  as well as for the extraordinary remedy of the disbarment of SEVEN attorneys, and their referral to state bars for disciplinary action. The City had previously moved for sanctions under 28 U.S.C. § 1927 ("Section 1927"),.  (See ECF 70 and 73). On January 14, 2021, the State Defendants filed a Consent to the City's motion stating that they reserve the right to file their own motion for sanction at a future date.  ECF __.  The "Consent" is not a recognizable motion and adds nothing to the motion presented by the City.

On November 25, 2020, Plaintiffs filed their Complaint. [ECF 1].  Plaintiffs amended their complaint on November 29th and also filed a motion for a TRO [ECF

Exhibit F

6, 7]. Since its initial filings, Plaintiffs have taken every reasonable measure to expedite this proceeding and to terminate the proceeding once their claims were no longer viable. In their November 29, 2020 "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" ("TRO Motion"), ECF No. 7, Plaintiffs requested an expedited briefing schedule, which the Court granted. ECF No. 24. On December 7, 2020, without oral argument, and based solely on the initial pleadings and responses, the Court denied the TRO Motion (See ECF No. 62). Plaintiffs promptly appealed to the Sixth Circuit and to the US Supreme Court. [ECF Nos. 64 and 68].

On December 22, 2020, with these appeals pending, the State Defendants and Intervenors moved to dismiss the Amended Complaint. [ECF Nos. 70, 72, 73] On January 6, 2021, the US Congress "certified the election", rendering Plaintiffs' claims moot. On January 14, 2020 Plaintiffs voluntary dismissed the Amended Complaint for all Defendants and Defendant/Intervenors other than Mr. Davis. On January 17, 2021 regarding Intervenor Defendant Davis, Plaintiffs moved for voluntary dismissal ECF No. 86-92.

## **LEGAL ARGUMENT**

### I.  **The Requests for Rule 11 Sanctions Fail for Procedural Reasons.**

The City's Motion for both Rule 11 sanctions and for disbarment of attorneys and their referral to state bar associations for disciplinary action is procedurally improper because it violates the requirement that a Rule 11 sanctions motion "must be

Exhibit F

made separately from *any other motion*," Fed. R. Civ. P. Rule 11(c)(2) (emphasis added). The City has not cited any provision of the Federal Rules of Civil Procedure or Local Rules authorizing such a bundling or multiple types of sanctionable relief. The City intervened in this suit solely for the purpose of seeking sanctions—an action itself improper. It filed its specious motion in its own improper effort to promote its own agenda with the media and to distract from explosive evidence of voter fraud. Its motion is far more of a crafted smear to injure the standing and reputation of the Plaintiffs' attorneys than one to uphold any professional standards. Indeed, the City violated the very standards it purported to uphold by filing its spurious motion. There is no legal or factual basis for this Court to grant the City's requested relief. Accordingly, because the City has submitted one motion for Rule 11 sanctions and other types of punitive non-Rule 11 relief, the entire motion must be denied. *See, e.g., Dolinka Vannoord & Co. v. Oppenheimer & Co.,* 891 F. Supp. 1244, 1252 (W.D. Mich. 1995) (sanctions denied for failure to comply with separate Rule 11 motion requirement; "In any event, due to the uncertainty of Michigan law on the key issues in this case … sanctions would [have] be[en] inappropriate."); *Peloza v. Capistrano United Sch. Dist.,* 37 F.3d 517, 524 (9th Cir. 1994) (reversing sanctions award of $32,000 and finding First Amendment claims non-frivolous because plaintiff raised important questions of first impression), *cert. denied*, 515 U.S. 1173 (1995); *Milwaukee Concrete Studios, Ltd. v. Field Mfg. Co.,* 8 F.3d 441 (7th Cir. 1993) (vacating sanctions because case involved issues of first impression); *United States v. Alexander,* 981 F.2d 250, 253 (5th Cir. 1993) (vacating

Exhibit F

imposition of sanctions; case presented novel issues and party's argument was plausible); *Clancy v. Mobil Oil Corp.,* 906 F. Supp. 42, 50 (D. Mass. 1995) ("In light of the lack of clearly defined First Circuit precedent in this area, plaintiffs' argument … is not entirely unfounded. … Plaintiffs' arguments therefore fall outside the reach of Rule 11."); *Fowler v. Towse*, 900 F. Supp. 454, 461 (S.D. Fla. 1995) (sanctions denied for non-frivolous argument on novel issue).

Secondly, the City's motion must be denied as to all attorneys who did not actually appear or sign any pleadings in this matter. Rule 11 is concerned with the signing of frivolous pleadings and other papers. *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986). It may not be invoked against attorneys whose names appear on a pleading but who have not signed the pleading or otherwise formally appeared in the action. *In re Ruben*, 825 F.2d 977, 984, (6th Cir. 1987).

Indeed, "[w]here plaintiff signed filed papers, but the attorney's name appeared on papers only in typewritten form, sanctions cannot be imposed on attorney since Rule 11 focuses only on individual who signed document in question. *White v. American Airlines, Inc.*, 915 F.2d 1414, 17 Fed. R. Serv. 3d (Callaghan) 1199, 6 I.E.R. Cas. (BNA) 1086, 116 Lab. Cas. (CCH) ¶56400, 1990 U.S. App. LEXIS 17201 (10th Cir. 1990). Typewritten name is not signature for purpose of Rule 11, and therefore senior partner of law firm which represented defendants and whose name was typed on pleadings but who did not personally sign them is not subject to Rule 11 sanctions. *Giebelhaus v. Spindrift Yachts*, 938 F.2d 962, 91 Cal. Daily Op. Service 5352, 91 D.A.R.

Exhibit F

8248, 19 Fed. R. Serv. 3d (Callaghan) 1364, 1991 U.S. App. LEXIS 14212 (9th Cir.

1991)."

*Id.  See also* Commentary, USCS Fed Rules Civ Proc R 11.

The Sixth Circuit in *In re Ruben* cited to *Oliveri v. Thompson*, 803 F.2d 1265, 1274

(2nd Cir. 1986) which held that:

> Rule 11, requires that "every pleading, motion, and other paper of a party represented by an attorney shall be signed" by the attorney. It then provides that:

> the signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

> Fed. R. Civ. P. 11.

> …From this language it is apparent that a sanction for attorneys' fees may be imposed either on the attorney who signs a paper, or on the party he represents, or on both. The key to rule 11 lies in the certification flowing from the signature to a pleading, motion, or other paper in a lawsuit. While a continuing prohibition against dilatory litigation is imposed by § 1927, *see Roadway Express*, 447 U.S. at 757; *Browning Debenture Holders' Committee*, 560 F.2d at 1088, rule 11, by contrast, deals with the signing of particular papers in violation of the implicit certification invoked by the signature.

> Rule 11 applies only to the initial signing of a "pleading, motion, or other paper". Limiting the application of Rule 11 to testing the attorney's conduct at the time a paper is signed is virtually mandated by the plain language of the rule. Entitled "Signing of Pleadings, Motions, and Other Papers; Sanctions", the rule refers repeatedly to the signing of papers; its central feature is the certification established by the signature.

*Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986)

Exhibit F

For this reason alone, the City's motion against all counsel other than local counsel, must be denied.  The only signator or appearance made in the short life of this case has been by Plaintiffs' local counsel.  No other counsel signed any pleadings.  Indeed, the City recognizes that E. D. Mich. LR 83.20(a)(1) defines "practice in this court," to include: "appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court."  (See ECF 78, p. 37). None of that applies to any of Plaintiffs' non-local counsel.

## II.    Rule 11(c)(2)'s Safe Harbor Notice Requirement and Plaintiff's Voluntary Dismissal of Complaint within 21 Days.

As a preliminary matter, Rule 11(c)(2) sets forth that:

> (2) <u>Motion for Sanctions</u>. A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

USCS Fed Rules Civ Proc R 11.

The City' Rule 11 motion claims regarding frivolous legal claims and unsupported factual allegations must be dismissed for failure to provide 21-days' notice and opportunity for response under Rule 11(c)(2).  Plaintiffs moved to voluntarily dismiss this case (and thereby withdraw all pleadings) on January 14, 2021.  The City

Exhibit F

served a copy of notice of an anticipated Motion on Plaintiffs' counsel on December 15, 2020. That "notice" makes only conclusory statements and blanket assertions regarding the alleged violations of Rule 11 and fails altogether to "describe the specific conduct that allegedly violates Rule 11(b)." *Id.* Further, it fails to identify any specific factual allegation or witness that lacks evidentiary support. Instead, it is only in the accompanying Brief, filed on January 5, 2021, that the City first identifies the "specific conduct" that allegedly violates Rule 11. For r example, the Motion contains only a single sentence identifying specific contested factual allegations, ECF No. 78 at vii, while the Brief spends 13 pages.

In *Hadges & Kunstler v. Yonkers Racing Corp.,* 48 F.3d 1320, 1327-28 (2d Cir. 1995) the Second Circuit commented on the amendment, as follows:

> Of particular relevance here, the 1993 amendment establishes a "safe harbor" of 21 days during which factual or legal contentions may be withdrawn or appropriately corrected in order to avoid sanction. Fed. R. Civ. P. 11(c)(1)(A).
> *Photocircuits Corp. v. Marathon Agents*, 162 F.R.D. 449, 451, (E.D. N.Y. 1995)

In addition, as the court in *Cromwell v. Cummings*, *supra*, 65 Cal. App. 4th Supp. 10, recognized, "[a]pplication of the doctrine of substantial compliance would be inconsistent with the plain language of the 'safe harbor' provision, which has been strictly construed as an absolute perquisite to an award of sanctions under revised rule 11 of the Federal Rules of Civil Procedure (28 U.S.C). *Barnes v. Department of Corrections*, 74 Cal. App. 4th 126, 135-136, 87 Cal. Rptr. 2d 594, 602, (Ca. App. 1999)(*Citing Ridder*

Exhibit F

*v. City of Springfield, supra,* 109 F.3d at p. 296.)" (*Id.* at p. Supp. 15.) Indeed, the Advisory Committee Notes to rule 11 state: "To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, **the revision provides that the 'safe harbor' period begins to run only upon *service of the motion*.** In most cases however, *counsel should be expected to give informal notice* to the other party, whether in person or by a telephone call or *letter*, of a potential violation before proceeding to prepare and serve a Rule 11 motion." (Fed. Rules Civ. Proc., Rule 11, 28 U.S.C.A., *supra,* Advisory Com. Notes, 1993 amendments, p. 284, italics added.)

This Court must, at a minimum, deny the Motion with respect to any argument, claim or contention first described in the City's Brief, as protected under the Rule 11(c)(2) safe harbor, and should deny the Motion as a whole based on the City's filing of the Motion on January 5th, 2020, because Defendants' filed dismissals to this Court for all parties on January 14, 2020, and regarding Intervenor Defendant Davis on January 17th, 2020.

As explained above, Plaintiffs promptly moved to voluntarily dismiss this case in its entirety, including pending appeals, within the 21-day notice period of the filing of the motion on January 5, 2020, (See ECF 78) and (ECF 86-92).

## III.    Rule 11(b)(1): The Complaint Was Properly Filed with Proper Purpose

### A.    Plaintiffs Did Not Seek to Harass the City

Exhibit F

Even if the City's Motion were not procedurally barred, Plaintiffs and their counsel have not violated Rule 11. Rule 11 provides that "sanctions may be imposed if a reasonable inquiry discloses [that a] pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Sony/ATV Music Publ'g LLC v. 1729172 Ont., Inc.*, 2018 U.S. Dist. LEXIS 140856, *36-37, 2018 WL 4007537, (*citing Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (citation omitted).... 'In order for conduct to be considered so "unreasonable" as to warrant sanctions, that conduct must be "relatively egregious."' *Id.* (*citing Fulmer v. MPW Indus. Servs., Inc.*, 2006 U.S. Dist. LEXIS 42038, 2006 WL 1722433 at *5 (M.D. Tenn. June 21, 2006) (Trauger, J.).

"'A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *Shirvell v. Gordon*, 602 Fed. Appx. 601, 604 (6th Cir. 2015) (*citing Merritt v. Int'l Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quoting *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005)).

Plaintiffs did not file for "any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase cost of litigation." Fed. R. Civ. P. Rule 11(b)(1). First, the City of Detroit was an intervenor in this proceeding, not a defendant; nor was the City of Detroit a necessary party. Plaintiffs did not seek any

Exhibit F

relief from the City of Detroit, or its officials or employees. The City voluntarily intervened purportedly to "protect its reputation" and its own perception of election integrity. *See* ECF No. 5 at 4. But the City was not accused of conducting elections improperly. It does not conduct elections for the President of the United States. States, through their counties, do. So while Detroit sits in Wayne County, and allegations were made concerning fraudulent election activity in that county, the City of Detroit has no role in the matter, and it should not have intervened.

Apart from its serial motions for sanctions, the City of Detroit has not made any unique legal arguments, but simply parroted the same arguments made by Defendants and other intervenors. Accordingly, Plaintiffs cannot be deemed to have filed for purposes of harassing the City, and in fact, opposed the City's intervention. *See* ECF No. 5 at 1.

**B.   Public Statements and Tweets By Co-Counsel Do Not Demonstrate That Plaintiffs or Counsel Had Improper Purpose but State Defendants' Statements Call into Question the Propriety of Defendants' Purpose.**

The City's speculative attribution of an improper motive attributable to Plaintiffs' counsel because of the media appearances of Lin Wood and Sidney Powell do not implicate Rule 11(b)(1), as neither Mr. Wood nor Ms. Powell was a signer to the pleadings. The tweets referenced in the City of Detroit's outlandish character assassination of plaintiffs' counsel have nothing to do with the merits of the suit, the claims set forth in this Court, or the evidence provided by plaintiffs' counsel in support

Exhibit F

of their claims. Put frankly, they are entirely irrelevant to a Rule 11 consideration, particularly because no signer was the author or instigator of this media content. The actual signers of the pleading did not produce the tweets, reference the tweets, or retweet the tweets and have not been accused of making improper media appearances.

The Fourth Circuit in *In re Kunstler* held that any improper purpose must be "derived from the motive of the *signer* in pursuing the suit." 914 F.2d 505, 518–19 (4th Cir. 1990) (emphasis added). A Court may consider a *signer's* subjective beliefs in the purpose analysis, solely if they so clearly demonstrate the signer knew the motion was baseless, and despite this knowledge, proceeded to file. *Id* at 519. Otherwise, the Court must judge the conduct of counsel under an objective standard of reasonableness. *Id.* at 518. Any evidence that cannot be viewed by a court without fear of misinterpretation, or that involves difficult determinations of credibility, is not objective for purposes of a Rule 11(b)(1) analysis. *Id.* at 519. Because neither Mr. Wood nor Ms. Powell were signers to the pleading, this Court may not assess their subjective beliefs in the improper purpose analysis; and there is not even a viable inference that local counsel had any improper purpose.

Even if the Court were to improperly consider the tweets, an evidentiary hearing would be required to assess the veracity of the media statements and their role in impacting the signer's decision to file the suit. As "determinations of credibility are best made after an evidentiary hearing," and because these media statements are the opinions of attorneys who did not sign the pleading, this Court cannot assume improper purpose

Exhibit F

from extrajudicial statements that are not objective, nor were made by the signer. *Id.* at 519-20. Plaintiffs' counsel welcomes the opportunity to participate in an evidentiary hearing to consider the credibility of the evidence presented before this Court.

The State Defendants address Sidney Powell's tweets regarding election integrity issues and concerns about getting an opportunity to be heard in court in their Motion for Sanctions. (See ECF No. 78, pp. 6, 10). Defendants cite tweets alleging that "those false messages are deliberately advanced by these attorneys to support their goals of undermining our democracy" but by threatening plaintiffs and counsel over messages, Defendants undermine the Due Process Clause of the Constitution, "No person shall...be deprived of life, liberty, or property, without due process of law..." Defendants, however, have instead put out ,media headlines and talking points and messages *under the official color of law* to attempt punish Ms. Powell or other counsel over messages on election integrity or the lack thereof - while they had not yet filed or put Plaintiffs on notice of a Rule 11(c)(2) Motion for Sanctions, and appear to be working with one political party rather than from a position of neutrality incumbent on official government actors.

On December 22, 2020, the Michigan Attorney General is quoted in public statements on making assertions that, under color of law, she will seek to get counsel disbarred, where she is using her public office and appears that it is coordinated with DNC Counsel's statements from December 15, 2020.

Exhibit F

On December 15, 2002, the City emailed a notice of its intent to file sanctions motions, purportedly to provide "notice to correct" under Rule 11 - but that December 15th notice appears instead to be coordinated with public statements put out that same day by both the Michigan Attorney General and counsel for the DNC. Specifically, they commented on the need to ensure Plaintiffs' and Plaintiffs' counsel "*pay a price*" for filing election integrity cases. "It's time for this nonsense to end," the City's lawyer **David Fink** told Law & Crime in a phone interview. "The lawyers filing these frivolous cases that undermine democracy **must pay a price**," Fink added.

Indeed, even before the City's motion had been filed, it was tweeted out by **Marc Elias**, an attorney from the Washington-based firm Perkins Coie who has regularly intervened in these cases on behalf of the Democratic Party and the Biden campaign.[1]

But that's not all. Not to be undone by counsel for the City and the DNC, the Michigan Attorney General made the following slanderous and outrageous official statement concerning the filings in this case in which her office appears as counsel of record for the State Defendants:

> "These are *flagrant lies* that Ms. Powell is submitting to, of all places, the United States Supreme Court in some cases. It's disturbing and it undermines our entire profession, and she has to be held accountable,"

---

[1] *Detroit Is Trying to Get Sidney Powell Fined, Banned from Court, and Referred to the Bar for Filing the 'Kraken'*, lawandcrime.com, by Adam Klasfeld, December 15, 2020 https://lawandcrime.com/2020-election/detroit-is-trying-to-get-sidney-powell-fined-banned-from-court-and-referred-to-the-bar-for-filing-the-kraken/)

Exhibit F

Nessel told Detroit reporters. "We'd be asking there be action taken against her law license including potential disbarment."[2]

It appears that their primary motivation in seeking to intervene in this case was to file serial sanctions motions and to defend its reputation, a purpose that has been held to be an impermissible and not to provide standing for filing Rule 11 sanctions. *See, e.g., New York News, Inc. v. Kheel*, 972 F.3d 482, 488 (2d Cir. 1992) (finding aggrieved non-party lacked standing to file Rule 11 motion for purportedly baseless allegations in plaintiffs' complaint).Accordingly, there is no basis for this Court to apply Rule 11 sanctions to non-counsel of record for public statements made. On the contrary, it is defense counsel whose motives for bringing the instant motion and whose

---

[2] Michigan Attorney General Wants to Disbar Sidney Powell, Pro-Trump Attorneys: Michigan is moving to disbar Sidney Powell and other pro-Trump attorneys for the work exposing credible accusations of voter fraud. The National File, By Frankie Stockes by Frankie Stockes December 26, 2020.

https://nationalfile.com/michigan-attorney-general-wants-to-disbar-sidney-powell-pro-trump-attorneys/; see also "The Democratic attorney general also plans to pursue court costs and fees and to file complaints with the attorney grievance commission, Nessel told reporters Tuesday." Sanctions sought against lawyers who pushed to overturn Michigan's election, the Detroit News, by Beth LeBlanc and Craign Mauger, December 22, 2020

https://www.detroitnews.com/story/news/local/michigan/2020/12/22/nessel-seek-sanctions-against-lawyers-challenging-election-results/4009929001/

The Motor City's motion asks a federal judge to fine the lawyers, ban them from practicing in the Eastern District in Michigan and refer them to the Wolverine State's bar for grievance proceedings.)

Exhibit F

contrary, it is the public statements made by counsel for the City of Detroit and the State of Michigan, under color or law, which should be closely scrutinized.

### C. Plaintiffs Have Not Caused Unnecessary Delay or to Unnecessarily Increased Costs

Plaintiffs have taken every reasonable measure to expedite this proceeding and to terminate the proceeding once their claims were no longer viable while seeking relief for their clients. In their November 29, 2020 "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" ("TRO Motion"), ECF No. 7, Plaintiffs requested an expedited briefing schedule, and agreed to forego an evidentiary hearing and discovery specifically because of the time pressure on the relevance of the claims related to election fraud which by their very nature are challenging to bring because of the short time available to file suit. This Court granted the request for expedited briefing, ECF No. 24, and based solely on the initial pleadings and responses, dismissed the TRO Motion <u>a mere eight days later on December 7, 2020</u>. (See ECF No. 62). Further, thereafter Plaintiffs expeditiously moved for voluntary dismissal of the November 29, 2020 Amended Complaint, ECF No. 6, because the relief requested in the Amended Complaint appears to now have become moot.

Plaintiffs moved as expeditiously as possible, while acting in the best interests of their clients, from the outset through the termination of this proceeding, it is the City that seeks to prolong this proceeding with meritless claims for sanctions, supported

Exhibit F

solely by incendiary accusations and ad hominem attacks on Plaintiffs' counsel and willful misrepresentations of Plaintiffs' claims and motives.

## V.    Rule 11(b)(2), (b)(3): Plaintiffs Legal Claims Had Evidentiary Support and Were Not Frivolous

The commentary applicable to determining Rule 3.1. Meritorious Claims and Contentions explains:

> The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. What is required of lawyers is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good-faith arguments in support of their clients' positions.

MRPC 3.1. 'As amended, the rule "stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed." *Merritt v. Int'l Ass'n of Machinists & Aero. Workers*, 613 F.3d 609, 626 (6th Cir. 2010), (*citing Id.* (*citing* Fed. R. Civ. P. 11 advisory committee's note to the 1983 amendment); *see also Century Prods., Inc. v. Sutter*, 837 F.2d 247, 250 (6th Cir. 1988)).

Rule 11 is "not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories," and "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct" based on what was "reasonable to believe" at the time of filing. *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir. 1987), *cert. denied*, 484 U.S. 927 (1987). (quoting Fed. R. Civ. P. Rule 11. Notes of Advisory Committee on Rules -- 1983

Exhibit F

Amendment).  Plaintiffs' central claim -- whether Presidential Electors had standing to bring federal constitutional claims under the Electors Clause and other constitutional provisions -- a was a novel claim for which there was no controlling authority in the Sixth Circuit, but for which there was support in other circuits.

As the Supreme Court has observed in a similar statute providing for recovery of attorney's fees for frivolous claims:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic would discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).  The Supreme Court affirmed the denial of attorney's fees where, as here, the defendant prevailed on "an issue of first impression requiring judicial resolution."  *Id.* (internal quotations omitted).  "If the area of law is considered complex and uncertain, however, Rule 11 sanctions are rarely granted …"  *Balfour Guthrie, Inc. v. Hunter Marine Transport, Inc.*, 118 F.R.D. 66, 74 (M.D. Tenn. 1987) (*citing Vatican Shrimp Co. v. Solis*, 820 F.2d 674, 681 (5th Cir. 1987)).

### A. Plaintiffs Had Reasonable Basis for Legal Claims

### 1.   Standing

Plaintiffs' central claim was that the Michigan Presidential Elector Plaintiffs had standing to file claims for violation of the Electors Clause, as well as standing to bring

Exhibit F

Equal Protection and Due Process claims and under the Fourteenth Amendment as candidates for office and as voters. While the court found that Plaintiffs' claims lacked standing, the fact is Plaintiffs made a good faith legal argument under Article III, § 2, of the U.S. Constitution which provides that,

> "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority[.]"

"It is clear that the cause of action is one which 'arises under' the Federal Constitution." *Baker v. Carr*, 369 U.S. 186, 199 (1962) (A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally; or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.).

These claims were not frivolous as they had support in other circuits, and there was not at the time of filing, any controlling authority in the Sixth Circuit. Instead, there was a circuit split on the elector standing. Plaintiffs relied on a very recent case where the Eighth Circuit interpreted the presidential elector provisions of Minnesota law that were nearly identical to Michigan's electoral law as giving electors standing, as candidates for office, under the Electors Clause to challenge state law violations. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in

Exhibit F

implementing or modifying State election laws).  In that case, the Eighth Circuit Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  The Third Circuit, in a case dealing with a failed congressional candidate, not a Presidential elector, reached a different conclusion in *Bognet v. Secy Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020).

The existence of a circuit split on candidate standing demonstrates that Plaintiffs and counsel had a reasonable basis for their claims and that their position was not frivolous. In fact, the existence of a circuit split can defeat a motion for sanctions even if the position taken runs counter to current controlling authority.  *See, e.g., Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 154-56 (4th Cir. 2002) (vacating district court order imposing Rule 11 sanctions where other circuits had taken legal position contrary to controlling Fourth Circuit precedent). Here, by contrast, there was no controlling Sixth Circuit or Supreme Court authority on elector standing.

### 2. The Eleventh Amendment.

The Supreme Court has held that "[i]t is clear … that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984). However, "[w]hen the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.

Exhibit F

This Court determined that Plaintiffs' claims against Governor Whitmer and Secretary of State Benson were "suit[s] against state officials when 'the state is the real, substantial party in interest.'" Dkt. 62, pp. 8-9. Plaintiffs respectfully disagree with that conclusion. Their Complaint alleges *ultra vires* executive conduct in violation of state law. Plaintiffs' cause of action is premised on the fact that Defendants Whitmer and Benson have acted inconsistently with state and federal law. Accordingly, in Plaintiffs' view, the state is not the real party in interest. If it were, then no citizen could ever maintain a cause action against a state defendant. Ultimately, the point is that the resolution of this issue is fact-intensive, not "clear."

### 3. Laches.

Laches is an equitable doctrine that is necessarily fact-dependent. After a diligent search, Plaintiffs have been unable to locate any analogous case in which a court imposed sanctions on a plaintiff for bringing a claim that the court subsequently deemed barred by laches.

In the instant case, most of Defendants' conduct did not become apparent until Election Day. Thereafter, Plaintiffs diligently collected dozens of affidavits and drafted a seventy-five page initial complaint detailing each of its claims. Plaintiffs filed their Complaint a mere two days after the Michigan Board of State Canvassers certified the election results. Plaintiffs had a reasonable argument for the roughly twenty-one day delay between Election Day and the filing of this Complaint. As such, sanctions would be grossly inappropriate on this basis.

Exhibit F

### 4. Mootness.

Plaintiffs and this Court disagreed on the question of whether or not the relief Plaintiffs sought was moot. The Court essentially concluded that it did not have the power to "decertify" election results once those results had been certified by the Governor. In delivering its reasons, the Court did not cite any controlling case law in support because this is a novel area. (*See* ECF No. 62, Court Op. and Order) However, in their complaint to the US Supreme Court on December 7, 2020, the state of Texas, joined by 18 other state attorney generals, believed a federal court did have the authority to decertify or otherwise invalidate certified state elections results. (See Plaintiffs' Brief in Opposition to 1927 Sanctions] Accordingly, Plaintiffs' reasonable arguments in support of their entitlement to relief cannot be sanctionable on this basis.

### B. Dismissal on Equitable Grounds Should Not Be Basis for Sanctions

Equitable remedies allow that "substantial justice may be attained in particular cases where the prescribed or customary forms of ordinary law seem to be inadequate." 27A Am. Jur. 2d Equity § 1 (*citing Securities and Exchange Com'n v. U.S. Realty & Imp. Co.,* 310 U.S. 434, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940)). By its very nature, equitable claims are heavily fact and circumstance dependent and a particularly bad fit for sanctions when relief is denied. Litigants must know that they can come to court seeking out of the box equitable remedies in unusual disputes, without fear of sanctions. While equitable defenses, such as latches or mootness, may foreclose relief given a particular

Exhibit F

fact pattern it is particularly unlikely that the relief requested is factually or legally baseless because of the purposefully flexible nature of equity.

## C. Dismissal for Failure to Adequately Plead Claims Is Not Basis for Sanctions.

While the Court's rationale for dismissing Plaintiffs' Equal Protection and Due Process claims appears to be that the Court accepted the claims of the City and other parties that Plaintiffs' either failed to adequately plead these claims or to allege facts that, if true, would have stated a claim for relief. *See* ECF No. 62 at 33-34. "Although a legal claim might be so inartfully pled that it cannot survive a motion to dismiss, such a flaw will not in itself support Rule 11 sanction--only the lack ***any*** legal or factual basis is sanctionable." *Hunter*, 281 F.3d at 153 (emphasis added). *See also id.* ("Creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment") (internal quotations omitted). A district court, however, should not impose sanctions so as to chill creativity or stifle enthusiasm or advocacy. *See Securities Indus. Ass'n v. Clarke,* 898 F.2d 318, 322 (2d Cir. 1990).

Moreover, plaintiffs and counsel "need not have in hand before filing enough proof to establish the case." *Samuels v. Wilder*, 906 F.2d 272, 274 (2d Cir. 1990). It "requires only an outline of case," and "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case …" *Id.* (internal citations and quotations omitted). Here, there is a disagreement about the significance of the facts and testimony supporting Plaintiffs' complaint, particularly with

Exhibit F

respect to the allegations of differential weighting of Republican and Democratic votes by Dominion voting machines, discriminatory enforcement (or nonenforcement) of state election laws, and other illegal and discriminatory conduct at the TCF Center described in sworn eyewitness testimony. Plaintiffs alleged that this illegal and unconstitutional conduct did not affect all voters equally, and that it resulted in counting of illegal votes predominantly for Democrats and not counting legal votes for Republican voters. This Court found that Plaintiffs' allegations could not support these claims, and dismissed eyewitness statements in sworn testimony who believed that they observed vote switching or destruction as unsupported, and similar allegations as "theories, conjecture, and speculation that such alterations *were possible.*" ECF No. 62 at 34. But these are precisely the types of credibility determinations that could have been made at an evidentiary hearing, and allegations that could have found additional evidentiary support if discovery had been permitted.

The central goal of Rule 11 sanctions is the deterrence of baseless filings and the curbing of abuses. *Photocircuits Corp. v. Marathon Agents*, 162 F.R.D. 449, 451, (1995) (citing *Cooter & Gell v. Hartmarx Corporation,* 496 U.S. 384, 393, 110 S. Ct. 2447, 2454, 110 L. Ed. 2d 359 (1990**)**; *Caisse Nationale De Credit Agricole-CNCA v. Valcorp,* 28 F.3d 259 (2d Cir. 1994); *McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 21 (2d Cir. 1990) (Rule 11 was enacted to "discourage dilatory and abusive litigation tactics and eliminate frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process."). Rule 11 is designed to deter parties from abusing judicial

Exhibit F

resources, not from filing complaints. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 411, 110 S. Ct. 2447, 2464, 110 L. Ed. 2d 359, 385, (J. Stevens, 1990).

## VI.    Rule 11(b)(3): Plaintiffs Factual Allegations Had Evidentiary Support and/or Would Have Support After Further Discovery or Investigation

### A.    Plaintiffs' Factual Allegations Have Not Been "Debunked."

As an initial matter, the only contested factual allegations that may be before this Court (assuming the Motion is not dismissed as procedurally improper or on other grounds) are those in the Motion served on December 15, 2020, and filed with this Court on January 5, 2021.  The only "specific conduct" identified in the Motion are "[t]he allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center," which according to the City, "have been rejected by every court that has considered them," ECF No. 78 at 7, but does not cite to any case where this was "debunked." *Id.*  Nor could they because it appears that no court has addressed these factual allegations on the merits or held an evidentiary hearing.

While factual allegations made for the first time in the January 5, 2021 Brief are not properly before this Court for failure to comply with Rule 11(c)(2)'s safe harbor and 21-day notice requirement, Plaintiffs will nevertheless demonstrate that the City of Detroit's claims are without merit.  The City of Detroit heavily relies on the Wayne County Circuit Court's opinion and order in *Constantino v. Detroit*, Case No. 20-014780-AW (Nov. 13, 2020), ECF No. 78 at 13-18 ("*Constantino I*"), *aff'd*, 950 N.W.2d 707 (Mich. Nov. 23, 2020) ("*Constantino II*").  There, the circuit court denied a motion for

26

Exhibit F

preliminary injunctive relief that included many of the same factual allegations regarding misconduct at the TCF Center, supported by sworn affidavits from many of the same fact witnesses, as were included in the Complaint, Amended Complaint, and TRO Motion. ECF Nos. 1, 6, 7.

In doing so, the City neglects to mention that the Circuit Court, like this Court, did not conduct an evidentiary hearing. And Defendants fail to point out how it that case substantively differs from the case at bar which addressed a widespread pattern of actual fraud. The City also neglects to mention that three Michigan Supreme Court judges in *Constantino* issued concurring and dissenting opinions finding serious allegations of fraud that needed to be investigated. The Rule 11 Advisory Committee Notes direct district courts to consider minority opinions in determining whether an attorney has conducted a reasonable inquiry as required. Fed. R. Civ. P. Rule 11, Notes of Advisory Committee – 1993 Amendment (directing district courts to take into account "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions").

Specifically, in his dissenting opinion, Justice Viviano highlighted the fact that the Circuit Court's "credibility determinations were made without the benefit of an evidentiary hearing," which "[o]rdinarily … is required where the conflicting affidavits create factual questions that are material to the trial court's decisions on a motion for preliminary injunction" under Michigan state law. *Constantino II*, 950 N.W.2d at 710 n.2

Exhibit F

(Viviano, J. dissenting). In his view, "**[t]he trial court's factual finding have no significance** …" *Id.*, at 710-711 (emphasis added).

Justice Zahra, in a concurring opinion joined by Justice Markman, also disagreed with the Circuit Court's decision not to hold an evidentiary hearing. They also appear to have found the factual allegations of these witnesses to have some merit:

> Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by affiants …, among whom is Ruth Johnson, Michigan's immediate past Secretary of State."

*Id.* at 708 (Zahra, J., concurring). Justice Zahra therefore urged the Circuit Court to "meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants …" *Id.*

A court may, and given the exigencies of time sometimes must, act on motions for preliminary injunctive relief based on "the parties' bare affidavits," *Id.* at 710 (Viviano, J. dissenting), without an evidentiary hearing. However, such purported factual findings cannot be given preclusive effect much less form the basis for finding that factual allegations made in sworn affidavits lacked evidentiary support. Plaintiffs' Amended Complaint presented over 200 sworn fact witness (as well as sworn affidavits from more than a dozen expert witnesses (that were not addressed in *Constantino I* or *Constantino II*), that constitutes more than sufficient evidentiary support to meet the requirements of Rule 11, even before conducting any discovery which likely would have resulted in additional evidence supporting Plaintiffs' allegations.

Exhibit F

While district courts are required to articulate a basis for awarding sanctions, nothing requires them to explain their reasons for not ordering sanctions." *Gibson v. Solideal USA*, Inc., 489 Fed. Appx. 24, 32, 2012 FED App. 0740N (6th Cir. 2012) (*cited Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996) (addressing a district court's silence on its reason to deny sanctions under its inherent powers); *see also Eaton Aerospace, L.L.C. v. SL Montevideo Tech.*, 129 F. App'x 146, 153 (6th Cir. 2005).

In the event this Court declines to deny the City's Motion and consider imposing Rule 11 sanctions under Rule 11(b)(3) it must first conduct an evidentiary hearing to make credibility determinations for Plaintiffs' witnesses. *See, e.g., Donaldson v. Clark*, 819 F.3d 1551, 1561 (11th Cir. 1987) ("when a court is asked to resolve an issue of credibility ...the risk of an erroneous imposition of sanctions under limited procedures and the probably value of additional hearing are likely to be greater.") A hearing is further required in light of the draconian, punitive, and unprecedented nature of the City of Detroit's proposed sanctions: "[T]he more serious the possible sanction both in absolute size and in relation to actual expenditures, ***the more process that will be due.***" *Id.* (emphasis added). Moreover, "[w]hen, as here, the case was dismissed without a trial, due process may require some kind of hearing." *Davis v. Crush*, 862 F.2d 84, 89 (6th Cir. 1988) (internal quotations omitted).

Exhibit F

## B. Plaintiffs Provided Adequate Evidentiary Support for Factual Allegations and/or Would Have After Reasonable Opportunity for Further Investigation or Discovery

The standard is more importantly, to survive a motion to dismiss, respondents need only allege "enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309, 1322, 179 L. Ed. 2d 398, 413, (2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Nevertheless, the City begins its motion with language that claims Plaintiffs have "lied," to this court. Such outrageous and unprofessional allegations are entirely unacceptable. The City cannot back up its absurd allegation. Proffering expert reports that are disputed by plaintiffs' experts does not make counsel liars. And, if this were simply the ranting of a third rate five-man Detroit law firm, we would dismiss this behavior as pathetic unprofessionalism. But these are the dirty, media-attention hungry, slanderous and completely out-of-bounds statements by representatives of the City of Detroit. It should not be countenanced by this Court.

Rule 11 specifically says, "(d) *Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.* USCS Fed Rules Civ Proc R 11(d). None of the allegations and evidence proffered by the plaintiffs were allowed to be developed through discovery. None of the defense witnesses or evidence were permitted to be tested through discovery. Awarding Rule 11 sanctions on such a bare record is unprecedented and wrong.

Exhibit F

The Amended Complaint presented expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A.   A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (*see* Ex. 104 ¶14);

B.   A report from Dr. Louis Bouchard finding to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4), *see* Ex. 110 at 28);

C.   A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (*See* Ex. 101);

D.   A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (*See* Ex. 102);

E.   A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (*See* Ex. 110);

F.   A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an

Exhibit F

additional 217,271 ballots for which there was no return date (*i.e.*, consistent with eyewitness testimony described in Section II below).  (*See* Ex. 110);

G.   A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precinct, but that the Democrat advantage (*i.e.*, the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated.  (*See* Ex. 110); and

H.   A report by an affiant whose name must be redacted to protect his safety who concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points.  Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400.  However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (*See* Ex. 111 ¶13).

(*See* ECF 6, Pls. Am. Compl. at par. 16).  And Plaintiff's December 4, 2020 response included signed and sworn Rebuttal sworn statements in response to Defendant-Intervenor's response, from Plaintiffs' expert witnesses, Russell Ramsland, William Briggs, Eric Quinell, and expert testimony submitted under seal.  (*See* ECF No. 49, Exhs. 1-4).

## Young and Quinell

The language invoked by Defendants is largely inappropriate in their attack on Dr. Young and Dr. Quinell.  Defendants argue generally and broadly that these highly qualified individuals submitted reports that are "sloppy" and show "incomprehensible ignorance."  (See ECF No. 78, p. 19).  While Defendants are not examining these

Exhibit F

witnesses before a trier of fact they appear instead to seek to prejudice the court with hyperbole, without a counter expert or even a citation to published expert literature. Dr. Quinell holds a Ph.D. in computer arithmetic and is an electrical engineer who works in silicon computation devices and herein opines on a mathematical anomaly. In a reply that was submitted to this court Dr Quinell explained:

> These mathematical anomalous vote gains, until explained and/or investigated are of a large enough quantitative magnitude and consequence that the barrier of speculation should be held to engineering and mathematical standards, not to those of political science and editorial publications.
>
> In statistics, any "new population" may be added and absorbed to the whole- this population seems to have 8,000 voters who didn't appear in 2016 that parachuted in and voted 80 Dem/ 20 Rep – which is in complete opposition to Troy's moderate voting history. In a technique called "resampling", any new population that is added to an existing one is expected to behave and slightly change the behavior of the existing mass, testable by re-simulating the same dataset with the existing distribution mathematical qualities. Resampling in this case puts this new population deep into the tail of its own distribution, indicating again a completely new phenomena that needs explaining. Why would a populous increase its own turnout by 15% over 2016, and 98% of that go to one candidate? Mathematically this behavior is anomalous to its own dataset.
>
> What "literature" exists to explain that absentee ballot requests are a single variable – with a perfect scalar multiple of Democrats above Republicans – with a Pearson coefficient of 0.797? Every precinct where a Republican voted by absentee guaranteed roughly 1.7 Democrats to vote absentee, regardless of precinct. This "national phenomenon" of mathematically non-independent variables is not ubiquitous in all the Michigan counties nor in national data…

(See ECF 49-2, pp. 4-6).

Exhibit F

The City's bald and toothless disagreement with the experts cited, would at best become a question for a trial or evidentiary hearing through the cross-examination of a witness. It is not a basis for a Rule 11 motion.

## Spyder/Spider

Defendants attack the Declarant known as Spider because they attack his background - despite the fact that they have not deposed him or otherwise examined him. Spider's identity and credentials were required to be withheld. In Plaintiffs' motion to file under seal [ECF No. 8] the reasons were explained. Nevertheless, defendants do not address the substance of Spider's 17-page report filled with analysis and evidence. Instead they simply attack his credentials. This is not a basis upon which to grant a Rule 11 motion.

## Russell James Ramsland

Defendants address Russell James Ramsland and allege that "the Secretary of State report is not even discussed." And based on this assumption, and lack of genuine research, Defendants proceed to allege that he makes false claims. (See ECF No. 78, p. 21). Yet, Mr. Ramsland already responded to the same points raised by defendants' expert, Dr. Rodden, and stands by his conclusions. (*See* Ramsland Reply Report, Docket No 49, Ex. 3 at par 6, filed 12/3/2020). He specifically addresses and thoroughly documents the lack of evidence for the Secretary of State's conclusion and summarizes:

Exhibit F

We do not believe that the Secretary of State report addresses this and states the issue at the time was not on the printed totals tape. The Secretary even states "Because the Clerk correctly updated the media drives for the tabulators with changes to races, and because the other tabulators did not have changes to races, all tabulators counted ballots correctly." This is not the case.

(*See Id.* at p. 12).

The report later summarizes:

> If this had been a user setup issue, then the test ballots they run to verify the results they get by comparing them with the test matrix should have caught that. When they made the software change that that used to tabulate the 11/6/20 rerun, there should be a log of the test ballots run through the system and verified against the test matrix. This alone might not show fraud, but it is a crucial part of the software configuration validation process and apparently was not done. We believe to a reasonable degree of professional certainty that this shows fraud and that vote changing at the local tabulator level has occurred due to a software change in all precincts were Dominion software was used in Michigan. This small sample amplified in a large population area would have major results. Without the explanation of why there was a re-tabulation, why the issue of numbers being off to a significant degree when a vote change was noted, and no further investigation occurred – and when 3 ballots were removed from the totals that changed the final outcome of one proposal, constitutes a definitive indication of fraud.

(*See Id.* p. 13).

Mr. Ramsland also addresses the "event" reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb, and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more

35

Exhibit F

ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount alone is **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.*, 154,188). (See Am. Compl. at pars. 144-145).

Mr. Ramsland further explains in depth in his declaration, which Defendants do not raise or discuss that:

> Mr. Ramsland's analysis of the raw data, which provides **votes counts, rather than just vote shares, in decimal form** provides highly probative evidence that, in his professional opinion, demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting" algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[1]  Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below. *Id.*

Mr. Ramsland describes how the RCV algorithm can be implemented, and the use of fractional vote counts as evidence, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

> For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes.  The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done.  Otherwise, votes would be solely represented as whole numbers.  Below is an excerpt from Dominion's

Exhibit F

direct feed to news outlets showing actual calculated votes with decimals. *Id.[3]*

(See ECF 6, Am. Compl. at ¶¶ 140-141).

## William Briggs / Matt Braynard

Defendants spend the better part of three full pages in this motion for sanctions, disbarment and referral to disciplinary bodies, attacking the credibility of Dr. Briggs, a Ph.D. statistician, with over 100 peer reviewed publications and yet, quite tellingly Defendants did not mention the most pertinent and important part of Dr. Briggs' analysis. (See ECF No. 78 at pp. 39-43). This was the estimate for how many ballots went missing, calculated from answers to the question (in short) "*Did you return your ballot?*" There can be no arguable ambiguity in that question. Dr. Briggs estimated that between about 28 to 35 thousand votes were returned but never recorded in Michigan. This represents significant voter disenfranchisement --which cannot be ignored.

   a. **Plaintiffs' Counsel Have Not Acted "Unreasonably or Vexatiously," or Engaged in Any Reckless or Intentional Misconduct to Delay or Increase Defendants' Costs**.

---

[3] *See id. (quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

Exhibit F

Even assuming *arguendo* that this claim were not barred as a matter of law, the State Defendants failed to allege that any specific conduct by Plaintiffs' counsel, or factual allegation or legal claim in the pleadings, that could qualify as "unreasonabl[e] or vexatious[]," as required under Section 1927, or any specific reckless, bad faith or intentional misconduct required under controlling Sixth Circuit precedent.

Instead, the State Defendants simply make blanket assertions that Plaintiffs' counsel has filed a "frivolous lawsuit" and "raised false allegations and pursued unsupportable legal theories." ECF No. 78 at 44.

Finally, the State Defendants engage in their own unsupported speculation that Plaintiffs' co-counsel filed this lawsuit "hoping not to prevail but to damage democracy," ECF No. 23, a reckless and defamatory claim. This highlights the lack of specificity in these allegations, with a blanket demand against all counsel whereas liability under Rule 11 is direct, and not vicarious.

b. **Many other attorneys, witnesses and legislative representatives have raised election integrity issues in the Presidential Election of 2020.**

Public reports have also highlighted wide-spread election fraud in the Contested States that prompted competing Electors' slates.[1] In the Navarro report, it is shown that:

At midnight on the evening of November 3, and as illustrated in Table 1, President Trump was ahead by more than 110,000 votes in Wisconsin and more than 290,000 votes in Michigan. In Georgia, his lead was a whopping 356,945; and he led in Pennsylvania by more than half a million votes. By December 7, however, these wide Trump leads would turn into razor thin Biden leads –11,779 votes in Georgia, 20,682 votes in Wisconsin, 81,660 votes in Pennsylvania, and 154,188 votes in Michigan.

Exhibit F

*Id.*, Table 1: A Trump Red Tide Turns Biden Blue[4]

> There was an equally interesting story unfolding in Arizona and Nevada. While Joe Biden was ahead in these two additional battleground states on election night –by just over 30,000 votes in Nevada and less than 150,000 votes in Arizona.

*Id.*

Most recently, an attorney in Catania, Italy, Prof. Alfio D'Urso, testified that the US presidential election results were hacked and changed by foreign actors on November 4, 2020 and that a cyber operator was criminally charged for his role in admitted testimony of switching votes from Donald Trump to Joe Biden:

> **Arturo D'Elia, former head of the IT Department of Leonardo SpA** has been **charged by the public prosecutor of Naples**, Italy for technology / data manipulation and implementation, of viruses in main computers of Leonardo SpA. December 20, 2020.  D'Elia has been deposed by the presiding judge in Naples, and in  sworn testimony states that on 4 11 20, under instruction and direction of U.S. persons working from the U.S. Embassy in Rome, [he] undertook the **operation to switch data from the U.S. election of 3 Nov. 20 from significant margin of victory for Donald Trump to Joe Biden in a number of states where Joe Biden was losing the vote totals**.  Defendant states that he was working in Pascara facility of Leonardo SpA and utilized military grade cyber warfare encryption capabilities to transmit switched votes via military satellite of Fucino Tower to Frankfurt Germany...

This Testimony is available and in an attached written affidavit.  (*See* **Exh. B**).

---

[4] *See* EXH. A, copy of Immaculate Deception, Six Key Dimensions of Election Irregularities, The Navarro Report, *available at:* https://bannonswarroom.com/wp-content/uploads/2020/12/The-Immaculate-Deception-12.15.20-1.pdf

Exhibit F

Defendants seek to allege, in a nutshell, that Plaintiffs filed a frivolous claim or it must be false, (similar to a *res ipsa* argument) because CISA issued a statement on November 12, 2020 that "the November 3rd Election was the most secure in American history." (*See* ECF No. 78 at p. 8, f.n. 12). But 12 days earlier CISA had issued a joint statement with the FBI, entitled a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled:

**Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**
> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). **CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related working on the computers. disinformation in mid-October 2020**.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* ECF 6, Pls. Am. Compl. (citing Ex. 18 at 1, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)).

Notably, on January 7, 2021 the Director of National Intelligence issued a report titled,

"Views on Intelligence Community Election Security Analysis" which concludes:

> In that same spirit, I am adding my voice in support of the stated minority view – based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure – that t**he People's Republic of China sought to**

Exhibit F

**influence the 2020 U.S. federal elections**, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlines above.

(*See* **Exh. C**, Copy of DNI report 01/07/21)

Yet, this appeared as a non-partisan issue back in late December of 2019, when three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their *'particularized concerns that secretive & "trouble -plagued companies'" "have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Am. Compl. At p. 59, pars. G and H). Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "*yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy.*" It's also an indictment, he said, "*of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist.*" (*See Id.*[5]).

Indeed, the House was highly critical of election integrity risks and passed H.R. 2722 on June 27, 2019: *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*

---

[5] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

Exhibit F

*The bill establishes requirements for voting systems, including that systems (1) use individual, durable, **voter-verified paper ballots**; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including **the prohibition of the connection of a voting system to the internet.***

(*See* Congress.gov/H.R. 2722).

The Michigan state Senate Oversight Committee held the hearing in or about early December, which included testimony from a former senator with expertise on data and technology who explained that the Voting machines were connected to the internet in Detroit. The witness spoke to the committee under oath about voting by dead people, a truck full of ballots coming into the counting center long after the deadline, and vulnerable voting machines[2]. Further, testimony among others including evidence of voters who voted absentee but had fake addresses or were deceased. *Id.*

> "What I can say for sure, and swear to you here today, is that overall, **8.9% of the 30,000 absentee ballots we've gone through and investigated, just in the city of Detroit, were unqualified, fraudulent ballots that should have been spoiled**," Schornak said. He extrapolated about how the 30,000 sample could reflect on all of the absentee votes cast.  "At the lowest levels, if these percentages carry through, this means of the 172,000 [absentee votes] in the city of Detroit, 1,300 of them could be deceased," he told the senators. "We are investigating it. And another 15,000 could have fraudulent addresses, described as living on vacant lots or [in] burnt-down houses."

The claims of fraud in Michigan have gained widespread attention and attacks on witnesses credibility such as when the Michigan Oversight Committee heard from a witness who was an IT specialist for Dominion Voting Systems and she appeared and

Exhibit F

described what she called "complete fraud" at Detroit's TCF Center[3].  She described the same ballots being repeatedly rescanned over and over.  *Id.* While she is not an affiant in this case, this reflects Michigan's Oversight Committee took statements from many people because the complaints on the lack of integrity reached far and wide within Michigan and within the Contested States.

More recently, John Lott, Ph.D. recently did a study, first published in late December 2020 and updated January 6, 2021 called "*A Simple Test for the Extent of Vote Fraud with Absentee Ballots in the 2020 Presidential Election: Georgia and Pennsylvania Data.*" (*See* Exh D, copy of Dr. Lott's Study).  Dr. Lott's conclusion addresses Michigan and other contested states:

> … The voter turnout rate data provides stronger evidence that there are significant excess votes in Arizona, Michigan, Nevada, and Wisconsin as well. While the problems shown here are large, there are two reasons to believe that they are underestimates: 1) the estimates using precinct level data assume that there is no fraud occurring with in-person voting and 2) the voter turnout estimates do not account for ballots for the opposing candidate that are lost, destroyed, or replaced with ballots filled out for the other candidate.

We highlight the wide-spread complaints of election fraud separate and apart of Plaintiffs' filing and evidence to show that many people have submitted evidence of reports and eye-witness testimony of fraud in the 2020 election.

The State of Texas, along with Alabama, Arizona, Arkansas, Florida, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Utah and West Virginia, sued

Exhibit F

the Defendant states, Michigan, Wisconsin, Georgia and the Commonwealth of Pennsylvania alleging that each of the Defendant states had election irregularities. (*See* Response to 1927 Motion).

### c. Moreover, Plaintiffs' Complaint plead facts that the Defendant City does not actually dispute many facts plead in the Complaint.

The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount. *See supra* Paragraph 94. The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials. This was not done." *(See* Am. Compl. at par. 136*) (citing* Exh. 104, Ramsland Aff. at ¶10. Mr. Ramsland points out that "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system." *Id.* Further, **such a glitch would not be an "isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed happening in the data** (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id. (See* Am. Compl. at par. 136*)*

Tabulator issues and election violations occurred elsewhere in Michigan **reflecting a pattern**, where multiple incidents occurred. In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when: "***A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have been sent to us as absentee votes***," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[4] (See Am. Compl. at pars. 131-132). The Oakland County flip of votes becomes significant because it **reflects a second systems error, wherein both favored the Democrats, and precinct votes were sent out to be counted,**

44

Exhibit F

and they were counted twice as a result until the error was caught on a recount.  <u>Precinct votes should never be counted outside of the precinct, and they are required to be sealed in the precinct.  See generally, MCLS § 168.726. (*See Id*).</u>

These are just a few of the specific facts cited by Plaintiffs, which are not genuinely disputed, while Defendants cite to the Secretary of State's opinion on a systems error, but Plaintiffs submit with both expert testimony in support, and the undisputed facts that two such incidents of "error" instead reflect evidence **of a pattern of defects** in the voting systems machines of tabulating ballots favoring one candidate not the other. Rather than allowing for a full investigation, these two well documented and known incidents  -- which also include the legal violation of counting precinct ballots outside of the precinct, were instead summarily dismissed rather than reviewed substantively. The sheer gravity of those claims, and their implications on the integrity of our electoral system, justified counsel in pursuing every arguably permissible avenue to assist Plaintiffs in seeking redress.

### d. The State Defendants Failed to Identify Any "Discrete Acts of Misconduct" That Could Have Caused the City to Incur Any Additional Costs.

As shown above, the City has not identified any "discrete acts of claimed misconduct," *Ruben*, 825 F.2d at 990, much less shown that such purported misconduct "cause[d] additional expenses to" the City." *Id.* at 984.  Blanket and defamatory assertions cannot meet this requirement.  In any case, all of City's expenses are due to the City's voluntary and unnecessary intervention in this proceeding. The City was not named as a party defendant to this action, but rather requested to intervene on its own

Exhibit F

motion following Plaintiffs' filing of the initial complaint. (ECF No. 5). Indeed, neither the City, nor the other intervenors were a party to this action until this Court granted its motion to intervene by order entered December 2, 2020 (ECF No. 28), after Plaintiffs' First Amended Complaint had already been filed. As a result, they do not have standing to make this claim, and even if the City could demonstrate that either the Complaint or the First Amended Complaint's filing satisfied § 1927 (which it cannot), it cannot trace any expense to Plaintiffs' counsel's filing of the complaint. Since the City entered this litigation on its own motion after the action was already instituted, any sanctions must arise out the City's expense resulting from some unreasonable and prolonging conduct occurring on or after the entry of Court's order of December 2, 2020.

Plaintiffs' counsel has not only done nothing to delay this proceeding, they have in fact taken every reasonable measure to expedite, and then to terminate the proceeding once their claims were no longer viable. This Court granted the request for expedited briefing, ECF No. 24, and based solely on the initial pleadings and responses, dismissed the TRO Motion a mere eight days later on December 7, 2020. ECF No. 62. Further, Plaintiffs have expeditiously, and concurrently within the 21 days of the service of the motion herein, moved for voluntary dismissal of the November 29, 2020 Amended Complaint, ECF No. 6.

## **CONCLUSION**

Exhibit F

For all the foregoing reasons, the Plaintiffs and their counsel respectfully request that this Honorable Court deny the State Defendants' motions for an award of sanctions and attorneys' fees Rule 11. (ECF 78 and 84). Moreover, the City of Detroit should be ordered to pay Plaintiffs' legal fees for opposing this motion pursuant to Federal Rule of Civil Procedure 11(c)(2).

Respectfully submitted,

/s/ Stefanie Lambert Junttila

STEFANIE LAMBERT JUNTTILA
(P71303)
Attorney for the Plaintiffs
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

Exhibit F

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>        Plaintiffs,<br><br>v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, et al,<br><br>        Defendants,<br><br> and<br><br>CITY OF DETROIT, et al,<br><br>        Intervenor-Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## THE CITY OF DETROIT'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO <u>STATE BAR DISCIPLINARY BODIES</u>

Exhibit G

Let there be no mistake, there is blood on Lin Wood and Sidney Powell's hands and on the hands of all those who pushed this lawsuit. Brian Sicknick, a Trump supporting Capitol Police Officer, died defending the Capitol against those who were deranged by Plaintiffs' counsel and their ilk. Ex. 1. Rosanne Boyland, of Kennesaw, Georgia, who fell prey to the election lies, was crushed to death by fellow rioters. *Id.* The life of Ashli Babbitt, a 35-year-old Air Force veteran from California, was cut short because she tragically believed the lies spread in this lawsuit. *Id.* Ms. Babbitt's final tweet was a retweet of L. Lin Wood stating, "Mike Pence@vp @Mike_Pence must resign & thereafter be charged with TREASON," and "Chief Justice John Roberts must RESIGN." Ex. 2. As the rioters stormed the Capitol, they created makeshift gallows and screamed for the hanging of Mike Pence. Ex. 3. Meanwhile, Wood was tweeting "1776 Again," "the time has come Patriots … Time to take back our country … Time to fight for our freedom." Ex. 4. "WE TRIED TO WARN THEM … YOU COULD HAVE PREVENTED THIS," he wrote. Ex. 5 (all caps in original). Sidney Powell approvingly retweeted someone calling the assault a "last resort to petition the government for grievances." Ex. 6.

Instead of accepting responsibility for their part inciting the mob, both Powell and Wood quickly pivoted to assigning blame to others: Powell tweets "It's #Antifa." Ex. 7. Wood started the rumor that Antifa activists were behind the violence by posting photos of two of the rioters which were on the website of a local

Exhibit G

Antifa group. Ex. 8. Wood, of course, did not advise his 800,000 followers that the photos were from pages on the website which identified known white supremacists. Ex. 9. Wood then tried to claim that Ms. Babbitt's death was a "false flag" operation to "frame" him. Ex. 10. He also continued unabated, posting to "free speech" website Parler that "Mike Pence is a dark soul … [h]e uses 13, 14, & 15 year old boys for his own self-serving purposes …." Ex. 11.

Even though Plaintiffs voluntarily dismissed their lawsuit on the day they would have had to defend it on the merits, they chose to use their Response brief to repeat their misrepresentations. They continue to assert *all* of their false claims and add more. They even accuse the City of filing its Motion for Sanctions "to distract from explosive evidence of voter fraud"-- evidence that has not been presented here or anywhere else. An attorney sincerely withdrawing or correcting misrepresentations in compliance with Rule 11 would not repeat those false claims.

Plaintiffs and their counsel appear dangerously incapable of understanding the consequences of their actions. They are unrepentant and refuse to correct the damage they helped create. Plaintiffs, and, more importantly, their attorneys, must face the most severe consequences available to this Court.

## I. Plaintiffs' "Procedural" and Safe Harbor Arguments Fail

Plaintiffs make several "procedural arguments" arguing against sanctions under Fed. R. Civ. P. 11. Each argument is misplaced.

Exhibit G

## A. Signatures

Incredibly, in a Response intended to prove that they have not misrepresented facts to this Court, Plaintiffs repeatedly misrepresent other facts. Plaintiffs falsely claim that only the Michigan attorneys signed the sanctionable pleadings and motions. *See* Response, PageID.4118. This is blatantly false, and it is mindboggling that these attorneys misrepresent facts about their own actions. The Complaint was signed by Michigan attorneys Scott Hagerstrom and Gregory Rohl, *and it was also signed by* Sidney Powell. ECF No. 1, PageID.75. It also included signature blocks for Lin Wood, Howard Kleinhendler, Emily Newman and Julia Haller:

Respectfully submitted, this 25th day of November, 2020.

/s Sidney Powell*
Sidney Powell PC

Texas Bar No. 16209700

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

*Id.*

3

Exhibit G

The First Amended Complaint was signed by the same two Michigan attorneys *and by* Sidney Powell, with signature blocks for the other attorneys. ECF No. 6, PageID.957. The Emergency Motion for Temporary Restraining Order was signed by Sidney Powell, with *secondary* signatures from the two Michigan attorneys and a signature block for Howard Kleinhendler. ECF No. 7, PageID.1847-49. The Emergency Motion to Seal was signed by Sidney Powell. ECF No. 8, PageID.1854. The Reply in support of the TRO was signed by Sidney Powell, again with secondary signatures by the Michigan attorneys. ECF No. 49, PageID.3098. The Petition for Writ of Certiorari was signed by Howard Kleinhendler, with signature blocks for the other attorneys identified above and a new one for Stefanie Lambert Junttila. Ex. 12.[1]

Irrespective of this extraordinary misrepresentation, Plaintiffs' legal argument is dead wrong. They rely entirely on case law interpreting the 1983 version of the Rule (*Oliveri* (2nd Cir. 1986), *Giebelhaus* (9th Cir. 1991), *In re Ruben* (6th Cir. 1987) and *White v. American Airlines* (10th Cir. 1990))[2] while failing to acknowledge that Rule 11 was fundamentally altered in 1993 in a manner that

---

[1] To the extent Plaintiffs are suggesting that Rule 11 does not apply because signature lines were typewritten, Rule 11 would be a dead letter. Today, almost all attorney signatures on court filings are electronic signatures.

[2] *Oliveri v. Thompson*, 803 F.2d 1265 (2nd Cir. 1986); *Giebelhaus v. Spindrift Yachts*, 938 F.2d 962 (9th Cir. 1991); *In re Ruben*, 825 F.2d 977 (6th Cir. 1987); *White v. American Airlines, Inc.*, 915 F.2d 1414 (10th Cir. 1990).

Exhibit G

renders their cited case law wholly inapposite. Based on the pre-1993 case law, Plaintiffs argue that courts may only sanction the attorney who signs a paper or the parties. However, the modern version of Rule 11(c) changes the paradigm; the sanctions in 11(c) now specifically apply not to violations of 11(a), which relates to signatures, but to violations of 11(b), which is not concerned with who signs a document. The requirements of 11(b) unambiguously apply to *anyone* who presents "to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it …." FRCP 11(b). While the 1983 version restricted sanctions to the signing attorney and the represented party, the current Rule states that if "the court determines that *Rule 11(b)* has been violated, the court may impose an appropriate sanction on *any attorney*, *law firm, or party* that violated the rule *or is responsible for the violation*." Rule 11(c)(1) (emphasis added).[3] The reference to 11(b) makes clear that no longer are signatories or parties solely responsible for filings; responsibility now extends to any attorney involved in a case who advocates for a filing with an improper purpose, with unwarranted legal contentions, or with facts without evidentiary support. *See*, *e.g.*, *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 471 (7th Cir. 2005); *In re Lane*, 604 B.R. 23, 31 (B.A.P. 6th

---

[3] The Advisory Committee on Rules' note on the 1993 amendment states "[t]he revision permits the court to consider whether other attorneys in the firm, *co-counsel*, other law firms, or the party itself should be held accountable for their part in causing a violation."

Exhibit G

Cir. 2019) (distinguishing *In re Ruben* and the pre-1993 case law while holding that attorneys listed as "additional counsel" could be sanctioned); *Stalley ex rel. U.S. v. Mountain States Health All.*, 644 F.3d 349 (6th Cir. 2011) (imposing sanctions against non-signatory for bringing vexatious lawsuit). Plaintiffs do not cite a single case interpreting the 1993 amendment.

In the present case, each attorney either signed frivolous documents or advocated for frivolous positions. Indeed, this case was not local counsel's case; it was Sidney Powell's case. She announced she was filing it. She promoted the claims and the "experts." It was also Lin Wood's case. He announced he was filing it. He promoted the claims, even adopting the Parler username @krakenwood. Plaintiffs' attorneys have engaged in a systematic and coordinated attack on our democracy in courts across the country, filing remarkably similar and equally disturbing suits in multiple states. *See Feehan v. Wisconsin Elections Comm'n*, No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020); and *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020). And, incredibly, they continue that campaign even after dismissing the lawsuits, including by pushing misrepresentations in Response to the instant Rule 11 Motion.[4]

---

[4] Plaintiffs claim that the subjective belief of Powell and Wood cannot be considered by the Court because only the motivations of those who signed

## B. "Combining" Motions

Plaintiffs argue that the City's motion for "both Rule 11 sanctions and for disbarment of attorneys and their referral to state bar associations for disciplinary action is procedurally improper" because a Rule 11 sanctions motion "must be made separate from *any other motion*." ECF No. 95, PageID.4114-15 (emphasis in original) (quoting Fed R. Civ. P. 11(c)(2)). The text of Rule 11 clearly contemplates both monetary and nonmonetary relief, providing that a "sanction may include nonmonetary directives" in addition to fines. Fed. R. Civ. P. 11(c)(4). *See also Tropf v. Fid. Nat. Title Ins. Co.*, 289 F.3d 929, 939-40 (6th Cir. 2002) (noting that, in addition to fines, "Rule 11 also authorizes nonmonetary sanctions"). Further, as the committee notes to that rule explain:

> The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; *referring the matter to disciplinary authorities*… etc.

---

sanctionable pleadings and motions are material. Again, this assertion is factually incorrect, because Powell signed numerous documents in this case. And, again, Plaintiffs mistakenly rely on pre-1993 amendment case law. The case they rely on— *In re Kunstler*, 914 F.2d 505, 519 (4th Cir. 1990)—held that "[c]ircumstantial facts surrounding the filing may also be considered as evidence of the signer's purpose." However, the scope of the Rule has since changed to cover all attorneys in a case, not just the one who signed a pleading. The pleadings and motions were facially and objectively sanctionable, but the statements made by the attorneys further demonstrate the improper purpose for these filings.

Exhibit G

Fed. R. Civ. P. 11(c)(4), advisory committee's note to the 1993 Amendments (emphasis added). A request for both monetary and nonmonetary sanctions does not violate Rule 11(c)(2)'s prohibition against mixing sanction and non-sanction relief in a single motion.

Furthermore, Sixth Circuit precedent directly refutes Plaintiffs' argument. As the Sixth Circuit has explained, Rule 11's single motion requirement "is intended to highlight the sanctions request by preventing it from being tacked onto or buried in motions on the merits, such as motions to dismiss or for summary judgment." *Ridder v. City of Springfield*, 109 F.3d 288, 294 n. 7 (6th Cir. 1997). However, "[t]he requirement does not foreclose combining a Rule 11 request with other provisions regulating attorney behavior," in that case, 42 U.S.C. § 1988 and § 1927. *Id.* Requiring parties to file "Rule 11 sanctions separate from other requests for attorney fees based on the same conduct would amount to needless duplication of paper, time, and effort, for practitioners as well as the courts." *Id.*

The Michigan Rules of Professional Conduct, the Eastern District of Michigan Local Rules and the Code of Conduct for United States Judges all support the requested disciplinary referrals:

• The out-of-state lawyers who have participated in this lawsuit are subject to professional discipline in Michigan as well as in their home states. Michigan's discipline authority extends to any "lawyer not admitted in this jurisdiction" who "provides or offers to provide any legal services in this jurisdiction". MRPC 8.5(a);

8

• "When misconduct or allegations of misconduct that, if substantiated, would warrant discipline of an attorney who is a member of the bar of this court or has practiced in this court as permitted by LR 83.20 come to the attention of a judicial officer . . . whether by complaint or otherwise, the judicial officer may refer the matter to: (1) the Michigan Attorney Grievance Commission for investigation and prosecution, (2) another disciplinary authority that has jurisdiction over the attorney, or (3) the chief judge for institution of disciplinary proceedings by this court under LR 83.22(e)". E D Mich LR 83.22(c);[1],[2] and

• a federal judge is ethically required to report lawyers' unprofessional conduct to disciplinary authorities. Code of Conduct for United States Judges, Canon 3(B)(6) ("A judge should take appropriate action upon receipt of reliable information indicating the likelihood that . . . a lawyer violated applicable rules of professional conduct.").

Plaintiffs do not address this Court's authority to make the requested referrals.

### C. The Safe Harbor Period

Plaintiffs mistakenly argue that the City failed to comply with Rule 11(c)(2)'s

safe harbor provision. Response, PgID.4118-20. To comply with this provision,

litigants must follow a "two-step process: first, serve the Rule 11 motion on the

---

[1] "'[P]ractice in this court' means, in connection with an action or proceeding pending in this court, to appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court. A person practicing in this court must know these rules, including the provisions for sanctions for violating the rules. A person is not permitted to circumvent this rule by directing the conduct of litigation if that person would not be eligible to practice in this court." E D Mich LR 83.20(a)(1).

[2] See also, generally, MRPC 8.3(a), which provides in relevant part that *every* lawyer "having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer *shall inform the Attorney Grievance Commission*" (emphasis added).

Exhibit G

opposing party for a designated period (at least twenty-one days); and then file the motion with the court." *Ridder*, 109 F.3d at 294. The purpose of this 21-day waiting period is to give the offending party an opportunity to "withdraw[] or correct[] the challenged document or position after receiving notice of the allegedly violative conduct." *Id.*

The City complied with the Rule. As Plaintiffs concede, the City served its motion for sanctions on December 15th, then waited until January 5th to submit its motion to the court, along with an accompanying brief. *See* Response, PageID.4118-19. Plaintiffs contend, however, that the safe harbor period only began to run when the City filed its brief with this Court, as the initial notice did not identify the conduct that violated Rule 11(b) or "identify any specific allegation or witness that lacks evidentiary support." *Id*. at PageID.4119. Yet the City's motion describes Plaintiffs' violative conduct in detail. It identifies Plaintiffs' improper purpose in pursuing this litigation; specifically, their intent to "raise doubts in the minds of millions of Americans about the legitimacy of the 2020 Presidential Election," ECF No. 78, PageID.3618. It also identifies how Plaintiffs' claims were not supported by existing law and did not constitute a good-faith attempt to change the law or create new law; while most of Plaintiffs' claims were procedurally deficient—clearly moot or barred by the doctrine of laches—they were substantively deficient as well, lacking legal authority or basis in fact beyond mere speculation or conjecture. *Id.* at PageID.3619-

Exhibit G

21. The motion also explains that Plaintiffs' contentions lacked evidentiary support, referring them to 125 pages of material in the record of this proceeding debunking Plaintiffs' various baseless claims and assertions. *Id.* at PageID.3621-22 (citing ECF No. 39 PageID.2808-2933).

Essentially, Plaintiffs are arguing that the Rule 11 Motion served on them did not include the same detail as the one filed, because the served Motion did not include a brief. However, Rule 11(c)(2) requires service of a motion, not a brief in support. *See Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2d Cir. 2012) (delivery of sanctions motion was sufficient for Rule 11(c)(2) notice, even though it was not accompanied by "supporting affidavits or a memorandum of law"); *see also Ideal Instruments, Inc. v. Rivard Instruments, Inc.,* 243 F.R.D. 322, 339 (N.D. Iowa 2007) ("Rule 11 says nothing about requiring service of the *brief* in support of a Rule 11 motion to trigger the twenty-one day 'safe harbor.'") (emphasis in original).[5]

Finally, it must be noted that Plaintiffs have not actually "withdrawn or corrected the challenged document[s] or position[s]." They filed Notices of

---

[5] It is not clear why Plaintiffs reference the "substantial compliance" doctrine, which has been rejected since the 1993 amendments to Rule 11. *See Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997). The doctrine held that the notice provision of Rule 11 could be satisfied by "substantial compliance" of providing "informal notice" in lieu of serving a Motion. *Id.* Here, Plaintiffs were not provided informal notice, they were served with a Rule 11 Motion.

11

Voluntary Dismissal as to the Defendants who did not file an Answer, just in time to avoid having to defend their case on the merits. But even after those dismissals, Plaintiffs continue to advance their specious claims and repeat the same falsehoods. They did so in their Response to the City's Motion for § 1927 sanctions, ECF No. 85, and again in Response to the instant Motion. Instead of withdrawing or correcting their lies, counsel repeats them, using the judicial system to again and again publish the same harmful falsehoods.

## II. The Claims in this Lawsuit did not have Legitimate Evidentiary Support

Plaintiffs' counsel not only argue that they had a good-faith basis to believe their allegations, but they also use their brief to continue to broadcast those baseless allegations. They pressed so many objectively false claims—including, for instance, lying about the credentials of *Spyder* to pretend that he would have had a foundation to make his outlandish claims—that it would be impossible to go through each one without a long evidentiary hearing. However, the first 9 pages of the First Amended Complaint (ECF No. 6, the "FAC") do a pretty good job of summarizing the lies:

- *Plaintiffs and their counsel allege that this case "brings to light a massive election fraud ... a scheme and artifice to defraud [] for the purpose of illegally and fraudulently manipulating the vote count to elect Joe Biden as President of the United States." FAC ¶¶ 1-2.* In fact, the case presented *no* legitimate evidence of election fraud, let alone "massive" election fraud. They presented *no*

12

Exhibit G

evidence that a single vote was manipulated. The unsupported claims of fellow conspiracy theorists and academic hucksters did not come close.

- *Plaintiffs and their counsel assert that the FAC "details an especially egregious range of conduct in Wayne County and the City of Detroit" and that "[e]lection workers [in Detroit] illegally forged, added, removed or otherwise altered information on ballots, the Qualified Voter File (QVF) and Other Voting Records." Id. ¶¶ 2, 14.* In fact, as Plaintiffs and their counsel knew full well, the FAC detailed no such thing. Every *single* allegation related to Wayne County and Detroit has either been repeatedly disproven, been shown to be mistaken or was based on fantasy. Even in the unlikely event that the initial declarants were innocently mistaken about the process, by the time the attorneys in this case latched on to them, the allegations had been conclusively disproven by objective facts. And, crucially, it is clear that Plaintiffs' counsel did not investigate the veracity of any of these allegations, because the allegations were compiled entirely from allegations and witness statements gathered by partisans in other cases. Counsel here merely pulled the statements off court filings in other cases and adopted them verbatim.

- *The FAC alleges that "Dominion systems derive from the software designed by Smartmatic Corporation," that "Smartmatic and Dominion were founded by foreign oligarchs and dictators" as part of "a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez." Id. ¶¶ 4-6.*

13

Exhibit G

There is simply no evidence supporting these wild claims. The fact that trolls from sundry corners of the internet and other fraudsters make the claim, does not protect Plaintiffs' counsel from the obligation to independently confirm the representations.

- *Plaintiffs and their counsel allege that there "is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence." Id.* ¶ 9. There was *no* evidence that the physical security of the machines and software were breached, and, indeed, the flawed and fabricated reports from the various "experts" do not actually make that claim, instead (falsely) asserting that the machines and software were susceptible to breach.[6]

- *Plaintiffs and their counsel alleged that "Detroit election workers added "tens of thousands of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden." Id.* ¶ 14a. There was never any legitimate support for the claim. And, by the time

---

[6] Plaintiffs argue that they should not be sanctioned because other attorneys and various politicians also advanced similar frivolous claims, including from identical witness statements. The attorneys here do not get a pass for jumping off the bridge of ethical conduct, just because other people did. We have all witnessed the deadly consequences of shared delirium. Rule 11 is clear that every attorney in a case has an obligation to independently confirm the accuracy of the information they present to a court.

Exhibit G

these plaintiffs and their attorneys attached the witness statements and allegations made in prior lawsuits, they had been proven false.[7]

  • *Plaintiffs and their counsel allege that Detroit election workers counted "ineligible ballots – and in many cases – multiple times;" and counted ballots "without signatures, or without attempting to match signatures and ballots without postmarks, pursuant to direct instructions from Defendants." Id.* ¶ 15. As with all the other allegations about Detroit and Wayne County, these claims were objectively disproven. It was pure speculation to claim that "ineligible" ballots were counted, when, in fact, the City demonstrably followed election law and disallowed the tabulation of any ballot received after 8:00 p.m. on election day. Similarly, there was no legitimate basis for anyone to claim that signatures were not verified—a claim based entirely on statements that signatures were not being verified at the TCF Center—when verification occurred before the ballots were delivered to the TCF

---

[7] The Superior Court for the State of Delaware recently revoked Lin Wood's *pro hac vice* admission. *See Page v. Oath*, Case No. S20C-07-030, Memorandum Opinion & Order (Del Sup. Ct. Jan. 11, 2020). Ex. 17. There, like here, Wood sought to evade accountability by claiming he was not the "filing" attorney. *Id.*, *7. But the court found that contrary to his obligation "to file only cases which have a good faith basis in fact or law" his Georgia election lawsuit "was textbook frivolous litigation," with Wood's failure to review for accuracy "an error-ridden affidavit of an expert witness" "either mendacious or incompetent." *Id.*, *6. "The conduct of Mr. Wood [in pursuing frivolous election lawsuits], albeit not in my jurisdiction, exhibited a toxic stew or mendacity, prevarication and surprising incompetence. What has been shown in Court decisions of our sister States [Wisconsin and Georgia] satisfies me that it would be inappropriate and inadvisable to continue Mr. Wood's permission to practice before this Court." *Id.*, * 7.

Exhibit G

Center. Plaintiffs and their counsel cannot hide behind the ignorance of challengers at the TCF Center or people who did not understand the process; they had a duty to investigate the veracity of the claims before regurgitating them.

- *Plaintiffs and their counsel also try to hide behind their expert reports.* That does not work, because, as outlined in Defendants' briefing in this case, the reports are not based in fact or supported by legitimate expert analysis. They are all tied together by a uniform disregard for the facts: absentee ballots were predicted to, and did, favor the Democratic candidates; in Michigan, where absentee ballots could not be counted before election day, the reporting of results for absentee ballots generally trail those for in-person votes; unofficial results are released in data "dumps" on election night and during the tabulation, rather than being updated on a continual basis; most urban areas in the country, including Detroit and Wayne County, strongly favor Democratic candidates for federal office; the preference of many voters change based on the conduct and policies of the candidates; Michigan uses paper ballots, so each and every one of Plaintiffs' claims can be tested by a hand recount or other audit of those ballots; no candidate demanded a recount; canvassing and recounting of paper ballots conclusively disproved claims that votes were changed in tabulating machines. All of these facts were ignored in order to make specious statistical analysis, comparing irrelevant data points, to get to a contrived pre-determined outcome.

16

Exhibit G

Not satisfied with their original "experts," Plaintiffs now add a new report from John Lott, Jr. This new "expert," who was once a respected academic, is now well-known for academic fraud and various misrepresentations. Plaintiffs, of course, fail to note that as of January 5, 2021, Lott had admitted that the findings in much of his "paper" were "a mistake." Ex. 13. The one conclusion in his report that he has not conceded was wrong, essentially boils down to the nonsensical claim that a 1 or 2 percentage point "higher than expected," "unexplained" turnout in Wayne County and the other urban counties "targeted" in post-election lawsuits in Pennsylvania, Wisconsin, Arizona and Nevada, is proof of voter fraud.[8] Lott's sleight of hand is accomplished by inexplicably comparing Wayne County and the other urban counties sued post-election, not with other counties in the state (which also would not lead to accurate results) but with counties in other states which did not have "suspicious" counties (i.e. a county sued in one of the frivolous post-election lawsuits) and which had lower increases in voter turnout such as Florida, Ohio and North Carolina. So, if turnout increased in the counties targeted with election lawsuits (all of which are large urban counties with comparable racial demographics in states that went for Biden), as compared to states Trump won that had lower turnout increases, Lott concludes that there was voter fraud, even if the counties in

---

[8] It should be noted that the increase in turnout in Wayne County was approximately 10%, which is less than most other counties in the state. Ex. 14.

17

the lawsuits had lower increases than other counties in their own state. The only conclusion Lott could have reached in good faith is that his methodology was nonsensical.[9]

When Lott retracted his finding, he stated "when u make a mistake, u make a mistake." Ex. 13. That is correct. Statisticians (or those who pose as statisticians) make mistakes. Attorneys make mistakes. But, where you make countless "mistakes" and every single one is in favor of your preferred pre-determined outcome, you no longer get the benefit of the doubt. None of the lies in this lawsuit were made in mistake or out of ignorance. Plaintiffs' counsel knew exactly what they were doing and must be held to account.[10]

## III. This Lawsuit Was Filed for Nefarious Purposes

Plaintiffs argue they did not file for "any improper purpose," or to harass the City, because "the City was not accused of conducting elections improperly ... It does not conduct elections for the President of the United States … States, through

---

[9] Because Lott couches his conclusions in statistical double-speak and unclear data points, the City is attaching a comprehensive dismantling co-authored by three highly respected academics from Stanford and the University of Chicago. Ex. 15.

[10] As argued in the City's opening brief, most of Plaintiffs' legal arguments were frivolous. Plaintiffs argue that it was not frivolous for them to assert they had standing as electors because the claim was novel in this Circuit and other circuits were split, with the Eighth alone in finding standing. The Eighth Circuit opinion was interpreting the contours of Minnesota's unique election law, not Michigan's. More importantly, there was no basis for Plaintiffs' counsel to pursue the legal theory where their underlying claims were false. There is no non-frivolous argument "for establishing new law" based on false allegations.

18

their counties, do … So while Detroit sits in Wayne County, and allegations were made concerning fraudulent election activity in that county, the City of Detroit has no role in the matter, and it should not have intervened." That is clearly false. Michigan elections are primarily conducted at the local level. M.C.L. § 168.801. Indeed, Michigan Court of Claims Judge Cynthia Stephens provided clear guidance on the issue, advising the plaintiffs in the first of this series of lawsuits that "the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk." *Donald J. Trump for President, Inc. et al v Benson*, Mich. Court of Claims Case No. 20-000225-MZ, Opinion and Order (Nov 6, 2020) Ex. 16. *All* the (false) allegations about election fraud in Wayne County were (false) allegations against the City of Detroit.[11]

That said, the fact that the City was not initially named in the lawsuit is of no moment. Rule 11(b)(1) does not limit sanctions to parties initially in a lawsuit. The Rule clearly states that sanctions can attach to any filing "presented for any improper purpose, such as to harass" and does not limit that improper purpose or harassment to a particular party. Fed. R. Civ. P. 11(b)(1). The improper purpose of the lawsuit

---

[11] Plaintiffs assert an evidentiary hearing is necessary to determine whether the lawsuit was file for an improper purpose, because credibility is best determined after an evidentiary hearing. This Court has more than sufficient information to reach a conclusion with each Rule 11 factor—counsels' actions and filings speak for themselves.

19

Exhibit G

is obvious from the face of the lawsuit itself. A lawsuit this full of misstatements of fact and law could not possibly have been filed for anything other than an improper purpose. Plaintiffs' purpose was subverting democracy by obtaining judicial imprimatur to lend credence to baseless election conspiracy theories.[12]

January 26, 2021                          Respectfully submitted,

                                          **FINK BRESSACK**[13]

                                          By:    /s/ David H. Fink
                                          David H. Fink (P28235)
                                          Nathan J. Fink (P75185)
                                          *Attorneys for City of Detroit*
                                          38500 Woodward Ave., Ste. 350
                                          Bloomfield Hills, MI 48304
                                          Tel: (248) 971-2500
                                          dfink@finkbressack.com
                                          nfink@finkbressack.com

                                          **CITY OF DETROIT**
                                          **LAW DEPARTMENT**
                                          Lawrence T. Garcia (P54890)
                                          James D. Noseda (P52563)
                                          *Attorneys for City of Detroit*
                                          2 Woodward Ave., 5th Floor
                                          Detroit, MI 48226
                                          Tel: (313) 237-5037
                                          garcial@detroitmi.gov
                                          nosej@detroitmi.gov

---

[12] Plaintiffs' arguments all relate to Rule 11 sanctions, not disciplinary action. In fact, the only argument against disciplinary action under the local rules or the rules of professional conduct is their erroneous claim that those requests cannot be combined with a Rule 11 Motion.

[13] The "third rate five-man Detroit law firm" referenced by Plaintiffs. (ECF No. 95; PageID.4140)

Exhibit G

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 26, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

<div align="center">

**FINK BRESSACK**

</div>

By:    <u>*/s/ Nathan J. Fink*</u>
Nathan J. Fink (P75185)
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel.: (248) 971-2500
nfink@finkbressack.com

Exhibit G

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, et al,<br><br>　　　　　　Defendants,<br><br>　and<br><br>CITY OF DETROIT, et al,<br><br>　　　　　Intervenor-Defendants. | No. 2:20-cv-13134<br><br><br>Hon. Linda V. Parker |

## THE CITY OF DETROIT'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO <u>STATE BAR DISCIPLINARY BODIES</u>

## INDEX OF EXHIBITS

Ex. 1       Jan. 14, 2021 *Washington Post* article

Ex. 2       Ashli Babbitt Retweet

Ex. 3       Jan. 21, 2021 AP Article

Ex. 4       Lin Wood Parler Post

Ex. 5       Lin Wood Parler Post

Ex. 6       Sidney Powell Retweet

Ex. 7       Sidney Powell Retweet

Ex. 8       Lin Wood Parler Post

Ex. 9       Jan. 6, 2021 Mashable Article

Ex. 10      Lin Wood Parler Post

Ex. 11      Lin Wood Parler Post

Ex. 12      Plaintiffs' Petition for Writ of Certiorari in the Supreme Court of the United States

Ex. 13      John R. Lott, Jr. Tweet

Ex. 14      Nov. 5, 2020 MLive Article

Ex. 15      Eggers, Garro, and Grimmer Jan 8, 2021 Article

Ex. 16      Nov. 6, 2020 Michigan Court of Claims Opinion and Order

Ex. 17      Jan. 11, 2021 Superior Court for the State of Delaware Opinion and Order

# EXHIBIT 1



# The Washington Post
*Democracy Dies in Darkness*

# Veterans on each side of the divide among Capitol mob dead

By **Associated Press**

Jan. 14, 2021 at 2:49 p.m. EST

The five people who died amid the chaos that erupted on Jan. 6 at the Capitol represented different walks of life.

Two died violently — military veterans who wound up on opposite sides of an insurrection. The others, who suffered medical emergencies, came from different parts of the nation and different backgrounds, but were united in their belief that a presidency on its last legs should be saved.

BRIAN SICKNICK

From his early days growing up in a New Jersey hamlet, Brian Sicknick wanted to be a police officer.

Family members said he saw the military as a path to reaching that goal. He enlisted in the National Guard six months after graduating high school in 1997, deploying to Saudi Arabia and then Kyrgyzstan.

He would join the U.S. Capitol Police in 2008, serving until his death at the hands of the mob of President Donald Trump's supporters that breached Capitol security.

Sicknick, 42, was hit in the head with a fire extinguisher, two law enforcement officials said. The officials could not discuss the ongoing investigation publicly and spoke to The Associated Press on condition of anonymity.

Rep. Elissa Slotkin, a Democrat from Michigan, says she has asked military officials that Sicknick be buried with posthumous honors at Arlington National Cemetery.

ASHLI BABBITT

Ashli Babbitt, 35, had served in the Air Force on active duty from 2004 to 2008, with subsequent stints in the Air Force Reserve and, until 2016, the Air National Guard.

Capitol Police Chief Steven A. Sund said she was among rioters who smashed their way into the U.S. Capitol, forcing members of Congress to hide. Videos from the mob scene appear to show Babbitt being hoisted up to the broken panes of a barricaded door. An officer points a gun at her and fires.

In social media posts, she strongly supported Trump and opposed mandates to fight the spread of COVID-19. She also referenced the QAnon conspiracy theory that Trump has been secretly fighting "deep state" enemies and a cabal of Satan-worshipping cannibals operating a child sex trafficking ring.

She and her husband ran a pool service business in Spring Valley, California. Her husband, Aaron Babbitt, told KSWB-TV, "she was doing what she thought was right to support her country. … She was voicing her opinion and she got killed for it."

KEVIN GREESON

His family in Athens, Alabama, describes Kevin Greeson, 55, as a loving family man, dog owner and motorcycle enthusiast.

Social media posts, however, included incendiary rants and false claims that the November election was stolen from Trump. Weeks after the election, he shared a photo of himself standing beside a Christmas tree with large guns in each hand and more stuffed in his waistband. There also was a screed questioning why Republicans weren't doing more to support Trump.

In a statement issued on behalf of his family, widow Kristi Greeson said her husband didn't attend the Washington protests to participate in violence or rioting, "nor did he condone such actions."

"Kevin had a history of high blood pressure, and in the midst of the excitement, suffered a heart attack," she said. "Our family is devastated."

ROSANNE BOYLAND

Rosanne Boyland, 34, of Kennesaw, Georgia, was a recovering drug addict who had put a history of drug arrests behind her and stayed sober for years while finding a new purpose in politics, one of her friends told The Associated Press.

She had become a strong supporter of Trump and, her sister told the AP, a follower of the bizarre QAnon conspiracy theory.

"It just spiraled," her sister, Lonna Cave, said recently outside her home in suburban Atlanta.

Cave said family members had begged Boyland, who aspired to be a sobriety counselor, not to go to the Washington protests. They said she had no intention of engaging in violence.

Cave said the family has heard conflicting accounts of her death. A friend who was with her said Boyland was trampled during a clash between rioters and police. But a police detective told the family Boyland had collapsed while standing off to the side in the Capitol rotunda, Cave said.

BENJAMIN PHILIPS

Benjamin Philips, 50, of Ringtown, Pennsylvania, was a computer programmer, and founder of Trumparoo LLC, a startup that promoted Trump and marketed stuffed toys online.

His profile on the site, which was no longer available as of Thursday morning, said he was organizing a bus from the Bloomsburg area to go to the rally and expressed anger at Democratic officials and moderate Republicans.

The Philadelphia Inquirer reported that Philips drove from Pennsylvania to Washington in a van along with Trump-related memorabilia he had produced.

He died after experiencing what authorities said was a medical emergency during the ride.

Copyright 2021 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed without permission.

# EXHIBIT 2



**Lin Wood** @LLinWood · 14h

MUST BE DONE LIST before Congress meets today:

1. Mike Pence @vp @Mike_Pence must resign & thereafter be charged with TREASON.

2. Rod Rosenstein @RodRosenstein must be arrested & charged with being accessory to murder & TREASON.

3. Chief Justice John Roberts must RESIGN.

◯ 5.3K     ↻ 25.6K     ♡ 62.9K     ↑

# EXHIBIT 3

25°

**LIVE UPDATES /** COVID-19 cases in Illinois & Iowa

**NATIONAL NEWS**

# Capitol mob built gallows and chanted 'Hang Mike Pence'



TOPSHOT – A noose is seen on makeshift gallows as supporters of US President Donald Trump gather on the West side of the US Capitol in Washington DC on January 6, 2021. – Donald Trump's supporters stormed a session of Congress held today, January 6, to certify Joe Biden's election win, triggering unprecedented chaos and violence at the heart of American democracy and accusations the president was attempting a coup. (Photo by Andrew CABALLERO-REYNOLDS / AFP) (Photo by ANDREW CABALLERO-REYNOLDS/AFP via Getty Images)

by: JILL COLVIN, Associated Press

Posted: Jan 9, 2021 / 12:07 PM CST / Updated: Jan 9, 2021 / 12:07 PM CST

25°

Pence made their marriage of political convenience work.

Now, in the last days of their administration, each is feeling betrayed by the other. It's part of the fallout from an extraordinary 24-hour stretch in which Pence openly defied Trump, Trump unleashed his fury on the vice president, and a mob of violent supporters incensed by Trump's rhetoric stormed the Capitol building and tried to halt the peaceful transfer of power.

The Trump-Pence relationship is "pretty raw right now," said one top GOP congressional aide, who described multiple phone calls in which Trump berated Pence and tried to pressure the vice president to use powers he does not possess to try to overturn the results of the 2020 election. Pence, for his part, was left feeling "hurt" and "upset" by the episode, according to people close to him. They spoke on condition of anonymity to discuss internal matters.

Pence's decision to publicly defy Trump was a first for the notoriously deferential vice president, who has been unflinchingly loyal to Trump since joining the GOP ticket in 2016. Pence has spent his tenure defending the president's actions, trying to soothe anxious world leaders put off by Trump's caustic rhetoric, and carefully avoiding the president's ire.

He has taken on some of the administration's most high-pressure projects, including leading its response to the coronavirus. And he has stood by Trump even as the president leveled baseless allegations of voter fraud and refused to concede the election after his loss to Democrat Joe Biden.

Under normal circumstances, the vote-tallying procedure that began on Wednesday would have been a mere formality. But after losing court case after court case, and with no further options at hand, Trump and his allies zeroed in on the congressional tally as their last chance to try to challenge the race's outcome.

25°

makes clear that only Congress has that power.

The effort effectively turned Pence into a scapegoat who could be blamed for Trump's loss if the vice president refused to go along with the plan. Trump and his lawyers spent days engaged in an aggressive pressure campaign to force Pence to bend to their will in a series of phone calls and in-person meetings, including one that stretched for hours on Tuesday.

When Pence, who consulted with his own legal team, constitutional scholars and the Senate parliamentarian, informed Trump on Wednesday morning that he would not be going along with the effort, the president "blew a gasket," in the words of one person briefed on the conversation.

Not long after, Trump took the stage in front of thousands of his supporters at a "Stop the Steal" rally, where he urged them to march to the Capitol and continued to fan false hopes that Pence could change the outcome.

"If Mike Pence does the right thing we win the election," Trump wrongly insisted. He repeatedly returned to Pence throughout his speech as he tried to pressure the vice president to fall in line.

But Trump already knew what Pence intended. And as Trump spoke, Pence released a letter to Congress laying out his conclusion that a vice president cannot claim "unilateral authority" to reject states' electoral votes. He soon gaveled into order the joint session of Congress where his and Trump's defeat would be cemented.

Not long after that, members of Trump's rally crowd arrived at the Capitol, where they overwhelmed police, smashed windows, occupied the building and halted the electoral proceedings. Pence was whisked from the Senate chamber to a secure location, where he was held for hours with staff as well as his wife and daughter, who had been there to support him.

25°

tweeting, "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution."

Later, members of the mob outside the Capitol were captured on video chanting, "Hang Mike Pence!"

Trump supporters chanting 'HANG MIKE PENCE' at the Capitol Building
pic.twitter.com/iMSOl4u3tg

— Dallas (@59dallas) January 6, 2021

For allies of Pence, it was a deeply upsetting episode that put the vice president in danger after four years of unstinting loyalty to the president and left Pence himself feeling hurt.

"I just think he's had enough," said John Thompson, who served as Pence's campaign spokesman and and also worked for the Republican Governors' Association.

"Yesterday just really pulled on his heartstrings," Thompson said. "He's been this loyal individual and the president was asking him to break the law and act outside his constitutional duties. I think it just reached a boiling point and the vice president said, 'I've had enough.'"

Republican Sen. Jim Inhofe of Oklahoma told Tulsa World, "I've never seen Pence as angry as he was today."

"He said, 'After all the things I've done for (Trump),'" Inhofe added.

Former House Speaker Newt Gingrich, an informal Trump adviser, also came to Pence's defense, tweeting that his action was "a profile in courage."

It remains unclear how the dynamic between Trump and Pence will play out over the next two weeks and how long the president will hold his grudge. The White

25°

He is also expected to attend Biden's inauguration.

And while Pence had been banking on his close relationship with the president to propel him to top-tier status if he decides to run for president in 2024, allies said they didn't think the vice president's actions this week would have long-term consequences, even if some voters blame him for Trump's defeat.

"I thought that was a very courageous moment for him," Thompson said. "And I think that's going to help his future."

___ Associated Press writers Alan Fram and Zeke Miller contributed to this report.

Copyright 2021 Nexstar Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**SHARE THIS STORY**

**AROUND THE WEB**





**Mortgage Rates Fall Again. Recalculate Your House Payment in a Few Steps**

Quicken Loans





**See if You Can Consolidate Your Debt by Refinancing (It's Easier Than You Think)**

Quicken Loans



# EXHIBIT 4





**LLinWood**  1 day ago · 👁 4.5m
@linwood

The time has come Patriots. This is our time. Time to take back our country. Time to fight for our freedom.

Pledge your lives, your fortunes, & your sacred honor.

There will not be another chance.

Speak TRUTH. Be FEARLESS. Almighty God is with you.

TODAY IS OUR DAY.
read less



 3.0k    🏷 13k    ⬆ 34k

Member Agreement    Privacy Policy    Community Guidelines    © 2021 Parler

# EXHIBIT 5



# EXHIBIT 6



**Sidney Powell** 🇺🇸 ⭐ ⭐ ⭐
#Kraken Retweeted

**Steph**
@steph93065

I'm trying to be upset about this, but what other method do people have?

The politicians won't listen.
The court won't listen.
The media won't listen.

I consider it a last resort to "petition the government for a redress of grievances"



**Kyle Becker** ✔ @kylenabecker · 1d
ELECTORAL COLLEGE. 🛑

Reports of *GUNFIRE* at the chambers.
TEAR GAS has reportedly been deployed.
Reinforcements are being brought in.There...

12:10 PM · 1/6/21 · Twitter for iPhone

# EXHIBIT 7



< **Tweet**

**Sidney Powell** 🇺🇸⭐⭐⭐ #Kraken ...
@SidneyPowell1

It's #ANTIFA

> 🔵 **David Limbaugh** @DavidLimbaugh · 1d
> I've been working & didn't even see the insanity but let me say that we all should condemn this violence. This is not what we do; this is not who we are. This is what we oppose. The framers crafted our system to...

3:23 PM · 1/6/21 · Twitter for iPhone

**8,719** Retweets  **204** Quote Tweets  **24.8K** Likes

♡      ↻      ♡      ↑

**North Texas Beer Run** @texas_... · 1d ...
Replying to @SidneyPowell1
Thank you Sidney!
♡      ↻      ♡ 6      ↑

**Barbara Estanga** 🇻🇪🇺🇸 @esta... · 1d ...
Replying to @SidneyPowell1
We have been condemning this

Tweet your reply

   

# EXHIBIT 8



linwood



**LLinWood** 23 hours ago · 👁 6.8m
@linwood

Indisputable photographic evidence that antifa violently broke into Congress today to inflict harm & do damage. NOT @realdonaldtrump supporters.

Do not be fooled. Trump supporters are peaceful. It was antifa that created the violence in our cities over the past several months.

read less



💬 6.9k   ⬦ 33k   ⬆ 59k



# EXHIBIT 9

Mashable    VIDEO   ENTERTAINMENT ▾   CULTURE ▾   TECH ▾   SCIENCE ▾   SOCIAL GOOD ▾   AMPLIFY   SHOP ▾   MORE ▾

Ad removed. Details

Culture

FOLLOW MASHABLE ▾    Like   Follow

# No, antifa did not invade the Capitol today, despite what Trump supporters say

f  y  🔖



Conservatives are spreading falsehoods claiming these Trump supporters are actually antifa in disguise.

IMAGE: WIN MCNAMEE/GETTY IMAGES

**BY MATT BINDER**
JAN 08, 2021

Trump supporters have threatened for months that if Trump's loss in November's election wasn't overturned, a civil war would ensue.

On Wednesday, a mob of Donald Trump supporters attempted just that. A large crowd of "Make America Great Again" hat-adorned people stormed the U.S. Capitol, attacked police, and broke into the Congressional chambers. One person was shot by police and three more died of "medical complications" during the incident.

Now, Trump supporters are saying the mob wasn't really made up of Trump supporters. They're instead claiming the violent mob was actually made up of left-wing antifascists, or antifa, disguised as Trump supporters.

Two Republican U.S. Congressmen, Louie Gohmert and Mo Brooks, are even spreading this conspiracy theory on Twitter. Late Wednesday night, Congressman Matt Goetz pushed these false claims on the House floor.

It's a lie, plain and simple.



Aaron Rupar ✔
@atrupar

Replying to @atrupar

Holy shit. Matt Gaetz just said, "some of the people who breached the Capitol today were not Trump supporters, they were masquerading as Trump supporters and in fact were members of the violent terrorist group antifa."

REP. MATT GAETZ
R-Florida, 1st District
Pensacola, Fort Walton Beach, DeFuniak Springs        C-SPAN
U.S. SENATE REJECTS OBJECTION TO ARIZONA ELECTORAL VOTES, 93-6

10:21 PM · Jan 6, 2021                                   ⓘ

♡ 18.6K    ⭕ 16K people are Tweeting about this



On Friday, FBI Assistant Director Steven D'Antuono confirmed that there is no evidence that antifa was involved.

Tom Winter ✔
@Tom_Winter

NEW: FBI Assistant Director Steven D'Antuono was just asked



TECH
These are the tech terms to know in 2021



TECH
Check out Amazon's new iOS app icon









CULTURE
'The Crown' cast dancing to Lizzo's 'Good As Hell' between scenes will make your day

ENTERTAINMENT
Seth Meyers lambasts Republicans trying to squirm out of impeaching Trump



SOCIAL GOOD
7 acts of self-care you can practice during a winter lockdown



ENTERTAINMENT
Jimmy Fallon surprises Steve Kornacki by cleaning up his very messy office



Antifa to "frame" Trump supporters for the violence at the Capitol.

He said, "We have no indication of that, at this time."

2:00 PM - Jan 8, 2021

♡ 8.3K    ⊙ 2.9K people are Tweeting about this

In their effort to spread their antifa disinformation campaign, prominent conservatives have mainly focused on two individuals who were part of the Trump mob. An article from the Washington Times that was widely shared on social media claimed the two men were identified by XRVision, which purports to be a facial recognition software company but is largely a shadowy entity. XRVision disputed the Washington Times' assertion that they were involved in identifying either individual, and they have since removed the article from their site.

One of those at the center of this conspiracy theory is Jake Angeli, who is also known as the "QAnon Shaman." Even with no facial recognition software, with his viking hat and face paint he is easy to spot in pictures from Wednesday's attack on the Capitol. As one of the first people to make it inside the Senate chambers, Angeli's photo was everywhere on social media during the mayhem.



The "QAnon Shaman" was one of the first Trump supporters to break into the Senate chambers.

IMAGE: WIN MCNAMEE/GETTY IMAGES

Soon after that though, a photo spread on Twitter showing Angeli at a Black Lives Matter protest earlier this year. This was proof enough for conservatives that Angeli must be an antifa infiltrator and not a real Trump supporter.

The photo and the caption are accurate, Angeli was indeed at a BLM protest. However, the photo is manipulated to crop out his QAnon sign. Angeli was photographed at a BLM protest...because he was there as a pro-Trump counter-protestor.



SaLoSHoo....💚😎 ⚡ @AuSSie_SaL · Jan 6, 2021
Replying to @onajourney67 and @paulsperry_

AZ BLM rally in June, DC Capital in January

Kubrick's Lens Cap
@jonresling

Here's the UNCROPPED image for you "Q Sent Me". That's Jake Angeli BTW - he's an actor and MAGA from Phoenix.

5:15 PM · Jan 6, 2021

♡ 642    ⊙ 124 people are Tweeting about this

Furthermore, Angeli has made a name for himself as a big supporter of QAnon conspiracy, which is a hardcore pro-Trump movement. He has even spoken at pro-Trump events in support of Trump's re-election.

Another antifa conspiracy theory gaining traction following the Jan. 6 insurrection is being spread by Lin Wood, a prominent right-wing conspiracy theorist and pro-Trump



TECH
Apple's new 'Time to Walk' feature officially lands on Fitness+

TECH
Twitter launches crowdsourced fact-checking portal 'Birdwatch'

TECH
Google workers in 10 countries form union alliance: 'We will hold Alphabet accountable'

CULTURE
Champ and Major Biden, our new First Dogs, have moved into the White House

ENTERTAINMENT
Shudder's creepy 'The Dark and the Wicked' trailer is some serious nightmare fuel

CULTURE
Who you should follow from Biden-Harris administration

CULTURE
Lips is a new social network where sexual expression is welcome

TECH
Tesla sues a former employee for allegedly

Wood shared an image of an individual pictured in the Capitol today alongside a photo of the same person posted on "PhillyAntifa.org." Wood's claim is that this is proof the individual is actually an antifascist, and it has received nearly 50,000 retweets.

Wood's claim is totally false. First of all, it's unclear if the man in both photos is the same person. Wood uses a screenshot from Google Images in the second photo. Google is simply showing that they found the image of that person on PhillyAntifa.org. It's true that the picture is on that website. However, if you actually click the link, the image on PhillyAntifa.org website is located on a page outing that person as "Jason Tankersley," a white supremacist. PhillyAntifa.org is literally warning their community about him. The person standing in that photo with Tankersley is Matthew Heimbach, a prominent neo-Nazi.

The individual in Wood's first photo is also the same person Rep. Gohmert claimed had a hammer and sickle tattoo. In actuality, as many on social media have pointed out, the tattoo is a logo from a video game.

However, if you're looking for a tattoo on Tankersley that explains his political ideology, head on over to PhillyAntifa.org's exposé where they identify him as a far-right fascist. The post includes a photo showcasing the huge swastika tattoo on Tankersley's chest.

The antifa blame game is nothing new for the far right. Disinformation spread far and wide on social media this past summer blaming antifa for everything from civil unrest over police brutality to west coast wildfires.

Since President Trump's loss in November, his most hardcore supporters have been protesting the election results under the "#StopTheSteal" banner. Some have threatened violence and even civil war if Joe Biden's win wasn't overturned. Many Trump supporters explicitly saw Jan. 6 as their last chance to get their way.

Now that it has come to pass, some Republicans have seen what their fellow Trump supporters have wrought and are trying to escape the blame and pin it on antifa by spreading disinformation on social media.

*UPDATE: Jan. 6, 2021, 9:48 p.m. CST This article was updated to include the claim that XRVision was involved in identifying the two individuals.*

*UPDATE: Jan. 7, 2021, 3:34 p.m. AEDT This article was updated to note three people died due to medical emergencies during the siege.*

*UPDATE: Jan. 7, 2021, 10:33 a.m. CST This article has been updated to include XRVision's dispute over their involvement.*

*UPDATE: Jan. 7, 2021, 1:29 p.m. CST This article was updated to include the Washington Times removing the article from their site.*

### WATCH: How to recognize and avoid fake news



TOPICS: ANTIFA, CULTURE, DONALD TRUMP, MISINFORMATION, POLITICS

---

## RECOMMENDED FOR YOU



CULTURE
Internet sleuths misidentified some of the Trump supporters who stormed the Capitol



CULTURE
After Twitter banned Trump, misinfo on the site fell dramatically



TECH
Twitter's election label now acknowledges Joe Biden as president-elect



ENTERTAINMENT
Get 14 PC games and a month of EA Play Pro for only $15 with this Humble Bundle



TECH
The new MacBook Pro with Apple's fancy M1 chip just got its biggest discount yet




Sign up for Mashable Newsletters to get personalized updates on top stories and viral hits.

SIGN UP



TECH
Apple's new 'Time to Walk' feature will serve inspiring audio stories while you stroll around



TECH
Apple warns iPhone 12, MagSafe users with medical implants to keep a safe distance



CULTURE
Seth Rogen is trending because Ted Cruz is desperate for a distraction



CULTURE
'Black excellence': Gymnast Nia Dennis blesses the internet with another stunning floor routine



CULTURE
'Black excellence': Gymnast Nia Dennis blesses the internet with another stunning floor routine



SCIENCE
SpaceX sends more than 100 satellites skyward in a dazzling Sunday launch



SCIENCE
SpaceX sends more than 100 satellites skyward in a dazzling Sunday launch

# EXHIBIT 10

≡ ⫸ PARLER

linwood 🔍

🏠 🔔 🧭 ✉ 👤



# ⚑ #FIGHTBACK

**LLinWood**
@linwood
Joined Dec 13, 2018

**Follow**

✉

| 1.1m Followers | 79 Following | 2 Comments |

1 Votes

💬 623 Parleys   🖼 182 Media

**LLinWood** 37 minutes ago · 👁 849k ⌄
@linwood

🔗 https://nam11.safelinks.protection.outlook.com/?url=https%3A

💬 3.9k   👐 9.9k   ⌃ 17k   ⤢ ⤴

🏷 echoed by @linwood

**LLinWood** 7 hours ago · 👁 5.9m
@linwood

Several people have sent me screen shots of Ashli Babbitt's Twitter page. Below you will see that it appears Ms. Babbitt retweeted my tweet the day she was shot, 1/6. It appears to be her last post before her death. She had 1,915 Followers.

## Hashtag Feed

 #parler    #parlerusa

#parleruk   #parlerksa

#gardenclub   #fatkidclub

#twexit   #techtyrants

#bitcoin   #videogames

#meme

## people to follow

 **Sean Hannity**
@SeanHannity   

 **Mark Levin**
@Marklevinshow   

 **Tucker Carlson**
@TuckerCarlson   

 **Devin Nunes**
@Devinnunes   

 **Phil Robertson**
@officialphilrobertson   

 **Mariabartiromotv**
@Mariabartiromotv   

 **Sharyl Attkisson**
@SharylAttkisson   

 **Kirstie Alley**
@Kirstiealley   

 **Tito Ortiz**
@TitoOrtiz   

 **Wayne Dupree Media L.L.C**
@waynedupreeshow

⊕

Member Agreement   Privacy Policy   Community Guidelines   © 2021 Parler



linwood

     

 @GovernorNoem



**CommonAshSense**
@Ashli_Babbitt
#Veteran #AMERICA #Libertarian #2A #KAG- I ❤ my dude, my 🇺🇸 & above all, my country- 🇺🇸 #FREEDOM
🇺🇸 United States  📅 Joined October 2016
1,841 Following   1,915 Followers
Not followed by anyone you're following

Tweets    Tweets & replies    Media    Likes

CommonAshSense Retweeted
Lin Wood @LLinWood · 13h
MUST BE DONE LIST before Congress meets today:
1/2

 **LLinWood** 6 hours ago · 👁 2.5m
@linwood

I was suspended from Twitter promptly after the DC incident. From my #FightBackLaw Twitter account, I checked Ms. Babbitt'a account & it had been suspended. Then my #FightBack Twitter account was banned.

Something is not right here.

 4.4k     11k     32k

 **LLinWood** 6 hours ago · 👁 2.9m
@linwood



**Ashli Babbit ALIVE and WELL The FALSE FLAG Shooting**
You have been PLAYED. Chalk one more for the DeepState. Sheeple will still believe whatever they are told. In this Slowe...
🔗 https://www.brighteon.com/22375a2f-1f93-44fe-8fb5-4a2d0b2729

## Hashtag Feed

#parler              #parlerusa

#parleruk            #parlerksa

#gardenclub          #fatkidclub

#twexit              #techtyrants

#bitcoin             #videogames

#meme

## people to follow

 **Sean Hannity**
@SeanHannity    

 **Mark Levin**
@Marklevinshow    

 **Tucker Carlson**
@TuckerCarlson    

 **Devin Nunes**
@Devinnunes    

 **Phil Robertson**
@officialphilrobertson    

 **Mariabartiromotv**
@Mariabartiromotv    

 **Sharyl Attkisson**
@SharylAttkisson    

 **Kirstie Alley**
@Kirstiealley    

 **Tito Ortiz**
@TitoOrtiz    

 **Wayne Dupree Media L.L.C**
@waynedupreeshow    

# EXHIBIT 11



# EXHIBIT 12

CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

IN RE: TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners.

**PETITION FOR WRIT OF CERTIORARI PURSUANT TO 28 U.S.C. § 1651(a), On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan**

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorney for Plaintiffs/Petitioners
    TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD,
    CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and
    DAREN WADE RUBINGH
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
Attorney for Defendants/Respondents
      Attorneys for GRETCHEN WHITMER, in her official capacity as Governor of
      the State of Michigan, JOCELYN BENSON, as Michigan Secretary of State
      and the Michigan BOARD OF STATE CANVASSERS
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
      Attorneys for Intervenor Defendant and
      Respondent City of Detroit
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
      Attorney for Robert Davis
46350 Grand River Ave.
Novi, MI 48374
248 568-9712 Email: aap43@hotmail.com
MARY ELLEN GUREWITZ
Attorney for Intervenor
      Democratic National Committee
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
      Attorney for Intervenor Defendant
      Michigan Democratic Party
Miller, Canfield,
One Michigan Avenue; Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
      Attorney for Michigan State Conference NAACP
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

ISSUES PRESENTED

I. THE TRIAL COURT ERRED WHEN IT DENIED THE
PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR
ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND
PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD
PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF
WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE
OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES
AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND
UTTERLY IGNORGED THE DOZENS OF AFFIDAVITS, TESTIMONIALS,
EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE
PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING
PROCESS.

A. WHETHER THE PETITIONERS HAVE PRESENTED
SUFFICIENT EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO
42 USC§ 1983: (Count I) VIOLATION OF THE ELECTIONS AND
ELECTORS CLAUSES; (Count II) VIOLATION OF THE FOURTEEN
AMENDMENT EQUAL PROTECTION CLAUSE AND (Count III) DENIAL
OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND A
VIOLATION OF THE MICHIGAN ELECTION CODE?

B.  WHETHER THE PETITIONERS PRESENTED SUFFICIENT
EVIDENCE WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A
PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE
ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE
PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE
ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF
EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE
PUBLIC INTEREST?

II.  WHETHER THE DISTRICT COURT ERRED WHEN IT
DISMISSED THE PETITIONERS EMERGENCY MOTION AND REQUEST
FOR PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE
PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE
BARRED BY ELEMENTH AMENDMENT IMMUNITY?

III.  WHETHER THE DISTRICT COURT ERREONEOUSLY HELD
THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY
INJUNCTION WERE BARRED AS BEING MOOT WHEN THE
ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL
ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY?

i

IV.  WHETHER THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS?

V.  WHETHER THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER WITHOUT ANY SHOWING OF PARALLEL STATE COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT?

VI.  WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE PETITIONERS CLEARLY HAVE STANDING?

VII.  WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?

PARTIES TO THE PROCEEDINGS AND STANDING

All parties appear in the caption of the case on the cover page.

Each of the following Plaintiffs/Petitioners are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and, John Earl Haggard, a resident of Charlevoix, Michigan;

Each of these Plaintiffs/Petitioners has standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors).As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." Carson v. Simon, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); see also McPherson v. Blacker, 146 U.S. 1, 27 (1892); Bush v. Palm Beach Cty. Canvassing Bd., 531 U.S. 70, 76 (2000) (per curiam). Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020. The certified results showed a plurality of 154,188 votes in favor of former Vice-President Joe Biden over President Trump.

Petitioner James Ritchard is a registered voter residing in Oceana County. He is the Republican Party Chairman of Oceana County. Petitioner James David Hooper is a registered voter residing in Wayne County. He is the Republican Party Chairman for the Wayne County Eleventh District. Petitioner Daren Wade Ribingh is a registered voter residing in Antrim County. He is the Republican Party Chairman of Antrim County.

Respondent Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan. Respondent Jocelyn Benson ("Secretary Benson") is named as a defendant/respondent in her official capacity as Michigan's Secretary of State. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. Respondent Michigan Board of State Canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide…." Michigan Election Officials' Manual, p. 4. See also MCL 168.841, etseq. On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

# TABLE OF CONTENTS

ISSUES PRESENTED…………………………………………….    i

PARTIES TO THE PROCEEDINGS AND STANDING………………..  iii

TABLE OF CONTENTS………………………………………..    iv

INDEX TO APPENDICES………………………………………..  vi

TABLE OF AUTHORITIES…………………………………………  vii

INTRODUCTION………………………………………………… 1

OPINION BELOW……………………………………………    3

JURISDICTION………………………………………………    3

CONSTITUTIONAL AND STATUTORY PROVISIONS……………….. 5

STATEMENT OF THE CASE……………………………………  6

REASONS IN SUPPORT OF GRANTING WRIT OF CERTIORARI     10

ARGUMENTS

    I.  THE TRIAL COURT ERRED WHEN IT DENIED THE
PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR
ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND
PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD
PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF
WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE
OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES
AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND
UTTERLY IGNORED THE DOZENS OF AFFIDAVITS, TESTIMONIALS,
EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE
PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING
PROCESS.                                             10

    A. THE PETITIONERS HAVE PRESENTED SUFFICIENT
EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO 42 USC§ 1983:
VIOLATION OF THE ELECTIONS AND ELECTORS CLAUSES;
VIOLATION OF THE 14TH AMENDMENT EQUAL PROTECTION CLAUSE
AND (Ct III) DENIAL OF THE 14th AMENDMENT DUE PROCESS
CLAUSE AND A VIOLATION OF THE MICHIGAN ELECTION CODE.  11

    B.  THE PETITIONERS PRESENTED SUFFICIENT EVIDENCE WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.          12

    II.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEMENTH AMENDMENT IMMUNITY.    14

    III.  THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE BARRED AS BEING MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY.        15

    IV.  THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS.    16

    V.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER WITHOUT ANY SHOWING OF PARALLEL STATE COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT.    20

    VI.  THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE PETITIONERS CLEARLY HAVE STANDING.    22

VII.  WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?                                    24

CONCLUSION……………………………………………………     25

CERTIFICATE OF SERVICE………………………………………

## INDEX TO APPENDICES

Lower Court King Et al vs. Whitmer Et al, Case No. 20-cv-13134, US District Court, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831)

|     |                                                              | Page No. |
| --- | ------------------------------------------------------------ | -------- |
| 1.  | Civil Docket For Case 20-cv-13134                            | 1-12     |
| 2.  | Exhibit 1  R. 6  Amended Complaint                           | 13-97    |
| 3.  | Exhibit 2  R. 6-1  Redacted Declaration                      | 98-105   |
| 4.  | Exhibit 3  R 6-2  Ballot Making Devices (BMD) Cannot Assure Will of Voters | 106-133 |
| 5   | Exhibit 4  R 6-3  Affidavits including Abbie Helminen, Andrew Mill, Anna Pennala, Etc.    234 pages | 134-367 |
| 6.  | Exhibit 5  R. 6-4  Constantino  v. City of Detroit          | 368-444  |
| 7.  | Exhibit 6  R. 6-5  Mellissa Carona                          | 445-447  |
| 8.  | Exhibit 7  R. 6-6  Jessica Connard                          | 448-451  |
| 9.  | Exhibit 8  R. 6-7  Matt Ciantar                             | 452-454  |
| 10. | Exhibit 9  R. 6-8  Dominion Voting System Contract          | 455-615  |
| 11. | Exhibit 10 R. 6-9  Texas-Preliminary Statement, Dominion Voting System | 616-618 |
| 12  | Exhibit 11 R. 6-10 Kayla Toma                               | 619-625  |
| 13. | Exhibit 12 R. 6-11 Monica Palmer                            | 626-631  |
| 14  | Exhibit 13 R. 6-12 William Hartmann                         | 626-631  |
| 15  | Exhibit 14 R. 6-13 Patrick Colbeck                          | 637-643  |
| 16  | Exhibit 15 R. 6-14 Patrick Colbeck                          | 644-645  |
| 17  | Exhibit 16 R  6-15  Carlos Malony, Member of Congress       | 646-647  |
| 18  | Exhibit 17 R. 6-16 US Senators Letter                       | 648-662  |

19      Exhibit 18 R. 6-17 Ann Cardozo                              663-667
20      Exhibit 19 R. 6-18 Cybersecurity Advisory, IRAN            668-677
21      Exhibit 20 R. 6-19 Joseph Oltrann                          678-683
22      Exhibit 21 R. 6-20 Marian Sheridan                         684-685
23      Exhibit 22 R. 6-21 Analysis of Surveys                     686-705
24      Exhibit 23  R. 6-22 Statistical Voting Analysis in the Michigan 2020
Presidential Election                                              706-713
25      Exhibit 24 R. 6-23 Matt Braynard on Twitter               714
26      Exhibit 25 R. 6-24 Russel James Ramsland, Jr.             715-722
27      Exhibit 26 R. 6-25 Electronic Intelligence Analyst        723-739
28      Exhibit 27 R. 6-26 Ronald Watkins                         740-746
29      Exhibit 28 R. 6-27 Harri Hursti                           747-803
30      Exhibit 29 R. 6-28 Electronic J. Alex Halderman           804-913
31      Exhibit 30 R. 6-29 Michigan 2020 Voter Analysis
report, 11-17-20                                                  914-970
32      Exhibit 31 R. 6-30 Redacted Declaration                  971-974
33.     Exhibit 32 R. 7 Motion for Temporary Restraining Order  975-992
34.     Exhibit 33 R. 49  Reply to response Re: Emergency Motion for
Temporary Restraining Order                                       993-1025
35.     Exhibit 34 R. 49-1  Response to Stephen Ansolabehere's Comments
Regarding Absentee Ballots Across
Several States                                                    1026-1029
35.     Exhibit 35 R. 49-2 Expert report of Eric Quinnell, PhD  1030-1035
36.     Exhibit 36 R. 49-3 Expert Report of Russell  J.         1036-1068
37.     Exhibit 37 R. 49-4      Redacted Affidavit              1069-1077
38.     Exhibit 38 R. 57 Supplemental Brief Re: Motion for Temporary
Restraining Order.                                                1078-1082
39.     Exhibit 39 R. 57-1  Freehan v. Wisconsin
Elections Comm                                                    1083-1092
40.     Exhibit 40 R. 57-2   Amended Complaint Freehan vs. Wisconsin
Elections Committee                                               1093-1143
41      Exhibit 41 R. 60  Response to Emergency Motion for Temporary
Restaining Order                                                  144-1146
42.     Exhibit 42 R. 62,  OPINION AND ORDER DENYING
PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY,
EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" PgID 3295-
3330                                                              1147-1182
43.     Exhibit 42, R. 64 Notice of Appeal                        1183

## TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

<u>Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.</u>, 354 F.3d
438, 445 (6th Cir. 2003) *aff'd sub nom.*      22

<u>Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n</u>,
576 U.S. 787 (U.S. 2015)      6, 7

<u>Baker v. Carr</u>, 369 U.S. 186 (1962)      20

<u>Barrow v. Detroit Mayor</u>, 290 Mich. App. 530 (2010      21

<u>Bush v. Gore</u>, 531 U.S. 98, 113 (2000)      3, 5, 22

<u>Cheney v. U.S. Dist. Court</u>, 542 U .S. 367 (2004)      4

<u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800,
808 (1976)      16-18

<u>Ex Parte Republic of Peru</u>, 63 S.Ct. 793 (1943)      4

<u>FTC v. Dean Foods Co.</u>, 86 S.Ct. 1738 (1966)      5

<u>George v. Haslam</u>, 112 F.Supp.3d 700, 710 (M.D. Tenn. 2015)      21

<u>Graco Children's Products, Inc. v. Regalo International</u>, LLC,
77 F. Supp. 2d 660, 662 (E.D. Pa. 1999)      18

<u>*In Roche* *Evaporated Milk Ass'n*</u>, 63 S.Ct. 938, 941 (1943),      5

<u>Hamlin v. Saugatuck Twp.</u>, 299 Mich. App. 233 (2013)      20-21

<u>Harman v. Forssenius</u>, 380 U.S. 528 (1965)      17, 25

<u>Louisville Bedding Co. v. Perfect Fit Indus.</u>, 186 F. Supp. 2d 752
Dist. LEXIS 9599      18

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992)      21

<u>McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky.</u>,
545 U.S. 844 (2005)      22

Meade v. Pension Appeals and Review Committee,
966 F.2d 190 (6th Cir. 1992)                                    15

Obama for America vs. Husted, 697 F.3d 423 (6th Cir. 2012)

Ohio Citizens for Responsible Energy, Inc. v. NRC,
479 U.S. 1312 (1986)                                            4

Reynolds v. Sims, 377 U.S. 533 (1964)                          20

Russell v. Lundergan-Grimes, 784 F.3d 1037 (6th Cir. 2015).    11, 14
Smiley v. Holm, 285 U.S. 355, 365(1932)                        3, 6-7

State of Texas v. Commonwealth of Pennsylvania Et al,
SCt Case No. 22O155                                            4

Toney v. White, 488 F.2d 310 (5th Cir. 1973)                   15

**STATUTES, RULES, CONSTITUTIONAL CITATIONS**

U.S. CONST. art. I, § 4 ("Elections Clause").                  5, 6

U.S. CONST. art. II, § 1 ("Electors Clause").                  6

U.S. Const. art. II, §1, cl. 2                                 5

**Fourteenth Amendment of the United States Constitution**     **5**

**28 U.S.C. § 1331**                                           **1**

28 U.S.C. §§ 2201and 2202                                      3

28 U.S.C. § 1391(b) &(c)                                       3

28 USC § 1254(1)                                               4

28 U.S.C.§ 1367                                                3

Article III, §2 of the United States Constitution             4

28 U.S.C. § 1651(a)                                            4

**28 U.S.C. § 1651(a)**                                        **5**

ix

42 U.S.C. §§ 1983 and 1988, and under MCL 168.86     6

**250 U.S.C. § 20701**     **1**

The Mich. Const., art.2, sec.4,     7

**MCL § 168.31a**     **25**

**MCL § 168.861**     **25**

**Michigan Election Code, MCL §§ 168.730-738,**     **23**

**MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).**     **23**

MCL § 168.730 & § 168.733(1)     6

MCL § 168.31(1)(a)     6

MCL 168.765a;     6

MCL 168.733     6

MCL §§ 168.42 & 168.43.     6

**MCL § 168.31a**     **21**

**MCL § 168.861**     **21**

**MCL §§ 168.730-738**     **1**

Rule 57, Fed. R. Civ. P.     3

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, the Petitioners herein disclose the following: There is no parent or publicly held company owning 10% or more of Respondent's stock or corporate interest.

## INTRODUCTION

Petitioners file this motion seeking immediate relief in anticipation of their petition for certiorari from the judgment of the District Court dated December 7, 2020, dismissing their case after denying their motion for a Temporary Restraining Order. (R.62). Petitioners filed a notice of appeal to the Sixth Circuit on December 8, 2020. (R.64). Because of the exigencies of time, they have not presented their case to the Sixth Circuit but, rather, will seek certiorari before judgment in the court of appeals pursuant to S. Ct. R. 11. This motion for immediate preliminary relief seeks to maintain the status quo so that the passage of time and the actions of Respondents do not render the case moot, depriving this Court of the opportunity to resolve the weighty issues presented herein and Respondents of any possibility of obtaining meaningful relief.

Petitioners seek review of the district court's order denying any meaningful consideration of credible allegations of massive election fraud, multiple violations of the Michigan Election Code, see, e.g., MCL §§ 168.730-738 and Equal Protection Clause of the U.S. Constitution that occurred during the 2020 General Election throughout the State of Michigan. Petitioners presented substantial evidence consisting of sworn declarations of dozens of eyewitnesses and of experts identifying statistical anomalies and mathematical impossibilities, as well as a multistate, conspiracy, facilitated by foreign actors, including China and Iran, designed to deprive Petitioners to their rights to a fair and lawful election. The district court ignored it all. It failed to hear from a single witness or consider any expert and made findings without any examination of the record.

1

The scheme and artifice to defraud illegally and fraudulently manipulate the vote count to manufacture the "election" of Joe Biden as President of the United States. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run the vote tabulation by domestic and foreign actors for that very purpose. The petition detailed an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State with the cooperation and control of Michigan state election officials, including Respondents.

The multifaceted schemes and artifices to defraud implemented by Respondents and their collaborators resulted in the unlawful counting, or outright manufacturing, of hundreds of thousands of illegal, ineligible, duplicate, or purely fictitious ballots in Michigan. The same pattern of election fraud and vote-counting fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona, and Wisconsin. See Ex. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report"). Unlike some other petitions currently pending, this case presented an enormous amount of evidence in sworn statements and expert reports. According to the final certified tally in Michigan, Mr. Biden had a slim margin of 146,000 votes.

The election software and hardware from Dominion Voting Systems ("Dominion") used by the Michigan Board of State Canvassers was created to achieve election fraud. See Ex. 1, Redacted Declaration of

2

Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

The trial court did not examine or even comment on Petitioners' expert witnesses, including Russell James Ramsland, Jr. (Ex. 101, "Ramsland Affidavit"), who testified that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan. This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below). This, by itself, requires that the district court grant the declaratory and injunctive relief Petitioners sought. Andrew W. Appel, et al., "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

In addition to the Dominion computer fraud, Petitioners identified multiple means of "traditional" voting fraud and Michigan Election Code violations, supplemented by harassment, intimidation, discrimination, abuse, and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity, or fairness from the vote counting process. Systematic violations of the Michigan Election Code cast significant doubt on the results of the election and call for this Court to set aside the 2020 Michigan General Election and grant the declaratory and injunctive relief requested herein. King Et al vs. Whitmer Et al, No. 20-cv-13134, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831.

3

## OPINION BELOW

Judge Linda Parker, in the Eastern District of Michigan, without an evidentiary hearing or even oral argument, denied Petitioners "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief." The court held the Eleventh Amendment bars Petitioners claims against Respondents (R, 62, PgID, 3307); Petitioners claims for relief concerning the 2020 General Election were moot (R, 62, PgID, 3310); Petitioners claims were barred by laches as a result of "delay" (R,62, PgID, 3313); and abstention is appropriate under the *Colorado River* doctrine; (R, 62, PgID 3317). The Court further held that petitioners lacked standing. (R, 62, PgID 3324).

The Court stated, "it appears that Petitioners' claims are in fact state law claims disguised as federal claims" (R, 62, PgID 3324) and held there was no established equal protection claim (R, 62, PgID 3324). The Court declined to discuss the remaining preliminary injunction factors extensively. (R, 62, PgID, 3329). Opinion and Order Attached Denying Petitioner's' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief. (R. 62).

## JURISDICTION

The district Court had subject matter over these federal questions under 28 U.S.C. § 1331 because it presents numerous claims based on federal law and the U.S. Constitution. The district court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential

4

electors presents a federal constitutional question." <u>Bush v. Gore</u>, 531
U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); <u>Smiley v. Holm</u>, 285
U.S. 355, 365(1932).

The district court had authority to grant declaratory relief under
28 U.S.C. §§ 2201and 2202 and by Fed. R. Civ. P. 5 7 . The district
court had supplemental jurisdiction over the related Michigan
constitutional claims and state-law claims under 28 U.S.C.§ 1367.

This Court has jurisdiction under 28 USC § 1254(1) because the
case is in the Court of Appeals for the Sixth Circuit and petitioners
are parties in the case. This Court should grant certiorari before
judgment in the Court of Appeals pursuant to Supreme Court Rule
11 because "the case is of such imperative public importance as to
justify deviation from normal appellate practice and to require
immediate determination in this Court." The United States
Constitution reserves for state legislatures the power to set the time,
place, and manner of holding elections for Congress and the President,
state executive officers, including but not limited to Secretary
Benson, have no authority to unilaterally exercise that power, much
less flout existing legislation. Moreover, Petitioners Timothy King,
Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard,
James David Hooper, and Daren Wade Rubingh, are candidates for
the office of Presidential Electors who have a direct and personal
stake in the outcome of the election and are therefore entitled to
challenge the manner in which the election was conducted and the
votes tabulated under the authority of this Court's decision in *Bush v.
Gore*, 531 U.S. 98 (2000).

Additionally, this Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a) and United States Supreme Court Rule 20, Procedure on a Petition for an Extraordinary Writ. Petitioners will suffer irreparable harm if they do not obtain immediate relief. The Electors are set to vote on December 14, 2020. The issues raised are weighty as they call into question who is the legitimate winner of the 2020 presidential election. These exceptional circumstances warrant the exercise of the Court's discretionary powers, particularly as this case will supplement the Court's understanding of a related pending case, State of Texas v. Commonwealth of Pennsylvania et al, S.Ct. Case No. 220155.

The All Writs Act authorizes an individual Justice or the full Court to issue an injunction when (1) the circumstances presented are "critical and exigent"; (2) the legal rights at issue are "indisputably clear"; and (3) injunctive relief is "necessary or appropriate in aid of the Court's jurisdiction." *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986) (Scalia, J., in chambers) (citations and alterations omitted).

A submission directly to this Court for a Writ of Certiorari, a Stay of Proceeding and a Preliminary Injunction is an extraordinary request, but it has its foundation. While such relief is rare, this Court will grant it "where a question of public importance is involved, or where the question is of such a nature that it is peculiarly appropriate that such action by this Court should be taken." *Ex Parte Peru*, 318 U.S. 578, 585 (1943). *See also* Cheney v. U.S. Dist. Court, 542 U.S. 367, 380–81 (2004).

6

Here, Petitioners and the public will suffer irreparable harm if this Court does not act without delay. Once the electoral votes are cast, subsequent relief would be pointless. In *Federal Trade Commission v. Dean Foods Co.*, 384 U.S. 597 (1966), the Court affirmed the Seventh Circuit, finding authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where the statute itself was silent on whether injunctive relief was available regarding an application by the FTC. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Id.* at 1743. This Court rendered a similar decision in *Roche v. Evaporated Milk Assn*, 319 U.S. 21 (1943), granting a writ of mandamus, even though there was no appealable order and no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by unauthorized action of the district court obstructing the appeal."

CONSTITUTIONAL AND STATUTORY PROVISIONS

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for president. U.S. Const. art. II, §1, cl. 2.

The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, §4, cl. 1.

The Constitution of Michigan, Article II, § 4, clause 1(h) states: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections. All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

The Michigan Election Code provides voting procedures and rules for the State of Michigan. M.C.L. § 168.730, designation, qualifications, and number of challengers, M.C.L. § 168.733,challengers, space in polling place, rights, space at counting board, expulsion for cause, protection, threat or intimidation, MCL § 168.31(1)(a) Secretary of state, duties as to elections, rule MCL 168.765a absent voter counting board.

8

## STATEMENT OF THE CASE

Petitioners brought this case to vindicate their constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."

The Mich. Const., art.2, sec.4, par. 1(h) further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

These state-law procedures, in turn, implicate Petitioners' rights under federal law and the U.S. Constitution. "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. at 104. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson* v. *Celebrezze*, 460 U.S. 780, 794-795 (1983) (footnote omitted).

9

Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, this Court should exercise its authority to issue the writ of certiorari and stay the vote for the Electors in Michigan.

<u>Fact Witness Testimony of Voting Fraud & Other Illegal Conduct</u>

Respondents and their collaborators have executed a multifaceted scheme to defraud Michigan voters, resulting in the *unlawful counting of hundreds of thousands* of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan. Evidence included in Respondents' complaint and reflected in Section IV herein shows with specificity the minimum number of ballots that should be discounted, which is more than sufficient to overturn and reverse the certified election results. This evidence, provided in the form of dozens of affidavits and reports from fact and expert witnesses, further shows that the entire process in Michigan was so riddled with fraud and illegality that certified results cannot be relied upon for any purpose by anyone involved in the electoral system.

There were three broad categories of illegal conduct by election workers in collaboration with other state, county and/or city employees and Democratic poll watchers and activists.

*First*, election workers illegally forged, added, removed or otherwise altered information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A.    Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden.

B.    Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900.

C.    Changing dates on absentee ballots received after the 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline.

D.    Changing votes for Trump and other Republican candidates.

E.    Adding votes to "undervote" ballots and removing votes from "overvote" ballots.[1]

*Second*, to facilitate and cover up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.    Denied Republican election challengers' access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted.

B.    Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting, and locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

---

[1] As explained in *Bush v. Gore*, "overvote" ballots are those where "the [voting] machines had failed to detect a vote for President," 531 U.S. at 102, while "overvote" ballots are those "which contain more than one" vote for President. *Id.* at 107.

11

C.      Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center.

D.      Systematically discriminated against Republican poll watchers and favored Democratic poll watchers.

E.      Ignored or refused to record Republican challenges to the violations outlined herein.

F.      Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate.

G.      Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going over to the voting booths with voters in order to watch them vote and coach them for whom to vote. As a result, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines).

H.      Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.


*Third*, election workers in some counties committed several additional categories of violations of the Michigan Election Code to enable them to accept and count other illegal, ineligible or duplicate ballots, or reject Trump or Republican ballots, including:


A.      Permitting illegal double voting by persons that had voted by absentee ballot and in person.

B.      Counting ineligible ballots – and in many cases – multiple times.

C.      Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Respondents.

D.      Counting "spoiled" ballots.

E.      Systematically violating of ballot secrecy requirements.

F.      Counted unsecured ballots that arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline, in particular, tens of thousands of ballots that arrived on November 4, 2020.

G.      Accepting and counting ballots from deceased voters.

Expert Witness Testimony Regarding Voting Fraud

In addition to the above fact witnesses, this Complaint presented expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

(1) A report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes tabulated by four precincts on November 4, 2020 in two hours and thirty-eight minutes, that derived from the processing of nearly 290,000 more ballots than available machine counting capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws).

(2) A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

13

(3) A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100%, and frequently more than 100%, of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes were accepted and tabulated from these precincts.

Foreign actors interfered in this election. As explained in the accompanying redacted declaration of a former electronic intelligence analyst who served in the 305th Military Intelligence Unit with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent U.S. general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer, Dominion's security director, is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

Another expert explains that U.S. intelligence services had developed tools to infiltrate foreign voting systems, including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were probably transferred to former Vice-President Biden. (Ex. 109).

These and other irregularities provide substantial grounds for this Court to stay or set aside the results of the 2020 General Election in Michigan and provide the other declaratory and injunctive relief requested herein.

Irreparable harm will inevitably result for both the public and the Petitioners if the Petitioners were required to delay this Court's review by first seeking relief in the United States Court of Appeals, Sixth Circuit. Once the electoral votes are cast, subsequent relief would be pointless and the petition would be moot. As such, petitioners are requesting this Honorable Court grant the petition under the most extraordinary of circumstances. A request which, although rare, is not without precedent.

Similar relief was granted in  FTC v. Dean Foods Co., 86 S.Ct. 1738 (1966) affirming the Seventh Circuit, involving an application by the FTC and a holding by this Court that found authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where statute itself was silent on whether injunctive relief was available. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Id.* at 1743. A similar decision was reached in In *Roche Evaporated Milk Ass'n,* 63 S.Ct. 938, 941 (1943), the Supreme Court granted a writ of mandamus where there was no appealable order or where no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ

15

thwarted by unauthorized action of the district court obstructing the appeal."

For these reasons, this Honorable Court should exercise its authority to review this pending application, to stay the Electoral College Vote pending disposition of the forthcoming petition for writ of certiorari and to allow Petitioners a full and fair opportunity to be heard.

ARGUMENT

**I.  THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONERS' EMERGENCY MOTION BECAUSE PETITIONERS PRESENTED A PRIMA FACIE CASE OF WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE OF MICHIGAN IN THE PROCESSING AND TABULATION OF POLLING-PLACE VOTES AND ABSENTEE BALLOTS**.

The record includes overwhelming evidence of widespread systemic election fraud and numerous serious irregularities and mathematical impossibilities not only in the state of Michigan but numerous states utilizing the Dominion system. Sworn witness testimony of "Spider", a former member of the 305th Military Intelligence Unit, explains how Dominion was compromised and infiltrated by agents of hostile nations China and Iran, among others. (R. 49, PgID, 3074). Moreover, expert Russell Ramsland testified that 289,866 ballots must be disregarded as a result of voting machines counting 384,733 votes in two hours and thirty-eight minutes when the actual, available voting machinery was incapable of counting more than 94,867 votes in that time frame. (R. 49, PgID, 3074). According to the final certified tally in Michigan, Mr. Biden has a slim margin of 146,000 votes over President Trump.

16

In the United States, voting is a sacrament without which this Republic cannot survive. Election integrity and faith in the voting system distinguishes the United States from failed or corrupt nations around the world. Our very freedom and all that Americans hold dear depends on the sanctity of our votes.

Judge Parker issued a Notice of Determination of Motion without Oral Argument (R. 61, PgID, 3294) on this most sensitive and important matter. She ignored voluminous evidence presented by Petitioners proving widespread voter fraud, impossibilities, and irregularities that undermines public confidence in our election system and leaves Americans with no reason to believe their votes counted. It the face of all Petitioners' evidence, it cannot be said that the vote tally from Michigan reflects the will of the people. From abuses of absentee ballots, fraudulent ballots, manufactured ballots, flipped votes, trashed votes, and injected votes, not to mention the Dominion algorithm that shaved votes by a more than 2% margin from Trump and awarded them to Biden, the Michigan results must be decertified, the process of seating electors stayed, and such other and further relief as the Court finds is in the public interest, or the Petitioners show they are entitled.

**A. PETITIONERS PRESENTED SUFFICIENT EVIDENCE, WHICH WAS IGNORED BY THE DISTRICT COURT, TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS, THAT PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF INTERLOCUTORY RELIEF, THAT THE BALANCE OF EQUITIES TIPS IN THIER FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST**.

Respondents have submitted a number of affidavits, consisting mostly of recycled testimony from ongoing State proceedings, that purport to rebut Plaintiffs' fact witnesses all of which boil down to: (1) they did not see what they thought they saw; (2) maybe they did see what they thought they saw, but it was legal on the authority of the very government officials engaged in or overseeing the unlawful conduct; (3) the illegal conduct described could not have occurred because it is illegal; and/or (4) even if it happened, those were independent criminal acts by public employees over whom State Respondents had no control.

Below are a few examples of State Defendant affiants' non-responsive responses, evasions and circular reasoning, followed by Plaintiff testimony and evidence that remains unrebutted by their testimony.

- **Illegal or Double Counted Absentee Ballots**. Affiant Brater asserts that Plaintiffs' allegation regarding illegal vote counting can be "cursorily dismissed by a review of election data," and asserts that if illegal votes were counted, there would be discrepancies in between the numbers of votes and numbers in poll books. ECF No. 31-3 ¶19. Similarly, Christopher Thomas, asserts that ballots could not, as Plaintiffs allege, see FAC, Carrone Aff., have been counted multiple times because "a mistake like that would be caught very quickly on site," or later by the Wayne County Canvassing Board. ECF No. 39-6 ¶6. Mr. Brater and Mr. Thomas fail to acknowledge that is precisely what happened: The Wayne County Canvassing Board found that over 70% of Detroit Absentee Voting Board ("AVCB") were unbalanced, and that two members of Wayne County Board of Canvassers initially refused to certify results and conditioned certification on a manual recount and answers to questions such as "[w]hy the pollbooks, Qualified Voter Files, and final tallies do not match or balance." FAC ¶¶105-107 & Ex. 11-12 (Affidavits of Wayne County Board of Canvasser Chairperson Monica Palmer and Member William C. Hartmann). Further, Plaintiffs' affiants testified to observing poll workers assigning ballots to different voters than the one named on the ballot. FAC ¶86 & Larsen Aff. Defendants do not address this allegation, leaving it un-rebutted.

18

- **Illegal Conduct Was Impossible Because It Was Illegal**. Mr. Thomas wins the Begging the Question prize in this round for circular reasoning that "[i]t would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November," and "no ballot could have been backdated," because no ballots received after the deadline "were ever at the TCF Center," nor could the ballot of an ineligible voter been "brought to the TCF Center." ECF No. 39-5 ¶20; id. ¶27. That is because it would have been illegal, you understand. The City of Detroit's absentee voter ballot quality control was so airtight and foolproof that only 70% of their precincts were unbalanced for 2020 General Election, which exceeded the standards for excellence established in the August 2020 primary where 72% of AVCB were unbalanced. FAC Ex. 11 ¶¶7&14.

State Respondents Affiants did not, however, dismiss all of Plaintiff Affiants'claims. Rather, they made key admissions that the conduct alleged did in fact occur, while baldly asserting, without evidence, that this conduct was legal and consistent with Michigan law. Defendants admitted that:

- Election Workers at TCF Center Did Not Match Signatures for Absentee Ballots.

- Election Workers Used Fictional Birthdates for Absentee Voters. ECF No. 39- 5 ¶15. The software made them do it.

Election Workers Altered Dates for Absentee Ballot Envelopes. Mr. Thomas does not dispute Affiant Jacob's testimony that "she was instructed by her supervisor to adjust the mailing date of absentee ballot packages" sent to voters, but asserts this was legal because "[t]he mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes."  This is not a factual assertion but a legal

19

conclusion—and wrong to boot. Michigan law the Michigan Constitution provides all registered voters the right to request and vote by an absentee ballot without giving a reason. MICH. CONST. art. 2, § 4. M.C.L. § 168.759(3). That statute limits the procedures for requesting an absentee ballot to three specified ways: An application for an absent voter ballot under this section may be made in any of the following ways: By a written request signed by the voter on an absent voter ballot application form provided for that purpose by the clerk of the city or township. Or on a federal postcard application. M.C.L. § 168.759(3) (emphasis added). The Michigan Legislature thus did not include the Secretary of State as a means for distributing absentee ballot applications. *Id.* § 168.759(3)(b). Under the statute's plain language, the Legislature explicitly gave *only local clerks* the power to distribute absentee voter ballot applications. *Id.* Secretary Benson lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan.

Secretary Benson also violated Michigan law when she launched a program in June 2020 allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. The Michigan Legislature did not approve or authorize Secretary Benson's unilateral actions. MCL § 168.759(4) states in relevant part: "An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application." MCL § 168.761(2), in turn, states: "The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot. Signature comparisons must be made with the digitized signature in the qualified voter file." Nowhere does Michigan Law authorize counting of an absent voter's ballot without verifying the voter's signature.

20

**II. THE DISTRICT COURT ERRED WHEN IT DISMISSED PETITIONERS' EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION BY HOLDING THAT THE PETITIONERS STATE-LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEVENTH AMENDMENT IMMUNITY.**

The Sixth Circuit recently addressed the scope of Eleventh Amendment sovereign immunity in the election context in *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015). In *Russell*, the appellate court held that federal courts do in fact have the power to provide injunctive relief where the defendants, "The Secretary of State and members of the State Board of Elections," were, like State Respondents in this case, "empowered with expansive authority to "administer the election laws of the state." *Russell*, 784 F.3d at 1047 (internal quotations omitted).

> The appellate court held that the Eleventh Amendment does not bar"[e]njoining a statewide official under *Young* based on his obligation to enforce a law is appropriate" where the injunctive relief requested sought to enjoin actions (namely, prosecution) that was within the scope of the official's statutory authority." *Id*.

This is precisely what the Petitioners request in the Amended Complaint, namely, equitable and injunctive relief "enjoining Secretary [of State] Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College." (See ECF No. 6 ¶1). Under *Russell*, the Eleventh Amendment is no bar to this Court granting the requested relief. (R. 49, PgID 3083).

### III. THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY.

This Court can grant the primary relief requested by Petitioners – de- certification of Michigan's election results and an injunction prohibiting State Respondents from transmitting the certified results – as discussed below in Section I.E. on abstention. There is also no question that this Court can order other types of declaratory and injunctive relief requested by Petitioners – in particular, impounding Dominion voting machines and software for inspection – nor have State Respondents claimed otherwise. (R. 49, PgID 3082). The District Court erroneously held that the Petitioners claims seeking a preliminary injunction were barred as being moot when the Electoral College has yet to certify the national election and as such the relief is timely.

### IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS' CLAIMS WERE BARRED BY LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ADDRESS HARM THAT IS CONTINUING AND FORTHCOMING, AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS.

Laches consists of two elements, neither of which are met here: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party. *Meade v. Pension Appeals and Review Committee*, 966 F.2d 190, 195 (6th Cir. 1992). The bar is even higher in the voting rights or election context, where Respondents asserting the equitable defense must show that the delay was due to a "deliberate" choice to bypass judicial remedies and they must do so "by clear and

convincing" evidence. *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973). Petitioners' "delay" in filing is a direct result of Respondents failure to complete counting until November 17, 2020. Further, Petitioners' filed their initial complaint on November 25, 2020, two days after the Michigan Board of State Canvassers certified the election on November 23, 2020. (R. 49, PgID 3082).

Additionally, the "delay" in filing after Election Day is almost entirely due to Respondents failure to promptly complete counting until weeks after November 3, 2020. Michigan county boards did not complete counting until November 17, 2020, and Defendant Michigan Board of State Canvassers did not do so until November 23, 2020, ECF No. 31 at 4—a mere two days before Petitioners filed their initial complaint on November 25, 2020. Petitioners admittedly would have preferred to file sooner, but needed time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint, and this additional time was once again a function of the sheer volume of evidence of illegal conduct by Respondents and their collaborators. Respondents cannot now assert the equitable defense of laches, when any prejudice they may suffer is entirely a result of their own actions and misconduct.

Moreover, much of the misconduct identified in the Complaint was not apparent on Election Day, as the evidence of voting irregularities was not discoverable until weeks after the election. William Hartman explains in a sworn statement dated November 18, 2020, that "on November 17th there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County" and he had "determined that approximately 71% of Detroit's 134 Absentee Voter

23

Counting Boards were left unbalanced and unexplained." He and Michele Palmer voted *not* to Certify and only later agreed to certify after a representation of a full audit, but then reversed when they learned there would be no audit. (See ECF No. 6, Ex. 11 &12.) Further, filing a lawsuit while Wayne County was still deliberating whether or not to certify, despite the demonstrated irregularities, would have been premature.  Respondents appropriately exhausted their non-judicial remedies by awaiting the decision of the administrative body charged with determining whether the vote count was valid. Id.

It is also disingenuous to try to bottle this slowly counted election into a single day when in fact waiting for late arriving mail ballots and counting mail ballots persisted long after "Election Day."

### III. THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS' CLAIMS BASED ON *COLORADO RIVER* ABSTENTION WITHOUT IDENTIFYING ANY PARALLEL STATE-COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT.

The District Court accepted State Respondent' abstention claim arguments based on Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 808 (1976), a case addressing concurrent federal and state jurisdiction over water rights. See ECF No. 31 at 19-20. Presumably it did so because the case setting the standard for federal abstention in the voting rights and state election law context, Harman v. Forssenius, 380 U.S. 528, 534, (1965) is not favorable to the Respondents.

This Court rejected the argument that federal courts should dismiss voting rights claims based on federal abstention, emphasizing that abstention may be appropriate where "the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law," and "deference to state court adjudication only be made where the issue of state law is uncertain." <u>Harman</u>, 380 U.S. at 534 (citations omitted). But if state law in question "is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," then "it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* (citation omitted).

Respondents described several ongoing state proceedings where there is some overlap with the claims and specific unlawful conduct identified in the Complaint. See ECF No. 31 at 21-26. But State Respondents have not identified any uncertain issue of state law that would justify abstention. See ECF No 31 at 21-26. Instead, as described below, the overlaps involve factual matters and the credibility of witnesses, and the finding of these courts would not resolve any uncertainty about state law that would impact Petitioners' constitutional claims (Electors and Elections Clauses and Equal Protection and Due Process Clauses).

Respondents' reliance on *Colorado River* is also misplaced insofar as they contend that abstention would avoid "piecemeal" litigation, *see id.* at 38, because abstention would result in exactly that. The various Michigan State proceedings raise a number of isolated factual and legal issues in separate proceedings, whereas Plaintiffs' Complaint addresses most of the legal claims and factual evidence submitted in

25

Michigan State courts, and also introduces a number of new issues that
are not present in any of the State proceedings. Accordingly, the
interest in judicial economy and avoidance of "piecemeal" litigation would
be best served by retaining jurisdiction over the federal and state law claims.

Respondents cited to four cases brought in the State courts in
Michigan, none of which have the same plaintiffs, and all of which are
ongoing and have not been resolved by final orders or judgments. (See
ECF Nos. 31-6 to 31-15.)

The significant differences between this case and the foregoing
State proceedings would also prevent issue preclusion. A four-element
framework finds issue preclusion appropriate if: (1) the disputed issue is
identical to that in the previous action, (2) the issue was actually
litigated in the previous action, (3) resolution of the issue was necessary
to support a final judgment in the prior action, and (4) the party against
whom issue preclusion is sought had a full and fair opportunity to
litigate the issue in the prior proceeding. See Louisville Bedding Co. v.
Perfect Fit Indus., 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS
9599 (citing Graco Children's Products, Inc. v. Regalo International,
LLC, 77 F. Supp. 2d 660, 662 (E.D. Pa. 1999). None of these
requirements have been met with respect to petitioners or the claims in
the Complaint.

Of equal importance is the fact that the isolated claims in State
court do not appear to present evidence demonstrating that a sufficient
number of illegal ballots were counted to affect the result of the 2020
General Election. The fact and expert witnesses presented in the
Complaint do. As summarized below, the Complaint alleges and

26

provides supporting evidence that the number of illegal votes is potentially multiples of Biden's 154,188 margin in Michigan. (See ECF No. 6 ¶16).

   A.    A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (see Ex. 104 ¶14).

   B.    A report from Dr. Louis Bouchard finding it to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4, see Ex. 110 at 28).

   C.    A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (See Ex. 101).

   D.    A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts when compared to the 2016 election, and thus indicates that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (See Ex. 102).

   E.    A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016, almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (See Ex. 110).

   F.    A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (i.e., the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date (i.e., consistent with eyewitness testimony described in Section II below). (See Ex. 110).

27

G.    A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precincts, but that the Democrat advantage (i.e., the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated. (See Ex. 110).

H.    A report by an affiant whose name must be redacted to protect his safety concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five-point six percentage points. Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (See Ex. 111 ¶13).

## IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT PETITIONERS, WHO ARE CANDIDATES FOR THE OFFICE OF PRESIDENTIAL ELECTOR, LACKED STANDING TO PURSUE THEIR EQUAL PROTECTION AND OTHER CLAIMS

Petitioners are not simply voters seeking to vindicate their rights to an equal and undiluted vote, as guaranteed by Michigan law and the Equal Protection Clause of the U.S. Constitution, as construed by this court in *Reynolds v. Sims*, 377 U.S. 533 (1964) and its progeny. Rather, Petitioners are candidates for public office. Having been selected by the Republican Party of Michigan at its 2019 Fall convention, and their names having been certified as such to the Michigan Secretary of States pursuant to Michigan Election Law 168.42, they were nominated to the office of Presidential Electors in the November 2020 election pursuant to MCL § 168.43. Election to this office is limited to individuals who have been citizens of the United States for 10 years, and registered voters of the district (or the

28

state) for at least 1 year, and carries specific responsibilities defined by law, namely voting in the Electoral College for President and Vice-President. MCL §168.47. While their names do not appear on the ballot, Michigan Law makes it clear that the votes cast by voters in the presidential election are actually votes for the presidential electors nominated by the party of the presidential candidate listed on the ballot. MCL § 168.45.[2]

The standing of Presidential Electors to challenge fraud, illegality and disenfranchisement in a presidential election rests on a constitutional and statutory foundation—as if they are candidates, not voters.[3] Theirs is not a generalized grievance shared by all other voters; they are particularly aggrieved by being wrongly denied the responsibility, emoluments and honor of serving as members of the Electoral College, as provided by Michigan law. Petitioners have the requisite legal standing, and the district court must be reversed on this point. As in the Eighth Circuit case of *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020),"[b]ecause Minnesota law plainly treats presidential electors as candidates, we do, too." *Id*. at 1057. And this Court's opinion in *Bush v. Gore*, 531 U.S. 98 (2000) (failure to set state-wide standards for recount of votes for presidential electors violated federal Equal Protection), leaves no doubt that presidential candidates have standing to raise post-election challenges to the

---

[2] This section provides: " Marking a cross (X) or a check mark ( ) in the circle under the party name of a political party, at the general November election in a presidential year, shall not be considered and taken as a direct vote for the candidates of that political party for president and vice-president or either of them, but, as to the presidential vote, as a vote for the entire list or set of presidential electors chosen by that political party and certified to the secretary of state pursuant to this chapter."
[3] *See* https://sos.ga.gov/index.php/Elections/voter_registration_statistics, last visited November 5, 2020.

manner in which votes are tabulated and counted. The district court therefore clearly erred in concluding that Petitioners lack standing to raise this post-election challenge to the manner in which the vote for *their* election for public office was conducted.

There is further support for Petitioners' standing in the Court's recent decision in *Carney v. Adams* involving a challenge to the Delaware requirement that you had to be a member of a major political party to apply for appointment as a judge. In Adams, the Court reiterated the standard doctrine about generalized grievance not being sufficient to confer standing and held that *Adams* didn't have standing because he "has not shown that he was 'able and ready' to apply for a judicial vacancy in the imminent future". In this case, however, Petitioners were not only "able and ready" to serve as presidential electors, they were nominated to that office in accordance with Michigan law.

The Respondents have presented compelling evidence that Respondents not only failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Respondents executed a scheme and artifice to fraudulently and illegally manipulate the vote count to ensure the election of Joe Biden as President of the United States. This conduct violated Petitioners' equal protection and due process rights, as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

In considering Petitioners' constitutional and voting rights claims under a "totality of the circumstances" standard, this Court must consider the cumulative effect of the specific instances or categories of Respondents' voter dilution and disenfranchisement claims. Taken together, these various forms of unlawful and unconstitutional conduct destroyed or shifted tens or hundreds of thousands of Trump votes, and illegally added tens or hundreds of thousands of Biden votes, changing the result of the election, and effectively disenfranchising the majority of Michigan voters. If such errors are not address we may be in a similar situation as Kenya, where voting has been viewed as not simply irregular but a complete sham. (Coram: Maraga, CJ & P, Mwilu, DCJ & V-P, Ojwang, Wanjala, Njoki and Lenaola, SCJJ)

## CONCLUSION

WHEREFORE, the Petitioners respectfully request this Honorable Court enter an emergency order instructing Respondents to de-certify the results of the General Election for the Office of the President, pending disposition of the forthcoming Petition for Certiorari. Alternatively, Petitioners seek an order instructing the Respondents to certify the results of the General Election for Office of the President in favor of President Donald Trump.

Petitioners seek an emergency order prohibiting Respondents from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing

or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of the petition.

Petitioners respectfully request an order of preservation and production of all registration data, ballots, envelopes, voting machines necessary for a final resolution of this dispute.

Respectfully submitted,

*/s/ Howard Kleinhendler*
HOWARD KLEINHENDLER
Howard Kleinhendler Esquire
Suite 300
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

STEFANIE LAMBERT JUNTTILA
500 Griswold Street, Suite 2340
Detroit, Michigan 48301
(248) 270-6689
attorneystefanielambert@gmail.com

SCOTT HAGERSTROM
222 West Genesee
Lansing, Michigan 48933
Date: December 10, 2020

SIDNEY POWELL
Sidney Powell, P.C.
2911 Turtle Creek, Blvd,

Dallas, Texas 75219
 (517) 763-7499
 sidney@federaappeals.com

*Of Counsel*
JULIA Z. HALLER
BRANDON JOHNSON
EMILY P. NEWMAN

L. LIN WOOD
L. LIN WOOD, P.C.
P.O.Box 52584
Atlanta, GA 30305
(404) 891-1402

Gregory J Rohl
41850 West 11 Mile Road, Suite 110
Novi MI 48375

<u>CERTIFICATE OF COMPLIANCE</u>

The attached Writ of Certiorari complies with the type-volume limitation. As required by Supreme Court Rule 33.1(h), I certify that the document contains 8,324 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

Respectfully submitted,

<u>/s/ Howard Kleinhendler</u>
HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorneys for Plaintiffs/Petitioners
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

Date: December 11, 2020

CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

TIMOTHY KING, MARIAN ELLEN SHERIDAN,  JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners,

v.

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan
BOARD OF STATE CANVASSERS

Defendants/Respondents,

and

CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY, and ROBERT DAVIS,

Intervenor-Defendants/Respondents.

<u>PROOF OF SERVICE</u>

STATE OF MICHIGAN)
                                        )ss
COUNTY OF WAYNE  )

STEFANIE LAMBERT JUNTTILA, affirms, deposes and states that on the

11th day of December, 2020, she did cause to be served the following:

1.  PETITION FOR WRIT OF CERTIORARI On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan;
2.  Attached Exhibits;
3.  Certificate of Conformity;
4.  Proof of Service

UPON:

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
Attorneys as Law
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
Attorney at Law
46350 Grand River Ave.
Novi, MI 48374
248 568-9712
Email: aap43@hotmail.com

MARY ELLEN GUREWITZ
Attorney at Law
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
Attorney at Law
Miller, Canfield,
One Michigan Avenue
Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
Attorney at Law
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

By email and by placing said copies in a properly addressed envelope with sufficient

postage fully prepaid, and placing in a U.S. Mail Receptacle.

FURTHER AFFIANT SAYETH NOT.

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA

# EXHIBIT 13

**John R Lott Jr.**
@JohnRLottJr

When u make a mistake, u make a mistake. The results in my paper had 2 parts. The precinct level data was in error, though I believe there is a way to do it correctly. That said, the results for the 1st part are inconclusive. 2nd part still holds.

@aeggers

papers.ssrn.com/sol3/papers.cf...

> **Andy Eggers** @aeggers · Jan 4
>
> See below for my response (with @justingrimmer and Haritz Garro) to @JohnRLottJr's paper claiming to show election fraud in GA and PA absentee voting. A couple extra thoughts of my own: twitter.com/justingrimmer/...
>
> Show this thread

# EXHIBIT 14



**Please support high-quality journalism. Subscribe to MLive.com.**

Politics & Elections

# See 2020 election turnout by Michigan county compared to 2016

Updated Nov 05, 2020; Posted Nov 05, 2020



Election officials, poll watchers and challengers monitor the counting of Grand Rapids absentee ballots at DeVos Place on Wednesday, Nov. 4, 2020. (Cory Morse | MLive.com)  Cory Morse | MLive.com

3,121
shares

By Julie Mack | jmack1@mlive.com and Scott Levin | slevin@mlive.com

A total of 5,568,097 Michigan ballots were cast in Tuesday's election, shattering the state's previous record of 5,039,080 set in November 2008.

This week's total also is 14% higher than the 4,874,619 ballots cast in November 2016.

In all, 71% of Michigan adults age 18 and older participated in the 2020 presidential election, the largest percentage since 1960, when 73% participated in the election that pitted John F. Kennedy against Richard Nixon. (Kennedy won Michigan that year, with 51% of the state's vote.)

That 71% is also, easily, the highest percentage since the voting age was lowered from 21 to 18 in 1970. That dropped turnout by percentage because of the low turnout rate among young adults.

About 3.2 million voted by absentee ballot in this week's election, about 57% of total votes cast.

Here's a look at voter turnout by county in 2020 compared to 2016, shaded by the percentage change. You can put your cursor over a county to see the underlying numbers. (Can't see the map? Click here.)



2020 General election voter turnout

MAP    LEGENDS

Map by Scott Levin | slevin@mlive.com

A few takeaways from the data:

**1. Only one county saw a decrease.**

Dickinson County in the Upper Peninsula was the only county with fewer votes in November 2020 compared to 2016, and that decrease was minimal -- the county counted 13,325 ballots this week, which was 34 fewer than 2016.

**2. The five counties with the biggest percentage increases:**

- Luce, from 2,624 in 2016 to 3,795 in 2020, up 45%;
- Huron, from 15,167 in 2016 to 18,557 in 2020, up 22%;
- Mecosta, from 17,392 in 2016 to 21,159 in 2020, up 22%;
- Jackson, from 70,701 in 2016 to 85,449 in 2020, up 21%;
- Clare, from 13,588 in 2016 to 16,375 in 2020, up 21%.

**3. The five counties with the lowest percentage increases:**

- Bay, from 53,745 in 2016 to 54,296 in 2020, up 1%;
- Newaygo, from 26,959 in 2016 to 27,323 in 2020, up 1.4%;
- Keweenaw, from 1,465 in 2016 to 1,566 in 2020, up 6.9%;
- Ontonagon, from 3,531 in 2016 to 3,833 in 2020, up 8.6%;
- Saginaw, from 95,604 in 2016 to 103,991 in 2020, up 8.8%.

**4. Wayne County had a 10% increase.**

Wayne County, which is Michigan's largest county and includes Detroit, went from 788,459 voters in 2016 to 867,409 in 2020.

The number of ballots in Wayne was a little more than the votes cast in Michigan's 55 smallest counties.

About 39% of Michigan ballots were cast in the tri-county metro Detroit region of Wayne, Oakland and Macomb counties. Oakland had a 15% increase in turnout compared to 2016 and Macomb was up 18%.

**More on MLive:**

No 'blue wave' for Michigan

Michigan 2020 live election results: President, Congress and ballot proposals

Joe Biden wins Michigan, flipping state in narrow victory over Trump

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

---

# Around the web

## Ever Wondered What Kind of American Accent You Have?

**World Life Style** | Sponsored

---

## Harley N95 Respirator Face Mask - Model L-188 - NIOSH Approved - 20 per box

**Bona Fide Masks** | Sponsored

Shop Now

## Relieve Dark Spots in the Blink of an Eye (Watch THIS)

**Gundry MD** | Sponsored

# EXHIBIT 15

# Comment on "A Simple Test for the Extent of Voter Fraud with Absentee Ballots in the 2020 Presidential Election"[*]

Andrew C. Eggers[a], Haritz Garro[b], and Justin Grimmer[c]

[a]Political Science. University of Chicago
[b]Democracy and Polarization Lab. Stanford University
[c]Democracy and Polarization Lab, Political Science, and Hoover Institution. Stanford University

January 8, 2021

## Abstract

In a recent paper,[1] John Lott Jr. claims to find evidence of anti-Trump fraud in the 2020 U.S. presidential election. We show that Lott's analysis is fundamentally flawed and provides no evidence of unusual patterns (let alone fraud) in either voting or turnout. Lott's analysis of voting patterns in Fulton County, GA, and Allegheny County, PA, uses an unusual estimation strategy that suffers from a subtle but fundamental flaw: his conclusions about fraud in those two counties are entirely dependent on the arbitrary order in which pairs of precincts in *other* counties are entered in the dataset. Using a more appropriate specification, we find nothing unusual about voting patterns in these two counties. Lott (2020) also claims that turnout unusually increased in counties where Republicans have made accusations of fraud; we show that Lott (2020)'s test is seriously biased and that turnout rates in these counties are consistent with broader patterns in contested states. In short, Lott's (2020) analysis provides no evidence of anything distinctive or suspicious about voting or turnout in the 2020 election.

---

[*]We thank John Lott for sharing the precinct-level data on the same day we made the request.

[1]John Lott Jr., "A Simple Test for the Extent of Voter Fraud with Absentee Ballots in the 2020 Presidential Election". https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3756988.

# 1   Introduction

We reexamine the evidence for voter fraud presented in "A Simple Test for the Extent of Voter Fraud with Absentee Ballots in the 2020 Presidential Election" (hereafter Lott (2020)). Lott (2020) claims that a comparison of adjacent election precincts in Georgia and Pennsylvania supports the Trump campaign's allegations that the 2020 presidential election was "stolen" through fraud. In Lott (2020)'s abstract, he estimates that fraud in Fulton County contributed 11,350 votes to Biden (which would account for nearly all of Joe Biden's margin of victory in Georgia) and fraud in Allegheny County contributed about 55,270 votes to Biden's victory in Pennsylvania (which would account for around 2/3 of Biden's margin in Pennsylvania). Lott (2020) also claims to detect unusually large turnout increases in a set of counties where Republicans have made post-election accusations of malfeasance, interpreting this as evidence of fraud that could account for "up to 289,000 excess votes." If true, these claims would cast serious doubts on the integrity of the 2020 election. The paper has already received widespread attention.[2]

In this comment, we show that Lott's claims are entirely baseless. Our reanalysis of Lott (2020)'s data shows that Lott's claims about absentee voting in GA and PA depend on an entirely arbitrary decision about how counties are entered in the dataset: the conclusion is reversed when an alternative and equally justified data entry rule is used. When we replace Lott's unusual specification with a more standard approach that does not depend on arbitrary coding rules, we find absolutely no evidence for fraud in either Fulton County or Allegheny County. We also find that, once simple allowances are made for differences in turnout trends across states, there is nothing unusual about the turnout rate in the counties that Republicans have targeted with fraud claims.

In short, even if we accept Lott's premise that small differences in Trump's share of the absentee vote between adjacent precincts or small amounts of unexplained turnout in a set of counties targeted for post-election appeals constitute evidence of fraud (which we do not), we find that Lott (2020)'s analysis provides no evidence of fraud whatsoever in the 2020 presidential election.

# 2   Lott's (2020) Precinct-Level Analysis Depends Entirely on an Arbitrary Coding Rule

Lott (2020) first seeks to estimate the effect of the absentee ballot counting procedure in two counties where fraud has been alleged by Trump and other Republicans: Fulton County, GA, and Allegheny County, PA. Lott (2020)'s approach assumes that Trump's share of the

---

[2]Peter Navarro, the outgoing Assistant to the President and Director of the Office of Trade and Manufacturing Policy, promoted the paper in a tweet on December 29 (https://twitter.com/RealPNavarro/status/1343979253659004928). The next day, Donald Trump also tweeted about the study (https://twitter.com/realDonaldTrump/status/1344173684983017473).

absentee vote in a precinct is related to Trump's share of the *in-person* vote in the precinct and voter demographics. Lott (2020) recognizes, however, that a difference in Trump's share of the absentee vote across neighboring counties, even controlling for Trump's share of the in-person vote and demographics, is not necessarily evidence of fraud. There may be other factors that vary across counties that could produce such differences.

To eliminate some of these alternative explanations for differences in Trump's absentee support between "suspect" counties and neighboring counties, Lott (2020) focuses on precincts that lie along county borders. Specifically, he forms pairs of precincts that lie along a boundary separating a suspect county (i.e. one where Republicans have alleged that fraud took place) and an adjacent county where Trump won a majority of the vote and no fraud allegations have been made.[3] Lott (2020) also forms pairs of precincts that lie along the boundary between two of these Republican counties, which serve as a kind of control group for the other pairs. Lott (2020) then conducts his analysis using within-pair *differences* in each variable: he regresses the difference in Trump's share of the absentee vote between the two precincts on the difference in Trump's share of the in-person vote between the two precincts and an indicator for whether the pair contains a precinct in a suspect county.[4] That is, his basic regression equation is

$$\left(\text{Absentee}_i - \text{Absentee}_j\right) = \beta_0 + \beta_1\left(\text{InPerson}_i - \text{InPerson}_j\right) + \delta\text{SuspectCounty}_i + u_{ij},$$

where $\text{Absentee}_i$ is Trump's share of the absentee vote in precinct $i$, $\text{InPerson}_i$ is Trump's share of the in-person vote in precinct $i$, $\text{SuspectCounty}_i$ indicates whether precinct $i$ is located in a "suspect" county, and $i$ and $j$ are adjacent precincts that Lott assigns to a pair. Thus $\beta_0$ measures the within-pair difference in Trump's share of the absentee vote among pairs that don't involve a suspect county (adjusting for the within-pair difference in Trump's in-person share), and the key coefficient is $\delta$, which compares the adjusted difference in Trump's share of the absentee vote within pairs involving the suspect county against the corresponding adjusted difference within pairs not involving the suspect county. The underlying logic seems to be that fraud is the likely explanation if there is a bigger drop in Trump's share of the absentee vote when we cross from, for example, Coweta County to Fulton County than when we cross from Coweta County to Carroll County, two Republican counties where no fraud has been alleged.

Even if we stipulate that focusing on adjacent precincts eliminates all between-county differences in true absentee support for Trump (conditional on Trump's in-person support),[5] Lott (2020)'s design suffers from a fatal flaw. As noted, Lott (2020)'s design measures a

---

[3]Lott (2020) provides no justification for not comparing Fulton and Allegheny counties (or others where fraud was alleged) with surrounding counties carried by Biden. By ruling out these comparisons, Lott severely restricts his sample size and likely excludes the most similar comparisons.

[4]In some specifications he also includes differences in various race-and-gender groups between the two precincts.

[5]This is doubtful. For example, Trump won just 9.6% of the in-person vote in a precinct in Fulton County (FA01B) that is adjacent to a precinct in Coweta County where Trump won 78% of the in-person vote (Fischer Road). It seems unlikely that precincts that differ so markedly in voting outcomes would be similar in e.g. voters' propensity to vote in person vs. absentee conditional on their vote choice.

difference between two differences: is the drop in Trump's share of the absentee vote larger when we cross the Fulton County border into Republican counties than when we cross the border of one Republican county into another Republican county? The problem arises in measuring the second drop: there is no clear rule for determining the order of the difference. For example, should we record the change in Trump's absentee vote share as we move from Carroll to Coweta, or as we move from Coweta to Carroll? Neither county is "suspect", so either approach could be justified. Lott (2020, footnote 13) chooses one rule (subtracting east from west and north from south) but the opposite rule or indeed any rule would be equally justified. This arbitrariness is a symptom of the underlying lack of compelling logic behind this aspect of the design: there is no clear reason to benchmark the difference in voting patterns across the key county boundary against the corresponding difference across another boundary.[6]

As it turns out, Lott (2020)'s evidence for fraud in Fulton County, GA, and Allegheny County, PA, relies entirely on this arbitrary coding rule: if a different but equally valid rule is used we reach the opposite conclusion from Lott (2020). Figure 1 illustrates the point for Fulton County. In both panels, each red dot corresponds to a pair of precincts lying on opposite sides of the Fulton County boundary; each blue dot corresponds to a pair of precincts lying on opposite sides of the boundary between two nearby Republican counties. The vertical axis shows the difference in Trump's share of the absentee vote within the precinct pair; the horizontal axis shows the difference in Trump's share of the in-person vote within the precinct pair.

The left panel of Figure 1 shows the analysis using Lott (2020)'s coding: for pairs including a Fulton County precinct, the Trump share for the non-Fulton County precinct is subtracted from the Trump share for the Fulton County precinct; for pairs not including a Fulton County precinct, Lott (2020) uses the arbitrary rule noted above. This coding results in what Lott interprets as evidence for anti-Trump bias in Fulton County. Conditional on the difference in Trump's in-person vote share within a precinct pair, the difference in Trump's absentee vote share is lower in precinct pairs involving Fulton County than in other precinct pairs.

In the right panel of Figure 1 we show that the conclusion is reversed when we reverse Lott's arbitrary coding rule: instead of subtracting east from west and north from south in computing differences for non-Fulton precinct pairs, we subtract west from east and south from north. The scatterplot looks identical to the left panel except that the four blue dots (representing non-Fulton precinct pairs) are reflected through the origin. This small change reverses the conclusion, however: by Lott (2020)'s logic we now have evidence of pro-Trump bias in Fulton County.

Table 3 (Appendix) reports coefficient estimates and standard errors for both sets of

---

[6]One could imagine a better design that compared the *magnitude* (i.e. absolute value) of differences across suspect boundaries and other boundaries. In this case the ordering of precinct pairs would not matter. This is not Lott's design.

Figure 1: Evidence for fraud in Fulton County, GA, is reversed if arbitrary coding rule is reversed



analysis depicted in Figure 1. The evidence of pro-Trump fraud with the alternative coding rule has a similar absolute t-statistic ($t = 1.67$) as Lott's evidence of anti-Trump fraud with the original coding rule ($t = 1.89$).

The Pennsylvania results also depend on Lott's arbitrary coding rule, as we show in the same manner in Figure 2 and Table 4 (Appendix). Lott (2020) concludes from his analysis that anti-Trump fraud took place in Allegheny County, but if we apply a different but equally valid coding rule we find (by the same logic) stronger evidence for *pro-Trump* fraud in Allegheny County: the positive coefficient we obtain with the alternative coding rule is both larger in magnitude and more significant than the negative coefficient Lott reports.

We can further highlight the dependence of Lott's results on arbitrary coding decisions by exploring the universe of possible fraud estimates that Lott could have reported with equally justified alternative coding rules. In Figure 3 we show that, among the possible rules that could be used, any alternative rule would have produced weaker apparent evidence for anti-Trump fraud in Fulton County and almost any rule would have produced weaker evidence for anti-Trump fraud in Allegheny County.[7] In the Fulton County analysis, there are four non-Fulton precinct pairs and thus $2^4 = 16$ possible rules for computing differences within non-Fulton pairs. The left panel of Figure 3 shows the histogram of the key coefficient across

---

[7]In personal communication Lott said the ordering of precincts followed a rule in a prior AER paper. We believe that is Bronars and Lott (1998).

Figure 2: Evidence for fraud in Allegheny County, PA, is reversed if arbitrary coding rule is reversed



Figure 3: Evidence for fraud in Georgia and Pennsylvania depends on arbitrary coding rules; Lott's estimates are outliers in the distribution of estimates



these sixteen possible rules, with a vertical line highlighting the estimate for the rule Lott used. Among the sixteen possible rules, Lott's rule produces the strongest apparent evidence of anti-Trump fraud; six possible rules produce apparent evidence of pro-Trump fraud. In the Pennsylvania analysis we have seventeen non-implicated precinct pairs, allowing for over 130,000 possible coding rules. The right panel of Figure 3 shows the distribution of estimates for a random sample (with replacement) of 100,000 of these rules,[8] with the actual estimate again shown with a vertical line. The distribution is centered around zero, with roughly as many rules producing apparent evidence of pro-Trump and anti-Trump fraud; Lott's rule again happens to produce among the strongest apparent evidence of anti-Trump fraud.

Although the issue we highlight was not obvious to us on first reading Lott's study, it is an example of a known problem that crops up in research studying pairs of observations, or "dyads." When there is a clear distinction between members of dyads, such as aggressor/victim or source/destination, it can be sensible to address unobserved differences across dyads by studying within-dyad differences as Lott does. When no such distinction exists for some or all dyads (as in Lott's case), it becomes arbitrary how to define within-dyad differences. In such cases, "there is no consistent, non-arbitrary way to order the two members" of a dyad (Olsen and Kenny, 2006) and, as pointed out in Wheeler, Updegraff and Umaña-Taylor (2018), dyads whose members cannot logically be classified in a meaningful way "cannot be easily analyzed with the difference approach", i.e. the approach that Lott

---

[8]To explore the space of changes to the difference order, we first sample the number of difference orders to change from a Uniform$(1, 16)$. Once this number is obtained, we then randomly sample the specific units that will have the difference order changed. This explores the space, but does not provide a sampling distribution that gives an equal probability to each rearrangement, because our sampling method is biased towards either too few or too many rearrangements.

7

(2020) uses.[9]

# 3  A More Standard Estimation Strategy Produces No Evidence of Fraud in Absentee Voting

Although Lott's specification problematically depends on arbitrary coding decisions, Lott's basic strategy of examining differences in voting patterns across a county boundary has some merit. Such differences in voting patterns could of course be explained by differences in voter behavior rather than fraud (particularly because county boundaries determine school districts and other policy outcomes, and some precincts along county boundaries are rather large geographically), but focusing on precincts along the county border does seem likely to reduce the role of these differences.[10]

To more effectively achieve Lott's objective of comparing voting patterns across county boundaries, we reanalyze Lott's data using a more standard specification that does not suffer from the problems highlighted in the previous section. Rather than using within-pair differences as Lott does, we employ a simple fixed effects model. The regression equation can be written as

$$\text{Absentee}_i \;=\; \beta_1 \text{InPerson}_i + \delta \text{SuspectCounty}_i + \sum_{k=1}^{K} \alpha_k I(\text{pair}_i = k) + \epsilon_i \qquad (1)$$

where $\text{Absentee}_i$ and $\text{InPerson}_i$ denote Trump's share of the absentee and in-person vote (respectively) in precinct $i$, $\text{SuspectCounty}_i$ indicates whether precinct $i$ is located in a "suspect" county (Fulton or Allegheny, depending on the state being analyzed), and each precinct is identified with one of $K$ precinct pairs indexed by $k$, with $\alpha_k$ indicating the fixed effect for pair $k$. The regression thus asks whether Fulton or Allegheny county precincts have lower absentee support for Trump than would be expected controlling for their in-person support for Trump and any factors (observable or unobservable) that are common to paired precincts. Precinct pairs that do not involve a suspect county contribute to estimating the coefficient $\beta_1$ but do not otherwise contribute to the estimation of the key coefficient $\delta$. Crucially, no arbitrary coding decisions are necessary.

We report the results of these analyses for Georgia in Table 1 below. In column 1 we simply regress Trump's share of the absentee vote on Trump's share of the in-person vote and a dummy for Fulton County; in column 2 we add precinct-pair fixed effects as in equation 1, essentially allowing the intercept to vary across Lott's precinct pairs; in column 3 we instead use county-pair fixed effects, with one intercept for Fulton-Coweta pairs, another for Carroll-Coweta pairs, etc. None of these specifications shows a substantively or statistically

---

[9]See also Chapter 2 in Kenny, Kashy and Cook (2006) for a rigorous overview of the problems with unordered or indistinguishable pairs in dyadic data.

[10]Even if we could find a difference in voting patterns between county $A$ and county $B$ that is so suspicious as to suggest fraud, we may not know which county conducted the fraud.

significant difference between Trump's share of the absentee vote in Fulton County precincts and other precincts.

Table 1: A Fixed Effects Specification Shows Nothing Suspicious in Fulton County, GA

|  | *Dependent variable:* | | |
|---|---|---|---|
|  | Trump Share Absentee | | |
|  | (1) | (2) | (3) |
| Trump Share, In-Person | 0.760 | 0.606 | 0.654 |
|  | (0.049) | (0.077) | (0.056) |
| **Fulton County** | 0.019 | −0.003 | 0.006 |
|  | (0.019) | (0.020) | (0.018) |
| Observations | 44 | 44 | 44 |
| Precinct-Pair Fixed Effects |  | ✓ |  |
| County-Pair Fixed Effects |  |  | ✓ |

Table 2 shows the same analysis for Pennsylvania in the same manner. Again, none of the specifications shows a substantively or statistically significant difference between Trump's share of the absentee vote in Allegheny County precincts and other precincts.

In short, when we reanalyze Lott (2020)'s data with a more sensible fixed effects specification, we find no evidence of differences in voting patterns between precincts in Fulton County or Allegheny County and adjacent precincts in Republican-leaning counties. If such differences existed they would hardly be convincing evidence of fraud, given possible differences between precincts located in different counties that are served by different school systems. But we find no such differences, undermining the basis for Lott (2020)'s claims.[11]

# 4    No Evidence of Distinctively High Turnout in "Suspicious" Counties

Lott (2020) provides a second analysis that he claims demonstrates evidence for voter fraud. First, Lott argues that fraud can increase turnout through a variety of mechanisms. He then claims to show that turnout rates increased more in 2020 in a set of counties where Republicans have alleged fraud. Lott argues that there was an "unexplained increase in voter

---

[11]In the Appendix we also replicate and extend Lott's analysis of provisional ballots in Pennsylvania. As with his analysis of absentee voting, his conclusions about provisional ballots depend on the arbitrary coding of non-Allegheny precinct pairs (Figures 8 and 9) and fixed effects estimation shows no difference in Biden's share of the provisional vote in Allegheny precincts and other precincts (Tables 5 and 6).

Table 2: A Fixed Effects Specification Shows Nothing Suspicious in Allegheny County, PA

| | *Dependent variable:* | | |
|---|---|---|---|
| | Trump Share, Absentee | | |
| | (1) | (2) | (3) |
| Trump Share, In-Person | 0.511 | 0.307 | 0.442 |
| | (0.042) | (0.066) | (0.048) |
| **Allegheny County** | 0.003 | 0.003 | 0.006 |
| | (0.008) | (0.009) | (0.009) |
| Observations | 174 | 174 | 174 |
| Precinct-Pair Fixed Effects | | ✓ | |
| County-Pair Fixed Effects | | | ✓ |

turnout" in the key counties of between 1.26 and 2.42 percent, which Lott says is equivalent to 150,000 to 289,000 votes in those states. Lott concludes that this is evidence consistent with fraud.

While the first half of Lott's (2020) paper focuses on narrow comparisons across county boundaries, this section engages in analysis that spans hundreds of counties across nine states. Specifically, Lott checks whether turnout in the 2020 election was higher than would be expected (given previous turnout, political leaning, and local demographics) in counties where, according to Republican lawsuits, fraud may have taken place. Lott identifies 19 counties across six swing states where Republicans have alleged that fraud took place.[12] Lott (2020) compares turnout in these counties to turnout in other counties in the same six states plus counties in three other swing states (Florida, Ohio, and North Carolina). He argues that, if turnout is higher in these counties than would be expected given covariates, it would be evidence of fraud.

Before digging deeper into Lott (2020)'s turnout analysis, we emphasize that we question the premise of Lott (2020)'s analysis; that is, we do not believe that even a robust finding of slightly higher than expected turnout in a set of counties Republicans targeted in post-election lawsuits would constitute convincing evidence of electoral fraud. The differences Lott claims to have found are small (1-2 percentage points), and in the absence of fraud turnout is not perfectly explained by the covariates Lott (2020) uses: a particularly energetic local mobilization campaign (on either side) or an especially effective down-ballot candidate could affect turnout by these amounts. Perhaps more to the point, Lott (2020)

---

[12]Lott identifies the following "suspicious" counties—Georgia: Fulton, Dekalb; Pennsylvania: Allegheny, Centre, Chester, Delaware, Montgomery, Northampton, Philadelphia; Arizona: Apache, Coconino, Maricopa, Navajo; Michigan: Wayne; Nevada: Clark, Washoe; Wisconsin: Dane.

looks for unexplained turnout in places Republicans chose to target in post-election lawsuits. We do not know how Republicans chose which counties to target, but it seems plausible that they targeted counties based on district characteristics that are related to turnout (but not modeled by Lott (2020)) or even based on observed results (including turnout). This creates a thorny selection: was fraud the cause of high turnout, or was high turnout the cause of allegations of fraud? Highly anomalous turnout figures could provide evidence of a problem, but a percentage point or two of unexplained turnout has other more plausible explanations and could not on its own establish fraud.

Nevertheless, given the possible implications of such a serious claim, we investigate the issue to see if Lott (2020) has shown a genuinely unexplained anomaly in the counties where Republicans have alleged that fraud took place. We assembled an original dataset that would allow us to assess Lott (2020)'s claims beyond his chosen set of states, if necessary. We use turnout rates for the county citizen voting-age population. For total votes, we use Dave Leip's county-level vote results for 2020 and 2016. For the number of voting-aged citizens we use the five-year ACS from 2019 and 2015.[13]

If we visually examine how turnout in 2020 compared to turnout in 2016 for counties in the six states where Lott alleged fraud, we find that there is nothing remarkable about the turnout rate in the suspicious counties. In Figure 4 we plot turnout in 2020 against turnout in 2016 for counties in the six states with counties that Lott codes as having alleged fraud; we do this separately by state, with counties where fraud was alleged colored red and a linear regression line superimposed.[14] On a simple visual inspection, there is nothing puzzling about 2020 turnout in the highlighted counties. In fact, turnout seems to have been lower on average in these counties than in other counties in the same state, conditional on prior turnout. In light of this observation, Lott (2020)'s finding is puzzling: why would he conclude that turnout is suspiciously high in these counties, given the information in this figure?

The answer is that Lott's conclusions are driven by the inclusion of states that have lower turnout increases and no "suspicious" counties—namely Florida, North Carolina, and Ohio. Figure 5 shows that, conditional on turnout in 2016, turnout in Florida, Ohio, and North Carolina was lower than turnout in the six states that contain a suspicious county in Lott's analysis. This is relevant because Lott (2020)'s analysis compares changes in turnout in suspicious counties with changes in turnout in all other counties, so these smaller increases in turnout rates across states will be conflated with the suspicious county indicator in his analysis. The smaller the turnout increase in these three "non-suspect" states, the more turnout in the suspect counties will appear to be suspiciously high, even if the changes in turnout in these suspect counties are unremarkable relative to the changes in turnout in other counties in their own state.

---

[13]This follows best practice from Michael McDonald http://www.electproject.org/home/voter-turnout/faq/congress. We provide our county-average turnout rates by state in the appendix. We note that our estimates of turnout are lower than Lott (2020)'s average turnout rates, but closer to official statistics.

[14]The regression line is drawn based on the non-suspect counties.



Figure 4: "Suspicious" counties (in red) are not remarkable relative to other counties in their state



Figure 5: Swing states without suspicious counties had smaller average turnout increases, which drives Lott's (2020) results



Figure 6: Lott's (2020) estimates of suspicious county differences in turnout are zero and null once we address state-level differences.

Figure 6 shows that once we address the level differences across states, Lott's (2020) estimates of the turnout differences in suspicious counties go to zero and become null. We examine all four of Lott's (2020) models (organized on the vertical axis) and present the estimate of the average difference in turnout rates for suspicious counties. The circle/purple estimates of suspicious county turnout depict the estimates using the four specifications for which Lott (2020) presents results in his Table 10. The triangle/dark-green estimates depict our estimates when we exclude Florida, Ohio, and North Carolina - three states in which no fraud was alleged. Across models, the difference in suspicious counties is close to zero and—in the case of model 4—the estimate is negative. The square/light-green estimates are from a model where we merely include an indicator for a state that has suspicious counties. Again, this reduces the estimate to null. Finally, the last plus/lime-green estimate includes state-level fixed effects. Across models, this gives a close to zero and null difference for suspicious counties. Thus, simply by focusing only on states where at least one county had alleged fraud (i.e. swing states that Biden won) or allowing that state-wide turnout trends may differ across states or groups of states, we are able to explain what Lott (2020) claimed was unexplained turnout in counties where Republicans had claimed fraud.

To highlight the deficiency of Lott's approach, we undertake a falsification test. To reit-

erate, the fundamental problem with Lott's analysis is that it compares "suspect" counties in states that experienced large turnout increases against a pooled control group comprising of non-suspect counties in states that experienced large turnout increases and counties in states that experienced smaller turnout increases. Given this flaw, we should find similar evidence of fraud if we replace Lott's coding of "suspect" counties with a random set of counties in the same states. To investigate this, we repeatedly draw a random set of counties from the states where Republicans alleged fraud, designate these counties (counterfactually) as "suspect", and conduct the same analyses reported in Figure 6.[15] If Lott (2020)'s design is valid, the coefficient on "suspect county" should be significant in about 5% of random draws. We expected otherwise: by including states with lower turnout increases in the control group (without including state fixed effects or otherwise accounting for cross-state turnout differences), Lott (2020)'s analysis builds in a bias toward finding "inexplicably" high turnout increases in counties where Republicans have alleged fraud.

Figure 7 shows the distribution of $t$-statistics across 1000 random reshufflings. The top row shows Lott (2020)'s specifications: the estimate from the true coding of suspect counties is statistically significant in each specification (as shown by the vertical red line at or above 2), but this $t$-statistic is actually typical of the distribution of $t$-statistics across random reshufflings (shown in the histogram). Across Lott (2020)'s specifications, the proportion of random reshufflings that produce a significant "effect" (the false discovery rate, or type I error, shown by the dark region of the histograms) is between .6 and .75. In fact, the $t$-statistic is larger on average when we randomly select counties than when we use the counties in which Republicans actually alleged fraud (according to Lott (2020))).

The next three rows of Figure 7 show the same exercise conducted for the alternative specifications we used in Figure 6 above. False discovery rates are near .05, suggesting that adjusting for differences in turnout across states renders Lott (2020)'s tests statistically valid.

# 5    Conclusion

Using precinct-level analysis of absentee voting in Georgia and Pennsylvania as well as county-level analysis of turnout, Lott (2020) claims to provide statistical evidence for voter fraud sufficient to explain Trump's defeat. After scrutinizing Lott (2020)'s analysis we conclude that this claim is false. Lott (2020)'s precinct-level findings in Georgia and Pennsylvania are reversed if we alter an entirely arbitrary coding rule, and we find no evidence of differences in voting behavior across county boundaries in those states using a more standard and appropriate estimation technique. Lott (2020)'s analysis of voter turnout collapses when we make simple adjustments to his specifications: what he claims is inexplicably high voter turnout is easily explained by differences in turnout trends across states. Thus, even if we accepted the questionable premise that minor differences in voting behavior or slightly elevated turnout rates constituted convincing evidence of fraud (we do not), we find that

---

[15]In a state where $n$ counties had allegations of fraud, we randomly draw $n$ counties to be the pseudo-suspect counties.



Figure 7: If "suspicious" counties were chosen at random rather than identified from Republican allegations as in Lott (2020), Lott (2020)'s test would usually find evidence of "fraud"; our improved specifications would not

Lott (2020)'s analysis provides no such evidence.

Like other claims of fraud following the 2020 election, Lott (2020)'s assertions have the potential to undermine belief in the integrity of American elections. Unlike most of these other claims, Lott's analysis has the appearance of careful social scientific research and cannot easily be dismissed as obviously illogical or mere hearsay. Indeed, it is because Lott (2020) shares several characteristics with rigorous social scientific research that we considered it especially important to investigate these claims more deeply.

Observers concerned about the integrity of the 2020 election can be reassured that Lott (2020)'s claims of election fraud have no basis in fact. We hope that our analysis helps undo some of the damage that has already been done by these and other unfounded claims of election fraud.

# References

☐ **Kenny, David A., Deborah A. Kashy and William L. Cook**, "Dyadic Data Analysis," *Guilford Press*, 2006, New York, NY.

☐ **Lott, John R.**, "A Simple Test for the Extent of Voter Fraud with Absentee Ballots in the 2020 Presidential Election: Georgia and Pennsylvania Data," *Unpublished Manuscript*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3756988, 2021.

☐ **Olsen, Joseph A. and David A. Kenny**, "Structural Equation Modeling with Interchangeable Dyads," *Psychological Methods*, 2006, Vol. 11, 2, pp. 127-141.

☐ **Wheeler, Lorey A., Kimberly A. Updegraff and Adriana J. Umaña-Taylor**, "A Dyadic Data Analytic Primer: An Illustration with Mexican-origin Couples," *Journal of Latina/o Psychology*, 2018, Vol. 6, 4, pp. 276-290.

# Appendix

Table 3: Lott's Conclusions Are Reversed if the Arbitrary Ordering of Precinct Differences is Reversed (Georgia)

|  | *Dependent variable:* | |
| --- | --- | --- |
|  | Difference, Trump Absentee (Lott (2020), Table 2) | |
|  | (1) | (2) |
| Difference, Trump In-Person Vote | 0.574 | 0.574 |
|  | (0.073) | (0.073) |
| **Fulton County** | −0.072 | 0.055 |
|  | (0.038) | (0.033) |
| Observations | 22 | 22 |
| Reverse Coding |  | ✓ |

Table 4: Lott's Conclusions Are Reversed if the Arbitrary Ordering of Precinct Differences is Reversed (Pennsylvania)

|  | *Dependent variable:* | |
| --- | --- | --- |
|  | Difference, Trump Absentee (Lott (2020), Table 5) | |
|  | (1) | (2) |
| Difference, Trump In-Person Vote | 0.359 | 0.359 |
|  | (0.069) | (0.069) |
| **Allegheny County** | −0.034 | 0.041 |
|  | (0.019) | (0.020) |
| Observations | 87 | 87 |
| Reverse Coding |  | ✓ |

19

Table 5: Pennsylvania Provisional Ballot Results

| | Difference, Trump Provisional (Lott (2020), Table 6) | Trump Provisional Vote | | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| Difference, Trump In-Person Vote | 1.038 (0.558) | | | |
| Trump, In-Person Vote | | 0.729 (0.222) | 1.055 (0.552) | 0.690 (0.257) |
| **Allegheny County** | −0.125 (0.141) | −0.004 (0.036) | −0.036 (0.044) | −0.047 (0.048) |
| Observations | 34 | 120 | 120 | 120 |
| Precinct-Pair Fixed Effects | | | ✓ | |
| County-Pair Fixed Effects | | | | ✓ |

*Dependent variable:*

Table 6: Pennsylvania Provisional Ballot Results, Total Ballots

| | Difference, Biden Share of Votes From Provisional Ballots (Lott (2020), Table 7a) | Biden Share of Votes From Provisional Ballots | | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| Difference, Share of Trump Vote from Provisional Ballots | 0.364 (0.105) | | | |
| Share of Trump Vote from Provisional Ballots | | 0.371 (0.078) | 0.385 (0.103) | 0.342 (0.082) |
| **Allegheny County** | 0.010 (0.004) | 0.007 (0.002) | 0.007 (0.002) | 0.007 (0.002) |
| Observations | 87 | 174 | 174 | 174 |
| Precinct-Pair Fixed Effects | | | ✓ | |
| County-Pair Fixed Effects | | | | ✓ |

*Dependent variable:*

Case 2:20-cv-13134-LVP-RSW ECF No. 108-36, PageID.4963 Filed 05/03/21 Page 22 of 24

Figure 8: Distribution of Estimates for Alternative Precinct Differencing Orders, Pennsylvania Provisional Ballots



Figure 9: Distribution of Estimates for Alternative Precinct Differencing Orders, Share of Biden Ballots from Pennsylvania Provisional Ballots



# 6 Turnout Rate in States

Table 7: County-Average Turnout Rates

|  | Turnout 2016 | Turnout 2020 | Difference |
|---|---|---|---|
| States with "Suspect" Counties | | | |
| AZ | 0.54 | 0.64 | 0.10 |
| MI | 0.63 | 0.73 | 0.10 |
| NV | 0.60 | 0.70 | 0.10 |
| PA | 0.58 | 0.67 | 0.09 |
| GA | 0.54 | 0.62 | 0.08 |
| WI | 0.67 | 0.74 | 0.07 |
| States Without "Suspect" Counties | | | |
| NC | 0.63 | 0.70 | 0.07 |
| FL | 0.64 | 0.70 | 0.06 |
| OH | 0.61 | 0.66 | 0.05 |

# EXHIBIT 16

# STATE OF MICHIGAN

# COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT, INC.
and ERIC OSTEGREN,

             Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

             Defendants.

_____/

**OPINION AND ORDER**

Case No.  20-000225-MZ

Hon. Cynthia Diane Stephens

Pending before the Court are two motions.  The first is plaintiffs' November 4, 2020 emergency motion for declaratory relief under MCR 2.605(D).  For the reasons stated on the record and incorporated herein, the motion is DENIED.  Also pending before the Court is the motion to intervene as a plaintiff filed by the Democratic National Committee.  Because the relief requested by plaintiffs in this case will not issue, the Court DENIES as moot the motion to intervene.

According to the allegations in plaintiffs' complaint, plaintiff Eric Ostegren is a credentialed election challenger under MCL 168.730.  Paragraph 2 of the complaint alleges that plaintiff Ostegren was "excluded from the counting board during the absent voter ballot review process."  The complaint does not specify when, where, or by whom plaintiff was excluded.  Nor does the complaint provide any details about why the alleged exclusion occurred.

-1-

The complaint contains allegations concerning absent voter ballot drop-boxes. Plaintiffs allege that state law requires that ballot containers must be monitored by video surveillance. Plaintiff contends that election challengers must be given an opportunity to observe video of ballot drop-boxes with referencing the provision(s) of the statute that purportedly grant such access, . See MCL 168.761d(4)(c).

Plaintiffs' emergency motion asks the Court to order all counting and processing of absentee ballots to cease until an "election inspector" from each political party is allowed to be present at every absent voter counting board, and asks that this court require the Secretary of State to order the immediate segregation of all ballots that are not being inspected and monitored as required by law. Plaintiffs argue that the Secretary of State's failure to act has undermined the rights of all Michigan voters. While the advocate at oral argument posited the prayer for relief as one to order "meaningful access" to the ballot tabulation process, plaintiffs have asked the Court to enter a preliminary injunction to enjoin the counting of ballots. A party requesting this "extraordinary and drastic use of judicial power" must convince the Court of the necessity of the relief based on the following factors:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Davis v Detroit Fin Review Team*, 296 Mich App 568, 613; 821 NW2d 896 (2012).]

As stated on the record at the November 5, 2020 hearing, plaintiffs are not entitled to the extraordinary form of emergency relief they have requested.

I.  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A. OSTEGREN CLAIM

Plaintiff Ostegren avers that he was removed from an absent voter counting board. It is true that the Secretary of State has general supervisory control over the conduct of elections. See MCL 168.21; MCL 168.31. However, the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk. See MCL 168.764d. The complaint does not allege that the Secretary of State was a party to or had knowledge of, the alleged exclusion of plaintiff Ostegren from the unnamed absent voter counting board. Moreover, the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements. Thus, allegations regarding the purported conduct of an unknown local election official do not lend themselves to the issuance of a remedy against the Secretary of State.

### B. CONNARN AFFIDAVIT

Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief. The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note. In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer." She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20." Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in

fraudulent activity in order to count invalid absent voter ballots that were received after election day.

This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

## C. BALLOT BOX VIDEOS

It should be noted at the outset that the statute providing for video surveillance of drop boxes only applies to those boxes that were installed after October 1, 2020. See MCL 168.761d(2). There is no evidence in the record whether there are any boxes subject to this requirement, how many there are, or where they are. The plaintiffs have not cited any statutory authority that requires any video to be subject to review by election challengers. They have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of such boxes. The clear language of the statute directs that "[t]he city or township clerk must use video monitoring of that drop box to ensure effective monitoring of that drop box." MCL 168.761d(4)(c) Additionally, plaintiffs have not directed the Court's attention to any authority directing the

-4-

Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated from other ballots, and rendering it impossible for the Court to grant the requested relief against this defendant. Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested. As a result, plaintiffs are unable to show a likelihood of success on the merits.

## II.   MOOTNESS

Moreover, even if the requested relief could issue against the Secretary of State, the Court notes that the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day. By the time this action was filed, the votes had largely been counted, and the counting is now complete. Accordingly, and even assuming the requested relief were available against the Secretary of State—and overlooking the problems with the factual and evidentiary record noted above—the matter is now moot, as it is impossible to issue the requested relief. See *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018)

IT IS HEREBY ORDERED that plaintiff's November 4, 2020 emergency motion for declaratory judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that proposed intervenor's motion to intervene is DENIED as MOOT.

This is not a final order and it does not resolve the last pending claim or close the case.

November 6, 2020

Cynthia Diane Stephens
Judge, Court of Claims

# EXHIBIT 17

**EFiled: Jan 11 2021 01:29PM EST**
**Transaction ID 66242606**
**Case No. S20C-07-030 CAK**

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| CARTER PAGE, an individual, | : |
| | : |
| Plaintiff, | : C.A. No. S20C-07-030 CAK |
| | : |
| v. | : |
| | : |
| OATH INC., a corporation, | : |
| | : |
| Defendant. | : |

Date Submitted: January 6, 2021
Date Decided: January 11, 2021

## MEMORANDUM OPINION AND ORDER

*Opinion following the Issuance of a Rule to Show Cause*

Sean J. Bellew, Esquire, BELLEW LLC, 2961 Centerville Road, Suite 302, Wilmington, DE 19808. Attorney for Plaintiff.

John M. Pierce, Esquire, PIERCE BAINBRIDGE P.C., 355 S. Grand Ave., 44th Floor, Los Angeles, CA 90071. Attorney for Plaintiff. *Pro Hac Vice*

K. Lawson Pedigo, Esquire, MILLER KEFFER & PEDIGO PLLC, 3400 Carlisle Street, Suite 550, Dallas, TX 75204. Attorney for Plaintiff. *Pro Hac Vice*

L. Lin Wood, Esquire, L. Lin Wood, P.C., P.O. Box 52584, Atlanta, GA 30355. Attorney for Plaintiff. *Pro Hac Vice*

T. Brad Davey, Esquire and Jonathan A. Choa, Esquire, Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, DE 19899. Attorney for Defendant

Elbert Lin, Esquire and David M. Parker, Equire, Hunton Andrews Kurth LLP, 951 E. Byrd Street, Richmond, VA 23219. Attorney for Defendant. *Pro Hac Vice*

Jonathan D. Reichman, Esquire and Jennifer Bloom, Esquire, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166. Attorney for Defendant. *Pro Hac Vice.*

Several weeks ago, and pursuant to Superior Court Civil Rule 90.1, I issued a Rule to Show Cause why the approval I had given to L. Lin Wood, Esquire to practice before this Court in this case should not be revoked. Mr. Wood is not licensed to practice law in Delaware. Practicing *pro hac vice* is a privilege and not a right. I respect the desire of litigants to select counsel of their choice. When out of state counsel is selected, however, I am required to ensure the appropriate level of integrity and competence.

During the course of this litigation, a number of high profile cases have been filed around the country challenging the Presidential election. The cases included, *inter alia*, suits in Georgia, Wisconsin and Michigan. Opinions were delivered in all of the States which were critical in various ways of the lawyering by the proponents of the lawsuits. In the Rule to Show Cause, I raised concerns I had after reviewing written decisions from Georgia and Wisconsin. Specifically, in Georgia, a lawsuit filed by Mr. Wood resulted in a determination that the suit was without basis in law or fact. The initial pleadings in the Wisconsin case were riddled with errors. I had concerns as listed in the Rule to Show Cause.

I gave Mr. Wood until January 6, 2021 to file a response. He did so at 10:09 p.m., January 6. The response focused primarily upon the fact that none

3

of the conduct I questioned occurred in my Court. The claim is factually correct.

In his response, Mr. Wood writes:

> Absent conduct that prejudicially disrupts the proceedings,
> trial judges have no independent jurisdiction to enforce
> the Rules of Professional Conduct.

Mr. Wood also tells me it is the province of the Delaware Supreme

Court to supervise the practice of law in Delaware and enforce our Rules of

Professional Conduct. With that proposition I have no disagreement. In my view

it misses the point and ignores the clear language of Rule 90.1. The response also

contains the declaration of Charles Slanina, Esquire. I know Mr. Slanina and have

the highest respect for him, especially for his work and expertise in the area of

legal ethics. His declaration here focused on my lack of a role in lawyer discipline

and was not helpful regarding the issue of the appropriateness and advisability of

continuing *pro hac vice* permission.

Rule 90.1(e) reads in full:

> Withdrawal of attorneys admitted *pro hac vice* shall
> be governed by the provisions of Rule 90(b). The
> Court may revoke a *pro hac vice* admission *sua sponte*
> or upon the motion of a party, if it determines, after
> a hearing or other meaningful opportunity to respond,
> the continued admission *pro hac vice* to be inappropriate
> or inadvisable.

The standard then I am to apply is if the continued admission would

4

be inappropriate or inadvisable.

I have no intention to litigate here, or make any findings, as to whether or not Mr. Wood violated other States' Rules of Professional Conduct. I agree that is outside my authority. It is the province of the Delaware Office of Disciplinary Counsel, and ultimately the Delaware Supreme Court, or their counterparts in other jurisdictions, to make a factual determination as to whether Mr. Wood violated the Rules of Professional Conduct. Thus, the cases cited by Mr. Wood are inapposite and of no avail. In *Lendus, LLC v. Goode*, 2018 WL 6498674 (Del. Ch. Dec. 10, 2018) and *Crumpler v. Superior Court, ex. rel New Castle County*, Del. Supr., 56 A.3d 1000 (Del. 2012), the courts allowed the foreign lawyer to withdraw as *pro hac vice* counsel and referred alleged ethical violations to the Office of Disciplinary Counsel. Neither of those is happening here. Similarly, in *Kaplan v. Wyatt*, 1984 WL 8274 (Del. Ch. Jan. 18, 1984), Chancellor Brown, on very different facts, allowed *pro hac vice* counsel to continue his representation but stressed that this did not constitute approval of his conduct and that ethical violations could be addressed elsewhere.

What I am always required to do is ensure that those practicing before me are of sufficient character, and conduct themselves with sufficient civility and truthfulness. Violations of Rules of Professional Conduct are for other entities to

5

judge based upon an appropriate record following guidelines of due process. My role here is much more limited.

In response to my inquiry regarding the Georgia litigation Mr. Wood tells me he was (only) a party, and the case is on appeal. He also tells me that the affidavit filed in support of the case only contained errors. Neither defense holds merit with me. As an attorney, Mr. Wood has an obligation, whether on his own or for clients, to file only cases which have a good faith basis in fact or law. The Court's finding in Georgia otherwise indicates that the Georgia case was textbook frivolous litigation.

I am also troubled that an error-ridden affidavit of an expert witness would be filed in support of Mr. Wood's case. An attorney as experienced as Mr. Wood knows expert affidavits must be reviewed in detail to ensure accuracy before filing. Failure to do so is either mendacious or incompetent.

The response to the Rule with regard to the Wisconsin complaint calls the failings "proof reading errors". Failure to certify a complaint for

6

injunction or even serve the Defendants are not proof reading errors. The

Complaint would not survive a law school civil procedure class.[1]

Prior to the pandemic, I watched daily counsel practice before me in a

civil, ethical way to tirelessly advance the interests of their clients. It would

dishonor them were I to allow this *pro hac vice* order to stand. The conduct of Mr.

Wood, albeit not in my jurisdiction, exhibited a toxic stew of mendacity,

prevarication and surprising incompetence. What has been shown in Court

decisions of our sister States satisfies me that it would be inappropriate and

inadvisable to continue Mr. Wood's permission to practice before this Court. I

acknowledge that I preside over a small part of the legal world in a small state.

However, we take pride in our bar.

One final matter. A number of events have occurred since the filing

of the Rule to Show Cause. I have seen reports of "tweets" attributable to Mr.

Wood. At least one tweet called for the arrest and execution of our Vice-

President. Another alleged claims against the Chief Justice of the Supreme Court

of the United States which are too disgusting and outrageous to repeat. Following

---

[1] Mr. Wood in his response tells me he is not responsible, as he is listed as "Counsel for Notice". My reading of the docket is he was one of the counsel of record for the Plaintiffs, and thus fully responsible for the filing. Moreover, since I am not addressing choice of law issues with respect to professional misconduct, Delaware Rule of Professional Conduct 8.5 need not be discussed. Nor am I imposing any sanctions under Delaware Superior Court Civil Rule 11.

7

on top of these are the events of January 6, 2021 in our Nation's Capitol. No doubt these tweets, and many other things, incited these riots.

I am not here to litigate if Mr. Wood was ultimately the source of the incitement. I make no finding with regard to this conduct, and it does not form any part of the basis for my ruling. I reaffirm my limited role.

I am revoking my order granting Lin Wood, Esquire the privilege of representing the Plaintiff in this case. Given my ruling, here the hearing scheduled for January 13, 2021 is cancelled.[2] My staff will contact the parties to schedule as soon as possible a date for argument on the Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**

Craig A. Karsnitz

cc: Prothonotary

FILED PROTHONOTARY
SUSSEX COUNTY
2021 JAN 11 D 1: 16

---

[2] Rule 90.1 requires either a hearing on the issue or other meaningful opportunity to respond. Mr. Wood was afforded the latter.

8

## IN THE UNITED STATES DISTRICCT COURT, NORTHERN DISTRCOICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| **CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, , CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY,**<br><br>      **Plaintiffs.**<br><br>**v.**<br><br>**BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N.SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board,**<br><br>      **Defendants.** | **CASE NO.** |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

Exhibit H

## NATURE OF THE ACTION

This civil action brings to light a massive election fraud, multiple violations of Georgia laws, including O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1 and §21-2-522, and multiple Constitutional violations, as shown by fact witnesses to specific incidents, multiple expert witnesses and the sheer mathematical impossibilities found in the Georgia 2020 General Election.[1]

1.

As a civil action, the plaintiff's burden of proof is a "preponderance of the evidence" to show, as the Georgia Supreme Court has made clear that, *"[i] was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (*citing Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002).

---

[1]   The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations, see expert reports, regarding Michigan, Pennsylvania, Arizona and Wisconsin. (See William M. Briggs Decl., attached here to as Exh. 1, Report with Attachment).  Indeed, we believe that in Arizona at least 35,000 votes were illegally added to Mr. Biden's vote count.

Exhibit H

2.

The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to make certain the election of Joe Biden as President of the United States.

3.

The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious is the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Georgia. Especially egregious conduct arose in Forsyth, Paulding, Cherokee, Hall, and Barrow County. This scheme and artifice to defraud affected tens of thousands of votes in Georgia alone and "rigged" the election in Georgia for Joe Biden.

---

[2] 50 USC § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system.

3

Exhibit H

4.

The massive fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") only recently purchased and rushed into use by Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger, and the Georgia Board of Elections. Sequoia voting machines were used in 16 states and the District of Colombia in 2006. Smartmatic, which has revenue of about $100 million, focuses on Venezuela and other markets outside the U.S. [3]

After selling Sequoia, Smartmatic's chief executive, Anthony Mugica. Mr. Mugica said, he hoped Smartmatic would work with Sequoia on projects in the U.S., though Smartmatic wouldn't take an equity stake." Id.

5.

Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  (*See* Redacted whistleblower affiant, *attached as Exh*. 2)  Notably, Chavez "won" every election thereafter.

---

[3] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

Exhibit H

6.

As set forth in the accompanying whistleblower affidavit, the

Smartmatic software was designed to manipulate Venezuelan elections in

favor of dictator Hugo Chavez:

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system.

7.

A *core requirement* of the Smartmatic software design was the

*software's ability to hide its manipulation of votes from any audit.* As the

whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not be tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that

5

accomplished that result for President Chavez. (See Id., see also Exh. 3, Aff. Cardozo, attached hereto)).

8.

The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  (*See* Hursti August 2019 Declaration, attached hereto as Exh. 4, at pars. 45-48; and attached hereto, as Exh. 4B, October 2019 Declaration in Document 959-4, at p. 18, par. 28).

9.

Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to

Exhibit H

the internet in violation of professional standards and state and federal laws.

(*See Id.*)

10.

Moreover, lies and conduct of Fulton County election workers about a delay in voting at State Farm Arena and the reasons for it evince the fraud.

11.

Specifically, video from the State Farm Arena in Fulton County shows that on November 3rd after the polls closed, election workers falsely claimed a water leak required the facility to close.  All poll workers and challengers were evacuated for several hours at about 10:00 PM.  However, several election workers remained unsupervised and unchallenged working at the computers for the voting tabulation machines until after 1:00 AM.

12.

Defendants Kemp and Raffensperger rushed through the purchase of Dominion voting machines and software in 2019 for the 2020 Presidential Election[4].  A certificate from the Secretary of State was awarded to Dominion

---

[4]   Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019. https://www.ajc.com/blog/politics/georgia-governor-inks-law-replace-voting-machines/xNXs0ByQAOvtXhd27kJdqO/

Exhibit H

Voting Systems but is undated.  (*See* attached hereto Exh. 5, copy

Certification for Dominion Voting Systems from Secretary of State).

Similarly a test report is signed by Michael Walker as Project Manager but is

also undated.  (See Exh. 6, Test Report for Dominion Voting Systems,

Democracy Suite 5-4-A)

13.

Defendants Kemp and Raffensperger disregarded all the concerns that

caused Dominion software to be rejected by the Texas Board of Elections in

2018, namely that it was vulnerable to undetected and non-auditable

manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of

Computer Science and Election Security Expert has recently observed, with

reference to Dominion Voting machines: "I figured out how to make a slightly

different computer program that just before the polls were closed, it switches

some votes around from one candidate to another. I wrote that computer

program into a memory chip and now to hack a voting machine you just need

7 minutes alone with it and a screwdriver." (Attached hereto Exh. 7, Study,

Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters by

Andrew W. Appel Princeton University, Richard A. DeMillo, Georgia Tech

Philip B. Stark, for the  Univ. of California, Berkeley, December 27, 2019).[5]

---

[5] Full unredacted copies of all exhibits have been filed under seal with the Court and Plaintiffs
have simultaneously moved for a protective order.

Exhibit H

14.

As explained and demonstrated in the accompanying redacted declaration of a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems.  (See Attached hereto as Exh. 8, copy of redacted witness affidavit, 17 pages, November 23, 2020).

15.

Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states.  He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden.  (Exh. 26).

Exhibit H

16.

Additionally, incontrovertible evidence Board of Elections records demonstrates that at least 96,600 absentee ballots were requested and counted but were never recorded as being returned to county election boards by the voter. *Thus, at a minimum, 96,600 votes must be disregarded.* (See Attached hereto, Exh. 9, R. Ramsland Aff.).

17.

The Dominion system used in Georgia erodes and undermines the reconciliation of the number of voters and the number of ballots cast, such that these figures are permitted to be unreconciled, opening the door to ballot stuffing and fraud. The collapse of reconciliation was seen in Georgia's primary and runoff elections this year, and in the November election, where it was discovered during the hand audit that 3,300 votes were found on memory sticks that were not uploaded on election night, plus in Floyd county, another 2,600 absentee ballots had not been scanned. These "found votes" reduced Biden's lead over Donald Trump[6].

---

[6] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

18.

Georgia's election officials and poll workers exacerbated and helped, whether knowingly or unknowingly, the Dominion system carry out massive voter manipulation by refusing to observe statutory safeguards for absentee ballots.  Election officials failed to verify signatures and check security envelopes.  They barred challengers from observing the count, which also facilitated the fraud.

19.

Expert analysis of the actual vote set forth below demonstrates that at least 96,600 votes were illegally counted during the Georgia 2020 general election.  All of the evidence and allegation herein is more than sufficient to place the result of the election in doubt.  More evidence arrives by the day and discovery should be ordered immediately.

20.

Georgia law, (OCGA 21-5-552) provides for a contest of an election where:

> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result; . . . (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

Exhibit H

21.

As further set forth below, all of the above grounds have been satisfied and compel this Court to set aside the 2020 General Election results which fraudulently concluded that Mr. Biden defeated President Trump by 12,670 votes.

22.

Separately, and independently, there are sufficient Constitutional grounds to set aside the election results due to the Defendants' failure to observe statutory requirements for the processing and counting of absentee ballots which led to the tabulation of more than fifty thousand illegal ballots.

## THE PARTIES

23.

Plaintiff Coreco Ja'Qan ("CJ") Pearson, is a registered voter who resides in Augusta, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia. He has standing to bring this action under *Carson v. Simon*, 2020 US App Lexis 34184 (8th Cir. Oct. 29, 2020). He brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Georgia Secretary of State on November 20, 2020. The certified results showed a plurality of 12,670 votes in favor of former Vice-President Joe Biden over President Trump.

12

Exhibit H

24.

Plaintiff Vikki Townsend Consiglio, is a registered voter who resides in Henry County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

25.

Plaintiff Gloria Kay Godwin, is a registered voter who resides in Pierece County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

26.

Plaintiff James Kenneth Carroll, is a registered voter who resides in Dodge County, Georgia.  He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

27.

Plaintiff Carolyn Hall Fisher, is a registered voter who resides in Forsyth County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

28.

Plaintiff Cathleen Alston Latham, is a registered voter who resides in Coffee County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

Exhibit H

29.

Plaintiff Jason M. Shepherd is the Chairman of the Cobb County Republican Party and brings this action in his official capacity on behalf of the Cobb County Republican Party.

30.

Plaintiff Brian Jay Van Gundy is registered voter in Gwinnett County, Georgia.  He is the Assistant Secretary of the Georgia Republican Party.

31.

Defendant Governor Brian Kemp (Governor of Georgia) is named herein in his official capacity as Governor of the State of Georgia.  On or about June 9, 2019, Governor Kemp bought the new Dominion Voting Systems for Georgia, budgeting 150 million dollars for the machines.  Critics are quoted, "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacy] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[7]

---

[7] *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019

14

Exhibit H

32.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia and the Chief Election Official for the State of Georgia pursuant to Georgia's Election Code and O.C.G.A. § 21-2-50. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).  Secretary  Raffensperger  serves as the Chairperson of Georgia's State Election Board,  which  promulgates  and enforces rules and regulations to (i) obtain uniformity in the practices and proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

33.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulating, adopting, and promulgating such rules and regulations, consistent with law, as will be

15

Exhibit H

conducive to the fair, legal, and orderly conduct of primaries and elections."

O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules

and regulations to define uniform and nondiscriminatory standards

concerning what constitutes a vote and what will be counted as a vote for

each category of voting system" in Georgia.  O.C.G.A.  § 21-2-31(7).  The State

Election Board, personally and through the conduct of the Board's employees,

officers, agents, and servants, acted under color of state law at all times

relevant to this action and are sued for emergency declaratory and injunctive

relief in their official capacities.

## JURISDICTION AND VENUE

34.

This Court has subject matter jurisdiction under 28 U.S.C. 1331 which

provides, "The district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States.

35.

This Court also has subject matter jurisdiction under 28 U.S.C. 1343

because this action involves a federal election for President of the United

States. "A significant departure from the legislative scheme for appointing

Presidential electors presents a federal constitutional question." *Bush v.*

*Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*,

285 U.S. 355, 365 (1932).

Exhibit H

36.

The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

37.

This Court has jurisdiction over the related Georgia Constitutional claims and State law claims under 28 U.S.C. 1367.

38.

In Georgia, the "legislature" is the General Assembly.  *See* Ga. Const. Art.  III, § I, Para. I.

39.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to  exercise that power unilaterally, much less flout existing legislation or the Constitution itself.

## STATEMENT OF FACTS

40.

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under Georgia law, O.C.G.A. § 21-2-522 to remedy deprivations of rights,

Exhibit H

privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results.

<div align="center">41.</div>

The United States Constitution sets forth the authority to regulate federal elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

<div align="center">42.</div>

With respect to the appointment of presidential electors, the Constitution provides: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").

<div align="center">43.</div>

Neither Defendant is a "Legislature" as required under the Elections Clause or Electors Clause. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley* 285 U.S. 365.  Regulations of congressional and presidential elections, thus, "must be in accordance with

<div align="center">18</div>

the method which the state has prescribed for legislative enactments." Id. at

367; see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576

U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

44.

While the Elections Clause "was not adopted  to  diminish  a State's

authority to determine its own lawmaking processes," *Ariz.  State Legislature,*

135 S. Ct. at 2677, it does hold states accountable to their chosen processes

when it comes to regulating federal elections, *id.* at 2668. "A significant

departure from the legislative scheme for appointing Presidential electors

presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist,

C.J., concurring); *Smiley,* 285 U.S. at 365.

45.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522,

Grounds for Contest:

> A result of a primary or election may be contested on one or more of
> the following grounds:
>
> (1) Misconduct, fraud, or irregularity by any primary or election
> official or officials sufficient to change or place in doubt the result;
>
> (2) When the defendant is ineligible for the nomination or office in
> dispute;
>
> (3) When illegal votes have been received or legal votes rejected at
> the polls sufficient to change or place in doubt the result;
>
> (4) For any error in counting the votes or declaring the result of the
> primary or election, if such error would change the result; or

Exhibit H

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

46.

Under O.C.G.A. *§* 21-2-10, Presidential Electors are elected.

47.

Under O.C.G.A. *§* 21-2-386(a)(l)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein. The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article." *See* O.C.G.A. *§* 21-2-380.1.

48.

The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall,*** if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the

20

voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. *§* 21-2-386(a)(l )(B) (emphasis added).

49.

Under O.C.G.A. *§* 21-2-386(a)(l)(C), the Georgia Legislature also established a clear and efficient process to be used by County Officials  if they determine that an elector has failed to sign  the  oath  on  the  outside envelope  enclosing the ballot or that  the  signature  does  not  conform  with the  signature on file in the registrar's or clerk's office (a "defective absentee ballot").

50.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> ***If the elector has failed to sign the oath, or if the signature does not appear to be valid***, or if the elector has failed to furnish required information ***or information so furnished does not conform with that on file in the registrar's or clerk's office***, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope "Rejected," giving the reason therefor.  The board of registrars or absentee ballot clerk *shall* promptly ***notify the elector of such rejection***, a copy of which notification ***shall*** be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2 -386(a) (l)(C) (emphasis added).

Exhibit H

# I.   Defendants' Unauthorized Actions Violated the Georgia Election Code and Caused the Processing of Defective Absentee Ballots.

51.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia[8].

52.

Under the Settlement, however, the Administrators agreed to change the statutorily prescribed manner of handling absentee ballots in a manner that is not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

---

[8] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger,  et al.,* Civil Action File No. 1:l 9-cv-05028-WMR, United States District Court for the  Northern District of Georgia, Atlanta Division, Doc.  56-1.

22

Exhibit H

53.

The Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

54.

The Settlement also changed the signature requirement reducing it to a broad process with discretion, rather than enforcement of the signature requirement as statutorily required under O.C.G.A. 21-2-386(a)(l).

55.

The Georgia Legislature instructed county registers and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. S 21-2-386(a)(1)(B), 21-2-380.1.  The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each absentee ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope.  The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absent elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath …

Exhibit H

O.C.G.A. S 21-2-386(a)(1)(B).

56.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. *§* 21-2-38 l(b )(1) (providing,  in pertinent  part, "In  order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417 ...").

57.

An Affiant testified, under oath, that "It was also of particular interest to me to see that signatures were not being verified and that there were no corresponding envelopes seen in site."  (Attached hereto as Exh. 10, Mayra Romera, at par. 7).

58.

To reflect the very reason for process, it was documented that in the primary election, prior to the November 3, 2020 Presidential election, many ballots got to voters after the election.  Further it was confirmed that "Untold thousands of absentee ballot requests went unfulfilled, and tens of thousands of mailed ballots were rejected for multiple reasons including arriving too late

Exhibit H

to be counted.  See the Associated Press, *Vote-by-Mail worries: A leaky pipeline in many states*, August 8, 2020.[9]

59.

Pursuant to the Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith only partisan-based training - "additional guidance and training materials" drafted by the Democrat Party Agencies' representatives contradicting O.C.G.A. § 21-2-31.

## B. Unlawful Early Processing of Absentee Ballots

60.

In April 2020, the State Election Board adopted on a purportedly "Emergency Basis" Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day. Under this rule, county election officials are authorized to begin processing absentee ballots up to three weeks befoe election day. Thus, the rule provides in part that "(1) Beginning at 8:00 AM on the third Monday prior to Election Day, the county election superintendent **shall be authorized to open the outer envelope of accepted absentee ballots** …" (Emphasis added).

---

[9]     *https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7*

25

Exhibit H

61.

Rule 183-1-14-0.9-.15 is in direct and irreconcilable conflict with

O.C.G.A. § 21-2-386(a)(2), which prohibits the opening of absentee ballots

until election day:

> **After the opening of the polls** on the day of the primary, election, or runoff, the registrars or absentee ballot clerks **shall be authorized to open the outer envelope** on which is printed the oath of the elector in such a manner as not to destroy the oath printed thereon; provided, however, that the registrars or absentee ballot clerk shall not be authorized to remove the contents of such outer envelope or to open the inner envelope marked "Official Absentee Ballot," except as otherwise provided in this Code section.

(Emphasis added).

62.

In plain terms, the statute clearly prohibits opening absentee ballots

prior to election day, while the rule authorizes doing so three weeks before

election day. There is no reconciling this conflict. The State Election Board

has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and

regulations, but no authority to promulgate a regulation that is directly

contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore

plainly and indisputably unlawful.

63.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

26

Exhibit H

## C. Unlawful Audit Procedures

64.

According to Secretary Raffensperger, in the presidential general election, 2,457,880 votes were cast in Georgia for President Donald J. Trump, and 2,472,002 votes were cast for Joseph R.  Biden, which narrowed in Donald Trump's favor after the most recent recount.

65.

Secretary Raffensperger declared that for the Hand Recount:

Per the instructions given to counties as they conduct their audit triggered full hand recounts, designated monitors will be given complete access to observe the process from the beginning. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely. The general public and the press will be restricted to a public viewing area. Designated monitors will be able to watch the recount while standing close to the elections' workers conducting the recount.

Political parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every  ten  audit boards in a county... Beyond being able to  watch  to ensure  the recount is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted , providing monitors and the public an additional way to keep tabs on  the process.[10]

---

[10] *Office of Brad Raffensperger, Monitors Closely Observing Audit-Triggered Full Hand Recount: Transparency is Built Into Process*,
https://sos.ga.gov/index.php/elections/monitors_closely_observing_audit-triggered_full_hand_recount_transparency_is_built_into_process

Exhibit H

66.

The audit was conducted O.C.G.A. § 21-2-498. This code section requires that audits be completed "in public view" and authorizes the State Board of Elections to promulgate regulations to administer an audit "to ensure that collection of validly cast ballots is complete, accurate and trustworthy throughout the audit."

67.

Plaintiffs can show that Democrat-majority counties provided political parties and candidates, including the Trump Campaign, no meaningful access or actual opportunity to review and assess the validity of mail-in ballots during the pre-canvassing meetings.  While in the audit or recount, they witnessed Trump votes being put into Biden piles.

68.

Non-parties Amanda Coleman and Maria Diedrich are two individuals who volunteered to serve as designated monitors for the Donald J. Trump Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the Georgia Republican Party (the "Republican Party") at the Hand Recount. (Attached hereto and incorporated herein as Exhibits 2 and 3), respectively, are true and correct copies of (1) the Affidavit of Amanda Coleman in Support of Plaintiffs' Motion for Temporary Restraining Order (the "Coleman Affidavit"), and (2) the Affidavit of Maria Diedrich in Support of Plaintiffs'

28

Exhibit H

Motion for Temporary Restraining Order (the "Diedrich Affidavit").  (See

Exh. 11, Coleman Aff.,2; Exh. 12, Diedrich Aff., 2.)

69.

The Affidavits set forth various conduct amounting to federal crimes,

clear improprieties, insufficiencies, and improper handling of ballots by

County Officials and their employees that Ms. Coleman and Ms. Diedrich

personally observed while monitoring the Hand Recount.  *(See* Exh. 11,

Coleman Aff., 3-10; Exh. 12, Diedrich Aff.,4-14.)

70.

As a result of her observations of the Hand Recount as a Republican

Party monitor, Ms. Diedrich declared, "There had been no meaningful way to

review or audit any activity" at the Hand Recount. *(See* Exh. 12, Diedrich

Aff.,14.)

71.

As a result of their observations of the Hand Recount as Republican

Party monitors, Ms. Coleman likewise declared, "There was no way to tell if

any counting was accurate or if the activity was proper." (See Exh. 12,

Coleman Aff.,10).

72.

On Election Day, when the Republican poll watchers were, for a limited

time, present and allowed to observe in various polling locations, they

29

observed and reported numerous instances of election workers failing to follow the statutory mandates relating to two critical requirements, among other issues:

(1) a voter's right to spoil their mail-in ballot at their polling place on election day and to then vote in-person, and

(2) the ability for voters to vote provisionally on election day when a mail-in ballot has already been received for them, but when they did not cast those mail-in ballots, who sought to vote in person during early voting but was told she already voted; she emphasized that she had not.  The clerk told her he would add her manually with no explanation as to who or how someone voted using her name. (Attached hereto as Exh. 13, Aff. Ursula Wolf)

73.

Another observer for the ballot recount testified that "*at no time did I witness any Recounter or individual participate in the recount verifying signatures [on mail-in ballots].*" (Attached hereto as Exh. 14, Nicholas Zeher Aff).

74.

In some counties, there was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees

Exhibit H

simply conducted another machine count of the *same* ballots. (See. Exh. 9,

10).  That will not reveal the massive fraud of which plaintiffs complain.

<center>75.</center>

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

> 15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.

> 16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device.  By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden.  I only observed two of these ballots as votes for President Donald J. Trump." (See Exh. 15 Attached hereto).

<center>76.</center>

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

> we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed.  **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.**

<center>31</center>

The Milton precinct received its machines at 1:00 AM in the morning on Election Day.  This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id.*

## II. EVIDENCE OF FRAUD

### A PATTERN SHOWING THE ABSENCE OF MISTAKE

77.

The stunning pattern of the nature and acts of fraud demonstrate an absence of mistake.

78.

The same Affiant further explained, in sworn testimony, that the breach included: "when we did receive the machines, they were not sealed or locked, the serial numbers were not what were reflected on the related documentation…" *See Id.*

79.

An affiant testified that "While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden, I witnessed this happen at table "A".' (See Exh. 14, par. 27).

80.

The Affiant further testified, that "when this was brought to Ms. Pitts attention, it was met with extreme hostility.  At no time did I witness any ballot cast for Joseph Biden be placed in the pile for Donald Trump.  (See Exh. 14, par. 28).

32

Exhibit H

81.

Another Affiant in the mail-in ballot and absentee ballot recounting process, testified in her sworn affidavit, that "on November 16, 2020 … It was also of particular interest to me to see that signatures were not being verified and there were no corresponding envelopes seen in sight."  (See Exh. 10, at Par. 7).

82.

Yet another Affiant, in the recount process, testified that he received push back and a lack of any cooperation and was even threatened as if he did something wrong, when he pointed out the failure to follow the rules with the observers while open mail-in ballot re-counting was occurring, stating:

> "However, as an observer, I observed that the precinct had twelve (12) counting tables, but only one (1) monitor from the Republican Party.  I brought it up to Erica Johnston since the recount rules provided for one (1) monitor from each Party per ten (10) tables or part thereof…"

(See Attached hereto, Exh. 16, Ibrahim Reyes Aff.)

83.

Another Affiant explains a pattern of behavior that is alarming, in his position as an observer in the recount on absentee ballots with barcodes, he testified:

> ***I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray.*** I also witnessed the same two poll workers putting the already separated paper receipt b*a*llots in

Exhibit H

the "No Vote" and "Jorgensen" tray, and removing them and putting
them inside the Biden tray,  They then took out all of the ballots out
of the Biden tray and stacked them on the table, writing on the count
ballot sheet.

*(*See Attached hereto, Exh.17*, pars. 4-5, Aff. of Consetta Johson*).

84.

Another Affiant, a Democrat, testified in his sworn affidavit, that

before he was forced to move back to where he could not see, he had in fact

seen "absentee ballots for Trump inserted into Biden's stack, and counted as

Biden votes.  This occurred a few times".  (See attached hereto, Exh. 18 at

Par. 12, Aff. of Carlos Silva).

85.

Yet another Affiant testified about the lack of process and the hostility

only towards the Republican party, which is a violation of the Equal

Protection Clause.   He testified:

I also observed throughout my three days in Atlanta, not once did
anyone verify these ballots.  In fact, there was no authentication
process in place and no envelopes were observed or allowed to be
observed.  I saw hostility towards Republican observers but never
towards Democrat observers.  Both were identified by badges.

(*See Id*., at pars. 13-14).

86.

Another Affiant explained that his ballot was not only not processed in

accordance with Election law, he witnessed people reviewing his ballot to

decide where to place it, which violated the privacy of his ballot, and when he

34

Exhibit H

tried to report it to a voter fraud line, he never received any contact or

cooperation stating:

> "I voted early on October 12 at the precinct at Lynwood Park …
> Because of irregularities at the polling location, I called the voter
> fraud line to ask why persons were discussing my ballot and
> reviewing it to decide where to place it.  When I called the state fraud
> line, I was directed to a worker in the office of the Secretary of
> State…"

(See Attached hereto, Exh. 19, Andrea ONeal Aff, at par. 3).

87.

He further testified that when he was an Observer at the Lithonia

location, he saw many irregularities, and specifically "saw an auditor sort

Biden votes that he collected and sorted into ten ballot stacks, which [the

auditor] did not show anyone."  Id. at p. 8.

88.

Another Affiant testified about the use of different paper for ballots,

that would constitute fraud stating:

> I noticed that almost all of the ballots I reviewed were for Biden.
> Many batches went 100% for Biden.  I also observed that the
> watermark on at least 3 ballots were solid gray instead of
> transparent, leading me to believe the ballot was counterfeit.  I
> challenged this and the Elections Director said it was a legitimate
> ballot and was due to the use of different printers.  Many ballots had
> markings for Biden only, and no markings on the rest of the ballot.

(See Attached hereto, Exh. 20, Aff of Debra J. Fisher, at pars. 4, 5, 6).

35

Exhibit H

89.

An Affiant testified, that while at the Audit, '**While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden.  I witnessed this happen at table "A"**".  (*See* attached hereto as Exh. 22, Kevin Peterford, at par. 29).   Another Affiant testified, that "I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt abllots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet. (See Exh. 17, Johnson, pars. 4-5).

90.

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, he had in fact seen**, "*I also saw absentee ballots for Trump inserted**

36

***into Biden's stack, and counted as Biden votes.  This occurred***

***a few times".***  (See Exh. 18, Par. 12).

<div align="center">91.</div>

A Republican National Committee monitor in Georgia's election

recount, Hale Soucie, told an undercover journalist there are individuals

counting ballots who have made continuous errors," writes O'Keefe. Project

Veritas, Watch:  Latest Project Veritas Video reveals "Multiple Ballots Meant

for Trump Went to Biden in Georgia.[11]

<div align="center">

**B.   THE VOTING MACHINES, SECRECY**

**SOFTWARE USED BY VOTING MACHINES THROUGHOUT GEORGIA
IS CRUCIAL**

92.

</div>

These violations of federal and state laws impacted the election of

November 3, 2020 and set the predicate for the evidence of deliberate

fraudulent conduct, manipulation, and lack of mistake that follows. The

commonality and statewide nature of these legal violations renders

certification of the legal vote untenable and warrants immediate

---

[11]     https://hannity.com/media-room/watch-latest-project-veritas-video-reveals-multiple-ballots-meant-for-trump-went-to-biden-in-georgia/

<div align="center">37</div>

<div align="right">Exhibit H</div>

impoundment of voting machines and software used throughout Georgia for expert inspection and retrieval of the software.

93.

An Affiant, who is a network & information cyber-security expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that the information about scanned **ballots can be tracked inside the software system for Dominion**:

> (a)    When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.

(*See* attached hereto Exh 22, Declaration of Ronald Watkins, at par. 11).

94.

**Affiant further explains that the central operator can remove or discard batches of votes.**   "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "(*Id.* at par. 8).

38

Exhibit H

95.

Affiant further testifies that the Dominion/ Smartmatic user manual itself makes clear that the system allows for threshold settings to be set to mark all ballots as "problem ballots" for *discretionary determinations* on where the vote goes.  It states:

> *During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id*. at pars. 9-10.

96.

The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made

39

Exhibit H

to a flash memory card – and that is connected to a Windows computer

stating:

> It is possible for an administrator of the "ImageCast Central"
> workstation to view and delete any individual ballot scans from the
> "NotCastImages" folder by simply using the standard Windows delete
> and recycle bin functions provided by the Windows 10 Pro operating
> system. … The upload process is just a simple copying of a "Results"
> folder containing vote tallies to a flash memory card connected to the
> "Windows 10 Pro" machine. The copy process uses the standard drag-
> n-drop or copy/paste mechanisms within the ubiquitous "Windows
> File Explorer". While a simple procedure, this process may be error
> prone and **is very vulnerable to malicious administrators**.

*Id*. at par. 11-13 (emphasis supplied).

97.

It was announced on "Monday, [July 29, 2019], [that] Governor Kemp

awarded a contract for 30,000 new voting machines to Dominion Voting

Systems, scrapping the state's 17-year-old electronic voting equipment and

replacing it with touchscreens that print out paper ballots."[12]  Critics are

quoted: "Led by Abrams, Democrats fought the legislation and pointed to

cybersecurity experts who warned it would leave Georgia's elections

susceptible to hacking and tampering." And "Just this week, the Fair Fight

voting rights group started by [Stacy] Abrams launched a television ad

---

[12] *Georgia Buys New Voting Machines for 2020 Presidential Election, by Mark Niesse, the Atlanta Journal-Constitution, July 30, 2019, https://www.ajc.com/news/state--regional-govt--politics/georgia-awards-contract-for-new-election-system-dominion-voting/tHh3V8KZnZivJoVzZRLO4O/*

Exhibit H

critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[13]

98.

It was further reported in 2019 that the new Dominion Voting Machines in Georgia "[w]ith Georgia's current voting system, there's **no way to guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results**, with it being reported that:

(a)     Recounts are meaningless on the direct-recording electronic voting machines because they simply reproduce the same numbers they originally generated.

(b)     But paper ballots alone won't protect the sanctity of elections on the new touchscreens, called ballot-marking devices.

(c)     The new election system depends on voters to verify the printed text of their choices on their ballots, a step that many voters might not take. The State Election Board hasn't yet created regulations for how recounts and audits will be conducted. And paper ballots embed selections in bar codes that are only readable by scanning machines, leaving Georgians uncertain whether the bar codes match their votes.[14]

---

[13] *Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, by Greg Bluestein and Mark Niesse, June 14, 2019; Credit: Copyright 2019 The Associated Press, June 2019*

Exhibit H

**i.**     *As part of the scheme and artifice to defraud the plaintiffs, the candidates and the voters of undiminished and unaltered voting results in a free and legal election, the Defendants and other persons known and unknown committed the following violations of law:*

50 U.S.C. § 20701 requires the retention and preservation of records

and papers by officers of elections under penalty of fine and imprisonment:

> **§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation**
>
> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

50 U.S.C.§ 20701.

<div align="center">99.</div>

In the primaries it was confirmed that, "The rapid introduction of new

technologies and processes in state voting systems heightens the risk of

<div align="center">42</div>

<div align="right">Exhibit H</div>

foreign interference and insider tampering.  That's true even if simple human error or local maneuvering for political advantage are more likely threats[15].

100.

A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."[16]

101.

As evidence of the defects or features of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[17]

---

[15] *See Threats to Georgia Elections Loom Despite New Paper Ballot Voting, By Mark Niesse, The Atlanta Journal-Constitution and (The AP, Vote-by-Mail worries: A leaky pipeline in many states, August 8, 2020).*

[16] Penn Wharton Study by Matt Caufield, The Business of Voting, July 2018.

[17] Attached hereto, Exh. 23, copy of Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

Exhibit H

102.

Plaintiffs have since learned that the "glitches" in the Dominion system–that have the uniform effect of taking votes from Trump and shifting them to Biden—have been widely reported in the press and confirmed by the analysis of independent experts.

103.

Plaintiffs can show, through expert and fact witnesses that:

**c.   Dominion/ Smartmatic Systems Have Massive End User Vulnerabilities.**

1. Users on the ground have full admin privileges to machines and software.  Having been created to "rig" elections, the Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder.  Any anomaly, such as pen drips or bleeds, results in a ballot being rejected.  It is then handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for purely discretionary and improper vote "adjudication."

2. Affiant witness (name redacted for security reasons[18]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation to insure Venezuelan dictator Hugo Chavez never lost an election and he saw it work. Id.

   "The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against

Exhibit H

persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 2, pars. 6, 9, 10).

104.

Smartmatic's incorporators and inventors have backgrounds evidencing their foreign connections, including Venezuela and Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso.[19]

105.

The presence of Smartmatic in the United States—owned by foreign nationals, and Dominion, a Canadian company with its offices such as the Office of General Counsel in Germany, would have to be approved by CFIUS. CFIUS was created in 1988 by the Exon-Florio Amendment to the Defense Production Act of 1950. CFIUS' authorizing statute was amended by the Foreign Investment and National Security Act of 2007 (FINSA).

As amended, section 721 of the DPA directs "the President, acting through [CFIUS]," to review a **"covered transaction to determine the effects of the transaction on the national security of the United States."** 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines

---

19 *https://patents.justia.com/assignee/smartmatic-corp*

Exhibit H

a covered transaction as "any merger, acquisition, or takeover ..., by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." Id. § 2170(a)(3).  *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 302, 411 U.S. App. D.C. 105, 111, (2014).  Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.

106.

Then Congresswoman Carolyn Maloney wrote October 6, 2006 to the Secretary of Treasury, Henry M. Paulson, Jr., Objecting to approval of Dominion/Smartmatic by CFIUS because of its corrupt Venezuelan origination, ownership and control.  (See attached hereto as Exh. 24, Carolyn Maloney Letter of October 6, 2006).  Our own government has long known of this foreign interference on our most important right to vote, and it had either responded with incompetence, negligence, willful blindness, or abject corruption.  In every CFIUS case, there are two TS/SCI reports generated. One by the ODNI on the threat and one by DHS on risk to critical infrastructure.  Smartmatic was a known problem when it was nonetheless approved by CFIUS.

107.

The Wall Street Journal in 2006 did an investigative piece and found that, "Smartmatic came to prominence in 2004 when its machines were used

46

Exhibit H

in an election to recall President Chávez, which Mr. Chávez won handily --

and which the Venezuelan opposition said was riddled with fraud.

Smartmatic put together a consortium to conduct the recall elections,

including a company called Bizta Corp., in which Smartmatic owners had a

large stake. For a time, the Venezuelan government had a 28% stake in Bizta

in exchange for a loan.'[20] …"Bizta paid off the loan in 2004, and Smartmatic

bought the company the following year. But accusations of Chávez

government control of Smartmatic never ended, especially since Smartmatic

scrapped a simple corporate structure, in which it was based in the U.S. with

a Venezuelan subsidiary, for a far more complex arrangement. The company

said it made the change for tax reasons, but critics, including Rep. Carolyn

Maloney (D., N.Y.) and TV journalist Lou Dobbs, pounded the company for

alleged links to the Chávez regime.  *Id.*  Since its purchase by Smartmatic,

Sequoia's sales have risen sharply to a projected $200 million in 2006, said

Smartmatic's chief executive, Anthony Mugica." *Id.*

108.

Indeed, Mr. Cobucci testified, through his sworn affidavit, that he born

in Venezuela, is cousins with Antonio ('Anthony') Mugica, and he has

---

[20] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis,*
*12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

Exhibit H

personal knowledge of the fact that Anthony Mugica incorporated Smartmatic in the U.S. in 2000 with other family members in Venezuela listed as owners.  He also has personal knowledge that Anthony Mugica manipulated Smartmatic to ensure the election for Chavez in the 2004 Referendum in Venezuela.  He also testified, through his sworn affidavit, that Anthony Mugica received tens of millions of dollars from 2003- 2015 from the Venezuelan government to ensure Smartmatic technology would be implemented around the world, including in the U.S.  (See attached hereto, Exh. 25, Juan Carlos Cobucci Aff.)

109.

Another Affiant witness testifies that in Venezuela, she was in an official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed.  Corroborating the testimony of our secret witness, and our witness Mr. Cobucci, cousin of Anthony Mugica, who began Smartmatic, and this witness explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Exh. 3, Diaz Cardozo Aff).

110.

Specific vulnerabilities of the systems in question that have been documented or reported include:

48

a. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Exh. 7). [21]

b. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

c. We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [22]

---

[21] *Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters,* Andrew W. Appel, Richard T. DeMillo, University of California, Berkeley, 12/27/2019.
[22] *Exclusive:  Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

Exhibit H

d.  October 6, 2006 – Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.  (See Exh. 24)

e.  Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are."  *Id*.

f.  Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire[23].

g.  Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software

---

[23] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions, Access Wire, August 10, 2017, https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.*

Exhibit H

inventory provided by Smartmatic is inadequate, … which brings into question the software credibility…"[24]

h. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion).[25].

i. Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election—the biggest automated election run by a private company.  The international community hailed the automation of that first election in the Philippines.[26] The results' transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local election law requirements, Smartmatic and Dominion were required to provide the source code of

[24]  *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010*
*https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches*
[25] *The Business of Voting*, Penn Wharton, Caufield, p. 16.
[26] *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010*
*https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches*

Exhibit H

the voting machines prior to elections so that it could be independently verified.[27]

j.   In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their *'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."  (See attached hereto as Exh. 26, copy of Senator Warren, Klobuchar, Wyden's December 6, 2019 letter).

k.   Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county

---

[27] Presumably the machiens were not altered following submission of the code.  LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*

Exhibit H

election offices, many of whom do not employ a single cybersecurity specialist."[28]

111.

An analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China.  By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  (See Exh. 7).

112.

An expert witness in pending litigation in the United States District Court, Northern District Court of Georgia, Atlanta Div., 17-cv-02989 specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on October 4, 2020, (See Exh. 4B, Document 959-4

---

[28] *Exclusive:  Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

Exhibit H

attached hereto, paragraph. 18 and 20 of p. 28, Exh. 4, Hursti Declaration).
wherein he testified or found:

1)      The failure of the Dominion software "*to meet the methods and
processes for national standards for managing voting system problems and
should not be accepted for use in a public election under any circumstances*."

2)      In Hursti's declaration he explained that "There is evidence of
remote access and remote troubleshooting which presents a grave security
implication and certified identified vulnerabilities should be considered an
"extreme security risk."  *Id*. Hari Hursti also explained that USB drives with
vote tally information were observed to be removed from the presence of poll
watchers during a recent election. *Id*. The fact that there are no controls of
the USB drives was seen recently seen the lack of physical security and
compliance with professional standards, " in one Georgia County, where it is
reported that 3,300 votes were found on memory sticks not loaded plus in
Floyd county, another 2,600 were unscanned, and the "found votes" reduced
Biden's lead over Donald Trump[29].

(a)      In the prior case against Dominion, supra, further
implicating the secrecy behind the software used in Dominion Systems,

---

[29] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and
David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-
votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

Exhibit H

Dr. Eric Coomer, a Vice President of Dominion Voting Systems,

testified that even he was not sure of what testing solutions were

available to test problems or how that was done, " *I have got to be*

*honest, we might be a little bit out of my bounds of understanding the*

*rules and regulations…* and in response to a question on testing for

voting systems problems in relation to issues identified in 2 counties,

he explained that "*Your Honor, I'm not sure of the complete test plan…*

*Again Pro V&V themselves determine what test plan in necessary based*

*on their analysis of the code itself.*"  (*Id.* at Document 959-4, pages 53,

62 L.25- p. 63 L3).

<div align="center">113.</div>

Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the
failure to harden the computers, performing operations directly on
the operating systems, lax control of memory cards, lack of
procedures, and potential remote access are extreme and destroy the
credibility of the tabulations and output of the reports coming from a
voting system."

(See Paragraph 49 of Hursti Declaration).

<div align="center">114.</div>

Rather than engaging in an open and transparent process to give

credibility to Georgia's brand-new voting system, the election processes were

<div align="center">55</div>

<div align="right">Exhibit H</div>

hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Georgia's Election Code and federal law.

115.

The House of Representatives passed H.R. 2722 in an attempt to address these very risks identified by Hursti, on June 27, 2019:

> *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*
>
> *The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.*

## ADDITIONAL SPECIFIC FRAUD

116.

On November 4, 2020, the Georgia GOP Chairman issued the following statement:

> *"Let me repeat.  Fulton County elections officials told the media and our observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night to continue counting ballots in secret until 1:00 a.m.* [30]

56

Exhibit H

117.

It was widely reported that "As of 7 p.m. on Wednesday Fulton County Elections officials said 30,000 absentee ballots were not processed due to a pipe burst."[31] Officials reassured voters that none of the ballots were damaged and the water was quickly cleaned up.  But the emergency delayed officials from processing ballots between 5:30 a.m. and 9:30 a.m.  Officials say they continued to count beginning at 8:30 a.m. Wednesday.  The statement from Fulton County continues:

> "Tonight, Fulton County will report results for approximately 86,000 absentee ballots, as well as Election Day and Early Voting results. These represent the vast majority of ballots cast within Fulton County.

> "As planned, Fulton County will continue to tabulate the remainder of absentee ballots over the next two days. Absentee ballot processing requires that each ballot is opened, signatures verified, and ballots scanned. This is a labor-intensive process that takes longer to tabulate than other forms of voting. Fulton County did not anticipate having all absentee ballots processed on Election Day." Officials said they will work to ensure every vote is counted and all laws and regulations are followed.[32]

---

[31] "4,000 remaining absentee ballots being counted in Fulton County", Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing
[32]  4,000 remaining absentee ballots being counted in Fulton County, Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing

Exhibit H

118.

Plaintiffs have learned that the representation about "a water leak affecting the room where absentee ballots were counted" was not true. The only water leak that needed repairs at State Farm Arena from November 3 – November 5 was a toilet overflow that occurred earlier on November 3.  It had nothing to do with a room with ballot counting, but the false water break representation led to "everyone being sent home."  Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers.

119.

An Affiant recounts how she was present at State Farm Arena on November 3, and saw election workers remaining behind after people were told to leave.  (See Exh. 28, Affidavit of Mitchell Harrison; Exh. 29, Affid. of Michelle Branton)

120.

Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio, Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors.  Dominion altered its website after

58

Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated

ANTIFA, a domestic terrorist organization where he recorded Eric Coomer

representing: "Don't worry. Trump won't win the election, we fixed that." – as

well as social media posts with violence threatened against President Trump.

(See Joe Oltmann interview with Michelle Malkin dated November 13, 2020

which contains copies of Eric Coomer's recording and tweets).[33]

121.

While the bedrock of American elections has been transparency, almost

every crucial aspect of Georgia's November 3, 2020, General Election was

shrouded in secrecy, rife with "errors," and permeated with anomalies so

egregious as to render the results incapable of certification.

### MULTIPLE EXPERT REPORTS AND STATISTICAL ANALYSES PROVE HUNDREDS OF THOUSANDS OF VOTES WERE LOST OR SHIFTED THAT COST PRESIDENT TRUMP AND THE REPUBLICAN CANDIDATES OF CONGRESSIONAL DISTRICTS 6 AND 7 THEIR RACES.

122.

As evidenced by numerous public reports, expert reports, and witness

statements, Defendants egregious misconduct has included ignoring

legislative mandates concerning mail-in and ordinary ballots and led to

---

33  *Malkin Live: Election Update, Interview of Joe Oltmann,* by Michelle Malkin, November 13, 2020, *available at:*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

59

Exhibit H

disenfranchisement of an enormous number of Georgia voters.  Plaintiffs experts can show that, consistent with the above specific misrepresentations, analysis of voting data reveals the following:

(a)     Regarding uncounted mail ballots, based on evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiff's expert, Williams M. Briggs, PhD, shows, based on a statistically significant sample, **that the total number of mail ballots that voters mailed in, but were never counted, have a 95% likelihood of falling between 31,559 and 38,886 total lost votes.**  This range exceeds the margin of loss of President Trump of 12,670 votes by at least 18,889 lost votes and by as many as 26,196 lost votes. (See Exh. 1, Dr. Briggs' Report, with attachments).

(b)     Plaintiff's expert also finds that **voters received tens of thousands of ballots that they never requested.**    (See Exh. 1). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request ranges from 16,938 to 22,771.  **This range exceeds the margin of loss of**

60

**President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.**  *Id.*

(c)     This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. **These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud down ballot as well.**

(d)     **Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.**  (See Id., attachment to report).  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

Exhibit H

(e)     Applying *pro-rata* the above calculations separately to Cobb

County based on the number of unreturned ballots, a range of 1,255

and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897

lost mail ballots, plus 10,684 voters documented in the NCOA as

having moved, **for a combined minimum of 14,276 missing and**

**unlawful ballots, and maximum of 15,250 missing and unlawful**

**ballots, which exceeds the statewide Presidential race total**

**margin by a range of as few as 1,606 ballots and as many as**

**2,580 in the County of Cobb alone impacting the Cobb County**

**Republican Party ("Cobb County Republicans").**

123.

As seen from the **expert analysis of Eric Quinnell**, mathematical

anomalies further support these findings, when in various districts within

Fulton County such as vote gains that exceed reasonable expectations

when compared to 2016, and a failure of gains to be normally distributed

but instead shifting substantially toward the tail of the distribution in

what is known as a platykurtic distribution.  Dr. Quinell identifies

numerous anomalies such as votes to Biden in excess of 2016 exceed the

registrations that are in excess of 2016.  Ultimately, he identifies the

counties in order of their excess performance over what would have fit in a

62

Exhibit H

normal distribution of voting gains, revealing a list of the most anomalous counties down to the least.  These various anomalies provide evidence of voting irregularities.  (See Exh.27, Declaration of Eric Quinnell, with attachments).

<div align="center">124.</div>

In sum, with the expert analysis of William M. Briggs PhD based on recorded calls and declarations, the extent of missing AND unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism.  In short, tens of thousands of votes did not count while the pattern of fraud makes clear that tens of thousands were improperly counted.  This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

<div align="center">125.</div>

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.  These election results must be reversed.

<div align="center">126.</div>

Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots

<div align="center">63</div>

ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").** (See Exh. 1).

<div align="center">127.</div>

Mr. Braynard also found a pattern in Georgia of voters registered at totally fraudulent residence addresses, including shopping centers, mail drop stores and other non-residential facilities[34].

<div align="center">128.</div>

In sum, with the expert analysis of William M. Briggs PhD based on extensive investigation, recorded calls and declarations collected by Matt Braynard, (See attachments to Exh. 1, Briggs' report) the extent of missing and unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In

---

[34] Matt Braynard, https://twitter.com/MattBraynard/status/1331324173910761476; https://twitter.com/MattBraynard/status/1331299873556086787?s=20; (a) https://twitter.com/MattBraynard/status/1331299873556086787?s=20

Exhibit H

short, tens of thousands of votes did not count while the pattern of fraud and mathematical anomalies that are impossible absent malign human agency makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

129.

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.

130.

**Russell Ramsland confirms that data breaches in the Dominion software permitted rogue actors to penetrate and manipulate the software during the recent general election.  He further concludes that at least 96,600 mail-in ballots were illegally counted as they were not cast by legal voters.**

131.

In sum, as set forth above, for a host of independent reasons, the Georgia certified election results concluding that Joe Biden received 12,670 more votes that President Donald Trump must be set aside.

Exhibit H

# COUNT I

## DEFENDANTS VIOLATED THE ELECTIONS CLAUSE AND 42 U.S.C. § 1983

132.

Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1 (emphasis added).

134.

The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 193.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

Exhibit H

135.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2.  Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

136.

Defendants are not the legislature, and their unilateral decision to create a "cure procedure" violates the Electors and Elections Clauses of the United States Constitution.

137.

The Secretary of State and the State Election Board are not the legislature, and their decision to permit early processing of absentee ballots in direct violation of the unambiguous requirements of O.C.G.A. § 21-2-386(a)(2) violates the Electors and Elections Clauses of the United States Constitution.

67

Exhibit H

138.

Many Affiants testified to many legal infractions in the voting process, including specifically switching absentee ballots or mail-in ballots for Trump to Biden.  Even a Democrat testified in his sworn affidavit that before he was forced to move back to where he could not see, he had in fact seen, "*I also saw absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times*".  (See Exh. 18, Par. 12).

139.

Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request one ranges from 16,938 to 22,771.   This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

140.

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not

68

Exhibit H

be in the database of unreturned ballots analyzed here.  *See* O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

141.

Further, as shown by data collected by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state.  The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

142.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clauses of the Constitution.  Accordingly, the results for President and Congress in the November 3, 2020 election must be set aside.  The results are infected with Constitutional violations.

**COUNT II**

69

Exhibit H

## The Secretary of State and Georgia Counties Violated The Fourteenth Amendment U.S. Const. Amend. XIV, 42 U.S.C. § 1983

### Denial of Equal Protection

### Invalid Enactment of Regulations Affecting Observation and Monitoring of the Election

143.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

144.

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

Exhibit H

145.

The Court has held that to ensure equal protection, a "problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Bush v. Gore*, 531 U.S. 98, 106, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000).

146.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

147.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020, General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

Exhibit H

148.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.* In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore plainly and indisputably unlawful.

Exhibit H

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

149.

A result of a primary or election may be contested on one or more of the following grounds:

150.

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

(2) When the defendant is ineligible for the nomination or office in dispute;

(3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election. O.C.G.A. § 21-2-522.

151.

Several affiants testified to the improper procedures with absentee ballots processing, with the lack of auditable procedures with the logs in the computer systems, which violates Georgia law, and federal election law.  See

73

Exhibit H

also, 50 U.S.C. § 20701 requires the retention and preservation of records and

papers by officers of elections under penalty of fine and imprisonment.

152.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

153.

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been
> written on by people, and the edges were worn. They showed obvious
> use. However, one batch stood out. It was pristine. There was a
> difference in the texture of the paper - it was if they were intended
> for absentee use but had not been used for that purposes. There was
> a difference in the feel.
>
> 15. These different ballots included a slight depressed pre-fold so
> they could be easily folded and unfolded for use in the scanning
> machines. There were no markings on the ballots to show where they
> had com~ from, or where they had been processed. These stood out.
>
> 16. In my 20 years of experience of handling ballots, I observed that
> the markings for the candidates on these ballots were unusually
> uniform, perhaps even with a ballot-marking device.  By my estimate
> in observing these ballots, approximately 98% constituted votes for
> Joe Biden.  I only observed two of these ballots as votes for President
> Donald J. Trump."  (See Exh. 15).

154.

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

74

we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed.  **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.** The Milton precinct received its machines at 1:00 AM in the morning on Election Day.  This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id*.

155.

Defendants have a duty to treat the voting citizens in each County  in the same manner as the citizens in other counties in Georgia.

156.

As set forth in Count I above, Defendants failed to comply with the requirements of the Georgia Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Georgia voters and electors in violation of the United States Constitution guarantee of Equal Protection.

157.

Specifically, Defendants denied the plaintiffs equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Georgia Counties by:

(a) mandating that representatives at the pre-canvass and canvass of all absentee and mail-ballots be either Georgia barred

75

Exhibit H

attorneys or qualified registered electors of the county in which
they sought to observe and monitor;

(b) not allowing watchers and representatives to visibly see and
review all envelopes containing official absentee and mail-in
ballots either at or before they were opened and/or when such
ballots were counted and recorded; and

(c) allowing the use of Dominion Democracy Suite software and
devices, which failed to meet the Dominion Certification Report's
conditions for certification.

158.

Instead, Defendants refused to credential all of the Trump Republican's
submitted watchers and representatives and/or kept Trump Campaign's
watchers and representatives by security and metal barricades from the
areas where the inspection, opening, and counting of absentee and mail-in
ballots were taking place. Consequently, Defendants created a system
whereby it was physically impossible for the candidates and political parties
to view the ballots and verify that illegally cast ballots were not opened and
counted

159.

Many Affiants testified to switching absentee ballots or mail-in ballots
for Trump to Biden, including a Democrat.  He testified in his sworn
affidavit, that before he was forced to move back to where he could not see, he

76

had in fact seen, "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See Exh. 18, Par. 12).

160.

Other Georgia county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Republicans and the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards and without restricting representatives by any county residency or Georgia bar licensure requirements.

161.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

162.

Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.

77

Exhibit H

163.

Defendants further violated Georgia voters' rights to equal protection insofar as Defendants allowed the Georgia counties to process and count ballots in a manner that allowed ineligible ballots to be counted, and through the use of Dominion Democracy Suite, allowed eligible ballots for Trump and McCormick to be switched to Biden or lost altogether.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment and the Georgia Election Code.

164.

Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be enjoined from transmitting Georgia's certified Presidential election results to the Electoral College.  Georgia law forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden, through the unlawful use of Dominion Democracy Suite software and devices.

165.

Alternatively, Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be required to recertify the results declaring that Donald

78

Trump has won the election and  transmitting Georgia's certified Presidential election result in favor of President Trump.

166.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Georgia law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately. O.C.G.A. § 21-2-520 et seq.

167.

In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by: 1) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; 2) all "dead votes"; and 4) all 900 military ballots in Fulton county that supposedly were 100% for Joe Biden.

79

Exhibit H

# COUNT III

## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS

### DISPARATE TREATMENT OF ABSENTEE/MAIL-IN VOTERS AMONG DIFFERENT COUNTIES

168.

Plaintiffs incorporate each of the prior allegations in this Complaint.

Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin*, 570 F.2d at 1077-78. "[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

169.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to executing the laws as passed by the legislature  Although the Georgia General Assembly may enact laws governing the conduct of elections, "no legislative enactment may

80

Exhibit H

contravene the requirements of the Georgia or United States Constitutions."
*Shankey*, 257 A. 2d at 898.

<div align="center">170.</div>

Federal courts "possess broad discretion to fashion an equitable
remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837
F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable
relief, and, if granted, what form it shall take, lies in the discretion of the
district court.").

<div align="center">171.</div>

Moreover, "[t]o the extent that a voter is at risk for having his or her
ballot rejected due to minor errors made in contravention of those
requirements, … the decision to provide a 'notice and opportunity to cure'
procedure to alleviate that risk is one best suited for the Legislature[,] . . .
particularly in light of the open policy questions attendant to that decision,
including what the precise contours of the procedure would be, how the
concomitant burdens would be addressed, and how the procedure would
impact the confidentiality and counting of ballots, all of which are best left to
the legislative branch of Georgia's government." *Id.*

<div align="center">81</div>

<div align="right">Exhibit H</div>

172.

The disparate treatment of Georgia voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

173.

Defendants are not the legislature, and their unilateral decision to create and implement a cure procedure for some but not all absentee and mail-in voters in this State violates the Due Process Clause of the United States Constitution.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

Exhibit H

## COUNT IV

### FOURTEENTH AMENDMENT, U.S. CONST. ART. I § 4, CL. 1; ART. II, § 1, CL. 2; AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS ON THE RIGHT TO VOTE

174.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

175.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at See also *Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell,* 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

83

Exhibit H

176.

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," Burson v. Freeman, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

177.

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

178.

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or

84

fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

179.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

180.

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

181.

In Georgia, the signature verification requirement is a dead letter. The signature rejection rate for the most recent election announced by the Secretary of State was 0.15%. The signature rejection rate for absentee ballot applications was .00167% - only 30 statewide. Hancock County, Georgia,

85

Exhibit H

population 8,348, rejected nine absentee ballot applications for signature mismatch. Fulton County rejected eight. No other metropolitan county in Georgia rejected even a single absentee ballot application for signature mismatch. The state of Colorado, which has run voting by mail for a number of years, has a signature rejection rate of between .52% and .66%.[35] The State of Oregon had a rejection rate of 0.86% in 2016.[36] The State of Washington has a rejection rate of between 1% and 2%.[37] If Georgia rejected absentee ballots at a rate of .52% instead of the actual .15%, approximately 4,600 more absentee ballots would have been rejected.

## COUNT V

## THERE WAS WIDE-SPREAD BALLOT FRAUD.

## OCGA 21-2-522

### 182.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

---

[35] *See* https://duckduckgo.com/?q=colorado+signature+rejection+rate&t=osx&ia=web last visited November 25,2020

[36] *See* https://www.vox.com/21401321/oregon-vote-by-mail-2020-presidential-election, last visited November 25,2020.

[37] *See* https://www.salon.com/2020/09/08/more-than-550000-mail-ballots-rejected-so-far-heres-how-to-make-sure-your-vote-gets-counted/ last visited November 25, 2020.

Exhibit H

183.

Plaintiffs contest the results of Georgia's election, with Standing conferred under pursuant to O.G.C.A. 21-2-521.

184.

Therefore, pursuant to O.G.C.A. 21-2-522, for misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result. The foundational principle that Georgia law "nonetheless allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately." *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga. 193, 194, 835 S.E.2d 245, 248 (2019).   The Georgia Supreme Court has made clear that Plaintiffs need not show how the [] voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result." See OCGA § 21-2-520 et seq., *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) the Supreme Court invalidated an election, and ordered a new election because it found that,

> Thus, [i]t was not incumbent upon [the Plaintiff] to show how the [481] voters would have voted if their [absentee] ballots had been regular. He only had to show that there were enough irregular ballots to place in doubt the result. He succeeded in that task.

Exhibit H

*Id.* at 271 (citing *Howell v. Fears*, 275 Ga. 627, 571 SE2d 392, (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

<div align="center">185.</div>

The "glitches" in the Dominion system—that seem to have the uniform effect of hurting Trump and helping Biden have been widely reported in the press and confirmed by the analysis of independent experts.

<div align="center">186.</div>

Prima facie evidence in multiple affidavits shows specific fraudulent acts, which directly resulted in the flipping of the race at issue:

a) votes being switched in Biden's favor away from Trump during the recount;

b) the lack of procedures in place to follow the election code, and the purchase and use, Dominion Voting System despite evidence of serious vulnerabilities;

c) a demonstration that misrepresentations were made about a pipe burst that sent everyone home, while first six, then three, unknown individuals were left alone until the morning hours working on the machines;

<div align="center">88</div>

<div align="right">Exhibit H</div>

d) further a failure to demonstrate compliance with the Georgia's Election
Codes, in maintaining logs on the Voting system for a genuine and
sound audit, other than voluntary editable logs that prevent genuine
audits.  While the bedrock of this Democratic Republic rests on citizens'
confidence in the validity of our elections and a transparent process,
Georgia's November 3, 2020 General Election remains under a pall of
corruption and irregularity that reflects a pattern of the absence of
mistake.  At best, the evidence so far shows ignorance of the truth; at
worst, it proves a knowing intent to defraud.

187.

Plaintiff's expert also finds that voters received tens of thousands of
ballots that they never requested.  (See Exh. 1, Dr. Briggs' Report).
Specifically, Dr. Briggs found that in the state of Georgia, based on a
statistically significant sample, the expected amount of persons that received
an **absentee ballot that they did not request ranges from 16,938 to
22,771.**  This range exceeds the margin of loss of President Trump by 12,670
votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful
requests.

89

Exhibit H

188.

This widespread pattern, as reflected within the population of

unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality

that, in addition to the calculations herein, third parties voted an untold

number of unlawfully acquired absentee or mail-in ballots, which would not

be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-

522. These unlawfully voted ballots prohibited properly registered persons

from voting and reveal a pattern of widespread fraud.

189.

Further, there exists clear evidence of 20,311 absentee or early voters

in Georgia that voted while registered as having moved out of state.

Specifically, these persons were showing on the National Change of Address

Database (NCOA) as having moved, or as having filed subsequent voter

registration in another state also as evidence that they moved and even

potentially voted in another state.  The 20,311 votes by persons documented

as having moved exceeds the margin by which Donald Trump lost the

election by 7,641 votes.

190.

Plaintiffs" expert Russell Ramsland concludes that at least 96,600

mail-in ballots were fraudulently cast.  He further concludes that up to

90

136,098 ballots were illegally counted as a result of improper manipulation of the Dominion software. (Ramsland Aff).

191.

The very existence of absentee mail in ballots created a heightened opportunity for fraud.  The population of unreturned ballots analyzed by William Briggs, PhD, reveals the probability that a far greater number of mail ballots were requested by 3rd parties or sent erroneously to persons and voted fraudulently, undetected by a failed system of signature verification. The recipients may have voted in the name of another person, may have not had the legal right to vote and voted anyway, or may have not received the ballot at the proper address and then found that they were unable to vote at the polls, except provisionally, due to a ballot outstanding in their name.

192.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin of votes between the presidential candidates in the

Exhibit H

state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

<center>193.</center>

The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

<center>194.</center>

Plaintiffs have no adequate remedy at law.  As seen from the expert analysis of William Higgs, PhD, based on actual voter data, tens of thousands of votes did not count, and tens of thousands of votes were unlawfully requested.

<center>92</center>

Exhibit H

195.

The Fourteenth Amendment Due Process Clause protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978).

196.

Separate from the Equal Protection Clause, the Fourteenth Amendment's due process clause protects the fundamental right to vote against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Florida State  Conference  of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (*quoting Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (*citing Curry v. Baker*, 802 F.2d  1302, 1315 (11th Cir.1986))). *See also Griffin*, 570 F.2d at 1077 ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

Exhibit H

197.

Part of courts' justification for such a ruling is the Supreme Court's recognition that the right to vote and to free and fair elections is one that is preservative of other basic civil and political rights. *See Black*, 209 F.Supp.2d at 900 (quoting *Reynolds*, 377 U.S. at 561-62 ("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")); see also *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is regarded as a fundamental political right, because [sic] preservative of all rights.").

198.

"[T]he right to vote, the right to have one's vote counted, and the right to have ones vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the Constitution of the United States." Black, 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process). "Just as the equal protection clause of the Fourteenth Amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the Fourteenth amendment forbids state

94

Exhibit H

officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704.  "Having once granted the right to vote on equal terms, [Defendants] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

<div align="center">199.</div>

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

<div align="center">200.</div>

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties, including without limitation Plaintiff, Republicans, and the Trump Campaign, shall be "present" and have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

<div align="center">95</div>

<div align="right">Exhibit H</div>

201.

Defendants have a duty to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.  Rather than heeding these mandates and duties, Defendants arbitrarily and capriciously denied the Trump Campaign and Republicans meaningful access to observe and monitor the electoral process by: (a) mandating that representatives at the pre- canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor; and (b) not allowing watchers and representatives to visibly see and review all envelopes containing official absentee and mail-in ballots either at the time or before they were opened and/or when such ballots were counted and recorded. Instead, Defendants refused to credential all of the Trump Campaign's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. The lack of meaningful access with actual access to see the ballots invited further fraud and cast doubt of the validity of the proceedings.

Exhibit H

202.

Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted.

203.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, and included the unlawfully not counting and including uncounted mail ballots, and that they failed to follow absentee ballot requirements when thousands of **voters received ballots that they never requested.** Defendants have acted and will continue to act under color of state law to violate the right to vote and due process as secured by the Fourteenth Amendment to the United States Constitution.

204.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

205.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these

Exhibit H

unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

206.

Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the Presidential electors for the state of Georgia should be disqualified from counting toward the 2020 election.

207.

The United States Code (3 U.S.C. 5) provides that,

"[i]f any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

3 USCS § 5.

Exhibit H

## REQUEST FOR RELIEF

208.

Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

209.

In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, or (iii) are delivered in-person by third parties for non-disabled voters.

210.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented

99

Exhibit H

proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the state of Georgia should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Georgia should be directed to vote for President Donald Trump.

<div align="center">211.</div>

For these reasons,  Plaintiff asks this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Kemp, Secretary Raffensperger and the Georgia State Board of Elections to de-certify the election results;

2. An order enjoining Governor Kemp from transmitting the currently certified election results to the Electoral College;

3. An order requiring Governor Kemp to transmit certified election results that state that President Donald Trump is the winner of the election;

<div align="center">100</div>

Exhibit H

4. An immediate order to impound all the voting machines and software in Georgia for expert inspection by the Plaintiffs.

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6. A declaratory judgment declaring that Georgia Secretary of State Rule  183-1-14-0.9-.15 violates the Electors and Elections Clause, U.S. CONST. art. I, § 4;

7. A declaratory judgment declaring that Georgia's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

8. A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

9. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

Exhibit H

10.    An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by plaintiffs' expects;

11.    A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

12.    A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

13.    Immediate production of 36 hours of security camera recording of all rooms used in the voting process at State Farm Arena in Fulton County, GA from 12:00am to 3:00am until 6:00pm on November 3.

14.    Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 25th day of November, 2020.

Exhibit H

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile
hmacdougald@cpdlawyers.com
Counsel for Plaintiffs

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
Julia Z. Haller *
Emily P. Newman*
Virginia Bar License No. 84265
2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler*
NEW YORK BAR NO. 2657120Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
Office (917) 793-1188
Mobile (347) 840-2188
howard@kleinhendler.com
www.kleinhendler.com

103

Exhibit H

*Application for admission pro hac vice
Forthcoming

*Attorneys for Plaintiffs*

Exhibit H

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-14480

_____

D.C. Docket No. 1:20-cv-04809-TCB

CORECO JA'QUAN PEARSON, et al.,

Plaintiff - Appellants,

versus

BRIAN KEMP, et al.,

Defendant - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 4, 2020)

Before WILSON, ROSENBAUM, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal arises from last-minute litigation that alleges widespread election-related misconduct and seeks sweeping relief. The issue before us, however, is a narrow question of appellate jurisdiction: has the district court entered an order that

Exhibit I

we have jurisdiction to review? Because the answer to that question is "no," we must dismiss this appeal for lack of jurisdiction and allow the proceedings to continue in the district court.

## I.    BACKGROUND

The plaintiffs in this case are a group of Presidential Electors from Georgia. On the Wednesday before Thanksgiving, they sued Georgia's Governor, its Secretary of State, and other defendants. They asserted that Georgia's certified 2020 Presidential Election results were suspect because of alleged vulnerabilities in Georgia's election machines and alleged mathematical and statistical anomalies in the vote count. Two days later—the Friday after Thanksgiving—the plaintiffs filed a motion for injunctive relief, seeking (1) a temporary restraining order preventing the defendants from erasing or altering forensic data on voting machines, (2) an injunction de-certifying the Presidential election results, or alternatively a stay in the delivery of the certified results to the Electoral College, and (3) an injunction making the voting machines available to the plaintiffs for forensic analysis.

The district court took the complaint and motion seriously and, on Sunday night, held a hearing on the plaintiffs' motion via Zoom. There, the plaintiffs' counsel explained that the evidence the plaintiffs hoped to collect from Georgia's voting machines might be permanently lost if the defendants were not immediately enjoined from altering the machines, since those machines needed to be recalibrated

Exhibit I

for upcoming state and local runoff elections. Rather than waiting for a ruling on the motion for injunctive relief that covered ten counties, the plaintiffs proposed that the district court order "very limited" relief in "two or three counties." This solution would allow the plaintiffs to quickly collect the data they sought without impeding the runoff elections. The district judge agreed with the plaintiffs, and said that he would "order and temporarily restrain the Defendants . . . from altering or destroying or erasing[,] or allowing the alteration, destruction, or erasing of any of the computer information on any of the [voting] machines" in Cobb, Gwinnett, and Cherokee Counties.

True to his word, the district judge issued a written temporary restraining order on Sunday night that gave the plaintiffs what they said they wanted. That order enjoined the defendants from erasing or altering data on voting machines in the three counties listed above. It also ordered the defendants to produce a copy of the contract between the State of Georgia and Dominion Voting Systems. Two follow-up orders set an expedited evidentiary hearing for the morning of December 4, 2020 on the broader relief requested in the plaintiffs' motion and certified that the Sunday night order contained the elements required for a permissive appeal under 28 U.S.C. § 1292(b).

A few days later, the plaintiffs filed a notice of appeal as to the district court's Sunday night order. As a result, the district court canceled the hearing on the broader

Exhibit I

relief the plaintiffs had requested. The defendants filed a conditional cross-appeal. Later, the plaintiffs also requested permission to appeal in this Court under 28 U.S.C. § 1292(b).

## II.     DISCUSSION

In our judicial system, the district court is the central forum for testing, advancing, proving, or disproving a party's allegations. It is where trials take place and the parties present their evidence. As a court of appeals, "we are a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718, n.7 (2005). Typically, we enter the picture only after the district court has considered the parties' competing positions and a winner has emerged. Less frequently, we review preliminary injunctions or orders that ask a particularly important, purely legal question.

The district court has not issued one of those appealable orders. In this case, the district court issued an emergency temporary restraining order at the plaintiffs' request, worked at a breakneck pace to provide them an opportunity for broader relief, and was ready to enter an appealable order on the merits of their claims immediately after its expedited hearing on December 4, 2020. But the plaintiffs would not take the district court's "yes" for an answer. They appealed instead. And, because they appealed, the evidentiary hearing has been stayed and the case

Exhibit I

considerably delayed. For our part, the law requires that we dismiss the appeal and return the case to the district court for further proceedings.

### A. The Sunday night order is not appealable under 28 U.S.C. §§ 1291 or 1292(a)(1)

We begin with the obvious: we cannot exercise our customary appellate jurisdiction because the district court has not entered a final judgment. *See* 28 U.S.C. § 1291. A final judgment is a decision that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Ray Haluch Gravel Co. v. Centr. Pension Fund of Operating Eng'rs and Participating Emp'rs*, 571 U.S. 177, 183 (2014). An appeal from a final judgment may be taken as a matter of right. *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 407 (2015).

The plaintiffs concede no final judgment has been entered in this case. Instead, the plaintiffs argue that the district court's Sunday night order is immediately appealable as an order denying their request for a temporary restraining order. The plaintiffs argue that that—even though the Sunday night order granted their request for a temporary restraining order in part and did not, on its face, deny anything—the order *effectively* denied their request because of the exigent circumstances involved. This argument fails for three reasons.

First, the district court's order does not deny the plaintiffs their requested relief at all. The plaintiffs filed their motion on the Friday after Thanksgiving. The district court held an emergency hearing over the weekend and, on Sunday,

Exhibit I

November 29th, entered a TRO granting the plaintiffs' request in part. Notably, this Sunday night order gave the plaintiffs almost exactly what their counsel proposed as a temporary solution at the hearing: it "identif[ied] a very limited . . . number of counties" and enjoined the defendants from erasing or altering data contained on Dominion voting machines in those counties, thus, preserving them for future inspection. The district court then set an expedited briefing schedule and an emergency evidentiary hearing for December 4th. The purpose of the briefing schedule was to allow the defendants an opportunity to respond to the plaintiffs' allegations. And the purpose of the evidentiary hearing was to allow the plaintiffs to support their allegations with evidence and, potentially, to win the injunctive relief that they were seeking. Nothing about that chain of events suggests an adverse ruling on the plaintiffs' motion.

Second, even if the district court's order were properly construed as the denial of the plaintiffs' request—again, ignoring the fact that it did not deny anything—we do not ordinarily have jurisdiction over TRO rulings. *McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir. 1986). We exercise appellate jurisdiction over TRO decisions only "when a grant or denial of a TRO might have a serious, perhaps irreparable, consequence, and can be effectually challenged only by immediate appeal[.]" *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (quoting *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir.1995)). This is a high hurdle for

Exhibit I

appellants to clear, and our caselaw provides for emergency appeals from TRO decisions only in the direst of circumstances. In *Ingram*, we permitted an appeal where a prisoner was set to be executed within twenty-four hours of a TRO being denied. *Ingram*, 50 F.3d at 899-900. In *Schiavo*, we permitted an appeal where a court denied a TRO that would have put a terminally ill patient back on life support. *Schiavo*, 403 F.3d at 1225.

The plaintiffs here are not in the same position as an inmate about to be executed or a patient removed from life support. The "irreparable" harm threatened here is that voting machines will be "wiped," erasing the data they contain and preventing the plaintiffs from conducting the forensic inspection they request. But the plaintiffs have not demonstrated that the alleged harm is imminent—that the defendants would have wiped all these machines county-by-county, destroying all the data they contain, unless the district court had granted broader relief on Sunday night. In fact, the district court's order was specifically designed to avoid this consequence by enjoining the defendants from erasing or altering data on the machines in three counties. It preserved the status quo in a way that gave the plaintiffs what they said they wanted and was minimally disruptive to the State of Georgia's ability to conduct special run-off elections in other counties. Nothing compelled an immediate appeal: had the plaintiffs not appealed the district court's Sunday night order, the district court would have held the evidentiary hearing it set

7

Exhibit I

for December 4th and, by now, would likely have ruled on the plaintiffs' broader request for injunctive relief. Afterwards, the plaintiffs could have appealed.

Third, and for many of the same reasons, the district court's Sunday night order was not an appealable preliminary injunction order masquerading as a ruling on a request for a TRO. To determine whether an order denominated as a TRO is actually an appealable decision on a preliminary injunction, we review certain factors including "the duration of the order" and "the extent of evidence submitted to the district court." *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995). The Sunday night order lacks the hallmarks of a preliminary injunction ruling. It does not engage the traditional four-factor test for granting preliminary injunctions. Its duration is limited to ten days. And, although some evidence has been submitted to the district court, no live witnesses have testified, no discovery has been conducted, and the defendants have not even had a chance to file a response to the complaint.

**B. The Sunday night order is not appealable under 28 U.S.C. § 1292(b)**

Alternatively, the plaintiffs ask that we permit them to appeal under 28 U.S.C. § 1292(b). Where no other avenue of appeal is open, Section 1292(b) allows a court of appeals to exercise jurisdiction under certain specified conditions. *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994). Review under this statute was "intended, and should be reserved, for situations in which the court of appeals

Exhibit I

can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts" and should not, in contrast, turn on case-specific inquiries, such as "whether the district court properly applied settled law to the facts or evidence of a particular case." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). This Court has identified five conditions necessary for it to consider an issue in an interlocutory appeal under Section 1292(b): "(1) the issue is a pure question of law, (2) the issue is controlling of at least a substantial part of the case, (3) the issue was specified by the district court in its order, (4) there are substantial grounds for difference of opinion on the issue, and (5) resolution may well substantially reduce the amount of litigation necessary on remand." *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016) (quotation marks omitted).

This avenue of appellate jurisdiction is also closed. The case does not meet our criteria for Section 1292(b) interlocutory review for at least three reasons.

First, Section 1292(b) does not countenance an interlocutory appeal at this point in the case. The district court's Sunday night order was entered after only a weekend's worth of litigation and does not conclusively answer any legal questions. *Cf. Ray v. American Nat. Red Cross*, 921 F.2d 324, 325 (D.C. Cir. 1990) (no appeal when the district court certified the question under § 1292(b) without first deciding it). Perhaps for that reason, the order certifies that the case involves a

9

Exhibit I

controlling question of law but does not identify what that question is. *See McFarlin*, 381 F.3d at 1264 ("If the district court is unsure about which of the questions, if any, that are answered by its order qualify for certification under § 1292(b), it should not certify the order for review. If convinced that a particular question does qualify, the district court should tell us which question it is."). And, most problematic in our view, the parties intended to present more evidence on the issues addressed in the district court's order, and the district court scheduled briefs and a hearing to allow it. We cannot use Section 1292(b) to "offer advisory opinions rendered on hypotheses which evaporate in the light of full factual development." *Paschall v. Kansas City Star Co.*, 605 F.2d 403, 406 (8th Cir. 1979) (cleaned up).

Second, we are not convinced the primary question the plaintiffs suggest we answer—whether county-level election officials are the proper defendants to redress the plaintiffs' alleged injuries—is a "pure or abstract legal question" that can be "stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case." *McFarlin*, 381 F.3d at 1259, 1262. This issue goes to the redressability element of standing. "Standing for Article III purposes requires a plaintiff to provide evidence of an injury in fact, causation and redressability." *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010). A court must assess standing by making "a legal determination based on the facts established by the record." *Church of Scientology Flag Serv. Org., Inc. v. City of*

Exhibit I

*Clearwater*, 777 F.2d 598, 607 n.24 (11th Cir. 1985). The facts have played a role in evaluating redressability in other election litigation,[1] and they could also play a role here. Because the plaintiffs' appeal asks us to apply "settled law to the facts or evidence of [this] particular case," it is "the antithesis of a proper § 1292(b) appeal." *McFarlin*, 381 F.3d at 1259.

Third, a decision about whether the plaintiffs need to sue county officials will not cut short the case. If the answer is that the plaintiffs do not need to add these defendants, then the case will continue as is. If the answer is that the plaintiffs must add these defendants, the case will continue with additional defendants. We have "little doubt that a question is not controlling" if the litigation "can readily be accommodated to whatever ruling is made." 16 C. Wright & A. Miller, Federal Practice & Procedure § 3930 (3d ed. 2020).

## III.   CONCLUSION

Because we lack jurisdiction, the appeal is **DISMISSED** and the motion for permissive appeal is **DENIED**. Because we must dismiss this appeal, the defendants' conditional cross appeal is also **DISMISSED**. Any other pending motions are **DENIED AS MOOT**.

---

[1] Both parties cite our recent decision in *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020), where the Florida Secretary of State argued that she could not remedy the alleged problem and we held that "no contrary evidence" established otherwise. *Id.* at 1253. *See also id.* at 1254 ("absence of any evidence"), 1255 ("not proved"), 1255 ("not established"), 1257 ("no contrary evidence").

Exhibit I

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 04, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-14480-RR
Case Style:  Coreco Pearson, et al v. Gov. of the State of Georgia, et al
District Court Docket No:  1:20-cv-04809-TCB

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF")
system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF
system by registering for an account at www.pacer.gov. Information and training materials related to
electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today
in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later
date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for
rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate
filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the
time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content
of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list
of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-
1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition
for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time
spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of
a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404)
335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the
signature block below. For all other questions, please call Regina A. Veals-Gillis, RR at (404) 335-6163.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion

Exhibit I

20-14480  Pearson, et al. v. Governor of Georgia, et al.


ERRATA:


Corrected spelling of "Presidential" on p. 2.

Exhibit I

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN and DERRICK VAN
ORDEN,

                                             CASE NO.  2:20-cv-1771

            **Plaintiffs.**

      **v.**

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMAN,
JULIE M. GLANCEY, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS, in
his official capacity,

            **Defendants.**

_____

### COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

_____

## NATURE OF THE ACTION

1. This civil action brings to light a massive election fraud, multiple violations of the Wisconsin Election Code, *see, e.g.,* Wis. Stat. §§ 5.03, *et. seq.*, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution.  These violations occurred during the 2020 General Election throughout the State of Wisconsin, as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2. The scheme and artifice to defraud was for the purpose of illegally and fraudulently

Exhibit J

manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  This Complaint details an especially egregious range of conduct in Milwaukee County and the City of Milwaukee, along with Dane County, La Crosse County, Waukesha County, St. Croix County, Washington County, Bayfield County, Ozaukee County and various other counties throughout the Third District and throughout Wisconsin employing Dominion Systems, though this conduct occurred throughout the State at the direction of Wisconsin state election officials.

3. The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin, that collectively add up to multiples of Biden's purported lead in the State of 20,565 votes.

4. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief requested herein.

Exhibit J

**Dominion Voting Systems Fraud and Manipulation**

5.  The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Wisconsin Board of State Canvassers.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6.  Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report").  Notably, Chavez "won" every election thereafter.

7.  As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic.  The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.  . . .
>
> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the

3

Exhibit J

entire system.  *Id.* ¶¶ 10 & 14.

8.   A core requirement of the Smartmatic software design ultimately adopted by Dominion for Wisconsin's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9.   The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[1]

10.  This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties or hostile foreign actors to access the system and manipulate election results, and moreover potentially to

---

[1]   *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia).  The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 9, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

Exhibit J

cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code (pursuant to Wisconsin Statute § 5.905) is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records.  See 52 U.S.C. § 20701.

11.  These and other problems with Dominion's software have been widely reported in the press and been the subject of  investigations. In certifying Dominion Voting Systems Democracy Suite, Wisconsin officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation.  Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation.  (See Exhs 11 A and B).

12.  An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[2]

13.  In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud that occurred as a direct result of Defendant Wisconsin Election Commission ("WEC") and other Defendants directing Wisconsin clerks and other election officials to ignore or violate the express requirements of the Wisconsin Election Code.

---

[2] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Exh. 10 ("Appel Study")).

Exhibit J

First, the WEC issued "guidance" to county and municipal clerks not to reject "indefinitely confined" absentee voters, even if the clerks possess "reliable information" that the voter is no longer indefinitely confined, in direct contravention of Wisconsin Statute § 6.86(2)(6), which states that clerks must remove such voters.  Second, the WEC issued further guidance directing clerks – in violation of Wisconsin Statute § 6.87(6)(d), which states that an absentee envelope certification "is missing the address of a witness, the ballot may not be counted" – to instead fill in the missing address information.

14.  This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

   A.  A report from Dr. William Briggs, showing that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots;

   B.  Reports from Redacted Expert Witnesses who can show an algorithm was used to pick a winner.

15.  In the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  (See Ex. 12, copy of redacted witness affidavit).

16.  These and other "irregularities" demonstrate that at least 318,012 illegal ballots were counted in Wisconsin.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

17.  This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties

Exhibit J

of the United States."

18.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

19.   The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

20.   This Court has jurisdiction over the related Wisconsin constitutional claims and state-law claims under 28 U.S.C. § 1367.

21.   Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

22.   Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

### THE PARTIES

23.   Plaintiff William Feehan, is a registered Wisconsin voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin.  Mr. Feehan is a resident of the City of La Crosse and La Crosse County, Wisconsin.

24.   Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions

Exhibit J

of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

25.   Plaintiff Feehan has standing to bring this action as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq (election procedures for Wisconsin electors).  As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

26.   Plaintiff Derrick Van Orden is a former United States Navy SEAL, who was the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the United States House of Representatives.  Mr. Van Orden is a resident of Hager City, Pierce County, Wisconsin.

27.   Mr. Van Orden "lost" by approximately 10,000 votes to the Democrat incumbent, U.S. Representative Ron Kind.  Because of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code.

28.   Plaintiff Van Orden has standing as the ostensible "defeated" candidate in the Third Congressional District race, and seeks an order for a new election, complying with Wisconsin election law.  Plaintiff Van Order received 189,524 votes or 48.67% as tallied versus Ron Kind who received 199,870 or 51.33% of the votes as reportedly tallied.

Exhibit J

29.   Plaintiffs brings this action to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin and to obtain the other declaratory and injunctive relief requested herein.  Those results were certified by Defendants on November 30, 2020, indicating a plurality for Mr. Biden of 20,565 votes out of 3,240,867 cast.

30.   The Defendants are Wisconsin Elections Commission ("WEC"), a state agency, and its members Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., in their official capacities

31.   Defendant Governor Tony Evers is named as a defendant in his official capacity as Wisconsin's governor.

32.   Defendant WEC was created in 2015 by the Wisconsin Legislature as an independent agency under the Executive branch to administer Wisconsin's election laws. Wis. Stat.  §§ 5.03 & 15.61.  The WEC is authorized to adopt administrative rules pursuant to Chapter 227 of the Wisconsin Statutes, but nothing under Wisconsin's election laws authorizes the WEC to issue any documents, make any oral determinations or instruct governmental officials administering elections to perform any act contrary to Wisconsin law governing elections.

33.   Furthermore, the Wisconsin Legislature also created municipal elections commissions for municipalities with a population greater than 500,000 and a county elections commissions for counties with a population greater than 750,000.  Wis Stat.  § 7.20.  As a result, the City of Milwaukee Elections Commission was created as well as the Milwaukee County Elections Commission and the Dane County Elections Commission. These county and municipal elections commissions are responsible for administering the elections in their respective jurisdictions.

Exhibit J

**STATEMENT OF FACTS**

34.  Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Wisconsin Constitution.

35.  The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.

> U.S. CONST. art. I, § 4 ("Elections Clause").

36.  With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

> U.S. CONST. art. II, § 1 ("Electors Clause").

37.  None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38.  The WEC certified the Presidential Election results on November 30, 2020.  The Presidential election results in Wisconsin show a difference of 20,565 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

Exhibit J

39.   Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

## I.   VIOLATIONS OF WISCONSIN ELECTION CODE

### A.   WEC Directed Clerks to Violate Wisconsin Election Code Requirements for Absentee Voting by "Indefinitely Confined" without Photo ID.

40.   The Wisconsin State Legislature adopted Act 23 in 2011 to require Wisconsin electors to present an identification containing a photograph, such as a driver's license, to either a municipal or county clerk, when registering to vote and when voting. Wis. Stat. §§ 6.34; 6.79 (2). The Wisconsin State Legislature adopted the photo ID requirement to deter the casting of ballots by persons either not eligible to vote or persons fraudulently casting multiple ballots. *League of Women Voters of Wisconsin Education Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

41.   Wisconsin's absentee voting is governed by Wisconsin Statutes § 6.84 - § 6.89.   Under Wisconsin Statutes §6.86, every absentee elector applicant must present a photo ID when registering to vote absentee except absentee voters who registered as "indefinitely confined," Wis. Stat. §6.86 (ac), meaning someone confined "because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. § 6.86(2)(a). As a result, Wisconsin election procedures for voting absentee based on "indefinitely confined" status circumvent the photo ID requirement, creating an avenue for fraudulent voting.

42.   In order to ensure that only those who are "indefinitely confined" may use the "indefinitely confined" absentee ballot in an election, Wisconsin Statutes §6.86 provides that any elector who files an application for an absentee ballot based on indefinitely confined status may not use the absentee ballot if the electoral is no longer "indefinitely confined."   Wisconsin Statutes § 6.86 (2)(b) further

11

Exhibit J

provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

43.   Despite this clear statutory requirement, the Administrator of the Wisconsin Election Commission, Meagan Wolfe, issued a written directive on May 13, 2020 to the clerks across the State of Wisconsin stating that the clerks cannot remove an allegedly "indefinitely confined" absentee voter from the absentee voter register if the clerk had "reliable information" that an allegedly "indefinitely confined" absentee voter is no longer "indefinitely confined." The directive specifically stated:

> Can I deactivate an absentee request if I believe the voter is not indefinitely confined? No. All changes to status must be made in writing and by the voter's request. Not all medical illnesses or disabilities are visible or may only impact the voter intermittently.  (*See* WEC May 13, 2020 Guidance Memorandum).

44.   The WEC's directive thus directly contradicts Wisconsin law, which specifically provides that clerks "shall" remove an indefinitely confined voter from the absentee voter list if the clerk obtains "reliable information" that the voter is no longer indefinitely confined.

45.   As a result of the directive, clerks did not remove from the absentee voter lists maintained by their jurisdictions the absentee voters who claimed "indefinitely confined" status but who in fact were no longer "indefinitely confined."   This resulted in electors who were allegedly "indefinitely confined" absentee voters casting ballots as "indefinitely confined" absentee voters who were not actually "indefinitely confined" absentee voters.

### B. WEC Directed Clerks to Violate Wisconsin Law Prohibiting Counting of Absentee Ballot Certificates Missing Witness Addresses.

46.   In 2015, the Wisconsin Legislature passed Act 261, amending Wisconsin's election laws, including a requirement, codified as Wisconsin Statute § 6.87(d), that absentee ballots include both

Exhibit J

elector and witness certifications, which must include the address of the witness.   If the address of the witness is missing from the witness certification, however, "the ballot may not be counted." *Id.*

47.   On October 18, 2016, WEC reacted to this legislation by issuing a memorandum, which, among other things, permitted clerks to write in the witness address onto the absentee ballot certificate itself, effectively nullifying this express requirement. (*See* WEC October 18, 2016 Guidance Memorandum).   Wisconsin election officials reiterated this unlawful directive in publicly posted training videos.  For example, in a Youtube video posted before the November 3, 2020 General Election by Clarie Woodall-Voog of the Milwaukee Elections Commission, Ms. Woodall-Voog advised clerks that missing items "like witness address may be written in red."[3]

### C.  WEC Directed Clerks to Illegally Cure Absentee Ballots by Filling in Missing Information on Absentee Ballot Certificates and Envelopes.

48.   On October 19, 2020, WEC instructed its clerks that, without any legal basis in the Wisconsin Election Code, they could simply fill in missing witness or voter certification information using, e.g., personal knowledge, voter registration information, or calling the voter or witness.  The WEC further advised that voters or witnesses could cure any missing information at the polling place, again without citing any authority to do so under Wisconsin Election Code.

### II. EXPERT WITNESS TESTIMONY: EVIDENCE OF WIDESPREAD VOTER FRAUD

### A.  Approximately 15,000 Wisconsin Mail-In Ballots Were Lost, and Approximately 18,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

49.   The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Wisconsin voters collected by Matt Braynard,

---

[3] *See* https://www.youtube.com/watch?v=hbm-pPaYiqk (video a 10:43 to 11:07).

Exhibit J

which was conducted from November 15-17, 2020.  *See* Ex. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey").  The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.*  Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 96,771 unreturned mail-in ballots for the State of Wisconsin.

50.  With respect to **Error #1**, Dr. Briggs' analysis estimated that **16,316-19,273 ballots** out of the total 96,771 unreturned ballots were recorded for voters who had **not** requested them.  *Id.*  With respect to **Error #2**, he found **13,991 – 16,757 ballots** out of 96,771 unreturned ballots recorded for voters who **did return their ballots were recorded as being unreturned.**  *Id.* Taking the average of the two types of errors together, **29,594 ballots, or 31% of the total, are "troublesome."**

51.  These errors are not only conclusive evidence of widespread fraud by the State of Wisconsin, but they are fully consistent with the fact witness statements cited above regarding the evidence about Dominion presented below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

52.  With respect to **Error #1**, Dr. Briggs' analysis demonstrates that approximately **17,795 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.

Exhibit J

Regarding ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.

53.   With respect to **Error #2**, Dr. Briggs' analysis indicates that approximately **15,374 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.**  Dr. Briggs' analysis shows that 31% of "unreturned ballots" suffer from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 45%) – and provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

### B.   Nearly 7,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Wisconsin.

54.   Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.  Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.  The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.[4]

### C.   A Statistical Study Reveals that Biden Overperformed in those Precincts that Relied on Dominion Voting Machines

55.   From November 13th, 2020 through November 28th, 2020, the Affiant conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election.  This data

---

[4] Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20.  This Complaint includes a copy of his Report, (attached hereto as Exh. 3).

Exhibit J

included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee.  The Affiant's analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting machines provided by Dominion Voting Systems.   These red flags occurred in several States in the country, including Wisconsin.  (See attached hereto as Exh. 4, copy of redacted Affiant, B.S. Mathematics and M.S. Statistics).

56.  The Affiant began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias.  Affiant posed the following question: "Do any voting machine types appear to have unusual results?"   The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results.  *Id.*

57.  Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Wisconsin. The results from the vast majority of counties using the Dominion machines is 3 to 5.6 percentage points higher in favor of candidate Biden.  This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties.  The results from "Dominion" counties do not match the results from the rest of the counties in the United States.  The results are clearly statistically significant, with a p-value of < 0.00004.  This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring. This pattern appears in multiple States, including Wisconsin, and the margin of votes implied by the unusual activity would easily sway the election results.  *Id.*

58.  The following graph shows the pattern.  The large red dots are counties in Wisconsin that use Dominion voting machines.  Almost all of them are above the blue prediction line, when in

Exhibit J

normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline). The p-value of statistical analysis regarding the centerline for the red dots (Wisconsin counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random" statistical anomaly. Some external force caused this anomaly:



*Id.*

59. To confirm that Dominion machines were the source of the pattern/anomaly, Affiant conducted further analysis using propensity scoring using U.S. census variables (including ethnicities, income, professions, population density and other social/economic data), which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so

17

Exhibit J

abnormalities in the margin for Biden are driven by other characteristics unrelated to the election. *Id.*

60.   After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines.  This approach again showed a highly statistically significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county.   The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines.  Id.

61.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points.  **Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440.**  *Id.*

62.   The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- returned ballots that were deemed unreturned by the state: 15,374

- unreturned mail ballots unlawfully ordered by third parties: 17,795

- votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 6,966

- Votes that were improperly relying on the "indefinitely confined" exemption to voter ID:  96,437

- And excess votes arising from the statistically significant outperformance of Dominion machines on behalf of Joe Biden: 181,440

Exhibit J

*In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.*

## III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

63. The State of Wisconsin, in many locations, used either Sequoia, a subsidiary of Dominion Systems, and or Dominion Systems, Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: *"dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."* (See Exh. 5, attached hereto, a copy of the Equipment for WI election systems).

### A. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

64. Affiant Keshel's findings that reflect the discussion cited above:

While Milwaukee County is focal for transparency and observation violations, including reporting statistically impossible vote counts in the early morning hours away from scrutiny, Dane County has surged far past support totals for President Obama, despite expected difficulties mobilizing student voters to polls. President Trump has reconsolidated the Republican base in suburban Milwaukee and far surpassed his 2016 support levels but has been limited in margin growth by historically improbable Democratic support in these strongholds, which defy years of data in Wisconsin in which the Republican party surged as the Democratic Party plunged. Finally, in strong Trump counties showing a double inversion cycle (one party up, the other down), particularly in rural and exurban Wisconsin, Trump's totals are soaring, and against established trends, Biden's totals are at improbable levels of support despite lacking registration population
(*See* attached hereto, Exh. 9, Aff. of Seth Keshel, MBA)

Exhibit J

| County | Rep '08 | Dem '08 | Rep '12 | Dem '12 | Rep '16 | Dem '16 | Rep '20 | Dem '20 | Dem Percentage of Obama 2008 Votes |
|---|---|---|---|---|---|---|---|---|---|
| Ozaukee | 32,172 | 20,579 | 36,077 | 19,159 | 30,464 | 20,170 | 33,912 | 26,515 | 128.8% |
| % Increase | N/A | N/A | 12.1% | (6.9%) | (15.6%) | 5.3% | 11.3% | 31.5% | |
| ---- | | | | | | | | | |
| Dane | 73,065 | 205,984 | 83,644 | 216,071 | 71,275 | 217,697 | 78,789 | 260,157 | 126.3% |
| % Increase | N/A | N/A | 14.5% | 4.9% | (14.8%) | 0.8% | 10.5% | 19.5% | |
| ---- | | | | | | | | | |
| Waukesha | 145,152 | 85,339 | 162,798 | 78,779 | 142,543 | 79,224 | 159,633 | 103,867 | 121.7% |
| % Increase | N/A | N/A | 12.2% | (7.7%) | (12.4%) | 0.6% | 12.0% | 31.1% | |
| ---- | | | | | | | | | |
| Racine | 45,954 | 53,408 | 49,347 | 53,008 | 46,681 | 42,641 | 54,475 | 50,154 | 117.6% |
| % Increase | N/A | N/A | 7.4% | (0.7%) | (5.4%) | (19.6%) | 16.7% | 17.6% | |

*Id.*

65.  Keshel provides a graph reflecting the voter returns in a time-series.  The highly unlikely and remarkably convenient attainment of this block of votes provides for a stunning depiction of the election and generates many questions.  The analysis provided by Plaintiffs' multiple experts, including data, statistics and cyber, will reveal clear evidence of the multiple frauds that combined to change the outcome of the 2020 election.

Exhibit J



*See Id.*

## B. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

66. **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

67. **Texas.** The same Dominion Democracy Suite was denied certification in Texas by the

Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[5]

68. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

69. A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised. Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper**

---

[5] See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Exhibit J

**ballot**;" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).  Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

See Order, pp. 81-82. (Emphasis added).

70.  This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to

Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir.

2018). The Court found,

> **In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.**

*Id.at* 1294-1295.

71.  The expert witness in the above litigation in the United States District Court of

Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security

vulnerabilities, *see* Ex. 107, wherein he testified or found:

A.  "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security

Exhibit J

risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### C. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### 1. Evidence of Vulnerability to Foreign Hackers.

72. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY

ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified**

**Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

24

Exhibit J

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Exh. 18.)

73.  An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China.  (*See* Exh. 1, Spider Declaration, (who remains redacted for security reasons).)

74.  The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  (See Exh. 12, Spider Declaration. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

75.  Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.  She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries. On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…

(See Exh. 13, Aff. of Computer analysis, at par. 32).

76. The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that

Exhibit J

Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)"

77.  This Declarant further explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

> (See Id. at ¶32).

78.  This Declarant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and specifically the port that Wisconsin uses:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers. Wisconsin Port.

> China is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server [for] Dominion Software.

> (See Id. at par. 21).

79.  The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

Exhibit J

**The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot.  Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX."  (*See Id*. at pars. 67-69)

"The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id*. at par. 73)

### 2. Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

80.  An expert analysis by Russ Ramsland agrees with the data reflecting the use of an algorithm that causes the spike in the data feed, which is shown to be an injection of votes to change the outcome, because natural reporting does not appear in such a way.

81.  And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl -- and was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

82.  The report concludes that **"**Based on the foregoing, I believe these statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the

27

Exhibit J

vote count in Wisconsin, in particular for candidates for President contain at least 119,430 (Para. 13) up to 384,085 (Para. 15) illegal votes that must be disregarded.  In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States."

### The History of Dominion Voting Systems

83.  Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

> Applicant: SMARTMATIC, CORP.
>
> Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[6]

84.  Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed.  She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

### 3.  US Government Warnings Regarding Hacking by Hostile Foreign Governments.

85.  In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI

---

[6] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

Exhibit J

assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(See Ex. 18, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

### D.   Additional Independent Findings of Dominion Flaws.

86.   Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1.   Central Operator Can Remove, Discard or Manipulate Votes.

87.   Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Ex. 106, Watkins aff. ¶11). ¶8.

88.   Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

9.  During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

Exhibit J

10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

89.  The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

§ **20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

Exhibit J

### 3. Dominion Vulnerabilities to Hacking.

90. Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (Ex. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

91. Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including

31

Exhibit J

Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[7] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into

---

[7] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

Exhibit J

question the software credibility."[8]

F.   Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G.   In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H.   Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[9]

92.   The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

This bill addresses election security through grant programs and requirements for voting systems and paper ballots.

The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make

---

[8] *Smartmatic-TIM Running Out of Time to Fix Glitches*, ABS-CBN News (May 4, 2010), *available at*:   https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

[9] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems   have-been-left-exposed-online-despite-official-denials.

Exhibit J

a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

**E. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

93. Dr. Eric Coomer is listed as the co-inventor for several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[10]  He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's patented ballot adjudication technology into Dominion voting machines sold throughout

_____

[10] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014); (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

Exhibit J

the United States, including those used in Wisconsin. (See attached hereto Exh 6, Jo Oltmann Aff.).

94. In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[11]  He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated.  See Id.[12]

95. Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media.  An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history).  (See Id.)

96. Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity.  Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW! I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[**]K YOU! Seriously, this f[**]king ass-clown stands

---

[11] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[12] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

Exhibit J

against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.  *Id.* (July 21, 2016 Facebook post).[13]

97.  In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I know it is going on a lot."  This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1.  Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news…  There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach…  [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."]  *Id.* (September 14, 2017 Facebook post.] (Id.)

98.  Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool").  *Id.* (June 2, 2020 Facebook post).  Lest someone claims that these

---

[13]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

Exhibit J

are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

99.  Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado.  *Id.* at 1.  "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present.  In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

100.  By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***.  It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

101.  In sum, as set forth above, for a host of independent reasons, the Wisconsin election results concluding that Joe Biden received 20,608 more votes that President

Exhibit J

Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

102.  Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

103.  The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

104.  The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

105.  Defendants are not part of the Wisconsin Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Wisconsin Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

106.  Section I details three separate instances where Defendants violated the Wisconsin Election Code.  First, the WEC May 23, 2020 "guidance", see Ex. 16, on the treatment of "indefinitely confined" voters, who are exempt from Wisconsin's photo ID

Exhibit J

requirement for absentee ballot application, that directly contravened the express requirement in Wisconsin Election Code that clerks "shall" remove an allegedly "indefinitely confined" voter if the clerk has "reliable information" that that voter is not, or is no longer, "indefinitely confined." Second, the WEC's October 18, 2016, see Ex. 18, directed clerks to violate the express requirements of Wisconsin Statutes § 6.87(6)(d), which states "[i]f a certificate is missing the address of a witness the ballot may not be counted," when it directed clerks to fill in missing information on absentee ballot envelopes.  Third, WEC and Wisconsin election officials violated Wisconsin Election Code, or acted *ultra vires*, insofar as they filled in missing witness or voter information on absentee ballots and permitted voters to cure ballots without statutory authorization. Section II provides expert witness testimony quantifying the number of illegal or ineligible ballots that were counted, and lawful ballots that were not, as a result of these and Defendants' other violations.

107.   A report from Dr. William Briggs, shows that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

108.   Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.  Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.  The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.

109.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

Exhibit J

harm unless the injunctive relief requested herein is granted.  Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

110.  Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Wisconsin should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Governor Evers and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

### Invalid Enactment of Regulations & Disparate Treatment of Absentee vs. Mail-In Ballots

111.  Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

112.  The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").  The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude,

40

necessary.").

113.  The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

114.  The disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at \*4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

115.  In statewide and federal elections conducted in the State of Wisconsin, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, in having the election laws enforced fairly and uniformly.

116.  As set forth in Section I above, Defendants failed to comply with the requirements of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection. Further, Defendants enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters – Democratic absentee voters – over Republican voters. Further, all of these invalidly enacted rules by Defendant Wisconsin executive and administrative agencies, had the intent and effect of

Exhibit J

eliminating protections against voter fraud, and thereby enabled and facilitated the counting of fraudulent, unlawful and ineligible votes, which were quantified in Section II.  Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

117.  Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Wisconsin Constitution, and the Wisconsin Election Code.

118. Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

119.  The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

120.  In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Wisconsin Counties can be included in the final vote tally unless a challenger

Exhibit J

was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Wisconsin law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

## COUNT III

### Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983

### Denial of Due Process On The Right to Vote

122. Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

123. The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal

43

Exhibit J

citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

124. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

125. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

126. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

127. The right to vote includes not just the right to cast a ballot, but also the right to have it

Exhibit J

fairly counted if it is legally cast.  The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

128.  The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

129.  Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

130. Section I details the Defendants violations of the Wisconsin Election Code. Section II provides estimates of the number of fraudulent, illegal or ineligible votes counted, and demonstrates that this number is many times larger than Biden's margin of victory.

131. Plaintiffs seek declaratory and injunctive relief enjoining Defendants from

Exhibit J

certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Wisconsin Board of State Canvassers and the Wisconsin county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Wisconsin law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

<div align="center">

**COUNT IV**

**Wide-Spread Ballot Fraud**

</div>

132.  Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133.  The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

134.  Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

135.  The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between 3 and 5.6 percentage points. Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440. *Id.*

136.  The Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state

<div align="center">46</div>

Exhibit J

of Wisconsin.

137.   The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

138.   Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Wisconsin's 2020 General Election because it is fundamentally corrupted by fraud.  Defendants intentionally violated multiple provisions of the Wisconsin Election Code to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

### PRAYER FOR RELIEF

139.   Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

140.   Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

141.  In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Wisconsin Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from

Exhibit J

observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Wisconsin Election Code violations set forth in Section II of this Complaint.

142. Order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law. When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Wisconsin and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Wisconsin cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Wisconsin should be disqualified from counting toward the 2020 election. Alternatively, the electors of the State of Wisconsin should be directed to vote for President Donald Trump.

143. For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results;

Exhibit J

2.   An order enjoining Governor Evers from transmitting the currently certified election results the Electoral College;

3.   An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4.   An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b)11. related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiffs;

5.   An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

6.   A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7.   A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

8.   A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that

49

Exhibit J

invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.  A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3, 2020 and November 4, 2020.

12. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Exhibit J

Respectfully submitted, this 1st day of December, 2020.

LEAD COUNSEL FOR PLAINTIFFS

/s Sidney Powell**
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
sidney@federalappeals.com

Of Counsel:

Julia Z. Haller (D.C. Bar No. 466921) **
Brandon Johnson (D.C. 491730) **
Emily P. Newman (Virginia Bar No. 84265) **

2911 Turtle Creek Blvd.
Suite 300
Dallas, Texas 75219

L. Lin Wood **
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler **
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

** Applications for admission forthcoming

Exhibit J

Local Counsel for Plaintiffs

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044
miked@michaelddeanllc.com


Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
daneastman@me.com

Exhibit J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN,

               Plaintiff,

                                    Case No. 20-cv-1771-pp

     v.

WISCONSIN ELECTIONS COMMISSION,
COMMISSIONER ANN S. JACOBS,
MARK L. THOMSEN, JULIE M. GLANCEY,
COMMISSIONER MARGE BOSTELMANN,
COMMISSIONER DEAN KNUDSON,
ROBERT F. SPINDELL, JR. and TONY EVERS,

               Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS
(DKT. NOS. 51, 53), DENYING AS MOOT PLAINTIFF'S AMENDED MOTION
FOR INJUNCTIVE RELIEF (DKT. NO. 6) AND DISMISSING CASE**

---

At 8:24 a.m. on Tuesday, December 1, 2020—twenty-eight days after the November 3, 2020 general Presidential election, thirteen days after President Donald J. Trump petitioned for a recount in Milwaukee and Dane Counties and one day after the Wisconsin Elections Commission and the Governor certified that Joseph R. Biden and Kamala D. Harris had received the highest number of votes following that recount—two plaintiffs filed this lawsuit in federal court for the Eastern District of Wisconsin. Although state law governs the election process, the plaintiffs brought the suit in a federal court, asking that federal court to order state officials to decertify the election results that state officials had certified the day before, order the Governor not to transmit to the Electoral

1

Exhibit K

College the certified results he'd transmitted the day before and order the
Governor to instead transmit election results that declared Donald Trump to be
"the winner of this election."

The election that preceded this lawsuit was emotional and often divisive.
The pleadings that have been filed over the past week are passionate and
urgent. People have strong, deep feelings about the right to vote, the freedom
and opportunity to vote and the value of their vote. They should. But the legal
question at the heart of this case is simple. Federal courts have limited
jurisdiction. Does a federal court have the jurisdiction and authority to grant
the relief this lawsuit seeks? The answer is no.

Federal judges do not appoint the president in this country. One wonders
why the plaintiffs came to federal court and asked a federal judge to do so.
After a week of sometimes odd and often harried litigation, the court is no
closer to answering the "why." But this federal court has no authority or
jurisdiction to grant the relief the remaining plaintiff seeks. The court will
dismiss the case.

## I.    Background

According to defendant the Wisconsin Elections Commission's November
18, 2020 canvass results, 3,297,352 Wisconsin residents voted in the
November 3, 2020 general election for President. https://elections.wi.gov/
sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28pre
-Presidential%20recount%29.pdf. Of those, 49.45%—1,630,673—voted for
Biden for President and Harris for Vice-President. Id. Biden and Harris received

Exhibit K

approximately 20,600 more votes than Donald J. Trump for President and Michael R. Pence for Vice-President. Id.

Under Wis. Stat. §9.01(1)(a)(1), any candidate in an election where more than 4,000 votes were cast for the office the candidate seeks and who trails the leading candidate by no more than 1 percent of the total votes cast for that office may petition for a recount. On November 18, 2020, Donald J. Trump filed a recount petition seeking a recount of "all ballots in all wards in every City, Village, Town and other voting unit in Dane and Milwaukee Counties." https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/WEC%20-%20Final%20Recount%20Order_0.pdf. The Wisconsin Elections Commission granted that petition and ordered a recount "using the ballot count method selected per Wis. Stat. § 5.90(1) unless otherwise ordered by a court per Wis. Stat. § 5.90(2)." Id. The WEC ordered the recount to be completed by 12:00 p.m. on December 1, 2020. Id.

The partial recount was completed on November 29, 2020. https://elections.wi.gov/elections-voting/recount. On November 30, 2020, the chair of the Wisconsin Elections Commission signed the statement of canvass certifying that Joseph R. Biden and Kamala D. Harris received the greatest number of votes and certified their electors. https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Jacobs%20-%20Signed%20Canvass%20for%20President%20-%20Vice%20President.pdf. The same day—November 30, 2020—Wisconsin Governor Tony Evers announced that he had signed the Certificate of Ascertainment for the electors for Biden and Harris.

3

Exhibit K

https://content.govdelivery.com/accounts/WIGOV/bulletins/2aef6ff. The web site for the National Archives contains the Certificate of Ascertainment signed by Evers on November 30, 2020, certifying that out of 3,298,041 votes cast, Biden and Harris and their electors received 1,630,866 votes, while Trump and Pence and their electors received 1,610,184 votes. https://www.archives.gov/files/electoral-college/2020/ascertainment-wisconsin.pdf.

On December 1, 2020, Donald J. Trump filed a petition for an original action in the Wisconsin Supreme Court. <u>Trump v. Evers</u>, Case No. 2020AP001971-OA (available at https://wscca.wicourts.gov). On December 3, 2020, the court denied leave to commence an original petition because under Wis. Stat. §9.01(6), appeals from the board of canvassers or the Wisconsin Elections Commission must be filed in circuit court. Dkt. No. 59-7. The same day—December 3, 2020—Donald J. Trump filed lawsuits in Milwaukee and Dane Counties. <u>Trump v. Biden</u>, Case No. 2020CV007092 (Milwaukee County Circuit Court; <u>Trump v. Biden</u>, Case No. 2020CV002514 (Dane County Circuit Court) (both available at https://wcca.wicourts.gov). Those cases have been consolidated and are scheduled for hearing on December 10, 2020 at 1:30 (or for December 11, 2020 at 9:00 a.m. if the parties are litigating in another court).

Meanwhile, on December 2, 2020, Donald J. Trump filed suit in federal court for the Eastern District of Wisconsin, suing the defendants in this case and others. <u>Trump v. Wisconsin Elections Commission, *et al.*</u>, Case No. 20-cv-

4

Exhibit K

1785-BHL (E.D. Wis.). There is an evidentiary hearing scheduled for December

10, 2020 at 9:00 a.m. by videoconference. Id. at Dkt. No. 45.

## II.   **Procedural History of the Case**

On December 1, 2020—the day after Governor Evers signed the

Certificate of Ascertainment—William Feehan and Derrick Van Orden filed a

complaint in the federal court for the Eastern District of Wisconsin. Dkt. No. 1.

Feehan identified himself as a resident of La Crosse, Wisconsin, a registered

voter and "a nominee of the Republican Party to be a Presidential Elector on

behalf of the State of Wisconsin." Id. at ¶23. Van Orden was identified as a

resident of Hager City, Wisconsin and the 2020 Republican nominee for

Wisconsin's Third Congressional District Seat for the U.S. House of

Representatives. Id. at ¶26. The complaint alleged that "Mr. Van Orden 'lost' by

approximately 10,000 votes to the Democrat incumbent," and stated that

"[b]ecause of the illegal voting irregularities as will be shown below, Mr. Van

Orden seeks to have a new election ordered by this court in the Third District,

with that election being conducted under strict adherence with the Wisconsin

Election Code." Id. at ¶27.

The complaint alleged "massive election fraud, multiple violations of the

Wisconsin Election Code, *see e.g.,* Wis. Stat. §§5.03, *et seq.,* in addition to the

Election and Electors Clauses and Equal Protection Clause of the U.S.

Constitution" based on "dozens of eyewitnesses and the statistical anomalies

and mathematical impossibilities detailed in the affidavits of expert witnesses."

Dkt. No. 1 at ¶1. The plaintiffs alleged four causes of action: (1) violation of the

Exhibit K

Elections and Electors Clauses and 42 U.S.C. §1983; (2) violation of the Equal

Protection Clause of the Fourteenth Amendment, 42 U.S.C. §1983 and the

"invalid enactment of regulations & disparate treatment of absentee vs. mail-in

ballots"; (3) denial of the Fourteenth Amendment due process right to vote and

42 U.S.C. §1983; and (4) "wide-spread ballot fraud." Id. at ¶¶106-138.    The

plaintiffs asked for the following emergency relief:

> 1.    An order directing Governor Evers and the Wisconsin
> Elections Commission to de-certify the election results:
>
> 2.    An order enjoining Governor Evers from transmitting the
> currently certified election results [sic] the Electoral College;
>
> 3.    An order requiring Governor Evers to transmit certified
> election results that state that President Donald Trump is the
> winner of the election;
>
> 4.    An immediate emergency order to seize and impound all
> servers, software, voting machines, tabulators, printers, portable
> media, logs, ballot applications, ballot return envelopes, ballot
> images, paper ballots, and all "election materials" referenced in
> Wisconsin Statutes §9.01(1)(b)11 related to the November 3, 2020
> Wisconsin election for forensic audit and inspection by the Plaintiffs;
>
> 5.    An order that no votes received or tabulated by machines that
> were not certified as required by federal and state law be counted;
>
> 6.    A declaratory judgment declaring that Wisconsin's failed
> system of signature verification violates the Electors and Elections
> Clause by working a de facto abolition of the signature verification
> requirement;
>
> 7.    A declaratory judgment declaring that currently certified
> election results violate the Due Process Clause, U.S. Const. Amend.
> XIV;
>
> 8.    A declaratory judgment declaring that mail-in and absentee
> ballot fraud must be remedied with a Full Manual Recount or
> statistically valid sampling that properly verifies the signatures on
> absentee ballot envelopes and that invalidates the certified results if

<div align="center">6</div>

Exhibit K

the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.     A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10.     A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11.     Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center[1] for November 3, 2020 and November 4, 2020;

12.     Plaintiffs further request the Court grant such relief as is just and proper including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. §1988.

Id. at 50.

With the complaint, the plaintiffs filed a motion for declaratory, emergency, and permanent injunctive relief, dkt. no. 2, and memorandum in support of that motion, dkt. no. 3. The motion stated that the specific relief the plaintiff requested was set out in an attached order, dkt. no. 2 at 1, but there was no order attached. The memorandum asked the court to grant the motion and enter the proposed order, dkt. no. 3 at 10; again, no proposed order was provided.

Later that day, the plaintiffs filed a corrected motion for declaratory, emergency, and permanent injunctive relief. Dkt. No. 6. The plaintiff did not file a memorandum in support of this motion but did file a proposed order. Dkt.

---

[1] The plaintiff may be referring to the TCF convention center in Detroit, Michigan; the court is unaware of a "TCF Center" in Wisconsin.

Exhibit K

No. 1. The relief described in the proposed order was almost identical to the relief requested in the complaint, with a notable exception. Instead of the request for an order requiring production of forty-eight hours of security camera footage from the TCF Center, the plaintiffs asked for an order prohibiting "any wiping or alteration of data or other records or materials" from voting machines, tabulations machines, servers, software and printers, and any alteration or destruction of ballot applications, ballot return envelopes, ballot images, paper ballots, registration lists, poll lists or other election materials, "across the state of Wisconsin." Dkt. No. 6-1 at 7-8.

Two days later, plaintiff Freehan filed an amended complaint removing Derrick Van Orden as a plaintiff. Dkt. No. 9. It differed from the original complaint only in the removal of Van Orden as a plaintiff.

Along with the amended complaint, the plaintiff filed a motion for temporary restraining order and preliminary injunction "to be considered in an expedited manner." Dkt. No. 10. The plaintiff did not file a memorandum in support of the motion; his main purpose in filing the amended motion appears to have been to ask the court to rule on the motion quickly. The plaintiff attached a proposed briefing schedule, suggesting that the court should require the defendants to respond by 8:00 p.m. on Friday, December 4, 2020 and require him to file his reply by 8:00 p.m. on Saturday, December 5, 2020; he proposed to submit the matter on briefs without argument. Dkt. No. 10-1. The defendants objected to this severely truncated schedule. Dkt. Nos. 25

Exhibit K

(defendant Evers), 26 (defendants Wisconsin Election Commission and its members).

Construing the amended motion as a Civil L.R. 7(h) expedited, non-dispositive motion for an expedited briefing schedule, the court granted the request on December 4, 2020, setting a schedule that, while not as expedited as the plaintiff requested, gave the parties a short leash. Dkt. No. 29.

Wisconsin voter James Gesbeck filed a motion to intervene, dkt. no. 14, and later an expedited motion to intervene, dkt. no. 33. The Democratic National Committee (DNC) also sought to intervene. Dkt. No. 22. The court denied both requests, dkt. nos. 41 (DNC), 74 (Gesbeck), but allowed both to file *amicus curiae* briefs by the December 7, 2020 deadline it had set for the defendants to oppose the plaintiff's motion for injunctive relief, dkt. nos. 37 (Gesbeck), 41 (DNC).

Recall that the plaintiff had not filed a memorandum in support of the December 1, 2020 corrected motion for injunctive relief or in support of the December 3, 2020 amended motion. On Sunday, December 6, 2020, the plaintiff filed an amended memorandum in support of the motion. Dkt. No. 42. In the first paragraph, the plaintiff indicated that he filed the amended memorandum to "avoid possible confusion from removal of Mr. Van Orden is [sic] plaintiff." <u>Id.</u> at 1. He said that the memorandum was identical to the original memorandum "except for amending references to plaintiffs to refer to Mr. Meehan [sic] only and correcting several inadvertent references to the State of Georgia." <u>Id.</u>

<div align="center">9</div>

Exhibit K

On Sunday, December 6, the plaintiff also filed a motion asking the court to schedule an evidentiary hearing "on the merits" for Wednesday, December 9, 2020 at 9:00 a.m. Dkt. No. 44. Although the plaintiff had not asked for a hearing in any prior motion, and had represented in the amended motion that he was submitting the matter on the briefs without argument, the plaintiff explained that he had changed his position based on the court's December 4, 2020 order. Id. at ¶4. The court denied the motion in a telephonic hearing on December 8, 2020, explaining that before it could reach the merits of the motion for injunctive relief, it must resolve issues regarding justiciability. Dkt. Nos. 70, 71.

In opposing the plaintiff's amended motion for injunctive relief, defendants Wisconsin Election Commission and its members argued that the case has jurisdictional and procedural defects that require dismissal. Dkt. No. 52 at 5. They asserted that the plaintiff lacks Article III standing, id. at 6, that the doctrine of laches bars consideration of his claims, id. at 8 and that the Eleventh Amendment shields them from the relief he seeks, id. at 10. They asserted that the complaint fails to state a claim for relief under the Election or Electors Clauses, id. at 11, or under the Equal Protection or Due Process Clauses, id. at 13, and they contended that the plaintiff's purported evidence fails to meet basic evidentiary standards, id. at 20.

In his brief opposing injunctive relief, defendant Governor Evers argued that there is no evidence of fraud in Wisconsin's election results, dkt. no. 55 at 10, that the plaintiff's witnesses and experts lack qualifications and are

10

Exhibit K

unreliable, id. at 12, and that the plaintiff has failed to state valid claims, id. at 22. Evers also argued that an adequate remedy at law exists because the recount procedures under Wis. Stat. §9.01 unambiguously constitute the "exclusive remedy" for challenging election results. Id. at 55. With respect to the balancing of harms, Evers argued that the requested relief would prejudice the defendants and "retroactively deprive millions of Wisconsin voters of their constitutional right to vote in the 2020 presidential election." Id. at 32.

James Gesbeck, filing as friend of the court, opposed the motion for injunctive relief on the grounds that the plaintiff has not established subject matter jurisdiction and that the court should defer to the Wisconsin courts and Wisconsin's procedural mechanism for resolving disputed elections. Dkt. No. 47 at 11, 12. Gesbeck applied the balancing analysis for injunctive relief, asserting that relief in this court would moot the Wis. Stat. §9.01 challenge pending in the Wisconsin courts. Id. at 17. He argued that this, in turn, would put the "insurmountable weight of the Federal Government on the election result in Wisconsin and would be unbalancing the scale created by the system of checks and balances that have been maintained since the Constitution was adopted." Id. at 17.

*Amicus* DNC opposed the motion on many of the same grounds as the other defendants. Dkt. No. 57. The DNC argued that the plaintiff lacks standing, that the doctrine of laches bars the plaintiff's claims, that the defendants are immune from suit under the Eleventh Amendment, that principles of federalism and comity require abstention, and that the plaintiff

Exhibit K

fails to state a claim upon which relief can be granted. Dkt. No. 57. It asserted that the plaintiff cannot establish irreparable harm and has an adequate remedy of law. Id. at 36.

The defendants have filed motions to dismiss the case. The WEC and its members seek dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 53. Defendant Evers seeks dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), failure to plead fraud with particularity under Fed. R. Civ. P. 9(b) and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

The Wisconsin State Conference of the NAACP and three of its members (Dorothy Harrell, Wendell J. Harris, Jr. and Earnestine Moss) sought leave to file an *amicus* brief on the question of whether the court should dismiss the case. Dkt. No. 56. The court granted that motion. Dkt. No. 69.

## III.   Procedural Posture

From the outset, the plaintiff has sought to have the claims in the complaint resolved through a motion for injunctive relief under Fed. R. Civ. P. 65. The relief he requests in the second iteration of his motion for injunctive relief is the same relief he requests in the lawsuit itself. As defendant Evers points out in his motion to dismiss, the plaintiff's December 6, 2020 motion for an evidentiary hearing (which the court has denied) "makes clear that what [the plaintiff] seeks—without any discovery or basic adversarial development of evidence—is a trial and final adjudication on the merits." Dkt. No. 51 at 2.

12

Exhibit K

Evers points to Fed. R. Civ. P. 12(i), which states that "[i]f a party so moves, any defense listed in Rule 12(b)(1)-(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial." Because Evers has raised defenses under Rule 12(b)(1) and (b)(6), and because in asking for a hearing the plaintiff sought what would have been a trial on the merits of the causes of action raised in the complaint, the court must resolve the defenses before moving to the merits.

As the court stated in the hearing on December 8, that requirement is more than a procedural nicety. The defendants and the *amici* have raised questions about this federal court's authority to decide the claims alleged in the amended complaint. If this court does not have jurisdiction to hear and decide those claims, any decision it might make regarding the merits of the claims would be invalid. For that reason, the court considers the motions to dismiss before considering the plaintiff's request for injunctive relief.

## IV.   The Motions to Dismiss

### A.   Legal Standards

#### 1.   *Rule 12(b)(1)—Lack of Subject Matter Jurisdiction*

In evaluating a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the court must first determine whether a factual or facial challenge has been raised." Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015) (citing Apex Dig., Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443 (7th Cir. 2009). A *factual* challenge alleges that even if the pleadings are

sufficient, no subject matter jurisdiction exists. A *facial* challenge alleges that the complaint is deficient—that the plaintiff has not sufficiently alleged subject matter jurisdiction. Id. The difference matters—a court reviewing a factual challenge "may look beyond the pleadings and view any evidence submitted to determine if subject matter exists," while a court reviewing a facial challenge "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id.

   2. *Rule 12(b)(6)—Failure to State a Claim*

  A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of the complaint. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." W. Bend Mut. Ins. Co. v. Schumacher, 844 F.3d 670, 676 (7th Cir. 2016).

Exhibit K

3.    *42 U.S.C. § 1983*

To state a claim for a civil rights violation under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of that right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

B.    Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Subject matter jurisdiction has to do with "the courts' statutory or constitutional *power* to adjudicate the case." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998) (emphasis in the original). "Article III, §2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" Id. at 102. The defendants raise a factual challenge to the court's subject matter jurisdiction, arguing that regardless of the pleadings, subject matter jurisdiction does not exist. The court may look outside the four corners of the complaint in considering that challenge.

1.    *Standing*

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." Apex Dig., Inc., 572 F.3d at 443 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "[N]o principle is more fundamental to the judiciary's proper

15

Exhibit K

role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997). "Standing to sue is part of the common understanding of what it takes to make a justiciable case." Id. "Standing is an element of subject-matter jurisdiction in a federal civil action . . . ." Moore v. Wells Fargo Bank, N.A., 908 F.3d 1050, 1057 (7th Cir. 2018).

> The "irreducible constitutional minimum of standing contains three requirements. *Lujan v. Defenders of Wildlife*, [504 U.S. 555], at 560 [1992]]. First and foremost, there must be (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, [495 U.S. 149], at 149 [1990] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101-102 . . . (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 . . . (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.*, at 45-46 . . .; see also *Warth v. Seldin*, 422 U.S. 490, 505 . . . (1975). This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 . . . (1990).

Steel Co., 523 U.S. at 102-104.

Regarding the "injury in fact" leg of the triad, the injury must be "particularized," such that it "affect[s] the plaintiff in a personal and individual way." Spokeo, Inc. v. Robins, ___ U.S. ___, 136 S. Ct. 1540, 1548 (2016) (citations omitted). The injury also must be "concrete"—it must be "real," not "abstract." Id. A plaintiff cannot show a particularized and concrete injury by showing "that he has merely a general interest common to all members of the public." Ex parte Levitt, 302 U.S. 633, 634 (1937). A plaintiff may not use a

16

Exhibit K

"federal court as a forum in which to air his generalized grievances about the conduct of government . . . ." United States v. Richardson, 418 U.S. 166, 174 (1974) (quoting Flast v. Cohen, 392 U.S. 83, 106 (1942)).

As for the redressability leg of the triad, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co., 523 U.S. at 107. The plaintiff must show that it is "likely," not merely "speculative," that the injury the plaintiff alleges will be "redressed by a favorable decision." Lujan, 504 U.S. at 561 (quoting Simon, 426 U.S. at 38).

In addition to the Article III case-or-controversy requirement, there is a prudential limitation in Fed. R. Civ. P. 17(a), requiring that "[e]very action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a), and "requir[ing] that the complaint be brought in the name of the party to whom that claim 'belongs' or the party who 'according to the governing substantive law, is entitled to enforce the right.'" Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 756 (7th Cir. 2008) (quoting Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir. 2003)); see also RK Co. v. See, 622 F.3d 846, 850 (7th Cir. 2010) ("the real party in interest rule is only concerned with whether an action can be maintained in the plaintiff's name," and is "similar to, but distinct from, constitutional ... standing"). The real party in interest is "the one who by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." Act II Jewelry, LLC v. Wooten, 301 F. Supp. 3d 905, 910-911 (N.D.

17

Exhibit K

Ill. 2018) (quoting Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338,

1343 (7th Cir. 1988) (internal citations omitted)). The purpose of the rule is to

"protect the defendant against a subsequent action by the party actually

entitled to recover." RK Co., 622 F.3d at 850 (citing Fed. R. Civ. P. 17(a)

advisory committee note (2009)).

      The amended complaint alleges that the plaintiff has standing "as a voter

and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, *et seq*

(election procedures for Wisconsin electors)." Dkt. No. 9 at 8. The defendants

argue that the plaintiff lacks standing in either capacity. Dkt. No. 43 at 4-5;

Dkt. No. 59 at 8-9.

                a.     Standing as a voter

      The amended complaint does not assert that the plaintiff voted in the

2020 general Presidential election in Wisconsin. It says that he is a registered

voter, but it does not affirmatively state that he voted in the election the results

of which he asks the court to decertify. His counsel asserts in the brief in

opposition to the defendants' motion to dismiss—filed eight days after the

original complaint and five days after the amended complaint—that the plaintiff

"voted for President Trump in the 2020 General Election." Dkt. No. 72 at 17.

For the first time at the motion to dismiss stage, the plaintiff provided his own

declaration, in which he attests that he voted for President Donald J. Trump in

the November 3, 2020 election. Dkt. No. 72-1.

      The plaintiff claims that the defendants failed to comply "with the

requirements of the Wisconsin Election Code and thereby diluted the lawful

<div align="center">18</div>

Exhibit K

ballots of the Plaintiff and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection." Dkt. No. 9 at ¶116. He alleges that the defendants enacted regulations or issued guidance that, in intent and effect, favored Democratic absentee voters over Republican voters, and that these regulations and this guidance enable and facilitated voter fraud. Id. The plaintiff also asserts that he has a right to have his vote count and claims that a voter is injured if "the important of his vote is nullified." Id. at ¶127.

Several lower courts have addressed the plaintiff's theory that a single voter has standing to sue as a result of his vote being diluted by the possibility of unlawful or invalid ballots being counted. The district court for the Middle District of North Carolina catalogued a few of those decisions, all finding that the harm was too speculative and generalized—not sufficiently "concrete"—to bestow standing. These courts concluded that the vote dilution argument fell into the "generalized grievance" category. In Moore v. Circosta, the court wrote:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., Donald Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), __ F. Supp. 3d __, __, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, ___ F. Supp. 3d ___, ___, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F. Supp.

19

Exhibit K

3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because affects all voters," Martel, __ F. Supp.3d at __, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . . .

Moore v. Circosta, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14,

The court agrees. The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if the Wisconsin election process were, as the plaintiff alleges, "so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election." Dkt. No. 9 at ¶5. The plaintiff has not alleged that, as a voter, he has suffered a particularized, concrete injury sufficient to confer standing.

The plaintiff argues that it is incorrect to say that his standing is based on a theory of vote dilution. Dkt. No. 72 at 19. He then proceeds to opine that he has shown in great detail how his vote and the votes of others who voted for Republican candidates was diluted. Id. at 19-20. He says the vote dilution did not affect all Wisconsin voters equally, asserting that it had a negative impact

20

Exhibit K

on those who voted for Republican candidates and a positive impact on those who voted for Democratic candidates. Id. at 20. He asserts that he also has shown that the defendants sought to actively disenfranchise voters for Republican candidates. Id. These are the same arguments he made in the amended complaint and they still show no more than a generalized grievance common to any voter. Donald J. Trump carried some Wisconsin counties; the voters who voted for Joseph R. Biden in those counties could make the same complaints the plaintiff makes here.

The plaintiff says that his interests and injury are "identical to that of President Trump," and cites to Bush v. Gore, 531 U.S. 98 (2000), which he characterizes as holding that "then-candidate George W. Bush of Texas had standing to raise the equal protection rights of Florida voters that a majority of the Supreme Court deemed decisive." Id. at 21 (quoting Hawkins v. Wayne Twp. Bd. of Marion Cty., Ind, 183 F. Supp. 2d 1099, 1103 (S.D. Ind. 2002)). The court is stymied by the plaintiff's assertion that his interests and injury are identical to that of President Trump. As the court will explain in the next section, contrary to his assertions, the plaintiff is not a "candidate" in the way that President Trump was a candidate for office. President Trump's interest is in being re-elected, while the plaintiff has said that his interest is in having his vote count and not be diluted. If his interest is solely in getting President Trump re-elected, as opposed to having his vote be counted as part of a valid election process, the court is aware of no constitutional provision that gives him the right to have his candidate of choice declared the victor.

21

Exhibit K

Nor does the decision in <u>Bush v. Gore</u> say what the plaintiff claims it says. As far as the court can tell, the word "standing" does not appear in the majority opinion. In the Indiana decision the plaintiff cites, then-district court judge David Hamilton wrote: "If candidate Hawkins did not have standing to raise equal protection rights of voters, it would be difficult to see how then-candidate George W. Bush of Texas had standing to raise equal protection rights of Florida voters . . . in *Bush v. Gore*." <u>Hawkins</u>, 183 F. Supp.2d at 1103. But the Supreme Court in <u>Bush v. Gore</u> never explained how candidate Bush had standing, and even if it had, the plaintiff is not a candidate.

Nor has the plaintiff demonstrated redressability. He complains that his vote was diluted and that he wants his vote to count. But he asks the court to order the results of the election de-certified and then to order defendant Evers to certify the election for Donald J. Trump. Even if this *federal* court had the authority to order the governor of the *state* of Wisconsin to certify the results of a national presidential election for any candidate—and the plaintiff has presented *no* case, statute or constitutional provision providing the court with that authority—doing so would further invalidate and nullify the plaintiff's vote. The plaintiff wants Donald J. Trump to be certified as the winner of the Wisconsin election *as a result of the plaintiff's vote*. But what he asks is for Donald J. Trump to be certified the winner *as a result of judicial fiat*. That remedy does not redress the plaintiff's alleged injury. Even the plaintiff concedes in his brief in opposition to dismissal that "[d]efendant Evers can . . . provide partial redress in terms of the requested injunctive relief, namely, by

22

Exhibit K

refusing to certify or transmit the election results, and providing access to voting machines, records and other 'election materials.'" Dkt. No. 72 at 21. The plaintiff is wrong in that regard, as the court will explain when it discusses the related doctrine of mootness; the point is that even from the plaintiff's perspective, the remedy he seeks will not fully redress the injury he claims.

Circling back to Article III's "case or controversy" requirement, the Supreme Court has held that "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)). In other words, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Gill v. Whitford, ___ U.S. ___, 138 S. Ct. 1916, 1934 (2018) (citing Cuno, 547 U.S. at 353). Even if the plaintiff had alleged a particularized, concrete injury and even if the relief he seeks would redress that injury, that relief is not tailored to the alleged injury. As the Michigan court explained in King v. Whitmer, Case No. 20-13134 at Dkt. No. 62, page 25 (E.D. Mich. Dec. 7, 2020), "Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote."

The plaintiff's status as a registered voter does not give him standing to sue.

Exhibit K

b.      Standing as a nominee for elector

The amended complaint alleges that the plaintiff has standing to bring the suit "as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq." Dkt. No. 9 at ¶26. The amended complaint cites to "Wis. Stat. §§5.10, et seq," but the court is not sure what the "*et seq.*"—"and what follows"— contributes to the plaintiff's belief that he has standing. Wis. Stat. §5.10 is followed by Wis. Stat. §5.15, which concerns the "Division of municipalities into wards," as well as other sections concerning polling places and voting machines. The court assumes the plaintiff meant to reference only Wis. Stat. §5.10.

Wis. Stat. §5.10 states:

> Although the names of the electors do not appear on the ballot and no reference is made to them, a vote for the president and vice president named on the ballot is a vote for the electors of the candidates for whom an elector's vote is cast. Under chs. 5 to 12, all references to the presidential election, the casting of votes and the canvassing of votes for president, or for president and vice president, mean votes for them through their pledged presidential electors.

Relying on this section, the amended complaint directs the court's attention to <u>Carson v. Simon</u>, 978 F.3d 1051, 1057 (8th Cir. 2020).[2] In <u>Carson</u>,

---

[2] The complaint also cites two Supreme Court cases: <u>McPherson v. Blacker</u>, 146 U.S. 1, 27 (1892) and <u>Bush v. Palm Beach Cty. Canvassing Bd.</u>, 531 U.S. 70, 76 (2000) (*per curiam*). Neither address the Article III standing of an elector. In <u>McPherson</u>, the Court reviewed the Michigan supreme court's decision on the constitutionality of the Michigan statute governing selection of electors. While the parties who brought the suit in state court were nominees for presidential electors, the Court did not address their standing (or lack of it). The petitioner in <u>Bush</u> was the then-Republican candidate, George W. Bush, who was challenging the Florida supreme court's interpretation of its election statutes; again, the Court did not address (and had no need to address) the standing of an elector to sue.

24

Exhibit K

two certified nominees of the Republican Party to be presidential electors sued the Minnesota secretary of state, challenging a consent decree that "essentially ma[de] the statutorily-mandated absentee ballot receipt deadline inoperative." Id. at 1054. As a result of the decree, the secretary of state had directed election officials "to count absentee ballots received up to a week after election day, notwithstanding Minnesota law." Id. The potential electors sought an injunction in federal court, but the district court found they lacked standing. Id.

The Eighth Circuit reversed, finding that the potential electors had standing as candidates "because the plain text of Minnesota law treats prospective presidential electors as candidates." Id. at 1057. The court found that candidates suffered particularized and concrete injury from an inaccurate vote tally. Id. at 1058.

The plaintiff urges this court to reach the same conclusion. An Eighth Circuit decision is not binding on this court, but the question is whether the reasoning in that decision is persuasive. A member of the panel in Carson dissented from the majority opinion and expressed doubt about the potential electors' standing. Circuit Judge Jane Kelley wrote:

> . . . I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as "candidates," see, e.g., Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. Id. § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote

25

Exhibit K

for that party's electors.") They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals. But even if we nonetheless assume the Electors should be treated like traditional political candidates for standing purposes, I question whether these particular candidates have demonstrated the "concrete and particularized" injury necessary for Article III standing. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 . . . (1992). To the contrary, their claimed injury—a potentially "inaccurate vote tally" . . .—appears to be "precisely the kind of undifferentiated, generalized grievance about the conduct of government: that the Supreme Court has long considered inadequate for standing. <u>Lance v. Coffman</u>, 549 U.S. 437, 442 . . . (2007) (examining standing in the context of a claim under the Elections Clause). Because the Electors, should they in fact assume that office, must swear an oath to mark their Electoral College ballots for the presidential candidate who won the popular vote, Minn. Stat. § 208.43 (2015), it is difficult to discern how they have more of a "particularized stake," <u>Lance</u>, 549 U.S. at 442 . . . , in Minnesota conducting fair and transparent elections than do the rest of the state's voters.

<u>Id.</u> at 1063.

Judge Kelly's reasoning is the more persuasive. Under Wisconsin law, a vote for the candidates of president and vice president is a vote for the electors of those candidates. Wis. Stat. § 5.65(3)(a). When the electors meet, they must vote for the candidates of the party that nominated the electors. Wis. Stat. §7.75(2). Like Minnesota electors, Wisconsin electors may be referred to as "candidates" by statute but they are not traditional political candidates presented to and chosen by the voting public. Their interest in seeing that every valid vote is correctly counted and that no vote is diluted is no different than that of an ordinary voter. And the court has concluded, as did Judge Kelly, that the plaintiff's status as a voter does not give him standing.

The amended complaint does not mention the Elections Clause or the Electors Clause of the Constitution in relation to standing. In his brief in

Exhibit K

opposition to the motions to dismiss, the plaintiff alleges that he has standing under "Electors and Elections Clause." Dkt. No. 72 at 17. He asserts that the Eighth Circuit found in <u>Carson</u> that electors had "both Article III and Prudential standing under the Electors and Elections Clauses." <u>Id.</u> The plaintiff reads <u>Carson</u> differently than does this court. The <u>Carson</u> majority did not mention the Electors or Elections Clause in its discussion of Article III standing. The entire discussion of Article III standing was based on Minnesota law. <u>See</u> <u>Carson</u>, 978 F.3d at 1-57-1058. In its discussion of *prudential* standing, the <u>Carson</u> majority stated that "[a]lthough the Minnesota Legislature may have been harmed by the Secretary's usurpation of its constitutional right under the Elector Clause, the Electors have been as well." <u>Id.</u> at 1058-59.

This court has found that the plaintiff does not have Article III standing, but even if had not, it disagrees that the Elector Clause[3] provides prudential standing to electors. Article II, Section 1, Clause 2 of the Constitution—known as the "Elector Clause"—states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of

---

[3] The plaintiff cites the "Elector and Elections Clause" or "Clauses" in the same breath but does not discuss the text of either. It is not clear how the plaintiff sees the Elections Clause—Article II, Sec. 1, cl. 3—as providing him with standing and the plaintiff has not developed that argument. The court notes only that in <u>Lance v. Coffman</u>, the Supreme Court found that plaintiffs whose only alleged injury was that the Elections Clause had not been followed did not have standing because they alleged "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." <u>Lance</u>, 549 U.S. at 442.

Exhibit K

Trust or Profit under the United States, shall be appointed an Elector." The clause confers on the *state* the right to appoint electors and confers on the *legislature* the right to decide the way those electors will be appointed. It confers no right on the *electors* themselves. Just a few months ago, the Supreme Court stated as much in <u>Chiafalo v. Washington</u>, ___ U.S. ___, 140 S. Ct. 2316, 2328 (July 6, 2020), in the context of considering whether a state could penalize an elector for breaking his pledge and voting for someone other than the candidate who won his state's popular vote:[4] "Article II and the Twelfth Amendment give States broad powers over electors, and give electors themselves no rights." The Court went on to say,

> Early in our history, States decided to tie electors to the presidential choices of others, whether legislatures or citizens. Except that legislatures no longer play a role, that practice has continued for more than 200 years. Among the devices States have long used are pledge laws, designed to impress on electors their role as agents of others. A State follows in the same tradition if, like [the state of] Washington, it chooses to sanction an elector for breaching his promise. Then, too, the State instructs its electors that they have no ground for reversing the vote of millions of its citizens. That direction accords with the Constitution—as well as with the trust of a Nation that here, We the People rule.

<u>Id.</u>

The plaintiff's status as a nominee to be a Republican elector does not give him Article III or prudential standing.

---

[4] Wisconsin's "pledge law"—Wis. Stat. §7.75(1)—does not impose a penalty on a "faithless elector."

Exhibit K

2. *Mootness*

Mootness "has sometimes been called 'the doctrine of standing set in a time frame.'" Chi. Joe's Tea Room, LLC v. Vill. of Broadview, 894 F.3d 807, 812-13 (7th Cir. 2018) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 189 (2000)). A case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)). "Mootness strips a federal court of subject-matter jurisdiction." Id. at 815 (citing DJL Farm LLC v. EPA, 813 F.3d 1048, 1050 (7th Cir. 2016). This is because "[a] case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III.'" United States v. Sanchez-Gomez, __ U.S. __, 138 S. Ct. 1532, 1537 (2018) (quoting Already, LLC, 568 U.S. at 91).

The amended complaint states that the plaintiff brought this suit "to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin . . . ." Dkt. No. 9 at ¶27. The plaintiff asks the court to prohibit from occurring an event that already has occurred— an event that occurred the day before he filed this lawsuit and nine days before the court issues this order. He asks the court to enjoin defendant Evers from transmitting the certified election results, id. at ¶142—an event that already has occurred. He asks the court to order that certain votes not be counted, id., when the vote counting has been over since November 29.

29

Exhibit K

The plaintiff himself demonstrates the mootness problem in his brief in opposition to dismissal. He states that defendant Evers can provide partial redress for his alleged injuries "by refusing to certify or transmit the election results." Dkt. No. 72 at 21. But Evers already has certified and transmitted the elections results—he cannot refuse to do that which he already has done.

At the December 8 hearing, the plaintiff argued that there remains a live controversy because the electors have not yet voted and will not do so until Monday, December 14, 2020. Dkt. No. 70. This argument ignores the fact that several of the events that dictate which slate of nominees are certified to vote already have taken place and had taken place at the time the plaintiff filed his complaint. The votes have been counted. In two counties, they've been counted twice. The WEC chair has signed the canvass and certified electors for Biden/Harris. The governor has signed the Certificate of Ascertainment and the National Archive has that certificate.

In his brief in opposition to dismissal, the plaintiff points to this court's own order earlier in this case, determining that the plaintiff had not demonstrated why the December 8, 2020 "safe harbor" deadline under 3 U.S.C. §5 was the date by which the plaintiff needed the court to issue a decision to preserve his rights. Dkt. No. 72 at 25 (citing Dkt. No. 29 at 7). The court noted in that order that the plaintiff's brief in opposition to a motion to reassign another case erroneously referred to December 8 as the date that the College of Electors was scheduled to meet. Dkt. No. 29 at 7. The court pointed out that that was incorrect, and that December 8 was the deadline by which the state

30

Exhibit K

would have to make its final determination of any election dispute in order to avoid congressional challenge. Id. The court then said, "Because the electors do not meet and vote until December 14, 2020, the court will impose a less truncated briefing schedule than the one the plaintiff proposes . . . ." Dkt. No. 29.

The plaintiff says that "[i]mplicit in this Court's determination" is the assumption that "this Court can still grant some or perhaps all of the relief requested and this Plaintiff's claims are not moot." Dkt. No. 72 at 25. The plaintiff reads more into the court's language than the court intended. In the plaintiff's earliest pleadings—the first motion for injunctive relief, the "corrected" motion for injunctive relief, the "amended" motion for injunctive relief—the plaintiff failed to identify a date by which he needed the court to act. The first time he identified such a date was in his brief in opposition to a motion to reassign another case—and then, the reference was oblique. In his opposition brief, the plaintiff stated, "With the College of Electors scheduled to meet December 8, there could never be a clearer case of 'justice delayed is justice denied.'" Dkt. No. 18 at 1. From that, the court deduced that the plaintiff needed the court to act by the date the College of Electors was scheduled to meet. But the College of Electors was not scheduled to meet December 8—it was (and is) scheduled to meet December 14. So the court set a briefing schedule that would give the defendants a chance to respond, but would complete briefing ahead of the event the plaintiff deemed important—the

31

Exhibit K

electoral meeting and vote. That was not a decision by this court—implicit or explicit—on the mootness of the plaintiff's claims.

The plaintiff also asserts that the "cutoff for election-related challenges, at least in the Seventh Circuit, appears to be the date that the electors meet, rather than the date of certification." Dkt. No. 72 at 24. He cites Swaffer v. Deininger, No. 08-CV-208, 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008). Swaffer is not a Seventh Circuit case, and the court is not aware of a Seventh Circuit case that establishes a "cutoff for election-related challenges." And the plaintiff seems to have made up the "quote" in his brief that purports to be from Swaffer. The plaintiff asserts that these words appear on page 4 of the Swaffer decision: "even though the **election** has passed, the meeting of electors obviously has not, so plaintiff's claim here is hardly moot." Dkt. No. 72 at 24-25. The court has read page 4 of Swaffer—a decision by this court's colleague, Judge J.P. Stadtmueller—three times and cannot find these words. In fact, Swaffer did not involve a challenge to a presidential election and it did not involve electors. Mr. Swaffer sought to challenge a Wisconsin statute requiring individuals or groups promoting or opposing a referendum to file a registration statement and take other actions. Swaffer, 2008 WL 5246167, at *1. The defendants argued that the election (in which the plaintiff had taken steps to oppose a referendum on whether to allow liquor sales in the Town of Whitewater) was over and that Swaffer's claims thus were moot. Id. at 2. Judge Stadtmueller disagreed, finding that because Swaffer alleged that he intended

32

Exhibit K

to violate the statutes at issue in the future, a credible threat of prosecution remained. Id. at 3.

Some of the relief the plaintiff requests may not be moot. For example, he asks for an immediate order seizing voting machines, ballots and other materials relating to the physical mechanisms of voting. And there remain five days until the electors vote—as the events of this year have shown, anything can happen. But most of the relief the plaintiff seeks is beyond this court's ability to redress absent the mythical time machine.

### 3.  *Conclusion*

The plaintiff does not have Article III standing to sue in federal court for the relief he seeks.

### C.  Other Arguments

Standing is the *sine qua non* of subject matter jurisdiction. Absent standing, the court does not have jurisdiction to consider the plaintiff's claims on the merits. Arguably, it has no jurisdiction to consider the other bases the defendants and *amici* assert for why the court should dismiss the case. At the risk of producing dicta (and spilling even more ink on a topic that has received an ocean's worth by now), the court will briefly address some of the other bases for the sake of completeness.

### 1.  *Eleventh Amendment Immunity*

The defendants argue that the plaintiff's claims are barred by the Eleventh Amendment. Dkt. No. 59 at 15; Dkt. No. 54 at 10. The Eleventh Amendment "bars most claims in federal court against a state that does not

Exhibit K

consent to suit." <u>Carmody v. Bd. of Trs. of Univ. of Ill.</u>, 893 F.3d 397, 403 (7th Cir. 2018) (citations omitted). States are immune from suit in federal court "unless the State consents to the suit or Congress has abrogated their immunity." <u>Tucker v. Williams</u>, 682 F.3d 654, 658 (7th Cir. 2012) (citing <u>Seminole Tribe v. Florida</u>, 517 U.S. 44 (1996)). This includes suits brought in federal court against nonconsenting states by their own citizens. <u>See</u>, <u>e.g.</u>, <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974); <u>Hans v. Louisiana</u>, 134 U.S. 1, 15 (1890) ("Can we suppose that, when the eleventh amendment was adopted, it was understood to be left open for citizens of a state to sue their own state in the federal courts, while the idea of suits by citizens of other states, or of foreign states, was indignantly repelled?").

The plaintiff has sued the Governor of Wisconsin, Tony Evers, in his official capacity; the Wisconsin Elections Commission and each member of the WEC in his or her official capacity. Before going too much further down the Eleventh Amendment road, the court notes that the vehicle for the plaintiff to bring his constitutional claims—his claims under the Elector Clause, the Elections Clause, the Equal Protection Clause and the Due Process Clause—is 42 U.S.C. §1983. Section 1983 prohibits a "person" acting under color of state law from violating another's civil rights. The Wisconsin Elections Commission is not a "person." It is an arm of the state of Wisconsin, Wis. Stat. §5.05, and "states are not suable 'persons' under 42 U.S.C. § 1983." <u>Phillips v. Baxter</u>, 768 F. App'x 555, 559-560 (7th Cir. 2019) (citing <u>Sebesta v. Davis</u>, 878 F.3d 226, 231 (7th Cir. 2017)). <u>See also</u>, <u>Will v. Mich. Dept. of State Police</u>, 491 U.S. 58,

<div align="center">34</div>

Exhibit K

64 (1989) ("a State is not a person within the meaning of § 1983"). "Section

1983 provides a federal forum to remedy many deprivations of civil liberties,

but it does not provide a federal forum for litigants who seek a remedy against

a State for alleged deprivations of civil liberties." <u>Will</u>, 491 U.S. at 66. The WEC

is not the proper defendant for the plaintiff's constitutional claims.

The plaintiff faces the same problem with his claims against the

individual defendants, all of whom are state officials whom he sues in their

official capacities.[5]

> Obviously, state officials literally are persons. But a suit against a
> state official in his or her official capacity is not a suit against the
> official but rather is a suit against the official's office. *Brandon v.*
> *Holt*, 469 U.S. 464, 471 . . . (1985). As such, it is no different from a
> suit against the State itself. See, *e.g.*, *Kentucky v. Graham*, 473 U.S.
> 159, 165-66 . . . (1985); *Monell* [*v. New York City Dept. of Social*
> *Services*, 436 U.S. 658], at 690 [(1978)].

<u>Id.</u> at 71. Arguably, *none* of the defendants are subject to suit under 42 U.S.C.

§1983, which means that even if the plaintiff had standing, the court would

have to dismiss Counts I, II and III of the amended complaint.

Circling back to the defendants' Eleventh Amendment argument, "The

Eleventh Amendment extends to state agencies and departments and, subject

to the <u>*Ex Parte* Young</u> doctrine, to state employees acting in their official

capacities." <u>Nelson v. LaCrosse Cty. Dist. Atty. (State of Wis.)</u>, 301 F.3d 820,

---

[5] Had the plaintiff sued the individual defendants in their *personal* capacities,
he could have sought relief against them under 42 U.S.C. §1983, assuming he
had standing.

35

Exhibit K

827 n.7 (7th Cir. 2002) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123-24 (1984)).

There are three exceptions to Eleventh Amendment immunity: (1) congressional abrogation, Nuñez v. Ind. Dep't of Child Servs., 817 F.3d 1042, 1044 (7th Cir. 2016) (citing Alden v. Maine, 527 U.S. 706, 754-55 (1999); (2) "a state's waiver of immunity and consent to suit," id. (citing College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999)); and (3) a suit "against state officials seeking only prospective equitable relief," id. (citing Ex parte Young, 209 U.S. 123, 159-60 (1908)). None of the exceptions apply here.

Congress did not abrogate the sovereign immunity of the states when it enacted 42 U.S.C. §1983. Will, 491 U.S. at 66. Wisconsin has not waived its immunity from civil actions under §1983. See Shelton v. Wis. Dep't of Corr., 376 Wis. 2d 525, *2 (Table) (Ct. App. 2017) (citing Boldt v. State, 101 Wis. 2d 566, 584-85 (1981)). And the Ex parte Young doctrine does not apply when a plaintiff asserts a claim—regardless of the relief requested—against a state official based on *state* law. Pennhurst, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). "In determining whether the Ex parte Young doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward

36

inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 636 (2002) (quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 296 (1997); <u>McDonough Assocs., Inc. v. Grunloh</u>, 722 F.3d 1043, 1051 (7th Cir. 2013)).

   Count IV of the amended complaint alleges "[w]ide-spread ballot fraud," a *state*-law claim. The Eleventh Amendment bars that claim against the defendants in their official capacities. The Eleventh Amendment also bars the plaintiff's federal claims to the extent that the plaintiff seeks retrospective relief. The Supreme Court has refused to extend the <u>*Ex Parte* Young</u> doctrine to claims for retrospective relief. <u>Green v. Mansour</u>, 474 U.S. 64, 68 (1985) (citing <u>Pennhurst</u>, 465 U.S. at 102-103). The amended complaint seeks (1) a "temporary restraining order instructing Defendants to de-certify the results of the General Election for the Office of President," dkt. no. 9 at 47; (2) "an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump," <u>id.</u>; (3) "a temporary restraining order" prohibiting the tabulation of unlawful votes," id.; (4) an order preserving voting equipment and data, <u>id</u>.; (5) "the elimination of the mail ballots from counting in the 2020 election," <u>id</u>. at 48; (6) the disqualification of Wisconsin's electors from participating in the 2020 election, <u>id.</u>; and (7) an order directing Wisconsin's electors to vote for President Donald Trump, <u>id.</u> As the court already has noted, with the possible exception of the

Exhibit K

request for an order preserving voting equipment and data, the relief the plaintiff requests is retrospective.

The plaintiff disagrees—he characterizes the certification of the election results as "ongoing violations of federal law . . . ongoing violations of the Electors and Elections Clauses, the Equal Protection and Due Process Clauses, as well as likely violations of federal law including the Voting Rights Act and the Help America Vote Act." Dkt. No. 72 at 25-26. The plaintiff has not brought claims under the latter two statutes and saying that a completed event is an ongoing violation doesn't make it so.

> 2.   *Exclusive Remedy/Exhaustion/Abstention*

Defendant Evers moves to dismiss because Wisconsin provides a remedy to address irregularities or defects during the voting or canvassing process: Wis. Stat. §9.01(11). Four days ago, the Wisconsin Supreme Court held that §9.01(6) requires that a party aggrieved after a recount must appeal by filing suit in circuit court. <u>Trump v. Evers</u>, No. 2020AP1971-OA, Order at *2 (Wis. Dec. 3, 2020). In a concurring opinion, Justice Hagedorn noted that Wis. Stat. §9.01(11) provides that §9.01 is the exclusive judicial remedy for an aggrieved candidate. Defendant Evers points out that President Trump has lawsuits pending in state circuit courts and argues that those cases raise many of the claims the plaintiff raises here. Dkt. No. 59 at 11. He argues that the process detailed in Wis. Stat. §9.01 is designed to allow an aggrieved candidate to resolve election challenges promptly, and that for this court to permit the

Exhibit K

plaintiff to circumvent that process "would eviscerate Wisconsin's careful process for properly and quickly deciding election challenges." Id. at 11-12.

Of course, the plaintiff has no redress under Wis. Stat. §9.01, because he is not a "candidate" in the sense of that statute. But Evers argues that there was a form of state-law relief available to the plaintiff. He asserts that the plaintiff should have filed a complaint with the Wisconsin Elections Commission under Wis. Stat. §5.06. Dkt. No. 59 at 13. That statute allows a voter dissatisfied with the Wisconsin election process to file a written, sworn complaint with the elections board. Wis. Stat. §5.06(1). The statute states that no voter may "commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official" without first filing a complaint under §5.06(1). Wis. Stat. §5.06(2). Evers points out that the plaintiff has not demonstrated that he followed this procedure and thus that the plaintiff did not exhaust his remedies before coming to federal court. Dkt. No. 59 at 14.

The plaintiff does not directly respond to the exhaustion argument. He simply maintains that he has a right to bring his constitutional claims in federal court, argues that there is no evidence that the statute Evers cites is an exhaustion requirement and asserts that the court has federal question jurisdiction under 28 U.S.C. §1331 and supplemental jurisdiction over any state-law claims under 28 U.S.C. §1367.[6] Dkt. No. 72 at 27-28. He neatly

---

[6] The court could exercise supplemental jurisdiction over state-law claims only if there remained federal claims to which those state-law claims related. As the court has noted, it likely would have been required to dismiss the federal

Exhibit K

sidesteps the question of why he did not follow a procedure that would have allowed him to direct his concerns to the entity in charge of enforcing the state's election laws and in a way that likely would have brought those concerns to that entity's attention long before the election results were certified.

Because the court has concluded that the plaintiff does not have standing, and because the plaintiff has sued defendants who either are not suable under §1983 or are protected by Eleventh Amendment immunity, the court will not accept the invitations of the defendants and *amici* to wade into the waters of the various types of abstention. If this court does not have subject matter jurisdiction, there is no case or controversy from which it should abstain. The court agrees with the parties, however, that the relief the plaintiff requests—asking a federal judge to order a state governor to decertify the election results for an entire state and direct that governor to certify a different outcome—constitutes "an extraordinary intrusion on state sovereignty from which a federal court should abstain under longstanding precedent." Dkt. No. 57 at 28.

3.   *Laches*

The defendants argue that the equitable defense of laches requires dismissal, because the plaintiff "inexplicably waited until after the election, after the canvassing, after the recount, after the audit, after results were

---

claims because the plaintiff asserted them through §1983 against state officials in their official capacities, which in turn would have required dismissal of any state claims for lack of subject matter jurisdiction.

Exhibit K

certified, and indeed until the eve of the electoral college vote, to bring his claim of state law violations and widespread fraud . . . ." Dkt. No. 52 at 11. <u>See also</u>, Dkt. No 59 at 17 ("the doctrine of laches bars [the plaintiff's] claims because he has unreasonably delayed bringing his claims to the detriment not only of Defendants, but also of the nearly 3.3 million voters in Wisconsin who voted in this last election under the good-faith belief that they were following the correct procedures to have their votes counted.").

The doctrine of laches "addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." <u>Hot Wax, Inc. v. Turtle Wax, Inc.</u>, 191 F.3d 813, 820 (7th Cir. 1999). "For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." <u>Id.</u> (citing <u>Cannon v. Univ. of Health Scis./The Chicago Med. Sch.</u>, 710 F.2d 351, 359 (7th Cir. 1983)). "Timeliness must be judged by the knowledge of the plaintiffs as well as the nature of the right involved." <u>Jones v. v. Markiewicz-Qualkinbush</u>, 842 F.3d 1053, 1061 (7th Cir. 2016).

"The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept." <u>Id.</u> at 1060-61. In fact, the Seventh Circuit has held that such "claims must be brought expeditiously . . . to afford the district court sufficient time in advance of an election to rule without disruption of the electoral cycle." <u>Id.</u> at 1061 (internal quotation marks and citations omitted).

<div align="center">41</div>

Exhibit K

The amended complaint asserts that the alleged problems with the Dominion voting machine software "have been widely reported in the press and have been subject to investigation." Dkt. No. 9 at ¶12. It cites to exhibits from January and August of 2020. Dkt. No. 9 at 5 n.1. It cites to the WEC's May 13, 2020 directive to clerks that they should not reject the ballots of "indefinitely confined" absentee voters. Id. at ¶40. It cites an October 18, 2016 memorandum issued by the WEC instructing clerks on how to handle absentee envelope certifications that did not bear the address of the witness. Id. at ¶44. It cites October 19, 2020 instructions by the WEC to clerks about filling in missing ballot information. Id. at ¶45.

Defendant Evers points out that the plaintiff's own allegations demonstrate that he has known about the Dominion voting machine issues since long before the election. Dkt. No. 59 at 17-18. He argues that the WEC guidance about which the plaintiff complains came in directives issued in October 2016, May 2020 and October 2020. Id. He asserts that the plaintiff has made no effort "to offer a justifiable explanation for why he waited until weeks after the election to challenge" these issues. Id. at 18. The WEC defendants advise the court that the issue regarding "indefinitely confined" voters was litigated in state court almost eight months ago. Dkt. No. 54 at 9 (citing Pet. For Original Action dated March 27, 2020, Supreme Court of Wisconsin, No. 2020AP000557-OA). They assert that the plaintiff "waited to challenge widely-known procedures until after millions of voters cast their ballots in reliance on those procedures." Id. at 6. They state that "[i]f the doctrine of laches means

<p style="text-align:center">42</p>

Exhibit K

anything, it is that Plaintiff here cannot overturn the results of a completed and certified election through preliminary relief in this late-filed case." Id.

The plaintiff first responds that laches is a defense and shouldn't be raised on a motion to dismiss. Dkt. No. 72 at 22. He then claims that he could not have known the bases of any of these claims until after the election. Id. at 22-23. He says that because Wisconsin election officials did not "announce or publicize their misconduct," and because, he alleges, they "prevented Republican poll watchers from observing the ballot counting and handling," it took him time to gather the evidence and testimony he attached to the amended complaint. Id. at 23. Finally, he alleges that the delay post-November 3, 2020 is attributable to the defendants' failure to timely complete the election count. Id. He insists that he filed this suit at the earliest possible moment—the day after the certification. Id.

The court has determined that the plaintiff does not have standing. That means that the court does not have jurisdiction to assess the plaintiff's credibility, and it will refrain from doing so.

        4.    *Failure to state a claim upon which relief can be granted*

Both defendants asked the court to dismiss the case for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Because the court does not have subject matter jurisdiction, it will not address the sufficiency of the substantive claims in the amended complaint.

43

Exhibit K

5.    *Requests for injunctive relief*

For the same reason, the court cannot address the merits of the plaintiff's request for preliminary injunctive relief.

## V.    Conclusion

This court's authority to grant relief is confined by the limits of the Constitution. Granting the relief the plaintiff requests would take the court far outside those limits, and outside the limits of its oath to uphold and defendant the Constitution. The court will grant the defendants' motion to dismiss.

The court **GRANTS** Defendant Governor Tony Evers's Motion to Dismiss Plaintiff's Amended Complaint. Dkt. No. 51.

The court **GRANTS** Defendant Wisconsin Elections Commission and Its Members' Motion to Dismiss. Dkt. No. 53.

The court **DENIES AS MOOT** Plaintiff's Corrected Motion for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 6.

The court **DENIES AS MOOT** Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction to be Considered in an Expedited Manner Dkt. No. 10.

The court **DISMISSES** the Amended Complaint for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 9.

44

Exhibit K

The court **ORDERS** that this case is **DISMISSED.**

Dated in Milwaukee, Wisconsin this 9th day of December, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

45

Exhibit K

Sidney Powell (pro hac application forthcoming)
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
Sidney@federalappeals.com


Alexander Kolodin, AZ Bar No. 030826
Christopher Viskovic, AZ Bar No. 035860[1]
**KOLODIN LAW GROUP PLLC**
3443 N. Central Ave. Ste. 1009
Phoenix, AZ 85012
Telephone: (602) 730-2985
Facsimile: (602) 801-2539
E-Mail:
Alexander.Kolodin@KolodinLaw.com
CViskovic@KolodinLaw.com
SAtkinson@KolodinLaw.com (file copies)

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TYLER BOWYER, MICHAEL JOHN BURKE, NANCY COTTLE, JAKE HOFFMAN, ANTHONY KERN, CHRISTOPHER M. KING, JAMES R. LAMON, SAM MOORHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, SALVATORE LUKE SCARMARDO, KELLI WARD, and MICHAEL WARD | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF** |
| v. | (Election Matter) |
| DOUG DUCEY, in his official capacity as Governor of the State of Arizona, and KATIE HOBBS, in her official capacity as the Arizona Secretary of State | (TRO Requested) |
| Defendants. | |

[1] District of Arizona admission scheduled for 12/9/2020.

Exhibit L

## NATURE OF THE ACTION

1.      This civil action brings to light a massive election fraud, of the Election and Electors Clauses, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, of the U.S. Constitution and multiple violations of the Arizona election laws. These violations occurred during the 2020 General Election throughout the State of Arizona, as set forth in the affidavits of eyewitnesses and the voter data cited, the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.      The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. This Complaint details an especially egregious range of conduct in Maricopa County and other Arizona counties using employing Dominion Systems, though this conduct occurred throughout the State at the direction of Arizona state election officials.

3.      The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Arizona, that collectively add up to multiples of Biden's purported lead in the State of 10,457 votes.

4.      While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Arizona's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election. Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief

Exhibit L

requested herein.

**Dominion Voting Systems Fraud and Manipulation**

5. The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used in Maricopa County. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6. Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

7. As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record

Exhibit L

of that voter's identity. Smartmatic created and operated the entire system. *See Exh. 1.* ¶¶ 10 & 14.

8.      A core requirement of the Smartmatic software design ultimately adopted by Dominion for Arizona's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9.      The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[2]

10.      This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties

---

[2] *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 11A, 11B, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

- 4 -

Exhibit L

or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11. These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In using Dominion Voting Systems Democracy Suite, Arizona officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. (See Exhs 11A&11B ).

12. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[3]

13. Further, Dominion's documented, and intentional, security flaws facilitated foreign interference in the 2020 General Election. For example, in the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Ex. 12, copy of redacted witness affidavit).

---

[3] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Ex. 10 ("Appel Study")).

Exhibit L

14.     Because this Complaint concerns mainly federal questions, it was not styled as a Statement of Contest within the meaning of ARS §§ 16-671 - 16-678.

15.     Nonetheless, the factual basis of this Complaint would also support an election contest under Arizona law since A.R.S. § 16-672 allows for contests on the grounds of misconduct, offenses against the elective franchise, on account of illegal votes, and by reason of erroneous count of votes.

16.     Similarly, the relief sought is in accord with Arizona law. A.R.S. § 16-676 provides clear remedies in the event of a successful contest, providing that the results of an election may either be annulled and set aside, A.R.S. § 16-676(B), or, if it appears that the winner was other than the person certified, the erroneously declared winner's certificate of election can be revoked A.R.S. § 16-676(C).

17.     In the event that the election is annulled and set aside, there would certainly not be time to hold a new election, especially given the issues identified herein. However, it would be eminently proper for the question of the choice of electors to then revert to the legislature, for "[t]here is no doubt of the right of the legislature to resume the power [to appoint electors] at any time, for it can neither be taken away nor abdicated." *Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 529-30, 148 L.Ed.2d 388, 398 (2000) (citing with approval *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S. Ct. 3, 10, 36 L.Ed. 869, 877 (1892)).

18.     Furthermore, this Court need not be concerned with whether such weighty questions can be addressed on an expedited timeline, because Arizona law provides very aggressive deadlines for the resolution of elections challenges. Specifically, Arizona law provides for election challenges to be resolved on the merits within 10 days of filing. A.R.S. § 16-676(A).

### Expert Witness Testimony on Widespread Voting Fraud

19.     This Complaint presents expert witness testimony demonstrating that several  thousands of illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

- 6 -

Exhibit L

A. Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135

B. Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845

C. Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D. "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E. And Plaintiffs can show Mr. Biden received a statistically significant Advantage, based on fraud, from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

20.     Except for the estimate of illegal out-of-state votes, each of these experts has identified distinct sources of illegal votes in sufficient numbers (*i.e.*, greater than Biden's purported margin of 10,457 votes), not only to affect, but to change the result of the 2020 General Election in Arizona. Taken together, the irregularities, anomalies and physical and statistical impossibilities, account for at least 412,494 illegal ballots that were counted in Arizona. This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

21.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below. Section I describes specific violations of Arizona law. Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct. Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and the history of Dominion and its executives demonstrating that

Exhibit L

Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

## JURISDICTION AND VENUE

22. This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

23. This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

24. The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

25. This Court has jurisdiction over the related Arizona constitutional claims and state-law claims under 28 U.S.C. § 1367.

26. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona. 28 U.S.C. § 1391(b) & (c).

27. Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

28. Each of the following Plaintiffs is a registered Arizona voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Arizona: Tyler Bowyer, a resident of Maricopa County; Nancy Cottle, a resident of Maricopa County; Jake Hoffman, a resident of Maricopa County; Anthony Kern, a resident of Maricopa County; James R. Lamon, a resident of Maricopa County; Samuel Moorhead, a resident of Gila County; Robert Montgomery, a resident of Cochise County; Loraine Pellegrino, a

Exhibit L

resident of Maricopa County; Greg Safsten, a resident of Maricopa County; Kelli Ward, a resident of Mohave County; and Michael Ward, a resident of Mohave County.

29.　　Plaintiff Michael John Burke is a registered Arizona voter residing in Pinal County.　Mr. Burke is the Republican Party Chairman for Pinal County.

30.　　Plaintiff Christopher M. King is a registered Arizona voter residing in Pima County.　Mr. Burke is the Republican Party Vice Chairman for Pima County.

31.　　Plaintiff Salvatore Luke Scarmado is a registered Arizona voter residing in Mohave County.　Mr. Burke is the Republican Party Chairman for Mohave County.

32.　　Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."　*Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

33.　　Plaintiffs bring this action to prohibit certification of the election results for the Office of President of the United States in the State of Arizona and to obtain the other declaratory and injunctive relief requested herein.　Defendants certified those results on November 30, 2020, indicating a plurality for Mr. Biden of 10,457 votes out of 3,420,565 cast.

34.　　The Defendants are Arizona Governor Doug Ducey, and Arizona Secretary of State Katie Hobbs.

35.　　Defendant Governor Doug Ducey is named as a defendant in his official capacity as Arizona's governor.

36.　　Defendant Secretary of State Katie Hobbs is named as a defendant in her official capacity as Arizona Secretary of State, who serves as the chief election officer in the State of Arizona.

## STATEMENT OF FACTS

Exhibit L

37.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Arizona Constitution.

38.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

39.

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.
> U.S. CONST. art. I, § 4 ("Elections Clause").

40.     With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
> U.S. CONST. art. II, § 1 ("Electors Clause").

41.     None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

42.     While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

Exhibit L

43. Secretary Hobbs certified the Presidential Election results on November 30, 2020. The Presidential election results in Arizona show a difference of 10,457 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

44. The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below. Section I describes specific violations of Arizona law. Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct. Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and includes a summary of information relating to the motive and opportunity, and a pattern of behavior to prove that Dominion and its executives demonstrating that Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

45. Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results and invalidate the election results...

## I. VIOLATIONS OF ARIZONA ELECTION LAW

### A. Arizona Election Law

46. Pursuant to A.R.S. § 16-550(A), the county recorder or other officer in charge of elections shall compare the signatures on the early ballot affidavit with the signature of the elector on the elector's registration record. If the signature is inconsistent, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter and allow the voter to correct or confirm the inconsistent signature.

47. Pursuant to A.R.S. § 16-625, the officer in charge of elections shall ensure that electronic data from and electronic or digital images of ballots are protected from physical and electronic access, including unauthorized copying or transfer, and that all

Exhibit L

security measures are at least as protective as those prescribed for paper ballots.

**B.** Fact Witness Testimony of Arizona Law Violations

**1. Poll Watchers Failed to Adequately Verify Signatures on Ballots.**

48.      Affiant Burns stated that, while she was not permitted to be within viewing range of computer screens or monitors, she did have an opportunity to view "High Confidence" signatures following a brief power outage. *Id.* Upon seeing these, she was "disturbed … that the signatures were not even close to the signatures that they were 'comparing' the ballot signature to," and because she was told by the one poll worker with whom she was allowed to speak that "these signatures were counted." *(See Exh. 21)*

**2. Biased and Partisan Maricopa County Poll Referees.**

49.      Affiant Low expressed concern that "the two Maricopa County *referees*, who [were] called upon to settle any unresolved disputes between the adjudicators, were registered 'Independent Party' members." (See Exh. 20, Low aff. ¶7) (emphasis in original). When asked about that, they told Mr. Low that "this *set up* was laid out per Arizona Statute." *Id.* (emphasis in original).

Due to the high likelihood of the Dominion machine rejecting ballots, a "set up" like the one discussed above, impacts the outcome of the results of the election. The machines make determinations on what ballots to invalidate or validate based on an algorithm that operates offshore before tallying the votes locally..

To begin, the judges that adjudicate ballots must be evenly distributed amongst the major parties per A.R.S. § 16-531(A). There should be zero tolerance of fraud like this in any election system.

**3. Irregularities Involving Dominion Voting Machines & Employees.**

50.      Affiant Low and fellow poll watcher Greg Wodynski repeatedly asked the Dominion employee (named "Bruce") at their polling location as to whether the Dominion machines were connected to the internet and how data was backed up. The Dominion employee repeatedly denied that the machines were connected to the Internet, *id.* ¶11, but "admitted that he took a complete copy of the voter files, being stored in the Dominion

- 12 -

Exhibit L

system out of the building with him every night as a form of a 'back up' copy." *Id.* ¶22.

51.     Low's fellow poll watcher, Affiant Gregory Wodynski, provides more detail on these regularities.  First, Dominion employees and supervisors informed Mr. Wodynski "that about 12% of mail in ballots were being rejected and needed human intervention in the adjudication process," which "amounted to tens of thousands of ballots that required intervention" in the days he was an observer.  Ex. 22, Wodynski aff at ¶9.  Mr. Wodynski confirms that "Bruce" stated that "he would perform a manual daily system backup to an external hard drive," *id.* ¶10, and that "he made a daily second disk backup to a new spare hard drive[] … [that] were being physically moved off site to another building outside the MTEC building," but would not say where. *Id.* ¶11.  Bruce further stated "**there was NO CHAIN OF CUSTODY on data backup hard drives leaving the MTEC facility on a daily basis for an undisclosed location.**" *Id.* (emphasis in original).

52.     Mr. Wodynski also testified to a conversation with Dominion employee Bruce of the "the specifics of a process where he was manually manipulating stored scanner tabulation data files," which "he described as a processing issue at the numerous adjudication computer workstations." *Id.* ¶12.  Bruce claimed that this was to split large files into small files for adjudication.  *Id.* ¶13. Mr. Wydnoski was concerned because this "**was a human intervention process and therefore creating a potential for intention or non-intentional errors or lost ballot files.**" *Id.*

**4. Problems with Certification of Dominion Voting Machines.**

53.     Affiant Linda Brickman, the 1st Vice-Chair of the Maricopa County Republican Committee, oversaw the Secretary of State certification of Dominion voting machines on November 18, 2020.  Ex. 23, Brickman Aff at 1.  Mr. Brickman observed the following problems:

- Signature verification standards were constantly being lowered by Supervisors in order to more quickly process that higher amount of early and mail-in ballots (from approx. 15 points of similarities, to a minimum of 3, lowered to 1, and ultimately to none – "Just pass each signature verification through")  …

Exhibit L

- Challenged signatures on envelopes where the signature was a completely different person than the name of the listed voter, was let through and approved by supervisors.

- Challenged runs or batches of envelopes for signature verification observed by me to be the exact same handwriting on the affidavit envelopes on numerous envelopes. When I asked if the County Attorney would be alerted for possible ballot fraud, I was told no, but supervisors would take care of it. …

- In the Duplication room, I observed with my Democratic partner the preparation of a new ballot since the original may have been soiled, damaged, or ripped, and wouldn't go through the tabulator. I read her a Trump/Republican ballot and as soon as she entered it into the system the ballot defaulted on the screen to a Biden/Democratic ballot. We reported this to supervisors, and others in the room commented that they had witnessed the same manipulation. We were never told what, if any, corrective action was taken.

- Election Office Observers – when it became apparent that more and more early and mail-in ballots would need to be processed, I mentioned that the current rule of the number of observers per party was not adequate (1 per party, unless all parties agreed to more). And since the Governor refused to call the Legislature into session for any reason, and little incentive for the Democrats to agree to a higher adequate number, there was no way 1 observer per Party, forced to the back of a room, or behind a see-through wall, had a legitimate opportunity to see what elections workers were seeing in real time and doing, especially where up to 20 or more workers processing tasks, sometimes in 10 seconds or less! And I personally observed most observers acting "clueless", and do not believe any of them even realized the challenges I made and referenced above.

- And lastly, one of the most egregious incidents in both the Duplication and Adjudication rooms which I worked, I observed the problem of Trump votes with voters checking the bubble for a vote for Trump, but ALSO, writing in the name "Donald Trump" and checking the bubble next to his hand written name again, as a duplicated vote, counting as an "OVERVOTE," which means – no vote was counted at all, despite the policy having been changed to allow these overvotes. Supervisors contradicted their own policies where the intent was clear. Ray Valenzuela, Director of Elections, told me openly at the morning of the Dominion Certification (November 18, 2020), that this was incorrect, the Supervisors were terribly mistaken and as an Adjudicator, I was instructed incorrectly, and these many votes SHOULD HAVE BEEN COUNTED AND NOT TURNED AWAY AS AN OVERVOTE.

Exhibit L

*Id.* at 5-6.

## II.  EXPERT WITNESS TESTIMONY:
## EVIDENCE OF WIDESPREAD VOTER FRAUD

**1.      In Arizona 86,845 Mail-In Ballots Were Lost, and 219,135 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.**

54.      The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Arizona voters collected by Matt Braynard, which was conducted from November 15-17, 2020. *See* Ex., Dr. Briggs Report at 1, and Att. 1 ("Briggs Survey").  The Briggs Survey identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots ***without*** requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  *Id.*  Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors are from a total population of 518,560 unreturned mail-in ballots for the State of Arizona.

55.      With respect to **Error #1**, Dr. Briggs' analysis estimated that **208,333 to 229,337 ballots** out of the total 518,560 unreturned ballots were recorded for voters who had **not** requested them.  *Id.*  All of these absentee ballots were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter.  *Id.*  (Ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.)

56.      With respect to **Error #2**, he found **78,714 to 94,975 ballots** out of 518,560 unreturned ballots recorded for voters who **did return their ballots, but were recorded as being unreturned.** *Id.*  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled

- 15 -

Exhibit L

out by election workers, Dominion or other third parties.

57.     Taking the average of the two types of errors together, **303,305 ballots, or 58% of the total, are disenfranchisement and unlawful.** *Id.* These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

58.     Dr. Briggs' finding that 58% of "unreturned ballots" suffer from one of the two errors above is consistent with his findings in the four other States analyzed (Georgia 39%, Michigan 45%, Pennsylvania 37%, and Wisconsin 45%).  His analysis also provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

> **2.    Evidence That At Least 5,790 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Arizona.**
>
> 3.    Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 5,085 Arizona voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.   Mr. Braynard also identified 744 Arizona voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.   The merged number is 5,790 ineligible voters whose votes must be removed from the total for the 2020 General ElectionEstimate of Illegal or Fictitious Votes Due to Dominion Voting Fraud and Manipulation.

59.     Expert witness Russell James Ramsland, Jr. identifies two types of statistical anomalies that he concludes are the result of voting fraud. (*See* Ex. 17).  First, as in other States Mr. Ramsland has analyzed (Georgia, Michigan and Wisconsin), Mr. Ramsland

Exhibit L

finds historically unprecedented levels of turnout in specific counties or precincts. Using publicly available data, Mr. Ramsland determined that 66 percent of Pima County precincts (164 of 248) had turn out above 80%, and at least 36 had turnout above 90%, and that 54 percent of Maricopa County precincts (300 of 558) had turnout of 80% or more, and at least 30 over 90%. *Id.* ¶14. The report concludes that these extraordinary, and likely fraudulent, turnout levels "compels the conclusion to a reasonable degree of professional certainty that the vote count in Arizona, in particular for Maricopa and Pima counties for candidates for President contain at least 100,724 illegal votes that must be disregarded. *Id.*¶14.

60.      Mr. Ramsland also identifies an impossibility: "an improbable, and possibly impossible spike in processed votes," *id.* ¶16, like those also found in Georgia, Michigan and Wisconsin. Specifically, at 8:06:40 PM on November 3, 2020, there was a spike of 143,100 votes for Biden in Maricopa and Pima Counties. *Id.* Mr. Ramsland believes that the spike in Arizona, like those in the other three States he analyzed could have been manufactured by Dominion voting machines through a method described in greater detail in Section III below. *Id.*

61.      The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- Returned ballots that were deemed unreturned by the state (average for Briggs Error #1): 219,135.

- Unreturned mail ballots unlawfully ordered by third parties (average for Briggs Error #1): 86,845.

- Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

- "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima

- 17 -

Exhibit L

County precincts: 100,724.

62.     In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 412,494 or over 40 times the margin by which candidate Biden leads President Trump in the state of Arizona.

**III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS**

5.     The State of Arizona used Dominion Voting Systems in Maricopa County. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

63.     *]*

64.     Mr. Ramsland analyzed the Edison data reported to, and posted by, the New York Times, and concludes that this data "strongly suggests" the use of an "additive algorithm" (referred to as "ranked choice voting algorithm" ("RCV") in Dominion's user guide), combined with blank ballots loaded by the election workers or system operators, to manipulate votes in Arizona.[6]

65.     Mr. Ramsland cites two specific examples from the Edison data demonstrating Dominion's algorithmic vote manipulation. The figure below, reproduced from his testimony, graphs the Edison data on election night for Arizona, where the blue bars "indicate the percentage of the batch that went for Biden," while the red trend lines and arrows "indicate the impossible consistencies" in that vote percentage. *Id.* ¶15. In other words, the blue bars and the horizontal trend lines show that "the percentage of the votes submitted in each batch that went towards candidate [Biden] remain unchanged for a series of time and for a number of *consecutive* batches …" *Id.* Mr. Ramsland concludes

---

[6] *See* Ex. 17, ¶15 (quoting Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2, which reads in part, "**RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.**") Using the RCV method allows the operator to enter "blank ballots … into the system and treated as 'write-ins.' Then the operator can enter an allocation of the write-ins among candidates as he or she wishes. The result then awards the winner based on "points" that the algorithm computes, not actual voter votes." *Id.*

Exhibit L

that the probability of such a consistent percentage in multiple consecutive batches "approaches zero," and "makes clear an algorithm is allocating votes based on a percentage." *Id.*



Impossible consistency in percentage of votes counted

66.     The second example analyzed by Mr. Ramsland is "the improbable, and



Exhibit L

possibly impossible spike in processed votes" for Biden, namely, the insertion of 143,100 Biden votes in Maricopa and Pima Counties at 8:06:40 PM on November 3, 2020. *See id.* ¶16.

This spike, cast largely for Biden, could easily be produced in the Dominion EMS control system by pre-loading batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure (to cast Write-In, Blank, or Error ballots) that is available to the operator of the system. A few batches of blank ballots electronically pre-loaded into the adjudication files could easily produce a processed ballot stream this extreme so that actual paper ballots would not be needed until later to create "corroboration" for the electronic count. *Id.*

### 6. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

67.      **Texas.** Texas, through its by the Secretary of State, denied certification to nearly the same Dominion Democracy Suite on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[7]

68.      **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and

---

[7] See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Exhibit L

transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

69.     **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

70.     The Secretary of State appoints a committee of three people to test different voting systems.  The committee is required to submit their recommendations to the Secretary of state who then makes the final decision on which voting system(s) to adopt. **A**.R.S. § 16-442(A) and (C)In explaining that "In summary, [the court] rejected the Secretary's argument that her certification of voting machines for use in Arizona is **a** political question that is inappropriate for judicial review." In doing so, the court explained the application of HAVA because Arizona requires that its voting systems are HAVA compliant which includes accreditation pursuant to HAVA.  *Chavez v. Brewer*, 222 Ariz. 309, 317, 214 P.3d 397, 405, 2009). During the subsequent four years, the Arizona Legislature amended and enacted several statutes to effectuate HAVA. Among these changes, the legislature amended Arizona Revised Statutes (**A**.R.S.) section **16-442**(**A**) to require that the secretary of state determine the voting machines that are "certified for use" in elections. 2003 Ariz. Sess. Laws, ch. 260, § 9 (1st Reg. Sess.). The

Exhibit L

1  legislature also amended the process for selecting electronic voting machines by

2  requiring that the secretary of state certify only voting machines that "comply with

3  [HAVA]" and requiring that all election machines or devices be "tested and approved by

4  **a** laboratory that is accredited pursuant to [HAVA]." *Id.;* **A**.R.S. § **16-442**(B) (2006). The

5  legislature also authorized the secretary of state to revoke the certification of any voting

6  system that fails to meet the new standards. 2003 Ariz. Sess. Laws, ch. 260, § 9; 2005

7  Ariz. Sess. Laws, ch. 144, § 2; **A**.R.S. § **16-442**(**C**), (D).

8  *Chavez v. Brewer*, 222 Ariz. 309, 312, 214 P.3d 397, 400, (App. 2009).

9  Dominion Voting Systems is not currently certified pursuant to the EAC Voting
   Systems

10  71. A District Judge found that Dominion's BMD ballots are not voter verifiable,

11  and they cannot be audited in a software independent way. The credibility of a BMD ballot

12  can be no greater than the credibility of Dominion's systems, which copious expert analysis

13  has shown is deeply compromised. Similar to the issues in Arizona and Wisconsin, Judge

14  Totenberg of the District Court of Georgia Northern District held:

15

16  Georgia's Election Code mandates the use of the BMD system as the
    uniform mode of voting for all in-person voters in federal and statewide

17  elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate
    voting on "electronic ballot markers" that: (1) use "electronic technology to

18  independently and privately mark a paper ballot at the direction of an
    elector, interpret ballot selections, ... such interpretation **for elector**

19  **verification**, and print **an elector verifiable paper ballot**;" and (2)
    "produce paper ballots which are marked with the elector's choices **in a**

20  **format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-
    2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are

21  required to vote on **a system that does none of those things**. Rather, the
    evidence shows that the Dominion BMD system does **not produce a voter-**

22  **verifiable paper ballot or a paper ballot marked with the voter's**
    **choices in a format readable by the voter because the votes are**

23  **tabulated solely from the unreadable QR code**.

24

25  See Order, pp. 81-82. (Emphasis added).

26  72. This case was later affirmed in a related case, in the Eleventh Circuit in 2018

27  related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d

28

Exhibit L

1270 (11th Cir. 2018). The Court found that:

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted. *Id.at* 1294-1295.

73.     The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

Exhibit L

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### 7. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### a. The Origins of Dominion Voting Systems

74. Smartmatic and its inventors have backgrounds evidencing foreign connections with countries such as Serbia. Upon information and belief, the inventors listed below have such connections:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[8]

75. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

#### b. US Government Advisory on Vulnerability to Foreign Hackers.

76. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

---

[8] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

- 24 -

Exhibit L

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Ex. 18.)

### c. Expert Witness Testimony on Dominion Vulnerability to Foreign Interference and Ties to Hostile Foreign Governments

77.     A PhD Declarant analyzed the cumulative vote percentages sorted by ward or precinct sizes.  This concept was previously used throughout the report on voter irregularities in lulu Fries'dat and Anselmo Sampietro's "*An electoral system in crisis*" at http://www. electoralsystemincrisis.org/.   In Fries' dat's report there was an anomalous dependency on precinct size in many of the 2016 primary elections.  The larger precincts had introduced the use of voting machines.  However, one could also theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight. Normally, we would expect the cumulative vote percentage to converge to an asymptote, and bounce around the mean until convergence.  An example of this can be found from the 2000 Florida Democratic presidential primary between Gore and Bradley. (*See* Exh. __, at p. 8).  This is shown in Figure 8, and is taken from Fries' dat's report:

Exhibit L

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 8: Baseline Cumulative Fractions Sorted by Precinct Size

(*See* Exh. __, at p. 9).

The Declarant then analyzed Maricopa county in Arizona, in addition to other swing

states. The data was obtained from the Maricopa county recorder website at

https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt

The Declarant sorted precincts by size and tallied the cumulative vote percentages. It

should rapidly approach an asymptote, but again in Figure 18 we see an anomaly. The

Biden percentage is higher in the smaller precincts, primarily at the expense of Trump,

again suggesting vote switching, since the 3rd party percentages immediately approach

the asymptote.

Exhibit L





Figure 18: Maricopa County Arizona Percentage vs Precinct Size

(*See* Exh. 19, at p. 14).

In Figure 19 the Declarant focuses on the third-party percentages, which we see are indeed independent of precinct size and converge quickly to the asymptote. This is about what we would expect if the third-party candidates were counted fairly. It is in sharp contrast to the precinct size dependency and slow convergence of the Trump and Biden percentages.



Figure 19: Third Party Percentages vs Size in Maricopa County

Exhibit L

1   (*See* Exh. 19, at p. 15).

2   78.     An analysis of the Dominion software system by a former US Military

3   Intelligence expert subsequently found that the Dominion Voting system and software are

4   accessible - and was compromised by rogue actors, including foreign interference by Iran

5   and China.  (*See* Ex. 12, Spider Declaration (redacted for security reasons).)

6   79.     The expert does an analysis and explains how by using servers and

7   employees connected with rogue actors and hostile foreign influences combined with

8   numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to

9   access data and intentionally provided access to Dominion's infrastructure in order to

10  monitor and manipulate elections, including the most recent one in 2020.  *Id*. Several facts

11  are set forth related to foreign members of Dominion Voting Systems and foreign servers

12  as well as foreign interference.).

13  80.     Another Declarant first explains the foundations of her opinion and then

14  addresses the concerns of foreign interference in our elections through hardware

15  components from companies based in foreign countries with adverse interests. (*See* Ex.

16  13).  She explains that Dominion Voting Systems works with SCYTL, and that votes on

17  route, before reporting, go to SCYTL in foreign countries.  On the way, they get mixed and

18  an algorithm is applied, which is done through a secretive process.

19

20  The core software used by ALL SCYTL related Election Machine/Software

21  manufacturers ensures "anonymity" Algorithms within the area of this

    "shuffling" to maintain anonymity allows for setting values to achieve a

22  desired goal under the guise of "encryption" in the trap-door… *Id*.

23  81.     The Affiant goes on to explain the foreign relationships in the hardware used

24  by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port

25  that Dominion uses, which is called Edge Gateway and that is a part of Akamai

26  Technologies based in Germany and China.

27  82.     This Declarant further explains the foundations of her opinion and then

28

Exhibit L

addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity".
> **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(See Id. at ¶32).

83.        Scytle, contracts with the AP – which receives the results tallied by SCYTL on  behalf of Dominion.  (See Exh. 13 at par. 33). This becomes highly relevant since SCYTLE is complete offshore.  (See Exh. 13 at par.44) And where the ballots go through a process described in three categories for a ballot cast, Step 1 involves Configuring the Data; Step 2 involves Cleansing which means determining which ballots are valid and which are not; and Step 3 involves "Shuffling" where the ballots get mixed and the algorithm is applied to distribute the votes. It is when the algorithm is applied, that happens secretly and the parameters of that algorithm are only known to SCYTL and Dominion. (See Exh. 13, pars. 44-50)  – and  where it gets encrypted as "ciphertexts."

> Certification Program, nor is its' provider.  China is not currently the only nation involved with COTS system provided to election machines or the networking, so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies – that have their offices in China and are linked to the server for Dominion Software.  (See Exh. 13 at par. 36))

Mathematical evidence of the seeding "injection"  of votes can be seen from the data feed on November 3, 2020 for Maricopa and Pima counties, where a spike can be seen which means a large number of votes were injected into the totals. (See Exh. 13 at par. 69).

Exhibit L

84. The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

> **The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \le n^{\frac{1}{2}\log(n)}$$

> Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX."
> (*See Id*. at pars. 67-69)

> "The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

> (*See Id*. at par. 73)

85. And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl based on certain available data, that it was reported with decimal points, which is contrary to one vote as one ballot: **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

Exhibit L

**8. Additional Independent Findings of Dominion Flaws.**

86.     Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

**1. Central Operator Can Remove, Discard or Manipulate Votes.**

87.     Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Ex. 14, Watkins aff. ¶11). ¶8.

88.     Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> 9.  During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".
>
> 10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.
>
> 11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named

Exhibit L

"NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

89.     The Voting Rights Act, 52 U.S.C. §10101(e), provides, in relevant part:

… When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election;

    a.  The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

    b.  No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

    c.  Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

    d.  Each voting system used in an election for Federal office shall meet the following requirements:     (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6)

    e.  State laws define a "vote" as a "ballot" that clearly indicates the intent of the voter to choose a candidate.  "Ballot" means a ballot label, sheet of paper or

Exhibit L

envelope on which votes are recorded. The term also includes a sheet or card, filmstrip or other device listing or containing information relative to offices, candidates and referenda which is placed, projected or composed on the board or screen inside a voting machine.  Wis. Stat. § 5.02 Every ballot, except a voting machine ballot, shall bear substantially the following information on the face: "Notice to electors: This ballot may be invalid unless initialed by 2 election inspectors. If cast as an absentee ballot, the ballot must bear the initials of the municipal clerk or deputy clerk.   Wis. Stat. Ann. § 5.54 (emphasis in original Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481. Among other things, it provides that, "Each voting system used in an election for Federal office shall meet the following requirements: …  (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 42 U.S.C. §15481(a)(6)

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

90.      The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

**§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the

- 33 -

Exhibit L

Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

91.     Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication.   (Ex. 14 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic

Exhibit L

voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

92. Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 10, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that

Exhibit L

has played a significant role in the U.S. market over the last decade.'"[9] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[10]

F. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, &

---

[9] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

[10] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

Exhibit L

Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[11]

93.     The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

> This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
> The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

**9. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

94.     Dr. Eric Coomer is listed as the co-inventor for several patents on

---

[11]  Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

Exhibit L

ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[12]  He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's patented ballot adjudication technology is built into Dominion voting machines sold throughout the United States, including those used in Arizona.  (See attached hereto Exh 6, Jo Oltmann Aff.).

95.      In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[13]  He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[14]

---

[12] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014);  (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[13] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[14] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

Exhibit L

96.     Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media.  An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history).  (See Id.)

97.     Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity.  Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW!  I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.
> *Id.* (July 21, 2016 Facebook post).[15]

98.     In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I

---

[15]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

Exhibit L

know it is going on a lot." This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1. Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (Id.)

99. Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

100. Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

Exhibit L

101.     By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house *and has forfeited any presumption of objectivity, fairness, or even propriety*.  It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

102.     In sum, as set forth above, for a host of independent reasons, the Arizona election results concluding that Joe Biden received more votes that President Donald Trump must be set aside.

## COUNT I

### Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.

103.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

104.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

105.     The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

Exhibit L

106. Defendants are not part of the Arizona Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Arizona Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

    i. The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

    ii. No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

    iii. Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

    iv. Each voting system used in an election for Federal office shall meet the following requirements: (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6).

107. With respect to unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, Plaintiffs have identified 78,714 to 94,975 ballots out of 518,560 absentee / mail ballots. Id. These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.

108. Taking the average of the two types of errors together, 303,305 ballots, or

Exhibit L

58% of the total, are defective. These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden, and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

109.     There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.

110.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

111.     Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Arizona should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

112.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

113.     The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the

Exhibit L

right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

114.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

115.    The disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

116.    In statewide and federal elections conducted in the State of Arizona, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have an interest in having the election laws enforced fairly and uniformly.

117.    Defendants failed to comply with the requirements of Arizona law and the Equal Protection Clause and thereby diluted the lawful ballots of the Plaintiffs and of other Arizona voters and electors in violation of the United States Constitution guarantee

Exhibit L

1
2
3
4
5

of Equal Protection. In Section II, Plaintiff experts provide testimony quantifying the number of illegal votes resulting from Defendants' statutory and constitutional violations. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

6
7
8
9
10
11
12

118.    Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution and Arizona law.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of Arizona election law.

13
14
15
16

119.    Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

17
18
19
20

120.    In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

21
22

121.    Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

23
24
25
26
27
28

122.    There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.  That is the dilution of lawful votes, while 78,714 to 94,975 ballots out of 518,560 unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, and their vote was taken from

Exhibit L

them.

123.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Arizona law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

### COUNT III

### Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983
### Denial of Due Process On The Right to Vote

124.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

125.     The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665.    *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").  Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)).  *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

Exhibit L

126.      The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

127.      "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

128.      "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

129.      The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast.  The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of

Exhibit L

eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

130.     The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

131.     Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

132.     Arizona law makes clear with regard to the electronic voting systems, that "[a]fter the close of the polls and after compliance with section 16-602 the members of the election board shall prepare a report in duplicate of the number of voters who have voted, as indicated on the poll list, and place this report in the ballot box or metal container, in which the voted ballots have been placed, which thereupon shall be sealed with a numbered seal and delivered promptly by two members of the election board of different political parties to the central counting place or other receiving station designated by the board of supervisors or officer in charge of elections, which shall not be more than fifty miles from the polling place from which the ballots are delivered. The person in charge of receiving ballots shall give a numbered receipt acknowledging receipt of such ballots to the person in charge who delivers such ballots. B. The chairman of the county committee of each political party represented on the ballot may designate a member of his party to accompany the ballots from each polling place to the central counting place.  A.R.S. § 16-608.

133.     As Plaintiffs have shown the ballots processed by Dominion Voting Systems reports to SCYTL, which is offshore, and uses an algorithm, that is secretive, and applies

Exhibit L

Case 2:20-cv-01093-DJH  Document 35-1  Filed 03/03/21  Page 744 of 677

a cleansing of invalid versus valid ballots, before the votes get tallied for distribution.

134.    Plaintiffs seek declaratory and injunctive relief enjoining Defendants from certifying the results of the General Election. This Court should enjoin Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

<div align="center">

**COUNT IV**

**Wide-Spread Ballot Fraud**

</div>

135.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

136.    The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

137.    Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

138.    The Supreme Court of Arizona set forth the standard of fraud for elections when it that held in the State of Arizona, fraud in an election is based on ballots procured in violation to the law: "We therefore hold that HN5 a showing of **fraud** is not a necessary condition to invalidate absentee **balloting**. It is sufficient that an express non-technical statute was violated, and **ballots** cast in violation of the statute affected the election. *Miller v. Picacho Elementary Sch. Dist. No*. 33, 179 Ariz. 178, 180, 877 P.2d 277, 279, (S. Ct.1994).

> "Contrary to *Findley,* election statutes are mandatory, not "advisory," or else they would not be law at all. If a statute expressly provides that non-compliance invalidates the vote, then the vote is invalid. If the statute does not have such a provision, non-compliance may or may not invalidate the vote depending on its effect. In the context of this case, "affect the result, or at least render it uncertain," *id.* at 269, 276 P. at 844, means **ballots** procured in violation of a non-technical statute in sufficient numbers to alter the outcome of the election.

Id.

Exhibit L

139.     This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A. Unreturned mail ballots unlawfully ordered by third parties: 219,135

B. Returned ballots that were deemed unreturned by the state: 86,845

C. Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D. "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E. And Plaintiffs can show Mr. Biden received a statistically significant Advantage from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

140.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

141.     Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Arizona's 2020 General Election because it is fundamentally corrupted by fraud. Defendants should be enjoined from certifying an election where there were intentional violations of multiple provisions of Arizona law to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

Exhibit L

**PRAYER FOR RELIEF**

142.     Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

143.     In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with Arizona law.

144.     Further, Plaintiffs ask this Court to order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Arizona and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Arizona cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Arizona should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Arizona should be directed to vote for President Donald Trump.

145.     For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.   An order directing Governor Ducey and Secretary Hobbs to de-certify the election results;

2.   An order enjoining Governor Ducey from transmitting the currently certified election results the Electoral College;

3.   An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs,

Exhibit L

ballot applications, ballot return envelopes, ballot images, paper ballots, and all election materials related to the November 3, 2020 Arizona election for forensic audit and inspection by the Plaintiffs;

4.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

5.  A declaratory judgment declaring that Arizona's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

6.  A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

7.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

8.  A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

9.  A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

10. Immediate production of 48 hours of security camera recording of all rooms used in Maricopa County for November 3, 2020 and November 4, 2020.

Exhibit L

11. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 1st day of December 2020.

/s Sidney Powell*                                      /s Alexander Kolodin

Sidney Powell PC                                       Kolodin Law Group PLLC
Texas Bar No. 16209700                                        AZ Bar No. 030826

2911 Turtle Creek Blvd, Suite 300              3443 N. Central Ave Ste 1009
Dallas, Texas 75219                                          Phoenix, AZ 85012

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)

2911 Turtle Creek Blvd. Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice Forthcoming

L. Lin Wood (Georgia Bar No. 774588)
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler (New York Bar No. 2657120)
Howard Kleinhendler Esquire
369 Lexington Ave. 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit L

2020 WL 7238261
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Tyler BOWYER, et al., Plaintiffs,
v.
Doug DUCEY, et al., Defendants.

No. CV-20-02321-PHX-DJH
|
Signed 12/09/2020

**Synopsis**
**Background:** Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs brought action against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. Plaintiffs moved for temporary restraining order (TRO) and, after county board of supervisors and county recorder intervened as defendants, defendants filed motions to dismiss.

**Holdings:** The District Court, Diane J. Humetewa, J., held that:

[1] county chairs failed to establish their standing to bring action for violation of the Elections Clause;

[2] electors lacked standing to bring action for violations of the Electors and Elections Clauses;

[3] plaintiffs lacked standing to bring vote dilution claim under the Equal Protection Clause;

[4] *Colorado River* abstention was warranted in light of parallel litigation in state court;

[5] Eleventh Amendment barred plaintiffs' claims under § 1983;

[6] *Ex parte Young* doctrine did not apply so as to provide exception to Eleventh Amendment immunity as bar to plaintiffs' claims for prospective injunctive relief; and

[7] plaintiffs' claim for injunctive relief was moot.

Motions to dismiss granted, remaining pending motions denied as moot, and preliminary injunction vacated.

West Headnotes (57)

**[1]**  **Federal Courts**  ⬦ Rights and interests at stake;  adverseness

To ensure that the Federal Judiciary respects the proper and properly limited role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy. U.S. Const. art. 3, § 2, cl. 1.

**[2]**  **Federal Civil Procedure**  ⬦ In general; injury or interest

**Federal Courts**  ⬦ Case or Controversy Requirement

For there to be a case or controversy over which federal courts may exercise judicial power, the plaintiff must have standing to sue. U.S. Const. art. 3, § 2, cl. 1.

**[3]**  **Federal Civil Procedure**  ⬦ In general; injury or interest

Whether a plaintiff has standing presents a threshold question in every federal case, because it determines the power of the court to entertain the suit. U.S. Const. art. 3, § 2, cl. 1.

**[4]**  **Federal Courts**  ⬦ Case or Controversy Requirement

No principle is more fundamental to the judiciary's proper role in the country's system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies. U.S. Const. art. 3, § 2, cl. 1.

**[5]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Courts** 🔑 Case or Controversy
Requirement

A suit brought by a plaintiff without Article III
standing is not a case or controversy, and an
Article III federal court therefore lacks subject
matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**[6]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Civil Procedure** 🔑 Rights of third
parties or public

To have Article III standing, a plaintiff seeking
relief in federal court must first demonstrate a
personal stake in the outcome, distinct from a
generally available grievance about government.
U.S. Const. art. 3, § 2, cl. 1.

**[7]**   **Constitutional Law** 🔑 Nature and scope in
general

**Federal Civil Procedure** 🔑 In general;
injury or interest

The threshold requirement for standing that
the plaintiff must demonstrate a personal stake
in the outcome, distinct from a generally
available grievance about government, ensures
that the federal courts act as judges, and do not
engage in policymaking properly left to elected
representatives. U.S. Const. art. 3, § 2, cl. 1.

**[8]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Civil Procedure** 🔑 Causation;
redressability

To establish Article III standing, a plaintiff has
the burden of clearly demonstrating that she
has: (1) suffered an injury in fact; (2) that is
fairly traceable to the challenged conduct of the
defendant; and (3) that is likely to be redressed
by a favorable judicial decision. U.S. Const. art.
3, § 2, cl. 1.

**[9]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

To establish an injury in fact, as required
to have Article III standing, a plaintiff must
show that he or she suffered an invasion of
a legally protected interest that is concrete
and particularized and actual or imminent, not
conjectural or hypothetical. U.S. Const. art. 3, §
2, cl. 1.

**[10]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

To establish an injury in fact, as required to have
Article III standing, the plaintiff must establish
a "particularized injury," which means that the
injury must affect the plaintiff in a personal and
individual way. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[11]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

Although imminence is concededly a somewhat
elastic concept in the context of establishing
Article III standing, it cannot be stretched beyond
its purpose, which is to ensure that the alleged
injury is not too speculative for Article III
purposes, that the injury is certainly impending.
U.S. Const. art. 3, § 2, cl. 1.

**[12]**   **Federal Courts** 🔑 Dismissal or other
disposition

When a plaintiff has not established the elements
of standing, the case must be dismissed for lack
of subject matter jurisdiction. U.S. Const. art. 3,
§ 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[13]**   **Federal Courts** 🔑 Pleadings and motions

**Federal Courts** 🔑 Evidence; Affidavits

A challenge on a motion to dismiss for lack of
subject matter jurisdiction may be either facial or
factual. Fed. R. Civ. P. 12(b)(1).

**[14]**   **Federal Courts**   Dismissal or other disposition

In a facial attack on a motion to dismiss for lack of subject matter jurisdiction, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[15]**   **Federal Courts**   Pleadings and motions

In a facial attack on a motion to dismiss for lack of subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 12(b)(1).

**[16]**   **Federal Courts**   Weight and sufficiency

When a court evaluates a factual challenge to jurisdiction, on a motion to dismiss for lack of subject matter jurisdiction, the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. Fed. R. Civ. P. 12(b)(1).

**[17]**   **United States**   Relation to state law; preemption

The Elections Clause of the United States Constitution authorizes the state governments to regulate federal elections held in the state, while Congress retains exclusive control to alter a state's regulations. U.S. Const. art. 1, § 4, cl. 1.

**[18]**   **United States**   Regulation of Election of Members

**United States**   Presidential electors

While the Electors Clause and Elections Clause are separate Constitutional provisions, they share considerable similarity and are therefore often considered together. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cl. 2.

**[19]**   **Injunction**   Persons entitled to apply; standing

**United States**   In general; election contests

Republican county chairs failed to establish their standing to bring action against Arizona's governor and secretary of state, alleging violation of the Elections Clause of the Constitution and seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where chairs did not allege any grounds for their standing in their complaint, and their briefings did not contain any arguments that they had standing to assert claim under the Elections Clause. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. art. 1, § 4, cl. 1.

**[20]**   **Injunction**   Persons entitled to apply; standing

**United States**   In general; election contests

**United States**   Presidential electors

Republican nominees for Arizona's presidential electors were not considered candidates for office under Arizona law, and, thus, they lacked standing to bring action against Arizona's governor and secretary of state, alleging violations of the Electors and Elections Clauses of the Constitution and seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where electors were limited to merely fulfilling ministerial function, and voters in Arizona did not vote for any single electors listed next to presidential candidates' names. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cl. 2; U.S. Const. art. 3, § 2, cl. 1; Ariz. Rev. Stat. Ann. §§ 16-212(C), 16-344, 16-507(B).

1 Cases that cite this headnote

**[21]**   **Constitutional Law**   Elections

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs failed to allege they suffered any concrete harm, as required to establish injury in fact required to have Article III standing to bring vote

dilution claim under Equal Protection Clause against Arizona's governor and secretary of state, in action seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where state actors' alleged counting of ballots in violation of state election law did not involve any votes being weighed differently in violation of the Equal Protection Clause, and plaintiffs raised only generally available grievance about government. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[22]    Constitutional Law** 👈 **Equality of Voting Power (One Person, One Vote)**

Vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. U.S. Const. Amend. 14.

**[23]    Constitutional Law** 👈 **Ballots in general**

State actors counting ballots in violation of state election law is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. Amend. 14.

**[24]    Constitutional Law** 👈 **Elections**

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs did not request relief that was redressable in tailored way, as required to establish Article III standing to bring vote dilution claim under Equal Protection Clause against Arizona's governor and secretary of state, in action seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where providing relief requested would disenfranchise nearly 3.4 million Arizonans that voted in general election, transforming all allegedly diluted votes from being diluted to being destroyed. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[25]    Federal Courts** 👈 **Right to Decline Jurisdiction;  Abstention**

Generally, a federal court has a duty to exercise the jurisdiction conferred by Congress.

**[26]    Federal Courts** 👈 **Right to Decline Jurisdiction;  Abstention**

Under certain circumstances, it is prudent for a federal court to abstain from hearing a matter.

**[27]    Federal Courts** 👈 **Right to Decline Jurisdiction;  Abstention**

Abstention by a federal court may be warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration.

**[28]    Federal Courts** 👈 **Colorado River abstention**

*Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations.

**[29]    Federal Courts** 👈 **Colorado River abstention**

The factors for determining whether *Colorado River* abstention is warranted are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

**[30]    Federal Courts** 👈 **Elections, Voting, and Political Rights**

*Colorado River* abstention was warranted in action brought by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's

governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, although plaintiffs' allegations of widespread fraud in relation to vote tabulation systems and software were not before state courts, where plaintiffs' claims were similar to those raised in ongoing state court cases, federal forum was less convenient than state forum considering state election law violations alleged, state actors involved, and interplay of state election law, many of same parties and attorneys were litigating related matters in both forums, federal action was last filed case, crux of plaintiffs' arguments and statutes upon which they relied involved Arizona election law, and state courts were adequately equipped to protect rights of named plaintiffs.

**[31]** **Federal Courts** 🔑 Right to Decline Jurisdiction;  Abstention

When considering abstention, proper constitutional adjudication, regard for federal-state relations, and wise judicial administration inform the court.

**[32]** **Federal Courts** 🔑 Suits Against States;  Eleventh Amendment and Sovereign Immunity

Eleventh Amendment immunity applies when a citizen brings a claim against their own state. U.S. Const. Amend. 11.

**[33]** **Federal Courts** 🔑 Agencies, officers, and public employees

Eleventh Amendment immunity extends to suits against state officials when the state is the real, substantial party in interest. U.S. Const. Amend. 11.

**[34]** **Federal Courts** 🔑 Suits Against States;  Eleventh Amendment and Sovereign Immunity

**Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief;  Ex parte Young doctrine

The jurisdictional bar of a suit against a state, under the Eleventh Amendment, applies regardless of the nature of the relief sought. U.S. Const. Amend. 11.

**[35]** **Federal Courts** 🔑 Agencies, officers, and public employees

When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself, as would be barred under the Eleventh Amendment. U.S. Const. Amend. 11.

**[36]** **Federal Courts** 🔑 What Are Suits Against States;  Entities and Individuals Entitled to Immunity

The general rule is that a suit is against the sovereign, for purposes of Eleventh Amendment immunity, if the effect of the judgment would be to restrain the government from acting, or to compel it to act. U.S. Const. Amend. 11.

**[37]** **Federal Courts** 🔑 Exceptions to Immunity

**Federal Courts** 🔑 Agencies, officers, and public employees

There are three recognized exceptions to a state's Eleventh Amendment immunity: (1) Congress has abrogated the immunity within a federal statute; (2) the state has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law. U.S. Const. Amend. 11.

**[38]** **Federal Courts** 🔑 Civil rights and discrimination in general

**Federal Courts** 🔑 Other particular entities and individuals

Congress did not abrogate states' immunity from suit in enacting language of § 1983, as would provide exception to Eleventh Amendment immunity as bar to claims brought in § 1983 action by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

[39]   **Federal Courts** 🔑 Waiver by State; Consent

State of Arizona did not explicitly waive its immunity for elections challenges, as would provide exception to Eleventh Amendment immunity as bar to claims brought in § 1983 action by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

[40]   **Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

[41]   **Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

When claims are state law claims, masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment clearly bars the suit, whether the relief requested is prospective or retroactive in nature. U.S. Const. Amend. 11.

[42]   **Federal Courts** 🔑 Other particular entities and individuals

*Ex parte Young* doctrine did not apply so as to provide exception to Eleventh Amendment immunity as bar to claim for prospective injunctive relief brought by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where plaintiffs' fraud claims were entirely based on state election law, and even if plaintiffs had asserted independent federal claims, those claims concerned past conduct related to alleged issues with signature verification, ballot duplication, and poll observation, and did not assert any ongoing violation of federal law. U.S. Const. Amends. 11, 14.

[43]   **Equity** 🔑 Prejudice from Delay in General

Laches will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in filing the action and the delay caused prejudice to the defendant or the administration of justice.

[44]   **Constitutional Law** 🔑 Delay in assertion of rights; laches
**Election Law** 🔑 Limitations and laches

Laches can bar untimely claims for relief in election cases, even when the claims are framed as constitutional challenges.

[45]   **Injunction** 🔑 Laches

Doctrine of laches barred claims asserted by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where plaintiffs

delayed nearly a month after general election in seeking to decertify election results, even though basis for their claims was either known well before election day or soon thereafter, and Arizona state election challenge law, which required electors to file challenge to election in state court within five days of certification of election, did not excuse plaintiffs' delay because they opted to file their federal constitutional challenges in federal court. Ariz. Rev. Stat. Ann. § 16-673.

**[46]    Federal Courts** 🔑 Mootness

**Federal Courts** 🔑 Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Mootness is a jurisdictional issue, and federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.

**[47]    Federal Courts** 🔑 Available and effective relief

A case is moot when a party cannot obtain relief for its claim.

**[48]    Injunction** 🔑 Mootness and ripeness; ineffectual remedy

**Injunction** 🔑 Conduct of elections

Claim for permanent injunction enjoining governor from transmitting certified results of general election, and decertifying election results, was moot, in action asserted by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where governor had already transmitted results, District Court lacked power to decertify results, and even if the Court could decertify election, such relief would necessarily run afoul of the Electoral Count Act by ignoring Arizona law that required election contest claims

to be brought in state court. 3 U.S.C.A. § 6; Ariz. Rev. Stat. Ann. § 16-672.

**[49]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

A motion to dismiss a complaint or claim grounded in fraud for failure to plead fraud with requisite particularity is the functional equivalent of a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 9(b), 12(b)(6).

**[50]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

The particularity requirement of the rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity demands a higher degree of notice than that required for other claims; the claim must identify who, what, where, when, and how. Fed. R. Civ. P. 9(b).

**[51]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

The rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties, and society enormous social and economic costs absent some factual basis. Fed. R. Civ. P. 9(b).

**[52]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs failed to plead fraud with requisite particularity, and failed to plead facts that could plausibly give rise to inference that Arizona's

secretary of state and governor conspired with various domestic and international actors to manipulate Arizona's general election results allowing Democratic candidate to defeat Republican candidate in presidential race, as required to state claim against Arizona's governor and secretary of state for injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. Fed. R. Civ. P. 9(b).

---

**[53]    Injunction 🔑 Relation or conversion to preliminary injunction**

The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction.

---

**[54]    Injunction 🔑 Extraordinary or unusual nature of remedy**

**Injunction 🔑 Extraordinary or unusual nature of remedy**

**Injunction 🔑 Clear showing or proof**

Under normal circumstances, both a temporary restraining order and a preliminary injunction are extraordinary and drastic remedies, and should not be granted unless the movant, by a clear showing, carries the burden of persuasion.

---

**[55]    Injunction 🔑 Grounds in general;  multiple factors**

**Injunction 🔑 Grounds in general;  multiple factors**

A plaintiff seeking a temporary restraining order or preliminary injunction must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest.

---

**[56]    Injunction 🔑 Other particular cases**

**Injunction 🔑 Sufficiency, particular cases**

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs seeking temporary restraining order (TRO) and preliminary injunction setting aside results of general election failed to show substantial likelihood of success on merits of their claims of fraud and election misconduct, where they faced serious jurisdictional impediments in bringing their claims to federal court at eleventh hour, and those insurmountable legal hurdles were exacerbated by insufficiently pled allegations of fraud, rendered implausible by multiple inadmissible affidavits, declarations, and expert reports upon which their complaint relied.

---

**[57]    Injunction 🔑 Conduct of elections**

Public interest did not support grant of temporary restraining order (TRO) and preliminary injunction setting aside results of general election in Arizona on basis of alleged fraud and election misconduct, where relief requested would cause enormous harm to Arizonans, supplanting will of nearly 3.4 million voters reflected in certified election results and potentially imperiling Arizona's participation in Electoral College.

---

**Attorneys and Law Firms**

Alexander Michael Kolodin, Christopher Alfredo Viskovic, Kolodin Law Group PLLC, Phoenix, AZ, Brandon Johnson, Emily P. Newman, Sidney Katherine Powell, Pro Hac Vice, Sidney Powell PC, Dallas, TX, Howard Kleinhendler, Pro Hac Vice, New York, NY, Julia Zuszua Haller, Defending the Republic, Washington, DC, L. Lin Wood, Wood Hernacki & Evans LLC, Atlanta, GA, for Plaintiffs.

Anni Lori Foster, Office of the Governor, Brett William Johnson, Colin Patrick Ahler, Derek Conor Flint, Ian R. Joyce, Snell & Wilmer LLP, Phoenix, AZ, for Defendant Doug Ducey.

David Andrew Gaona, Kristen Michelle Yost, Roopali H. Desai, Coppersmith Brockelman PLC, Phoenix, AZ, Davida Brook, Pro Hac Vice, Susman Godfrey LLP, Los Angeles,

CA, Elizabeth B. Hadaway, Pro Hac Vice, Justin A. Nelson, Pro Hac Vice, Susman Godfrey LLP, Houston, TX, Stephen Edward Morrissey, Pro Hac Vice, Susman Godfrey LLP, Seattle, WA, Stephen Lee Shackelford, Jr., Pro Hac Vice, Susman Godfrey LLP, New York, NY, for Defendant Katie Hobbs.

**ORDER**

Diane J. Humetewa, United States District Judge

**\*1** Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility ... that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2). By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties ... at the direction of Arizona state election officials." (Id.) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

**I. Background**

In Arizona, more than 3.4 million voters participated in the November 3, 2020, General Election. Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1] Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election. A.R.S. § 16-648. On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas. (Doc. 40 at 4). The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2] On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors. (Doc. 40 at 4). The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act. (Id.); see also 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10). The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3] (Doc. 1 at 51–52). The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election. (Id. at ¶ 3). And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots." (Id.)

**\*2** Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for various Arizona counties. (Id. at ¶¶ 29–31). The remaining eleven are Republican nominees for Arizona's presidential electors. (Id. at ¶ 28). One of the eleven, Dr. Kelli Ward, filed suit in state-court over allegations of fraud in this election. See Ward v. Jackson, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding no evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1). In that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's election. (Ward v. Jackson, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983 claims for violations of the Constitution's Elections and Electors Clauses, as well as the Fourteenth Amendment's Due Process and Equal Protection guarantees. (Doc. 1 ¶¶ 103–34). The final count, which does not specify a cause of action, is for "Wide-Spread Ballot Fraud." (Id. at ¶¶ 135–41).

On December 3, the day after Plaintiffs filed their Complaint, the Court received a Motion to Intervene from the Arizona Democratic Party, which was subsequently denied.[4] (Docs. 26 and 69). The Court also received a Motion to Intervene from the Maricopa County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was

granted. (Docs. 27 and 32). The Court held a status conference on the same day, in which it scheduled a December 8 hearing on the TRO. (Doc. 28). By subsequent Order (Doc. 43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on December 4. (Docs. 36, 38, and 40). Plaintiffs have filed their Response to the Motions (Doc. 44), and Defendants have filed their Replies. (Docs. 53, 54, and 55). On December 8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under advisement. Being fully briefed on the matter, the Court now issues its ruling.

## II. Analysis

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety. The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

### A. Article III Standing

**[1]  [2]  [3]  [4]  [5]**  "To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (internal citations omitted). Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies." U.S. Const. Art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) ("*Spokeo II*"). Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal

court therefore lacks subject matter jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**\*3  [6]  [7]  [8]**  "[A] plaintiff seeking relief in federal court must first demonstrate ... a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam). "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Gill*, 138 S. Ct. at 1923. To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. 2197); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

**[9]  [10]  [11]  [12]**  To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo II*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). "When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.' " *Id.* The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way." *Raines v. Byrd*, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

**[13]  [14]  [15]  [16]**  Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction. A Rule 12(b)(1) challenge may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the court may dismiss a

complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction. *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

**1. Elections and Electors Clause – Count One**

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 42 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone." (Doc. 1 at 41). Defendants argue that Plaintiffs do not have standing to assert such a claim. (Doc. 40 at 8–9).

**[17]    [18]** The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. Art. I, § 4, cl. 1. The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations. *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ...." U.S. Const. Art. II, § 1, cl. 2.[5]

**\*4    [19]** Plaintiffs' Complaint alleges that Defendants violated the Elections Clause. However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs. At oral argument, Plaintiffs' counsel stated that eleven of the Plaintiffs were Republican Party nominees to electors, and the other three were county GOP Chairs. As an initial matter,

Plaintiffs' briefing does not contain any arguments that the GOP Chairs have standing to assert this claim and the Court will dismiss the claim as to the GOP Chairs outright.

**[20]** Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and thus that they have standing under the Electors and Elections Clause pursuant to an Eighth Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). (Doc. 44 at 5). That case, which is based on the operation of Minnesota state election law, allowed electors to bring claims under the Elections Clause because electors were treated as candidates for office under Minnesota law and thus would be injured by the governor's failure to seat them if chosen as the state's electors. *See Carson*, 978 F.3d at 1057.

Plaintiff Electors likewise assert that under Arizona law they should also be considered "candidates." (Doc. 44 at 5–6) (citing A.R.S. § 16-344). However, the Electors are not candidates for office as the term is generally understood. Arizona law makes clear that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in scope and duration, and that they have no discretion to deviate at all from the duties imposed by the statute. *See* A.R.S. § 16-212(C) ("After the secretary of state issues the statewide canvass containing the results of a presidential election, the presidential electors of this state ***shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes*** in this state as prescribed in the canvass.") (emphasis added). Arizona voters do not show up to vote for any single Electors listed next to the presidential candidates' names; they vote for their preferred presidential candidate. By specifying that the electors "shall be enclosed in a bracketed list" next to "the surname of the presidential candidate and vice-presidential candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status from that of the presidential candidate running for office, the latter who unquestionably suffers the discrete injury required for standing.[6] Notably, the Republican candidate whose name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the *Carson* decision with disapproval, noting that there was no precedent for expanding standing in the way that it did.[7] *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond [v. United States*, 564 U.S. 211, 131 S.Ct. 2355,

180 L.Ed.2d 269 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots.... The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none."). Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance,* 549 U.S. at 442, 127 S.Ct. 1194.

**\*5** Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One.[8] Therefore, the Court will dismiss Count One.

**2. Vote Dilution – Count Two**

**[21]** In Count Two, Plaintiffs allege Equal Protection violations based on Defendants' failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud and manipulation," and in preventing "actual observation and access to the elector process," which allegedly resulted in "the dilution of lawful votes ... and the counting of unlawful votes." (Doc. 1 at 45). Plaintiffs ask the Court to order that "no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger [i]s allowed to meaningfully observe the process." (Doc 1 ¶ 120). Absent from the Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter) were deprived of their right to vote. Instead, they bring baseless claims of "disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another." (Doc. 1 ¶ 115). They do not allege what "class" of voters were treated disparately. Nor do the Elector Plaintiffs cite to any authority that they, as "elector delegates," are a class of protected voters. Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed. The Court agrees.

**[22]** **[23]** Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find Article III Standing for their vote dilution claim. As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud. "Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." *Bognet,* 980 F.3d at 355; *see also Rucho v. Common Cause,* ——— U.S. ———, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) ("[V]ote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight."). "This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." *Bognet,* 980 F.3d at 355; *see also Shipley v. Chicago Bd. of Election Comm'rs,* 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power,* 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

**\*6** Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet,* 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley,* 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-Rivera,* 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell,* 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

**[24]**  Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that their vote dilution claim was more than a generalized grievance to the point of asserting an injury, Plaintiffs have not established that the Court can redress this grievance. To give Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that voted in the 2020 General Election. Under Plaintiffs' theory of dilution, this would transform all of the alleged diluted votes from being "diluted" to being destroyed. As Plaintiffs raise "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or controversy." *See Lance*, 549 U.S. 437 at 439, 127 S.Ct. 1194. Therefore, Plaintiffs do not have standing to bring suit in this forum.[9]

### B. Abstention

Defendants also argue the Court should abstain from reaching Plaintiffs' claims based on their similarities with ongoing state court cases. Yesterday, the Arizona Supreme Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020 General Election results." *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1). That case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey certified the election results on November 30, 2020. (Doc. 58-1 at 17). The *Ward* plaintiffs alleged an insufficient opportunity to observe election officials, an overcounting of mail-in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the ballot duplication process. (*Id.* at 17–21). After an evidentiary hearing, the Maricopa County Superior Court issued a ruling on December 4, 2020, finding that there was no misconduct, fraud, or effect on the outcome of the election.[10] (*Id.*) This ruling was unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited review.[11]

**\*7**  Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions related to bringing suit for alleged election misconduct, including illegal votes and erroneous counting. (Doc. 1 at ¶ 15). A.R.S. § 16-672 also provides that an elections contest brought under this statute should be filed in the superior court of the county in which the person contesting resides or in the superior court of Maricopa county. A.R.S. § 16-672(B). Plaintiffs aver that their claims seek federal action under federal statutes, and therefore, their claims are distinguishable from the claims being litigated in the state court. The Court disagrees.

**[25]**   **[26]**   **[27]**   **[28]**  Generally, a federal court has a duty to exercise the jurisdiction conferred by Congress. However, under certain circumstances, it is prudent for a federal court to abstain from hearing a matter. "Indeed, we have held that federal courts may decline to exercise its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citing *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). Abstention may be "warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Id. Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

**[29]**  The Ninth Circuit has enumerated an eight-part test for whether *Colorado River* abstention is warranted, stressing that the factors are "not a mechanical checklist," with some factors that "may not have any applicability to a case." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841–42 (9th Cir. 2017). The factors are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Id.*

**[30]**  Factors two through seven all support abstaining from this case.[12] To begin, this federal forum is less convenient than the state forum, considering the state election law

violations alleged, the claims are brought against state actors, and the interplay of state election law. Moreover, the present suit reflects the very essence of "piecemeal litigation," with many of the same parties and attorneys litigating related matters in both forums. As to the primacy of cases, this case was the last filed case. All of the state court litigation filed related to the election preceded this action. As to the nature of the claims, while Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes upon which they rely, involve Arizona election law and the election procedures carried out at the county and state level by state officials. The state courts are adequately equipped to protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there. Moreover, as Congress has conferred concurrent jurisdiction on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims. Felder v. Casey, 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of. The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court. However, as discussed *infra*, the Court finds that claim lacks Rule 9(b) particularity and plausibility.

**\*8** **[31]** Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court. Quackenbush, 517 U.S. at 716, 116 S.Ct. 1712. If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson*. The Court cannot think of a more troubling affront to "federal-state relations" than this. See Quackenbush, 517 U.S. at 716, 116 S.Ct. 1712. Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

### C. Eleventh Amendment

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit. Further, they argue that no exception applies, that the

relief Plaintiffs seek is not prospective, and that the claims are barred.

**[32]** **[33]** **[34]** **[35]** **[36]** The Eleventh Amendment to the Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. Such immunity applies when a citizen brings a claim against their own state. See Hans v. Louisiana, 134 U.S. 1, 19, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "This jurisdictional bar applies regardless of the nature of the relief sought." Id. "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." Id. at 101, 104 S.Ct. 900. "The general rule is that a suit is against the sovereign ... if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

**[37]** There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking _prospective_ injunctive relief against state officials to remedy a state's _ongoing_ violation of _federal_ law." Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 865 (9th Cir. 2016) (citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)) (emphasis added).

**[38]** **[39]** None of these exceptions are present here. As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties"). Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges. Therefore, the second exception does not apply. As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

**[40]** **[41]** "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal citations omitted). However, where the claims are state law claims, masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment clearly bars the suit. *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90, 104 S.Ct. 900 ("[W]hen a plaintiff alleges that a state official has violated state law" and "when a federal court instructs state officials on how to conform their conduct to state law, this conflicts directly with the principles of federalism that underlie the Eleventh Amendment."). This is true whether the relief requested is "prospective or retroactive" in nature. *Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900.

**\*9** **[42]** Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants' sovereign immunity. Defendants argue that all of Plaintiffs' allegations are actually state law allegations masked under federal law. Defendants point to numerous instances in Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-all fraud claims, which are entirely based on state law. The Eleventh Amendment clearly bars such claims. *See Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900 ("On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

However, even assuming that Plaintiffs established that their claims are indeed independent federal claims, it is unclear what *ongoing* violation of federal law is being asserted. Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all fraud claim, that arise from Defendants' alleged failure to follow Arizona state election laws. (Doc. 1 at ¶¶ 106–120). These numerous alleged violations—related to alleged issues with signature verification, ballot duplication, and poll observation—concern past conduct.[13] The relief requested—compelling the Governor to decertify the election—similarly seeks to alter past conduct. Plaintiffs have not

identified an ongoing violation to enjoin. In short, "Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects." *See King v. Whitmer*, ––– F.Supp.3d ––––, ––––, 2020 WL 7134198, at \*5 (E.D. Mich. Dec. 7, 2020).

The Eleventh Amendment bars the injunctive relief sought.

### D. Laches

**[43]** **[44]** Defendants also argue that the doctrine of laches bars Plaintiffs' claims. Laches will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in filing the action and the delay caused prejudice to the defendant or the administration of justice. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that laches requires a "defendant [ ] prove both an unreasonable delay by the plaintiff and prejudice to itself"). Laches can bar untimely claims for relief in election cases, even when the claims are framed as constitutional challenges. *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) ("[A] 'constitutional claim can become time-barred just as any other claim can.' ") (quoting *Block v. North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 292, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983)).

**[45]** Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the election results on December 2, 2020, nearly a month after the General Election on November 3, 2020. Plaintiffs conclusively argue that they waited this long because they "could not have known the basis of their claim, or presented evidence substantiating their claim, until after the election." (Doc. 44 at 9). They further state that, because "Arizona election officials and other third parties did not announce or publicize their misconduct, and in fact prevented Republican poll watchers from observing the ballot counting and handling, it took Plaintiffs additional time post-election to gather the fact and expert witness testimony presented in the Complaint." (*Id.*) During oral argument, Plaintiffs' counsel repeatedly stated that the alleged fraud related to the Dominion voting machines was not known until election night, when their experts noted a "blip" in their reporting data that showed an increase in votes for Joe Biden around 8:00 p.m. Plaintiffs also argue that A.R.S. § 16-673 supports the timeliness of their Complaint because it requires an elector to file a challenge to the election in state court within five days of certification of the election.

**\*10** Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona elections officials, occurring on various dates over the past weeks, months, and even years. In addition to the objections regarding poll watchers' inability to observe ballot counting and handling, Plaintiffs also object to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis for each of these claims was either known well before Election Day or soon thereafter, and thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims through December 2. For example, Plaintiffs' Complaint cites to documents showing that Plaintiffs were in possession of information about suspected irregularities with the Dominion voting machines as early as 2018. (*Id.* at ¶¶ 21, 69, 71–73) (referencing "publicly available evidence (including judicial and administrative proceedings)" that discuss concerns with security flaws in Dominion voting machines dating back to 2018); (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020 (describing his concerns over Maricopa County Dominion voting machine security and observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30, Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his concerns over Maricopa County Dominion voting machine security and his perception that "Bruce," a Dominion employee, could manually manipulate voter data files while poll watching on October 24, 2020 and November 1, 2020).

Plaintiffs also include documents showing that the facts underlying their allegations of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time. (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in

observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020. (*Id.* at 35). Indeed, at least one Plaintiff has already raised some of these complaints in state court.[14] *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B). Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court. When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable. *See Kelly v. Penn.*, 2020 WL 7018314, at \*1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g., Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

**\*11** The Court does not find that the Arizona state election challenge deadline excuses delay on Plaintiffs' part in these circumstances. *See* A.R.S. § 16-673. As noted above, the facts underlying the suspected irregularities complained of were either known to Plaintiffs prior to Election Day or soon thereafter. Although Arizona electors may have a deadline by which to file election contests in Arizona state court, Plaintiffs here opted to file their federal constitutional challenges in federal court. The exhibits to the Complaint confirm that the events complained of occurred on or before Election Day. Accordingly, the Court rejects Plaintiffs' self-serving statement that they did not know the basis for their claims before December 2, 2020. The documents they submit with their Complaint plainly shows the contrary is true, and the delay—which has resulted in a rush by this Court and Defendants to resolve these issues before the Electoral College meeting deadline of December 14, 2020—is unreasonable.

The second part of the laches test—prejudice—is also unquestionably met. First, the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020 General Election would be extreme, and entirely

unprecedented, if Plaintiff were allowed to have their claims heard at this late date. *SW Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented."). As an Eastern District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially so considering that Plaintiffs' claims for relief are not merely last-minute— they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak." *King*, –– F.Supp.3d at ––––, 2020 WL 7134198, at *7.

Second, the challenges that Plaintiffs assert quite simply could have been made weeks ago, when the Court would have had more time to reflect and resolve the issues. "Unreasonable delay can prejudice the administration of justice by compelling the court to steamroll through ... delicate legal issues in order to meet election deadlines." *Arizona Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted). Plaintiffs offer no reasonable explanation why their claims were brought in federal court at this late date. Their delay and the resulting prejudice bars their claims by laches.

### E. Mootness

[46]  [47]  Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22). The Court agrees. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.' " *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999)). In addition, a case is moot when a party cannot obtain relief for its claim. *Id.*; *see also Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999).

[48]  Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting the certified results, (b) orders Defendants to "de-certify" the election results, (c) nullifies votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due Process and Equal Protections Clauses, (e) mandates a manual recount or statistical sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect voting hardware and software as well as security camera recordings "of all rooms used in Maricopa County" from November 3 to 4. (Doc. 1 at ¶ 145).

Obviously, the Court cannot enjoin the transmission of the certified results because they have already been transmitted. (Doc. 40 at 4). Plaintiffs' counsel orally argued that Defendants had the power to de-certify the election under 3 U.S.C. § 6. Nothing in that statute authorizes this Court to de-certify the results. The manner provided to contest elections under Arizona law requires election contest claims to be brought, "in the superior court of the county in which the person contesting resides or in the superior court of Maricopa County." A.R.S. § 16-672. Therefore, if de-certification were possible, it would only be possible through an action brought in Arizona superior court. In other words, this Court has no power to de-certify the results. But even assuming the Court were able to grant the extraordinary relief requested, ordering Governor Ducey to de-certify the election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law. In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona law.

*12  Because this Court cannot de-certify the results, it would be meaningless to grant Plaintiffs any of the remaining relief they seek. *See Wood v. Raffensperger*, ––– F.3d –––, –––, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified."); *King*, ––– F.Supp.3d at ––––, 2020 WL 7134198, at *5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting voting machines and software and security camera footage only would be useful if an avenue remained open for them to challenge the election results."). Plaintiffs' claims are moot.

### F. Failure to State a Claim

[49]  "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15] for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). In a Rule 12(b)(6) context, courts must consider all well-pleaded factual allegations as true and interpret them in the light most favorable to the plaintiff. *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir. 2013). Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011), *cert. denied*, *Blasquez v. Salazar*, 565 U.S. 1261, 132 S.Ct. 1762, 182 L.Ed.2d 532 (2012).

**[50]** When pleading allegations concerning fraudulent conduct, Rule 9(b) requires something more than Rule 8: particularity. *Ashcroft v. Iqbal*, 556 U.S. 662, 686, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

**[51]** Moreover, "claims of fraud or mistake ... must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.' " *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

**\*13** Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line " 'from conceivable to plausible.' " *Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard represents a balance

between Rule 8's roots in relatively liberal notice pleading and the need to prevent "a plaintiff with a largely groundless claim" from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.' " *Twombly*, 550 U.S. at 557–58, 127 S.Ct. 1955 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

**[52]** Advancing several different theories, Plaintiffs allege that Arizona's Secretary of State and Governor conspired with various domestic and international actors to manipulate Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in the presidential race. The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections. Because the Complaint is grounded in these fraud allegations, the Complaint shall be dismissed. *Vess*, 317 F.3d at 1107 ("When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint or claim.").

Plaintiffs first "describe specific violations of Arizona law" to support their fraud claims.[16] In doing so, they attach declarations from poll watchers that observed election officials during the November General Election. (Doc. 1 ¶¶ 46–53). As Intervenor-Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs with first-hand observation of the election administration. (Doc. 36 at 4). But these four declarants do not allege fraud at all. (*See* Doc. 1-10 at 18–24). Instead, they raise objections to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor

empowered to supervise ...." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

 *14 Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc.1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots [ ] are indicative of voter fraud" and that the election should consequently be overturned. (Doc.1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52, Ex. 3). Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey." But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs. (*Id.*) In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*) This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome. The sheer unreliability of the information underlying Mr. Briggs'

"analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122). To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020. (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17) (emphasis added). He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure ...." (Doc. 1-9 at 9, Ex. 17). This scenario is conceivable. However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed. (Doc. 40 at 17–18). Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties. *See Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937. Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards. *Id.*

**\*15**  Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

### G. Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint. Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

**[53]  [54]  [55]**  "The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction." *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015). Under normal circumstances, both are extraordinary and drastic remedies, and " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted). A plaintiff seeking a temporary restraining order or preliminary injunction must show that (1) he or she is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20, 129 S.Ct. 365.

**[56]**  Plaintiffs simply cannot establish they have a likelihood of success on their claims. Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court at the eleventh hour. These insurmountable legal hurdles are exacerbated by insufficiently plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits, declarations, and expert reports upon which their Complaint relies.

**[57]**  Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm the public interest. As stated by Defendant Hobbs, "the requested relief would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results and potentially imperiling Arizona's participation in the Electoral College. It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff." (Doc. 40 at 24). The Court agrees. The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs' requests for injunctive relief.[18]

### III. Conclusion

**\*16**  Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Governor Doug Ducey, Secretary of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are **GRANTED** for the reasons stated herein.

**IT IS FURTHER ORDERED** that all remaining pending motions (Docs. 14, 62, 65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary Injunction set for December 10, 2020 is **vacated**.

**IT IS FINALLY ORDERED** that this matter is dismissed, and the Clerk of Court is kindly directed to terminate this action.

### All Citations

--- F.Supp.3d ----, 2020 WL 7238261

Footnotes

1   Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

2   Ariz. Sec'y of State, State of Arizona Official Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

3    Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes. That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020. *See* 3 U.S.C. § 7.

4    The Arizona Democratic Party sought intervention under theories of permissive joinder. While the Court did not believe the Motion was inappropriate, the Court did not find their presence necessary to this lawsuit and therefore denied the Motion to Intervene.

5    While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting). These provisions are therefore often considered together. *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause). Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

6    A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname of the presidential candidate and vice-presidential candidate who is seeking election jointly with the presidential candidate shall be listed directly below the name of the presidential candidate. The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

7    *See also Carson*, 978 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

8    The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes. (Doc. 1 ¶ 106).

9    Having established that the Court does not have jurisdiction over Plaintiffs' Counts One through Three, the Court will decline to exercise supplemental jurisdiction over Count Four, which pleads no federal cause of action and is entirely based on alleged fraud under Arizona law.

10    Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's allegations of election misconduct. First, Ward argued that there was an insufficient opportunity to observe the actions of election officials. The State Court dismissed that claim as untimely, holding that "[t]he observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured," and citing *Lubin v. Thomas*, 213 Ariz. 496, 144 P.3d 510, 511 (2006) ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice."). Second, Ward alleged that "election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file." The state court allowed Ward to examine a sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots." Lastly, Ward alleged errors with duplication of ballots. The state court also allowed Ward to examine a sampling of duplicate ballots and held that "[t]he duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome." The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and no effect on the outcome of the election." *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020); (Doc. 58-1).

11    "The Court concludes, unanimously, that the trial judge did not abuse his discretion in denying the request to continue the hearing and permit additional inspection of the ballots." *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

12    The Court finds that the first factor is not relevant to the facts alleged herein.

13    These include objections regarding poll watchers' ability to observe ballot counting, issues related to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

14    As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials. Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

15    Although Plaintiffs strenuously argue that they can bring their Arizona election law-based claims in federal court because of the presence of federal allegations, they also boldly assert in their Reply that they need not follow the heightened pleading standard of Federal Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]" (Doc. 44 at 23). Plaintiffs cannot have it both ways. Plaintiffs have not provided any authority that a state court decision can alter the pleading requirements in federal court established by United States Supreme Court precedent and the Federal Rules of Civil Procedure.

16    Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the ***Georgia legislature***." (Doc 2 at 6) (emphasis added). Plaintiffs also nonsensically include references to Wisconsin state statutes. (Doc. 1 at 33).

17    Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

18    The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary Injunction scheduled for December 10, 2020.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROSLYN LA LIBERTE, | Case No.: 1:18-cv-05398-DLI-VMS |
| Plaintiff, | |
| - against - | |
| JOY REID, | |
| Defendant. | |

---

### DEFENDANT JOY REID'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO REVOKE L. LIN WOOD'S *PRO HAC VICE* ADMISSION

---

Respectfully submitted,

JOHNREICHMANLAW LLC
56 Oakwood Avenue
Montclair, New Jersey 07043
(917) 626-8025

*-and-*

GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Defendant Joy Reid*

Exhibit N

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................(ii)

INTRODUCTION ................................................................................................1

I.  BACKGROUND ...................................................................................3

II. ARGUMENT .......................................................................................4

    A.  The Governing Legal Standards ........................................................ 4

    B.  Mr. Wood Has Sought to Subvert the Constitution and the Rule of Law ............. 8

    C.  Mr. Wood's Attacks on Chief Justice John Roberts ............................. 12

        1.  Mr. Wood's Maliciously False, Scurrilous Attacks on the Chief Justice ....... 12

        2.  Mr. Wood's Attacks on the Chief Justice Violate the RPC and Make
           Mr. Wood Unfit to Practice in This or Any Other Court .............................. 13

    D.  Mr. Wood's Frivolous Filings and Rule 11 and RPC 3.1 Violations ................. 15

        1.  Mr. Wood's False, Frivolous, and Vexatious Actions Filed
           Around the Country Have Already Led to the Revocation of
           His Admission in Delaware ........................................................... 16

        2.  Other Frivolous Cases Mr. Wood Filed, But Not Relied Upon By the
           Delaware Court, Provide Separate and Independent Grounds for the
           Revocation of His *Pro Hac Vice* Admission .................................... 19

        3.  Mr. Wood Is Responsible and Answerable for the False Filings .................. 21

    E.  Mr. Wood's False Statements to This Court....................................... 21

III. CONCLUSION...................................................................................24

i

Exhibit N

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                                        **Page(s)**

*In re 60 East 80th Street Equities, Inc.*,
218 F.3d 109, 120 (2d Cir. 2000) ...................................................................................... 15

*Aird v. Ford Motor Co.*,
86 F.3d 216 (D.C. Cir. 1996) ............................................................................................. 21

*Betts v. Townsends, Inc.*,
765 A.2d 531, 535 (Del. Supr. 2000) ................................................................................. 18

*Bowyer v. Ducey*,
CV-20-02321, 2020 WL 7238261 (D. Az. Dec. 9, 2020) ............................................. 16, 20, 22

*Chambers v. NASCO, Inc.*,
501 U.S. 32, 43 (1991) ........................................................................................................ 6

*Doe v. Mastoloni*,
307 F.R.D. 305, 310-311 (D. Conn. 2015) ........................................................................ 7

*Erbacci, Cerone, and Moriarty, Ltd. v. U.S.*,
923 F. Supp. 482, 485-86 (S.D.N.Y. 1996) ...................................................................... 20

*In re Paul G. Evans*,
801 F.2d 703, 706–7 (4th Cir. 1986) ................................................................................. 14

*Feehan v. Wisc. Elections Comm'n*,
No. 20-cv-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020) ........................................ 16

*In re Goldstein*,
430 F.3d 106, 112 (2d Cir. 2005) ................................................................................... 2, 6

*Matter of Holtzman*,
78 N.Y.2d 184, 192 (1991) ................................................................................................ 14

*In re Jaffe*,
585 F.3d 118, 137-38 (2d Cir. 2009) .............................................................................. 2, 6

*King v. Whitmer*,
No. 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020) ...................................... 16, 19, 23

*Matter of Kramer*,
919 F.2d 135 (3d Cir. 1990) .............................................................................................. 15

Exhibit N

*L. Lin Wood Jr. v. Raffensperger*,
No. 1:20-cv-04651, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020),
*aff'd*, 981 F.3d 1307 (11th Cir. 2020) ........................................................... 16, 17

*Matter of Luna v. Dotson*,
97 N.Y.2d 178, 182-83 (2001) ....................................................................... 18

*Martens v. Thomann*,
273 F.3d 159, 175 (2d Cir. 2001) .................................................................. 7, 8

*Matthews v. Freedman*,
128 F.R.D. 194, 203 (E.D. Pa. 1989), *aff'd sub nom* ...................................... 15

*Matter of Morisseau*,
763 F. Supp. 2d 648, 663 (S.D.N.Y. 2011) .................................................... 13, 15

*Page v. Oath, Inc.*,
No. S20C-07-030 (Del. Supr. Ct. Dec. 18, 2020) ............................................ 16

*Page v. Oath, Inc.*,
No. S20C-07-030 (Del. Supr. Ct. Jan. 11, 2021) ............................................ 17-19

*Matter of Palmisano*,
70 F.3d 483, 487 (7th Cir. 1995) .................................................................... 14

*Pearson v. Kemp*,
No. 1:20-cv-4809, 2020 WL 7040582 (N.D. Ga. Dec. 7, 2020) ...................... 16

*Pintur v. Rogic*,
No. 16-cv-09696, 2017 WL 5565620, at *6 (S.D.N.Y. Oct. 25, 2017) ............ 20, 24

*Raylon LLC v. Complus Data Innovations, Co.*,
Nos. 6:09-CV-355, 6:09-CV-356, 6:09-CV-357,
2015 WL 11121530, at *8-*9 (E.D. Tex. May 4, 2015) ................................... 21

*Reynolds v. Sims*,
377 U.S. 533, 562 (1964) ............................................................................... 12

*Ritchie v. Gano*,
No. 07 Civ 7269, 2008 WL 4178152, at *3 (S.D.N.Y. Sept. 8, 2008) ............. 6

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
No. 03Civ.3120, 2003 WL 22339357 *3 (S.D.N.Y. Oct. 14, 2003) ............... 7

*Steele v. Bell*,
No. 11 Civ 9343, 2012 WL 6641491, at *2 n.1 (S.D.N.Y. Dec. 19, 2012) ...... 6

Exhibit N

*United States v. Seltzer*,
227 F.3d 36, 42 (2d Cir. 2000) ................................................................. 6

*Matter of Terry*,
271 Ind. 499, 502 (Ind. 1979) ................................................................. 14

*Ward v. Jackson*,
CV 2020-015285 at p. 8 (Maricopa Co. Supr. Ct. Dec. 4, 2020),
*aff'd*, CV 2020-0343 (Az. Dec. 8, 2020) .............................................. 22-23

*Matter of Wisehart*,
281 A.D.2d 23, 31-32 (1st Dep't 2001) ................................................... 14

*Matter of Yao*,
231 A.D.2d 346, 348 (1st Dep't 1997) ..................................................... 18

## **Statutes and Rules**

U.S. Const. art. I, § 3, cl. 4 ...................................................................... 8

N.Y. Const. art. XIII, § 1 .................................................................. 1, 5, 12

*N.Y. Jud. Law*, § 466 (McKinney 2020) ............................................. 1, 5, 12

*Fed. R. Civ. P.* 11 ............................................................................... 5, 15

Fed. R. Civ. P. 11, Advisory Committee Note to 1993 Amendment ............... 21

*E.D.N.Y. Local Rule* 1.3 ........................................................................ 6, 17

*E.D.N.Y. Local Rule* 1.5 ........................................................................ 6, 17

*New York Rules of Professional Conduct* Preamble ...................................... 5

*New York Rule of Professional Conduct* 3.1 ............................................ 5, 15

*New York Rule of Professional Conduct* 3.3 ............................................ 5, 21

*New York Rule of Professional Conduct* 4.1 ............................................ 4, 12

*New York Rule of Professional Conduct* 8.3 ................................................ 5

*New York Rule of Professional Conduct* 8.4 ............................................ 4, 12

Exhibit N

**<u>Treatises</u>**

Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct Annotated* § 8.4:15 (2020) ................. 13

Exhibit N

# INTRODUCTION

Defendant Joy Reid submits this memorandum of law in support of her motion to revoke the *pro hac vice* admission of L. Lin Wood, one of Plaintiff Roslyn La Liberte's attorneys in this action.

Mr. Wood's *pro hac vice* admission should be revoked for four reasons. First, the oath of admission to practice in any federal court requires each attorney to pledge that he "will conduct [himself] uprightly and according to law, and that [he] will support the Constitution of the United States." Declaration of John H. Reichman ("Reichman Decl.") Ex. AA[1]. In New York specifically, every attorney must likewise pledge to "solemnly swear (or affirm) that [he] will support the Constitution of the United States." N.Y. Const. art. XIII, § 1; N.Y. Jud. Law § 466 (McKinney 2020). Mr. Wood, however, has sought and is seeking to subvert, not support, the rule of law, Article II, Section 1 of the Constitution, and the Twelfth Amendment, which call for the peaceful transfer of power and the election of the President and Vice President, culminating with the Vice President presiding over the counting of the electoral college votes at a joint session of Congress. Mr. Wood sought to prevent this constitutional process from going forward by urging the imposition of martial law, making false statements about election results, encouraging the siege of the United States Capitol, and even calling for the arrest and assassination of then-Vice President Mike Pence. *See* Reichman Decl. ¶¶ 8-11, 14, 22-23, 25.

Second, Mr. Wood's outrageous and unfounded attacks on the Chief Justice of the United States, John G. Roberts, Jr., violate RPC 8.4 and 4.1 and are grounds for revocation of his *pro hac vice* status. Mr. Wood has accused the Chief Justice of arranging "an illegal adoption of two young children from Wales through Jeffrey Epstein" and saying during a telephone call that former

---

[1] All citations to exhibits refer to exhibits within the Reichman Declaration.

1

Exhibit N

President Trump is a "m-----f-------" who could not be allowed another term. Ex. Y at 4; Reichman Decl. ¶ 32. Mr. Wood has also suggested that the Chief Justice is a murderous pedophile, was mixed up with Jeffrey Epstein and involved in the death of Justice Scalia, was being blackmailed, and was trafficking children. Ex. Y at 3-4; Reichman Decl. ¶ 33. Even after Ms. Reid's counsel raised these issues with this Court on January 11 and Mr. Wood denied them, he repeated and amplified these false claims on the social media website Telegram. Reichman Decl. ¶¶ 25, 34. Numerous decisions in New York have held that far tamer false statements and misconduct are grounds for discipline, including loss of the privilege to practice in the jurisdiction. *See*, *e.g.*, *In re Jaffe*, 585 F.3d 118, 137-38 (2d Cir. 2009) (holding that sanction requiring withdrawal from the bar was appropriate following a pattern of "repeated neglect of . . . cases"); *In re Goldstein*, 430 F.3d 106, 112 (2d Cir. 2005) (affirming sanctions where attorney's breach of his "representational duties" resulted in his client personally seeking the aid of the court to finalize the settlement of their case).

Third, Mr. Wood has consistently violated Federal Rule of Civil Procedure ("FRCP") 11 and New York Rule of Professional Conduct ("RPC") 3.1 by filing at least five frivolous lawsuits relating to the 2020 presidential election based on outright lies and non-existent legal theories. One Delaware court has already revoked Mr. Wood's *pro hac vice* admission, finding that the "conduct of Mr. Wood, albeit not in my jurisdiction, exhibited a toxic stew of mendacity, prevarication and surprising incompetence. What has been shown in court decisions in our sister States satisfies me that it would be inappropriate and inadvisable to continue Mr. Wood's permission to practice before this Court." Ex. X at 7. This Court should reach the same conclusion. This Court's Local Rules 1.3 and 1.5 make suspension or discipline in another State a basis for refusing *pro hac vice* admission and imposing discipline. Moreover, the doctrine of collateral

Exhibit N

estoppel precludes Mr. Wood from contesting the Delaware court's findings that "the Georgia case [brought by Mr. Wood] was textbook frivolous litigation" and that Mr. Wood filed or caused to be filed an affidavit which contained materially false information. *Id.* at 6.

Fourth, Mr. Wood has exhibited a lack of candor with this Court and a lack of respect for his duties as an officer of the court. At the January 11 conference, Mr. Wood made a number of false statements: i) he never called for people to go to the Capitol, ii) he never said anyone should break the law, and iii) no court had found that evidence of election fraud was lacking, each of which are demonstrably belied by Mr. Wood's tweets and other social media posts, and the dismissal of all five of the cases he brought around the country falsely claiming election fraud. Moreover, Mr. Wood told this Court he "didn't have anything to do with" the complaints that were filed bearing his name—a claim that, if true, would be a violation of FRCP 11 in and of itself. Ex. K at 10.

Importantly, this motion is not based on what Mr. Wood during the January 11 conference called "rhetorical hyperbole," or on his ideology or viewpoint. *Id.* at 12. The First Amendment protects the right to express one's opinions, even offensive opinions using colorful and hyperbolic language. But Mr. Wood has traveled far beyond that boundary, encouraging the siege on the Capitol to thwart the vote count, falsely attacking the Chief Justice and the judicial system, filing frivolous lawsuits, and violating with impunity the rules of the legal profession. This Court should revoke his *pro hac vice* status to protect the rule of law and the public's confidence in it.

## I. BACKGROUND

Mr. Wood's motion for admission *pro hac vice* was granted at the outset of this case on October 11, 2018. Order on 10/11/18. At the time, two of Mr. Wood's former partners also moved for and were granted *pro hac vice* admission. *Id.*

3

Exhibit N

Mr. Wood's former partners subsequently withdrew from this action.  Dkt. 42.  They also sued Mr. Wood for fraud, among other claims for relief.  Ex. A at 61.  Their complaint alleges that Mr. Wood engaged in physical and verbal assaults on his former partners, including by communicating anti-Semitic slurs and participating in other misconduct.  *Id.* at 42-43.

Mr. Wood's application for *pro hac vice* admission in this Court stated that he was not the subject of any disciplinary proceedings, as required by Local Rule 1.3.  Dkt. 7 at 1.  As described below, *infra* § II, that is no longer the case and Mr. Wood has not informed this Court that there are pending disciplinary proceedings against him in Michigan, or that a court has already revoked his *pro hac vice* admission in Delaware.

Mr. Wood has had scant personal involvement in this case.  One of his former partners was primarily responsible for opposing Defendant's motion to dismiss and successfully arguing the appeal of that dismissal in the Second Circuit.  Reichman Decl. ¶ 5.  Mr. Wood did not participate in any of the attorney conferences regarding scheduling and discovery prior to the January 11 conference—Defendant's counsel was repeatedly informed that Mr. Wood was too busy attending to his election lawsuits to participate in this action.  *Id.*

## II.  ARGUMENT

### A.    The Governing Legal Standards

RPC 8.4(c) provides:

A lawyer or law firm shall not:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) engage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice. . . .

Moreover, RPC 4.1 states that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person."  This Rule is not limited to

4

Exhibit N

statements made in court. *See also* RPC 3.3 (a "lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal").

In addition, a lawyer practicing before the federal and New York courts has a duty to respect the law and conduct himself in a way that encourages others to do so, and must take an oath to follow the law and support the Constitution. Ex. AA; N.Y. Const. art. XIII, § 1; N.Y. Jud. Law § 466 (McKinney 2020). A lawyer is "an officer of the legal system" with "a duty to uphold the legal process; to demonstrate respect for the legal system; . . . and to promote . . . the administration of justice." RPC Preamble § 1. "In addition, a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because, in a constitutional democracy, legal institutions depend on popular participation and support to maintain their authority." *Id.*

While "[e]very lawyer is responsible for observance of the Rules," each is also supposed to "aid in securing their observance by other lawyers." *Id.* at § 5. When a lawyer becomes aware of another lawyer's violation of the RPC that "raises a substantial question as to that lawyer's honesty, trustworthiness or fitness," he or she is obligated to make a report to an authority empowered to investigate or act. RPC 8.3(a).

FRCP 11 and RPC 3.1 forbid lawyers from filing frivolous and unwarranted lawsuits with no basis in fact or law. *See* Fed. R. Civ. P. 11 ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that . . . it is not being presented for any improper purpose . . . ; the claims, defenses, and other legal contentions are warranted . . . ; [and] the factual contentions have evidentiary support. . . ."); RPC 3.1 ("A lawyer shall not bring . . . a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous.").

Exhibit N

The New York Rules of Professional Conduct govern the conduct of attorneys in federal courts sitting in New York as well as in New York state courts. *Ritchie v. Gano*, No. 07 Civ. 7269, 2008 WL 4178152, at *3 (S.D.N.Y. Sept. 8, 2008) ("New York's Code of Professional Responsibility . . . establishes appropriate guidelines for the professional conduct of attorneys in the United States District Courts in this state."); *see also Steele v. Bell*, No. 11 Civ. 9343, 2012 WL 6641491, at *2 n.1 (S.D.N.Y. Dec. 19, 2012). Attorneys arguing before this Court must thus abide by New York's RPC. E.D.N.Y. Local Rule 1.3. To interpret the RPC, federal courts sitting in New York look to decisions of the New York state courts. *Id.* at Rule 1.5(b)(5).

Local Rule 1.3(c) requires a *pro hac vice* applicant to disclose "whether the applicant has ever been censured, suspended, disbarred or denied admission or readmission by any court," and Rule 1.5(b)(2) specifically recognizes that clear and convincing evidence that an attorney was subject to suspension or disciplinary action in another State provides grounds for discipline in this Court.

A court may "determine, based on an attorney's prior behavior, that []he will be unable to conform h[is] future conduct to expected professional norms, and, as a result, that h[is] ability to practice in this Court should be barred as a corrective measure in order to protect the public, other attorneys and litigants, the Court, and the administration of justice." *In re Jaffe*, 585 F.3d at 121. RPC 8.5 provides that an attorney is subject to disciplinary authority such as this for improper conduct that occurs in other jurisdictions. Moreover, a federal court possesses certain inherent powers "to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). This includes the power to "police the conduct of attorneys as officers of the court" and to impose sanctions for attorney misconduct. *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000); *In re Goldstein*, 430 F.3d at 110.

6

Exhibit N

"Admission *pro hac vice* is not a right but a privilege, the granting of which rests in the sound discretion of the presiding judge." *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2003 WL 22339357 *3 (S.D.N.Y. Oct. 14, 2003) (internal quotations omitted). Exercising this discretion involves considering:

> [O]n the one hand, a litigant's right to choose its counsel, which should not lightly be interfered with, and, on the other hand, the Court's right to assure itself that an attorney applicant is familiar with the Federal Rules of Civil Procedure, the Local Rules . . . , this Court's Individual Rules, and the customs and practices of this Court, and that the attorney will conduct himself professionally and ethically, and will not disrupt the proper functioning of the Court.

*Id.* (internal citations and quotations omitted).

In some instances, prior to revoking an attorney's *pro hac vice* status, other intermediary steps are considered, such as motions to compel or orders imposing monetary sanctions. *See Doe v. Mastoloni*, 307 F.R.D. 305, 310-11 (D. Conn. 2015) (finding revocation of *pro hac vice* admission was not yet warranted where attorney failed to provide adequate discovery responses or agree to a protective order because the moving party could have first moved for a motion to compel, which would have allowed the court to make a finding of bad faith). Here, as shown below, no intermediary motion or order is necessary before the Court can revoke Mr. Wood's *pro hac vice* status. This is not a discovery complaint—Mr. Wood cannot correct the violence he encouraged, or the lies he told about the Chief Justice, or the frivolous actions he filed in other jurisdictions. Further, a Delaware court already found that Mr. Wood's filings in numerous jurisdictions were frivolous. *See infra* § D(1). As such, cases like *Doe v. Mastoloni* are inapplicable here.

Due process requires that courts provide notice and an opportunity to be heard before imposing any kind of sanction such as the revocation of *pro hac vice* status. *Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001). The revocation of such status must be evaluated as though the

7

Exhibit N

court was considering disqualifying a "regular member" of the district's bar. *Id.* at 175-76. As demonstrated below, no regular member of the New York bar who acted as Mr. Wood has would be allowed to set foot in a New York courtroom.

**B.    Mr. Wood Has Sought to Subvert the Constitution and The Rule of Law**

Article II, Section 1, Clauses 2 and 3, and the Twelfth Amendment of the United States Constitution provide for states to appoint electors and for those electors to then elect the President and Vice President. The votes are then counted on January 6 in a joint session of Congress, presided over by the President of the Senate, who the Constitution designates to be the sitting Vice President of the United States. U.S. Const. art. I, § 3, cl. 4. These constitutional provisions form a cornerstone of our democracy, and Mr. Wood sought to subvert them.

Mr. Wood is a major proponent of the falsehood that former President Trump won the 2020 presidential election in a landslide, and that President Biden stole the election. *See* Ex. B; Reichman Decl. ¶ 8. In furtherance of that view, Mr. Wood objected to the counting of the electoral votes and the peaceful transfer of power. For example, in early December, Mr. Wood led a rally in Georgia, where he called for the imprisonment of the Georgia Governor and Secretary of State for carrying out their duty of counting Georgia's votes in the presidential election. Reichman Decl. ¶ 7 n.3, video at 3:10. He instructed those present to "go to the [Georgia] Governor's mansion" and "circle it" to force the Georgia legislature into a special session. *Id.* Later that month, Mr. Wood called for no electoral vote to occur in any State. Ex. V at 24 (stating "there should be NO Electoral College vote in any state today"). That effort failed, but Mr. Wood persisted.

On social media sites like Twitter and Parler, Mr. Wood advocated for martial law, *i.e.*, for the military to replace our duly elected representatives with President Trump remaining as the

Exhibit N

Commander in Chief.  *See* Reichman Decl. ¶ 8.  Disturbingly, on January 1, Mr. Wood tweeted that Vice President Pence should face arrest and "execution by firing squad."  *Id.* ¶ 9.

Early on January 6, the day on which Vice President Pence was scheduled to count the electoral votes and the day of the siege of the United States Capitol, Mr. Wood posted a tweet saying it was "1776 Again" and that "[t]he time ha[d] come . . . to take back our country . . . [and] fight for our freedom."  *Id.* ¶ 10.  As people were gathering for the assault on the Capitol, Mr. Wood told his followers to "lock up Traitor Mike Pence" for allegedly conspiring with Rod Rosenstein to "overthrow our government."  *Id.* ¶ 11.

At 12:47 p.m., six minutes before the Capitol breach, *see* Ex. C at 5, Mr. Wood called Mr. Pence a "TRAITOR" and said he had evidence to support his claims.  Reichman Decl. ¶ 12.  A few hours later, as the siege continued, Mr. Wood tweeted to his 1.1 million followers, saying everyone should follow the advice of Bill White, who urged the mob to "enter the US Capitol building . . . sit in the peoples seats . . . fight for us . . . [and] fight for Trump. . . ."  Reichman Decl. ¶ 13.

Mr. Wood's words were heard by individuals who attacked the Capitol on January 6.  The social media account of Ashli Babbitt, a woman killed during the assault on the Capitol when she tried to invade the House chamber, followed Mr. Wood on Twitter.  Ex. D at 7-13 (chronicling Babbitt's repeated retweets of Mr. Wood's posts).  Her final tweet before her death was a retweet of one of Mr. Wood's posts on the day of the insurrection.  The tweet contained what Mr. Wood deemed his "MUST BE DONE LIST," and listed his three goals of charging Mike Pence with treason, charging Rod Rosenstein with treason, and demanding that Chief Justice John Roberts resign.  Reichman Decl. ¶ 14.

Exhibit N

The "Three Percenters"—one of "the two most prominent rightwing militia groups that participated in the mob onslaught on Congress," Ex. E at 1—are also significant supporters of Mr. Wood. The Three Percenters posted a short manifesto expressing their preparedness "'to take back our country from the pure evil that is conspiring to steal our country away from the American people.'" Ex. F at 5. That statement praised Mr. Wood as an "inspirational figure[] in th[at] looming battle." *Id.*

At the insurrection, the Three Percenters raised their "Release the Kraken" flag, which is a reference to a comment made by Mr. Wood's co-counsel in the election litigations, Sidney Powell (and then amplified by Mr. Wood), that Mr. Wood and Ms. Powell were releasing the Kraken, *i.e.*, exposing baseless voter fraud claims and planning to overturn the presidential election. *See* Reichman Decl. ¶ 16 n.10. Ms. Powell and Mr. Wood are known as the "'Kraken' lawyers." Ex. H at 17.

Mr. Wood is also a hero to the followers of the QAnon conspiracy theory, *see* Ex. D at 2, who believe that Mr. Trump and a secret military intelligence team are battling a "deep state" made up of Satan-worshipping pedophiles in the government, media, and Hollywood. Ex. G at 1-2. In the wake of the Capitol siege, Mr. Wood falsely claimed Antifa and Black Lives Matter were responsible for the insurrection. He has alleged that no one died during the Capitol insurrection (five people died), that the event was "staged," and that those who breached the Capitol were "Antifa dressed up as Trump people." Ex. HH at 2-3. In one instance, Mr. Wood posted a photograph of a man named Josiah Colt, falsely suggesting he was not a supporter of Mr. Trump. Reichman Decl. ¶ 18. Mr. Colt, however, confirmed he was the man in the photograph and sitting in former Vice President Pence's chair in the well of the Senate, and Mr. Colt is in fact a supporter of Mr. Trump. *See* Ex. I at 1.

Exhibit N

Mr. Wood also tweeted a photo of Jake Angeli, the now infamous "QAnon Shaman" who occupied the Senate floor, Reichman Decl. ¶ 20 n.14, video at 0:36, 7:36, and falsely claimed Mr. Angeli was part of Antifa, writing "Indisputable photographic evidence that antifa violently broke into Congress today. . . ." *Id.* ¶ 17.

Mr. Wood repeated his demonstrably false claims about Antifa to this Court on January 11, saying, "a Capitol Police Officer had opened the doors to let people in that appear to be, and the evidence seems to be suggesting, were members of either Antifa or Black Lives Matter." Ex. K at 12. There is no evidence suggesting the siege at the Capitol had anything to do with Antifa or Black Lives Matter.

Following Mr. Wood's barrage of false and violent tweets, his Twitter account was terminated on January 7. One of his final tweets accused Vice President Pence of being a "TRAITOR, a Communist Sympathizer & a Child Molester." Reichman Decl. ¶ 22. The tweet also said to "Lock him up." *Id.* Following his Twitter suspension, Mr. Wood turned to the social media sites Parler and Telegram to communicate with his followers.

On January 7, only a day after the attack on the Capitol, Mr. Wood again directly urged Mr. Pence's execution, saying "Get the firing squads ready. Pence goes FIRST." Reichman Decl. ¶ 23. This call for the execution of the sitting Vice President was directed toward user feeds nearly three million times, Ex. L at 6, and was viewed at least 788,000 times, according to a screenshot on the Internet Archive. Ex. M at 7. According to Fox News, Mr. Wood is being investigated by the United States Secret Service concerning his death threats against the Vice President. Ex. MM at 1-2.

On January 18, 2021, two days before Inauguration Day and still continuing to sow doubt over the election, Mr. Wood posted on Telegram that "the 'election' of Biden was a fraud" and

<div align="center">11</div>

<div align="right">Exhibit N</div>

claiming "Trump won a landslide re-election" and will be "President for at least 4 more years." Reichman Decl. ¶ 25. The following day he continued to attack Mr. Pence, saying "Vice President Pence must resign today. Pence is on videos captured by FBI. Discussions about murdering judges." *Id.*

The right to vote is fundamental and preserves all other rights in the United States Constitution. *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Mr. Wood's conduct and lies sought to undermine democracy and this bedrock right. Mr. Wood has violated his solemn oath that he "will conduct [himself] uprightly and according to law, and that [he] will support the Constitution of the United States." Ex. AA; *see also* N.Y. Const. art. XIII, § 1; N.Y. Jud. Law § 466 (McKinney 2020). Through his numerous false statements in support of this effort, he violated RPC 4.1 and 8.4 many times over. *See* RPC 4.1 ("lawyer shall not knowingly make a false statement of fact or law to a third person"); RPC 8.4 ("lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation"). He should be disqualified from appearing in this Court because of his many actions to subvert the Constitution and the rule of law.

## C. Mr. Wood's Attacks on Chief Justice John Roberts

### 1. Mr. Wood's Maliciously False, Scurrilous Attacks on the Chief Justice

Mr. Wood has repeatedly, viciously, and falsely attacked Chief Justice John Roberts. He has stated that the Chief Justice arranged the "illegal adoptions" of two children through Jeffrey Epstein, and linked the Chief Justice with the death of Justice Scalia and pedophilia. After pondering Justice Robert's motives on Twitter, Mr. Wood then asked if the Chief Justice was a member of any "club or cabal requiring minor children as an initiation fee" in the following tweets:

> A couple of more questions for Chief Justice John Roberts:
> (1) You are recorded discussing Justice Scalia's successor before date of his sudden death. How did you know Scalia was going to die?
> (2) Are you a member of any club or cabal requiring minor children as initiation fee? pic.twitter.com/jGxfgLCk4D

Exhibit N

> — Lin Wood (@LLinWood) December 31, 2020

Reichman Decl. ¶ 31.

> I have linked Roberts to illegal adoption, Jeffrey Epstein, pedophilia & prior knowledge of Scalia's death.
> — Lin Wood (@LLinWood) December 31, 2020

*Id.* Mr. Wood has alleged that the Chief Justice was being blackmailed, including in tweets that were retweeted by Ashli Babbitt shortly before her death as she stormed the Capitol. Mr. Wood has also implied that the Chief Justice said, during a phone call in August, that then President Trump is a "m-----f-----" who could not be allowed to have another term. *Id.* ¶ 32. Mr. Wood's attacks on Chief Justice Roberts have continued unabated to this day via the social media website Telegram. *Id.* ¶¶ 25, 34. For example, on January 19, Mr. Wood posted that "Chief Justice John Roberts must resign. . . . Jeffrey Epstein arranged for the adoption of Roberts' children. Roberts used the children to gain entry into the cabal of power & influence." *Id.* ¶ 34.

Mr. Wood has also attacked the judiciary as a whole. In trying to explain away that he and other lawyers have lost all 60 lawsuits they brought challenging the presidential election results, he was quoted in *The New Yorker* falsely claiming, "Nobody loses 0-60, unless the deck is stacked!" Ex. HH at 1.

### 2. Mr. Wood's Attacks on the Chief Justice Violate the RPC and Make Mr. Wood Unfit to Practice in This or Any Other Court

Mr. Wood's false attacks on the Chief Justice violate RPC 8.4(c), which "encompasses every kind of dishonesty, fraud, deceit, or misrepresentation, whether inside or outside law practice and whether civil or criminal." Roy D. Simon, Jr., *Simon's N.Y. Rules of Prof. Conduct Annotated* § 8.4:15 (2020). Unsupported attacks on a judge violate this Rule and, in New York and the federal courts, are grounds for disbarment. *Matter of Morisseau*, 763 F. Supp. 2d 648, 663 (S.D.N.Y. 2011) ("[T]he direct and implied accusations that Judge Kaplan is dishonest, violate a number of

13

Exhibit N

Disciplinary Rules and Rules of Professional Conduct as reflected in the findings below."

(citing *In re Paul G. Evans*, 801 F.2d 703, 706–7 (4th Cir. 1986) (unsubstantiated allegations that

judge had religious bias merited disbarment from federal court))).

The reason for the prohibition against false and unfounded attacks on judges is not to

protect individual judicial officers, but rather to safeguard the administration of justice, *see* RPC

8.4(d), and the integrity of the judicial system:

> Unlike defamation cases, "[p]rofessional misconduct, although it may directly
> affect an individual, is not punished for the benefit of the affected person; the wrong
> is against society as a whole, the preservation of a fair, impartial judicial system,
> and the system of justice as it has evolved for generations."

*Matter of Holtzman*, 78 N.Y.2d 184, 192 (1991) (citing *Matter of Terry*, 271 Ind. 499, 502 (Ind.

1979)).

An attorney who makes serious accusations of wrongdoing against a judge must be able to

present evidence demonstrating the reasonableness of his belief that those accusations are true.

*Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995) (finding that attorney's failure to provide

support for the slurs he made against the judiciary was grounds to justify the disciplinary action

taken).  Mr. Wood told this Court that his statements were simply "rhetorical hyperbole," Ex. K at

12, but his attacks on the Chief Justice are false statements of fact, not hyperbole or opinion, and

> [i]n this jurisdiction, an attorney who makes false, scandalous or other improper
> attacks upon a judicial officer is subject to discipline.  Attacks such as respondent's
> derogatory, undignified and inexcusable remarks tend to undermine the respect and
> confidence of the members of his profession and of the society which he serves,
> and will not be countenanced.

*Matter of Wisehart*, 281 A.D.2d 23, 31-32 (1st Dep't 2001) (imposing a suspension on an attorney

for making false statements about sitting judges) (internal citations and quotations omitted); *see*

*also Matter of Palmisano*, 70 F.3d at 487.

14

Exhibit N

Unless Mr. Wood can present in his answering papers plausible evidence to support each of his slurs against the Chief Justice, he should be disqualified from practicing in this Court. He of course cannot do so because those allegations are maliciously false—as such, this motion should be granted.

**D.      Mr. Wood's Frivolous Filings and Rule 11 and RPC 3.1 Violations**

FRCP 11 provides that when presenting a pleading to a court, "whether by signing, filing, submitting, or later advocating it . . . an attorney . . . certifies that to the best of [his] knowledge, information, and belief . . . it is not being presented for any improper purpose, . . . [and] the claims . . . are warranted . . . ." "[G]iven the important function of Rule 11 sanctions as a deterrent against an attorney's misconduct in the future," an attorney's past brushes with Rule 11 are relevant in determining appropriate discipline and whether to permit the attorney's admission *pro hac vice*. *Matthews v. Freedman*, 128 F.R.D. 194, 203 (E.D.Pa. 1989), *aff'd sub nom.*; *Matter of Kramer*, 919 F.2d 135 (3d Cir. 1990); *see also In re 60 East 80th Street Equities, Inc.*, 218 F.3d 109, 120 (2d Cir. 2000) (finding attorney's past sanctionable conduct was relevant to court's inquiry on the imposition of sanctions).

RPC 3.1 provides that an attorney shall not bring non-meritorious claims and contentions, and an attorney's conduct is "frivolous" if the lawyer "knowingly advances a claim or defense that is unwarranted. . . ." In *Morisseau*, 763 F. Supp. 2d at 663-65, the court revoked an attorney's ability to appear *pro hac vice* based on various violations of the RPC, including Rule 3.1, where the attorney had filed numerous, frivolous filings and had "commenced a series of unsupported and hate-filled public attacks" against Southern District Judge Lewis Kaplan. Violations even more severe have occurred here.

Exhibit N

After the presidential election, Mr. Wood and his co-counsel, Sidney Powell, filed four frivolous lawsuits in swing states, Georgia, Wisconsin, Arizona, and Michigan, where they falsely claimed voter fraud and sought to overturn the election results. Each of these cases was dismissed as Mr. Wood and his co-counsel could not even state a legally cognizable theory, let alone provide evidence, for their unsupported claims. *See Feehan v. Wisc. Elections Comm'n*, No. 20-cv-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261 (D. Az. Dec. 9, 2020); *Pearson v. Kemp*, No. 1:20-cv-4809, Ex. Q at 2; *King v. Whitmer*, No. 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020). Mr. Wood also filed a *pro se* action in Georgia, in which the district court denied his motion for a temporary restraining order. *L. Lin Wood Jr. v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020).

1. **Mr. Wood's False, Frivolous, and Vexatious Actions Filed Around the Country Have Already Led to the Revocation of His Admission in Delaware**

In *Page v. Oath, Inc.*, No. S20C-07-030, the Superior Court of Delaware *sua sponte* issued a "Rule to Show Cause" with respect to whether Mr. Wood's *pro hac vice* status should be revoked because of his role in the Wisconsin action and the *pro se* lawsuit in Georgia. Ex. W. The order stated that in the Wisconsin case it appeared that i) the suit was filed on behalf of a person who had not authorized it; ii) the complaint and related papers had multiple, serious deficiencies as outlined in the order of dismissal of the Wisconsin action; and iii) a citation to a case regarding a point of critical law, including a quotation, was found to be fictitious. *Id.* at 3. The Delaware court further stated that Mr. Wood's conduct in Wisconsin appeared to violate Delaware's rules of professional conduct with respect to competence, meritorious claims and contentions, candor to the tribunal, and misconduct. *Id.* at 1. The Delaware court also cited the decision in the Georgia *pro se* case, where Mr. Wood sought to prevent Georgia's certification of the votes in the general election for President. *Id.* at 2.

Exhibit N

After providing Mr. Wood with a full opportunity to respond to its show cause order, the Superior Court in Delaware revoked his *pro hac vice* status. Ex. W at 4; Ex. X at 8. The court began its analysis by stating, as is the case here, that it is required to ensure those practicing before the court "are of sufficient character, and conduct themselves with sufficient civility and truthfulness." Ex. X at 5. The court rejected Mr. Wood's argument that he merely made harmless errors in the Georgia litigation, finding "the Georgia case was textbook frivolous litigation." *Id.* at 6; *see also Wood*, 2020 WL 6817513, at *6, *13 ("[T]he futility of Wood's standing argument is particularly evident in that his sole relied-on authority—*Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471 (11th Cir. 1993)—is no longer good law. The Eleventh Circuit expressly abrogated its holding in that case over thirteen years ago"), *aff'd*, 981 F.3d 1307 (11th Cir. 2020). The Delaware court further found that Mr. Wood's submission of an error-ridden affidavit of an expert witness was "either mendacious or incompetent." Ex. X at 6.

Eastern District Local Rules 1.3 and 1.5 specifically contemplate disciplinary actions in other jurisdictions and their impact on admission in this district. Rule 1.3(c) requires any *pro hac vice* applicant to disclose "whether the applicant has ever been censured, suspended, disbarred or denied admission or readmission by any court." Rule 1.5(b)(2) states that clear and convincing evidence that an attorney was subject to suspension or disciplinary action in another state provides grounds for discipline in the Eastern District of New York. The disciplinary action taken in Delaware is, standing alone, grounds to grant this motion.

Moreover, under the doctrine of collateral estoppel, Mr. Wood is precluded from contesting the Delaware court's findings. As shown above, federal courts sitting in New York look to decisions of the New York state courts to determine attorney discipline. *Id.* at Rule 1.5(b)(5). Under New York's conflict of laws rules, New York gives the same preclusive effect to the

17

Delaware order as Delaware would under its law.  *See Matter of Luna v. Dotson*, 97 N.Y.2d 178,

182-83 (2001).

Under Delaware law, the collateral estoppel doctrine may be invoked to preclude a party

from raising an issue where:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[2]

*Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. Supr. 2000).  Whether Mr. Wood made baseless,

false, and incompetent filings was an issue already adjudicated by the court in Delaware, and Mr.

Wood had a full and fair opportunity to litigate those issues there.

The Delaware court also considered and rejected Mr. Wood's excuses for the incompetence

he exhibited in the Wisconsin action.  The court found these were not "'proof reading errors'" as

Mr. Wood claimed.  Ex. X at 6-7.  "Failure to certify a complaint for injunction or even serve the

Defendants are not 'proof reading errors.'  The Complaint would not survive a law school civil

procedure class." *Id.*

The Delaware court concluded:

> Prior to the pandemic, I watched daily counsel practice before me in a civil, ethical way to tirelessly advance the interests of their clients.  It would dishonor them were I to allow this *pro hac vice* order to stand.

*Id.* at 7.

Finally, the Delaware court made these findings regarding Mr. Wood's incitement of the

insurrection at the Capitol on January 6:

---

[2] New York's collateral estoppel doctrine is similar to Delaware's, and the Delaware ruling would have the same preclusive effect under New York's doctrine as it does under Delaware's.  *See Matter of Yao*, 231 A.D.2d 346, 348 (1st Dep't 1997) (applying collateral estoppel in a disciplinary proceeding).

Exhibit N

One final matter. A number of events have occurred since the filing of the Rule to Show Cause. I have seen reports of "tweets" attributable to Mr. Wood. At least one tweet called for the arrest and execution of our Vice-President. Another alleged claims against the Chief Justice of the Supreme Court of the United States which are too disgusting and outrageous to repeat. Following on top of these are the events of January 6, 2021 in our Nation's Capitol. No doubt these tweets, and many other things, incited these riots.

*Id.* at 7-8.

### 2. Other Frivolous Cases Mr. Wood Filed, But Not Relied Upon By the Delaware Court, Provide Separate and Independent Grounds for the Revocation of His *Pro Hac Vice* Admission

Other frivolous election cases Mr. Wood filed, apart from the Wisconsin and Georgia *pro se* actions addressed by the Delaware court, provide additional grounds for the revocation of his *pro hac vice* status. In Michigan, the district court found that the plaintiffs' claims were clearly barred by Sovereign Immunity under the Eleventh Amendment of the Constitution, laches, mootness, and the plaintiffs' lack of standing. *King*, 2020 WL 7134198, at \*3-9. In denying the Michigan plaintiffs' motion for injunctive relief, the court concluded:

Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government. Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do. The People have spoken.

*Id.* at \*13. The Michigan action led to sanctions motions being filed against Mr. Wood. The City of Detroit's motion, which is pending, seeks Mr. Wood's disbarment and disqualification, alleging there was no basis in law for plaintiffs' claims and that plaintiffs' expert reports were rife with misstatements and misinformation, which should have been easily discovered by Mr. Wood and his team with *any* due diligence. Ex. V at 17-18.

Exhibit N

The district court in Arizona likewise left no doubt that Mr. Wood's lawsuit was unfounded and warranted in its order dismissing the action:

> By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. . . . Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.

*Bowyer*, 2020 WL 7238261, at *1, *16.

*Pro hac vice* admission should be revoked where the court does not have reasonable assurance that an attorney is familiar with and will abide by the FRCP, the Local Rules for the Eastern District of New York, this Court's Individual Rules, the New York RPC, and the customs and practices of this Court. *See Pintur v. Rogic*, No. 16-cv-09696, 2017 WL 5565620, at *6 (S.D.N.Y. Oct. 25, 2017); *see also Erbacci, Cerone, and Moriarty, Ltd. v. U.S.*, 923 F. Supp. 482, 485-86 (S.D.N.Y. 1996) ("[B]efore this Court will admit an attorney to practice *pro hac vice,* this Court must have some reasonable assurance that such attorney is familiar with the Federal Rules of Civil Procedure, the Local Rules . . . , this Court's Individual Rules, and the customs and practices of this Court.").

Mr. Wood has shown that he either cannot or will not comply with his professional obligations. Indeed, in the January 11 conference before this Court, he defended his actions, falsely claiming that there was ample evidence of fraud to support the allegations universally rejected by multiple courts. Ex. K at 11 ("[The election fraud litigation is] based on a wealth of material and admissible evidence."). This baseless contention has been rejected by approximately 60 courts throughout the country. *See* Reichman Decl. ¶ 26, n.23.

Exhibit N

### 3. Mr. Wood Is Responsible and Answerable for the False Filings

During the January 11 conference with this Court, Mr. Wood stated:

> What I have done with Sidney Powell is, she asked me to sign on to two or three lawsuits where she was the lead counsel, in anticipation that there may be a need for a trial lawyer. I didn't draft the lawsuits. There were some typographical errors and things done in some of them that upset a judge in Wisconsin, I believe, maybe Michigan. But if you had a full hearing on what happened there, I didn't have anything to do with that, other than I did agree to sign on to help Sidney.

Ex. K at 9-10.

But Mr. Wood's claim that it was all the fault of Sidney Powell, his co-counsel, does not shelter him from responsibility for the meritless and frivolous filings. *See Aird v. Ford Motor Co.*, 86 F.3d 216, 223 (D.C. Cir. 1996) (finding that a lawyer was jointly and severally liable for sanctions while he was a counsel of record, even if he did not participate in the offending activities and even though he actively sought to remove his name from some of the offending filings, and subsequently withdrew from case); *Raylon LLC v. Complus Data Innovations, Co.*, Nos. 6:09-CV-355, 6:09-CV-356, 6:09-CV-357, 2015 WL 11121530, at *8-9 (E.D. Tex. May 4, 2015) (finding that an attorney who was not involved in the drafting of the pleadings, but benefited from the representation, is liable under Rule 11); *see also* Fed. R. Civ. P. 11, Advisory Committee Note to 1993 Amendment (stating multiple attorneys can be held accountable for the actions of their co-counsel if they had a part in "causing the violation").

### E. Mr. Wood's False Statements to This Court

RPC 3.3 provides that a "lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. . . ."

In the course of one short conference, Mr. Wood made numerous false statements to the Court. Space limitations preclude us from addressing all of his false contentions, but three

21

Exhibit N

statements go to the heart of this motion in particular, and are demonstrably false as shown by irrefutable documentary evidence.[3]

**"I didn't call for the people to go up there and meet, I didn't call for anybody to go to the Capitol."** Ex. K at 9.

Mr. Wood did, in fact, "call for" his supporters to storm and occupy the United States Capitol. *Id.* On the morning of January 6, Mr. Wood posted to his 1.1 million Twitter followers that "[t]he time ha[d] come . . . to take back our country . . . to fight for our freedom." Reichman Decl. ¶ 10. He wrote those words alongside an image stating that it was "1776 Again." *Id.* During the insurrection, as the mob was storming the Capitol building, Mr. Wood tweeted to his followers that they should follow the advice of Bill White to "enter the US Capitol Building . . . enter both houses . . . fight for us [and] . . . fight for Trump. . . ." *Id.* ¶ 13.

**"So there's been no finding by any court that the evidence of election fraud is lacking. In fact, if they discussed it, they would have to say it was literally conclusive that there was fraud."** Ex. K at 11.

As set forth above, several courts specifically found "that the evidence of election fraud is lacking," *id.*, in the election lawsuits filed by Mr. Wood. For example, in Arizona, the district court, in dismissing the complaint, declared that Mr. Wood had failed to provide any factual support for the claims:

> Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending

---

[3] As shown in Defendant's motion to strike the amended complaint, there are numerous material allegations in that complaint which are also belied by documentary evidence. That evidence refutes Plaintiff's allegations that the Defendant was responsible for the public learning about Plaintiff's conduct and disclosing Plaintiff's home and business information. These allegations go to the heart of Plaintiff's liability and damage claims and are the putative rationale for suing the Defendant and not the countless others who made the same accusations against Plaintiff including well-known political commentators, entertainers, actors, and musical artists. A quick Google search by Mr. Wood would have revealed that numerous material allegations in the amended complaint are false. *See* Dkt. 18. We are not, however, basing this motion on those false allegations.

Exhibit N

Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety.

*Bowyer*, 2020 WL 7238261 at *16.[4]

In the Michigan case, the district court denied the plaintiffs' motion for injunctive relief in all respects,[5] and noted that the plaintiffs had not presented any evidence to support the allegations of fraud, but instead relied on nothing more than "speculation and conjecture":

> Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. . . . [T]he closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request. . . . With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.

*King*, 2020 WL 7134198 *12-13 (internal citations omitted).

**"I have never advocated that anyone should break the law. I've advocated for people to follow the law."** Ex. K at 15.

As set forth above, Mr. Wood encouraged the conduct of individuals who committed federal offenses by breaking into the Capitol to unseat our duly elected representatives and prevent the counting of electoral college votes and the peaceful transfer of power. As of the date of this brief, over 100 people have been arrested and so charged with the FBI investigating hundreds

---

[4] Similarly, an Arizona state court found after a trial in another election case that there was "no misconduct, no fraud, and no effect on the outcome of the election," *Ward v. Jackson*, CV 2020-015285, at 8 (Maricopa Co. Supr. Ct. Dec. 4, 2020), https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1930, in a ruling that was unanimously affirmed by an *en banc* panel of the Arizona Supreme Court, No. CV-20-0343 (Az. Dec. 8, 2020), https://embed.documentcloud.org/documents/20421492-arizona-supreme-cv-20-0343-decision-order/?embed=1&title=1.

[5] The Court in the Michigan case did not have an opportunity to rule on the Defendants' motion to dismiss because the Plaintiffs voluntarily dismissed their complaint on January 14, 2021 while that motion was pending.

Exhibit N

more.  Ex. Z at 1.  By calling for the execution of the Vice President, Mr. Wood is also urging his

followers to break the law.

An attorney's lack of candor is a sufficient ground, standing alone, to revoke his *pro hac vice* admission.  *Pintur*, 2017 WL 5565620, at \*6.  Mr. Wood's false statements to this Court

should deprive him of the privilege of practicing before it.

### III.  CONCLUSION

The Court should grant Defendant's motion to revoke the *pro hac vice* admission of L. Lin

Wood.

Dated:  Montclair, New Jersey
January 25, 2021

**JOHNREICHMANLAW LLC**

By:  ___*s/  John Reichman*___
John H. Reichman
David Yeger, *Of Counsel*
56 Oakwood Avenue
Montclair, New Jersey 07043
(917) 626-8025
john@johnreichmanlaw.com
david@yegeresq.com

*-and-*

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous Jr.
Marcellus A. McRae
Marissa Moshell
333 S. Grand Avenue
Los Angeles, California 90071
(213) 229-7000
TBoutrous@gibsondunn.com
MMcRae@gibsondunn.com
MMoshell@gibsondunn.com

*Attorneys for Defendant Joy Reid*

24

Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROSLYN LA LIBERTE,

                      Plaintiff,

        - against -

JOY REID,

                      Defendant.

Case No.: 1:18-cv-05398-DLI-VMS

**NOTICE OF MOTION**

      **PLEASE TAKE NOTICE**, that upon the Declaration of John H. Reichman, dated January 25, 2020, and the exhibits annexed thereto, and the Memorandum of Law in Support, dated January 25, 2020, defendant Joy Reid, by and through her undersigned counsel, will move this Court, at the United States District Court for the Eastern District of New York, located at 225 Cadman Plaza East, Brooklyn, New York 11201, at a date and time to be designated by this Court, for an Order: (i) revoking the *pro hac vice* admission of plaintiff's counsel L. Lin Wood; and (ii) granting such other and further relief as is right and proper.

Dated:  Montclair, New Jersey
       January 25, 2021

                        **JOHNREICHMANLAW LLC**

                By:   *s/  John Reichman*
                   John H. Reichman
                   David Yeger, *Of Counsel*
                56 Oakwood Avenue
                Montclair, New Jersey 07043
                (917) 626-8025
                john@johnreichmanlaw.com
                david@yegeresq.com

                *-and-*

                **GIBSON, DUNN & CRUTCHER LLP**
                Theodore J. Boutrous Jr.
                Marcellus A. McRae

1

Exhibit N

Marissa Moshell
333 S. Grand Avenue
Los Angeles, California 90071
(213) 229-7000
TBoutrous@gibsondunn.com
MMcRae@gibsondunn.com
MMoshell@gibsondunn.com

*Attorneys for Defendant Joy Reid*

To:     David M. Olasov
        Olasov LLP
        485 Madison Avenue, 7th Fl.
        New York, New York 10022
        (212) 588-0540
        dolasov@olasov.com

        *-and-*

        L. Lin Wood (Admitted *Pro Hac Vice*)
        L. Lin Wood, P.C.
        1180 West Peachtree Street, Ste. 2040
        Atlanta, Georgia 30309
        (404) 891-1402
        lwood@linwoodlaw.com

        *Attorneys for Plaintiff*

2

Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROSLYN LA LIBERTE, | Case No.: 1:18-cv-05398-DLI-VMS |
| Plaintiff, | |
| | **DECLARATION IN SUPPORT OF DEFENDANT'S MOTION TO REVOKE THE *PRO HAC VICE* ADMISSION OF L. LIN WOOD** |
| - against - | |
| JOY REID, | |
| Defendant. | |

JOHN H. REICHMAN declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of Johnreichmanlaw LLC, attorneys for Defendant Joy Reid, along with Gibson, Dunn & Crutcher LLP.  I submit this declaration in support of Defendant's motion to revoke the *pro hac vice* admission of L. Lin Wood, one of Plaintiff's attorneys (the "Motion").

2.      The legal arguments supporting this application are set forth in the accompanying Memorandum of Law.  In this Declaration, I set out the factual support for the Motion.  The documents attached hereto are all a matter of public record.

**Background**

3.      Mr. Wood's motion for admission *pro hac vice* was granted at the outset of this case on October 11, 2018.  Order at 10/11/18.  At the time, two of Mr. Wood's former partners also moved for and were granted *pro hac vice* admission.  *Id.*

4.      Mr. Wood's former partners subsequently withdrew from this action.  Dkt. 42. They also sued Mr. Wood for fraud, among other claims for relief.[1]

---

[1] Annexed hereto as **Exhibit A** is a true and correct copy of the verified complaint filed by Mr. Wood's law partners on August 31, 2020.

Exhibit N

5.      Mr. Wood has had scant personal involvement in the case.  One of his former partners was primarily responsible for opposing Defendant's motion to dismiss and successfully arguing the appeal of that dismissal in the Second Circuit.  Mr. Wood did not participate in any of the attorney conferences regarding scheduling and discovery prior to the January 11 conference—Defendant's counsel was repeatedly informed that Mr. Wood was too busy attending to his election lawsuits to participate in this action.

**Mr. Wood's Posts Regarding the Election and Insurrection**

6.      The accompanying Memorandum of Law argues that Mr. Wood's *pro hac vice* admission should be revoked because, among other things, he has acted and is acting to subvert the United States Constitution[2] and the rule of law, violated his ethical obligations under the New York Rules of Professional Conduct ("RPC") and the New York Constitution, violated Federal Rule of Civil Procedure 11 and RPC 3.1, falsely attacked the Chief Justice of the United States Supreme Court, has recently been disciplined in another state court, and made misrepresentations to this Court.  We submit the following in support of this proposition.

7.      On December 2, 2021, Mr. Wood led a rally in Georgia, where he called for the imprisonment of the Georgia Governor and Secretary of State for carrying out their duty of counting Georgia's votes in the presidential election.[3]  He instructed those present to "go to the [Georgia] Governor's mansion" and "circle it" to force the Georgia legislature into a special session.

8.      Mr. Wood had 1.1 million Twitter followers before he was banned from Twitter. He used Twitter to claim that the 2020 election was fraudulent; then-President Elect Biden "stole"

---

[2] Annexed hereto as **Exhibit AA** is a true and correct copy of the "Oath on Admission" attorneys must take to practice in federal court.
[3] A true and correct copy of the video where Mr. Wood made these statements can be found here: https://www.youtube.com/watch?v=ep1yCTpMJvc (last visited January 22, 2021).

Exhibit N

the 2020 election; and then President Trump should declare martial law to remain in power.[4]  The

following are some examples of his social media posts[5]:



---

[4] Annexed hereto as **Exhibit B** is a true and correct copy of a January 17, 2021 article from *The Washington Post.*
[5] Because Twitter has suspended Mr. Wood's account, the public no longer has access to all of Mr. Wood's tweets.

Exhibit N



**Lin Wood** @LLinWood · 6m
Time to clean house in 2021.

Let the military LOCK THEM ALL UP.

The crime is treason. They are traitors.

It must be done if our country is to survive & once again serve as a bright beacon of light that provides hope of freedom to the world.

> **Lin Wood** @LLinWood · 12m
> (3) These groups aspire to the goals of Communism. A ruling elite & an oppressed class of people who exist to serve those in power.
>
> When arrests for treason begin, put Chief Justice John Roberts, VP Mike Pence @VP @Mike_Pence, & Mitch McConnell @senatemajldr at top of list.
> Show this thread

**Lin Wood**
@LLinWood

Folgen

We CANNOT trust courts to save our freedom. They are IGNORING massive evidence of fraud & unlawful election procedures.

We must trust @realDonaldTrump to take necessary action to save country. Just like Abraham Lincoln had to do.

Remember: We The People have all the power.



12:40 · 13. Dez. 2020

4

Exhibit N

9. On January 1, 2021, Mr. Wood tweeted that then-Vice President Pence should face arrest and "execution by firing squad":



10. On January 6, 2021, when the Capitol was under siege, Mr. Wood posted the following tweets throughout the day. At 11:23 a.m., he tweeted[6]:



---

[6] Annexed hereto as **Exhibit C** is a true and correct copy of a January 12, 2021 article from *The New York Times* establishing the timeline with respect to the siege of the Capitol.

Exhibit N

11.     At 11:57 a.m., when the mob was gathering for its eventual assault on the Capitol,

Mr. Wood tweeted:



12.     At 12:47 p.m., as individuals were poised to breach the Capitol, Mr. Wood tweeted

that the Vice President was a traitor for attempting to perform his constitutional duties:



Exhibit N

13.     As the siege of the Capitol was ongoing, Mr. Wood tweeted to his 1.1 million followers, encouraging them to occupy the Capitol and fight for President Trump:



14.     The social media account of Ashli Babbitt, a woman killed on January 6 when she tried to invade the House chamber, demonstrates that she followed Mr. Wood on Twitter and often retweeted his posts.[7]  Ms. Babbitt's final tweet before her death was a retweet of one of Mr. Wood's posts on the day of the insurrection.  The tweet contained what Mr. Wood deemed his "MUST BE DONE LIST":

---

[7] Annexed hereto as **Exhibit D** is a true and correct copy of a January 6, 2021 article from *Law&Crime*.

Exhibit N



15. Many prominent right wing conspiracy groups who were part of the mob at the Capitol have voiced their support for Mr. Wood, including the "Three Percenters"[8] and QAnon.[9] The Three Percenters posted a short manifesto expressing their preparedness "'to take back our country from the pure evil that is conspiring to steal our country away from the American people.'" Ex. F at 5. That statement praised Mr. Wood as an "inspirational figure[] in th[at] looming battle." *Id.*

16. At the insurrection, the Three Percenters raised their "Release the Kraken" flag, shown below, which is a reference to comments made by Mr. Wood and his co-counsel in the election litigations, Sidney Powell.[10] Ms. Powell and Mr. Wood are known as the "'Kraken' lawyers."[11]



---

[8] Annexed hereto as **Exhibit E** is a true and correct copy of a January 9, 2021 article from *The Guardian*. Annexed hereto as **Exhibit F** is a true and correct copy of a January 9, 2021 article from *The Washington Post*.
[9] Annexed hereto as **Exhibit G** is a true and correct copy of a November 24, 2020 article from *CBS News*.
[10] A true and correct copy of the video where Mr. Wood references the "Kraken" can be found here: https://www.youtube.com/watch?v=TaiL4KZOGRI (last visited January 22, 2021).
[11] Annexed hereto as **Exhibit H** is a true and correct copy of a January 10, 2021 article from *BBC News*.

Exhibit N

17.   In the wake of the Capitol siege, Mr. Wood claimed Antifa and Black Lives Matter were responsible for the insurrection[12]:



18.   In one instance, Mr. Wood posted a photograph of a man named Josiah Colt, suggesting he was not a supporter of then-President Trump:



_____

[12] Annexed hereto as **Exhibit HH** is a true and correct copy of a January 23, 2021 article from *The New Yorker*.

Exhibit N

19.    Mr. Colt, a Trump supporter, confirmed he was the man in the photograph and sitting in Vice President Pence's chair in the Senate.[13]

20.    Mr. Wood also tweeted a photo of Jake Angeli, *see supra*, ¶ 17, the "QAnon Shaman" who occupied the Senate floor.[14]  Mr. Wood claimed Angeli was part of Antifa, writing "Indisputable photographic evidence that antifa violently broke into Congress today. . . ." *Id.*

21.    Mr. Wood repeated his claims about Antifa to this Court at the January 11, 2021 conference.[15]

22.    Mr. Wood's Twitter account was terminated on Thursday, January 7.  One of his final tweets accused Vice President Pence of being a "TRAITOR, a Communist Sympathizer & a Child Molester":



23.    Following his Twitter suspension, Mr. Wood turned to the social media sites Parler and Telegram to communicate with his followers.  On Thursday, January 7, Mr. Wood posted the following on Parler:



---

[13] Annexed hereto as **Exhibit I** is a true and correct copy of a January 13, 2021 article from *CNN*.
[14] Annexed hereto as **Exhibit J** is a true and correct copy of a January 17, 2021 article from *The New Yorker*.  A true and correct copy of the video accompanying the article can be found here: https://www.newyorker.com/news/video-dept/a-reporters-footage-from-inside-the-capitol-siege (last visited January 22, 2021).
[15] Annexed hereto as **Exhibit K** is a true and correct copy of the transcript of the hearing on January 11, 2021.

Exhibit N

24.     This call for the execution of the Vice President was directed toward user feeds nearly three million times[16] and was viewed at least 788,000 times.[17]  According to Fox News, Mr. Wood is being investigated by the United States Secret Service concerning his death threats against Mr. Pence.[18]

25.     Mr. Wood has remained active on social media, primarily through Telegram, to this day:



---

[16] Annexed hereto as **Exhibit L** is a true and correct copy of a January 7, 2021 article from *The Washington Post*.
[17] Annexed hereto as **Exhibit M** is a true and correct copy of a January 9, 2021 article from *The New York Times*.
[18] Annexed hereto as **Exhibit MM** is a true and correct copy of a January 10, 2021 article from *Fox News*.

Exhibit N



**Lin Wood** 

Please be prepared to listen to President Trump or other legitimate Patriots in our government when they speak to you through the Emergency Broadcast System. They will be telling you the TRUTH. So listen carefully.

t.me/linwoodspeakstruth/26          308.8K ⊙ Jan 12 at 17:36



**Lin Wood** 

The "election" of Biden was a fraud. The US propaganda media has hidden that truth to many in America. Almost half the country has been deceived. People in other countries around the world know that Biden cheated and that Trump won because they have been exposed to more truth.

Use your common sense. Do you really think Biden got more votes than Obama and Hillary??? He did not campaign. His prior runs for office were dismal failures. He had no crowds at rallies. Look at Trump. His rallies were jam packed. There was a 92 mile caravan of supporters in Arizona. Do you really think he lost Arizona??? No way!

Think for yourself. Ignore the lies of the media.

Trump won a landslide re-election. That is the truth.

Telling you that Biden won is telling you a lie.

Trust that ultimately truth prevails over lies.

Trump will be President for at least 4 more years. He won.

So be patient. Every lie will be revealed. It takes time because there have been so many lies for so many years.

Trust God. Trust Truth. Trust Trump.

t.me/linwoodspeakstruth/69          394.3K ⊙ Jan 18 at 10:47

Exhibit N



**Lin Wood** 

Vice President Pence must resign today. Pence is on videos captured by FBI. Discussions about murdering judges. Roberts was involved. So was Hillary Clinton.

t.me/linwoodspeakstruth/102    248.5K ⊙  Jan 19 at 09:03



**Lin Wood** 

Justice Scalia learned of the plan to kill members of the judiciary. He reported it to the White House. Shortly thereafter, Justice Scalia was murdered.

t.me/linwoodspeakstruth/106    186.7K ⊙  Jan 19 at 09:09



**Lin Wood** 

Chief Justice John Roberts must resign today. Over the past several weeks, I have met with a courageous whistleblower who has risked his life to tell you the truth. Jeffrey Epstein arranged for the adoption of Roberts' children. Roberts used the children to gain entry into the cabal of power & influence. FBI, Rod Rosenstein & Crowdstrike knew it all.

t.me/linwoodspeakstruth/100    245.3K ⊙  Jan 19 at 08:58



**Lin Wood** 

Hillary Clinton thought she had rigged the 2016 election. The plan after her election was to kill federal judges so that Hillary could stack the judiciary. US Supreme Court targeted. FBI was complicit.

t.me/linwoodspeakstruth/104    213.4K ⊙  Jan 19 at 09:06

13

Exhibit N





## **Mr. Wood's Frivolous Filings in Numerous Courts**

26.     After the presidential election, Mr. Wood and his co-counsel, Sidney Powell, filed

four lawsuits in swing states, Georgia, Wisconsin, Arizona, and Michigan, where they claimed

voter fraud and sought to overturn the election results. *See Feehan v. Wisc. Elections Comm'n*,

No. 20-cv-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)[19]; *Bowyer v. Ducey*, No. 20-cv-

---

[19] Annexed hereto as **Exhibit N** is a true and correct copy of the complaint filed by Mr. Wood in the Eastern District of Wisconsin, *Feehan v. Wisc. Elections Comm'n*, No. 20-cv-1771, seeking to overturn the election results in

Exhibit N

02321, 2020 WL 7238261 (D. Az. Dec. 9, 2020); *Pearson v. Kemp*, No. 1:20-cv-4809, 2020 WL 7040582 (N.D. Ga. Dec. 7, 2020)[20]; *King v. Whitmer*, No. 20-cv-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020).[21] Each of these cases was dismissed. Mr. Wood also filed a *pro se* action in Georgia, in which the district court denied his motion for a temporary restraining order. *L. Lin Wood Jr. v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020).[22] The pleadings, oral arguments, and court decisions in these and other election cases are catalogued by the Moritz College of Law at Ohio State University.[23] The Michigan action led to sanctions motions being filed against Mr. Wood. The City of Detroit's motion sought Mr. Wood's disbarment and disqualification.[24]

27. In *Page v. Oath, Inc.*, the Superior Court of Delaware *sua sponte* issued a "Rule to Show Cause" with respect to whether Mr. Wood's *pro hac vice* status should be revoked because of his role in the Wisconsin action and the *pro se* lawsuit in Georgia.[25] After providing Mr. Wood

---

Wisconsin (the "Wisconsin Action"). Annexed hereto as **Exhibit O** is a true and correct copy of the decision dismissing the Wisconsin Action.

[20] Annexed hereto as **Exhibit P** is a true and correct copy of the complaint Mr. Wood filed in the Northern District of Georgia, *Pearson v. Kemp*, No. 1:20-cv-4809, seeking to overturn the election results in Georgia (the "Georgia Action"). Annexed hereto as **Exhibit Q** is a true and correct copy of the decision dismissing the Georgia Action.

[21] Annexed hereto as **Exhibit R** is a true and correct copy of the complaint filed by Mr. Wood in the Eastern District of Michigan, *King v. Whitmer*, No. 20-cv-13134, seeking to overturn the election results in Michigan (the "Michigan Action"). Annexed hereto as **Exhibit S** is a true and correct copy of the decision denying Plaintiffs relief in the Michigan Action.

[22] Annexed hereto as **Exhibit T** is a true and correct copy of the complaint Mr. Wood filed *pro se* in Georgia, *L. Lin Wood Jr. v. Raffensperger*, No. 20-cv-4651, seeking to overturn the election results in Georgia (the "Georgia *Pro Se* Action"). Annexed hereto as **Exhibit U** is a true and correct copy of the decision denying Plaintiffs relief in the Georgia *Pro Se* Action.

[23] A true and correct link to the election case database at Ohio State University can be found here: https://electioncases.osu.edu/case-tracker/?sortby=filing_date_desc&keywords=&status=all&state=all&topic=25 (last visited January 23, 2021).

[24] Annexed hereto as **Exhibit V** is a true and correct copy of the City of Detroit's motion for sanctions, disqualification, and disbarment of Mr. Wood filed in the Michigan Action.

[25] Annexed hereto as **Exhibit W** is a true and correct copy of the Order issued by the Superior Court of Delaware in *Page v. Oath, Inc.*, No. S20C-07-030, for Mr. Wood to show cause why he should not be disqualified from practicing law in a pending Delaware action (the "Delaware Action").

Exhibit N

with an opportunity to respond to its show cause order, the Superior Court in Delaware revoked his *pro hac vice* status.[26]

**Mr. Wood's False Attacks on Chief Justice John Roberts**

28.     As set forth in the accompanying memorandum of law, Mr. Wood has repeatedly falsely attacked Chief Justice John Roberts on social media.

29.     Mr. Wood has stated that the Chief Justice arranged the "illegal adoptions" of two children through Jeffrey Epstein.  *See* Ex. Y at 4.

30.     Mr. Wood linked the Chief Justice with the death of Justice Scalia and with pedophilia.  *See id.* at 3-4.

31.     Mr. Wood asked if the Chief Justice was a member of any "club or cabal requiring minor children as an initiation fee" in the following tweets[27]:

> A couple of more questions for Chief Justice John Roberts:
> (1) You are recorded discussing Justice Scalia's successor before date of his sudden death. How did you know Scalia was going to die?
> (2) Are you a member of any club or cabal requiring minor children as initiation fee? pic.twitter.com/jGxfgLCk4D
> — Lin Wood (@LLinWood) December 31, 2020
>
> I have linked Roberts to illegal adoption, Jeffrey Epstein, pedophilia & prior knowledge of Scalia's death.
> — Lin Wood (@LLinWood) December 31, 2020

32.     In another tweet, Mr. Wood implied that the Chief Justice said, during a phone call in August, that President Trump is a "m-----f-----" who could not be allowed to have another term:

---

[26] Annexed hereto as **Exhibit X** is a true and correct copy of the Order issued in the Delaware Action revoking Mr. Wood's *pro hac vice* admission in Delaware.

[27] Annexed hereto as **Exhibit Y** is a true and correct copy of a December 31, 2020 article from *The Daily Beast*.

Exhibit N



Lin Wood
@LLinWood

The People have list of questions for C.J. Roberts based on bizarre votes on major cases starting with Obamacare. But let's ask him just two:

1. Are you the John Roberts on Epstein flight logs?
2. Did you say about @realDonaldTrump "the mother f#*ker would never be re-elected."

9:55 PM · Dec 17, 2020 · Twitter for iPhone

33.    Mr. Wood alleged that the Chief Justice was being blackmailed, including in the tweets below, which were retweeted by Ashli Babbitt shortly before her death at the Capitol:



34.    Mr. Wood's attacks on Justice Roberts have continued to this day via the social media website Telegram:



17

Exhibit N

**Mr. Wood's Lack of Candor to This Court**

35.     Another ground for the instant motion is Mr. Wood's lack of candor to this Court at the conference on January 11. The transcript of the conference is annexed hereto as Exhibit K. On January 11, one of the false statements Mr. Wood told this Court was that he "never advocated that anyone should break the law." Ex. K at 15.

36.     Mr. Wood encouraged the conduct of individuals who committed federal offenses by breaking into the Capitol to unseat our duly elected representatives and prevent the casting of electoral college votes and the peaceful transfer of power. As of the date of this declaration, over 100 people have been arrested and so charged, with the FBI investigating hundreds more.[28]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 25, 2021

JOHN H. REICHMAN

---

[28] Annexed hereto as **Exhibit Z** is a true and correct copy of a January 19, 2021 article from *CNN*.

Exhibit N

# EXHIBIT A

Exhibit N

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:___**2020CV339937**

JURY TRIAL DEMANDED

### VERIFIED COMPLAINT

COME NOW Nicole Wade, Jonathan Grunberg, Taylor Wilson, and Wade, Grunberg & Wilson, LLC (collectively, "Plaintiffs"), and file this their Verified Complaint against Defendants L. Lin Wood and L. Lin Wood, P.C. (collectively, "Defendants"), showing the Court as follows:

### INTRODUCTION

1.

This lawsuit arises out of the breach of a Settlement Agreement and General Release executed by the Parties on March 17, 2020 (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto as *Exhibit A.*[1]

---

[1] Certain portions of the Settlement Agreement have been redacted for client confidentiality purposes, including the liquidated sum owed to Plaintiffs under the Settlement Agreement. Contemporaneous with serving this Complaint, Plaintiffs are serving discovery upon Defendants and third parties to allow for the disclosure of the liquidated sum. Plaintiffs will promptly amend the Complaint to provide the liquidated sum as soon as permitted.

Exhibit N

2.

The parties to the Settlement Agreement are all attorneys who practiced law successfully together in the firm of L. Lin Wood P.C. (hereinafter "LLW PC") for a number of years, working on many cases together, including each of the cases identified in the Settlement Agreement.

3.

In early 2020, due to the erratic, abusive, and unprofessional behavior of Defendant L. Lin Wood (hereinafter "Wood") as described herein, Plaintiffs sought to leave Defendant LLW PC and entered into the Settlement Agreement rather than litigate – and despite – the issues described herein. Indeed, Plaintiffs Wade, Grunberg, and Wilson made significant financial concessions in the Settlement Agreement, despite having no legal obligation to do so, specifically to avoid filing this lawsuit in favor of protecting the privacy of Defendant Wood and various third parties.

4.

Pursuant to the Settlement Agreement, Defendants owe Plaintiffs a liquidated sum arising from the fees for certain cases and eventual resolution of other business disputes as set forth in the Settlement Agreement.

5.

The amount owed to Plaintiffs is owed by Defendants out of fees they have already collected from clients for work performed by Plaintiffs when they were lawyers at LLW PC; thus, enforcement of Defendants' payment obligations under the Settlement Agreement does not require clients to pay fees beyond those paid to Defendants. And, indeed, it does not involve clients at all.

Exhibit N

6.

Defendants have failed to honor the terms of the Settlement Agreement and further advised Plaintiffs that they will not make the payment required by the Settlement Agreement.

7.

Defendants' stated position for breaching the Settlement Agreement is that the individual Plaintiffs "were not in Lin's firm [LLW PC] at any time relevant" to the cases addressed in the Settlement Agreement but only "*shared office space and worked on cases with LLW PC*" and, thus, client consent is required to split fees with said Plaintiffs, pursuant to Georgia Rule of Professional Conduct 1.5.

8.

Defendants' position that Plaintiffs Wade, Grunberg, and Wilson were never associated with Defendant LLW PC is apparently based solely on the fact that each Plaintiff received his or her compensation from Defendant LLW PC via separate LLCs, each owned only by the individual Plaintiffs, for which Defendants issued 1099s rather than W-2s, which is not only irrelevant to the issue, but also was an act taken by Defendants solely in their own discretion for the apparent purpose of not having to account for taxes on compensation paid to Plaintiffs Wade, Grunberg, and Wilson, who were required to account for their own income taxes via separate LLCs.

9.

Defendants have taken this position to avoid payment of the largest fee identified in the Settlement Agreement – the one case which, because of the size of its fee, was the primary motivation for the parties to enter into the Settlement Agreement (the "Disputed Case"). Defendants were at the time of the Settlement Agreement and remain to this day lead counsel on

3

Exhibit N

this case. Defendants now contend that this client has refused consent for Plaintiffs Wade, Grunberg, and Wilson to be paid the fee split Defendants agreed to in the Settlement Agreement – even though the entire fee has already been paid to Defendant LLW PC, and the division of compensation between the former lawyers of LLW PC should not involve clients in any way.

<div align="center">10.</div>

The bad faith of Defendants' position is plain from every fact attendant to the parties' relationship and practice of law. For instance, Defendants acknowledged Wade's, Grunberg's, and Wilson's status as lawyers and partners of Defendant LLW PC by:

(a) Creating, or causing to be created, Defendant LLW PC's website, which identified Wade, Grunberg, and Wilson as partners of LLW PC;

(b) Making public announcements via the Fulton County Daily Report, the State Bar Journal, and other publications regarding each individual Plaintiff's hiring and/or promotion to partners of Defendant LLW PC;

(c) Allowing and directing countless representations to be made to many courts, both federal and state, that each individual Plaintiff was a member of Defendant LLW PC by virtue of every filing by any of the individual Plaintiffs and every hearing, trial, deposition, mediation, and/or arbitration attended by any individual Plaintiff;

(d) Drafting, or causing to be drafted, countless engagement agreements entered into by Defendant LLW PC wherein one or more of the individual Plaintiffs were identified as lawyers of LLW PC who would be working on that client's matter;

(e) Providing to the individual Plaintiffs business cards identifying each individual Plaintiff as an attorney of LLW PC;

<div align="center">4</div>

<div align="right">Exhibit N</div>

(f) Providing each of the individual Plaintiffs with email addresses at LLW PC's domain "linwoodlaw.com";

(g) Making countless introductions in court, in depositions, to clients, and to third parties of each of the individual Plaintiffs as "Partners" of LLW PC;

(h) Drafting countless emails, texts, tweets, and conversations over a period of years acknowledging and holding out the individual Plaintiffs as "Partners" of Wood and LLW PC; and

(i) Expressly acknowledging in the Settlement Agreement that Plaintiffs Wade, Grunberg, and Wilson "never held any ownership interest in L. Lin Wood, P.C. (hereinafter "LLW PC") but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018."

11.

Thus, despite the avalanche of evidence to the contrary and their agreement in the Settlement Agreement, Defendants now apparently contend that Plaintiffs Wade, Grunberg, and Wilson were not "associated in a law firm" with Defendant Wood.

12.

It is now clear that Defendants committed fraud because they never intended to pay the majority of the money they owe to Plaintiffs under the Settlement Agreement. Defendants' fraudulent intent is evidenced in their first draft of the Settlement Agreement which contained a false recital that was a poison pill, as it mirrors Defendants' now-stated reason for breaching the contract: "Nicole Wade, Jonathan Grunberg, and Taylor Wilson and L. Lin Wood, P.C. are lawyers who practiced law, *co-counseled cases, and shared office space together*."

Exhibit N

13.

The Parties heavily negotiated Defendants' false recital about Plaintiffs Wade, Grunberg, and Wilson working as partners of Defendant LLW PC, ultimately resulting in the statement that Plaintiffs "*have worked as lawyers of L. Lin Wood, P.C.* on cases since 2018." (Ex. A emphasis added). The attention Defendants cast on this detail reveals their fraudulent intent.

14.

Defendants' breach of contract was premeditated; Defendant Wood never intended to make the payment required by the Settlement Agreement as he has repeatedly sworn since February 10, 2020 and as quoted herein.

15.

Defendants' bad faith in entering into a contract under which they never intended to perform, as shown herein, demonstrates that they fraudulently induced Plaintiffs to enter into the Settlement Agreement so that they could exact financial concessions from Plaintiffs for which Plaintiffs had no legal liability in exchange for finally obtaining Defendants' false promise to pay to Plaintiffs a larger sum, to which they were entitled, which Defendants never ultimately intended to pay.

**PARTIES, JURISDICTION AND VENUE**

16.

Plaintiff Nicole Wade ("Wade") is a citizen and resident of the State of Georgia.

17.

Plaintiff Jonathan Grunberg ("Grunberg") is a citizen and resident of the State of Georgia.

Exhibit N

18.

Plaintiff Taylor Wilson ("Wilson") is a citizen and resident of the State of Georgia.

19.

Plaintiff Wade, Grunberg & Wilson, LLC ("WGW LLC") is a limited liability company registered to transact business in the State of Georgia. Its principal place of business is located in Fulton County, Georgia 30309. Its only members are Plaintiffs' individual LLCs: Wade Law, LLC, J.D. Grunberg, LLC, and G. Taylor Wilson, LLC, each a single member Georgia limited liability company, owned solely by the individual Plaintiff identified in the LLC name.

20.

Defendant L. Lin Wood ("Wood") is a citizen of the State of Georgia and a resident of Fulton County, Georgia and may be served at his residence at ███████████████████
███████████

21.

Defendant L. Lin Wood P.C. ("LLW PC") is a professional corporation registered to transact business in Georgia. L. Lin Wood, P.C. may be served through its Registered Agent, L. Lin Wood, 1180 West Peachtree Street, Suite 2040, Atlanta, Fulton County, Georgia 30309. Its only shareholder is individual Defendant Lin Wood.

22.

Pursuant to O.C.G.A. § 15-6-8 and GA. CONST. art. VI, § 4, ¶ I, this Court has jurisdiction over this action and over Defendant Wood, a resident in Fulton County, Georgia, and Defendant LLW PC, a corporation operating in Fulton County and whose registered agent is located in Fulton County, Georgia. All actions giving rise to the basis of this Complaint

Exhibit N

occurred in Fulton County, Georgia, and pursuant to O.C.G.A. §14-2-510(b)(4), venue is proper in this Court.

## STATEMENT OF FACTS

### Detailed Facts Pertinent to Breach of Contract

### Background of Plaintiffs' Association with Defendant LLW PC

23.

Plaintiffs Wade, Grunberg, Wilson, and Defendant Wood are lawyers who are licensed to practice law in the State of Georgia.

24.

In or around September 2014, Plaintiff Grunberg was hired as an associate – a W-2 employee – by Defendant LLW PC when Wood's former firm, Wood, Hernacki & Evans, LLC disbanded.

25.

In May 2015, Plaintiff Wade joined LLW PC as a Partner.

26.

Effective May 2015, Plaintiff Wade and Defendant LLW PC entered into an agreement titled "Agreement for Nicole Jennings Wade to Join L. Lin Wood, P.C." with a term sheet providing, in material part, that "Nicole will join L. Lin Wood, P.C. between May 11, 2015 and June 15, 2015," that "Nicole will agree to work full-time and exclusively for L. Lin Wood, P.C.," that she will join "L. Lin Wood, P.C. as a 'Partner,'" and that "[t]he structure, and Nicole's partnership, will be re-evaluated, and potentially re-negotiated, after one year."

Exhibit N

27.

Defendants' hiring of Wade as a partner was announced in the Fulton County Daily Report (the "Daily Report"), stating as follows: "Trial law firm L. Lin Wood, P.C. has added Nicole Jennings Wade as a partner from Bryan Cave—the fourth lawyer for the firm. Wade handles fiduciary, trust and estate, and general business litigation. Until now, she had practiced at Bryan Cave and predecessor firm Powell Goldstein for her 20-year legal career."

28.

Defendants also arranged for an email blast from the Daily Report as follows:



29.

Plaintiff Wilson was hired as an associate – a W-2 employee – by Defendant LLW PC in November of 2015.

9

Exhibit N

30.

Following Wilson's arrival in November 2015, LLW PC operated as a law firm with 4 lawyers – Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson – until January/February 2020.

31.

In early 2018, Defendant Wood indicated his intent to begin practicing law alone as the sole lawyer of Defendant LLW PC.

32.

At that time, Defendant Wood began looking for office space for himself and one non-attorney employee.

33.

In light of Defendant Wood's stated intention, Plaintiffs Wade, Grunberg, and Wilson formed WGW LLC.

34.

WGW LLC agreed to hire the other non-attorney employee of LLW PC who Defendant Wood did not plan to keep at LLW PC.

35.

Plaintiffs Wade, Grunberg, and Wilson also began searching for office space, and with Defendant Wood's knowledge and approval, they employed Defendants' own real estate brokers to canvas for space.

Exhibit N

36.

During this time, Plaintiffs Wade, Grunberg, and Wilson had numerous discussions with Defendant Wood in which they sought his advice about the formation and structure of WGW LLC.

37.

For example, Plaintiff Wade specifically discussed with Defendant Wood the anticipated compensation structure of WGW LLC, and he provided his opinion on that issue.

38.

Defendant Wood indicated that he planned to continue to work with Plaintiffs' new firm as he anticipated that the individual Plaintiffs would continue doing the same work for Defendants' clients that they had been doing.

39.

Indeed, the individual Plaintiffs had lengthy written and oral discussions about Defendant Wood potentially serving as "of counsel" at Plaintiff WGW LLC, and Plaintiff Wilson undertook research regarding whether Defendant Wood could ethically practice with two different law firms, and determined that he could by express authority of the Georgia Bar via advisory opinion.

40.

In or around April 2018, Defendant Wood changed his mind and elected to keep Defendant LLW PC together with Plaintiffs Wade, Grunberg, and Wilson continuing as attorneys of Defendant LLW PC.

Exhibit N

41.

Effective May 1, 2018, Defendants promoted Plaintiffs Grunberg and Wilson to non-equity partners of Defendant LLW PC and announced their promotions to partner via the Daily Report and the Georgia Bar Journal as follows:





L. Lin Wood, P.C., announced that Jonathan D. Grunberg and G. Taylor Wilson were promoted to partners. Grunberg focuses his practice on complex civil litigation in federal court. Wilson focuses on complex civil litigation in both federal and state court. His principal areas of representation include business and commercial litigation in both contract and tort, false claims act cases and actions for defamation and related first amendment issues. The firm is located at 1180 W. Peachtree St., Suite 2400, Atlanta, GA 30309; 404-891-1402; Fax 404-506-9111; www.linwoodlaw.com.

42.

Plaintiffs Wade, Grunberg, and Wilson then abandoned Plaintiff WGW LLC, which never operated prior to their departure from Defendant LLW PC in February 2020.

43.

Defendant Wood changed his office space search to find space sufficient for Defendant LLW PC to continue operating with four lawyers and two assistants, and in July 2018, Defendant LLW PC ultimately signed a lease at 1180 W. Peachtree St. NE, Suite 2040, Atlanta, GA 30309 (the "Lease").

12

Exhibit N

44.

At Defendant Wood's instruction, Plaintiffs Wade, Grunberg, and Wilson executed the Lease on July 17, 2018, only as "Partners" of Defendant LLW PC. The Lease makes no mention of any of the Plaintiffs' LLCs, and Plaintiffs did not execute personal guarantees.

45.

Defendant LLW PC moved into the new office space at Suite 2040 in September of 2018—along with its attorneys Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson.

46.

By the middle of 2019, Defendant Wood indicated that he planned to enter into semi-retirement at the beginning of 2020.

47.

As part of his anticipated transition out of the practice of law, in late January 2020, Wood decided to re-brand Defendant LLW PC as a partnership named Wood, Wilson, Grunberg & Wade ("WWG&W").

48.

Defendants publicly announced the formation of WWG&W on or about January 24, 2020 in the Daily Report as follows:

13

Exhibit N



49.

Pursuant to Defendant Wood's instruction, the receptionist began answering the office phone with "Wood, Wilson, Grunberg & Wade" on the morning of Monday, January 27, 2020.

50.

No written documentation was ever prepared or executed setting forth the relationships between the partners of WWG&W, and no paperwork regarding the entity was ever filed with the Georgia Secretary of State.

51.

Neither Defendants nor Plaintiffs ever filed any document in any court under the name and or firm WWG&W; and thus for *every* case that Plaintiffs Wade, Grunberg, and Wilson were actively litigating as of February 14, 2020, they were listed on the docket as attorneys of Defendant LLW PC.

52.

For reasons more fully described below, Plaintiffs Wade, Grunberg, and Wilson determined that they could no longer practice law with Defendant Wood and terminated their association with Defendants on Friday, February 14, 2020.

14

Exhibit N

**Individual Plaintiffs Were Non-Equity "Partners" of LLW PC After May 1, 2018**

53.

Upon information and belief, Defendant Wood always has been the sole member of LLW PC.

54.

At all times from May 1, 2018, until their departure on February 14, 2020 (hereinafter, the "relevant time period"), Plaintiffs Wade, Grunberg, and Wilson were held out as "Partners" of Defendant Wood, whether in the entity LLW PC or the rebranded WWG&W.

55.

Throughout the relevant time period, the individual Plaintiffs received compensation for their work as lawyers and partners of LLW PC through their individual LLCs.

56.

Irrespective of their titles, at all times during the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were lawyers of LLW PC, including the rebranded firm WWG&W.

57.

Throughout the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were "associated with" Defendant LLW PC and Defendant Wood, including for the few weeks when the firm was rebranded as WWG&W..

58.

Throughout the relevant time period, Defendant Wood referred to Plaintiffs Wade, Grunberg, and Wilson as his partners and as partners of LLW PC in court appearances, in depositions, to clients, to third parties, and in countless emails, texts, and tweets.

Exhibit N

59.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were identified on the website of LLW PC, at linwoodlaw.com, as "Partners."

60.

Screenshots of pages on linwoodlaw.com as of January 2020, show each of the individual Plaintiffs represented as Partners of LLW PC:





Exhibit N





Exhibit N

61.

During the relevant time period, Defendants provided to the individual Plaintiffs e-mail addresses at Defendants' domain www.linwoodlaw.com.

62.

During the relevant time period, Plaintiffs Wade's, Grunberg's, and Wilson's @linwoodlaw.com e-mail addresses were their only professional e-mail addresses for corresponding with clients or any other purpose.

63.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson each sent hundreds of emails to Defendant Wood with a signature block identifying themselves as "Partner" of "L. Lin Wood, P.C."

64.

During the relevant time period, Defendant Wood never told Plaintiffs Wade, Grunberg, or Wilson that identifying themselves as "Partner" of "L. Lin Wood, P.C." was incorrect.

65.

During the relevant time period, Defendants provided to the individual Plaintiffs business cards evidencing their association in the law firm of LLW PC, for example:



18

Exhibit N





66.

During the relevant time period, Defendants filed countless court documents identifying the individual Plaintiffs as attorneys of LLW PC in the block identifying counsel.  For example, in a pleading signed by Defendant Wood in December of 2019, the block stated:

Case 2:18-cv-08048-SVW-JC   Document 143   Filed 12/02/19   Page 1 of 6   Page ID #:5639

```
1   L. LIN WOOD, P.C.
2   L. Lin Wood (pro hac vice)
    lwood@linwoodlaw.com
3   Nicole J. Wade (pro hac vice)
4   nwade@linwoodlaw.com
    Jonathan D. Grunberg (pro hac vice)
5   jgrunberg@linwoodlaw.com
6   G. Taylor Wilson (pro hac vice)
    twilson@linwoodlaw.com
7   1180 West Peachtree Street, Ste. 2040
8   Atlanta, Georgia 30309
    404-891-1402
9   404-506-9111 (fax)
```

67.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson and Defendant Wood maintained equal access to all current client files of Defendant LLW PC.

19

Exhibit N

68.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson and Defendant Wood shared operating expenses, 25% each, including for, *inter alia,* office space lease, salary of a non-lawyer employee, file maintenance, website hosting, telephones, internet, cable, Westlaw, malpractice insurance for Defendant LLW PC, office supplies, copier/scanner, technical support, file storage and archiving, and other miscellaneous overhead expenses.

**Plaintiffs Wade, Grunberg, and Wilson Practiced Law Only for LLW PC**

69.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson practiced law as attorneys acting solely on behalf of Defendant LLW PC.

70.

During the relevant time period, Defendant Wood originated the majority of the clients and business at Defendant LLW PC.

71.

Any client originated by Plaintiffs Wade, Grunberg, or Wilson during the relevant time period executed an engagement agreement with Defendant LLW PC, was billed by LLW PC, and made payments to LLW PC.

72.

At no time did WGW LLC, Wade LLC, Grunberg LLC, Wilson LLC, or Grunberg & Wilson LLC ever enter into an engagement agreement with a client, bill a client, collect fees from a client, or take any actions to represent a client during the relevant time period.

Exhibit N

73.

For example, while paragraph 1.A of the Settlement Agreement says of each of the clients in subparagraphs iv, v, and vi that he, she, or it "was and is the client of WGW," (Ex. A.), this simply referred to who originated the client and/or would manage the client's on-going matter. During the relevant time period: (1) each of those clients had an engagement agreement with Defendant LLW PC; (2) none of those clients had an engagement agreement with WGW LLC, Wade LLC, Grunberg LLC, Wilson LLC, or Grunberg & Wilson LLC; (3) Defendants were counsel of record for each of those clients; and (4) at least one of Wade, Grunberg, or Wilson were also counsel of record for those clients as attorneys of Defendant LLW PC.

74.

During the relevant time period, every correspondence or court filing made by Plaintiffs Wade, Grunberg, and/or Wilson on behalf of a client was made in their capacities as attorneys of LLW PC—with the exception of several letters that may have been sent after January 24, 2020, bearing the letter head of the rebranded firm, WWG&W.

75.

At all times during the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never represented a client through any law firm other than Defendant LLW PC (or possibly its rebranded name WWG&W after January 24, 2020).

76.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never entered into an attorney engagement agreement to represent a client under a firm other than Defendant LLW PC (or possibly its rebranded name WWG&W after January 24, 2020).

21

Exhibit N

77.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never made an appearance in any case on behalf of any client under any firm name other than Defendant LLW PC.

**Individual Plaintiffs Performed Significant Work for All LLW PC Clients**

78.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson generated nearly all of the work product for the clients of Defendant LLW PC.

79.

During the relevant time period, one or more of the individual Plaintiffs made an appearance on behalf of LLW PC in every proceeding in which Defendant LLW PC was counsel of record, in at least eight different states.

80.

Indeed, as of February 14, 2020, Plaintiffs Wade, Grunberg, and/or Wilson originally authored every pleading, substantive motion, and brief prepared by LLW PC and filed with the court for the cases subject of the Settlement Agreement for which a lawsuit had been filed, all pursuant to Defendant Wood's instruction and supervision, some of which were edited by Defendant Wood.

81.

During the relevant time period, every hourly fee engagement entered into by and between Defendant LLW PC and any client specifically listed one or more of Plaintiffs Wade, Grunberg, or Wilson as attorneys of Defendant LLW PC who were expected to perform work on behalf of the client.

22

Exhibit N

82.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson communicated extensively with clients of LLW PC on whose cases they were working.

83.

Specifically, the individual Plaintiffs communicated and worked with the clients for every case addressed in the Settlement Agreement, in some of those cases acting as the primary client contact.

**The Settlement Agreement**

84.

Within 48 hours of Plaintiffs' departure from LLW PC, and before the individual Plaintiffs had even discussed re-activating WGW LLC, the Parties began negotiating a resolution of the issues arising from Plaintiffs' separation from LLW PC.

85.

On February 17, 2020, the Parties reached an agreement with respect to compensation to be paid on past and pending cases, which Defendant Wood subsequently reneged on – only to agree to the same fee split one month later when represented by counsel.

86.

On March 17, 2020, Plaintiffs and Defendants entered into the global Settlement Agreement, which provided that Plaintiffs and Defendants would separate and practice law separately, which resolved issues regarding compensation to the individual Plaintiffs for their work on certain of Defendant LLW PC's pending cases, and which allocated expenses related to the Lease.

Exhibit N

87.

In the Settlement Agreement, the Parties resolved fee disputes: (1) regarding compensation already earned by Defendant LLW PC on cases for which Plaintiffs Wade, Grunberg, and Wilson had performed substantial work; (2) regarding compensation to be earned by Defendant LLW PC for cases on which Plaintiffs Wade, Grunberg, and Wilson had performed substantial work; (3) regarding compensation to be earned by Plaintiff WGW LLC on cases originating with Defendant LLW PC; and (4) regarding Defendants' claim that Plaintiffs owed to Defendant LLW PC rent due under the Lease for LLW PC's office space after they departed, even though Plaintiffs Wade, Grunberg and Wilson signed the Lease only as partners of Defendant LLW PC, the Lease does not contain any personal guaranty, and Defendants evicted Plaintiffs from the space on February 14, 2020.

88.

Specifically, the Settlement Agreement provided that Plaintiffs would pay to Defendant LLW PC a percentage of fees eventually recovered in three cases that they would take and continue to work on, and that Defendant LLW PC would pay Plaintiffs a specific dollar amount of its fees collected on three separate cases that had either officially or functionally been resolved but for which Defendant LLW PC had not yet been paid its attorneys' fees, as well as fees to be collected in connection with several other cases that had not yet resolved.

89.

Plaintiffs Wade, Grunberg, and Wilson performed substantial work—if not the majority of the work—during the relevant time period on behalf of LLW PC on each of the cases for which Defendants agreed to compensate Plaintiffs in the Settlement Agreement.

24

Exhibit N

90.

Plaintiffs were not compensated for any of their substantial work on the cases included in the Settlement Agreement, but Plaintiffs reasonably expected compensation from Defendant LLW PC based on the firm's practice and procedure and assurances by Defendant Wood.

91.

During the relevant time period, Plaintiffs Wade, Grunberg, and/or Wilson had communicated and worked with each client whose cases were included in the Settlement Agreement, such that each client was familiar with the fact that one of more of the individual Plaintiffs was working on his, her, or their case.

92.

In regard to the three cases that were already settled or functionally settled, Defendant LLW PC agreed to pay Plaintiffs a specific dollar amount, with payment to be made within seventy-two hours of LLW PC's receipt of its portion of the fees in the Disputed Case, less payment for a portion of the Lease.

93.

Thus, as drafted by Defendants, the Settlement Agreement provided that all payments from Defendant LLW PC would become due and owing only upon receipt of the proceeds for its attorneys' fees from the Disputed Case.

94.

At all times during the relevant time period, including at the time the Settlement Agreement was executed, Defendants were counsel for the clients in the Disputed Case.

Exhibit N

95.

Following execution of the Settlement Agreement, Defendants reported to Plaintiffs on multiple occasions regarding the status of the trigger for payment under the Settlement Agreement.

96.

Subsequently, however, Defendants advised Plaintiffs (through counsel) of their purported belief that client consent was required for the payments to Plaintiffs agreed to in the Settlement Agreement pursuant to Georgia Rule of Professional Conduct 1.5(e), that the client in the Disputed Case refused consent, and that after off-setting the fees to be paid to Plaintiffs from the other cases that had already been resolved, Plaintiffs owed Defendant LLW PC a significant sum pursuant to Paragraph 2 of the Settlement Agreement concerning the Lease.

97.

With respect to the Lease, the Settlement Agreement provides as follows: "WGW shall pay to LLW PC the amount of [redacted] in full satisfaction of any obligations WGW may have, or be alleged to have, under the lease agreement …" which "amount shall be deducted from the payment by LLW PC to WGW referenced in Section 1(B) above."

98.

Thus, there is no provision in the Settlement Agreement requiring Plaintiffs to affirmatively pay to Defendants any amount of money, nor any time frame by which Plaintiffs would have to do so. Instead, the Settlement Agreement explicitly provides for a net lump sum payment to Plaintiffs.

26

Exhibit N

99.

Despite Defendants' counsel expressly intertwining the payments to Plaintiffs with the Lease payment, and despite Defendants' receipt and retention of all fees in the resolved cases subject of the Settlement Agreement, Defendant LLW PC stated its intent to hold Plaintiffs liable for the Lease payment.

100.

Thereafter, Plaintiffs notified Defendants that Georgia Rule of Professional Conduct 1.5(e) does not apply to this situation because the rule governs only "lawyers who are not in the same firm" and that it does not "regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm." *See* Rule 1.5, cmt. 8.

101.

Prior to the execution of the Settlement Agreement, Defendants did not seek client consent for the purpose of paying compensation to Plaintiffs Wade, Grunberg, and Wilson as a matter of practice, both for hourly and contingency arrangements, and only Defendant LLW PC was listed as receiving fees in the settlement statement sent to clients following settlement of a contingency fee case.

102.

Upon information and belief, over seventy-hours (72) have passed since Defendant LLW PC received funds identified in the Settlement Agreement as the trigger for Defendants' payment to Plaintiffs.

103.

Thus, Defendants are obliged to pay to Plaintiffs the liquidated sum due under the Settlement Agreement, as well as additional funds due to Plaintiffs.

27

Exhibit N

104.

Plaintiffs have repeatedly demanded that Defendants honor their obligation to pay Plaintiffs the liquidated sum for fees required by the Settlement Agreement, as well as additional funds due to Plaintiffs, and have reminded Defendants' counsel of the facts and allegations contained herein.

105.

Defendants have continued in bad faith to refuse to pay the amount they agreed to pay Plaintiffs under the Settlement Agreement.

**Detailed Facts Pertinent to Fraud Claims**

**Deterioration of the Law Firm**

106.

Beginning in the fall of 2019 and continuing through 2020, Defendant Wood's behavior became increasingly erratic, hostile, abusive, and threatening toward Plaintiffs Wade, Grunberg, and Wilson, as well as many other individuals.

107.

While in the years before the Fall of 2019, Defendant Wood could at times be abusive, his bad behavior became far more serious and persistent than in years past.

108.

Plaintiffs Wade, Grunberg, and Wilson nevertheless remained in Defendant LLW PC because they were committed to serving as attorneys for a trial scheduled for early-December 2020, and Defendant Wood repeatedly assured them he would be stepping away from the practice of law after the trial ended.

28

Exhibit N

109.

Although relevant, Plaintiffs will avoid pleading the specifics of Defendant Wood's erratic behavior prior to February 14, 2020—except as to facts specifically and demonstrably related to Defendants' fraudulent and malicious intent to induce Plaintiffs to enter into the Settlement Agreement that Defendants would ultimately refuse to honor.

110.

The vast majority of the alleged communications below were made by Defendant Wood, and there is a noticeable void of responses by Plaintiffs Wade, Grunberg, and Wilson—who refused to respond in kind to Defendant Wood's behavior.

111.

Throughout late 2019 and January and February 2020, abusive, incoherent phone calls, voicemails, texts, and emails by Defendant Wood to Plaintiffs Wade, Grunberg, and Wilson sent in the middle of the night were the norm. All of these erratic communications have a few things in common:  most of these emails profess that God or the Almighty was commanding his actions; many were stating his refusal to pay the Plaintiffs "one thin dime;" and virtually all were abusive.

112.

Defendant Wood's behavior continued to deteriorate, including assault and battery on Wilson in Defendant Wood's home after he had traveled there to check on Wood. In the Fall of 2019, Defendant Wood also committed assault and battery on Grunberg in an elevator of a hotel during an out of town deposition.  In both assaults, there was essentially no reason whatsoever for the attack, and Defendant Wood later acknowledged and apologized for this violence.

Exhibit N

113.

Defendant Wood, himself, acknowledged during late 2019 that his behavior was abusive on October 2, 2019, when he e-mailed Plaintiffs Wade, Grunberg, and Wilson, stating, in relevant part, "The Boss, Pops, Lin, Asshole – whatever you wish to call me – knows that I have allowed a combination of pressures over the past many weeks, if not months, to become justifications for treatment of each of you, to varying degrees and at various times, that can only be described as rude, overly demanding, and at times abusive."

114.

Unfortunately, that acknowledgement changed nothing and his behavior toward Plaintiffs Wade, Grunberg, and Wilson continued to worsen.

115.

On February 10, 2020, Defendant Wood contacted Plaintiffs and begged for them to come to his house around 1:00 am, which Plaintiff Grunberg and Wade did. Once there, Defendant Wood urged them to stay with him until morning, with Plaintiff Grunberg leaving at approximately 4:30 am and Plaintiff Wade leaving after sunrise. This experience unnerved the Plaintiffs.

116.

That day, Plaintiffs Grunberg and Wilson confronted Defendant Wood about his behavior.

117.

Even at that early juncture, Defendant Wood immediately threatened Plaintiff Wilson that leaving his firm was "professional suicide" and threatened not to pay Wilson the money he was owed for his work in the Disputed Case, stating as follows: "let me tell you what's gonna

30

Exhibit N

happen to you … watch what happens with the [Disputed Case] fee.  I'll show you what I think of what you've done to me."

<center>118.</center>

That evening, Defendant Wood called Plaintiff Wade and, during a call that lasted approximately two hours, Wood advised Wade that he was going to destroy Plaintiffs Grunberg and Wilson.  During this conversation, Defendant Wood could not help but revisit his obsession with Plaintiff Wilson's wife, stating:  "by the time I am through with Taylor Wilson, he's going to wish all I had done was fuck his wife."

<center>119.</center>

On February 11, 2020, at 1:03 a.m., Defendant Wood e-mailed Plaintiffs Wade, Grunberg, and Wilson, firing the Plaintiffs and changing the firm, while insisting that Plaintiffs had the "fiduciary duties" of partners, stating, in material part, as follows[2]:

Taylor, Jonathan, and Nicole,

**Effectively immediately**, the law firm of **L. Lin Wood, P.C.** hereby withdraws from any and all law partnerships with your law firms and you, including, but not limited to the partnership of Wood, Wilson, Grunberg & Wade….

I want Taylor and Jonathan physically out of my office space as soon as possible. I am willing to be more lenient with Nicole but I want the physical separate of the lawyers from 1180 West Peachtree St., Suite 2040 executed with <u>no</u> delay....

I request that each of you provide me with a list of outstanding cases of LLW PC on which you are presently working…. I would like from each of you the number of hours (with description) you each have expended on the [Disputed Case]. Hours on the pending [redacted] can be submitted separately by end of week.  If you have any other [redacted] hours … please include them with some reasonable detail by the end of the week….

---

[2] To protect the privacy of many third-parties, Plaintiffs will not be tendering copies of Defendant Wood's e-mail correspondence and other communications with this Complaint but provide as much context as is appropriate in each quote.

<center>31</center>

<div align="right">Exhibit N</div>

In meantime, I remind you of **the fiduciary duty of non-disparagement** which shall be strictly enforced. You are hereby prohibited from contacting any of my clients, referring attorneys or co-counsel without my specific written authorization….

(Emphasis in original).

120.

Plaintiffs Wade, Grunberg, and Wilson began moving out of Defendant LLW PC's office space on February 11, 2020.

121.

By the afternoon of that same day, February 11, 2020, Defendant Wood had completely changed his mind and left voicemails for each of Plaintiffs Wade, Grunberg, and Wilson, rescinding his withdrawal from their partnership and their eviction from his office space. For example, Defendant Wood stated in part in a voicemail to Plaintiff Wade:

. . . This law firm is going to go forward as Wood, Wilson, Grunberg & Wade. Business as usual is back now being business as usual. Keep doing what you're doing on the cases you're doing. I don't need your hours in the [Disputed] case – I never have. No reason to do it now except in billable cases. . . . We are going to continue as a partnership. A partnership under that name that is going to be one of the great partnerships in the history of the law. . . . I'm going to ask you to do the big word "T." Trust me. . . . I'm going to let God's will be done for our law firm. . . Everything I said in that letter last night is rescinded.

122.

Plaintiffs Wade, Grunberg, and Wilson decided to give it one more shot in the hopes of helping Defendant Wood and in the hopes that the work environment would return to status quo.

123.

On February 13, 2020, the day before all 5 people who worked for Defendant Wood at Defendant LLW PC terminated their employment, Defendant Wood hosted an approximately 3.5 hour teleconference with Plaintiffs Grunberg and Wilson in which he spoke almost non-stop.

32

Exhibit N

124.

During the 3.5-hour teleconference, Defendant Wood referred to himself as Almighty; offered to fight the individual Plaintiffs to the death; demanded the Plaintiffs' undying loyalty; threatened to "hurt" the Plaintiffs; offered to have the Plaintiffs stay in the firm; and called Plaintiff Grunberg a "Chilean Jew" and demanded that he admit he does not look like the other lawyers in the firm. Unfortunately, the list goes on, as reflected by the following pertinent portion of the transcript of the call (except as indicated by brackets and double quotation marks, the words are Defendant Wood's):

… I own that office. Y'all know that now. I showed you who had power, didn't I? But I didn't exercise it. Cause I right now would never do anything in the exercise of my power do anything to hurt any of y'all or your families. Do you believe me? Cause if you don't believe that, this conversation is over. It will not be a problem solved. If you tell me you believe that, and I just showed you that, by not hurting you, by **showing you who had the power to hurt ya, to hurt your families, to hurt your law careers**, and didn't exercise it, yes or no, let's get a vote. Taylor, does everyone in that room believe, believe, choose to believe, that Lin Wood would never exercise his power in a fashion that he knew would hurt any one of you, personally or professionally, including your families, and your legacy as a lawyer. Yes or no, guys, gal? [Said by Wilson] "Lin, I certainly." I just wanted a yes or no, I didn't ask for a discussion, and I own that office and if you don't do what I say this time, you're gonna pack your bags, that's how much power I have, I don't wanna exercise that power, it would hurt you, don't force me, that's the point.

I'm telling you I have the power to hurt you and would never do so, and if you don't believe I have the power to hurt you, you are wrong. I can hurt you the minute I take you off that name [Wood, Wilson, Grunberg & Wade]. That will be a bad stain on your life, and if you try to hurt me back, you will be laughed at. Anybody in this law office that attacks Lin Wood may be right, but everybody's gonna disrespect you for doing it. There's a time to speak. There's a time to be silent. You people don't know the difference….

Now, would you accept this kind and loving admonishment. I could have thrown by my own free will every damn one of you out of my law office, off of the damn

33

Exhibit N

letterhead with my name on it, and Nicole is included, by doing one of two things, I could have pulled my name off that door in a heartbeat if I wanted to … I could have pulled all three of your names off of that damn thing and it would just be me, if I wanted to I'd have the power to do it, right? …

. . . If you keep showing me disrespect, Jonathan, there's gonna be a man come up there in your office … but if you ever don't give me respect in that office, knowingly … but if I ever discern that I think you are disrespecting me in that law office, that little man or woman is gonna come up in ten minutes and they're gonna throw your ass out. Do you understand, whether you agree with it or not, you concede that I have the power to do it.  Do you understand what's gonna happen to ya if you ever, if I ever discern that you show me an act of disrespect again? … if you [interrupt me] in a disrespectful way, in my judgment alone, any one of the three of you is gonna be escorted out of my law office within ten minutes … they're gonna take you out and throw you on the street if they want to … do you understand what I'm telling you?  Cause if you don't we got a problem.  You hear me?  Does everybody hear me?  Now I'm gonna tell you something very surprising, y'all just heard from the Almighty Lin and it sounds powerful and you believe it don't ya? … Almighty Lin just told you what would happen if he thinks you ever, in his opinion, discerns that you're being disrespectful to me by anything other than an accident or mistake, he's gonna throw you out. Ya hear me? … Now Almighty Lin's gonna tell you this … the power that I just had can change your life if I ever decide … even if it's good or bad, I can change your life with the exercise of that power, right? …

I'll commit sins.  I'll [physically] push you when you piss me off. Maybe you deserve it and I'm the only one that will inflict it upon you because I'm the only one that has the courage to tell you the lesson you fucked up don't do it again. Swear I'll never do it again to either one of you, although interestingly I've done it to both of you at once. I'll never do it to you again. Don't ever do anything that would even make me think about doing it again.  Cause I might make the same mistake then that I made then, I might push you and I wouldn't mean to hurt you. I wouldn't mean to push you around, especially cause either one of you would whip my ass *or maybe you wouldn't cause you don't have the courage I have. Maybe I would fight you till you damn die.  Or both of us died*. Cause I got courage inside of every bone in my body that you'll never know. I wish you had it. I wish everybody had it. Everybody doesn't have it guys.  You're practicing law with a man that has courage, to take on the big ones….

The best man you'll ever see in life won't be your daddy, Taylor.  It won't be your daddy, Jonathan.  It won't be your daddy, [redacted]. The best damn man

34

you've ever met in life is Lin Wood. Don't you forget it…. ***Or just plain member of one damn law firm, like we all are….***

One nation, one law firm, one law firm, under law, all members are created equal. ***All members of this one law firm are the same….***

125.

By the date of the 3.5-hour teleconference on February 13, 2020, Defendant Wood had effectively not been in the office for weeks since a December 2019 trial—with the exception of several brief appearances at the office. And from the time that Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson traveled to and attended a hearing out-of-state in mid-January, the only time any of the Plaintiffs had seen Wood was when he assaulted Plaintiff Wilson on January 27th and when Plaintiffs Grunberg and Wade were called to his home in the early morning hours of February 10th when Defendant Wood called them over saying it was a matter of life or death. Defendant Wood spent most of this period outside of Atlanta.

126.

All of LLW PC's cases were being handled primarily by one or more of the individual Plaintiffs, who coordinated with third party co-counsel. And LLW PC had active co-counsel outside the firm in every active case as of February 14, 2020, all of whom were on notice when Wade, Grunberg, and Wilson left the firm.

127.

Defendant Wood called for an in-person meeting on the morning of February 14, 2020.

128.

In the hours preceding this February 14 meeting, Defendant Wood repeatedly called Plaintiffs Wade, Grunberg, and Wilson, berating them, and also threatening them with alleged

Exhibit N

civil claims arising from their purported fiduciary duty *as his law partners* not to disparage him, although he failed to specify what words or actions he felt were disrespectful.

129.

Plaintiffs Wade, Grunberg, and Wilson – together with the only other two employees of Defendant LLW PC – all walked out of the LLW PC offices prior to Defendant Wood arriving out of fear for their physical safety.

130.

All five were forced to terminate their employment and association with Defendants on February 14, 2020.

131.

Immediately thereafter, Defendant Wood asked building security to escort all five out of the office, and he then changed the locks to the Leased space.

132.

At this point, Defendant Wood began a series of irrational and incomprehensible email, text, and voicemail threats. All of these emails, most of which are sent in the middle of the night, have a few common themes: False and manufactured accusations that Plaintiffs did some heinous federal crimes that he has chosen not to identify, Defendant is doing God's will, and Defendant will never pay the Plaintiffs anything, while reiterating nonetheless that the individual Plaintiffs were his law partners.

133.

On February 15, 2020, at 1:42 am, Defendant Wood e-mailed Plaintiff Wilson and 13 others, stating again that he felt he had somehow been victimized by some unspecified action

Exhibit N

which required him bringing down the "wrath of God" and referencing punishment "at the discretion of Almighty God."

<div align="center">134.</div>

Two hours later, at 3:45 a.m., Defendant Wood e-mailed Plaintiffs Wade, Grunberg, and Wilson, as well as 9 others, to continue his incoherent allegations and his belief that God was somehow commanding him or directing him to accuse the Plaintiffs and repeating his threat never to pay the Plaintiffs anything for their services. He began the email by stating "God has given me permission to be profane in this email, which is my last email of the night," and additionally stating, in material part, as follows:

> You damn dumb motherfuckers.

> You have now subjected yourselves and your families to the fact that you are all guilty of federal crimes. And you are going to be ruined financially, if necessary, in civil and criminal lawsuit. You committed computer fraud today and possibly bank fraud. Your lies and fraud upon law firms and your employers are going to come back quickly to haunt you for the rest of your lives.

> You fucked with the wrong guy. You fucked with Lin Wood. Bad fucking choice.

> Here are the findings of your final judgment day on earth for today, the day after my Valentine's Day massacre:

> Taylor, *you're not going to get one thin d[i]me from me on any case*. That includes [cases subject of the Settlement Agreement, including the Disputed Case]. Sue me. You will lose. You can tell your co-conspirators, Nicole, Jon[a]tha[n], [redacted] and [redacted]. All the damn criminal conspirator wars who deleted emails and Word documents related to the [redacted] and [redacted] cases are in fucking serious criminal and civil exposure…. You are all dumb as hell. I am not. I will be setting up a meeting next week with the US Attorney for the Northern District of Georgia. He will meet with me. He knows who I am. You apparently never did…. Nobody fucks with me and [redacted]. You have been all been playing your Bullshit games of lies for too long. Too long is too

<div align="center">37</div>

<div align="right">Exhibit N</div>

long. Always has been. Always shall be. *God Almighty told me to get you back to where you belong. Broke and essentially homeless*….

The fact that you, Taylor, involved innocent people like [redacted] and maybe even [redacted], *is going to haunt you and your wife and your children for the rest of your lives on earth*. Shame on you. You are disgusting….

You all better get on your knees and pray to Almighty God that He now asks me to show you mercy. If he does, I will show it, if he does not, *I will deliver a fiery judgment against you on earth*. Who the fuck did you think you were dealing with? You were screwing around me with, but I was someone else in disguise. You in fact have been screwing around with God Almighty. I am not God. You lied when you told others that I thought I was…. I am L. Lin Wood – the sole member of L. Lin Wood, P.C. The architect of the most masterful and powerful Valentine's Day massacre known in American history. *The last one **killed** seven. Mine will **ruin** many more before it is over*. Deservedly so.

You are the ones who are crazy, not me. You are all the fools, not me. You are all driven by fame and fortune, not me…. You are going to have to spend every day for the rest of your lives on earth by your every act and deed proving to God that you are genuinely sorry for the sins you have committed against HIM. I'm not going to waste anymore time listing your sins. You know them. God knows them….

Buckle up your damn seatbelts. Unless I change my mind under the instructions of God, you are in for the roughest ride of your lives. *I'm going to teach you all a lesson that you are going to learn*….

I shall sleep well tonight even though I'm writing a bunch of crazy people at a crazy person's hour. I live on God's time clock. This sane man had a lot of business to conduct tonight. Business that God Almighty exposed to him and told him to expose to others.

I bet it's going to be a long, long time before any of you ever sleep well again. Taylor, you are a damn pussy. You didn't even have the balls to show up for your little meeting that I already knew you were going to try to have before you had it….

Good night. I know you will not sleep well.

Exhibit N

PS: Taylor, tell all of you damn co-conspirators that their asses are in criminal and civil liability trouble. Be sure to tell Jonathan and Nicole. I listened to that damn blowhard Jonathan run his mouth. At midday, silently. Because I knew that I was getting ready to slam his ass deep into the ground with [when] my time came. My time came. His ass in trouble and this time, *he will not land on his 2 feet* [a reference to Plaintiff Grunberg's handicap after he had a rock climbing incident falling from more than 40 feet in the air resulting in several surgeries and permanent disabilities]. He will be on his damn two knees begging me and Almighty God for mercy. ***They will never get a dime from me. I dare you to sue me for it.*** You don't have the balls to do it and if you do it, you shall lose and in the process, lose more of your damn asses if there's anything left of your assess after I finish with your assess tomorrow if you don't call [redacted] and beg for mercy like damn dogs begging for a damn piece of meat after not eating for 3 months. I think my message is clear. God has now asked me to refrain for the rest of this night and tomorrow from further profanity. I shall always follow my God's's will and never anyone's on earth, including mine.

Last word, if any of you get within missile range of my office or home, I will have you arrested. You make one more threat, at false accusation or attempt to interrupt me and as far as I'm concerned, you can all rot to hell in jail.

You know me, always one more last word…. It's not going to be pretty for you. Fraud is never pretty. Ask Michael Avenatti. Never has been. Never shall.

Good night.

L. Lin Wood

(Emphasis added).

<center>135.</center>

Plaintiff Wilson responded respectfully on February 15, 2020 at 8:15 a.m., denying Defendant Wood's fantastical accusations and conspiracy theories.

<center>136.</center>

Defendant Wood responded, again copying the 9 additional individuals, stating, in material part, as follows:

<center>39</center>

<div align="right">Exhibit N</div>

Keep lying. USDOJ shall be checking ALL computers. I know liars. You been lying ever since your yelled at me and accused me of being insane. Liar.

You miserably lying sack of shit. You low life lying snake….

You are ALL in trouble. Big trouble. Computer fraud. Conspiracy to commit computer fraud. Violation of fiduciary duties. Conspiracy to violate fiduciary duties. Slander and defamation. Conspiracy to slander and defame. Conspiracy to interfere with my business relations, including clients and co-counsel. I think you are in more criminal and civil trouble than the former big mouth, Michael Avenatti.

Your time would best be served on your knees telling me you are sorry….

Best outcome for you in eternity Is Hell for repeatedly interfering with God's commandment to children to honor their father.

***I will make sure that you never practice law again ever if you do not admit your sins***, all of them by 10:30 am. Extensions grants each quarter hour thereafter depending on the amount of truth you tell me with each email. Start with admitting your lies.

Tell the truth or suffer through full pains thereafter….

I want those facts by 10:30 AM. ***If you want to have a chance to save your future for your career, yourself and your family***. You better come clean and tell the truthgiver the truth starting NOW.

I am going to learn that information in a criminal case involving you if necessary. I am going to learn that information from you in a civil case involving you that is an almost certainty. Your best chance for mercy from L. Lin Wood is for you to start pouring the truth on me regarding information on [redacted]/[redacted] by 10:30 AM this morning. ***Save your child. Save your wife. Save your life***….

Your are doing to want a major dose of mercy from me. The sooner you come clean, the better. The longer it takes, the worse….

(Emphasis added).

40

Exhibit N

137.

On February 15, 2020, at 2:18 pm, Defendant Wood left a voicemail for Plaintiff Wilson

stating, in material part, as follows:

> Taylor Wilson, your *former partner*… You're lucky you and I share something in
> common: I care about and love your wife, I care about and love your little
> boy. Right now, I don't give a damn about you. But if I hurt you bad enough, it's
> gonna hurt them. I don't wanna hurt you, Taylor…. I want you to tell me in an
> email in 15 minutes who in the hell asked for those computer files to be deleted. I
> think it was Jonathan Grunberg. I think he did it because [redacted] wanted it
> done… I'm going after [redacted]. I've already gone after [redacted]. . . . I'm
> going to get [redacted]. I don't want to get you cause it will hurt your wife and
> your child. Send me an email and just tell me the truth without getting a lawyer,
> without trying to cover your ass …

138.

After leaving voicemails for Plaintiff Wilson and Grunberg stating that he felt that

Plaintiff Grunberg was the chief force behind these unspecified criminal acts, on February 17,

2020 at 12:17 a.m., Defendant Wood left a voicemail for Plaintiff Wilson stating, in material

part, as follows:

> Taylor, I hate to call you at 12:14 am because it's the act of a crazy man, but it's
> not son. You need to watch out for Nicole Wade. She would be the person that
> would go in and get this information. She's evil…. [Redacted] was sent here by
> [redacted].... The FBI is going to be involved tomorrow. There's going to be
> some serious stuff going down. Watch your ass. I'm telling you. Watch out for
> Nicole Wade… You don't want to be unwittingly involved in a federal
> crime. [Redacted] could go to jail for the rest of his life…. If I'm right about
> Nicole, she's gonna come crashing down. She'll try to take everybody down that
> she can. I know Nicole Wade… He's gonna be in federal trouble because the FBI
> is on it. I don't want you to get hurt, Taylor… I love you. This is the time to
> understand that Lin Wood really loves you. Cause I'm trying to give you
> information to protect you and your family. You got some thieves and criminals
> around you. Don't get involved it in OK...

41

Exhibit N

139.

That same day at 6:16 a.m., Defendant Wood sent to Plaintiff Wilson and 8 other individuals an e-mail stating, in material part, as follows:

All,

Attached is the IC3 Complaint Referral Form I filed with the FBI this morning related to [redacted] and his co-conspirators this morning….

140.

In Defendant Wood's FBI complaint alleging federal crimes, Defendant Wood refers to Plaintiffs Wade, Grunberg, and Wilson as "***one or more former members of my law firm of L. Lin Wood, P.C.***" (Emphasis added).

141.

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 17, 2020, at 7:18 a.m., stating, in material part, as follows:

. . . You have damn fucked up your life.  Shame on you.  Your wife, your kid.  I take back everything I said nice about you.  You better get the word, that somebody better call me, and somebody better get over to my damn house, and tell me what the hell the truth is about what y'all did….  You people gotta get a criminal lawyer….  I'm gonna burn your asses.  Y'all fucked up.  Shame on you….  You're a son of a bitch, Taylor Wilson.  And you gonna rot in hell when I'm done with you, buddy, you got that?  Pass that message to every damn one of them….  *All of y'all are going down*….  Goodbye sir.  Get me the name of the person that's gonna get me the damn truth about this and they better call me in 30 fucking minutes.  You hear the rage?  *You ain't seen nothing yet, buddy.*  Goodbye.

142.

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 17, 2020 at 7:23 a.m., stating as follows:

Let me tell you something you little snotty ass son of a bitch.  Don't write me back and tell me you're taking care of your son.  Your son's looking into the eyes of a damn low life, cheating, lying, probably criminal defendant.  How could you

42

Exhibit N

do this to your family, Taylor? The FBI's not gonna play around. You've all engaged in computer fraud. I don't give a damn whether you did it or if Nicole did it. I know who did it, and you got [redacted] involved in it. You've ruined everybody's life. ***You're not gonna get one thin dime from me***. Sue me. I don't think they allow you to file lawsuits like that when you're behind bars. Somebody better call me, put their baby down, and give me the damn truth if there's gonna be any mercy shown by anybody for you, including the FBI, cause I'm one of their number one witnesses. [Redacted] is going to jail. Don't go with him. Quit playing your games ya snotty ass little bastard, you came in here and ran your damn mouth in my office and yelled at me. ***You're lucky I'm not with you right now, Taylor, cause I'd do to you what I'd do to* [redacted] *and I'd beat your ass with a switch till you couldn't sit down for 20 fucking years.***

143.

Also on February 17, 2020, Defendant Wood left a voicemail for Plaintiff Grunberg stating, in material part, as follows:

I'm gonna be a little calmer with you than I have been with Taylor and [redacted] on their voicemail messages, Jonathan Grunberg, you sorry slimy piece of shit. How do you look at those babies? I've got it all, I know what y'all been doing. But here's your problem, you teamed up with [redacted], he's going to federal penitentiary, I'm afraid y'all need criminal defense attorneys, in fact I know, I've been up all night dealing with this, I've locked it all down…. The FBI's gonna be knocking on your door, Jonathan. You need to go get a criminal defense lawyer. Somebody *in that damn former piece of shit firm I had* better get on the phone and tell me the damn truth so I can tell the FBI that at least somebody's gonna be good to them and cooperate. You got in bed with [redacted] and you manufactured shit from [redacted]…. In the process, you look at those two little babies, you hurt them. You look at your wife, you hurt her. ***You're not gonna get one thin dime from me about anything***. You might even get sued by me. What the hell were you thinking. Man oh man, ***you're glad you're not with me in an elevator with me right now buddy*** [referring to his prior battery of Grunberg], cause you're damn lucky, I'm that mad…. That's how serious it is you little fucker. You look in the mirror and you're gonna see **a Chilean Jewish fucking crook**. Goodbye, Jonathan … you sorry bastard.

Exhibit N

144.

Then on February 18, 2020, at 8:20 a.m., Defendant Wood recanted every one of his accusations in an e-mail to Plaintiffs Wade, Grunberg, and Wilson, along with 18 other individuals, subject "Correction and Retraction of False Accusations," stating, in material part, as follows:

> I know that I am generally recognized as an experienced and skilled lawyer in the area of First Amendment defamation law. I am also by my own admission, fully capable of being a dumb ass or worse. Given some of my recent emails and the filing of a IC3 Complaint Referral Form [with the FBI], the latter description may be more applicable to me than the former….
>
> *The primary purpose of this email is [sic] correct and retract some very hurtful and false accusations that I recently made against [redacted], [redacted], [redacted], [redacted], and **my current law partners** and employees.* In the worse example of a defamer, I published accusatory statements with incomplete information and out of anger, coupled with a tried brain and body….
>
> ***Allow me to make clear that in all of the recipients of this email, there is not a dishonest or criminal bone in any of their bodies***. I say this unequivocally and in direct contradiction to any suggestions or accusations or statements that I may have made against anyone on this email. In recent days. My legal career has been one of pursuing for truth and achieving justice which I define as providing fairness and respect to all within our legal system. The recent emails to which I refer are the worst examples of the failure by an individual – ME – to pursue truth and achieve justice. My statements against the identified individuals were not true and inflicted an injustice upon them, and all of the recipients[.] In addition to asking for your forgiveness, I want to make it very clear that ***the individuals who were falsely accused are innocent of any wrongdoing*** and are encouraged to seek any further remedies against me for my wrongdoing, which they feel are appropriate or necessary.
>
> With the help of [redacted], [redacted], [redacted], and individuals identified by [redacted], I have now completed an examination of my office computer system, and while my office computer system was hacked, ***no accused individual was involved in any manner in that improper and illegal activity***. After careful examination, no office emails have been deleted or otherwise altered in a manner that was not intended by authorized users of my system. If I had bothered to

44

Exhibit N

undertake the complete examination prior to making my unfounded accusations, I would never have made the accusations against the individuals….

For the past several months, particularly since Thanksgiving, I have been besieged by a variety of individuals, all of whom I love dearly with their own concerns about my mental health and my relationship with [redacted]…. Sadly, I did not serve well the best interest of my [redacted] and making my false statements and accusations against others. I can only hope and pray that my stupidity serves as a shining example to them of why statements should always be investigated before published and should never be made out of a state of mind that might alter reality. I have assessed my mental health and spent some time with [redacted] discussing it. I am a little crazy, but I'm also mainly sane and possess a healthy mind….

I love each and every one of individuals on this email and I love and respect [redacted] as a law firm. I hope and pray *that my own law partners* at the present time and all of the individuals who serve me so well at my firm will be willing to forgive me and continue to practice with me in the profession I love dearly and have loved for 43 years…..

(Emphasis added).

<div align="center">145.</div>

Unfortunately, three hours later, Defendant Wood changed his mind again. On February 18, 2020 at 11:38 a.m., Defendant Wood e-mailed co-counsel in the Disputed Case stating, in material part, as follows:

[Redacted],

Please inform your firm members that Taylor is NOT to be copied on any other emails on any [Disputed Case] matters. *He and the former members of my firm* will not be working on any of the other [Disputed Case] in the future. We have reached a binding agreement on other cases *so their transfer out of L. Lin Wood, P.C.* will be smooth going forward despite the recent bumps….

*The former members of my firm* are now off to a new and exciting adventure of their own….

(Emphasis added).

<div align="center">45</div>

<div align="right">Exhibit N</div>

146.

The very next day, at midnight, Defendant Wood changed his mind yet again. Following this e-mail, on February 18 and 19, 2020, Defendant Wood made multiple requests to Plaintiff Wilson for the individual Plaintiffs to return to work.  Wilson, continuing to try to avoid Wood's wrath, politely declined to return to work at Defendant LLW PC.

147.

After Plaintiff Wilson again refused to return to work at Defendant LLW PC with Defendant Wood, Wood left Wilson another voicemail on February 19, 2020 at 6:29 p.m., in contradiction to all other prior statements he had made, contrary to the Lease for the LLW PC office space, and contrary to the Parties' February 17 agreement, stating as follows:

> Taylor, hey buddy, give me one call back tonight, cause I'm close to making a decision.  [Redacted] is not coming back, and I that's a good thing, I think that I need a clean break.  And, I don't want to stay in that space and I don't need to cause I don't need the space as much as y'all do, and that means y'all gotta pick it up or pay three quarters of the lease.  Y'all are indemnitors on that, each one of ya individually.  I'm the, L. Lin Wood, P.C., is the leaseholder, and then our liability is a fourth, a fourth, a fourth, y'all signed it, so you've got three quarters of the liability for that space.  I figured under that scenario, y'all would wanna come up and take the space, strike a deal with me, I'll pay my quarter but I'm not gonna pay it up front, I'm not gonna pay it over the months, we'd have to kind of present cash dollar it down. Or, if you don't do that, Taylor, and I'm stuck with that lease*, I'm gonna have to hold every dime of your [Disputed Case] money against your liability until the end of that lease*.  So, it's easier for me to move out, which I'd like to do, candidly, Taylor, and for y'all to stay in there.  That may be the win-win.  So, give me a call and let me know what you think.  Bye bye.

148.

Defendant Wood left a similar voicemail on February 19, 2020, for Plaintiff Grunberg, threatening that he would hold Plaintiffs liable on the Lease for which they are not, and never

Exhibit N

were, liable, and that he would withhold the money he agreed to pay in the February 17 agreement until the Lease was satisfied.

<div align="center">149.</div>

Defendant Wood then e-mailed Plaintiffs Wade, Grunberg, and Wilson on February 19, 2020, at 8:01 p.m., along with four other individuals, stating, in material part, as follows:

> Nicole, Jonathan, and Taylor:
>
> … As Nicole has heard me say before, ***I do not intend to pay you "one thin dime" in satisfaction of your legal obligations***….
>
> *Until the matter is resolved between us and the building, I do not intend to make any payments to you on fees owed to you in any case.* I will escrow the amount that I agreed to pay you until I am satisfied that my escrow account has covered me for your amount of the entire remaining lease obligation and other legal liabilities you owe to me for your misconduct….

(Emphasis added).

<div align="center">150.</div>

Even after recanting all of his false and malicious accusations against Plaintiffs Wade, Grunberg, and Wilson, one day later on February 19, 2020, at 8:01 p.m., Wood again accused Plaintiffs of unspecified acts, referring to himself as "their partner" and threatening to hurt them "in the court of public opinion."

<div align="center">151.</div>

The next morning, Defendant Wood had changed his mind again and wanted to profess his love for Plaintiffs. On February 20, 2020, Defendant Wood left a voicemail for Plaintiff Grunberg stating, in material part, as follows:

> Jonathan … I want y'all to come over to my house tonight. I don't want another night of this nonsense that y'all have created. If ya wanna go to war and you think you're gonna beat me, you're gonna lose. I got ya every which way, coming and going…. The last thing you wanna do is start off your law firm,

<div align="center">47</div>

<div align="right">Exhibit N</div>

before you even get started ***getting crushed by me, and I got the power to do it***….
I've been two steps ahead of you at every damn…. I love you, I love your family,
I love your babies….

<div align="center">152.</div>

That same day, Defendant Wood emailed again to profess his love, and this time to make

a variety of threats, all based upon his desire to get Plaintiffs to help him pay for his Lease.

<div align="center">153.</div>

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 20,

2020 at 6:59 p.m., stating, in material part, that Plaintiffs had to pay for the Lease and he

threatened to drag out any claims or suits for any amounts that he owed Plaintiffs:

> Taylor Wilson, man oh man, it's your old boss, the guy you love one minute, test
> one minute, love one minute, test one minute. Taylor, you're in a damn mess, and
> you know it, and if you don't, you're gonna talk to a lawyer and you're gonna
> know it then.

> This is not the way to start your law firm, Taylor. Here's what we're gonna
> do. You're gonna get off your ass and put your pride aside, and you're gonna
> come over here and you're gonna talk to me. And I'm gonna tell you exactly what
> I'm willing to do to get y'all out of the mess you got yourselves in with your
> damn foolishness. ***You're playing with fire when you come after Lin Wood***.

> [talking to himself] "Now stop being mad, Lin. Okay, God."

> ***Taylor, I don't want to hurt you guys, but you've set it up where I could destroy
> you before you even got your foot off the ground.*** You can't pay for a
> lawyer. You can't afford to litigate with me and you're gonna lose, cause you
> owe 75% of that lease to me. Not a guarantor, you signed on that for me. I'll pay
> the building, and then I'll hold your money until I litigate it with you….

> If you wanna sit down, Taylor, with me, I'll be humble, you'll be humbler. We'll
> talk about what you did wrong, we'll talk about how you're gonna fix it. And I'm
> gonna fix it, cause you did just about what I thought you were gonna do. I'm
> always one step, two steps ahead of everybody. I see around corners, Taylor.

<div align="center">48</div>

<div align="right">Exhibit N</div>

Now why don't you come over and talk to me, it won't take an hour, and we'll settle this mess that y'all created? … *But if you wanna go to war, you wanna bash egos with me, you wanna do your free will versus mine, you're gonna lose and it's gonna affect your family and your baby boy,* and I'm not gonna let that happen if I can avoid it.  If it happens, it's gonna be on your watch, not mine.

So, please, Taylor, stop the foolishness.  Come talk to a man that loves you, that wants you to succeed, that's taken a lot of abuse from you but at every turn has reached out and tried to get you to do the right thing.  You're gonna be able to practice law with your people, you're not gonna have me around much to worry about, I'm gonna get out, I wanted to get out, I wanted to be by myself … everything's together, everything in your life is not.  Call me, bye.

<div align="center">154.</div>

On February 22, 2020, at 5:07 a.m., Defendant Wood e-mailed Plaintiffs Wade, Grunberg, and Wilson, and their counsel, stating, in material part, as follows:

[Disputed case] – As you were informed by [redacted], he will deposit … the [Disputed Case compensation] into his firm's escrow account.  [The client], not me, control the amount of fees to be paid to WGW, and the clients **will only agree at best to pay to WGW quantum meruit for services** strictly related to the [Disputed Case] *which will be very difficult for WGW to calculate*….

(Emphasis added).

<div align="center">155.</div>

On February 22, 2020 at 7:29 p.m., Defendant Wood e-mailed Plaintiffs' counsel and a third party stating, in material part, as follows:

… If I am right, and I and others believe I am, further discord, disagreement, or even God forbid, litigation *will destroy the chances your clients have if [sic] building a successful and financially viable law firm*….  With respect to the [Disputed Case], your client will have to submit to me their actual hours worked on the [Disputed Case] and Their proposed hourly rate.  Taylor can include any hours that he feels were reasonably dedicated to [the Disputed Case] when he began his initial [work].  ***To be clear, I will not pay Nicole Wade any money on the [Disputed Case].***  So only Jonathan and Taylor need to bother will [sic] compiling and submitting to you to provide to me their actual hours worked or their best estimate of them….

<div align="center">49</div>

<div align="right">Exhibit N</div>

(Emphasis added).

<div align="center">156.</div>

On February 25, 2020 at 4:51 a.m., Defendant Wood e-mailed Plaintiffs' counsel copying five third parties, referring to Plaintiffs' counsel's first name on 66 separate occasions and otherwise stating, in material part, as follows:

> … Take whatever action you and your clients believe is necessary, Drew. I will be prepared to respond with the full legal wrath and vengeance like an angry God, Drew….
>
> **One last matter, Drew. I shall not voluntarily pay you or your clients one thin damn dime, Drew.**

(Emphasis added).

<div align="center">157.</div>

Shortly thereafter, Defendants engaged their current counsel.

<div align="center">158.</div>

Hiring new counsel did not stop Defendant Wood from contacting Plaintiffs in a threatening and abusive manner.

<div align="center">159.</div>

On March 3, 2020, at approximately 10:30 p.m., Defendant Wood called and left a voicemail for Plaintiff Wilson's wife professing his love for her and her family in a manner she found terrifying and stating, in material part, as follows:

> [Redacted] Wilson. You've got a handsome little baby boy, I need to see him soon, I know I will. Listen, I know I'm calling you, I'm not calling Taylor, I'm not supposed to. You're gonna learn some things, Taylor's gonna learn some things in the next day or two, involving Taylor, Nicole, and Jonathan, and me and the lease. It's gonna sound bad for him at first. Bad for you. I want you to know something, [redacted]. I told you I loved you. I told you I loved your son, I love your husband, Taylor. *I'm not gonna let anybody get hurt too badly*…. I think

<div align="center">50</div>

<div align="right">Exhibit N</div>

Taylor Wilson's one of the best damn young lawyers I've ever seen. A lot of things about Taylor remind me of me. I meant it every time I told you I love you, I meant it then I mean it now. I meant every time I told Taylor I loved him, I meant it then I mean it now. Just relax, hang loose, it's all gonna be good, it's not gonna be good as everybody wants it to be on your side, his side, but it will be good in the long run…. We'll talk one day soon. It'll be when you decide to call me or maybe we'll run into each other, but we'll talk again and we'll be friends, cause I love you and you love me. That answers every dispute that we have in life, doesn't it? We don't have disputes, we're different. We're different but we're alike, we love each other…. I love you and you love me. I love Taylor, he loves me. We'll talk soon…. When you listen to this in the next day or two, you'll understand why. I see around corners before I cross the corner. Buh-bye, talk soon.

160.

Throughout this entire ordeal, Defendant Wood has continued to text Plaintiff Wilson's wife, despite being instructed to stop by Plaintiffs' counsel multiple times.

161.

On March 4, 2020 at 3:40 a.m., Defendant Wood made clear his intentions not to pay any amounts on the fee distribution agreement he had previously made with Plaintiffs on February 17 when he e-mailed Plaintiffs Wade, Grunberg, and Wilson, their counsel, and a third-party, alleging a series of unspecified criminal conduct in violation of their "fiduciary duties" and stating, in material part, as follows:

> ***In any event, you may rest assured that I shall never voluntarily pay your clients one thin damn dime***. Your clients shall be required to pay their 75% of the lease obligations even if they find themselves prohibited from engaging in the practice of law in the State of Georgia in the future….

(Emphasis added).

162.

Two days after Defendants stated they would not honor the terms of the Settlement Agreement for the reasons stated herein, Defendant Wood texted Plaintiff Grunberg, again

Exhibit N

threatening criminal liability based upon his admittedly blatantly false and recanted conspiracy theory that Grunberg, along with Defendants' former law partners, somehow committed some unspecified criminal act involving tampering with his computers:



> The CFAA ("the Computer Fraud and Abuse Act") provides for fines up to $250,000 and imprisonment for as long as 20 years for individuals convicted under the act.
>
> Sorry, that last text was inadvertently sent to you. My apologies. - Lin
>
> 10 min

**Defendants' Conduct During Negotiations of Settlement Agreement**

163.

Defendants' fraudulent and malicious intent is also revealed by and through their drafts of the Settlement Agreement.

164.

Upon information and belief, when they entered in the Settlement Agreement, Defendants were intent on forestalling a lawsuit by Plaintiffs Wade, Grunberg, and Wilson that would reveal Defendant Wood's indisputable pattern of violent, abusive, and erratic behavior supporting claims for assault, battery, intentional infliction of emotional distress, and defamation. Defendant Wood had repeatedly voiced his concerns about his misconduct being disclosed as he feared it would interfere with his imminent receipt of the Presidential Medal of Freedom and appointment as Chief Justice of United States Supreme Court. The latter belief was based, in part, on (1) a decade-plus old "prophecy" Defendant Wood heard in a YouTube video, and (2) a conspiracy theory that Chief Justice Roberts would be revealed to be part of Jeffrey Epstein's sex trafficking ring and was being blackmailed by liberals to rule in their favor.

52

Exhibit N

165.

More specifically, in reviewing Defendants' drafts of the Settlement Agreement, it is apparent that Defendants were always planning to find a way to "never pay one thin dime" and attempted to have Plaintiffs agree to a Settlement Agreement that would allow Defendants to renege on their covenant to pay Plaintiffs fee splits when the time came for performance, on the purported basis that client consent was required, by setting forth a false recital of their relationship as lawyers, fully cognizant of Georgia Rule of Professional Conduct 1.5(e) and its application.

166.

Defendants' first draft of the Settlement Agreement stated:   "Nicole Wade, Jonathan Grunberg, and Taylor Wilson have never been law partners in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked **with** L. Lin Wood, P.C. **by agreement on a case-by-case basis** while sharing office space since 2018." (Emphasis added).

167.

Plaintiffs objected to the above false description of their indisputable association with Defendant LLW PC.  Plaintiffs Wade, Grunberg, and Wilson did not work with Defendant LLW PC by agreement on a case-by-case basis.  Defendant Wood *never* handled any litigation solely by himself.  Since 2018, if not earlier, every case for which Defendant LLW PC entered into an engagement was worked on by Plaintiffs Wade, Grunberg, and/or Wilson, all as lawyers *of* Defendant LLW PC.  While Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson would discuss which attorneys should work on which matters, Defendant Wood would direct Plaintiffs Wade, Grunberg, and Wilson what work to handle for what case, because he was their "boss."

53

Exhibit N

168.

When Plaintiffs objected, Defendants claimed that this language was there "for insurance purposes."

169.

Defendants then edited this recital to state: "Nicole Wade, Jonathan Grunberg, and Taylor Wilson have never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but, through Wade Law, LLC and Grunberg & Wilson, LLC, have worked **with** L. Lin Wood, P.C. **by general agreement on hourly fee cases** and **by agreement on a case-by-case basis on contingency fee cases** while sharing office space since 2018." (Emphasis added)

170.

Plaintiffs again objected to the above false language. The distinction between hourly cases and contingency cases was a complete farce, plainly intended by Defendants as a material representation of the agreement, a false representation of the parties' relationship, and plainly designed to allow Defendants to renege on their promises to pay fee splits.

171.

Defendants edited this recital again to state: "WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but worked **with** L. Lin Wood, P.C. on cases and were held out as partners since 2018." (Emphasis added).

172.

Plaintiffs again objected to the above false language, questioning why – if Defendants insisted on a recital setting forth the facts and nature of their relationship with Defendant LLW PC – Defendants insisted on falsely stating Plaintiffs were anything but lawyers of Defendant LLW PC.

Exhibit N

173.

Defendants finally edited this recital a fourth time, arriving at the agreed upon language, which is the truth: "WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked as lawyers *of* L. Lin Wood, P.C. on cases since 2018." (Emphasis added).

174.

As demonstrated by the number of negotiations on this point, Defendants' agreement to this fact was a material representation inducing Plaintiffs to enter into the Settlement Agreement, as both parties knew this representation was integral to payment of fees under Rule 1.5 and liability for the Lease.

175.

Georgia Rule of Professional Conduct 1.5(e) "does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm." Rule 1.5(e), cmt. 8.

176.

Because Plaintiffs Wade, Grunberg, and Wilson acted as lawyers of Defendant LLW PC at the time they performed work in the Disputed Case (and all cases subject of the Settlement Agreement), Georgia Rule of Professional Conduct 1.5(e) is inapplicable with respect to Plaintiffs' claim for breach of contract.

177.

Defendants always intended to take the position that Plaintiffs were not lawyers of Defendant LLW PC, including prior to, at the time of, and after executing the Settlement Agreement.

55

Exhibit N

178.

Defendants always intended to take the position that client consent was required and knew as counsel for the clients in the Disputed Case, that such consent would not be given, including prior to, at the time of, and after executing the Settlement Agreement.

179.

Defendants' intent prior to, at the time of, and after executing the Settlement Agreement was as they had repeatedly stated: never to pay to Plaintiffs "one thin dime."

180.

As set forth herein, Defendants thereafter and prior to executing the Settlement Agreement, including as early as their February 11, 2020 e-mail, repeatedly threatened that they would pay to Plaintiffs only quantum meruit for their work on the Disputed Case even though Defendant Wood had already agreed to pay Plaintiffs a fee comparable to his previous practice and procedure with respect to distribution of attorneys' fees in cases.

181.

After multiple settlement offers of quantum meruit were rejected by Plaintiffs, Defendants agreed to the terms of the Settlement Agreement, which required payment to Plaintiffs on a lump sum basis rather than a quantum meruit basis.

182.

However, Defendants attempted to draft the agreement in a manner that would allow Defendants to do exactly what they always intended to do despite their express agreements to the contrary in the Settlement Agreement that (1) Plaintiffs were acting as lawyers of Defendant LLW PC and (2) Defendant LLW PC would pay to Plaintiffs the agreed sum: never pay to

Exhibit N

Plaintiffs "one thin dime," except possibly as quantum meruit as Defendants, or purportedly their clients, determine is appropriate in their sole authority.

183.

Moreover, despite the Settlement Agreement not containing a single provision requiring the payment of any money by Plaintiffs to Defendants – providing instead that Defendants would pay a lump sum to Plaintiffs after withholding the Lease payment (stating, "LLW PC shall pay the stated portion of said fees … to WGW, minus the lease amount referenced in Section 2 below," which itself provides that "[t]his amount [for the Lease] shall be deducted from the payment by LLW PC to WGW referenced" above) – Defendants took the position that they both get to keep the fees they were supposed to pay to Plaintiffs *and* Plaintiffs had to pay to Defendants the Lease payment, i.e., Defendants would not be paying Plaintiffs "one thin dime."

184.

In summary: (1) after months of repeatedly reiterating that Plaintiffs were partners and otherwise associated in Defendants' law firm LLW PC, falsely accusing Plaintiffs of various crimes, threatening them with various fantastical civil liabilities, making up various acts allegedly committed by Plaintiffs, assaulting and battering Plaintiffs Grunberg and Wilson, repeatedly reiterating that Defendants would never pay Plaintiffs "one thin dime" on the cases subject of the Settlement Agreement, repeatedly claiming Defendant Wood would destroy Plaintiffs' careers, and making repeated threats of physical harm against Plaintiffs Grunberg and Wilson, Defendants executed a Settlement Agreement promising to pay them a lump sum on various cases in return for which Plaintiffs made financial concessions totaling hundreds of thousands of dollars and giving Defendants a release for their conduct *specifically in order to avoid filing this lawsuit*; and (2) after executing the Settlement Agreement, Defendants made

57

Exhibit N

good on their repeated statements that they would never pay Plaintiffs "one thin dime" by claiming that the client in the Disputed Case, for whom Defendants were and remain counsel, refused his consent to the compensation required by the Settlement Agreement, which Defendants claimed was required because, despite the conduct described herein, it is Defendants' position that Plaintiffs were never associated with Defendants' law firm.

## COUNT I:
## BREACH OF CONTRACT

185.

Plaintiffs hereby incorporate by reference paragraphs 1 through 184 of their Complaint, as if specifically set forth herein.

186.

The parties entered into the Settlement Agreement on or around March 17, 2020, whereby Defendant LLW PC would pay Plaintiffs a portion of its fees for their work on certain cases, including the Disputed Case.

187.

The portion of Defendant LLW PC's fees in the Disputed Case is a liquidated sum.

188.

All conditions precedent under the Settlement Agreement have been satisfied to trigger the payment by Defendant LLW PC of a portion of its fees for the cases to Plaintiffs, including the Disputed Case.

189.

Defendants breached the terms of the Settlement Agreement by failing and refusing to pay to Plaintiffs the agreed amounts within 72 hours of Defendant LLW PC's receipt of its portion of its fees in the Disputed Case, as required in the Settlement Agreement.

Exhibit N

190.

Defendants' refusal to pay Plaintiffs the agreed-upon amounts was in bad faith as it was purportedly based upon a Georgia Rule of Professional Conduct which Defendants knew was inapplicable, especially since Defendants had personal knowledge that Plaintiffs Wade, Grunberg, and Wilson had acted as lawyers of Defendant LLW PC in all matters related to the Disputed Case, and no such consent was required for the fee sharing set forth in the Settlement Agreement because, inter alia, Plaintiffs Wade, Grunberg and Wilson were lawyers of Defendant LLW PC—i.e., they were associated in the law firm with Defendant Wood.

191.

The Settlement Agreement, itself, recites as follows: "WHEREAS, Nicole Wade, Jonathan Grunberg, and Taylor Wilson and Wood are lawyers who practiced law and shared office space together for several years."

192.

The Settlement Agreement, itself, recites as follows: "WHEREAS, WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018."

193.

In addition to the many indisputable facts contained herein establishing that Plaintiffs Wade, Grunberg, and Wilson have at all times acted as lawyers of Defendant LLW PC, the above recital is conclusive proof of that fact.

194.

The amounts owed by Defendants are owed for the substantial work that Plaintiffs performed for the clients of LLW PC and for which they have not yet been paid. The clients for

Exhibit N

the cases in question have already paid the fees to LLW PC, and the issue resolved in the Settlement Agreement was how those fees would be distributed among the lawyers who worked on the cases.

195.

In addition, Defendants executed the Settlement Agreement representing that clients in the Disputed Case were specifically clients of Defendant LLW PC and that Defendant Wood was their attorney. As such, Defendant Wood had the apparent authority to bind the clients in the Disputed Case to the terms of the Agreement, and in fact, did so bind these clients.

196.

Defendants further breached the Settlement Agreement by breaching the implied covenant of good faith and fair dealing, and by failing "to use [their] best efforts to bring about the happening of the condition to his promise," to the extent client consent can be said to have been a condition to performance. *Cf. Turner Broadcasting System, Inc. v. McDavid*, 303 Ga. App. 593, 602 (2010).

197.

Defendants' breach of the Settlement Agreement proximately caused Plaintiffs to suffer damages for the liquidated sum set forth in the Settlement Agreement, as well as other amounts owed under the Settlement Agreement.

198.

Defendant LLW PC is liable to Plaintiffs in the amount of the fees set forth in the Settlement Agreement owed to Plaintiffs for their work on those cases, together with attorney's fees for Defendants' bad faith refusal to pay and with interest pursuant to O.C.G.A. § 7-4-12.

Exhibit N

## COUNT II:
## FRAUDULENT INDUCEMENT

199.

Plaintiffs hereby incorporate by reference paragraphs 1 through 184 of their Complaint, as if specifically set forth herein.

200.

Defendants fraudulently induced Plaintiffs to enter into the Settlement Agreement.

201.

At the time they entered into the Settlement Agreement, Defendants did not intend to perform their obligations under the Settlement Agreement, including to pay a portion of the fees for the Disputed Case and to honor the non-disparagement provision, which was a misrepresentation of a material fact.

202.

Plaintiffs reasonably relied on Defendants' affirmative but fraudulent representation that they would perform their obligations under the Settlement Agreement, including to pay the promised fees for the Disputed Case and the other cases and to honor the non-disparagement provision.

203.

At the time they entered into the Settlement Agreement, Plaintiffs reasonably relied on Defendants' statement and representation in the Settlement Agreement that, *inter alia*, Plaintiffs Wade, Grunberg, and Wilson "worked as lawyers of L. Lin Wood, P.C. on cases since 2018"—a clause that was heavily negotiated, as Defendants initially drafted it to falsely convey that Plaintiffs Wade, Grunberg, and Wilson were not attorneys of Defendant LLW PC.

61

Exhibit N

204.

As Defendants have themselves proven, they never intended to abide by this true statement of fact that Plaintiffs Wade, Grunberg, and Wilson "worked as lawyers of L. Lin Wood, P.C. on cases since 2018".

205.

Defendants always intended to take the position that client consent to the fee splits in the Settlement Agreement was required, and they knew at the time they entered into the Settlement Agreement that such consent from the clients in the Disputed Case had been withheld or would be withheld, and/or that Defendants would ensure that it was withheld; i.e., that the future event would not take place.

206.

Defendants' fraud is proven by additional substantial and irrefutable circumstantial evidence concerning their fraudulent intent – prior to and at the time of executing the Settlement Agreement – to induce Plaintiffs to enter into the Settlement Agreement with false promises.

207.

Defendants represented as early as February 10, 2020, and on multiple occasions thereafter and prior to the Settlement Agreement, that the clients in the Disputed Case would only agree to compensate Plaintiffs in quantum meruit.

208.

To induce Plaintiffs to sign the Settlement Agreement, Defendant drafted the Settlement Agreement to state that Defendants were indeed counsel for the clients in all of the cases referenced therein, including the Disputed Case, and therefore, as their counsel, that Defendant Wood had all requisite authority to enter into the Settlement Agreement. Defendants further

62

Exhibit N

induced Plaintiffs to enter into the Settlement Agreement by drafting language that asserted that Plaintiffs at all times acted as lawyers of Defendant LLW PC, thereby eliminating any purported need for client consent.

<div align="center">209.</div>

Defendants further expressly instructed and demanded under threats of civil liability, criminal liability, and repercussions with the State Bar, that Plaintiffs were not permitted to contact Defendant LLW PC's clients or co-counsel, including the clients in the Disputed Case.

<div align="center">210.</div>

Defendants at all times relevant hereto acted as counsel to the clients in the Disputed Case, allowing Plaintiffs to reasonably rely on Defendants' apparent authority (1) to bind the clients in the Disputed Case and/or (2) rely on Defendants' implicit representation that said clients knew of and agreed to the terms of the Settlement Agreement.

<div align="center">211.</div>

Defendants' fraudulent intention to never pay to Plaintiffs "one thin dime" is further evidenced by the manner in which they drafted the terms triggering Defendant LLW PC's payment obligations to Plaintiffs. For instance, at the time the Settlement Agreement was entered into, Defendants had already received the compensation necessary to pay Plaintiffs fees in multiple cases subject of the Settlement Agreement, but they drafted the Agreement only to trigger payment to Plaintiffs upon receipt of compensation in the Disputed Case at a later date. Meanwhile, the Lease obligation Plaintiffs agreed to in the Settlement Agreement (but were not otherwise responsible for) was larger than the fees owed in cases other than the Disputed Case and would only be paid out of the fees in the Settlement Agreement. Thus, Defendants have

<div align="center">63</div>

<div align="right">Exhibit N</div>

attempted to make good on the "one thin dime" statements by withholding for months fees owed so that they could later claim the Lease obligation swallowed all fees owed to Plaintiffs.

212.

Defendants attempted to make good on their repeated statements they would never pay to Plaintiffs "one thin dime" by attempting (and failing) to build into the Settlement Agreement the very fraudulent defense on which they now rely: that Plaintiffs were not lawyers of Defendant LLW PC in the years preceding this dispute.

213.

All of Defendant Wood's prior conduct leads to one inescapable conclusion – that he never intended to pay Plaintiffs. That conduct includes his assault and battery of Plaintiffs Grunberg and Wilson; additional threats of physical harm against Plaintiffs Grunberg and Wilson, including that he would fight them to the death; repeatedly reiterating that he would never pay to Plaintiffs "one thin dime" prior to executing the Settlement Agreement; making repeated threats to destroy Plaintiffs' careers prior to executing the Settlement Agreement; making repeated false, fantastical, and malicious accusations of criminal conduct against Plaintiffs prior to executing the Settlement Agreement; making repeated fantastical threats that Plaintiffs would spend many years or the rest of their lives in prison for Defendant Wood's fantastical conspiracy theories about their alleged and false criminal acts; repeatedly threatening the families, including Plaintiffs Grunberg and Wilson's wives and young children aged between 3 months and approximately 2 years; and making numerous false, fantastical, and defamatory statements against Plaintiffs in addition to those relating to criminal acts, including that Plaintiffs were extortionists attempting to extort money from him to which they were not entitled (it appears based solely on Plaintiffs' request that Defendants honor his previous promises

Exhibit N

regarding their compensation), including the payment of the compensation owed to them in the Disputed Case.

<div align="center">214.</div>

Plaintiffs reasonably relied upon Defendant Wood's status as counsel to the clients in the Disputed Case and his implicit representations that he had all requisite authority and consent to enter into the Settlement Agreement and would otherwise employ best efforts to ensure his compliance with the Settlement Agreement.

<div align="center">215.</div>

Defendants' fraudulent inducement of Plaintiffs to enter into the Settlement Agreement proximately caused damage to Plaintiffs, including but not limited to by inducing them to enter into the Settlement Agreement and to give up their valuable claims for fees as well as tort claims and to agree to allow LLW PC to retain certain sums as payment on the Lease, all in the promise of payment on the Disputed Case, which Defendants never intended to pay. As such, Defendant Wood's fraudulent inducement bars Defendants from raising the defense they fraudulently attempted to build into the Settlement Agreement.

<div align="center">216.</div>

Plaintiffs are entitled to a verdict against Defendant Wood individually and against Defendant LLW PC for compensatory damages consisting of the full value of the Settlement Agreement, punitive damages, and attorneys' fees in an amount to be proven at trial.

<div align="center">

**COUNT III:**
**PUNITIVE DAMAGES**

217.
</div>

Plaintiffs hereby incorporate by reference paragraphs 1-216 of their Complaint, as if specifically set forth herein.

<div align="center">65</div>

<div align="right">Exhibit N</div>

218.

Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences as to entitle Plaintiffs to punitive damages against Defendants in accordance with O.C.G.A. § 51-12-5.1.

## COUNT IV:
## ATTORNEY'S FEES

219.

Plaintiffs hereby incorporate by reference paragraphs 1 – 216 of their Complaint, as if specifically set forth herein.

220.

Plaintiffs are entitled to the recovery of the costs of litigation and their attorney's fees under O.C.G.A. § 13-6-11 as Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense. Accordingly, Plaintiffs are entitled to expenses of litigation, including attorney's fees, under O.C.G.A. § 13-6-11.

221.

Further, Plaintiffs are entitled to the recovery of attorneys' fees and the costs of litigation from Defendants for the fraud they engaged in, including by fraudulently inducing Plaintiffs to enter into the Settlement Agreement. Defendants' behavior in negotiating, entering into, and carrying out the Settlement Agreement evidences that species of bad faith sufficient to justify an award of attorney's fee and the expenses of litigation under Georgia law.

**WHEREFORE**, Plaintiffs respectfully pray of this Court as follows:

A. Enter judgment in favor of Plaintiffs against Defendants as set forth in each count of this

Exhibit N

Complaint;

B.  Award Plaintiffs actual, special, and compensatory damages as set forth above in an amount to be determined at trial, plus interest pursuant to O.C.G.A. § 7-4-12;

C.  Award Plaintiffs punitive damages pursuant to O.C.G.A. § 51-12-5.1;

D.  Award Plaintiffs their reasonable attorneys' fees and expenses of litigation;

E.  For an award of Plaintiffs' costs of this action against Defendants; and

F.  For such other and further relief as this Court deems just, proper and equitable under the circumstances.

Respectfully submitted this 31st day of August, 2020.

/s/Andrew M. Beal
Andrew M. Beal
abeal@buckleybeal.com
Georgia Bar No. 043842
Milinda Brown
mbrown@buckleybeal.com
Georgia Bar No. 363307

BUCKLEY BEAL LLP
600 Peachtree Street, NE
Suite 3900
Atlanta, Georgia 30308
T: (404) 781-1100
F: (404) 688-2988
*Counsel for Plaintiffs*

67

Exhibit N

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No: **2020CV339937**

JURY TRIAL DEMANDED

## **VERIFICATION**

I, NICOLE WADE, Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This 25th day of August, 2020.

By: Nicole Wade

Sworn and subscribed before me
this 25th day of August, 2020.

NOTARY PUBLIC



CHELSEA HANEY
MY COMMISSION EXPIRES
NOTARY
PUBLIC
COBB COUNTY, GEORGIA
MARCH 07, 2023

Exhibit N

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

### VERIFICATION

I, Jonathan Grunberg, member of WADE, GRUNBERG & WILSON, LLC, Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Verified Complaint* is true and correct to the best of my knowledge, information, and belief.

This 25th day of August, 2020.

By: Jonathan Grunberg, Member,
Wade, Grunberg & Wilson, LLC

Sworn and subscribed before me
this 25th day of August, 2020.

_____
NOTARY PUBLIC

Exhibit N

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

## **VERIFICATION**

I, TAYLOR WILSON, Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This __25__ day of __August__, 2020.

By: Taylor Wilson

Sworn and subscribed before me
this __25__ day of __August__, 2020.

NOTARY PUBLIC

My Commission Expires July 9, 2022

MILLICENT VAN MOL VANCE
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY

Exhibit N

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

### VERIFICATION

I, JONATHAN GRUNBERG, Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This ⟨25th⟩ day of ⟨August⟩, 2020.

_____

By: Jonathan Grunberg

Sworn and subscribed before me
this 25th day of August, 2020.

_____

NOTARY PUBLIC



Exhibit N

# EXHIBIT AA

Case 1:21-cv-03858-DLI-LB Document 35-2 Filed 05/03/21 Page 894 of 677 #: 1,183

# The Washington Post

# Three ways the media can vanquish the Big Lie that will linger even after Trump is gone

By **Margaret Sullivan**

Jan. 17, 2021 at 3:00 a.m. PST



His administration is down to its last hours, but you can bet that the false belief held by millions of Americans that the election was rigged is not going away when President Trump does.

Journalists, if they take their core mission seriously, should think hard about how they're going to confront this Big Lie, as it's become known.

Our goal should go beyond merely putting truthful information in front of the public. We should also do our best to make sure it's widely accepted — "to create a public square with a common set of facts," as Tom Rosenstiel, an author and the executive director of the Virginia-based American Press Institute, put it.

But how? Here are a few ideas I've gathered.

Stop relying on shorthand.

Too often, even the most credible journalists who are trying to cover the disastrous effects of the Big Lie explain it by sprinkling phrases into their reporting like "baseless claims" or "without evidence" — and seem to expect them to do all the work.

But that's simply ineffective. "People don't notice this boilerplate language after a while," Rosenstiel said, "or even begin to bristle at it."

Exhibit N

Case 1:Case:1:21-cv-10089-DLC Document 35-7 Filed 01/05/03/21 Page 895 of 677 #: 1,184

What's the alternative? Journalists should take the time — even in an ordinary news story or brief broadcast segment — to be more specific. Let's offer a few sentences that give detail on *why* the claims are baseless and *how* they've been debunked.

The second paragraph of this January national security report in The Washington Post does just that: "By mid-December, President Trump's fraudulent claims of a rigged election were failing in humiliating fashion. Lawsuits were being laughed out of courts. State officials, including Republicans, were refusing to bend to his will and alter the vote. And in a seemingly decisive blow on Dec. 14, the electoral college certified the win for Joe Biden."

That's far better than a mere nod to "baseless claims." As Rosenstiel put it: "Engage in verification and explanation, not labeling."

Use an honesty litmus test.

Journalists long ago made a virtue of getting input from both sides of an issue. It's generally a healthy practice, but it also became a crutch. And when one side consistently engages in bad-faith falsehoods, it's downright destructive to give them equal time.

Joe Lockhart, President Bill Clinton's former press secretary, offers an extreme example: "If I went on the air and said the Holocaust didn't happen, the interview would end right there."

Similarly, the election-fraud lie — which was the foundation for the Jan. 6 attack on the Capitol — shouldn't be given a huge megaphone either. But you can expect some Republican members of Congress will trot this out during Trump's Senate impeachment trial, Lockhart warned. He argues that news organizations should think hard before allowing these claims to be broadcast live and at length.

"It's no longer a case of no harm, no foul," Lockhart told me. We know what damage has come from helping the Big Lie to spread.

Exhibit N

Case 1:Case 1:23-cv-18483-DLL694TCB Document 35-7 Filed 01/05/23/21 Page 896 of 1677#: 1,185

The NYU professor and press critic Jay Rosen put it memorably: "In the same way that you might begin an interview with a pro forma, 'this is on the record,' or 'how do you spell your name?' journalists (and talk show bookers) should set the ground rules with, 'Very quickly before we start: who was the legitimate winner of the 2020 election?' " If the answer is "we need to investigate that" or "President Trump," simply withdraw the opportunity.

In the bad-faith political world we live in, these kinds of sound policies will be branded as liberal bias and a free-speech violation. Not so.

"This isn't a cancel culture," Christopher Krebs, whom Trump fired as head of Cybersecurity and Infrastructure Security Agency, told CNN last week in arguing why it's essential to shoot down harmful false claims as he did. "There has to be an accountability culture in the United States right now."

Learn the science about how people absorb truthful information.

We know how propaganda works — largely through repetition, which Trump was a master of. He sowed the seeds of the election-fraud lie long before his voters went to the polls.

But how do you counter propaganda? How do you present the truth so it is accepted? Rosenstiel says we need "to understand the neuroscience of creating receptivity for reasonable but skeptical audiences."

Part of that involves going back to journalism fundamentals. We need to provide evidence and verification, instead of blustery claims and outrage — the bread-and-butter of cable news.

As one example, he pointed to the New York Times columnist Thomas Edsall, formerly of The Washington Post, who often helps his readers get underneath the surface of current issues by introducing research with significant depth.

In a column last week, he dug into the root causes of the largely White riot at the Capitol. While fully acknowledging racism as a cause, he also asked, "How toxic is the combination of pessimism and anger that stems from a deterioration in standing and authority?" And he provides some detailed, illuminating answers.

These methods — which admittedly are just a start — may be a poor match for what's out there: a fetid, endlessly renewing Niagara Falls of lies and disinformation.

Exhibit N

Case 1:Case:1:20339-DLL694TCB Document1435-7 Filed 01/05/03/21 Page 5 of 897 PageID 7#: 1:186

But given that democracy depends on a society accepting a common set of facts, it is urgently necessary to do something. Something, that is, beyond what we've always done before.

READ MORE by Margaret Sullivan:

Four years ago, I wondered if the media could handle Trump. Now we know.

There are flickers of hope for local journalism. So far, it's not nearly enough.

What Obama gets right — and very wrong — about the media

*For more by Margaret Sullivan visit wapo.st/sullivan*

---

Updated January 7, 2021

## Election 2020: Biden defeats Trump

**The latest:** Congress affirms Biden's presidential win following riot at U.S. Capitol

**Graphic:** How members of Congress voted on counting the electoral college vote

**Live updates:** Trump pledges 'orderly transition' after Biden is declared winner at the end of a violent day

**25th Amendment:** Senior officials have discussed removing Trump. Here's how that could work.

**Election results under attack:** Here are the facts

**Full election results**

---

Exhibit N

Case 1:21-cv-02995-CJN Document 35-7 Filed 05/03/21 Page 898 of 1677 #: 1,187

## Comments are now closed

The Washington Post may turn off the comments on stories dealing with
personal loss, tragedies, or other sensitive topics. For more details,
please see our discussion guidelines.

Exhibit N

# EXHIBIT B

VISUAL INVESTIGATIONS

# How a Presidential Rally Turned Into a Capitol Rampage

By Lauren Leatherby, Arielle Ray, Anjali Singhvi, Christiaan Triebert, Derek Watkins and Haley Willis   Jan. 12, 2021

When President Trump railed against the election results from a stage near the White House on Wednesday, his loyalists were already gathering at the Capitol. Soon, they would storm it. We analyzed a crucial two-hour period to reconstruct how a rally gave way to a mob that nearly came face to face with Congress.



The day's events were captured by protesters and witnesses who live-streamed the action or posted the scenes on social media. The footage shows the simultaneous and alternating perspectives of Mr. Trump at the podium, the lawmakers inside the Capitol and the swelling numbers — and growing violence — of the rioters on the ground.

Exhibit N

Before Noon

# A Brewing Storm





President Trump
prepares to go
onstage.



Supporters gather at
the Capitol.

For weeks, Mr. Trump had urged his supporters to go to Washington to stop the certification of the election results, and several simultaneous rallies were planned for Wednesday.

As the morning arrives, hundreds assemble on the Capitol lawn, more than a mile away from where Trump will soon speak near the White House. Among them are the Proud Boys, a far-right group, identifiable here by their orange hats.

**11:50 a.m.** East side of Capitol



Amanda Andrade-Rhoades/For The Washington Post via Getty Images

At the same time, near the White House, Donald Trump Jr. films the president and his inner circle backstage before his father's speech. In a video uploaded to his Facebook page, they are listening to the song "Gloria" and marveling at the size of the crowd.

**11:54 a.m.** South of White House





Donald Trump Jr. via Facebook

12:15 p.m.–12:50 p.m.

# Capitol Crowds Grow



Trump calls for march
on Capitol.



A large crowd heads in
that direction.

About 15 minutes into his speech, Mr. Trump tells rally attendees to walk to the Capitol. "You have to show strength," he says.

At this moment, the Capitol grounds are protected by temporary perimeter fences, and there are few officers equipped to defend them.

**12:17 p.m.** South of White House



After this, we're going to walk down,
and I'll be there with you —

Exhibit N

U.S. Network Pool

Supporters leave the rally in a steady stream before Mr. Trump's speech ends, and they head toward the Capitol.

**12:29 p.m.** Constitution Ave.



Talia Jane via Twitter

As they arrive, another crowd of Trump supporters that has already gathered along the west perimeter fence becomes more agitated.

**12:49 p.m.** West of the Capitol grounds



Status Coup via Storyful

Around this time, a pipe bomb is reported at the Republican National Committee building, just a block away from the Capitol. Not long after, another device is discovered nearby at the Democratic National Committee headquarters.



Exhibit N



12:53 p.m.–1:03 p.m.

# First Barriers Breached



Trump continues speaking.



Rioters topple a fence to the Capitol's west.



Congress begins joint session.

About 20 minutes before Trump's speech ends, some people in the Capitol crowd harass officers posted at the barricades and start to get physical. Others follow suit, until they violently overwhelm the police and breach the building's outer perimeter.

**12:53 p.m.** Northwest side of the Capitol



Elijah Schaffer via Twitter

The mob quickly breaks through three additional barricades, forcing officers back onto the west Capitol steps.

**12:53 p.m.**
First barricades breached

Fencing

N

Capitol
steps

Supporters
gathering

Supporters marching
from Trump rally

East side
barricades

NATIONAL MALL

U.S. CAPITOL

**1 p.m.** Joint session of
Congress convenes in
House chamber

1   **12:53 p.m.** First barricades breached.

2   **1 p.m.** Joint session of Congress convenes in House chamber.

Once at the steps, the group clashes with a small contingent of officers.
After a few minutes, Capitol Police officers in riot gear arrive to help
control the crowd.

**12:58 p.m.** West side of Capitol



Status Coup via Storyful

At this time, the speaker of the House, Nancy Pelosi, begins the
proceedings to certify the Electoral College vote at a joint session of
Congress, alongside Vice President Mike Pence.

Outside, the chants begin: "Whose house? Our house!"

**1:03 p.m.** House Chamber



Exhibit N



C-SPAN

1:12 p.m.–2:00 p.m.

# Trump's Call to Action



Trump again calls for a march on the Capitol.



Mob continues to clash with police.



Ted Cruz objects to certification.

As Mr. Trump's speech comes to an end, he calls on his supporters to "walk down Pennsylvania Avenue" toward the Capitol. Rioters there continue to violently clash with officers, including reinforcements from the local police department who have arrived on the scene. Both sides spray chemical agents.

**1:15 p.m.** West side of Capitol



Status Coup via Storyful

Inside the Capitol, members of Congress seem unaware of the extent of the violence outside. The House and Senate have moved to their separate chambers to debate certifying the vote. Senator Ted Cruz, Republican of Texas, argues that the Senate should not certify Arizona's electoral votes.

**1:48 p.m.** Senate Chamber



C-SPAN

A minute later, Chief Steven Sund of the Capitol Police makes the request for immediate assistance from the D.C. National Guard. Outside, rioters tear through scaffolding in front of the Capitol's northwest steps and make their way closer to the building.

**1:50 p.m.** West side of Capitol

Lev Radin/Pacific Press/LightRocket via Getty Images

Around 2 p.m.

# Assault on the East Side




Exhibit N



Groups breach police
barricades.



Amy Klobuchar and
other legislators
debate.

On the east side of the Capitol, where the police presence is much smaller,
another mob is about to reach the doors of the building.

Fencing

**N**

Mob continues
to riot

**Around 2:00 p.m.**
Police barricades
are breached
on the east side

NATIONAL MALL

West side
barricades

U.S. CAPITOL

Lawmakers continue to
debate in both chambers

1  **Around 2:00 p.m.** Police barricades are breached on the east side

2  Lawmakers continue to debate in both chambers

3  Mob continues to riot

The police remove a barricade at the northeast corner of the building after
violent confrontations between officers and the crowd.

**1:58 p.m.** Northeast side of Capitol



Exhibit N



Marcus DiPaola via TikTok

A YouTube live stream captures the exact moment a massive crowd also breaches a separate, larger barricade on the east side. This is the last physical barrier protecting that side of the Capitol.

**2:00 p.m.** East side of Capitol



Stephen Ignoramus via YouTube

2:10 p.m.

# Mob Reaches Doors on West Side





Group breaches west side barricades.

Legislators continue debate.

Back on the northwest side of the Capitol, another YouTube livestream captures the mob chasing officers up the steps and breaching the final barrier on that side.

**2:10 p.m.** Northwest side of Capitol



John Sullivan via YouTube

Violent clashes with the police have been ongoing for more than an hour by the time the mob finally breaks through.

The mob approaches an entrance near the Senate chamber, one floor below where senators continue to debate.

Fencing

N

**2:10 p.m.**
Group breaches
the final barrier

NATIONAL MALL

West side
barricades

East side
barricades
already breached

U.S. CAPITOL

Lawmakers continue to
debate in both chambers

1  **2:10 p.m.** Group breaches the final barrier on the west side

2  Lawmakers continue to debate

Exhibit N

Rioters surround the building on both sides, but there's no indication that the lawmakers inside know the extent of the breach. As the mob approaches the doors of the Senate wing, Senator Kyrsten Sinema, Democrat of Arizona, urges her colleagues to "reject this meritless challenge and uphold the will of Arizona's voters."

**2:10 p.m.** Senate Chamber



C-SPAN

Around 2:11 p.m. to 2:16 p.m.

# Rioters Break Into the Building



Mob enters the building.



Senators continue debate just steps away.

Rioters on the west side break into the building around 2:11 p.m. Two minutes later, as they reach the stairs next to the Senate chamber, the Senate is called into recess.

**2:13 p.m.** Senate Chamber



Exhibit N



My challenge today is not about
the good people of Arizona —

C-SPAN

Rioters continue to stream into the building. They enter through a door
and a broken window on the northwest side.

**2:15 p.m.** Northwest side of Capitol



John Sullivan via YouTube

Rioters chase an officer to the top of a staircase where there are entrances
to the Senate chamber in both directions.

**2:14 p.m.** Inside the Capitol



0:00
Cinemagraph Sample

Igor Bobic/HuffPost via Storyful

Exhibit N

The officer leads the rioters one way, and backup arrives — while the police inside the chamber are still trying to lock the doors.

N

U.S. CAPITOL
*Second Floor*

**2:14 p.m.**
Mob makes it to top of
stairs near Senate
chamber entrance

*East side*

Hallways

Mob faces off
with officers

**Senate
Chamber**

**2:13 p.m.**
Senate goes
into recess

*West side*

**2:11 p.m.**
Mob breaks through
doors and windows
on first floor

*Capitol grounds and
National Mall*

1 **2:11 p.m.** Mob breaks through doors and windows on first floor

2 **2:13 p.m.** Senate goes into recess

3 **2:14 p.m.** Mob makes it to top of stairs near Senate chamber entrance

4 Mob faces off with officers

Now rioters stand off with the police in the hall, feet away from the entrance to the Senate chamber. Senators are still milling about inside.

**2:16 p.m.** Hall outside Senate chamber

Win Mcnamee/Getty Images

Exhibit N

After the breach

# The Siege Continues



Thousands reach the Capitol.



Congress is halted.

More than five minutes after the first rioters break into the building, the House also goes into recess. Now, the police are clashing with the mob inside the building as some members of Congress are able to evacuate. Others are trapped inside while rioters pound on the doors.

Outside the building, the crowd grows as attendees from President Trump's rally continue to stream in. The mob becomes more violent, dragging and beating officers.

Three hours will pass before the sergeant-at-arms declares the building secure.

**2:19 p.m.** Near Capitol grounds on the west side

Exhibit N

Jim Lo Scalzo/EPA, via Shutterstock

Photo credits: John Minchillo/Associated Press; Andrew Harnik/Associated Press; Olivier Douliery/Agence France-Presse; Greg Nash/Pool via Reuters

Reporting was contributed by Stella Cooper, Cora Engelbrecht, Evan Hill, Robin Stein, Ben Decker and Malachy Browne. Additional production by Meg Felling, Dave Horn, Whitney Hurst, Christina Kelso and Scott Reinhard.

Exhibit N

CFR# 7-ZX17-00300 OFI-NXS · OFFTHHN-04-3 · bAtE 07/12/11 · brfTK 72 N 7X bfÑRO X- 7102

# EXHIBIT C

Exhibit N



*The attack on the Capitol was a predictable culmination of a months-long ferment. Throughout the pandemic, right-wing protesters had been gathering at statehouses, demanding entry and shouting things like "Treason!" and "Let us in!"* **Photograph by Balazs Gardi for The New Yorker**

<span style="color:red">A REPORTER AT LARGE</span>    JANUARY 25, 2021 ISSUE

# AMONG THE INSURRECTIONISTS

*The Capitol was breached by Trump supporters who had been declaring, at rally after rally, that they would go to violent lengths to keep the President in power. A*

*chronicle of an attack foretold.*

By **Luke Mogelson**

**January 15, 2021**

CVPR-3 2019-00389 071-NM2   09TTHRM4 EK-4   krRR 1/12/21   krRR 3 A.20  kRRKD X 7309

▶                    0:00 / 1:17:42

**Audio:** Listen to this article. To hear more, download Audm for iPhone or Android.

B y the end of President <u>Donald Trump's</u> crusade against American democracy—after a relentless deployment of propaganda, demagoguery, intimidation, and fearmongering aimed at persuading as many Americans as possible to repudiate their country's foundational principles—a single word sufficed to nudge his most fanatical supporters into open insurrection. Thousands of them had assembled on the Mall, in Washington, D.C., on the morning of January 6th, to hear Trump address them from a stage outside the White House. From where I stood, at the foot of the Washington Monument, you had to strain to see his image on a jumbotron that had been set up on Constitution Avenue. His voice, however, projected clearly through powerful speakers as he rehashed the debunked allegations of massive fraud which he'd been propagating for months. Then he summarized the supposed crimes, simply, as "bullshit."

"Bullshit! Bullshit!" the crowd chanted. It was a peculiar mixture of emotion that had become familiar at pro-Trump rallies since he lost the election: half mutinous rage, half gleeful excitement at being licensed to act on it. The profanity signalled a final jettisoning of whatever residual deference to political norms had survived the past four years. In front of me, a middle-aged man wearing a Trump flag as a cape told a young man standing beside him, "There's gonna be a war." His tone was resigned, as if he were at last embracing a truth that he had long resisted. "I'm ready to fight," he said. The young man nodded. He had a thin mustache and hugged a life-size mannequin with duct tape over its eyes, "TRAITOR" scrawled on its chest, and a noose around its neck.

"We want to be *so nice*," Trump said. "We want to be so respectful of everybody, including bad people. We're going to have to fight much harder. And <u>Mike Pence</u> is going to have to come through

Exhibit N

for us."

About a mile and a half away, at the east end of the Mall, Vice-President Pence and both houses of Congress had convened to certify the Electoral College votes that had made Joe Biden and Kamala Harris the next President and Vice-President of the United States. In December, a hundred and forty Republican representatives—two-thirds of the caucus—had said that they would formally object to the certification of several swing states. Fourteen Republican senators, led by Josh Hawley, of Missouri, and Ted Cruz, of Texas, had joined the effort. The lawmakers lacked the authority to overturn the election, but Trump and his allies had concocted a fantastical alternative: Pence, as the presiding officer of the Senate, could single-handedly nullify votes from states that Biden had won. Pence, though, had advised Congress that the Constitution constrained him from taking such action.

"After this, we're going to walk down, and I'll be there with you," Trump told the crowd. The people around me exchanged looks of astonishment and delight. "We're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women. We're probably not going to be cheering so much for some of them—because you'll never take back our country with weakness. You have to show strength."

"No weakness!" a woman cried.

Before Trump had even finished his speech, approximately eight thousand people started moving up the Mall. "We're storming the Capitol!" some yelled.

There was an eerie sense of inexorability, the throngs of Trump supporters advancing up the long lawn as if pulled by a current. Everyone seemed to understand what was about to happen. The past nine weeks had been steadily building toward this moment. On November 7th, mere hours after Biden's win was projected, I attended a protest at the Pennsylvania state capitol, in Harrisburg. Hundreds of Trump supporters, including heavily armed militia members, vowed to revolt. When I asked a man with an assault rifle—a "combat-skills instructor" for a militia called the Pennsylvania Three Percent—how likely he considered the prospect of civil conflict, he told me, "It's coming." Since then, Trump and his allies had done everything they could to spread and intensify this bitter aggrievement. On December 5th, Trump acknowledged, "I've probably worked harder in the last three weeks than I ever have in my life." (He was not talking about managing the pandemic, which

Exhibit N

since the election has claimed a hundred and fifty thousand American lives.) Militant pro-Trump outfits like the Proud Boys—a national organization dedicated to "reinstating a spirit of Western chauvinism" in America—had been openly gearing up for major violence. In early January, on Parler, an unfiltered social-media site favored by conservatives, Joe Biggs, a top Proud Boys leader, had written, "Every law makers who breaks their own stupid Fucking laws should be dragged out of office and hung."

On the Mall, a makeshift wooden gallows, with stairs and a rope, had been constructed near a statue of Ulysses S. Grant. Some of the marchers nearby carried Confederate flags. Up ahead, the dull thud of stun grenades could be heard, accompanied by bright flashes. "They need help!" a man shouted. "It's us versus the cops!" Someone let out a rebel yell. Scattered groups wavered, debating whether to join the confrontation. "We lost the Senate—we need to make a stand *now*," a bookish-looking woman in a down coat and glasses appealed to the person next to her. The previous day, a runoff in Georgia had flipped two Republican Senate seats to the Democrats, giving them majority control.

Hundreds of Trump supporters had forced their way past barricades to the Capitol steps. In anticipation of Biden's Inauguration, bleachers had been erected there, and the sides of the scaffolding were wrapped in ripstop tarpaulin. Officers in riot gear blocked an open flap in the fabric; the mob pressed against them, screaming insults.

"You are traitors to the country!" a man barked at the police through a megaphone plastered with stickers from "InfoWars," the incendiary Web program hosted by the right-wing conspiracist Alex Jones. Behind the man stood Biggs, the Proud Boys leader. He wore a radio clipped onto the breast pocket of his plaid flannel shirt. Not far away, I spotted a "straight pride" flag.

There wasn't nearly enough law enforcement to fend off the mob, which pelted the officers with cans and bottles. One man angrily invoked the pandemic lockdown: "Why can't *I* work? Where's my 'pursuit of happiness'?" Many people were equipped with flak jackets, helmets, gas masks, and tactical apparel. Guns were prohibited for the protest, but a man in a cowboy hat, posing for a photograph, lifted his jacket to reveal a revolver tucked into his waistband. Other Trump supporters had Tasers, baseball bats, and truncheons. I saw one man holding a coiled noose.

"Hang Mike Pence!" people yelled.

Exhibit N



*On the day Joe Biden's win was projected, hundreds of Trump supporters protested at the Pennsylvania state capitol.* Photograph by Balazs Gardi for The New Yorker

Soon the mob swarmed past the officers, into the understructure of the bleachers, and scrambled through its metal braces, up the building's granite steps. Toward the top was a temporary security wall with three doors, one of which was instantly breached. Dozens of police stood behind the wall, using shields, nightsticks, and pepper spray to stop people from crossing the threshold. Other officers took up positions on planks above, firing a steady barrage of nonlethal munitions into the solid mass of bodies. As rounds tinked off metal, and caustic chemicals filled the space as if it were a fumigation tent, some of the insurrectionists panicked: "We need to retreat and assault another point!" But most remained resolute. "Hold the line!" they exhorted. "Storm!" Martial bagpipes blared through portable speakers.

"Shoot the politicians!" somebody yelled.

"Fight for Trump!"

A jet of pepper spray incapacitated me for about twenty minutes. When I regained my vision, the mob was streaming freely through all three doors. I followed an overweight man in a Roman-era costume—sandals, cape, armguards, dagger—away from the bleachers and onto an open terrace on the Capitol's main level. People clambered through a shattered window. Video later showed that a Proud Boy had smashed it with a riot shield. A dozen police stood in a hallway softly lit by ornate chandeliers, mutely watching the rioters—many of them wearing Trump gear or carrying Trump flags—flood into the building. Their cries resonated through colonnaded rooms: "Where's the traitors?" "Bring them out!" "Get these fucking cocksucking Commies out!"

The attack on the Capitol was a predictable apotheosis of a months-long ferment. Throughout the pandemic, right-wing protesters had been gathering at statehouses, demanding entry. In April, an armed mob had filled the Michigan state capitol, chanting "Treason!" and "Let us in!" In December, conservatives had broken the glass doors of the Oregon state capitol, overrunning officers and spraying them with chemical agents. The occupation of restricted government sanctums was an affirmation of dominance so emotionally satisfying that it was an end in itself—proof to elected officials, to Biden voters, and also to the occupiers themselves that they were still in charge. After one of the Trump supporters breached the U.S. Capitol, he insisted through a megaphone, "We will *not* be denied." There was an unmistakable subtext as the mob, almost entirely white, shouted, "Whose house? *Our* house!" One man carried a Confederate flag through the building. A Black member of

the Capitol Police later told BuzzFeed News that, during the assault, he was called a racial slur fifteen times.

I followed a group that broke off to advance on five policemen guarding a side corridor. "Stand down," a man in a MAGA hat commanded. "You're outnumbered. There's a fucking million of us out there, and we are listening to Trump—your boss."

"We can take you out," a man beside him warned.

The officers backpedalled the length of the corridor, until we arrived at a marble staircase. Then they moved aside. "We love you guys—take it easy!" a rioter yelled as he bounded up the steps, which led to the Capitol's central rotunda.

Exhibit N

Case 1:21-cv-00300-DTI /AN2　DOTTMAN2 35-6　bIED 57/27/21　bAW 5 /8.00 bAWD X /329

*On an open terrace on the U.S. Capitol's main level, Trump supporters clambered through a shattered window. "Where's the traitors?" they shouted.*

Photograph by Balazs Gardi for The New Yorker

Beneath the soaring dome, surrounded by statues of former Presidents and by large oil paintings depicting such historical scenes as the embarkation of the Pilgrims and the presentation of the Declaration of Independence, a number of young men chanted, "America first!" The phrase was popularized in 1940 by Nazi sympathizers lobbying to keep the U.S. out of the Second World War; in 2016, Trump resurrected it to describe his isolationist foreign and immigration policies. Some of

Exhibit N

the chanters, however, waved or wore royal-blue flags inscribed with "*AF*," in white letters. This is the logo for the program "America First," which is hosted by Nicholas Fuentes, a twenty-two-year-old Holocaust denier, who promotes a brand of white Christian nationalism that views politics as a means of preserving demographic supremacy. Though America Firsters revile most mainstream Republicans for lacking sufficient commitment to this priority—especially neoconservatives, whom they accuse of being subservient to Satan and Jews—the group's loyalty to Trump is, according to Fuentes, "unconditional."

The America Firsters and other invaders fanned out in search of lawmakers, breaking into offices and revelling in their own astounding impunity. "Nancy, I'm *ho-ome!*" a man taunted, mimicking Jack Nicholson's character in "The Shining." Someone else yelled, "1776—it's now or never." Around this time, Trump tweeted, "Mike Pence didn't have the courage to do what should have been done to protect our Country. . . . USA demands the truth!" Twenty minutes later, Ashli Babbitt, a thirty-five-year-old woman from California, was fatally shot while climbing through a barricaded door that led to the Speaker's lobby in the House chamber, where representatives were sheltering. The congresswoman Alexandria Ocasio-Cortez, a Democrat from New York, later said that she'd had a "close encounter" with rioters during which she thought she "was going to die." Earlier that morning, another representative, Lauren Boebert—a newly elected Republican, from Colorado, who has praised QAnon and promised to wear her Glock in the Capitol—had tweeted, "Today is 1776."

When Babbitt was shot, I was on the opposite side of the Capitol, where people were growing frustrated by the empty halls and offices.

"Where the fuck *are* they?"

"Where the fuck is Nancy?"

No one seemed quite sure how to proceed. "While we're here, we might as well set up a government," somebody suggested.

Then a man with a large "*AF*" flag—college-age, cheeks spotted with acne—pushed through a series of tall double doors, the last of which gave onto the Senate chamber.

"Praise God!"

Exhibit N

There were signs of a hasty evacuation: bags and purses on the plush blue-and-red carpet, personal belongings on some of the desks. From the gallery, a man in a flak jacket called down, "Take everything! Take all that shit!"

"No!" an older man, who wore an ammo vest and held several plastic flex cuffs, shouted. "We do not take anything." The man has since <u>been identified</u> as Larry Rendall Brock, Jr., a retired Air Force lieutenant colonel.

CASE 2:21CV-00399-DFJAKD DOCUMENT 69-6 1495 07/23/21 WITH 31 PLGS FILING X 3138

The young America Firster went directly to the dais and installed himself in the leather chair recently occupied by the Vice-President. Another America Firster filmed him extemporizing a speech: "Donald Trump is the emperor of the United States . . ."

"Hey, get out of that chair," a man about his age, with a thick Southern drawl, said. He wore cowhide work gloves and a camouflage hunting jacket that was several sizes too large for him. Gauze hung loosely around his neck, and blood, leaking from a nasty wound on his cheek, encrusted his beard. Later, when another rioter asked for his name, he responded, "Mr. Black." The America Firster turned and looked at him uncertainly.

"We're a democracy," Mr. Black said.

"Bro, we just broke into the Capitol," the America Firster scoffed. "What are you talking about?"

Brock, the Air Force veteran, said, "We can't be disrespectful." Using the military acronym for "information operations," he explained, "You have to understand—it's an I.O. war."

---

<u>*Watch: A Reporter's Footage From Inside the Capitol Siege*</u>

---

The America Firster grudgingly left the chair. More than a dozen Trump supporters filed into the chamber. A hundred antique mahogany desks with engraved nameplates were arranged in four tiered semicircles. Several people swung open the hinged desktops and began rifling through documents inside, taking pictures with their phones of private notes and letters, partly completed crossword puzzles, manuals on Senate procedure. A man in a construction hard hat held up a hand-signed document, on official stationery, addressed from "Mitt" to "Mike"—presumably, <u>Romney</u> and Pence. It was the speech that Romney had given, in February, 2020, when he voted to impeach Trump for

Exhibit N

Case 1:21-cv-01169-TCB　Document 35-2　Filed 05/03/21　Page 928 of 1677

pressuring the President of Ukraine to produce dirt on Biden. "Corrupting an election to keep oneself in office is perhaps the most abusive and disruptive violation of one's oath of office that I can imagine," Romney had written.

Exhibit N

C IVR 3 19 17-32300 GFI-AR3   DHTNHM-04-4   b/#5 07/20/03   b/#5 73 N 00 b/#5N0 X. 7173

Exhibit N

*Armed militia members attended a Stop the Steal rally in Harrisburg, Pennsylvania, on November 7th.* Photograph by Balazs Gardi for The New Yorker

Some senators had printed out their prepared remarks for the election certification that the insurrectionists had disrupted. The man in the hard hat found a piece of paper belonging to Ted Cruz and said, "He was gonna sell us out all along—look! 'Objection to counting the electoral votes of the state of Arizona.' " He paused. "Oh, wait, that's actually O.K."

"He's with us," an America Firster said.

Another young man, wearing sweatpants and a long-sleeved undershirt, seemed unconvinced. Frantically flipping through a three-ring binder on Cruz's desk, he muttered, "There's gotta be something in here we can fucking use against these scumbags." Someone looking on commented, with serene confidence, "Cruz would *want* us to do this, so I think we're good."

Mr. Black wandered around in a state of childlike wonder. "This don't look big enough," he muttered. "This can't be the right place." On January 14th, Joshua Black was arrested, in Leeds, Alabama, after he posted a confession on YouTube in which he explained, "I just felt like the spirit of God wanted me to go in the Senate room." On the day of the riot, as he took in the chamber, he ordered everyone, "Don't trash the place. No disrespect." After a while, rather than defy him, nearly everybody left the chamber. For a surreal interlude, only a few people remained. Black's blood-smeared cheek was grotesquely swollen, and as I looked closer I glimpsed the smooth surface of a yellow plastic projectile embedded deeply within it.

"I'm gonna call my dad," he said, and sat down on the floor, leaning his back against the dais.

A moment later, the door at the back of the chamber's center aisle swung open, and a man strode through it wearing a fur headdress with horns, carrying a spear attached to an American flag. He was shirtless, his chest covered with Viking and pagan tattoos, his face painted red, white, and blue. It was Jacob Chansley, a vocal QAnon proponent from Arizona, popularly known by his pseudonym, the Q Shaman. Both on the Mall and inside the Capitol, I'd seen countless signs and banners promoting QAnon, whose acolytes believe that Trump is working to dismantle an occult society of cannibalistic pedophiles. At the base of the Washington Monument, I'd watched Chansley assure people, "We got 'em right where we want 'em! We got 'em by the balls, baby, and we're not lettin' go!"

Exhibit N

"*Fuckin' A*, man," he said now, looking around with an impish grin. A young policeman had followed closely behind him. Pudgy and bespectacled, with a medical mask over red facial hair, he approached Black, and asked, with concern, "You good, sir? You need medical attention?"

"I'm good, thank you," Black responded. Then, returning to his phone call, he said, "I got shot in the face with some kind of plastic bullet."

"Any chance I could get you guys to leave the Senate wing?" the officer inquired. It was the tone of someone trying to lure a suicidal person into climbing down from a ledge.

"We will," Black assured him. "I been making sure they ain't disrespectin' the place."

"O.K., I just want to let you guys know—this is, like, *the* sacredest place."

Chansley had climbed onto the dais. "I'm gonna take a seat in this chair, because Mike Pence is a fucking traitor," he announced. He handed his cell phone to another Trump supporter, telling him, "I'm not one to usually take pictures of myself, but in this case I think I'll make an exception." The policeman looked on with a pained expression as Chansley flexed his biceps.

Exhibit N

CASE 2:20-cv-02321-DJH Document 84-4 Filed 07/12/21 Page 00 PageID #: 1117

*Rioters forced their way past barricades to the Capitol steps, over which bleachers had been erected in anticipation of Biden's Inauguration. There wasn't nearly enough law enforcement to fend off the mob.*

Photograph by Balazs Gardi for The New Yorker

Exhibit N

A skinny man in dark clothes told the officer, "This is so weird—like, you should be stopping us."

The officer pointed at each person in the chamber: "One, two, three, four, five." Then he pointed at himself: "One." After Chansley had his photographs, the officer said, "Now that you've done that, can I get you guys to walk out of this room, please?"

"Yes, sir," Chansley said. He stood up and took a step, but then stopped. Leaning his spear against the Vice-President's desk, he found a pen and wrote something on a sheet of paper.

"I feel like you're pushing the line," the officer said.

Chansley ignored him. After he had set down the pen, I went behind the desk. Over a roll-call list of senators' names, the Q Shaman had scrawled, "ITS ONLY A MATTER OF TIME / JUSTICE IS COMING!"

The Capitol siege was so violent and chaotic that it has been hard to discern the specific political agendas of its various participants. Many of them, however, went to D.C. for two previous events, which were more clarifying. On November 14th, tens of thousands of Republicans, convinced that the Democrats had subverted the will of the people in what amounted to a bloodless coup, marched to the Supreme Court, demanding that it overturn the election. For four years, Trump had batted away every inconvenient fact with the phrase "fake news," and his base believed him when he attributed his decisive defeat in both the Electoral College and the popular vote to "rigged" machines and "massive voter fraud." While the President's lawyers inundated battleground states with spurious litigation, one of them, during an interview on Fox Business, acknowledged the basis of their strategy: "We're waiting for the United States Supreme Court, of which the President has nominated three Justices, to step in and do something." After nearly every suit had collapsed—with judges appointed by Republicans and Democrats alike harshly criticizing the accusations as "speculative," "incorrect," and "not credible," and Trump's own Justice Department vouching for the integrity of the election—the attorney general of Texas petitioned the Supreme Court to invalidate all the votes from Wisconsin, Georgia, Pennsylvania, and Michigan (swing states that went for Biden). On December 11th, the night before the second D.C. demonstration, the Justices declined to hear the case, dispelling once and for all the fantasy that Trump, despite losing the election, might legally remain in office.

Exhibit N

The next afternoon, throngs of Trump supporters crowded into Freedom Plaza, an unadorned public square equidistant from the Justice Department and the White House. On one side, a large audience pressed around a group of preppy-looking young men wearing plaid shirts, windbreakers, khakis, and sunglasses. Some held rosaries and crosses, others royal-blue "*AF*" flags. The organizers had not included Fuentes, the "America First" host, in their lineup, but when he arrived at Freedom Plaza the crowd parted for him, chanting, "Groyper!" The name, which America Firsters call one another, derives from a variation of the Pepe the Frog meme, which is fashionable among white supremacists.

Diminutive and clean-shaven, with boyish features and a toothy smile, Fuentes resembled, in his suit and red tie, a recent graduate dressed for a job interview. (He dropped out of Boston University after his freshman year, when other students became hostile toward him for participating in the deadly neo-Nazi rally in <u>Charlottesville</u>, Virginia, in 2017, and for writing on Facebook that "a tidal wave of white identity is coming.") Fuentes climbed atop a granite retaining wall, and someone handed him a megaphone. As his speech approached a crescendo of indignation, more and more attendees gravitated to the groypers. "It is *us* and *our* ancestors that created everything good that you see in this country," Fuentes said. "All these people that have taken over our country—we do not need them."

The crowd roared, "Take it back!"—a phrase that would soon ring inside the Capitol.

"It's time for us to start saying another word again," Fuentes shouted. "A very important word that describes the situation we're in. That word is 'parasite.' What is happening in this country is parasitism." Arguing that Trump alone represented "*our* interests"—an end to all legal and illegal immigration, gay rights, abortion, free trade, and secularism—Fuentes distilled America Firstism into concise terms: "It is the American people, and our leader, Donald Trump, against *everybody else* in this country and this world." The Republican governors, judges, and legislators who had refused to leverage their authority to secure Trump four more years in the White House—"traitors within our own ranks"—were on "a list" of people to be taken down. Fuentes also opposed the Constitution's checks and balances, which had enabled Biden to prevail. "Make no mistake about it," he declared. "The system is our enemy."

During the nine weeks between November 3rd and January 6th, extremists like Fuentes did their utmost to take advantage of the opening that Trump created for them by refusing to concede. They were frank about their intentions: undoing not just the 2020 Presidential outcome but also any form

Exhibit N

of representative government that allows Democrats to obtain and exercise power. Correctly pointing out that a majority of Republicans believed that the election had been stolen, Fuentes argued, "This is the opportunity to galvanize the patriots of this country behind a real solution to these problems that we're facing." He also said, "If we can't get a country that we deserve to live in through the legitimate process, then maybe we need to begin to explore some other options." In case anybody was confused about what those options might be, Fuentes explained, "Our Founding Fathers would get in the streets, and they would take this country back by force if necessary. And that is what we must be prepared to do."

In the days before January 6th, calls for a "real solution" became progressively louder. Trump, by both amplifying these voices and consolidating his control over the Republican Party, conferred extraordinary influence on the most deranged and hateful elements of the American right. On December 20th, he retweeted a QAnon supporter who used the handle @cjtruth: "It was a rigged election but they were busted. Sting of the Century! Justice is coming!" A few weeks later, a barbarian with a spear was sitting in the Vice-President's chair.

As Fuentes wrapped up his diatribe, he noticed a drag queen standing on the periphery of the crowd. She wore a blond wig and an evening gown with a beauty-queen sash identifying her as Lady MAGA. At the November D.C. rally, I had been surprised to see Trump supporters lining up to have their pictures taken with her. Now Fuentes yelled, "That is disgusting! I don't want to see that!," and the groypers wheeled on her, bellowing in unison, "Shame!"

No one in the crowd objected.

While Fuentes was proposing a movement to "take this country back by force," a large contingent of Proud Boys marched by. Members from Illinois, Pennsylvania, Oregon, California, and elsewhere were easy to identify. Most were dressed in the organization's black-and-yellow colors. Some had "RWDS"—Right-Wing Death Squad—hats and patches; others wore balaclavas, kilts, hockey masks, or batting helmets. One man was wearing a T-shirt with an image of South American dissidents being thrown out of a helicopter and the words "PINOCHET DID NOTHING WRONG!" Another T-shirt featured a Nazi eagle perched on a fasces, below the acronym "6MWE"— Six Million Wasn't Enough—a reference to the number of Jews slaughtered in the Holocaust.

Exhibit N

Many of the Proud Boys were drunk. At around nine-thirty that morning, I'd stopped by Harry's Pub, a dive bar close to Freedom Plaza, and found the street outside filled with men drinking Budweiser and White Claw. "We are going to own this town!" one of them howled. At the November 14th rally, clashes between the Proud Boys and antifascists had left a number of people injured. Although most of the fights I witnessed then had been instigated by the Proud Boys, Trump had tweeted, "ANTIFA SCUM ran for the hills today when they tried attacking the people at the Trump Rally, because those people aggressively fought back." It was clear that the men outside Harry's on December 12th had travelled to D.C. to engage in violence, and that they believed the President endorsed their doing so. Trump had made an appearance at the previous rally, waving through the window of his limousine; now I overheard a Proud Boy tell his comrade, "I wanna see Trump drive by and give us one of these." He flashed an "O.K." hand sign, which has become a gesture of allegiance among white supremacists. There would be no motorcade this time, but while Fuentes addressed the groypers Trump circled Freedom Plaza in Marine One, the Presidential helicopter.

Exhibit N

Exhibit N

*The conspiracist Alex Jones dominated a pro-Trump rally on November 14th. "Down with the deep state!" Jones yelled. "The answer to their '1984' tyranny is 1776!"* Photograph by Balazs Gardi for The New Yorker

The Proud Boys who marched past Fuentes at the end of his December 12th speech were heading to the Washington Monument. When I got there, hundreds of them covered the grassy expanse near the obelisk. "Let's take Black Lives Matter Plaza!" someone suggested. In June, the security fence around the White House had been expanded, subsuming green spaces previously open to the public, in response to protests over the killing of George Floyd, in Minneapolis. Muriel Bowser, the mayor of D.C., had renamed two blocks adjacent to the fence Black Lives Matter Plaza, and commissioned the city to paint "BLACK LIVES MATTER" across the pavement in thirty-five-foot-high letters. Throughout the latter half of 2020, Trump had sought to dismiss the popular uprisings that Floyd's death had precipitated by ascribing them to Antifa, which he vilified as a terrorist organization. The Proud Boys had seized on Trump's conflation to recast their small-scale rivalry with antifascists in leftist strongholds like Berkeley and Portland as the front line of a national culture war. During the Presidential campaign, Trump's histrionic exaggerations of the threat posed by Antifa fuelled conservative support for the Proud Boys, allowing them to vastly expand their operations and recruitment. The day after a Presidential debate in which Trump told the Proud Boys to "stand back and stand by," Lauren Witzke, a Republican Senate candidate in Delaware, publicly thanked the group for having provided her with "free security." (She lost the race.)

As Proud Boys from across the nation walked downhill from the Washington Monument toward Black Lives Matter Plaza on December 12th, they chanted, "Whose plaza? *Our* plaza!" Many of them carried staffs, canes, and holstered Maglites. There was a heavy police presence downtown, and it was still broad daylight. "We got numbers, let's do this!" a Proud Boy with a newsboy cap and a gray goatee shouted. "Fuck these gender-confused terrorists! They'll put the girls out first—they think that's gonna stop us?" His name was Richard Schwetz, though he went by Dick Sweats. (He could not be reached for comment.) While some Proud Boys hesitated, others followed Schwetz, including a taciturn man with a high-and-tight military haircut and a large Confederate flag attached to a wooden dowel. I saw him again at the Capitol on January 6th.

On Constitution Avenue, the Proud Boys encountered an unsuspecting Black man coming up the sidewalk. They began shoving and jeering at him. As the man ran away, several of them chased him,

Exhibit N

Among the Insurrectionists | The New Yorker

swinging punches at his back.

Officers had cordoned off Black Lives Matter Plaza, but the group soon reached Farragut Square, where half a dozen counter-protesters—two men and four women—stood outside the Army and Navy Club, dressed in black clothes marked with medic crosses made from red tape. They were smaller and younger than most of the Proud Boys, and visibly unnerved. As Schwetz and others closed in on them, the medics retreated until they were pressed against a waist-high hedge. "Fucking pussies!" Schwetz barked, hitting two of the women. Other Proud Boys took his cue, assailing the activists, who disappeared into the hedge under a barrage of boots and fists. Policemen stopped the beating by deploying pepper spray, but they did not arrest any Proud Boys, who staggered off in search of a new target.

They promptly found one: another Black man, passing through on his bicycle. He wore Lycra exercise gear and looked perplexed by what was happening on the streets. He said nothing to anybody, but "Black Lives Matter" was written in small letters on his helmet. The Proud Boys surrounded him. Pointing at some officers watching from a few feet away, a man in a bulletproof vest, carrying a cane, said, "They're here now, but eventually they won't be. And we're gonna take this country back—believe that shit. Fuck Black Lives Matter." Before walking off, he added, "What y'all need to do is take your sorry asses to the ghetto."

This was the tenor of the next eight hours, as hundreds of Proud Boys, groypers, militia members, and other Trump supporters openly marauded on the streets around the White House, becoming more inebriated and belligerent as the night wore on, hunting for people to harass and assault. "Fight for Trump!" they chanted. At one point, Proud Boys outside Harry's Pub ganged up on another Black man, Philip Johnson, who took out a knife in self-defense, wounding four of them. Police intervened and rushed Johnson to the hospital, where he was arrested. The charges were later dropped. Outside Harry's, I heard a Proud Boy joking about Johnson's injuries: "He's going to look different tomorrow."

Shortly thereafter, I followed a number of groypers past a hair salon with a rainbow poster attached to its window. Tearing the poster to pieces, a young man screamed, "This is sodomy!"

"Fuck the fags!" others cried.

Exhibit N

By eleven, I was following another group, which happened upon the Metropolitan African Methodist Episcopal Church. Built in the late nineteenth century, the steepled red brick building had hosted the funerals of Frederick Douglass and Rosa Parks. President <u>Barack Obama</u> had attended a service there on the morning of his second Inauguration. Outside the entrance, a large Black Lives Matter sign, illuminated by floodlamps, hung below a crucifix. Climbing over a low fence, several Proud Boys and men in red MAGA hats ripped down the sign and pried off boards from its scaffolding to use as weapons, eliciting wild cheers.

"Whose streets?"

"*Our* streets!"



*December 12th, just after 11 P.M., outside the Metropolitan African Methodist Episcopal Church.*

More people piled into the garden of the church, stomping on the sign and slashing it with knives. Amid the frenzy, one of the Trump supporters removed another placard from a different display. It had a verse from the Bible: "*I shall not sacrifice to the Lord my God that which costs me nothing*."

"Hey, that's Christian," someone admonished.

Exhibit N

The man nodded and gingerly set the placard down.

The cascade of destruction and ugliness triggered by Trump's lies about the election consummates a narrative that predates his tenure in the White House. In 2011, Trump became an evangelist for birtherism, the false assertion that Obama had been born in Kenya and was therefore an illegitimate President. Whether or not Trump believed the racist slander, he had been apprised of its political utility by his friend <u>Roger Stone</u>, who made his political reputation as a dirty trickster for President <u>Richard Nixon</u>. Five years later, in the months before the 2016 election, Stone created a Web site called Stop the Steal, which he used to undermine <u>Hillary Clinton</u>'s expected victory by insisting that the election had been rigged—a position that Trump maintained even after he won, to explain his deficit in the popular vote.

The day after the 2020 election, a new Facebook page appeared: Stop the Steal. Among its earliest posts was a video from the T.C.F. Center, in downtown Detroit, where Michigan ballots were counted. The video showed Republican protesters who were said to have been denied access to the room where absentee votes were being processed. Overnight, Stop the Steal gained more than three hundred and twenty thousand followers—making it among the fastest-growing groups in Facebook history. The company quickly deleted it.

I spent much of Election Day at the T.C.F. Center. COVID-19 had killed three thousand residents of Wayne County, which includes Detroit, causing an unprecedented number of people to vote by mail. Nearly two hundred thousand absentee ballots were being tallied in a huge exhibit hall. Roughly eight hundred election workers were opening envelopes, removing ballots from sealed secrecy sleeves, and logging names into an electronic poll book. (Before Election Day, the clerk's office had compared and verified signatures.) The ballots were then brought to a row of high-speed tabulators, which could process some fifty sheets a minute.

Republican and Democratic challengers roamed the hall. The press was confined to a taped-off area, but, as far as I could see, the Republicans were given free rein of the space. They checked computer monitors that displayed a growing list of names. A man's voice came over a loudspeaker to remind the election workers to "provide for transparency and openness." Christopher Thomas, who served as Michigan's election director for thirty-six years and advised the clerk's office in 2020, told me that things had gone remarkably smoothly. The few challengers who'd raised objections had mostly

Exhibit N

misunderstood technical aspects of the process. "We work through it with them," Thomas said. "We're happy to have them here."

Early returns showed Trump ahead in Michigan, but many absentee ballots had yet to be processed. Because Trump had relentlessly denigrated absentee voting throughout the campaign, in-person votes had been expected to skew his way. It was similarly unsurprising when his lead diminished after results arrived from Wayne County and other heavily Democratic jurisdictions. Nonetheless, shortly after midnight, Trump launched his post-election misinformation campaign: "We are up BIG, but they are trying to STEAL the Election."

Exhibit N

*A makeshift wooden gallows, with stairs and a rope, was erected near the Capitol on January 6th. Since November, militant pro-Trump outfits had been openly gearing up for major violence. In early January, on Parler, a Proud Boys leader had written, "Every law makers who breaks their own stupid Fucking laws should be dragged out of office and hung."* Photograph by Balazs Gardi for The New Yorker

The next day, I found an angry mob outside the T.C.F. Center. Police officers guarded the doors. Most of the protesters had driven down from Macomb County, which is eighty per cent white and went for Trump in both 2016 and 2020. "We know what's going on here," one man told me. "They're stuffing the ballot box." He said that his local Republican Party had sent out an e-mail urging people to descend on the center. Politico underline later reported that Laura Cox, the chairwoman of the Michigan G.O.P., had personally implored conservative activists to go there. I had seen Cox introduce Trump at a rally in Grand Rapids the night before the election; she had promised the crowd "four more years—or twelve, we'll talk about that later."

Dozens of protesters had entered the T.C.F. Center before it was sealed. Downstairs, they pressed against a glass wall of the exhibit hall, chanting at the election workers on the other side. The most strident member of the group was Ken Licari, a Macomb County resident with a thin beard and a receding hairline. The two parties had been allocated one challenger for each table in the hall, but Republicans had already exceeded that limit, and Licari was irate about being shut out. When an elderly A.C.L.U. observer was ushered past him, Licari demanded to know where she was from. The woman ignored him, and he shouted, "You're a coward, is where you're from!"

"Be civil," a woman standing near him said. A forty-eight-year-old caretaker named Lisa, she had stopped by the convention center on a whim, "just to see." Unlike almost everyone else there, Lisa was Black and from Detroit. She gently asked Licari, "If this place has cameras, and you've got media observing, you've got different people from both sides looking—why do you think someone would be intentionally trying to cheat with all those eyes?"

"You would have to have a hundred thirty-four cameras to track every ballot," Licari answered.

"These ballots are from Detroit," Lisa said. "Detroit is an eighty-per-cent African-American city. There's a huge percentage of Democrats. That's just a fact." She gestured at the predominantly Black poll workers across the glass. "This is my whole thing—I have a basic level of respect for these people."

Exhibit N

Rather than respond to this tacit accusation of bias, Licari told Lisa that a batch of illegal ballots had been clandestinely delivered to the center at three in the morning. This was a reference to another cell-phone video, widely shared on social media, that showed a man removing a case from the back of a van, loading it in a wagon, and pulling the wagon into the building. I had watched the video and had recognized the man as a member of a local TV news crew I'd noticed the previous day. I distinctly recall admiring the wagon, which he had used to transport his camera gear.

"There's a lot of suspicious activity that goes on down here in Detroit," another Republican from Macomb County told me. "There's a million ways you can commit voter fraud, and we're afraid it was committed on a massive scale." I had seen the man on Election Day, working as a challenger inside the exhibit hall. Now, as then, he wore old Army dog tags and a hooded Michigan National Guard sweatshirt with the sleeves cut off. I asked him if he had observed any fraud with his own eyes. He had not. "It wasn't committed by *these* people," he said. "But the ballots that they were given and ran through the scanners—we don't know where they came from."

Like many of the Republicans in the T.C.F. Center, the man had been involved in anti-lockdown demonstrations against Michigan's governor, Gretchen Whitmer, a Democrat. While reporting on those protests, I'd been struck by how the mostly white participants saw themselves as upholding the tradition of the civil-rights movement. Whitmer's public-health measures were condemned as oppressive infringements on sacrosanct liberties, and those who defied them compared themselves to Rosa Parks. The equivalency became even more bizarre after George Floyd was killed and anti-lockdown activists in Michigan adopted Trump's law-and-order rhetoric. Yet I never had the impression that those Republican activists were disingenuous. Similarly, the white people shouting at the Black election workers in Detroit seemed truly convinced of their own persecution.

That conviction had been instilled at least in part by politicians who benefitted from it. In April, in response to Whitmer's aggressive public-health measures, Trump had tweeted, "Liberate Michigan!" Two weeks later, heavily armed militia members entered the state capitol, terrifying lawmakers. Mike Shirkey, the Republican majority leader in the Michigan Senate, denounced the organizers of the action—a group called the American Patriot Council—as "a bunch of jackasses" who had brandished "the threat of physical harm to stir up fear and rancor." But, as Trump and other Republicans stoked anti-lockdown resentment across the U.S., Shirkey reversed himself. In May, he appeared at an

Exhibit N

Case 1:21-cv-01169-TCB   Document 35-2   Filed 05/03/21   Page 946 of 1677

American Patriot Council event in Grand Rapids, where he told the assembled militia members, "We need you now more than ever." A few months later, two brothers in the audience that day, William and Michael Null, were arrested for providing material support to a network of right-wing terrorists.

Exhibit N

CASE 2 19-cv-00389 GFI-NAD   DXFFHHA8-EH-6   kfX8 07/12/17   kaffh 30 fk 80 kAffH2 6   7116

Exhibit N

*Trump supporters inside the Capitol on January 6th. For right-wing protesters, the occupation of restricted government sanctums was an affirmation of dominance so emotionally satisfying that it was an end in itself—proof to elected officials, to Biden voters, and also to themselves that they were still in charge.* Photograph by Balazs Gardi for The New Yorker

Outside the T.C.F. Center, I ran into Michelle Gregoire, a twenty-nine-year-old school-bus driver from Battle Creek. The sleeves of her sweatshirt were pushed up to reveal a "We the People" tattoo, and she wore a handgun on her belt. We had met at several anti-lockdown protests, including the one in Grand Rapids where Shirkey spoke. In April, Gregoire had entered the gallery overlooking the House chamber in the Michigan state capitol, in violation of COVID-19 protocols. She had to be dragged out by the chief sergeant at arms, and she is now charged with committing a felony assault against him. (She has pleaded not guilty.)

Gregoire is also an acquaintance of the Nulls. "They're innocent," she told me in Detroit. "There's an attack on conservatives right now." She echoed many Republicans I have met in the past nine months who have described to me the same animating emotion: fear. "A lot of conservatives are really scared," she said. "Extreme government overreach" during the pandemic had proved that the Democrats aimed, above all, to subjugate citizens. In October, Facebook deleted Gregoire's account, which contained posts about a militia that she belonged to at the time. She told me, "If the left gets their way, they will silence whoever they want." She then expressed another prevalent apprehension on the right: that Democrats intend to disarm Americans, in order to render them defenseless against autocracy. "That terrifies me," Gregoire said. "In other countries, they've said, 'That will never happen here,' and before you know it their guns are confiscated and they're living under communism."

The sense of embattlement that Trump and other Republican politicians encouraged throughout the pandemic primed many conservatives to assume Democratic foul play even before voting began. Last month, at a State Senate hearing on the count at the T.C.F. Center, a witness, offering no evidence of fraud, demanded to see evidence that none had occurred. "We believe," he testified. "Prove us wrong." The witness was Randy Bishop, a conservative Christian-radio host and a former county G.O.P. chairman, as well as a felon with multiple convictions for fraud. I'd watched Bishop deliver a rousing speech in June at an American Patriot Council rally, which Gregoire and the Null brothers had attended. "Carrying a gun with you at all times and being a member of a militia is also your civic

Exhibit N

duty," Bishop had argued. According to the F.B.I., the would-be terrorists whom the Nulls abetted used the rally to meet and further their plans, which included televised executions of Democratic lawmakers. When I was under the bleachers at the U.S. Capitol, while the mob pushed up the steps, I noticed Jason Howland, a founder of the American Patriot Council, a few feet behind me in the scrum, leaning all his weight into the mass of bodies.

Even if it were possible to prove that the election was not stolen, it seems doubtful whether conservatives who already feel under attack could be convinced. When Gregoire cited the man with the van smuggling a case of ballots into the T.C.F. Center, I told her that he was a journalist and that the case contained equipment. Gregoire shook her head. "No," she said. "Those were ballots. It's not a conspiracy when it's documented and recorded."

Conspiracy theories have always helped rationalize white grievance, and people who exploit white grievance for political or financial gain often purvey conspiracy theories. Roger Stone became Trump's adviser for the 2016 Republican primaries, and frequently appeared on Alex Jones's "InfoWars" show, which warned that the "deep state"—a nefarious shadow authority manipulating U.S. policy for the profit of élites—opposed Trump because he threatened its power. Jones has asserted that the Bush Administration was responsible for 9/11 and that the Sandy Hook Elementary School massacre never happened. During the 2016 campaign, Stone arranged for Trump to be a guest on "InfoWars." "I will not let you down," Trump promised Jones.

This compact with the conspiracist right strengthened over the next four years, as the President characterized his impeachment and the special counsel Robert Mueller's report on Russian election meddling as "hoaxes" designed to "overthrow" him. (Stone was convicted of seven felonies related to the Mueller investigation, including making false statements and witness tampering. Trump pardoned him in December. Ten days later, Stone reactivated his Stop the Steal Web site, which began collecting donations for "security" in D.C. on January 6th.) This past year, the scale of the pandemic helped conspiracists broaden the scope of their theories. Many COVID-19 skeptics believe that lockdowns, mask mandates, vaccines, and contact tracing are laying the groundwork for the New World Order—a genocidal communist dystopia that, Jones says, will look "just like 'The Hunger Games.'" The architects of this apocalypse are such "globalists" as the Clintons, Bill Gates, and George Soros; their instruments are multinational institutions like the European Union, NATO, and

Exhibit N

the U.N. Whereas Trump has enfeebled these organizations, Biden intends to reinvigorate them. The claim of a plot to steal the election makes sense to people who see Trump as a warrior against deep-state chicanery. Like all good conspiracy theories, it affirms and elaborates preëxisting ones. Rejecting it can require renouncing an entire world view.

Trump's allegations of vast election fraud have been a boon for professional conspiracists. Not long ago, Jones seemed to be at risk of sliding into obsolescence. Facebook, Twitter, Apple, Spotify, and YouTube had expelled him from their platforms in 2018, after he accused the bereaved parents of children murdered at Sandy Hook of being paid actors, prompting "InfoWars" fans to harass and threaten them. The bans curtailed Jones's reach, but a deluge of COVID-19 propaganda drew millions of people to his proprietary Web sites. To some Americans, Jones's dire warnings about the deep state and the New World Order looked prophetic, an impression that Trump's claim of a stolen election only bolstered.

After Facebook removed the Stop the Steal group that had posted the video from the T.C.F. Center, its creator, Kylie Jane Kremer, a thirty-year-old activist, conceived the November 14th rally in Washington, D.C., which became known as the Million MAGA March. That day, Jones joined tens of thousands of Trump supporters gathered at Freedom Plaza. Kremer, stepping behind a lectern with a microphone, promised "an incredible lineup" of speakers, after which, she said, everyone would proceed up Pennsylvania Avenue, to the Supreme Court. But, before Kremer could introduce her first guest, Jones had shouted through a bullhorn, "If the globalists think they're gonna keep America under martial law, and they're gonna put that Communist Chinese agent Biden in, they got another thing coming!"

Hundreds of people cheered. Jones, who is all chest and no neck, pumped a fist in the air. "The march starts now!" he soon declared. His usual security detail was supplemented by about a dozen Proud Boys, who formed a protective ring around him. The national chairman of the Proud Boys, Henry (Enrique) Tarrio, walked at his side. Tarrio, the chief of staff of Latinos for Trump, is the son of Cuban immigrants who fled Fidel Castro's revolution. Although he served time in federal prison for rebranding and relabelling stolen medical devices, he often cites his family history to portray himself and the Proud Boys in a noble light. At an event in Miami in 2019, he stood behind Trump, wearing a T-shirt that said "ROGER STONE DID NOTHING WRONG!"

Exhibit N

"Down with the deep state!" Jones yelled through his bullhorn. "The answer to their '1984' tyranny is 1776!" As he and Tarrio continued along Pennsylvania Avenue, more and more people abandoned Kremer's event to follow them. As we climbed toward the U.S. Capitol, I turned and peered down at a procession of Trump supporters stretching back for more than a mile. Flags waved like the sails of a bottlenecked armada. From this vantage, the Million MAGA March appeared to have been led by the Proud Boys and Jones. On the steps of the Supreme Court, he cried, "This is the beginning of the end of their New World Order!"

Invocations of the New World Order often raise the age-old spectre of Jewish cabals, and the Stop the Steal movement has been rife with anti-Semitism. At the protest that I attended on November 7th in Pennsylvania, a speaker elicited applause with the exhortation "Do not become a cog in the ZOG!" The acronym stands for "Zionist-occupied government." Among the Trump supporters was an elderly woman who gripped a walker with her left hand and a homemade "Stop the Steal" sign with her right. The first letters of "Stop" and "Steal" were stylized to resemble Nazi S.S. bolts. In videos of the shooting inside the Capitol on January 6th, amid the mob attempting to reach members of Congress, a man—subsequently identified as Robert Keith Packer—can be seen in a sweatshirt emblazoned with the words "Camp Auschwitz." (Packer has been arrested.)

On my way back down Pennsylvania Avenue on November 14th, after Jones's speech, I fell in with a group of groypers chanting "Christian nation!" and "Emperor Trump!" I followed the young men to Freedom Plaza, where one of them read aloud an impassioned screed about "globalist scum" and the need to "strike down this foreign invasion." When he finished, I noticed that two groypers standing near me were laughing. The response felt incongruous, until I recognized it as the juvenile thrill of transgression. One of them, his voice high with excitement, marvelled, "He just gave a fascist speech!"

A few days later, Nicholas Fuentes appeared on an "InfoWars" panel with Alex Jones and other right-wing conspiracists. During the discussion, Fuentes warned of the "Great Replacement." This is the contention that Europe and the United States are under siege from nonwhites and non-Christians, and that these groups are incompatible with Western culture, identity, and prosperity. Many white supremacists maintain that the ultimate outcome of the Great Replacement will be "white genocide." (In Charlottesville, neo-Nazis chanted, "Jews will not replace us!"; the perpetrators

Exhibit N

of the New Zealand mosque massacre and the El Paso Walmart massacre both cited the Great Replacement in their manifestos.) "What people have to begin to realize is that if we lose this battle, and if this transition is allowed to take place, that's it," Fuentes said. "That's the end."

"Submitting now will destroy you forever," Jones agreed.

Because Fuentes and Jones characterize Democrats as an existential menace—Jones because they want to incrementally enslave humanity, Fuentes because they want to make whites a demographic minority—their fight transcends partisan politics. The same is true for the many evangelicals who have exalted Trump as a Messianic figure divinely empowered to deliver the country from satanic influences. Right-wing Catholics, for their part, have mobilized around the "church militant" movement—fostered by <u>Stephen Bannon</u>, Trump's former chief strategist—which puts Trump at the forefront of a worldwide clash between Western civilization and Islamic "barbarity." Crusader flags and patches were widespread at the Capitol insurrection.

Exhibit N

CASE 2:19-17-02309-DFI-NS4 · DOCTABLE OF-6 · LWE 07/12/21 · LWE 31 N.20 UNFRO K. 2345

*Members of Trump's base went to observe the tabulation of the vote in battleground states, and believed him when he attributed his decisive defeat to "rigged" machines and "massive voter*

Exhibit N

*fraud.*" **Photograph by Balazs Gardi for The New Yorker**

In the Senate chamber on January 6th, Jacob Chansley took off his horns and led a group prayer through a megaphone, from behind the Vice-President's desk. The insurrectionists bowed their heads while Chansley thanked the "heavenly Father" for allowing them to enter the Capitol and "send a message" to the "tyrants, the communists, and the globalists." Joshua Black, the Alabama who had been shot in the face with a rubber bullet, said in his YouTube confession, "I praised the name of Jesus on the Senate floor. That was my goal. I think that was God's goal."

While the religiously charged demonization of globalists dovetails with QAnon, religious maximalism has also gone mainstream. Under Trump, Republicans throughout the country have consistently situated American politics in the context of an eternal, cosmic struggle between good and evil. In doing so, they have rendered constitutional principles of representation, pluralism, and the separation of powers less inviolable, given the magnitude of what is at stake.

Trump played to this sensibility on June 1st, a week after George Floyd was killed. Police officers used rubber bullets, batons, tear gas, and pepper-ball grenades to violently disperse peaceful protesters in Lafayette Square so that he could walk unmolested from the White House to a church and pose for a photograph while holding a Bible. Liberals were appalled. For many of the President's supporters, however, the image was symbolically resonant. Lafayette Square was subsequently enclosed behind a tall metal fence, which racial-justice protesters decorated with posters, converting it into a makeshift memorial to victims of police violence. On the morning of the November 14th rally, thousands of Trump supporters passed the fence on their way to Freedom Plaza. Some of them stopped to rip down posters, and by nine o'clock cardboard littered the sidewalk.

"White folks feel real emboldened these days," Toni Sanders, a local activist, told me. Sanders had been at the square on June 1st, with her wife and her nine-year-old stepson. "He was tear-gassed," she said. "He's traumatized." She had returned there the day of the march to prevent people from defacing the fence, and had already been in several confrontations. While we spoke, people carrying religious signs approached. They were affiliates of Patriot Prayer, a conservative Christian movement, based in Vancouver, Washington, whose rallies have often attracted white supremacists. Kyle Chapman, a prominent Patriot Prayer figure from California (and a felon), once headed the Fraternal

Exhibit N

Order of Alt-Knights, a "tactical defense arm" of the Proud Boys. A few days before the march, Chapman had posted a statement on social media proposing that the Proud Boys change their name to the Proud Goys, purge all "undesirables," and "boldly address the issues of White Genocide" and "the right for White men and women to have their own countries where White interests are written into law."

The founder of Patriot Prayer, Joey Gibson, has praised Chapman as "a true patriot" and "an icon." (He also publicly disavows racism and anti-Semitism.) In December, Gibson led the group that broke into the Oregon state capitol. "Look at them," Sanders said as Gibson passed us, yelling about Biden being a communist. "Full of hate, and proud of it." She shook her head. "If God were here, He would smite these motherfuckers."

Since January 6th, some Republican politicians have distanced themselves from Trump. A few, such as Romney, have denounced him. But the Republican Party's cynical embrace of Trump's attempted power grab all the way up to January 6th has strengthened its radical flank while sidelining moderates. Seventeen Republican-led states and a hundred and six Republican members of Congress —well over half—signed on to the Texas suit asking the Supreme Court to disenfranchise more than twenty million voters. Republican officials shared microphones with white nationalists and conspiracists at every Stop the Steal event I attended. At the Million MAGA March, Louie Gohmert, a congressman from Texas, spoke shortly after Alex Jones on the steps of the Supreme Court. "This is a multidimensional war that the U.S. intelligence people have used on other governments," Gohmert said—words that might have come from Jones's mouth. "You not only steal the vote but you use the media to convince people that they're not really seeing what they're seeing."

"We see!" a woman in the crowd cried.

In late December, Gohmert and other Republican legislators filed a lawsuit asking the courts to affirm Vice-President Pence's right to unilaterally determine the results of the election. When federal judges dismissed the case, Gohmert declared on TV that the ruling had left patriots with only one form of recourse: "You gotta go to the streets and be as violent as Antifa and B.L.M."

Gohmert is a mainstay of the Tea Party insurgency that facilitated Trump's political rise. Both that movement and Trumpism are preoccupied as much with heretical conservatives as they are with

Exhibit N

Case 1:21-cv-01169-TCB Document 35-2 Filed 05/03/21 Page 956 of 1677

liberals. At an October rally, Trump derided RINOs—Republicans in name only—as "the lowest form of human life." After the election, any Republican who accepted Biden's victory was similarly maligned. When Chris Krebs, a Trump appointee in charge of national cybersecurity, deemed the election "the most secure in American history," the President fired him. Joe diGenova, Trump's attorney, then said that Krebs "should be drawn and quartered—taken out at dawn and shot."

Exhibit N

Case 1:21-cv-01169-TCB   Document 35-2   Filed 05/03/21   Page 957 of 1677

*There was an unmistakable subtext as the mob inside the Capitol, almost entirely white, shouted, "Whose house? Our house!"*

Photograph by Balazs Gardi for The New Yorker

As Republican officials scrambled to prove their fealty to the President, some joined Gohmert in invoking the possibility of violent rebellion. In December, the Arizona Republican Party reposted a tweet from Ali Alexander, a chief organizer of the Stop the Steal movement, that stated, "I am willing to give my life for this fight." The Twitter account of the Republican National Committee appended the following comment to the retweet: "He is. Are you?"

Alexander is a convicted felon, having pleaded guilty to property theft in 2007 and credit-card abuse in 2008. In November, he appeared on the "InfoWars" panel with Jones and Fuentes, during which he alluded to the belief that the New World Order would forcibly implant people with digital-tracking microchips. "I'm just not going to go into that world," Alexander said. He also expressed

Exhibit N

jubilant surprise at how successful he, Jones, and Fuentes had been in recruiting mainstream Republicans to their cause: "We are the crazy ones, rushing the gates. But we are winning!"

Jones, Fuentes, and Alexander were not seen rushing the gates when lives were lost at the Capitol on January 6th. Nor, for that matter, was Gohmert. Ashli Babbitt, the woman who was fatally shot, was an Air Force veteran who appears to have been indoctrinated in conspiracy theories about the election. She was killed by an officer protecting members of Congress—perhaps Gohmert among them. In her final tweet, on January 5th, Babbitt declared, "The storm is here"—a reference to a QAnon prophecy that Trump would expose and execute all his enemies. The same day that Babbitt wrote this, Alexander led crowds at Freedom Plaza in chants of "Victory or death!" During the sacking of the Capitol, he recorded a video from a rooftop, with the building in the distance behind him. "I do not denounce this," he said.

Trump was lying when, after dispatching his followers to the Capitol, he assured them, "I'll be with you." But, in a sense, he was there—as were Jones, Fuentes, and Alexander. Their messaging was ubiquitous: on signs, clothes, patches, and flags, and in the way that the insurrectionists articulated what they were doing. At one point, I watched a man with a long beard and a Pittsburgh Pirates hat facing off against several policemen on the main floor of the Capitol. "I will not let this country be taken over by globalist communist scum!" he yelled, hoarse and shaking. "They want us all to be slaves! Everybody's seen the documentation—it's out in the open!" He could not comprehend why the officers would want to interfere in such a virtuous uprising. "You *know* what's right," he told them. Then he gestured vaguely at the rest of the rampaging mob. "Just like these people know what's right."

After Chansley, the Q Shaman, left his note on the dais, a new group entered the Senate chamber. Milling around was a man in a black-and-yellow plaid shirt, with a bandanna over his face. Ahead of January 6th, Tarrio, the Proud Boys chairman, had released a statement announcing that his men would "turn out in record numbers" for the event—but would be "incognito." The man in the plaid shirt was the first Proud Boy I had seen openly wearing the organization's signature colors. At several points, however, I heard grunts of "Uhuru!," a Proud Boys battle cry, and a group attacking a police line outside the Capitol had sung "Proud of Your Boy"— from the Broadway version of "Aladdin"—for which the organization is sardonically named. One

Exhibit N

member of the group had flashed the "O.K." sign and shouted, "Fuck George Floyd! Fuck Breonna Taylor! Fuck them all!" He seemed overcome with emotion, as if at last giving expression to a sentiment that he had long suppressed.

On January 4th, Tarrio had been arrested soon after his arrival at Dulles International Airport, for a destruction-of-property charge related to the December 12th event, where he'd set fire to a Black Lives Matter banner stolen from a historic Black church. (In an intersection outside Harry's Pub, he had stood over the flames while Proud Boys chanted, "Fuck you, faggots!") He was released shortly after his arrest but was barred from remaining in D.C. On the eve of the siege, followers of the official Proud Boys account on Parler were incensed. "Every cop involved should be executed immediately," one user commented. "Time to resist and revolt!" another added. A third wrote, "Fuck these DC Police. Fuck those cock suckers up. Beat them down. You dont get to return to your families."

Since George Floyd's death, demands from leftists to curb police violence have inspired a Back the Blue movement among Republicans, and most right-wing outfits present themselves as ardently pro-law enforcement. This alliance is conditional, however, and tends to collapse whenever laws intrude on conservative values and priorities. In Michigan, I saw anti-lockdown protesters ridicule officers enforcing COVID-19 restrictions as "Gestapo" and "filthy rats." When police cordoned off Black Lives Matter Plaza, Proud Boys called them "communists," "cunts," and "pieces of shit." At the Capitol on January 6th, the interactions between Trump supporters and law enforcement vacillated from homicidal belligerence to borderline camaraderie—a schizophrenic dynamic that compounded the dark unreality of the situation. When a phalanx of officers at last marched into the Senate chamber, no arrests were made, and everyone was permitted to leave without questioning. As we passed through the central doors, a sergeant with a shaved head said, "Appreciate you being peaceful." His uniform was half untucked and missing buttons, and his necktie was ripped and crooked. Beside him, another officer, who had been sprayed with a fire extinguisher, looked as if a sack of flour had been emptied on him.

A policeman loitering in the lobby escorted us down a nearby set of stairs, where we overtook an elderly woman carrying a "TRUMP" tote bag. "We scared them off—that's what we did, we scared the bastards," she said, to no one in particular.

Exhibit N

The man in front of me had a salt-and-pepper beard and a baseball cap with a "We the People" patch on the back. I had watched him collect papers from various desks in the Senate chamber and put them in a glossy blue folder. As police directed us to an exit, he walked out with the folder in his hand.

The afternoon was cold and blustery. Thousands of people still surrounded the building. On the north end of the Capitol, a renewed offensive was being mounted, on another entrance guarded by police. The rioters here were far more bitter and combative, for a simple reason: they were outside, and they wanted inside. They repeatedly charged the police and were repulsed with opaque clouds of tear gas and pepper spray.

"Fuck the blue!" people chanted.

"We have guns, too, motherfuckers!" one man yelled. "With a lot bigger rounds!" Another man, wearing a do-rag that said "FUCK YOUR FEELINGS," told his friend, "If we have to tool up, it's gonna be over. It's gonna come to that. Next week, Trump's gonna say, 'Come to D.C.' And we're coming heavy."

Later, I listened to a woman talking on her cell phone. "We need to come back with guns," she said. "One time with guns, and then we'll never have to do this again."

Although the only shot fired on January 6th was the one that killed Ashli Babbitt, two suspected explosive devices were found near the Capitol, and a seventy-year-old Alabama man was arrested for possessing multiple loaded weapons, ammunition, and eleven Molotov cocktails. As the sun fell, clashes with law enforcement at times descended into vicious hand-to-hand brawling. During the day, more than fifty officers were injured and fifteen hospitalized. I saw several Trump supporters beat policemen with blunt instruments. Videos show an officer being dragged down stairs by his helmet and clobbered with a pole attached to an American flag. In another, a mob crushes a young policeman in a door as he screams in agony. One officer, Brian Sicknick, a forty-two-year-old, died after being struck in the head with a fire extinguisher. Several days after the siege, Howard Liebengood, a fifty-one-year-old officer assigned to protect the Senate, committed suicide.

Right-wing extremists justify such inconsistency by assigning the epithet "oath-breaker" to anyone in uniform who executes his duties in a manner they dislike. It is not difficult to imagine how, once

Trump is no longer President, his most fanatical supporters could apply this caveat to all levels of government, including local law enforcement. At the rally on December 12th, Nicholas Fuentes underscored the irreconcilability of a radical-right ethos and pro-police, pro-military patriotism: "When they go door to door mandating vaccines, when they go door to door taking your firearms, when they go door to door taking your children, who do you think it will be that's going to do that? It's going to be the police and the military."

During Trump's speech on January 6th, he said, "The media is the biggest problem we have." He went on, "It's become the enemy of the people. . . . We gotta get them straightened out." Several journalists were attacked during the siege. Men assaulted a *Times* photographer inside the Capitol, near the rotunda, as she screamed for help. After National Guard soldiers and federal agents finally arrived and expelled the Trump supporters, some members of the mob shifted their attention to television crews in a park on the east side of the building. Earlier, a man had accosted an Israeli journalist in the middle of a live broadcast, calling him a "lying Israeli" and telling him, "You are cattle today." Now the Trump supporters surrounded teams from the Associated Press and other outlets, chasing off the reporters and smashing their equipment with bats and sticks.

There was a ritualistic atmosphere as the crowd stood in a circle around the piled-up cameras, lights, and tripods. "This is the old media," a man said, through a megaphone. "This is what it looks like. Turn off Fox, turn off CNN."

Exhibit N

CASE 2:20-cv-02380-GFV-ARD · DOCUMENT 04-4 · JUNE 07/12/21 · WITH 46 PLOD WITHIN X. 1567

*Outside the Capitol, rioters surrounded news crews, chasing off the reporters and smashing their equipment with bats.*  Photograph by Balazs Gardi for The New Yorker

Exhibit N

Another man, in a black leather jacket and wraparound sunglasses, suggested that journalists should be killed: "Start makin' a list! Put all those names down, and we start huntin' them down, one by one!"

"Traitors to the guillotine!"

"They won't be able to walk down the streets!"

The radicalization of the Republican Party has altered the world of conservative media, which is, in turn, accelerating that radicalization. On November 7th, Fox News, which has often seemed to function as a civilian branch of the Trump Administration, called the race for Biden, along with every other major network. Furious, Trump encouraged his supporters to instead watch Newsmax, whose ratings skyrocketed as a result. Newsmax hosts have dismissed COVID-19 as a "scamdemic" and have speculated that Republican politicians were being infected with the virus as a form of "sabotage." The Newsmax headliner Michelle Malkin has praised Fuentes as one of the "New Right leaders" and the groypers as "patriotic."

At the December 12th rally, I ran into the Pennsylvania Three Percent member whom I'd met in Harrisburg on November 7th. Then he had been a Fox News devotee, but since Election Day he'd discovered Newsmax. "I'd had no idea what it even was," he told me. "Now the only thing that anyone I know watches anymore is Newsmax. They ask the hard questions."

It seems unlikely that what happened on January 6th will turn anyone who inhabits such an ecosystem against Trump. On the contrary, there are already indications that the mayhem at the Capitol will further isolate and galvanize many right-wingers. The morning after the siege, an alternative narrative, pushed by Jones and other conspiracists, went viral on Parler: the assault on the Capitol had actually been instigated by Antifa agitators impersonating Trump supporters. Mo Brooks, an Alabama congressman who led the House effort to contest the certification of the Electoral College votes, tweeted, "Evidence growing that fascist ANTIFA orchestrated Capitol attack with clever mob control tactics." (Brooks had warmed up the crowd for Trump on January 6th, with a speech whose bellicosity far surpassed the President's. "Today is the day American patriots start takin' down names and kickin' ass!" he'd hollered.) Most of the "evidence" of Antifa involvement seems to be photographs of rioters clad in black. Never mind that, in early January, Tarrio, the Proud

Exhibit N

Boys chairman, wrote on Parler, "We might dress in all BLACK for the occasion." Or that his colleague Joe Biggs, addressing antifascist activists, added, "We are going to smell like you, move like you, and look like you."

Not long after the Brooks tweet, I got a call from a woman I'd met at previous Stop the Steal rallies. She had been unable to come to D.C., owing to a recent surgery. She asked if I could tell her what I'd seen, and if the stories about Antifa were accurate. She was upset—she did not believe that "Trump people" could have done what the media were alleging. Before I responded, she put me on speakerphone. I could hear other people in the room. We spoke for a while, and it was plain that they desperately wanted to know the truth. I did my best to convey it to them as I understood it.

Less than an hour after we got off the phone, the woman texted me a screenshot of a CNN broadcast with a news bulletin that read, "ANTIFA HAS TAKEN RESPONSIBLITLY FOR STORMING CAPITAL HILL." The image, which had been circulating on social media, was crudely Photoshopped (and poorly spelled). "Thought you might want to see this," she wrote.

In the year 2088, a five-hundred-pound time capsule is scheduled to be exhumed from beneath the stone slabs of Freedom Plaza. Inside an aluminum cylinder, historians will find relics honoring the legacy of Martin Luther King, Jr.: a Bible, clerical robes, a cassette tape with King's "I Have a Dream" speech, part of which he wrote in a nearby hotel. What will those historians know about the lasting consequences of the 2020 Presidential election, which culminated with the incumbent candidate inciting his supporters to storm the Capitol and threaten to lynch his adversaries? Will this year's campaign against the democratic process have evolved into a durable insurgency? Something worse?

On January 8th, Trump was permanently banned from Twitter. Five days later, he became the only U.S. President in history to be impeached twice. (During the Capitol siege, the man in the hard hat withdrew from one of the Senate desks a manual, from a year ago, titled "PROCEEDINGS OF THE UNITED STATES SENATE IN THE IMPEACHMENT TRIAL OF PRESIDENT DONALD JOHN TRUMP.") Although the President has finally agreed to submit to a peaceful transition of power, he has admitted no responsibility for the deadly riot. "People thought that what I said was totally appropriate," he told reporters on January 12th.

Exhibit N

He will not disappear. Neither will the baleful forces that he has conjured and awakened. This is why iconoclasts like Fuentes and Jones have often seemed more exultant than angry since Election Day. For them, the disappointment of Trump's defeat has been eclipsed by the prospect of upheaval that it has brought about. As Fuentes said on the "InfoWars" panel, "This is the best thing that can happen, because it's destroying the legitimacy of the system." Fuentes was at the Capitol riot, though he denies going inside. On his show the next day, he called the siege "the most awe-inspiring and inspirational and incredible thing I have seen in my entire life."

At the heap of wrecked camera gear outside the Capitol, the man in the leather jacket and sunglasses declared to the crowd, "We are at war. . . . Mobilize in your own cities, your own counties. Storm your own capitol buildings. And take down every one of these corrupt motherfuckers." Behind him, lights glowed in the rotunda. The sky darkened. At 8 P.M., Congress reconvened and resumed certifying the election. For six hours, Americans had held democracy hostage in the name of patriotism.

The storm might be here. ♦

*Published in the print edition of the <u>January 25, 2021</u>, issue, with the headline "The Storm."*

---

*<u>Luke Mogelson</u> has written for The New Yorker since 2013. He is the author of "<u>These Heroic, Happy Dead</u>."*

---

More:   **Capitol Hill**   **Riots**   **Far Right**   **Donald Trump**   **Protests**   **Congress**   **Mob**   **U.S. Senate**   **Proud Boys**

**2020 Election**   **Republicans**   **Conspiracy Theories**   **Right Wing**   **QAnon**   **Extremists**   **Trump-Biden Transition**

---

Exhibit N

Exhibit N

# EXHIBIT D

# Pro-Trump Woman Shot and Killed at U.S. Capitol Retweeted Attorney Lin Wood's 'Must Be Done' List Before She Died

**AARON KELLER** | Jan 6th, 2021, 11:19 pm | 552





A woman shot and killed during violent protests that aimed to stop the certification of **Joe Biden** as the next President of the United States has been identified as 35-year-old **Ashli Babbitt**. Washington, D.C. Metropolitan Police Chief **Robert J. Contee III** and the U.S. Capitol Police both confirmed Babbitt's name Thursday. Her relatives, including her husband, previously identified her Wednesday evening to media outlets such as KUSI-TV, an independent television station in San Diego, Calif., the *New York Post*, and various Washington, D.C. television stations.

Exhibit N

A Twitter account linked to Babbitt, which was reviewed extensively by Law&Crime Wednesday night, indicates that Babbitt was a staunch QAnon adherent who retweeted dozens of conspiracy-theory-laden missives originally posted by Georgia attorney **L. Lin Wood**.

Wood was at the helm of independent litigation in support President **Donald Trump** but lost every court case he has filed in support of keeping Trump in office.  Indeed, Babbitt's final tweet was a retweet of an original message by Wood. The tweet contained what Wood — and, ergo, Babbitt — deemed to be a "MUST BE DONE LIST before Congress meets today" to certify Biden's election. The list demanded the resignation of and charges brought against Vice President **Mike Pence** and former Deputy Attorney General **Rod Rosenstein**.  It also demanded the resignation of U.S. Supreme Court Chief Justice **John Roberts**. Babbitt issued the retweet of Wood's list without adding her own comment.



Most of Babbitt's Twitter activity consisted of retweets. Occasionally, however, she posted pictures of herself wearing

Exhibit N

QAnon clothing and parroting the QAnon rallying cry
"WWG1GWA," meaning "Where We Go One, We Go All."



Other tweets showed Babbitt's obvious and staunch support for
Trump. Images showed her standing next to mountains of Trump
flags and displaying a pile of Trump bumper stickers.

Ashli Babbitt Retweeted Lin Wood (cont.) Did Axelrod Lin Woods



**CommonAshSense** @Ashli_Babbitt · Sep 4, 2020

@RealDealAxelrod @HomiesForTrump together we will Make Cali Great Again!

FYI: this is a predominantly Spanish/African American area! I was there for 15 min and there we no less than 100 cars giving LOVE for TRUMP

I love both of you my fellow Americans! #TRUM2020

HAPPY FRIDAY

💬 1          ⟲ 3          ♡ 9



Her retweets also indicated she strongly supported what ultimately occurred at the U.S. Capitol Building. In one rare comment tweeted by her own hand, she answered "Jan 6, 2021" to the question, "When do we start winning???"

That was the date she lost her life.



Exhibit N

Other tweets suggested Babbitt was heavily invested in whatever was to occur Jan. 6th. In one retweet, she echoed President Trump's call to the capital starting at 11:00 a.m., two hours before Congress was scheduled by federal law to meet to certify Biden's win, for a so-called "Stop the Steal!" rally.



Another retweet appeared to suggest a "COUP" was being staged against Trump.



In yet another, she rubber-stamped the concept that Jan. 6th would "be 1776 all over again . . . only bigger and better."



Another retweet was about planes full of Trump supporters, presumably en route to Washington, D.C., the day before the rally and the violence at the Capitol Building,



But Babbitt's nearly incessant retweets of content posted by Lin Wood, which are almost too numerous to count, stand out among a broader sea of retweets from other conservatives due to their sheer volume. Among the bizarre messages by Wood — again, retweeted by Babbitt — were the following:

Pro-Trump Woman Shot and Killed at U.S. Capitol | Retweeted by Lin Wood | Law&Crime



↻ **CommonAshSense Retweeted**

**Lin Wood** @LLinWood · Jan 4                                            ○○○

Many have previously seen this bath video. I will not re-post it to avoid
violation of Twitter rules. There are THOUSANDS of videos of pedophilia
crimes committed by powerful people.

Chief Justice John Roberts must resign immediately. The storm is coming.
@realDonaldTrump



KAPPY'S LAST
UPLOAD/DEADMANS SWITCH

·

💬 4.4K              ↻ 36.9K              ♡ 83.9K              ⬆

---

↻ **CommonAshSense Retweeted**



**Lin Wood** @LLinWood · Jan 4                                            ○○○

If @realDonaldTrump orders military to seize documents, Chief Justice
Roberts, Rod Rosenstein, Nancy Pelosi, & many others will be immediately
arrested.

Documents must be seized before they are destroyed. Time is now of the
essence if this part of the Kraken is to be successful.

>  **Lin Wood** @LLinWood · Jan 4
>
> I am not the Kraken. @SidneyPowell1 is not the Kraken. The Kraken is
> located in several places.
>
> Use all available methods to urge @realDonaldTrump to immediately
> order release of documents filed under seal as "National Security" in
> cases below. Have military seize documents.

Exhibit N

Ashli Babbitt Retweeted Lin Wood to Do. By She She. | Law and Crime



**CommonAshSense Retweeted**

**Lin Wood** @LLinWood · Jan 4

Jeffrey Epstein used this same blackmail scheme of child rape & child murder to either further his own interests or those of any intelligence agency with whom he worked.

ALL who flew on his private jet or visited his island must be IMMEDIATELY interrogated & brought to justice.

💬 1.6K        🔁 32.7K        ♡ 81.6K        ⬆️

**CommonAshSense Retweeted**

**Lin Wood** @LLinWood · Jan 4

I believe Chief Justice John Roberts & a multitude of powerful individuals worldwide are being blackmailed in a horrendous scheme involving rape & murder of children captured on videotape.

I have the key to the files containing the videos. I have also shared this information.

💬 5.7K        🔁 43.9K        ♡ 92.3K        ⬆️

**CommonAshSense Retweeted**

**Lin Wood** @LLinWood · Jan 4

This tweet was an insurance policy. The evil forces behind this blackmail scheme of child rape & murder need to know that others have encryption key. I have procedure in place if I die in near term or any member of my family is harmed or threatened, key will be released by many.

> **Lin Wood** @LLinWood · Jan 1
>
> I have always seen myself as more of a giver of gifts than a receiver of them. If I had key to a treasure trove, I would share the key or the treasure with others. But I always try to give to others with discernment.
>
> "For many are called, but few are chosen."
> - Matthew 22:14 twitter.com/LLinWood/statu...

💬 2.5K        🔁 28.8K        ♡ 67.3K        ⬆️

Ashli Babbitt Retweeted Lin Wood Before She Died | Law & Crime

 **CommonAshSense** Retweeted

**Lin Wood** @LLinWood · Jan 4

The 10 intelligence agencies who have members employing this blackmail scheme include CCP, CIA, Mossad, FBI, MI6. The others are easily identifiable.

The agencies do not which of them was hacked by Lizard Squad.

@realDonaldTrump

💬 1.9K      🔁 28.4K      ♡ 70.2K

 **CommonAshSense** Retweeted

**Lin Wood** @LLinWood · Jan 4

I have no idea extent of blackmail scheme of raping & killing children but given the number of agencies involved, the hundreds of thousands of missing children, & the otherwise inexplicable actions of many powerful officials, celebrities, & business leaders, I fear the worst.

💬 2.9K      🔁 35.8K      ♡ 87.1K

 **CommonAshSense** Retweeted

**Lin Wood** @LLinWood · Jan 4

I have shared with several individuals the TRUTH I will be speaking to you. Killing me will NOT prevent the TRUTH from being revealed - it will only trigger its release by many others.

I ask @realDonaldTrump to immediately appoint an honest special prosecutor to pursue justice.

💬 1.4K      🔁 27.8K      ♡ 75.5K

 **CommonAshSense** Retweeted

**Lin Wood** @LLinWood · Jan 4

The blackmail targets are approached with a gun, a child, & a camera. The target is ordered to rape the child on video. The target is then ordered to shoot the child on video. The target is then owned & controlled by the blackmailers until blackmail evidence loses its value.

💬 5.5K      🔁 40K      ♡ 76.9K



Exhibit N



⇅ **CommonAshSense** Retweeted



**Lin Wood** @LLinWood · Jan 3    ⚬⚬⚬

Our country must face truth about its so-called leaders. The good, bad &
ugly truth. We must expose swamp inhabitants to disinfectant of sunshine.

No more dirty little "inside Beltway" secrets. We need truth. These two men
do not even tell us truth about their adopted children.



💬 5.4K          ⇅ 38.9K          ♡ 94.4K          ⬆

---

⇅ **CommonAshSense** Retweeted



**Lin Wood** @LLinWood · Jan 2    ⚬⚬⚬

I am disappointed. I thought Justices Roberts & Breyer would avoid public
scandal & simply resign. Only a fool wants their dirty laundry aired in public.

Maybe I should consider filing a formal motion for recusal & hang their
laundry on the clothesline to be exposed to sunlight?

>  **Lin Wood** @LLinWood · Jan 1
>
> Chief Justice John Roberts & Justice Stephen Breyer should resign from
> their positions on the United States Supreme Court by Noon ET
> tomorrow, January 2, 2021.
>
> Our Constitution is based on God's laws.
>
> Roberts & Breyer are not worthy to interpret our Constitution.

Exhibit N

The Lin Wood retweets could go on and on. Notably, Babbitt also retweeted the recently pardoned Lt. Gen. **Michael Flynn** and his pro-Trump attorney **Sidney Powell**.



Babbitt also retweeted a video call for supported to come to Washington issued by Donald Trump himself.  And, she retweeted an answer as to why she (and others) were going to D.C. on Jan. 6th, the date she ultimately died:  "Because my President asked me to."





Rep. **Markwayne Mullin**, an Oklahoma Republican, <u>told NBC News late Wednesday afternoon</u> that the woman shot and killed — who has since been identified as Babbitt — "died because she stormed through the door and an officer had to make the split decision and had to shoot her." Mullin said the officer's life is now changed forever and that he grieved for the family of the victim.

Exhibit N

But he also claimed he would "have a hard time believing these [protesters] are actual, true Trump supporters" because he did not think genuine Trump fans were capable of such behavior.

Babbitt served four tours with the U.S. Air Force as part of a total enlistment of 14 years, KUSI-TV reported. She "was a high level security official," the station said; however, the Air Force on Thursday said Babbitt served for 12 years — slightly less time — as a "Security Forces Controller." Officials said Babbitt held the "enlisted rank of senior Airman," WJLA-TV reported, and that Babbitt served across multiple branches: she was in the Air Force itself from 2004 to 2008, in the Air Force Reserves from 2008 to 2010, and in the Air National Guard from 2010 to 2016. People with her rank and title "are responsible for providing security at Air Force bases," the Air Force told WJLA.

NPR reported that Babbitt was unarmed when she was shot.

The Capitol Police on Thursday described her death this way:

> As protesters were forcing their way toward the House Chamber where Members of Congress were sheltering in place, a sworn USCP employee discharged their service weapon, striking an adult female. Medical assistance was rendered immediately, and the female was transported to the hospital where she later succumbed to her injuries. She has been identified as Ashli Babbitt.

Multiple videos circulating online showed a woman who appeared to be Babbitt amid a group of people in the capitol who crowded a doorway area which separated a stair well from a hallway. Several law enforcement officers appeared to be guarding the hallway beyond the doors; others dressed as officers appeared to

Exhibit N

be among the protesters in the stair well. The doorway windows appeared smashed, and the doors themselves appeared barricaded. A woman wearing a red, white, and blue backpack and who was draped with a Trump flag attempted to climb through one of the busted windows. A single shot rang out, and the woman fell backwards. Panic ensued. A voice audible on one video of the scene said the sound was "just a flash bang." A man in a suit and tie began arguing with people dressed as officers who were among the protesters. In other recordings, voices accused the police of "murdering" the woman. Other voices questioned why she was shot. A still image which circulated online showed a man wearing a Capitol Police patch applying pressure to the woman's wound as she bled over his hand through her nose and mouth. Additional recordings showed emergency resuscitation efforts by who appeared to be Capitol Police officers. The officers argued with protesters that they could not attend to the woman unless the protesters moved out of the way.

Lin Wood's Twitter account was suspended early Thursday morning.

[featured image via Ashli Babbit/Twitter]

*Editor's note: this report has been updated after its initial publication to contain a verbal description of the videos and photos circulating online and to note that Wood's account was suspended. It was updated again to add official confirmation of Babbitt's identity and to clarify official confirmation of her military service.*

*Have a tip we should know?* [tips@lawandcrime.com](mailto:tips@lawandcrime.com)

Exhibit N

# EXHIBIT E



**This land is your land**

# Capitol attackers have long threatened violence in rural American west

Supported by



<span style="color:red">About this content</span>

**Christopher Ketcham**

Sat 9 Jan 2021 05.30 EST

When the full story of the 6 January storming of the US Capitol building is told, historians will have to make sense of what might seem an odd footnote. The two most prominent rightwing militia groups that participated in the mob onslaught on Congress – the Three Percenters, based in Idaho, and the Oath Keepers, based in Nevada – cut their teeth in obscure corners of the American west, where for close to a decade they have threatened violence against federal employees and institutions that steward the nation's public lands.

Exhibit N

"The mob violence that swarmed the halls of the Capitol building and other government offices flows from a series of smaller armed insurrections by domestic terrorists across the west," says Erik Molvar, executive director of the Western Watersheds Project, a non-profit that advocates for environmental regulation of public lands.

Time after time in Idaho, Nevada and Utah, the Three Percenters and Oath Keepers, paramilitary organizations formed in the wake of Barack Obama's election in 2008, have come to the rescue of ranchers, miners and loggers who have violated federal environmental regulations on the public domain but who the militias said were innocent commoners oppressed by a vicious state apparatus.

Brandishing arms and threatening their use against federal officials, the militias have enjoyed spectacular successes – with the Capitol only the latest example.



| ✉ Enter your email address | Sign up |

Sign up for monthly updates on America's public lands

The Three Percenters and Oath Keepers came to public attention in 2014, when they encamped with the notorious anti-government rancher Cliven Bundy. The recalcitrant old cowboy refused to remove his trespassing cattle from public lands around his 160-acre spread in Bunkerville, Nevada.

Holed up in his ranch house, Bundy issued a statement decrying "federal tyranny" and vowed "to do whatever it takes" to protect his "property", meaning the public land he was utilizing.

He put out a call for militia units. The Three Percenters and Oath Keepers, with other loosely affiliated citizens, arrived from across the nation with assault rifles and Gadsden flags – the ones with the coiled snake that says "Don't Tread on Me" (and which were also seen on 6 January in the halls of Congress). In a sprawl of tents and guard posts ringing Bundy's ranch, the militiamen established Liberty Camp. They spoke of Bundy as a modern-day hero of the west, a true-grit cowboy, defiant and free.

Soon a crowd of Bundyites numbering in the hundreds shut down a freeway in both directions, their rifles trained on federal officers gathered behind a line of SUVs. The standoff continued for two hours – until the government backed down.

Exhibit N



▲ Cliven Bundy in Las Vegas on 10 January 2018. Photograph: LE Baskow/AP

By the morning of 13 April, officials announced that due to "threats to public safety" it would immediately cease the removal of Bundy's cattle herd.

Two years later, the Bundy clan, with Cliven's son Ammon Bundy in the lead, memorably stormed and occupied the Malheur national wildlife refuge in Oregon, holding it at gunpoint for 40 days, again in protest of federal environmental regulations and the alleged oppression of local ranchers.

With Ammon were members of the Three Percenters and Oath Keepers, armed to the teeth. Federal law enforcement treated them with kid gloves, while Ammon promised a violent response if authorities attempted to remove his crew. The FBI stood back, afraid, and waited Ammon out. Federal authorities allowed the Bundyite militiamen to come and go from the refuge as they pleased, arguing – as government officials would later explain – that any confrontation would lead to bloodshed. The occupiers were even allowed to receive mail.

Meanwhile, federal employees who worked at Malheur and lived in the nearby town of Burns were being stalked. Having got hold of their street addresses, Ammon's militiamen - wandering in and out of the government facility they had occupied at gunpoint - went door to door issuing threats to the employees, telling them not to return to the refuge. Burns became a terrorized town. At least one Malheur employee was targeted for kidnapping. The refuge's 17 employees, traumatized, fled the area,

Exhibit N

living at government expense in hotels across the state for weeks, a relocation effort that cost taxpayers $2m.

The question lingered of how law enforcement might have acted at Malheur if it had been seized by Black Panthers. Or, more appropriately, by militiamen representing the native and historically oppressed Paiutes.

The siege ended in the death of one occupier, and the arrests of a dozen perpetrators, but in the end, not one member of the Bundy clan was successfully prosecuted, and only a few associates of the militia groups that backed them went to jail.

Today, on the public lands around Bunkerville, Cliven Bundy's cows continue to roam freely, trampling the fragile desert landscape, and he has yet to pay the fines he owes. Cliven won – with the help of the same militiamen who stormed the Capitol.

As Molvar of the Western Watersheds Project observed: "The rarity of arrests and indictments, and the botched prosecutions, that followed in the wake of these acts of terrorism in the west sent a message that law enforcement will turn a blind eye to 'alt-right' lawlessness by overwhelmingly white perpetrators."

In this analysis, years of selective law enforcement have privileged politically motivated crimes from the extreme right against government agencies, public lands and public property. And this has enabled and empowered militant rightwingers like the Bundys, the Three Percenters and the Oath Keepers to act with impunity.

Cheerleading the attack on the Capitol from afar, Cliven Bundy had this to say: "At Bundy Ranch, we had a job to do, go get it done, and We the People went forward and finished the job."

He added: "Today President Trump had hundreds of thousands of people and he pointed the way – pointed towards Congress and nodded his head go get the job done."

## Since you're here ...

... we have a favour to ask. Millions are flocking to the Guardian for open, independent, quality news every day. Readers in all 50 states and in 180 countries around the world now support us financially.

As the inauguration approaches, America has the opportunity for a fresh start. Despite unprecedented threats to democracy and bitter divisions, there are also reasons for hope. In the coming months, the US will rejoin the Paris climate accord. And the new leadership has pledged to put science first in its fight against the pandemic. Also,

Exhibit N

America's first female, first Black and first Asian vice-president will be sworn into office, taking the nation a step further toward building a more inclusive government.

The incoming administration has an opportunity to steer the nation toward a path of greater equality and justice. But every government needs to be invigilated. And this will be no different. The Guardian will do that. And we will continue to report on the corrosive forces that will continue to threaten US democracy, long after Donald Trump has left office – from a misinformation crisis to a surge in white nationalism to a crackdown on voting rights.

We believe everyone deserves access to information that's grounded in science and truth, and analysis rooted in authority and integrity. That's why we made a different choice: to keep our reporting open for all readers, regardless of where they live or what they can afford to pay. In these perilous times, an independent, global news organisation like the Guardian is essential. We have no shareholders or billionaire owner, meaning our journalism is free from commercial and political influence.

If there were ever a time to join us, it is now. Your funding powers our journalism. **Make a gift now from as little as $1. Thank you.**

**Support the Guardian** → ⬭ **Remind me in March** ⬭    

Exhibit N

# EXHIBIT F

Case 1:21-cv-03208-DLI-694-ECB Document 35-7 Filed 05/03/21 Page 991 of 677 #: 1280

# The Washington Post

# A mob insurrection stoked by false claims of election fraud and promises of violent restoration

By **Greg Miller**, **Greg Jaffe** and **Razzan Nakhlawi**

Jan. 9, 2021 at 5:49 p.m. PST



The problem with devotion to a prophet of falsehoods is that reality eventually intrudes.

By mid-December, President Trump's fraudulent claims of a rigged election were failing in humiliating fashion. Lawsuits were being laughed out of courts. State officials, including Republicans, were refusing to bend to his will and alter the vote. And in a seemingly decisive blow on Dec. 14, the electoral college certified the win for Joe Biden.

It was a disorienting sequence for legions of supporters who believed Trump's lies that the election had been stolen from him but that he would prevail and reclaim it — especially those who had already descended into deeper, more disturbing conspiracies.

Some clung to the hope that Vice President Pence would use his procedural role on Jan. 6 to write an alternative ending. But as it became clear that Pence would refuse with the backing of most Senate Republicans, Trump's most ardent abettors began planning the siege of the Capitol.

"War it is," read a post on TheDonald.win, a rabid pro-Trump forum that exploded in fury at post-election realities. "We kill now," said another user identified only as "AngloMercia."

Exhibit N

A mob insurrection stoked by false claims of election fraud and promises of violent restoration - The Washington Post    1/19/21, 10:48 AM

Sam Andrews, a Missouri gun-range manager and former member of the Oath Keepers movement, appeared on a video that spread rapidly on right-wing sites urging followers to descend on Washington "armed, in large groups." A Trump army, Andrews said, needed to arrive "en-masse in D.C., armed, demanding, not asking, that we get a peaceful resolution on these voter corruption issues."

By Dec. 19, Trump was, as he so often does, feeding these flames with accelerant. "Big protest in D.C. on January 6th," he tweeted. "Be there, will be wild!"

Come they did. And by day's end, insurrectionist fantasies nursed online culminated in one of the most harrowing, horrifying events in the 244-year history of U.S. democracy.

The sacking of the Capitol was enabled by a host of factors, including catastrophic security failures now being investigated. But the temporary seizure of a global seat of power was, at its core, an outgrowth of delusional and destructive forces cultivated online and unleashed by the president.

Among the dead were Brian D. Sicknick, a U.S. Capitol Police officer, and Ashli Babbitt, an Air Force veteran whose social media postings trace a descent into deep-state conspiracies.

Some Americans have traveled a path to radicalization that reminds current and former U.S. national security officials of the indoctrination of Islamist militants.

Cindy Storer, a former CIA counterterrorism analyst, said that adherents in both cases were drawn to an ideology that emphasizes a loss in control or status. "We had this glorious past and it got screwed up and now we need to do something about it," she said, summarizing the mind-set. What makes such movements turn violent, she said, is the additional belief that some other entity — usually based on race, religion, or nationality — is to blame for perceived humiliation.

"The world used to be a better place and it's someone else's fault that it isn't any longer," Storer said, noting that Trump's entire approach to politics employs this pervasive sense of victimhood and demonization of enemies.

"Trump played on and amplified these messages" leading up to the attack on the Capitol, she said. The conspiracy theories that he put forward, echoed by allies and prominent Republican lawmakers, morphed for thousands of followers into a call for action.

Exhibit N

In Greenville, N.C., cardiac sonographer Gena Shinn hung on the president's pronouncements, and by early December had reached what seemed an inescapable conclusion: Her country, the world's greatest democracy, was in peril.

"You have just witnessed a coup," she wrote on Facebook on Dec. 9, "the end of our constitutional republic." In the days that followed, even as Shinn shopped for Christmas presents for her 13-year-old son and decorated her home for the holidays, she spent hours online following Trump's desperate maneuvers to reverse the election.

At times, she had faith that he would prevail. "EVERYONE...CALM DOWN. NO NEED TO PANIC," she wrote when the Supreme Court rejected a lawsuit brought by Republican-led states alleging election fraud. Electoral college delegates might reject the vote tallies on Dec. 14, she prayed. She read a report on Parler, a right-wing alternative to Twitter, suggesting that Biden was a member of the KKK and another promising that Trump's director of national intelligence would soon release a dossier documenting the full extent of foreign interference in the 2020 election.

But the DNI's bombshell report never came, and Shinn's attention shifted to the Jan. 6 protest in Washington that Trump depicted as a final stand against tyranny. "We all need to stand up and fight back. NOW is our time," she wrote in response to posts from groups such as Wildprotest.com touting the rally.

In California, 3,000 miles away, Babbitt, a former Air Force airman and co-owner of a struggling swimming pool supply company, was consumed by the same apocalyptic pronouncements. Her Twitter feed starts in November with retweets, but builds to a conspiratorial crescendo.

"Nothing will stop us...They can try and try but the storm is here and it is descending upon DC in less than 24 hours," she wrote the day before she was shot and killed while trying to breach a police barrier in the Capitol. "Dark to light!" her message ended.

Exhibit N

Case 1:Case:123399-Dcl-l694FCBocDmnmeht1135-Tiled1e1/05/03/21aPaBe:994Rdgle67#: 1283

By early January, raiding Congress had emerged as a clear objective in dozens of far-right forums.

"If Congress illegally certifies Biden," a Jan. 4 post on TheDonald.win said, "Trump would have absolutely no choice but to demand us to storm Congress and kill/beat them up for it." Some referred to Trump as GEOTUS: "God Emperor of the United States."

Discussion boards filled with messages on implements to bring for violent confrontation, including riot shields and flagsticks that could also serve as bayonets or clubs for breaking windows. Some sought guidance on how to smuggle weapons into the District of Columbia with its strict gun possession restrictions.

"There is not enough cops in DC to stop what is coming," wrote one user.

Trump continued to goad them. "JANUARY SIXTH, SEE YOU IN DC!" he tweeted on Dec. 30. But his scheme to derail certification would have remained in the realm of fringe fantasy were it not legitimized by some Republican lawmakers.

When Sen. Josh Hawley (R-Mo.) declared his intent to object to accepting the Biden victory in Arizona, Sen. Ted Cruz (R-Tex.) and 11 other Republican senators fell in line behind him.

Their decisions to back Trump's baseless charges further convinced fanatics of their cause's righteousness, said Bruce Hoffman, a terrorism expert and senior fellow for homeland security at the Council on Foreign Relations.

Hoffman described radicalized Trump loyalists as a floating force of intimidation that Trump has been able to mobilize against shifting adversaries and targets. " 'End the lockdown' translates very smoothly into 'stop the steal,' " Hoffman said, referring to rallies last year by Trump supporters against state measures to contain the coronavirus.

The 2017 protests in Charlottesville showed the potential of such a mob to overwhelm law enforcement, Hoffman said. The occupation of the Michigan Capitol last spring, and the exposed plot to take the governor hostage, provided templates for this month's assault in Washington.

"When you have a president pushing them to descend on state capitols and take them over with few consequences," Hoffman said, "the next logical step is to move from states' to the nation's capitol."

Exhibit N

Case 1:Case:1:21393-cv-01694-DLC694ECRFDocumeDtc135-1Filed 1:05/03/21 3-Pagfiled 095/o3/6177#: 1:284

One after another, far-right groups declared their violent intentions.

The "Three Percenters" — a name based on the erroneous belief that only 3 percent of U.S. colonists fought the British — posted a short manifesto expressing their preparedness "to take back our country from the pure evil that is conspiring to steal our country away from the American people."

The statement mentioned Cruz and praised Trump lawyers Rudolph W. Giuliani, Sidney Powell and Lin Wood as inspirational figures in this looming battle. But it voiced particular reverence for former U.S. Army Gen. Michael Flynn, who after being pardoned by Trump appeared at rallies, spread falsehoods about the election and urged using the U.S. military to reverse the election outcome.

"We are ready to enter into battle with General Flynn leading the charge," the Three Percenters' statement said.

On the eve of the assault on the Capitol, Flynn delivered an incendiary speech riddled with falsehoods, claiming that more dead voters had cast ballots for Biden than filled the cemeteries of Gettysburg and Normandy.

He then issued a veiled threat to members of Congress. "Those of you who are feeling weak tonight, those of you who don't have the moral fiber in your body — get some tonight because tomorrow we the people are going to be here," Flynn said.

The next morning, Giuliani appeared before the same crowd and called for a "trial by combat." Then, as Pence made his way to the Senate chamber, Trump took the stage — behind sheets of bulletproof glass — and instructed the sea of red-clad supporters to follow the vice president and refuse to accept anything short of victory.

"You'll never take back our country with weakness," Trump said. "You have to show strength, you have to be strong."

Clint Watts, a former FBI counterterrorism analyst, compared the rhetoric of Flynn, Giuliani and Trump with the radicalizing messages from leaders of al-Qaeda and the Islamic State that so worried U.S. security officials in the aftermath of the 9/11 attacks.

"A decade ago, we worried [about] al-Qaeda ideologues inciting violence with speech, sending terrorists into places like [the] Capitol," Watts said in a Jan. 7 post on Twitter. "What did we observe over the past week by our elected leaders, their surrogates and their supporters?"

Exhibit N

Case 1:Case:1:23399-JDL1694-ECR Document 135-7 File 01/05/03/21 Page 996 of 667 # 1:285

Like many who gathered in Washington on Wednesday, Shinn and Babbitt weren't especially interested in the speeches from Trump and his allies, which were just restatements of the screeds they had already absorbed on social media.

In an interview, Shinn said she came to Washington for one purpose: to confront lawmakers who Trump insisted had stolen the election. "We went in to storm the Capitol so our voices would be heard," she said.

Before Trump had even finished speaking, Shinn began marching down the Mall toward the Capitol dome. She was joined in the crowd by Babbitt and Thomas Baranyi, a 28-year-old from New Jersey, who wore a Trump baseball cap and a New York Giants sweatshirt.

As he marched, Baranyi, in an interview posted online, recalled gazing up at the U.S. Justice Department building. Through the windows he said he could see federal workers "filming us and laughing at us."

Babbitt was filming herself for her social media followers: "We're walking to the Capitol in a mob. There's an estimated 3 million people here today," she said, using an utterly fictitious number.

A police officer fired and struck Babbitt, who fell back into Baranyi. Her body started to spasm. Blood spurted from her neck, nose and mouth, Baranyi said in an interview posted online. Minutes later Baranyi, who had come to Washington animated by Trump's fantasies, described in a trembling voice the gory reality he had just encountered.

"It was a joke to them until we got inside and then all of a sudden guns came out. We have to do something. People have to do something, because this could be you or your kids," he said, holding up his hand, still coated in Babbitt's blood.

For all its horror, experts said the event could have been — and perhaps was intended to be — scarier and deadlier.

Law enforcement officials have recovered suspected pipe bombs. Images showed armored people inside the Capitol brandishing plastic bands used to cuff prisoners — an indication, Hoffman said, that some intended to take lawmakers hostage.

Exhibit N

Rep. Adam B. Schiff (D-Calif.), a constant target of Trump's ire for his role in the president's impeachment, said that during lawmakers' frantic evacuation he was urged to stay out of sight of the mob by a worried Republican colleague.

"I know these people and can talk to them," the Republican said, according to a statement from Schiff, who did not identify his GOP counterpart. "You are in a whole different situation."

Shinn, who said a police officer pushed her down the Capitol's steps, still clung to the belief that she had been engaged in a righteous, peaceful protest sanctioned by the president.

In its aftermath, she embraced a new delusion advanced by some Republican lawmakers that the violence was the work of leftists who had infiltrated an otherwise peaceful gathering.

"We were unarmed, American citizens who came to Washington to have our voices heard, and now we're being called rioters and domestic terrorists," she said in an interview.

She spent the day after the riot driving around Washington with a friend flying a Trump and QAnon flag from the back of their convertible. She was bruised in her tumble down the steps, but clung as tightly as ever to the president's evidence-free conspiracies.

"We were not only robbed of our vote, we have had our voices silenced," she wrote on her Facebook page as she prepared to return home. "The fight is NOT over…"

.

*Devlin Barrett, Dalton Bennett and Julie Tate contributed to this report.*

*Clarification: An earlier version of this story included descriptions of Gena Shinn witnessing Ashli Babbitt's shooting, based on accounts provided by Shinn in interviews. After this story was published, Shinn recanted those statements, stating that she had misled The Post about witnessing Babbitt's shooting and entering the Capitol. The descriptions have been removed.*

Exhibit N

## Comments are now closed

The Washington Post may turn off the comments on stories dealing with personal loss, tragedies, or other sensitive topics. For more details, please see our discussion guidelines.

Exhibit N

# EXHIBIT G

What is QAnon? What does WWG1WGA mean? The conspiracy theory that explains everything and nothing - CBS News

Case 1:16-cv-01398-TWP-DDoouumeenntt 6253-2 FFiileedd 001/2252221 PPaggee 21000 PPff 11677 #: 1289

Download The CBS News App | Sign Up For Newsletters | Stream CBSN Live | Assault On The U.S. Capitol | Coronavirus Crisis | Biden Transition | Stimulus Checks | Unemployer

NEWS    U.S. CAPITOL ASSAULT    SHOWS    LIVE

# What is the QAnon conspiracy theory?

NOVEMBER 24, 2020 / 10:26 AM / CBS NEWS

What started as a fringe movement among President Trump's supporters, confined to the shadier corners of the internet, has taken a mainstream turn. The QAnon conspiracy theory started on 4chan, the bulletin board known for creating and spreading memes, but has moved to larger social media platforms. Facebook has taken action against QAnon groups and pages, while Twitter removed several thousand QAnon-linked accounts in 2020.

The FBI has warned that fringe conspiracy theories like QAnon pose a growing domestic terrorism threat.

What is the QAnon conspiracy theory? What do its followers believe? Those questions have become more difficult to answer as the movement has expanded since its inception in 2017.

---

**Sign up for Breaking News Alerts**

Be in the know. Get the latest breaking news delivered straight to your inbox.



By signing up, you agree to

---

## The story of Q

QAnon purports that America is run by a cabal of pedophiles and Satan-worshippers who run a global child sex-

Exhibit N

comes from a high-ranking government official who posts cryptic clues on 4chan and the even more <u>unfettered site 8chan</u> under the name "Q."

President Trump rally -- Tampa, Florida



Supporters of President Trump shout down a CNN news crew before a rally Tuesday, July 31, 2018, in Tampa, Fla.
AP

That's the central gist of the theory. The rest is open to some degree of interpretation, which is necessary because Q's posts tend to read like riddles. But YouTube videos created by QAnon believers help fill in the gaps and create a storyline that's more-or-less comprehensible.

QAnon exists as a kind of parallel history, in which <u>a "deep state"</u> took over decades ago. An all-encompassing theory of the world, it appears to tie together and explain everything from <u>"Pizzagate"</u> to ISIS to the prevalence of mass shootings and the JFK assassination.

It claims the military, supposedly eager to see the deep state overthrown, recruited President Trump to run for president. But the deep state, which controls the media, quickly tried to smear him through "fake news" and unfounded allegations of collusion with Russia. It goes on to insist that despite the deep state's best efforts, however, President Trump is winning, and that Q is releasing sanctioned leaks to the public in order to galvanize them ahead of "The Storm," which is the moment when the deep state's leaders are arrested and sent to Guantanamo Bay. QAnon believers have called this process "The Great Awakening."



Exhibit N

## Enter "the storm"

The storm takes its name from President Trump's enigmatic comment from October 2018 about "the calm before the storm." Q began posting soon after and said that the storm Mr. Trump referenced is a coming series of mass arrests that would end the deep state forever.

In QAnon lore, President Trump was secretly working with special counsel Robert Mueller to bring the deep state down, and the storm is a kind of Judgment Day in which the evildoers are punished and the faithful are redeemed. Q has repeatedly suggested that the storm would hit in the very near future and has even said certain people would be arrested at certain dates.

When those dates come and go without any arrests, Q says that they needed to be delayed for one reason or another, but that President Trump still has the situation well in hand.

## Bakers and breadcrumbs

Q's posts tend to be either vague or totally incomprehensible, but QAnon believers are more than happy to try and decipher them. Last year, for example, Q posted a photo of an unnamed island chain. Eager to divine the reasoning behind the post, QAnon adherents tried to "prove" that the photo must have been taken on Air Force One and thus that Q was traveling with the president.

The Q posts are known to the faithful as "breadcrumbs." The people who then try to figure out what they mean are called "bakers." According to The Daily Beast's Will Sommer, QAnon believers also spend a lot of time trying to figure out who in the government is a "white hat" Trump supporter and who is a "black hat" in league with the deep state. Their rallying cry is "where we go one, we go all," a line from the 1996 Jeff Bridges sailing adventure "White Squall" that they misattribute to President Kennedy.

The phrase is frequently abbreviated to "WWG1WGA," which Roseanne Barr — one of several celebrity QAnon supporters — tweeted in June 2018. Former Red Sox pitcher and current right-wing radio host Curt Schilling has also promoted QAnon online.

## Q's identity

The name refers to Q-level clearance at the Energy Department. But who's behind the posts is anybody's guess. According to Sommer, the QAnon faithful sometimes point to former national security adviser Michael Flynn and White House aide Dan Scavino as possibilities. Others believe it's Mr. Trump himself. Another theory is that John F. Kennedy Jr. faked his death and now posts on 8chan as QAnon.

On November 3, Election Day, 8chan (now 8kun) administrator Ron Watkins resigned from his post. Q did not post for the next week, raising questions about a connection.

## Evolution of QAnon

As the QAnon movement has migrated to more mainstream social media platforms such as Facebook and Twitter, it has developed new conspiracy theories that have helped subsume more followers.

Many QAnon supporters believe that President Kennedy was set to reveal the existence of the secret government when he was assassinated. They also believe President Reagan was shot on the deep state's orders, and that all the

Exhibit N

QAnon believers have also latched onto other conspiracies, such as the 9/11 "truther" movement and the Rothschild family owning the world's banks. Different QAnon followers identify with different conspiracies, though they all believe in the central conspiracy of child sex trafficking rings perpetrated by members of the Democratic party.

Most recently, followers have staged several #SaveOurChildren demonstrations.

"It seems like they've hijacked the 'Save Our Children' movement, infiltrating it and putting their spin on it," says Daryl Johnson, who previously researched right-wing terrorism for the Department of Homeland Security. "Think about children and how vulnerable they are. The issue really tugs at the hearts of anybody. But they're linking it to their conspiracy theories, which are crazy and very dangerous."

According to political science professor Joe Uscinski, who studies conspiracy theories, "The beliefs themselves are almost an incitement to violence. I mean, there isn't anything worse you can say about your political competitors than that they are satanic sex traffickers who molest and eat children."

"It has a lot of properties that make it more like a cult," Uscinski said.

## QAnon in Congress

At least 19 House Republican candidates who support or have elevated the QAnon movement were on the November ballot, according to tracking by Media Matters. Two QAnon supporters were elected to the United States House of Representatives:

- Marjorie Taylor Greene won her race for Georgia's 14th congressional district
- Lauren Boebert won her race for Colorado's 3rd congressional district

## QAnon on social media

QAnon spread from its fringe beginnings on 4chan and 8chan to larger social media platforms such as Facebook, Twitter, and YouTube. These platforms have faced increasing pressure to crack down on these accounts and groups, but have found it difficult to do so.

"QAnon is not one organization that you can just cancel or remove," says CNET senior producer and CBSN correspondent Dan Patterson.

"For a long time they did little" to moderate QAnon activity, says Patterson. Only in the summer and fall of 2020 have the larger platforms — Facebook, Twitter, and YouTube — taken stronger action, removing groups and banning accounts.

Still, Patterson says, these platforms provide little information beyond numbers of accounts affected. "These organizations are heavily driven by algorithms, and these algorithms really favor engagement, which QAnon is really good at doing."

*First published on August 2, 2018 / 6:00 AM*

© 2018 CBS Interactive Inc. All Rights Reserved.

## Trending News

House impeaches Trump for Capitol riot in historic rebuke    Live Updates: Trump faces Senate trial after historic second impeachment    Biden team prepares push for COVID relief bill expected to cost trillions    Biden to extend pause on federal student loan payments

CCPA Notice

Exhibit N

What is QAnon? What does WWG1WGA mean? The conspiracy theory that explains everything and nothing - CBS News

Case 1:21-cv-01169-MSBD Document 35-2 Filed 05/03/21 Page 1004 of 1677 #: 1293



**Getting this Treasure is impossible! Prove us wrong**

HERO WARS | FREE ONLINE RPG     PAID

**Before You Renew Amazon Prime, Read This**

CAPITAL ONE SHOPPING     PAID

**These Cars Are So Loaded It's Hard to Believe They're So Cheap**

LUXURY SUVS | SEARCH ADS     PAID

**Forget A Telescope, Get This Pocket Lens Instead**

STARSCOPE     PAID

**The Most Addictive Strategy Game of 2020**

TOTAL BATTLE - TACTICAL GAME ONLINE     PAID

**New Senior Apartments Coming to Los Angeles Are Turning Heads**

SENIOR LIVING | SEARCH ADS     PAID



**Challenge Your Brain With This Must-Play Strategy Game. No Install.**

FORGE OF EMPIRES     PAID

**If you have a mouse, you have to try this new game. No Install.**

BASE ATTACK FORCE     PAID



**Where should you invest $1,000 right now?**

THE MOTLEY FOOL     PAID

**20 Questions to Tell If You're Ready to Retire**

SMARTASSET     PAID

**This Doctor's Bone Loss Discovery Is Leaving Patients Speechless**

IMD     PAID

**Finally - New Clear, Comfy, Sociable Mask, With Anti-Fog Arrives In United…**

CRYSTAL SHIELD     PAID

Exhibit N

What is QAnon? What does WWG1WGA mean? The conspiracy theory that explains everything and nothing - CBS News

Case 1:21-cv-11110-MCBD Document 64-2 Filed 05/03/21 Page 1005 of 1677 #: 1294

**Look For Any High School Yearbook, It's Free**

CLASSMATES.COM

PAID

**Check Your Tone This Winter**

Don't let winter make your writing cold. Check your tone for free with Grammarly.

GRAMMARLY

PAID

**Man Who Bought Amazon at $48 Says Buy TaaS Now**

Wall Street legend Whitney Tilson says there's a huge new tech trend coming – and he's revealing his #1 pick for free.

EMPIRE FINANCIAL RESEARCH

PAID

**Need A Laptop? Here Are The Top Ones!**

STUFF ANSWERED

PAID

**The Most Relaxing Farm Game of 2020. No Install**

Enjoy farming, stock up and make friends. Taonga is a whole world full of adventure!

TAONGA: THE ISLAND FARM

PAID

**Breath And Speak Easily For Hours With This Nanotech Face Mask**

SPACE MASK

PAID

**You're Allowed To Do Anything You Want In This Game**

RAID SHADOW LEGENDS

PAID

**You Will Forget About Sleep With This War Game**

15 unique Captains, 30 professions, and 100+ monsters. Assemble the most effective army!

TOTAL BATTLE - ONLINE STRATEGY GAME

PAID

**Executions of federal inmates on pause**

CBS NEWS

**Some Democrats accuse GOP of aiding rioters**

CBS NEWS

**Why Did No One Tell Seniors In California About This?**

BILL CRUNCHER

PAID

**Is This $47 Monocular Better Than $3000 Telescopes?**

The most advanced miniature telescope that

**What Happens if You Eat Turmeric Every Day May Surprise You**

**The Israeli-made face mask Everyone Is Talking About in the US**

Exhibit N

What is QAnon? What does WWG1WGA mean? The conspiracy theory that explains everything and nothing - CBS News

Case 1:21-cv-02380-CJN Document 63-2 Filed 05/03/21 Page 1006 of 1677 #: 1295

**All Senior Drivers Should Claim This Large Reward This January (Check If You Qualify)**

COMPARISONS.ORG

PAID

**If You Like to Play, this Fantasy Game is a Must-Have in 2020. No Install.**

ELVENAR

PAID

THE JERUSALEM POST

PAID

Copyright © 2021 CBS Interactive Inc. All rights reserved.

Privacy Policy    California Privacy/Information We Collect    Do Not Sell My Personal Information    Ad Choice    Terms of Use    Mobile User Agreement    About    Advertise    Closed Captioning    CBS News Store    Site Map    Contact Us    Help

Exhibit N

# EXHIBIT H

Case 1:21-cv-01169-TCB   Document 35-2   Filed 05/03/21   Page 1008 of 1677

BBC 　○　| Home | News | Sport | More ▼ 　　🔍

US & Canada

ADVERTISEMENT

# Trump riots: 65 days that led to chaos at the Capitol

**By Shayan Sardarizadeh and Jessica Lussenhop**
BBC Monitoring and BBC News Washington

🕐 10 January

**US Capitol riots**



GETTY IMAGES

**Many were taken by surprise by the events in Washington, but to those who**

Exhibit N

**closely follow conspiracy and extreme right groups online, the warning signs were all there.**

At 02:21 Eastern Standard Time on election night, President Trump walked onto a stage set up in the East Room of the White House and declared victory.

"We were getting ready to win this election. Frankly, we did win this election."

His speech came an hour after he'd tweeted: "They are trying to steal the election".

He hadn't won. There was no victory to steal. But to many of his most fervent supporters, these facts didn't matter, and still don't.



### Donald J. Trump ✔
@realDonaldTrump

000

Some or all of the content shared in this Tweet is disputed and might be misleading about an election or other civic process. Learn more

## We are up BIG, but they are trying to STEAL the Election. We will never let them do it. Votes cannot be cast after the Polls are closed!

⚠ Learn about US 2020 election security efforts

Sixty five days later, a motley coalition of rioters stormed the US Capitol building. They included believers in the QAnon conspiracy theory, members of "Stop the Steal" groups, far-right activists, online trolls and others.

On Friday 8 January - some 48 hours after the Washington riots - Twitter began a purge of some of the most influential pro-Trump accounts that had been pushing conspiracies and urging direct action to overturn the election result.

Then came the big one - Mr Trump himself.

The president was permanently banned from tweeting to his more than 88 million followers "due to the risk of further incitement of violence".

The violence in Washington shocked the world and seemed to catch the authorities off guard.

Exhibit N

But for anyone who had been carefully watching the unfolding story - online and on the streets of American cities - it came as no surprise.

---

The idea of a rigged election was seeded by the president in speeches and on Twitter, months before the vote.

On election day, the rumors started just as Americans were going to the polls.

A video of a Republican poll watcher being denied entry to a Philadelphia polling station went viral. It was a genuine error, caused by confusion about the rules. The man was later **allowed into the station** to observe the count.



**Will Chamberlain**
@willchamberlain

A poll watcher in Philly was just wrongfully prevented from entering the polling place

#StopTheSteal

Exhibit N

5:19 AM · Nov 3, 2020                                    ⓘ

♡ 34.9K        ◯ 27.3K people are Tweeting about this

The BBC is not responsible for the content of external sites.

**View original tweet on Twitter**

But it became the first of many videos, images, graphics and claims that went viral in the days that followed, giving rise to a hashtag: #StopTheSteal.

The message behind it was clear - Mr Trump had won a landslide victory, but dark forces in the establishment "deep state" had stolen it from him.

In the early hours of Wednesday 4 November, while votes were still being counted and three days before the US networks called the election for Joe Biden, President Trump claimed victory, alleging "a fraud on the American public".

Mr Trump did not provide any evidence to back up his claims. **Studies carried out for previous US elections** have shown that voter fraud is extremely rare.

Exhibit N

GETTY IMAGES

By mid-afternoon a Facebook group called "Stop the Steal" was created and quickly became one of the fastest-growing in the platform's history. By Thursday morning, it had added more than 300,000 members.

Many of the posts focused on unsubstantiated allegations of mass voter fraud, including manufactured claims that thousands of dead people had voted and that voting machines had somehow been programmed to flip votes from Mr Trump to Mr Biden.

- **'Stop the steal': The deep roots of Trump's 'voter fraud' strategy**

- **US Election 2020: The 'dead voters' in Michigan who are still alive**

- **US Election 2020: Trump claims about Dominion machines fact-checked**

But some of the posts were more alarming, speaking of the need for a "civil war" or "revolution".

By Thursday afternoon, Facebook had taken down Stop the Steal, but not before it had generated nearly half a million comments, shares, likes, and reactions.

Dozens of other groups quickly sprang up in its place.

Exhibit N

GETTY IMAGES

The idea of a stolen election continued to spread online and take hold. Soon, a dedicated Stop the Steal website was launched in a bid to register "boots on the ground to protect the integrity of the vote".

––––––––––––––

On Saturday 7 November, major news organisations declared that Joe Biden had won the election. In Democratic strongholds, throngs of people took to the streets to celebrate. But the reaction online from Mr Trump's most ardent supporters was one of anger and defiance.

They planned a rally in Washington DC for the following Saturday, dubbed the Million MAGA (Make America Great Again) March.

Trump tweeted that he might try to stop by the demonstration and "say hello".

Exhibit N

GETTY IMAGES

Previous pro-Trump rallies in Washington had failed to attract large crowds. But thousands gathered at Freedom Plaza that sunny morning.

One extremism researcher **called it** the "debut of the pro-Trump insurgency".

As Trump's motorcade drove through the city, supporters screaming with delight rushed to catch a glimpse of the president, who beamed at them wearing a red MAGA hat.

REUTERS

While mainstream conservative figures were present, the event was dominated by far-right groups.

Dozens of members of the far-right, anti-immigrant, all-male group Proud Boys, who have repeatedly been involved in violent street protests and were

among those who would later break into the US Capitol, joined the march. Militia groups, far-right media figures and promoters of conspiracy theories were also there.

- **Capitol riots: Who broke into the building?**

- **US Election 2020: Who are the Proud Boys - and who are antifa?**

As night fell, clashes between Trump supporters and counter-protesters broke out, including a brawl about five blocks from the White House.

The violence - although largely contained by police on this occasion - was a clear sign of things to come.

---

By now, President Trump and his legal team had invested their hopes in dozens of legal cases.

Although a number of courts had already dismissed fraud allegations, many in the pro-Trump online world became fascinated with two lawyers with close ties to the president - Sidney Powell and L Lin Wood.

Ms Powell and Mr Wood promised they were preparing cases of voter fraud so comprehensive that when released, they would destroy the case for Mr Biden having won the presidency.

---

CIVIL 1:18-V-00389-OFJ-NMG   DSTHMMH 04-5   b35N 07/02/11   b35N 00 IS 15 b35N0 X. 7302

- **Watch Aleem Maqbool's film America: Storming the Capitol, in which he examines the question - how safe is American democracy?**

---

Ms Powell, 65, a conservative activist and former federal prosecutor, told Fox News that the effort would "release the Kraken" - a reference to a gigantic sea monster from Scandinavian folklore that rises up from the ocean to devour its enemies.

The "Kraken" quickly became an internet meme, representing sprawling, unsubstantiated claims of widespread election fraud.

Ms Powell and Mr Wood became heroes to followers of the QAnon conspiracy theory - who believe President Trump and a secret military intelligence team are battling a deep state made up of Satan-worshipping paedophiles in the Democratic Party, media, business and Hollywood.

- **What is QAnon?**

- **What is the 'Kraken' conspiracy?**

The lawyers became a conduit between the president and his most conspiracy-minded supporters - a number of whom ended up inside the Capitol on 6 January.

Ms Powell and Mr Wood were successful in whipping up sound and fury online,

Exhibit N

but their legal efforts came to nothing.

When they released almost 200 pages of documents in late November, it became clear that **their lawsuit** consisted predominantly of conspiracy theories and debunked allegations that had already been rejected by dozens of courts.

The filings contained simple legal errors - and basic misspellings and typos.

Still, the meme lived on. The terms "Kraken" and "Release the Kraken" were used more than a million times on Twitter before the Capitol riot.

As courts rejected Mr Trump's legal cases, far-right activists increasingly targeted election workers and officials.

Death threats were made against a Georgia election worker, and Republican officials in the state - including Governor Brian Kemp, Secretary of State Brad Raffensperger and the official in charge of the state's voting systems, Gabriel Sterling - were branded "traitors" online.

Mr Sterling issued an emotional and prescient warning to the president in a press conference on 1 December.





"This has to stop... someone's gonna get killed": Mr Sterling calls on President Trump to condemn the threats

"Someone's going to get hurt, someone's going to get shot, someone's going to get killed, and it's not right," he said.

In Michigan in early December, Secretary of State Jocelyn Benson, a Democrat, had just finished trimming her Christmas tree with her four-year-old son when she heard a commotion outside her Detroit home.

About 30 protesters with banners stood outside, shouting "Stop the steal!" through megaphones.

"Benson, you are a villain," one person yelled.

"You're a threat to democracy!" called another.

One of the demonstrators live-streamed the protest on Facebook, stating that her group was "not going away".

It was just one of a rash of protests targeting people involved in the vote.

In Georgia, a constant stream of Trump supporters drove past Mr Raffensperger's home, honking their horns. His wife received threats of sexual violence.

In Arizona, demonstrators gathered outside of the home of Secretary of State Katie Hobbs, a Democrat, at one point warning: "We are watching you."

———

On 11 December, **the Supreme Court rejected** an attempt by the state of Texas to throw out election results.

As the president's legal and political windows continued to close, the

Exhibit N

As the president's legal and political windows continued to close, the language in pro-Trump online circles became increasingly violent.

On 12 December, a second Stop the Steal rally was held in the capital. Once again, thousands attended, and once again prominent far-right activists,

QAnon supporters, fringe MAGA groups and militia movements were among the demonstrators.

GETTY IMAGES

Michael Flynn, Mr Trump's former national security advisor, likened the protesters to the biblical soldiers and priests breaching the walls of Jericho. This echoed the rally organisers' call for "Jericho Marches" to overturn the election result.

Nick Fuentes, the leader of Groypers, a far-right movement that targets Republican politicians and figures they deem too moderate, told the crowd: "We are going to destroy the GOP!"

The march once again turned violent.

Then two days later, the Electoral College certified Mr Biden's victory, one of the final steps required for him to take office.

On online platforms, supporters were becoming resigned to the view that

Exhibit N

On online platforms, supporters were becoming resigned to the view that all legal avenues were dead ends, and only direct action could save the Trump presidency.

Since election day, alongside Mr Flynn, Ms Powell and Mr Wood, a new figure had rapidly gained prominence among pro-Trump circles online.

Ron Watkins is the son of Jim Watkins, the man behind 8chan and 8kun - message boards filled with extreme language and views, violence and extreme sexual content. They gave rise to the QAnon movement.

In a series of viral tweets on 17 December, Ron Watkins suggested President Trump should follow the example of Roman leader Julius Caesar, and capitalise on "fierce loyalty of the military" in order to "restore the Republic".

Ron Watkins encouraged his more than 500,000 followers to make #CrossTheRubicon a Twitter trend, referring to the moment when Caesar launched a civil war by crossing the Rubicon river in 49BC. The hashtag was also used by more mainstream figures - including the chairwoman of Arizona Republican Party, **Kelli Ward**.

In a separate tweet, Ron Watkins said Mr Trump must invoke the Insurrection Act, which empowers the president to deploy the military and federal forces.

---

Mr Trump met Ms Powell, Mr Flynn and others at a strategy meeting at the White House the following day, 18 December.

During the meeting, according to the New York Times, Mr Flynn called on Mr.

Exhibit N

Trump to **impose martial law** and deploy the military to "rerun" the election.

The meeting further stoked online chatter about "war" and "revolution" in far-right circles. Many came to see the joint session of Congress on 6 January, normally a formality, as a last roll of the dice.

A wishful story began to take hold among QAnon and some MAGA supporters. They hoped that Vice-President Mike Pence, who was set to preside over the 6 January ceremony, would ignore the electoral college votes.

The president, they said, would then deploy the military to quell any unrest, order the mass arrest of the "deep state cabal" who had rigged the election and send them to Guantanamo Bay military prison.

Back in the land of reality, none of this was remotely feasible. But it launched a movement for "patriot caravans" to organise ride shares to help transport thousands from around the country to Washington DC on 6 January.

GETTY IMAGES

Long processions of vehicles flying Trump flags and sometimes towing elaborately decorated trailers gathered in car parks in cities including Louisville, Kentucky, Atlanta, Georgia, and Scranton, Pennsylvania.

"We are on our way," one caravaner posted on Twitter with a picture of about

Exhibit N

two dozen supporters.

At an Ikea parking lot in North Carolina, another man showed off his truck. "The flags are a little tattered - we'll call them battle flags now," he said.

---

As it became clear that Mr Pence and other key Republicans would follow the law and allow Congress to certify Mr Biden's win, the language towards them became vicious.

"Pence will be in jail awaiting trial for treason," Mr Wood tweeted. "He will face execution by firing squad."

Online discussion reached boiling point. References to firearms, war and violence were rife on self-styled "free speech" **social platforms** such as Gab and Parler, which are popular with Trump supporters, as well as on other sites.

In Proud Boys groups, where members had once supported police, some turned against authorities, whom they deemed to no longer be on their side.

Hundreds of posts on a popular pro-Trump site, TheDonald, openly discussed plans to cross barricades, carry firearms and other weapons to the march in defiance of Washington's strict gun laws. There was open chatter about storming the Capitol and arresting "treasonous" members of Congress.

On Wednesday 6 January, Mr Trump addressed a crowd of thousands at the Ellipse, a park just south of the White House, for more than an hour.

Early on he encouraged supporters to "peacefully and patriotically make your voices heard", but he ended with a warning. "We fight like hell, and if you don't fight like hell, you're not going to have a country anymore.

"So we're going to, we're going to walk down Pennsylvania Avenue… and we're going to the Capitol."

Exhibit N

REX FEATURES

To some observers, the potential for violence that day was clear from the outset.

Michael Chertoff, former secretary of homeland security under President George W Bush, blamed the Capitol Police, who reportedly turned down offers of assistance from the much larger National Guard ahead of time. He characterised it as "the worst failure of a police force I can think of".

"I think it was a very foreseeable potential negative turn of events," Mr Chertoff said.



Phone footage reveals chaotic scenes inside US Capitol

"To be blunt, it was obvious. If you read the newspaper and were awake, you understood that you've got a lot of people who have been convinced there was

a fraudulent election. Some of them are extremists, and violent. Some of the groups openly said, 'Bring your guns'."

Still, many Americans were astonished by Wednesday's scenes, like James Clark, a 68-year-old Republican from Virginia.

"I find it absolutely shocking. I didn't think it would come to this," **he told** the BBC.

But the signs were there for weeks. A hodgepodge of extreme and conspiratorial groups were convinced that the election was stolen. Online, they repeatedly talked about arming themselves, and violence.

Perhaps the authorities didn't think their posts were serious, or specific enough to investigate. They now face pointed questions.

For Joe Biden's inauguration on 20 January, Mr Chertoff is expecting a "much stronger showing" by security services than last Wednesday night.

But that hasn't stopped many on extreme platforms calling for further violence and disruption on the day.

There are questions, too, for the major social media platforms, which enabled conspiracy theories to reach millions of people.

Late on Friday, Twitter deleted the accounts of Mr Flynn, the former Trump advisor, the "Kraken" lawyers Ms Powell and Mr Wood, and Mr Watkins. Then Mr Trump himself.

- **Twitter permanently suspends Trump's account**

Arrests of those who stormed the Capitol continue. But most of the rioters still live in a parallel online universe - a subterranean world filled with alternative facts.

They have already come up with fanciful explanations to dismiss Mr Trump's **video statement**, posted on Twitter the day after the riots, in which he acknowledged for the first time that "a new administration will be inaugurated on 20 January".

He can't possibly be giving up, they contend. Among their new theories - it's not really him in the video but a computer-generated "deep fake". Or perhaps the president is being held hostage.

Many still believe Mr Trump will prevail.

There's no evidence behind any of this, but it does prove one thing.

Exhibit N

No matter what happens to Donald Trump, the rioters who stormed the US Capitol are not backing down anytime soon.

*Additional reporting: Olga Robinson and Jake Horton*

———

**All photographs subject to copyright**

## Related Topics

| Donald Trump | US Capitol riots | United States | Fake News |

## More Videos from the BBC

Recommended by Outbrain

**Why the Swedes love doing something that Americans hate**

**'I know it's me, but I see a different person'**

**How the Soviets accidentally discovered the 'Gates of Hell'**

**PM says he does not oppose devolution**

**Romney: 'Tell Trump voters the truth'**

**Irish 'laughing dad' goes viral**

## Elsewhere on BBC

Recommended by Outbrain

Exhibit N

Trump Doubles Down on diess al5%/Ga/pan - BBC News

CMR 2 7817-00380 DFI NR3 · DRTMW4 PI 8 · MR5 072/2/21 · MR5 30 N 15 MRR0 X 7372

BBC

**What do these first ladies' portraits reveal about them?**

BBC

**How the Soviet Union's end sparked a grand rewilding**

BBC

**Why our pursuit of happiness may be flawed**

BBC

**The 432-year-old manual on social distancing**

Exhibit N

BBC News

**Covid-19: New fear grips Europe as cases top 30m worldwide**

BBC

**Twenty films to watch in 2021**

ADVERTISEMENT

ADVERTISEMENT

Exhibit N

## BBC News Services

On your mobile

On smart speakers

Get news alerts

Contact BBC News

| Home | Sport | Worklife | Future | Music | Weather |
|------|-------|----------|--------|-------|---------|
| News | Reel | Travel | Culture | TV | Sounds |

Terms of Use    About the BBC    Privacy Policy    Cookies    Accessibility Help    Parental Guidance

Contact the BBC    Get Personalised Newsletters    Why you can trust the BBC    Advertise with us

AdChoices / Do Not Sell My Info

© 2021 BBC. The BBC is not responsible for the content of external sites. **Read about our approach to external linking.**

Exhibit N

Case 1:18-cv-11099-ALC Document 64-2 Filed 05/08/21 Page 1029 of 1677 Page ID #: 1318

# EXHIBIT HH

Case 1:21-cv-01169-TCB    Document 25-2    Filed 05/03/21    Page 1030 of 1677

ATLANTA POSTCARD   FEBRUARY 1, 2021 ISSUE

# A TRUMP HOLDOUT IN ATLANTA

*L. Lin Wood, a Georgia defamation attorney who cried when Nixon resigned, still believes that the former President won the election, and he wants Mike Pence to be charged with treason.*



**By Charles Bethea**

January 23, 2021

Two weeks before Joe Biden's Inauguration, L. Lin Wood answered his telephone. The defamation attorney and conspiracy theorist was at home, in Atlanta, watching a human-trafficking segment on the One America News Network. "I saw there was a warning out," Wood told the caller. Maybe there was work in it for him? His recent clients have included the Georgia congresswoman Marjorie Taylor Greene (Wood appends heart emojis to their correspondences) and Kyle Rittenhouse ("a hero"), and he has litigated on behalf of Donald Trump, whose election-fraud suits in Georgia had failed under Wood's watch. "Nobody loses 0–60," Wood said, "unless the deck is stacked!" Twitter had permanently banned Wood, as it had Trump, for inciting violence. Parler was shut down. Wood lost more than a million followers on the two platforms combined. He'd soon be removed from a case in Delaware, owing to "textbook frivolous litigation." There was also the matter of the Capitol insurrection, which Wood's words ("rhetorical hyperbole!") had arguably helped provoke.

Exhibit N



*L. Lin Wood*  Illustration by João Fazenda

Still, at home, watching OAN, Wood remained upbeat. "I have eternal life," he said at one point during the hour-long call. He flitted from firing squads to what makes a good father to the pitching mechanics of a Double-A guy known as Flame Fleming, "who threw like a cannonball." He waved away the fact that there had been a Trumpist insurrection the day before. "I don't believe anybody died yesterday," Wood said of the violence, which killed at least five, including a San Diego woman who, before she died

Exhibit N

storming the Capitol, had retweeted Wood's call for Mike Pence to be charged with treason. "I think it was all staged," he went on. "It was Antifa dressed up as Trump people."

How did he know? "I apply critical thinking and the instincts God gave me," he said, adding, "I'm not God!" Moments later, though, he did compare himself to King David. He continued, "I'm just a person who understands what's going on and why." He added a hedge: "*If* I am God, I've got one bad memory! I don't remember creating myself, the clouds, the oceans, the stars. But do I try to live like God? This is the second harvest. God is getting ready to show he's real again."

Wood was not referring to Biden's Inauguration. To make this point clear, he bet the caller a dinner at one of Atlanta's most expensive steakhouses that Trump would be re-inaugurated on the twentieth. The idea may have held some purely theoretical appeal had Wood not already explained that he almost never wore a mask and had never taken a COVID test, "and wouldn't believe it if I did." Still, would Wood pay up? A few days later, his curious correspondent sent him a screenshot of Trump admitting that a new Administration would be inaugurated on the twentieth. Wood replied, by text, "Ha! Not so quick! I prefer to wait to see who is inaugurated first!" What did Wood think, then, a few days later, when moving vans showed up at the White House? As a former sportswriter for the Macon *News*, Wood quoted Yogi Berra in his response: "It ain't over till it's over." On January 19th, the baseball metaphors continued. "9 innings," Wood texted. "Sometimes extra innings!"

The next morning, Trump finally flew off. Wood was among the millions who watched. What did he think now? The lawyer answered with a question: "What do you make of the gold-trimmed flags behind him when he spoke?" The caller noted that there were seventeen of them—much to the delight of the QAnon press corps. ("Q" is the seventeenth letter of the alphabet.) "I did not count them," Wood wrote of the flags. "I was just enjoying the beauty of the gold trim." And he added, in another text, referring to Biden's speech, "Waiting for it to end so I can play with my puppies!"

Now in his late sixties, Wood said that he'd cried, as a young man, when Richard Nixon resigned. He had not cried, however, when Trump got on the plane to Mar-a-Lago. "I'm pretty calm about everything," he said, television audible in the background, "even though a lot of people are pulling their hair out." He went on, "It's a way of God saying, 'Hey, you better trust *me*.'" As for his own future, Wood looked on the bright side. "I've always wanted to write," he said. "But I've never had the time to do it." Before hanging up, he added, "I'm afraid they're going to put me in jail, but that's where Paul wrote some of his greatest chapters of the Bible." ♦

*Published in the print edition of the* <u>February 1, 2021</u>, *issue, with the headline "Holdout."*



<u>Charles Bethea</u> *is a staff writer at The New Yorker.*

Exhibit N

# EXHIBIT I

Case 1:21-cv-01160-TCB Document 35-2 Filed 05/03/21 Page 1035 of 1677

# Man seen hanging off Senate balcony and sitting in Vice President's chair during Capitol riot is in custody

By **Madeline Holcombe** and Andy Rose, CNN

Updated 3:13 AM ET, Wed January 13, 2021



The FBI said that Josiah Colt was identified by a relative.

**(CNN)** — The man who was photographed hanging off the Senate balcony and then sitting in the Vice President's chair during the [riots at the US Capitol](#) has been identified and is in custody, according to officials.

In a sworn affidavit, an FBI agent says a relative of Josiah Colt confirmed that Colt is the person seen in a photo sitting in a chair where Vice President Mike Pence had been minutes earlier during the session to count presidential electoral votes. The affidavit included three two photos of the man identified as Colt in the chamber.

Colt was photographed hanging off a balcony and landing on the floor of the Senate chambers, the FBI affidavit said. Colt claimed in a Facebook video that he was the first person to sit in the House Speaker's chair, according to the affidavit, but the FBI said he "appears to be mistaken as he was also photographed in the seat reserved for the vice president, and not Speaker Pelosi."

Exhibit N



ROSA IBARRO/HUFFINGTON POST

Police say Josiah Colt is the man who was photographed in the seat where Vice President Mike Pence was earlier.

The Ada County Sheriff's Office in Boise, Idaho confirmed to CNN on Tuesday night that Colt was in custody on a hold for the US Marshals Service.

"In the moment I thought I was doing the right thing," Colt said in a text to CNN affiliate KBOI last week. "I realize now that my actions were in appropriate and I beg for forgiveness from America and my home state of Idaho." Colt and his family have not returned repeated requests for comment from CNN.

According to the FBI affidavit, there is probable cause that Colt violated a federal law against entering a restricted building without lawful authority, as well as a law against entering the Capitol to disrupt a session of Congress.

Colt is scheduled to have his first appearance before a judge Wednesday morning via videoconference.

The FBI has opened more than 170 case files in the six days since the attack, and prosecutors have already charged more than 70 cases.

*CNN's Sonia Moghe, Ted Barrett, Manu Raju and Peter Nickeas contributed to this report.*

**Related Article:** Republicans begin backing impeachment in 'vote of conscience'

Exhibit N

Search CNN...

US

World

Politics

Business

Opinion



US

● LIVE TV

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



US

FOLLOW CNN

  

Exhibit N

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Store    Newsletters

Transcripts    License Footage    CNN Newsource    Sitemap

© 2021 Cable News Network.  A Warner Media Company.  All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.



US

● LIVE TV



Exhibit N

# EXHIBIT J

Menu

Story Saved

To revisit this article, visit My Profile, then View saved stories.

Close Alert

Close

Latest Stories    Inside the Siege    Among the Insurrectionists    The Inciter-in-Chief    Newsletter

Video Dept.

**Subscribe**

# A Reporter's Footage from Inside the Capitol Siege

The New Yorker   January 17, 2021

Facebook   Twitter   Email

Save this story



Luke Mogelson followed Trump supporters as they forced their way into the Senate chamber.

When Luke Mogelson attended President Donald Trump's speech on the National Mall, in Washington, D.C., on January 6th, he was prepared for the possibility that violence might erupt that day. Mogelson, a veteran war correspondent and a contributing writer at *The New Yorker*, had spent the previous ten months reporting on the radical fringe of Trump supporters, from anti-lockdown militias to fascist groups such as the Proud Boys. After Election Day, he interviewed Trump supporters who showed up at ballot-tabulation sites, and who believed the President's lies that the results had been "rigged" and his victory "stolen." At one post-election pro-Trump rally in D.C., Mogelson witnessed racist violence against Black residents of the nation's capital. At another event, he watched the host of the white-supremacist Web program "America First" declare, "Our Founding Fathers would

Exhibit N

get in the streets, and they would take this country back by force if necessary. And that is what we must be prepared to do."

After Trump's incendiary speech, Mogelson followed the President's supporters as they forced their way into the U.S. Capitol, using his phone's camera as a reporter's notebook. What follows is a video that includes some of that raw footage. Mogelson harnessed this material while writing his panoramic, definitive report, "Among the Insurrectionists," which the magazine posted online on Friday. (It appears in print in the January 25th issue.) His prose vividly captures how the raging anger and violence of the initial breach of the Capitol was followed by an eerily quiet and surreal interlude inside the Senate chamber, where Mogelson watched people rummaging through desks and posing for photographs. Although the footage was not originally intended for publication, it documents a historic event and serves as a visceral complement to Mogelson's probing, illuminating report.

*Click here to read "Among the Insurrectionists."*

---

Read More About the Attack on the Capitol

- Donald Trump, the Inciter-in-Chief.
- He must be held accountable.
- An Air Force combat veteran was part of the mob in the Senate.
- The invaders enjoyed the privilege of not being taken seriously.
- The crisis of the Republican Party has only begun.
- A Pelosi staffer recounts the breach.
- Sign up for our daily newsletter for insight and analysis from our reporters and columnists.

---

*The New Yorker offers a signature blend of news, culture, and the arts. It has been published since February 21, 1925.*

More: Donald Trump  Capitol Hill  Trump-Biden Transition

# The Daily

Sign up for our daily newsletter and get the best of *The New Yorker* in your in-box.

Enter your e-mail address

## Sign up

Will be used in accordance with our Privacy Policy.

View all stories

Exhibit N

Rioters at the Capitol

The Presidential Transition

Among the Insurrectionists

The Capitol was breached by Trump supporters who had been declaring, at rally after rally, that they would go to violent lengths to keep the President in power. A chronicle of an attack foretold.

By Luke Mogelson

Exhibit N

Case 1:21-cv-02265-DLL69FCB Document 64-35-2 Filed 05/03/21 Page 1043 Page ID7#: 1332

A photo collage of Donald Trump with the White House in the background.



The Presidential Transition

The Trial of Donald Trump Must Tell the Full Story of the Capitol Insurrection

We need a truth-finding mission rather than just a punitive undertaking, and it requires the support of President-elect Biden.

By Masha Gessen

Exhibit N



Video

"That's Not Who We Are" Is the Wrong Reaction to the Attack on the Capitol

Andrew Marantz talks about why such sweeping statements, issued by many public figures after a mob of Trump supporters rioted in the halls of Congress, can stand in the way of necessary change.

Exhibit N

Case 1:21-cv-02265-DLF-TCB Document 64-35-2 Filed 05/03/21 Page 1045 of 1677 #: 1334

Donald Trump walks away from a bright spotlight.

Letter from Trump's Washington

## Obituary for a Failed Presidency

One final dispatch from Trump's Washington.

By Susan B. Glasser

Exhibit N



Exhibit N

# EXHIBIT K

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK




----------------------------X
                            :
ROSLYN LA LIBERTE,          :
                            :    18-CV-5398 (DLI)(VMS)
              Plaintiff,    :
                            :    January 11, 2021
                            :
          V.                :    Brooklyn, New York
                            :
JOY REID,                   :
                            :
              Defendant.    :
----------------------------X


     TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
          BEFORE THE HONORABLE VERA M. SCANLON
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:           DAVID OLASOV, ESQ.
                             LUCIEN L. WOOD, ESQ.


For the Defendant:           JOHN REICHMAN, ESQ.
                             DAVID YEGER, ESQ.
                             THEODORE BOUTROUS, ESQ.

Audio Operator:


Court Transcriber:           ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

Exhibit N

```
 1                    THE COURT:  La Liberte v. Reid, 18-CV-5398.

 2                    Let's start with plaintiff's counsel's

 3        appearance.

 4                    MR. OLASOV:  David Olasov for Roslyn La

 5        Liberte and Lin Wood for Roslyn La Liberte.

 6                    MR. WOOD:  Yes, good morning, your Honor,

 7        this is Lin Wood.

 8                    THE COURT:  Hello.

 9                    All right, for the defendant?

10                    MR. REICHMAN:  Good morning, your Honor.

11        This is John Reichman from John Reichman Law, and I am

12        joined by my colleague, David Yeger.  We also have our

13        co-counsel from Gibson Dunn, who will introduce

14        themselves.

15                    MR. BOUTROUS:  Yes, your Honor.  This is

16        Theodore Boutrous from Gibson Dunn & Crutcher for Ms.

17        Reid, and I'm joined by my colleagues, Marissa Moshell

18        and Marcellus McRea.

19                    THE COURT:  All right.  So we're here for

20        the discovery issues since you're back from the

21        circuit.  So we have at 57 your proposed order and then

22        at 58, the letter complaining about the initial

23        disclosures.  I've read the letter.  I think it's

24        premature.  We don't have a scheduling order and so you

25        can complain that there wasn't a need to have these
```

Exhibit N

1    initial disclosures done.  I know you submitted your

2    initial -- proposed initial scheduling order having

3    some earlier dates on there but they're not the

4    effective dates from a court order, so I'm just going

5    to reset it.

6          Plaintiff, you should look at the criticism

7    that the defendant is offering as to the alleged

8    incompleteness of your initial disclosures and you

9    should both have a conversation.  Then if you still

10    can't work it out, you can let me know.

11          Obviously, there's a fairly extensive record

12    already in this case on that legal issue.  Is there

13    anything anybody wants to say with regard to the merits

14    that you think I should know.  Mostly, does it affect

15    discovery, and then we'll talk about the particulars of

16    the discovery schedule.  So for plaintiff?

17          MR. OLASOV:  This is David Olasov.  Mr.

18    Reichman and I have had a conversation in which I

19    pointed out to him that the answer to the amended

20    complaint that was filed after the Second Circuit's

21    decision in our view pleaded matters that we believe

22    are foreclosed by the decision.  I've agreed to -- for

23    plaintiff to provide them with a letter that indicates

24    which defenses that they've raised we believe are

25    foreclosed by this decision.  Of course, that has some

Exhibit N

1   bearing on the scope of discovery since there's no

2   point in having discovery on matters that are

3   foreclosed by the decision.

4            THE COURT:  All right.  Defendants, your

5   view?

6            MR. REICHMAN:  Well, we await the letter but

7   I don't think it's really going to have an impact

8   whatsoever on discovery.  In our view, I think the only

9   defense that is arguably precluded is the legal defense

10  with respect to whether the posts were opinion or not,

11  but that wouldn't be the subject of discovery in any

12  event.

13           THE COURT:  All right.  And before we dive

14  into the discovery, is there any possibility of having

15  settlement discussions?  You've been at this for a

16  while now.  Has there been anything?  I mean, you could

17  have discussions with each other, you could have a

18  mediator try to bridge whatever gap there is because

19  you obviously having been doing this, what, since 2018?

20           MR. WOOD:  Your Honor, this is Lin Wood.  I

21  think it's standard handling, from my experience at

22  least, that from the plaintiff's perspective, the

23  plaintiff is always willing to listen to any reasonable

24  offer that a defendant makes.  But if the defendant has

25  no interest, then obviously, our hands our tied.  So I

Exhibit N

1    would kind of throw the ball over to the defense to say

2    if there's an interest and, if so, if there are any

3    suggestions on how a discussion could take place.  If

4    there's no interest, then we obviously can just

5    continue to move forward.

6            MR. REICHMAN:  This is John Reichman, your

7    Honor.  I think for reasons that we set out already to

8    the Court with respect to the initial disclosures, we

9    don't know of any real damages that the plaintiff has

10   sustained.  And before even considering any kind of

11   settlement, we need to know at least what the

12   plaintiff's damages are and the basis for them, and we

13   could then take it from there.

14           THE COURT:  All right, so I'll take that as

15   a maybe and say that we're going to set the dates --

16           MR. WOOD:  I like -- Judge, I appreciate

17   someone who is always on the optimistic side.

18           THE COURT:  I try.  All right, what --

19           MR. REICHMAN:  Your Honor -- I'm sorry.

20   There is another matter that we'd like to bring to the

21   Court's attention, and it involves Mr. Wood,

22   plaintiff's lead counsel.  Over the weekend, we have

23   come across some very disturbing information about the

24   conduct of Mr. Wood.  I'm sure you're aware that since

25   the election, Mr. Wood has been actively engaged in

1    attempting to overturn the election results.  All of

2    those cases have been dismissed.  There have also been

3    sanctions and disqualification motions filed.

4              MR. WOOD:  I have not been sanctioned.

5              MR. REICHMAN:  Now Mr. Wood --

6              THE COURT:  One at a time.

7              MR. REICHMAN:  -- has taken an even far

8    darker turn.  He is actively and has actively supported

9    the insurrection against our government and called for

10   the execution of the Vice President.

11             MR. WOOD:  Oh, nonsense.

12             MR. REICHMAN:  He's been permanently barred

13   from Twitter and his recent attempt to submit a post on

14   Parler calling for the Vice President's execution was

15   not permitted.  In fact, the posting of his tweet on

16   Parler was one of the reasons cited by Apple and Google

17   to ban Parler from their platforms.  The right to

18   appear pro hac vice in this District is a privilege and

19   not a right, and we believe there are at least three

20   reasons why that privilege should be revoked by the

21   Court.

22             First, in New York, every attorney pledges

23   to solemnly swear that he or she will support the

24   Constitution of the United States.  Mr. Wood is seeking

25   to undermine, not support the U.S. Constitution.  His

Exhibit N

1    call for violence in the streets and his tweets and

2    public utterances have been an impetus of the

3    insurrections to seize the Capitol.  It's noteworthy

4    that the last tweet of the woman shot at the Capitol,

5    Ashley Babbitt, was a re-posting of one of Mr. Wood's

6    posts.

7         Second, in violation of the disciplinary

8    rules, Mr. Wood has gone around the country filing

9    utterly frivolous lawsuits based on outright lies and

10   nonexistent legal theories.  In Delaware, a court has

11   issued a show-cause order, citing his conduct in

12   Wisconsin and Georgia actions, asking him to show cause

13   why he should not be disqualified from practicing law

14   in Delaware.  In Michigan, after the dismissal of the

15   lawsuit he filed there, a motion has been filed seeking

16   sanctions and disqualification and disbarment.

17        Third, Mr. Wood is actively threatening the

18   well-being of the judiciary, especially Justice

19   Roberts.  He has painted Justice Roberts as a murderous

20   pedofile.  He suggested that the Chief Justice was

21   mixed up in the death of Justice Scalia, was

22   trafficking in children, and apparently hinting that he

23   may have had Epstein killed if he was killed at all.

24   He recently tweeted, "My information from reliable

25   sources is that Roberts arranged an illegal adoption of

Exhibit N

8

1    two children from Wales through Jeffrey Epstein."

2              Now, as we all now clearly and sadly know,

3    words can and will lead to violence.  So under the

4    Disciplinary Rules at Section 8.3, we believe we have

5    an ethical duty to report this matter to the Court and

6    we would --

7              MR. OLASOV:  Who is speaking now?

8              MR. REICHMAN:  Please.

9              MR. OLASOV:  Who is speaking?

10             MR. REICHMAN:  John Reichman.

11             THE COURT:  Please stop, stop interrupting.

12             MR. REICHMAN:  And we welcome --

13             THE COURT:  All right, continue.

14             MR. REICHMAN:  So we welcome the Court's

15   guidance with respect to whether and how to further

16   this issue.  You know, we are prepared to provide more

17   information about Mr. Wood's activity.  I would add

18   that all of these are matters of public record.  It

19   seems to us there are at least two options with respect

20   to how to proceed.  We could submit a letter brief

21   under your Honor's rules directly seeking the

22   revocation of the pro hac vice order.  The other way

23   would be to present the information and ask the Court

24   whether it could issue a show-cause order such as was

25   done in Delaware.  That's a procedure that some judges

have used in considering the revocation of the right to
practice.

        THE COURT:  All right, let's first hear from
Mr. Wood.  Then we'll talk about the procedure.

        Go ahead, Mr. Wood.

        MR. WOOD:  Thank you, your Honor.  It's kind
of hard to respond to such serious accusations when I
am not at all sure about the accuracy of some of the
things that have been said to the Court.  In fact, I
know some of them are inaccurate.  And I have not been
sanctioned by any court in 43 and a half years, not any
court over the course of my career, nor any court now.

        It's almost like I'm being -- trying to make
me into a scapegoat.  I've had nothing to do, number
one, with what happened in Washington D.C.  I didn't
call for the people to go up there and meet, I didn't
call for anybody to go to the Capitol.  I certainly
didn't call for anybody to create a scene of what
appeared to be some type of violence.  So whether this
lady that died had re-tweeted me, I have no control
over that.

        What I can say to the Court and, if
necessary, at the appropriate time, present to the
Court is that what I have said publicly, I have
reliable information to support the truth of it.  What

1    I have done with Sidney Powell is, she asked me to sign

2    on to two or three lawsuits where she was the lead

3    counsel, in anticipation that there may be a need for a

4    trial lawyer.  I didn't draft the lawsuits.  There were

5    some typographical errors and things done in some of

6    them that upset a judge in Wisconsin, I believe, maybe

7    Michigan.  But if you had a full hearing on what

8    happened there, I didn't have anything to do with that,

9    other than I did agree to sign on to help Sidney.

10           I know for a matter of fact that all of the

11   information that Sidney Powell has presented in the

12   litigation with respect to the fraud in the election,

13   there is a mountain of admissible evidence in the form

14   of affidavits, authenticated videos, expert evidence

15   from reliable and credible experts.  So the lawsuits

16   were filed as they are allowed to be filed.

17           The only other lawsuits that I've been

18   involved in, I filed for myself as it related to the

19   Georgia election, where I contended that the election

20   was conducted illegally and in violation of precedent

21   of the Supreme Court that requires that the election

22   rules be set by the state legislature.  In Georgia,

23   they conducted the election with absentee ballots and

24   mail-in ballots based on a procedure that came up --

25   that came up from a settlement agreement by the

Exhibit N

1  Secretary of State with the Democratic Party.  It was

2  never adopted by the legislature, so that any

3  allegation that I filed a frivolous lawsuit is in fact

4  frivolous.

5         The lawsuit that I have presently have is

6  pending before the United States Supreme Court in a

7  writ of certiorari.  It has not yet been ruled on but

8  yet it's been pending for some almost three weeks.

9  They may still accept it.  So the Georgia litigation

10  I'm involved in is certainly within the rules and the

11  laws of this country.  The litigation that Sidney

12  Powell has filed, where I've been asked to sign on to,

13  is also based on legitimate causes of action, and I

14  know for a fact based on a wealth of material and

15  admissible evidence to support the allegations.

16         No court in any of the rulings -- no court

17  for some reason has mentioned the evidence of the

18  election fraud.  So there's been no finding by any

19  court that the evidence of election fraud is lacking.

20  In fact, if they discussed it, they would have to say

21  it was literally conclusive that there was fraud.  So

22  now I'm being attacked for taking legitimate actions as

23  a lawyer, legitimate actions as a plaintiff in Georgia.

24  They're trying to pin on me the sad tragedy of what

25  happened in Washington D.C., and now they're even

Exhibit N

12

1   saying that my tweet brought down Parler.  I've never

2   heard of where one man -- I know the pen is mightier

3   than the sword but what I tweeted about the Vice

4   President was rhetorical hyperbole.  I did not call for

5   any violence against any individual that would result

6   in immanent harm or a serious threat of harm to that

7   person.

8           I've seen tweets and posts where people have

9   asked protestors to be shot.  I didn't do that.  I've

10  seen tweets where they hold the President's head up

11  where it's been beheaded.  I didn't do that.  So this

12  is a matter of what's in the eye of the beholder.  What

13  I did was, I posted a photograph of where a Capitol

14  police officer had opened the doors to let people in

15  that appear to be, and the evidence seems to be

16  suggesting, were members of either Antifa or Black

17  Lives Matter.  I posted the photograph of that and I

18  said, they let them in.  They're all traitors, get the

19  firing squads ready, tense first.

20          Now, I don't control firing squads.  I

21  couldn't run out and put together a firing squad and go

22  shoot the Vice President.  But the law is that if you

23  are guilty of treason, one of the penalties available,

24  as publicly ratified recently in the last month by the

25  Department of Justice is the death penalty by firing

Exhibit N

1 squad, even by hanging.

2   If you look over and say that the doctor who

3 commits an abortion is a murderer, that's rhetorical

4 hyperbole. So what I said, because I know the law of

5 defamation, my statement was rhetorical hyperbole. It

6 was not intended, nor did anybody seriously think that

7 that was a call to run out and put the Vice President

8 in front of a firing squad. But for some reason, my

9 voice has reached a level, not because I wanted it to

10 -- I've never sought recognition in my life as a

11 lawyer. I just do my job. But for some reason, my

12 voice has reached a level where many people listen to

13 me. That's their choice. But I talk about facts and

14 truth, I don't make things up.

15   But what I do differently than most I guess

16 people that are voices to be heard is I relate almost

17 all of what I say to people to my belief in God, so

18 that my voice is one both of truth and a voice that

19 talks about things from a faith basis. So I'm entitled

20 to those opinions and I don't think I ought to be

21 chastised and called upon to be put on trial in effect

22 for doing what the law allows me to do and saying

23 things that I believe are consistent with what I know

24 to be the teachings of Jesus Christ.

25   So I've been accused of being crazy, nuts.

Exhibit N

1   I've never read such things about me.  If you went back

2   a few months ago, people would have told you I was the

3   greatest, smartest defamation lawyer in the world.

4   I've fought for truth and I've handled some big cases,

5   starting with Richard Jewell in 1996, where I went up

6   against the FBI and the media through representing a

7   number of other people in high-profile cases.

8           I've had cases of success against CNN,

9   Washington Post, a number of media outlets.  I

10  represent Nicholas Sandman (ph) and we've had very good

11  success in Kentucky.  Nobody has complained about my

12  conduct in Kentucky.  I just won a motion to dismiss

13  against Gannett newspapers, and then I did some work

14  when I formed a 501(c)(4) foundation this summer,

15  #fightback.  The foundation's purpose was, I thought

16  and still believe that the country is undergoing a

17  color revolution.  So I said our constitutional rights

18  are going to be at risk and I formed that foundation

19  to, in the future, be an advocate for maintaining and

20  protecting our constitutional rights.

21          Right after I formed it, people asked me to

22  help a young man named Kyle Rittenhouse.  I did.  I

23  went out and I took the time and made the effort to

24  raise two million dollars to make the boy's cash bond

25  in Kenosha.  Actually -- yeah, in Kenosha.  Then since

Exhibit N

15

1    that time, I'm not doing anything with respect to

2    raising any more money for Kyle, but I was trying to

3    help the young boy because I believe, based on the

4    video evidence, that the young man was exercising his

5    right of self defense and he was in effect a political

6    prisoner and he ought to be let out.  I was worried

7    about them hurting him when he was in jail.

8            So if you want to, your Honor, look at these

9    recent accusations against me, I would question why are

10   they being made, who's behind it?  But I would also

11   urge the Court to take the time to look at the body of

12   my life's work for 43 years.  I love this country.  I

13   love the rule of law.  I have never advocated that

14   anyone should break the law.  I've advocated for people

15   to follow the law.

16           I've been upset with what I've seen from the

17   evidence about how this election was conducted.  I

18   believe it was a fraud.  Now, I'm not going to be the

19   ultimate arbiter of that but I have the right to serve

20   as a lawyer for people that do litigate it, and I have

21   the right, in the case of Georgia, to be a plaintiff

22   because I believe my constitutional right to vote has

23   been diminished and it's in violation of equal

24   protection.

25           So how Lin Wood, the lawyer, has become now

Exhibit N

1  Lin Wood, the guy that this man would sit there and

2  represent to you is advocating the overthrow of our

3  government, the death of our Vice President, and

4  violence in the streets, you know, I can only say this:

5  It's errant nonsense.  I believe it's part of a

6  political agenda to harm me because of my message.  If

7  you can't shoot the message because it's solid, shoot

8  the messenger.  That's what they're trying to do,

9  Judge.  They're trying to attack the messenger because

10 they can't attack the message.

11         THE COURT:  So --

12         MR. WOOD:  So I would ask for at least -- if

13 the Court is interested in hearing all of this stuff, I

14 believe I'm entitled to due process and an opportunity

15 to respond to, with evidence and other information, any

16 type of accusation that's made against me before your

17 Honor does something that has never been done to me.

18 I've practiced law in 27 states.  Even in Michigan, the

19 City of Detroit is trying to get me disbarred.  Why?

20 I'm not a member of the Michigan Bar.  They're taking

21 action -- they're saying that I ought to be sanctioned

22 in Delaware for what I did in Wisconsin.  Well,

23 Wisconsin hasn't taken any action against me.  So

24 something is not right about this, your Honor, and I

25 hope that you'll treat me fairly because I've spent my

1  life working for the law, representing people that

2  needed help, putting them first and myself second.

3          MR. McRAE:  Your Honor --

4          MR. WOOD:  So I would -- I would simply end

5  by saying I'm entitled to respond with due process to

6  any of these accusations being made against because

7  they're false.  I reject the idea that I'm a scapegoat

8  in all of this.  I think it's an effort to hurt the

9  messenger because the message frightens them.  I don't

10  know.  That's up to them to decide.

11          THE COURT:  So the question --

12          MR. McREA:  Your Honor, Mr. Boutrous got

13  dropped from the call.  I'm sorry to interrupt.  This

14  is Mr. McRea.

15          THE COURT:  Okay.

16          MR. McREA:  I wouldn't interrupt, except my

17  partner got dropped from the call and the host has to

18  let him back in.  He got dropped a while ago but I

19  didn't want to interrupt.

20          THE CLERK:  I can do that.  The only problem

21  is, the other conference will be let in as well, Judge.

22          THE COURT:  That's fine.  If you do that,

23  then I'll ask them to --

24          THE CLERK:  Okay.

25          THE COURT:  -- not to speak.

Exhibit N

```
1                MR. McREA:  Thank you, your Honor.

2                THE CLERK:  It takes a few minutes.

3                MR. REICHMAN:  Your Honor, if I may --

4                THE COURT:  Hold on, just wait until

5    everybody is back.

6                MR. BOUTROUS:  I'm back.  Thank you, your

7    Honor.

8                THE COURT:  We only heard one person come

9    in.  If anyone is on --

10               MR. BRAND:  Your Honor, Ian Brand (ph) for

11   plaintiff in the Hargrave/State Farm litigation.

12               THE COURT:  If you're on for Hargrave, just

13   mute yourself.  We're not on the Hargrave case yet.

14               MR. BRAND:  Okay.

15               THE COURT:  We have probably another five or

16   ten minutes on what we're talking about now.  It's up

17   to you.  You can stay on or you can call back in a

18   couple of minutes, whatever you like.

19               MR. BRAND:  I'll mute.

20               THE COURT:  So on this point about whether

21   plaintiff's counsel should continue as counsel in this

22   case, I think the cleanest posture of this would be, if

23   the defendants want to make a motion to disqualify or

24   revoke the pro hac grant, then you can do that.  Let's

25   then have a schedule for your papers and counsel's
```

Exhibit N

19

```
 1   papers, and a brief reply if that's what you want.  I

 2   think it's a serious set of allegations so if you're

 3   pursuing it, I think -- yes, I agree, I normally do

 4   things by letter motion but this probably should have

 5   some more formality.

 6              So on the defendant's side, if you're going

 7   to do this motion, what do you think, two weeks?

 8              MR. REICHMAN:  That would be fine.

 9              THE COURT:  All right.  So you will serve

10   your papers by the 25th of January.

11              And then, plaintiff's counsel, if you want

12   to respond, can you do that by the 8th?

13              MR. WOOD:  The date for the defense's papers

14   would be when?

15              THE COURT:  The 25th.

16              MR. WOOD:  The 25th?  And then two weeks for

17   us to respond on the 8th?  Is that what I understood?

18              THE COURT:  Yes.  And then a reply by -- is

19   the 15th a holiday weekend that weekend?

20              MR. REICHMAN:  Yes, the 15th if Presidents'

21   Day.

22              THE COURT:  So the 16th for your reply.

23              MR. REICHMAN:  Okay.  Thank you, your Honor,

24   that works for us.

25              THE COURT:  All right.  Now let's talk about
```

Exhibit N

1  the discovery schedule.  In terms of the initial

2  disclosures, they should both -- both of your sets of

3  papers should be exchanged by the same date.  Except

4  for this motion practice, I would say two weeks is

5  enough time given the length of time that this case has

6  been pending, so you can tell me.  What I want

7  obviously is that before you raise anything with me,

8  that you speak with each other about it.

9         MR. REICHMAN:  Yes, your Honor.  This is

10  John Reichman again.  We did -- each side has already

11  served the initial disclosures.

12         THE COURT:  Yes.

13         MR. REICHMAN:  I don't think the plaintiff

14  has any problem with our disclosures and our problem is

15  limited to the disclosure with respect to damages, as

16  we've laid out.  So I'm not sure if -- so I'm not sure

17  where that puts us in terms of what you are suggesting.

18         THE COURT:  So let's say you try to work out

19  your concerns about the damages and have a date --

20  today is the 11th.  By the 29th of January, a revised,

21  complete set of the initial disclosures.  And then if

22  you still have your concerns about the damages issues

23  or any other issues, you can raise it as you go.

24         Then initial document requests and

25  interrogatories -- defendants, you've said you've done

Exhibit N

1  it, and plaintiff, you're going to.  You can start

2  obviously responding as you like but the time line for

3  when those responses are due -- we'll count off.  So

4  I'm going to put you down as the same date.  So by

5  February 8th, thirty days from there.  Is there any

6  possibility of joinder or amendment at this stage,

7  given again how long this has been around for?

8          MR. OLASOV:  We don't think so.

9          MR. REICHMAN:  I don't think either side --

10  we don't, either.

11          THE COURT:  Okay, all right, so we'll just

12  leave that as it is.  All right, the fact discovery

13  date is fine.  I'm going to change some of the dates

14  for the expert disclosures.  So the expert disclosure

15  should be provided with the close of fact discovery,

16  and I'll just tell you how I look at it.  I don't know

17  if this is going to match with what you have as a

18  general matter.

19          The way I would see it is, whoever is

20  carrying the burden of proof or raising an issue

21  uniquely -- so for example, if one of those defenses

22  that was mentioned required the burden of proof and you

23  were offering an expert with regard to that, that's the

24  moving report, the initial report.  So if you fall into

25  that category, your initial report disclosures would be

Exhibit N

1   due May 31st, and then we'll put the June 30th date for

2   the initial report, so that's 7(b) on this list.  Then

3   I will for now leave 8/6 as the rebuttal.  I think it

4   depends on what the topics are, whether a month is a

5   reasonable turnaround time or not.  I don't know yet

6   and we don't need to figure it out on this call.  We'll

7   have a status conference before you get to that.  Then

8   the other dates you have are largely -- they're all

9   fine.

10          So with the text order that comes out of

11  this conference, we'll have a status conference set

12  sometime in April.  And then a week or a little more

13  than a week before that, I'll ask you for -- submit a

14  letter letting me know what you've covered, what you

15  still have to cover.  And then particular at that

16  point, I would like to know, are you going to have

17  expert discovery or not?  If you're not, then many of

18  these dates will be moved up.  You won't need the

19  couple of months that are indicated on the schedule for

20  that.

21          A pretrial conference, that will be with the

22  district judge.  You have dates here that you put in

23  for having a demand and a response, and I see that

24  you're not asking for ADR at this point.  If you change

25  your mind and you want a referral to ADR, we could give

Exhibit N

1  you that.

2         A couple of other things.  Let me just pull

3  up the docket here.  So you do have a jury demand.

4  Again, this is something we can talk about more in the

5  future.  But as you can imagine, the trial calendar is

6  quite backed up.  Just so you know, there haven't been

7  many trials here since March of last year and the

8  general preference will be given to criminal trials

9  over civil trials.  The (ui) that was taken in the fall

10  when we were having trials was to have a criminal trial

11  calendar and a backup civil trial-ready calendar.  So

12  basically, if the criminal cases pled out, we would

13  bring the civil cases in because the jurors have been

14  summoned and we could move along that way.

15         I imagine in this case, there will be some

16  motion practice.  So this issue of when you're having a

17  jury trial, if you're having a jury trial, may be a

18  ways out.  To the extent you're thinking about how long

19  you're going to be litigating this, if you're

20  envisioning a trial at the end or almost the end, it's

21  going to be a while.  So just take that into account

22  when you're thinking about whether you want to have

23  settlement discussions or not.

24         All right, anything else?  Let me just say,

25  if you have (ui) on the way, for example if you don't

24

```
 1   resolve your question of what damages information needs
 2   to be turned over, you can raise it, preferably by a
 3   joint letter.  Other issues we should talk about?
 4            MR. WOOD:  Your Honor, this is Mr. Wood.
 5   Because I'm not the best note taker in the world --
 6            THE COURT:  There will be an order.
 7            MR. WOOD:  Could I ask the Court to also
 8   have, and we'll certainly pay whatever cost, an
 9   expedited transcript of this hearing prepared and filed
10   with the record of the Court?
11            THE COURT:  So we'll do two things:  There
12   will be a text order coming out of this and on the text
13   order, it will have the time stamp for the recording.
14   If you look on our court's website, there's a number
15   for ESR, which is our transcription service, and you
16   order the transcript there.  They give different rates
17   for the speed at which they do it, so I think you have
18   a couple of options with regard to the turnaround time.
19            MR. WOOD:  I bet the sooner you ask for it,
20   the more it costs, as it should.
21            THE COURT:  Yeah.  It's quite a difference
22   and you can decide what you need.
23            Okay, anything else?
24            MR. REICHMAN:  No, your Honor.
25            THE COURT:  All right, take care, Happy New
```

Exhibit N

```
1   Year.

2            MR. OLASOV:  Thank you very much, your

3   Honor.

4            MR. WOOD:  Thank you very much, your Honor.

5                      * * * * * * *
```

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18        I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                     January 12, 2021
```

Exhibit N

# EXHIBIT L

Sections menu

*Democracy Dies in Darkness*

Consumer Tech
One year for $29
Future of Transportation
Technology

Sign in profile

# 'Nothing can stop what's coming': Far-right forums that fomented Capitol riots voice glee in aftermath

**Online rage and real-world violence collided in the siege, with deadly consequences: "It's a new age of terrorism that can't exist without the Internet."**

Exhibit N

Trump supporters gather Wednesday at the Capitol.



Trump supporters gather Wednesday at the Capitol. (Matt McClain/The Washington Post)

By Craig Timberg, Drew Harwell, Razzan Nakhlawi and Harrison Smith

Jan. 7, 2021 at 12:05 p.m. PST

Men wearing camouflage shirts began building a makeshift defensive camp outside the Capitol on Wednesday afternoon. They moved barricades and green fencing into a circle, and then pulled helmets from a crate and donned goggles in preparation for a clash that had been brewing for weeks and, arguably, for years on far-right forums devoted to President Trump.

Exhibit N

"[TheDonald.win](#), that's where it's at," said one of the men, referring to the website where defiant talk, conspiracy theories and tips on how best to lay siege to Washington have grown since Trump lost the Nov. 3 election.



Violent scene unfolds as pro-Trump mob storms Capitol

Trump supporters overtook Capitol Police officers to enter the building as lawmakers attempted to count the electoral college votes on Jan. 6. (The Washington Post)

The comment underscored the potent, interactive role between the online and offline worlds in Wednesday's breach [of the Capitol](#). Violent talk on [far-right forums](#) fomented violent real-world action, which was then captured by smartphones, uploaded and celebrated on the same forums. The boundaries between the digital and analog all but disappeared as rage, provocation and gloating bounced back and forth, again and again.

*[[Facebook bans President Trump indefinitely, CEO Mark Zuckerberg says](#)]*

TheDonald, as the camouflaged men at the Capitol suggested, offered a particularly vivid view of this combustible dynamic. The forum, [banned last year from Reddit](#) for hate speech and violent talk and now turned into a website, had been one of many online staging grounds for Wednesday's riot, and the success of the takeover of the Capitol spurred celebration and calls for further action, including the execution of leading Democrats. For days before, the forum had featured advice on how best to sneak guns into Washington, despite its strict weapons laws.

AD

Exhibit N

Case 1:21-cv-01169-TCB Document 35-2 Filed 05/03/21 Page 1078 of 1677 Page ID #: 1367

By Thursday morning, though, different moods had set in on this and other pro-Trump forums. Anger and gloating were still there, but so was unease at the furious public and political backlash against the events of the day before, which led to dozens of arrests and left one person fatally shot by police and three people dead after medical emergencies. Some posters worried their favorite forums, including TheDonald, would get knocked offline by chastened Internet service providers. There also was a pitched effort to redirect blame against left-wing activists, such as antifa, for somehow dressing up as marauding Trump supporters — a claim that was obviously ridiculous to anyone who watched the events unfold on their televisions, computers or smartphones.

*[Pro-Trump forums erupt with violent threats ahead of Wednesday's rally against the 2020 election]*

On TheDonald, as users argued that the removal of some violent comments suggested the site's leaders had been "compromised," one moderator wrote, "What do you want? Us to try to lead a [expletive] revolution … from a forum on the internet, which ends up getting the site shut down in a matter of days and all of us sent to the gulag?" Many things born on the darkest corners of the Internet found their way to the heart of American democracy on Wednesday. Ludicrous claims among adherents of the QAnon conspiracy theory — including that leading Democrats are satanic pedophiles — got shouted by the mobs taking over the Capitol. The emerging garb of the far-right — camouflage, goggles, American flags draped as shawls — leaped directly from the far-right memeworld into the nation's capital.

AD

Years of social media comments about "lynching" political leaders opposed to Trump, meanwhile, manifested themselves as an actual noose, hanging from a makeshift gallows on the Mall. Someone wrote "BIDEN," in reference to President-elect Joe Biden, on the wooden structure, with an arrow pointing toward the noose.

It was not clear if TheDonald or any similar pro-Trump forum directly coordinated the takeover of the Capitol, or if posters simply shared general advice, promotion and celebration of the idea of thronging to Washington in support of the president. Much of that was included in a popular thread called "PATRIOTS STORM THE CAPITOL | WATCH PARTY."

The resulting mayhem appeared to proceed without obvious leaders, a common feature of political action developed and coordinated online, said Rita Katz, executive director of SITE Intelligence Group, which tracks political extremism.

Exhibit N

AD

"It's a new age of terrorism that can't exist without the Internet," Katz said. "Having said that, the movement has a spiritual leader, which is Trump."

Advance Democracy, a group headed by former FBI analyst and Senate investigator Daniel J. Jones, who led the review of the CIA's torture program, also was tracking pro-Trump forums as they built toward Wednesday's assault.

"In the lead-up to yesterday's violence, the Capitol rioters needed a place to plan for how the violence would unfold. They found this on unmoderated pro-Trump forums such as TheDonald.win," Jones said. "There, they posted their plans to take matters into their own hands and literally threatened to kill lawmakers. They encouraged each other to bring illegal weapons. When this came to fruition, the real-life actions provided fodder for those on the forum."

[*As QAnon grew, Facebook and Twitter missed years of warning signs about the conspiracy theory's violent nature*]

In the aftermath, pro-Trump forums wavered between glee, deflection and recrimination, shunting blame for the chaos onto a mass of scapegoats. They blamed Vice President Pence, for not subverting the reality of Trump's loss, and old foes like Democrats, the media and the "deep state." They also blamed the Capitol Police and other members of law enforcement.

AD

Some pro-Trump posters conjured new conspiracy theories to explain away the damage: "Does anyone else feel like this was all a complete setup?" conservative commentator Evan Kilgore tweeted late Wednesday, in a message that was "liked" more than 114,000 times.

Social media sites like Facebook and Twitter worked belatedly to tamp down some of the fervor. Facebook indefinitely suspended Trump's accounts Thursday, while Twitter blocked him from tweeting for 12 hours. A number of less-moderated alternatives offered refuge for Trump supporters eager to egg the chaos on.

Exhibit N

The pro-Trump attorney L. Lin Wood, whose Twitter account was suspended Wednesday after he baselessly accused Pence of being a "child molester," leaped quickly to the alternative social network Parler, where he urged Trump-supporting "patriots" to keep fighting, saying, "Almighty God is with you. TODAY IS OUR DAY."

AD

"Get the firing squads ready. Pence goes FIRST." Wood wrote in a Parler post that has been directed toward user feeds nearly 3 million times.

TheDonald, Wood and Parler did not respond to requests for comment.



Parler positions itself as the "free speech" alternative to Twitter and Facebook. And after the 2020 election, conservatives welcome that. (The Washington Post)

Seeing the chaos as a marketing opportunity, extreme right-wing groups used encrypted messaging services to coach their followers on recruitment strategies for winning newly disillusioned Trump supporters to their cause. One self-identified neo-Nazi account wrote to more than 7,000 followers on Telegram, advising them that many people normally averse to a violent ideology could now be more vulnerable to radicalization.

Exhibit N

"It will soon be the time to start individually reaching out to Rightwing types and spreading our 'There is No Political Solution' message," the account said.

*[Reddit closes long-running forum supporting President Trump after years of policy violations]*

Another white supremacist "fraternity" discussed the possibility of a White-led uprising after Wednesday's attempted insurrection. "Your mission is to invite [Trump supporters] into our spaces. Tell them there is a solution to their problem. Invite them to telegram. Seize the opportunity," the administrator posted. "I'm sure a lot of them lost faith with [Trump] today," one commenter responded.

AD

On TheDonald, where users had proudly shared their travel itineraries for Wednesday's demonstrations and planned meetups at hotels and restaurants near the White House, the triumphant mood quickly soured after Pence refused to intervene, with thousands of commenters labeling him a criminal traitor compromised by the "swamp." Even as they posted, their real-world compatriots tore through the Capitol building voicing the same anger.

"Where's Pence, show yourself!" one rioter said after barging onto the Senate floor.

When Trump tweeted a video asking protesters to return home, a barrage of posts ripped through the forum expressing a mix of disbelief and frustration.

"HE ASKED US TO COME. 'JAn 6 WILL BE WILD,' " wrote the user "RiverFenix" in a post quoting Trump's tweet from last month. "IM AM SO CONFUSED SOMEONE SHAKE ME AWAKE," the account added.

AD

While some posters expressed continued allegiance to the president, many others responded with cynicism. "Let's move on to someone that will actually fight and isn't afraid of scrutiny," one user commented. "He led us to slaughter," said another.

Still, a contingent of Trump supporters and believers in the QAnon conspiracy theory voiced the belief that the

Exhibit N

siege was all part of a plan to keep Trump in power — and that more tumult would come in the days ahead.

"Sleep well tonight patriots. ... You are going to love how this movie ends," wrote "StormIsUponUs," a QAnon-espousing account with more than 450,000 followers on Parler. "'Nothing can stop what's coming' wasn't just a catch-phrase."

*Michael E. Ruane contributed to this report.*

Updated January 17, 2021

## Complete coverage: Pro-Trump mob storms Capitol building

**Security**

**Live updates:** State capitols, D.C. brace for potentially violent protests

**Arrests:** Here are some of the people charged

**What happened on Jan. 6**

**Video timeline:** 41 minutes of fear from inside the Capitol siege

**Police turning in police:** Off-duty police were part of the Capitol mob

**Exclusive:** Capitol Police intelligence report warned three days before attack that 'Congress itself' could be targeted

**Attacked with bear spray and their own batons:** D.C. police describe brutal and chaotic moments

**Trump's second impeachment**

**Unprecedented:** House hands Trump a second impeachment, this time with GOP support

**Senate impeachment whip count:** Where Democrats and Republicans stand

comment3.4k Comments

Exhibit N

**Today's Headlines**

The most important news stories of the day, curated by Post editors and delivered every morning.

By signing up you agree to our Terms of Use and Privacy Policy

Most Read Technology

Exhibit N

# 1

Analysis

## The Capitol rioters kept posting incriminating things on social media. Unsurprisingly, they were mocked — and arrested.

2

## Misinformation dropped dramatically the week after Twitter banned Trump and some allies

3

## QAnon reshaped Trump's party and radicalized believers. The Capitol siege may just be the start.

4

## These are the platforms that have banned Trump and his allies

5

## Apple sued by group insisting it curb Telegram after Capitol attack

About Us

Public Relations

Careers

Diversity & Inclusion

Exhibit N

Newspaper in Education

Today's Paper

WP BrandStudio

Events

Policies & Standards

Get The Post

Home Delivery

Digital Subscription

Gift Subscriptions

Mobile & Apps

Newsletters & Alerts

Washington Post Live

Reprints & Permissions

Post Store

Books & eBooks

e-Replica

Help

Contact the Newsroom

Contact Customer Care

Reader Representative

Advertise

Licensing & Syndication

Request a Correction

Send a News Tip

Terms of Use

Digital Products Terms of Sale

Print Products Terms of Sale

Terms of Service

Privacy Policy

Submissions & Discussion Policy

RSS Terms of Service

Ad Choices

washingtonpost.com © 1996-2021 The Washington Post

Exhibit N

# EXHIBIT M

Case 1:21-cv-01169-TCB Document 135-2 Filed 05/03/21 Page 1087 of 1677

Case 1:21-cv-01169-TCB Document 35-2 Filed 05/03/21 Page 1087 of 1677 Page ID#: 1376

SUBSCRIBE FOR $1/WEEK

**Capitol Riot Fallout**

Latest Updates    Inside the Siege    Visual Timeline    Notable Arrests    Capitol Police in Crisis

ADVERTISEMENT

# *Amazon, Apple and Google Cut Off Parler, an App That Drew Trump Supporters*

The companies pulled support for the "free speech" social network, all but killing the service just as many conservatives are seeking alternatives to Facebook and Twitter.

Exhibit N



A rally by supporters of President Trump in Washington on Nov. 14 to protest the election results.  Kenny Holston for The New York Times

 

**By Jack Nicas and Davey Alba**

Published Jan. 9, 2021   Updated Jan. 13, 2021

Parler, a social network that pitches itself as a "free speech" alternative to Twitter and Facebook, is suffering from whiplash.

Over the past several months, Parler has become one of the fastest-growing

Exhibit N

apps in the United States. Millions of President Trump's supporters have flocked to it as Facebook and Twitter increasingly cracked down on posts that spread misinformation and incited violence, including muzzling Mr. Trump by removing his accounts this past week. By Saturday morning, Apple listed Parler as the No. 1 free app for its iPhones.

But, by Saturday night, Parler was suddenly fighting for its life.

First, Apple and Google removed the app from their app stores because they said it had not sufficiently policed its users' posts, allowing too many that encouraged violence and crime. Then, late Saturday, Amazon told Parler it would boot the company from its web-hosting service on Sunday night because of repeated violations of Amazon's rules.

Amazon's move meant that Parler's entire platform would soon go offline unless it was able to find a new hosting service on Sunday.

ADVERTISEMENT

"Big tech really wants to kill competition," John Matze, Parler's chief executive, said in a text message. "And I have a lot of work to do in the next 24 hours to make sure everyone's data is not permanently deleted off the internet."

Dig deeper into the moment.
Subscribe for $1 a week.

In a statement online, Mr. Matze added that the tech giants had acted in a "coordinated effort" to "completely remove free speech off the internet." Parler, he said, would probably be unavailable on the internet for up to a week, starting at midnight on Sunday. But, he went on, the company had "prepared" by not relying on Amazon's proprietary infrastructure and was looking for a new hosting provider.

A day earlier, Parler appeared poised to capitalize on growing anger at Silicon Valley in conservative circles and was even a logical choice to become Mr. Trump's next megaphone after he was kicked off Twitter. Now its future is looking bleak.

Exhibit N

In a letter to Parler on Saturday, Amazon said that it had sent the company 98 examples of posts on its site that encouraged violence and that many remained active. "It's clear that Parler does not have an effective process to comply with" Amazon's rules, the company said in the letter. Amazon "provides technology and services to customers across the political spectrum, and we continue to respect Parler's right to determine for itself what content it will allow on its site. However, we cannot provide services to a customer that is unable to effectively identify and remove content that encourages or incites violence against others."

On Friday, Apple gave Parler 24 hours to clean up its app or face removal from its App Store. Parler appeared to take down some posts over that period, but on Saturday, Apple told the company its measures were inadequate. "We have always supported diverse points of view being represented on the App Store, but there is no place on our platform for threats of violence and illegal activity," Apple said in a statement.

ADVERTISEMENT

"This is very huge," Amy Peikoff, Parler's policy chief, told Fox News after Apple gave its warning on Friday. Without access to the App Store, she said, "we're toast."

On Tech with Shira Ovide: Your guide to how technology is transforming our lives — in the time of coronavirus and beyond.
Sign Up

Several Parler executives accused the tech companies' moves as being politically motivated and anticompetitive.

Mr. Matze pointed to the fact that Twitter had recently promoted the phrase "Hang Mike Pence" as a trending topic. (The majority of the discussion on Twitter was about rioters chanting the phrase about the vice president on Wednesday.) "I have seen no evidence Apple is going after them," Mr. Matze said. "This would appear to be an unfair double standard as every other social media site has the same issues, arguably on a worse scale."

Exhibit N

The actions against Parler were part of a wider crackdown by tech companies on President Trump and some of his most extreme supporters after Wednesday's deadly riot in Washington. But unlike Twitter and Facebook, which make decisions about the content that appears on their own sites, Amazon, Apple and Google weighed in on how another company was operating.

Amazon Web Services supports a large share of the websites and apps across the internet, while Apple and Google make the operating systems that back nearly all of the world's smartphones. Now that the companies have made it clear that they will take action against sites and apps that don't sufficiently police what their users post, it could have significant side effects.

Several upstarts have courted Mr. Trump's supporters with promises of "unbiased" and "free speech" social networks, which have proven to be, in effect, free-for-all digital town squares where users hardly have to worry about getting banned for spreading conspiracy theories, making threats or posting hate speech. The tougher enforcement from the tech companies could preclude such apps from becoming realistic alternatives to the mainstream social networks. They now face the choice of either stepping up their policing of posts — undercutting their main feature in the process — or losing their ability to reach a wide audience.

That may reinforce the primacy of the social-media incumbents, Facebook, Twitter and Instagram. It also gives those companies' decisions more teeth. If they ban a pundit for violating their rules, that person will lack a strong alternative.

ADVERTISEMENT

Amazon, Apple and Google's moves could also spur other apps to strengthen their enforcement.

DLive, a livestreaming site that rioters storming the Capitol used to

Exhibit N

broadcast the moment, said on Friday that it had indefinitely suspended seven channels and permanently removed over 100 previous broadcasts of the mob. It added that the "lemons," a DLive currency that can be converted into real money, sent to the suspended channels would be refunded to donors in the next few days.

Other platforms that host posts by right-wing influencers, including CloutHub and MyMilitia — a forum for militia groups — adjusted their terms of service recently to ban threats of violence.

DLive was pressured by Tipalti, a payment company that helps it operate. Tipalti said in a statement that it had suspended its service until DLive removed the accounts that had broadcast the riots on Wednesday.

Such third-party companies that help apps and websites function, from payment processors to cybersecurity firms to web-hosting providers like Amazon, have used their positions to influence how their customers handle extremist or criminal activity. In 2019, Cloudflare, a company that protects sites from cyberattacks, effectively delivered the death knell to 8chan, an anonymous online message board that hosted the manifesto of a mass shooter, by halting its protections for the site. After Cloudflare backed away from 8chan, the site struggled to find other service providers that could keep it active.

Parler could have the same problem now that it lacked a way to host its website, particularly as the company suddenly became a pariah after Wednesday's riot, which was partially planned on Parler. Amazon had faced pressure from its own employees and at least one member of Congress before it pulled its support for Parler, and other companies could fear unwanted attention if they took its business.

BuzzFeed News first reported Amazon's decision to pull its support for Parler.

If Parler is able to find a provider and resume its service, it will still have an uphill journey to find new users without a place in the major app stores. Apple's decision blocks iPhone owners from downloading the Parler app. People who already have the app will still be able to use it — if it comes back online — but their versions of the app will soon become obsolete as Apple updates the iPhone software.

Google cut Parler out of its flagship Android app store, but it also allows apps to be downloaded from elsewhere, meaning Android users would still

Exhibit N

be able to find the Parler app, just with a bit more work. If Parler finds a new web-hosting provider, its website would also be available via web browsers on phones and computers.

ADVERTISEMENT

After Apple had given the company 24 hours to improve its moderation to avoid removal from the App Store, it appeared that Parler had tried to remove some posts that seemed to call for violence.

For instance, L. Lin Wood, a lawyer who had sued to overturn Mr. Trump's election loss, posted on Parler on Thursday morning: "Get the firing squad ready. Pence goes FIRST." The post was viewed at least 788,000 times, according to a screenshot on the Internet Archive. By Saturday morning, the post had been removed.

In a text message, Mr. Matze said the post had been removed "in compliance with Parler's terms of service and rules against incitement of violence."

In a notice to Parler on Saturday, Apple said that it had "continued to find direct threats of violence and calls to incite lawless action" on the app. Apple told the company its app would not be allowed on the App Store until "you have demonstrated your ability to effectively moderate and filter the dangerous and harmful content on your service."

In an interview, Jeffrey Wernick, Parler's chief operating officer, blamed "a cancel culture" at the tech companies for his company's dimming prospects. He said he would advise other platforms not to try to compete on Apple's App Store. "Because if you raise money and get investors and end up like Parler, what's the point?" he said.

**Apple, Google and Amazon kick Parler off their platforms**

Exhibit N

Apple and Google said they would
remove Parler from its App
Stores. Amazon said it would no
longer host Parler on its web
hosting service.

**Apple letter to Parler**

To the developers of the Parler app,

Thank you for your response regarding dangerous and harmful content on Parler. We have
determined that the measures you describe are inadequate to address the proliferation of
dangerous and objectionable content on your app.

Parler has not upheld its commitment to moderate and remove harmful or dangerous content
encouraging violence and illegal activity, and is not in compliance with the App Store Review
Guidelines.

In your response, you referenced that Parler has been taking this content "very seriously for
weeks." However, the processes Parler has put in place to moderate or prevent the spread of
dangerous and illegal content have proved insufficient. Specifically, we have continued to find
direct threats of violence and calls to incite lawless action in violation of Guideline 1.1 - Safety -
Objectionable Content.

Your response also references a moderation plan "for the time being," which does not meet the
ongoing requirements in Guideline 1.2 - Safety - User Generated content. While there is no
perfect system to prevent all dangerous or hateful user content, apps are required to have robust
content moderation in place to proactively and effectively address these issues. A
temporary "task force" is not a sufficient response given the widespread proliferation of harmful

ADVERTISEMENT

Subscribe for $1 a week. Ends soon.
**Thanks for reading The Times.**
EXPAND



**Put the facts top of mind.**
Subscribe for $1 a week.
Ends soon.

VIEW OFFER

© 2021 The New York Times Company

NYTCo    Contact Us    Work with us    Advertise    T Brand Studio    Your Ad Choices    Privacy Policy    Terms of Service    Terms of Sale    Site Map    Help    Subscriptions

Do Not Sell My Personal Information

Something went wrong. Please try again later.    California Notices

Exhibit N

# EXHIBIT MM

Case 1:21-cv-01169-TCB Document 35-2 Filed 05/03/21 Page 1096 of 1677

By using this site, you agree to our **Privacy Policy** and our **Terms of Use**.

Login    Watch TV

MIKE PENCE · Published January 10

# Secret Service investigating death threats against Pence

Source reveals while Pence was sheltering amid riot, Trump did not reach out to him

By **Bradford Betz | Fox News**



**Big Tech bans Trump from social media**

Fox News contributors Ed Rollins and Jessica Tarlov weighs in on 'America's News HQ.'

The U.S. Secret Service is investigating death threats against Vice President <u>Mike Pence</u> made by <u>pro-Trump</u> lawyer Lin Wood, Fox News has learned.

Wood, who was banned from Twitter last week, is suspected of writing a now-deleted post on Parler: "Get the firing squads ready. Pence goes FIRST."

Exhibit N

Case 1:21-cv-01169-TCB  Document 35-2  Filed 05/03/21  Page 1097 of 1677



**Vice President Mike Pence listens after reading the final certification of Electoral College votes cast in November's presidential election during a joint session of Congress after working through the night, at the Capitol in Washington, Jan. 7.  (AP)**

"We are aware of the comments and take all threats against our protectees seriously," a Secret Service spokesman told Fox News on Saturday.

The Secret Service and other federal agencies also are investigating others seen on a video inside the U.S. Capitol yelling "Hang Pence."

The threats to the vice president come days after a pro-Trump group stormed the U.S. Capitol to protest the formal certification of President-elect Joe Biden's victory. Lawmakers, staff members and others hid under tables and evacuated as the rioters roamed the halls of the Capitol, bearing pro-Trump flags and pounding on doors.

**ARNOLD SCHWARZENEGGER CONDEMNS TRUMP AS 'WORST PRESIDENT EVER' AFTER CAPITOL RIOT**

A source close to Pence told Fox News on Wednesday that while Pence was sheltering in "hardened rooms" in the Capitol, President Trump did not reach out to him to check on his status or condemn those who said the vice president "should be executed."

**CLICK HERE TO GET THE FOX NEWS APP**

Later in the week the hashtag "Hang Mike Pence" was trending on Twitter. A Twitter spokesperson told Fox News on Saturday that the company had "blocked the phrase and other variations of it from trending."

Exhibit N

*Fox News' David Spunt and The Associated Press contributed to this report.*

Bradford Betz is an editor for Fox News. Follow him on Twitter @bradford_betz.



## Conversation **13K Comments**

What do you think?

Sort by **Best** ⌄

**TheAmericanWay**                                                           ⋮
10 January, 2021

It's been a rough four years.  One concern that I've had since there's been so much drama since
President Trump was elected is the impact it has on younger children.  Some parents allow their
children to hear and see just about everything.  How many children have been negatively affected
by what they hear on the news or from what their parents are saying about world events?  And
then you have public school teachers who also are not doing a great job helping our children to
thrive.  What a world...

Reply  👍 385  👎 69

**Show 11 previous replies** ⌄

**jeff2018957** › TheAmericanWay                                              ⋮
10 January, 2021

Why did you bring up teachers?  Depending on the age the child should be made aware of
what is going on so we don't repeat this ever again.

Exhibit N

Reply 👍 31  👎 14

Show 1 more replies ⌄

**uckfay_idenbay** › TheAmericanWay
10 January, 2021

Were there any politico types not hiding under tables? The US is just an international joke full of cowardly sheep. "Comfort cowards" who kinda liked having a free country but don't really want to put anything on the line to preserve it. How long will foreign allies like Taiwan last now that China and others see we are just a bunch of kneeling paper tigers?

Reply 👍 29  👎 25

---

**Nyrepublucan**
10 January, 2021

Death threats against any American citizen should be taken equally seriously. Putting a politicians life above even the poorest person shows inequality. Only the wealthy and heartless would think once life is more important than another. People who threaten a life should not be allowed to escape justice. End life terms for Congress and you will see the value of individuals increase.

Reply 👍 999  👎 88

Show 28 previous replies ⌄

> **MedicalCorpsAlum** › Nyrepublucan
> 10 January, 2021
>
> Sorry, but uneducated rural farmers and factory workers that make 1/20th my annual salary and couldn't get accepted to university even if they wanted to are objectively less important than me and less important than Mike Pence. *(Edited)*
>
> Reply 👍  👎 109
>
> Show 1 more replies ⌄

> **dogbreath191** › Nyrepublucan
> 10 January, 2021
>
> I think some in congress deserve life terms.
>
> Reply 👍 37  👎 22
>
> Show 4 more replies ⌄

---

**regalley556**
10 January, 2021

I really feel bad for our young people who never knew the goodwill and cooperative spirit of the USA.

Reply 👍 2389  👎 41

Exhibit N

1/23/2021
Case 1:21-cv-01169-TCB Document 35-2 Filed 05/03/21 Page 1100 of 1677
Secret Service investigating death threats against Pence | Fox News

Show 84 previous replies ⌄

**USA1ST77777** › regalley556     ⋮

10 January, 2021

I feel sorry for all our young people who have been indoctrinated into a cult that is destroying our way of life. The DNC is the most nefarious political party to ever represent any country and that's saying a lot.

Reply 👍 79 👎 92

Show 1 more replies ⌄

*This post violated our policy.*

Show 1 previous reply ⌄

**whatacircus**     ⋮

10 January, 2021

the commie boogeyman. Yeah, you go with that. Not even worth my time to point out how many social programs or regulations you benefit from or accept without question.

Reply 👍 12 👎 5

**claymatthews11**     ⋮

10 January, 2021

If we were on the edge of communism, the stock market would be crashing. It's actually booming

Sorry you have been lied to

Reply 👍 13 👎 6

**Atticus_Finch**     ⋮

10 January, 2021

I don't agree with Pence politically. In fact I don't agree with him on almost anything. But he did not deserve this. I read yesterday that he was told by the State Department he would have to evacuate the building during the insurrection and he refused. He didn't want to leave his colleagues behind. Can you imagine Donald Trump ever suggesting such a thing?

Reply 👍 672 👎 126

Show 25 previous replies ⌄

**nolabels228** › Atticus_Finch

10 January, 2021

Exhibit N

No one deserves this. But you spend 4 years helping trump build an uncontrollable steamroller it's not a great look when it rolls over you.

He found out the hard way how transactional the transactional President really is.

Reply   👍 34   👎 18

Show 1 more replies ⌄

**mattMN** › Atticus_Finch

10 January, 2021

never would.  he would be crying like a little bi00ch

Reply   👍 23   👎 32

---

**guru970**

10 January, 2021

All Americans need to condemn this in the strongest terms,  any threat against any leader on the left or the right is not acceptable . Hopefully both sides of the pollical divide can agree. It's becoming very obvious that we have very radical people on both sides not thinking clearly and are dangerous !

Reply   👍 550   👎 34

Show 13 previous replies ⌄

    **Chinasucks884** › guru970

    10 January, 2021

    This is why china or russia will conquer the us

    Reply   👍 18   👎 4

    Show 2 more replies ⌄

    **ohiotpm1** › guru970

    10 January, 2021

    Ha. I wanna see Mad Maxine's condemnation of The actions of Antifa and BLM.

    Reply   👍 45   👎 12

    Show 2 more replies ⌄

---

**my2centsworth**

10 January, 2021

Pence should get a medal!  For standing up to the pressure and threats and sticking to the Constitution.  The fact that he got death threats over this, tells us a lot about the low brow level of the argument.

Exhibit N

Reply 👍 172 👎 14

Show 2 previous replies ⌄

**nolabels228** › my2centsworth    ⋮

11 January, 2021

You don't get to spend 4 years helping trump create a disinformation monster and then, at the 11th hour, be commended for doing your job in the face of said monster.

Reply  👍  👎

**butcher99** › my2centsworth    ⋮

10 January, 2021

That is true.   Took him 4 years but he finally grew a spine

Reply 👍 6 👎 4

**HWells13**    ⋮

10 January, 2021

The threats against Mike Pence are alarming for many reasons.  He is a man who seems to give his best to our nation and its Constitution, even when he must stand alone. We could use more politicians like him. Trump's treatment of him, after all he has done for Trump, says much more about Trump than is does Pence.

Reply 👍 32 👎 6

**gotem2020**    ⋮

10 January, 2021

people people we need to unite and rail against the profiteering power hungry tyrants that make money dividing us...they are not red blue left right they are themselves they believe only in profits and power...as long as they can keep us fighting each other and profiting off it they have won and nothing will change ever. since the mid 80s they've been taking taking taking from us and dividing us more and more. yeah I know it started before the 80s but at that time it got put into high gear and more violent in purpose and result.

Reply 👍 13 👎

**Trommie**    ⋮

10 January, 2021

It's unacceptable to make death threats against public officials, whether you agree with their decisions or not.  If you don't like them, then be sure that you cast your vote for the candidate that you prefer.

Exhibit N

Reply 👍 29 👎 3

Show 3 previous replies ⌄

> **AnneBonney** › Trommie      ⋮
>
> 10 January, 2021
>
> Think that we need to know exactly who is doing that...
>
> Reply 👍 1 👎

> **no8uddysbus1ness** › Trommie      ⋮
>
> 10 January, 2021
>
> REALLY? well i'll be...  then its way past time for the liberals in Hollywood and leftist to be put in prison,,,, Trump has been threatened ...  continually these past 5 yrs...  hell they want to blow the WHITE HOUSE UP, CHOP HIS HEAD OFF   BAH BAH..
>
> Reply 👍 23 👎 6

---

**lmephd424**      ⋮

10 January, 2021

Full disclosure, I voted for President Trump twice because I believed in his policies, although I was always critical of his rhetoric which was beneath the President of the United States.  But now, I am disgusted with his actions and just want him gone, but not by further dividing the country with impeachment, just let him ride into the sunset without frustrating and angering half of America.  If the democrats do this, their stance of unity is nothing more than partisan politics - telling people what they want to hear and doing the same old thing - fighting with each other.  It may be good short term optics but long term it's devastating.

Reply 👍 324 👎 169

Show 21 previous replies ⌄

> **open2change** › lmephd424      ⋮
>
> 10 January, 2021
>
> Agree with you. Trump maybe effective on executing some of his promised policies but he wants to win at any cost. It is in his nature. If you are on his side great if you are not he considers you worthless and can demean and bully you in the most disgusting way. Now we are not talking about just another citizen we are talking about the President of USA, a sitting president of USA.  Few years ago nobody would have believed that a President of the most powerful nation on the planet can rally people against his own country's institutions, blatantly disregard election results even after unbelievable number of frivolous cases of voter fraud were dismissed. Such a disrespect and callous disregard of our election process and judicial system by THE PRESIDENT OF USA just because it didn't go in his favor? is this for real?

Exhibit N

unfortunately for America, Yes it is. How much ever it gives me heartache on not making him accountable, I agree for the larger good avoiding impeachment might be a good idea.

Reply  👍 3  👎 4

**Wordsmith965**  ⟩ lmephd424

10 January, 2021                                                                              ⋮

How did you not see this coming out of him?  His policies?  You could have voted for a number of partisan Republicans that have the same policies so that's no reason. This mess is on all of you who didn't have a clue in 2016.

Reply  👍 8  👎 6

Show 1 more replies ⌄

**Show More Comments**

Powered by ⚙ OpenWeb                                    Terms  |  Privacy  |  Feedback

## Coronavirus                                    ## U.S.

Crime

Military

Education

Terror

Immigration

Economy

Personal Freedoms

Fox News Investigates

## World                                          ## Opinion

U.N.

Conflicts

Terrorism

Disasters

Global Economy

Environment

Religion

Scandals

## Politics

Executive

Senate

House

Judiciary

Foreign Policy

Polls

Elections

## Business

Personal Finance

Economy

Markets

Watchlist

Lifestyle

Real Estate

Tech

## Science

Archaeology

Air & Space

Planet Earth

Wild Nature

Natural Science

Dinosaurs

## Entertainment

Celebrity News

Movies

TV News

Music News

Style News

Entertainment Video

## Lifestyle

Food + Drink

Cars + Trucks

Travel + Outdoors

House + Home

Fitness + Well-being

Style + Beauty

Family

Faith

## Tech

Security

Innovation

Drones

Computers

Video Games

Military Tech

## Health

Coronavirus

Healthy Living

Medical Research

Mental Health

Cancer

Heart Health

Children's Health

## TV

Shows

Personalities

Watch Live

Full Episodes

Show Clips

News Clips

## About

Contact Us

Careers

Fox Around the World

Advertise With Us

Media Relations

Corporate Information

Compliance

Supplier Diversity

## Other

Fox Nation

Fox News Shop

Fox News Go

Fox News Radio

Newsletters

Alerts

Podcasts

Apps & Products

New Terms of Use   Updated Privacy Policy   Do Not Sell my Personal Information   Closed Captioning Policy   Help

Contact Us   Accessibility Statement

This material may not be published, broadcast, rewritten, or redistributed. ©2021 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

Exhibit N

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN and DERRICK VAN
ORDEN,

                                              **CASE NO. 2:20-cv-1771**

                     **Plaintiffs.**

       **v.**

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMAN,
JULIE M. GLANCEY, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS, in
his official capacity,

                     **Defendants.**

---

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

---

## NATURE OF THE ACTION

1. This civil action brings to light a massive election fraud, multiple violations of the Wisconsin Election Code, *see, e.g.,* Wis. Stat. §§ 5.03, *et. seq.*, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution. These violations occurred during the 2020 General Election throughout the State of Wisconsin, as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2. The scheme and artifice to defraud was for the purpose of illegally and fraudulently

1

Exhibit N

manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. This Complaint details an especially egregious range of conduct in Milwaukee County and the City of Milwaukee, along with Dane County, La Crosse County, Waukesha County, St. Croix County, Washington County, Bayfield County, Ozaukee County and various other counties throughout the Third District and throughout Wisconsin employing Dominion Systems, though this conduct occurred throughout the State at the direction of Wisconsin state election officials.

3. The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin, that collectively add up to multiples of Biden's purported lead in the State of 20,565 votes.

4. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election. Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief requested herein.

Exhibit N

**Dominion Voting Systems Fraud and Manipulation**

5. The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Wisconsin Board of State Canvassers. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6. Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

7. As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .
>
> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the

3

Exhibit N

entire system.  *Id.* ¶¶ 10 & 14.

8.   A core requirement of the Smartmatic software design ultimately adopted by Dominion for Wisconsin's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9.   The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[1]

10.  This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties or hostile foreign actors to access the system and manipulate election results, and moreover potentially to

---

[1]  *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia).  The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 9, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

Exhibit N

cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code (pursuant to Wisconsin Statute § 5.905) is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11. These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In certifying Dominion Voting Systems Democracy Suite, Wisconsin officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. (See Exhs 11 A and B).

12. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[2]

13. In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud that occurred as a direct result of Defendant Wisconsin Election Commission ("WEC") and other Defendants directing Wisconsin clerks and other election officials to ignore or violate the express requirements of the Wisconsin Election Code.

---

[2] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Exh. 10 ("Appel Study")).

Exhibit N

First, the WEC issued "guidance" to county and municipal clerks not to reject "indefinitely confined" absentee voters, even if the clerks possess "reliable information" that the voter is no longer indefinitely confined, in direct contravention of Wisconsin Statute § 6.86(2)(6), which states that clerks must remove such voters. Second, the WEC issued further guidance directing clerks – in violation of Wisconsin Statute § 6.87(6)(d), which states that an absentee envelope certification "is missing the address of a witness, the ballot may not be counted" – to instead fill in the missing address information.

14. This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

    A. A report from Dr. William Briggs, showing that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots;

    B. Reports from Redacted Expert Witnesses who can show an algorithm was used to pick a winner.

15. In the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Ex. 12, copy of redacted witness affidavit).

16. These and other "irregularities" demonstrate that at least 318,012 illegal ballots were counted in Wisconsin. This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

17. This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties

of the United States."

18.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

19.   The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

20.   This Court has jurisdiction over the related Wisconsin constitutional claims and state-law claims under 28 U.S.C. § 1367.

21.   Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

22.   Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

### THE PARTIES

23.   Plaintiff William Feehan, is a registered Wisconsin voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin.  Mr. Feehan is a resident of the City of La Crosse and La Crosse County, Wisconsin.

24.   Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions

Exhibit N

of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

25. Plaintiff Feehan has standing to bring this action as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq (election procedures for Wisconsin electors). As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

26. Plaintiff Derrick Van Orden is a former United States Navy SEAL, who was the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the United States House of Representatives. Mr. Van Orden is a resident of Hager City, Pierce County, Wisconsin.

27. Mr. Van Orden "lost" by approximately 10,000 votes to the Democrat incumbent, U.S. Representative Ron Kind. Because of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code.

28. Plaintiff Van Orden has standing as the ostensible "defeated" candidate in the Third Congressional District race, and seeks an order for a new election, complying with Wisconsin election law. Plaintiff Van Order received 189,524 votes or 48.67% as tallied versus Ron Kind who received 199,870 or 51.33% of the votes as reportedly tallied.

8

Exhibit N

29.  Plaintiffs brings this action to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin and to obtain the other declaratory and injunctive relief requested herein.  Those results were certified by Defendants on November 30, 2020, indicating a plurality for Mr. Biden of 20,565 votes out of 3,240,867 cast.

30.  The Defendants are Wisconsin Elections Commission ("WEC"), a state agency, and its members Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., in their official capacities

31.  Defendant Governor Tony Evers is named as a defendant in his official capacity as Wisconsin's governor.

32.  Defendant WEC was created in 2015 by the Wisconsin Legislature as an independent agency under the Executive branch to administer Wisconsin's election laws. Wis. Stat.  §§ 5.03 & 15.61.  The WEC is authorized to adopt administrative rules pursuant to Chapter 227 of the Wisconsin Statutes, but nothing under Wisconsin's election laws authorizes the WEC to issue any documents, make any oral determinations or instruct governmental officials administering elections to perform any act contrary to Wisconsin law governing elections.

33.  Furthermore, the Wisconsin Legislature also created municipal elections commissions for municipalities with a population greater than 500,000 and a county elections commissions for counties with a population greater than 750,000.  Wis Stat.  § 7.20.  As a result, the City of Milwaukee Elections Commission was created as well as the Milwaukee County Elections Commission and the Dane County Elections Commission. These county and municipal elections commissions are responsible for administering the elections in their respective jurisdictions.

Exhibit N

## STATEMENT OF FACTS

34.  Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Wisconsin Constitution.

35.  The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.

> U.S. CONST. art. I, § 4 ("Elections Clause").

36.  With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

> U.S. CONST. art. II, § 1 ("Electors Clause").

37.  None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38. The WEC certified the Presidential Election results on November 30, 2020.  The Presidential election results in Wisconsin show a difference of 20,565 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

10

Exhibit N

39.   Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

### I.   VIOLATIONS OF WISCONSIN ELECTION CODE

#### A.   WEC Directed Clerks to Violate Wisconsin Election Code Requirements for Absentee Voting by "Indefinitely Confined" without Photo ID.

40.   The Wisconsin State Legislature adopted Act 23 in 2011 to require Wisconsin electors to present an identification containing a photograph, such as a driver's license, to either a municipal or county clerk, when registering to vote and when voting. Wis. Stat. §§ 6.34; 6.79 (2). The Wisconsin State Legislature adopted the photo ID requirement to deter the casting of ballots by persons either not eligible to vote or persons fraudulently casting multiple ballots. *League of Women Voters of Wisconsin Education Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

41.   Wisconsin's absentee voting is governed by Wisconsin Statutes § 6.84 - § 6.89.   Under Wisconsin Statutes §6.86, every absentee elector applicant must present a photo ID when registering to vote absentee except absentee voters who registered as "indefinitely confined," Wis. Stat. §6.86 (ac), meaning someone confined "because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. § 6.86(2)(a). As a result, Wisconsin election procedures for voting absentee based on "indefinitely confined" status circumvent the photo ID requirement, creating an avenue for fraudulent voting.

42.   In order to ensure that only those who are "indefinitely confined" may use the "indefinitely confined" absentee ballot in an election, Wisconsin Statutes §6.86 provides that any elector who files an application for an absentee ballot based on indefinitely confined status may not use the absentee ballot if the electoral is no longer "indefinitely confined."   Wisconsin Statutes §6.86 (2)(b) further

11

Exhibit N

provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

43. Despite this clear statutory requirement, the Administrator of the Wisconsin Election Commission, Meagan Wolfe, issued a written directive on May 13, 2020 to the clerks across the State of Wisconsin stating that the clerks cannot remove an allegedly "indefinitely confined" absentee voter from the absentee voter register if the clerk had "reliable information" that an allegedly "indefinitely confined" absentee voter is no longer "indefinitely confined." The directive specifically stated:

> Can I deactivate an absentee request if I believe the voter is not indefinitely confined? No. All changes to status must be made in writing and by the voter's request. Not all medical illnesses or disabilities are visible or may only impact the voter intermittently. (*See* WEC May 13, 2020 Guidance Memorandum).

44. The WEC's directive thus directly contradicts Wisconsin law, which specifically provides that clerks "shall" remove an indefinitely confined voter from the absentee voter list if the clerk obtains "reliable information" that the voter is no longer indefinitely confined.

45. As a result of the directive, clerks did not remove from the absentee voter lists maintained by their jurisdictions the absentee voters who claimed "indefinitely confined" status but who in fact were no longer "indefinitely confined." This resulted in electors who were allegedly "indefinitely confined" absentee voters casting ballots as "indefinitely confined" absentee voters who were not actually "indefinitely confined" absentee voters.

**B. WEC Directed Clerks to Violate Wisconsin Law Prohibiting Counting of Absentee Ballot Certificates Missing Witness Addresses.**

46. In 2015, the Wisconsin Legislature passed Act 261, amending Wisconsin's election laws, including a requirement, codified as Wisconsin Statute § 6.87(d), that absentee ballots include both

Exhibit N

elector and witness certifications, which must include the address of the witness. If the address of the witness is missing from the witness certification, however, "the ballot may not be counted." *Id.*

47. On October 18, 2016, WEC reacted to this legislation by issuing a memorandum, which, among other things, permitted clerks to write in the witness address onto the absentee ballot certificate itself, effectively nullifying this express requirement. (*See* WEC October 18, 2016 Guidance Memorandum). Wisconsin election officials reiterated this unlawful directive in publicly posted training videos. For example, in a Youtube video posted before the November 3, 2020 General Election by Clarie Woodall-Voog of the Milwaukee Elections Commission, Ms. Woodall-Voog advised clerks that missing items "like witness address may be written in red."[3]

### C. WEC Directed Clerks to Illegally Cure Absentee Ballots by Filling in Missing Information on Absentee Ballot Certificates and Envelopes.

48. On October 19, 2020, WEC instructed its clerks that, without any legal basis in the Wisconsin Election Code, they could simply fill in missing witness or voter certification information using, e.g., personal knowledge, voter registration information, or calling the voter or witness. The WEC further advised that voters or witnesses could cure any missing information at the polling place, again without citing any authority to do so under Wisconsin Election Code.

## II. EXPERT WITNESS TESTIMONY:
## EVIDENCE OF WIDESPREAD VOTER FRAUD

### A. Approximately 15,000 Wisconsin Mail-In Ballots Were Lost, and Approximately 18,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

49. The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Wisconsin voters collected by Matt Braynard,

---

[3] *See* https://www.youtube.com/watch?v=hbm-pPaYiqk (video a 10:43 to 11:07).

Exhibit N

which was conducted from November 15-17, 2020. *See* Ex. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey"). The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.* Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 96,771 unreturned mail-in ballots for the State of Wisconsin.

50. With respect to **Error #1**, Dr. Briggs' analysis estimated that **16,316-19,273 ballots** out of the total 96,771 unreturned ballots were recorded for voters who had **not** requested them. *Id.* With respect to **Error #2**, he found **13,991 – 16,757 ballots** out of 96,771 unreturned ballots recorded for voters who **did return their ballots were recorded as being unreturned.** *Id.* Taking the average of the two types of errors together, **29,594 ballots, or 31% of the total, are "troublesome."**

51. These errors are not only conclusive evidence of widespread fraud by the State of Wisconsin, but they are fully consistent with the fact witness statements cited above regarding the evidence about Dominion presented below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

52. With respect to **Error #1**, Dr. Briggs' analysis demonstrates that approximately **17,795 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.

14

Exhibit N

Regarding ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.

53. With respect to **Error #2**, Dr. Briggs' analysis indicates that approximately **15,374 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.** Dr. Briggs' analysis shows that 31% of "unreturned ballots" suffer from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 45%) – and provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

### B. Nearly 7,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Wisconsin.

54. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.[4]

### C. A Statistical Study Reveals that Biden Overperformed in those Precincts that Relied on Dominion Voting Machines

55. From November 13th, 2020 through November 28th, 2020, the Affiant conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election. This data

---

[4] Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his Report, (attached hereto as Exh. 3).

15

Exhibit N

included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee. The Affiant's analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting machines provided by Dominion Voting Systems. These red flags occurred in several States in the country, including Wisconsin. (See attached hereto as Exh. 4, copy of redacted Affiant, B.S. Mathematics and M.S. Statistics).

56. The Affiant began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias. Affiant posed the following question: "Do any voting machine types appear to have unusual results?" The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results. *Id.*

57. Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Wisconsin. The results from the vast majority of counties using the Dominion machines is 3 to 5.6 percentage points higher in favor of candidate Biden. This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties. The results from "Dominion" counties do not match the results from the rest of the counties in the United States. The results are clearly statistically significant, with a p-value of < 0.00004. This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring. This pattern appears in multiple States, including Wisconsin, and the margin of votes implied by the unusual activity would easily sway the election results. *Id.*

58. The following graph shows the pattern. The large red dots are counties in Wisconsin that use Dominion voting machines. Almost all of them are above the blue prediction line, when in

16

Exhibit N

normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline). The p-value of statistical analysis regarding the centerline for the red dots (Wisconsin counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random" statistical anomaly. Some external force caused this anomaly:



*Id.*

59. To confirm that Dominion machines were the source of the pattern/anomaly, Affiant conducted further analysis using propensity scoring using U.S. census variables (including ethnicities, income, professions, population density and other social/economic data) , which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so

17

Exhibit N

abnormalities in the margin for Biden are driven by other characteristics unrelated to the election. *Id.*

60. After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines. This approach again showed a highly statistically significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county. The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines. Id.

61. The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points. **Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440.** *Id.*

62. The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- returned ballots that were deemed unreturned by the state: 15,374

- unreturned mail ballots unlawfully ordered by third parties: 17,795

- votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 6,966

- Votes that were improperly relying on the "indefinitely confined" exemption to voter ID: 96,437

- And excess votes arising from the statistically significant outperformance of Dominion machines on behalf of Joe Biden: 181,440

Exhibit N

*In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.*

### III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

63.   The State of Wisconsin, in many locations, used either Sequoia, a subsidiary of Dominion Systems, and or Dominion Systems, Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: *"*dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module.*"* (See Exh. 5, attached hereto, a copy of the Equipment for WI election systems).

#### A. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

64.   Affiant Keshel's findings that reflect the discussion cited above:

> While Milwaukee County is focal for transparency and observation violations, including reporting statistically impossible vote counts in the early morning hours away from scrutiny, Dane County has surged far past support totals for President Obama, despite expected difficulties mobilizing student voters to polls. President Trump has reconsolidated the Republican base in suburban Milwaukee and far surpassed his 2016 support levels but has been limited in margin growth by historically improbable Democratic support in these strongholds, which defy years of data in Wisconsin in which the Republican party surged as the Democratic Party plunged. Finally, in strong Trump counties showing a double inversion cycle (one party up, the other down), particularly in rural and exurban Wisconsin, Trump's totals are soaring, and against established trends, Biden's totals are at improbable levels of support despite lacking registration population
> (*See* attached hereto, Exh. 9, Aff. of Seth Keshel, MBA)

19

Exhibit N

| County | Rep '08 | Dem '08 | Rep '12 | Dem '12 | Rep '16 | Dem '16 | Rep '20 | Dem '20 | Dem Percentage of Obama 2008 Votes |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|--------------------------------------|
| Ozaukee | 32,172 | 20,579 | 36,077 | 19,159 | 30,464 | 20,170 | 33,912 | 26,515 | 128.8% |
| % Increase | N/A | N/A | 12.1% | (6.9%) | (15.6%) | 5.3% | 11.3% | 31.5% | |
| ---- | | | | | | | | | |
| Dane | 73,065 | 205,984 | 83,644 | 216,071 | 71,275 | 217,697 | 78,789 | 260,157 | 126.3% |
| % Increase | N/A | N/A | 14.5% | 4.9% | (14.8%) | 0.8% | 10.5% | 19.5% | |
| ---- | | | | | | | | | |
| Waukesha | 145,152 | 85,339 | 162,798 | 78,779 | 142,543 | 79,224 | 159,633 | 103,867 | 121.7% |
| % Increase | N/A | N/A | 12.2% | (7.7%) | (12.4%) | 0.6% | 12.0% | 31.1% | |
| ---- | | | | | | | | | |
| Racine | 45,954 | 53,408 | 49,347 | 53,008 | 46,681 | 42,641 | 54,475 | 50,154 | 117.6% |
| % Increase | N/A | N/A | 7.4% | (0.7%) | (5.4%) | (19.6%) | 16.7% | 17.6% | |

*Id.*

65. Keshel provides a graph reflecting the voter returns in a time-series. The highly unlikely and remarkably convenient attainment of this block of votes provides for a stunning depiction of the election and generates many questions. The analysis provided by Plaintiffs' multiple experts, including data, statistics and cyber, will reveal clear evidence of the multiple frauds that combined to change the outcome of the 2020 election.

Exhibit N



*See Id.*

## B. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

66. **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

67. **Texas.** The same Dominion Democracy Suite was denied certification in Texas by the

Exhibit N

Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[5]

68. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

69. A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised. Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper**

---

[5] See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Exhibit N

**ballot**;" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

See Order, pp. 81-82. (Emphasis added).

70. This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018). The Court found,

> **In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.**

*Id.at* 1294-1295.

71. The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security

23

Exhibit N

risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### C. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### 1. Evidence of Vulnerability to Foreign Hackers.

72. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY

ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified**

**Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

24

Exhibit N

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Exh. 18.)

73. An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China. (*See* Exh. 1, Spider Declaration, (who remains redacted for security reasons).)

74. The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See Exh. 12, Spider Declaration. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

75. Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries. On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…

(See Exh. 13, Aff. of Computer analysis, at par. 32).

76. The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that

Exhibit N

Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using Akamai Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)"

77. This Declarant further explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

> (See Id. at ¶32).

78. This Declarant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and specifically the port that Wisconsin uses:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers. Wisconsin Port.

> China is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server [for] Dominion Software.

> (See Id. at par. 21).

79. The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

Exhibit N

**The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot.  Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX."  (*See Id*. at pars. 67-69)

"The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id*. at par. 73)

### 2. Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

80.  An expert analysis by Russ Ramsland agrees with the data reflecting the use of an algorithm that causes the spike in the data feed, which is shown to be an injection of votes to change the outcome, because natural reporting does not appear in such a way.

81.  And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl -- and was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

82.  The report concludes that **"**Based on the foregoing, I believe these statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the

Exhibit N

vote count in Wisconsin, in particular for candidates for President contain at least 119,430 (Para. 13) up to 384,085 (Para. 15) illegal votes that must be disregarded. In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States."

### The History of Dominion Voting Systems

83. Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

> Applicant: SMARTMATIC, CORP.
>
> Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[6]

84. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

### 3. US Government Warnings Regarding Hacking by Hostile Foreign Governments.

85. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI

---

[6] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

28

Exhibit N

assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(See Ex. 18, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

### D. Additional Independent Findings of Dominion Flaws.

86. Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

#### 1. Central Operator Can Remove, Discard or Manipulate Votes.

87. Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Ex. 106, Watkins aff. ¶11). ¶8.

88. Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

9. During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

Exhibit N

10. Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

11. The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

89. The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

**§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

30

Exhibit N

### 3. Dominion Vulnerabilities to Hacking.

90. Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (Ex. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

91. Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including

31

Exhibit N

Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15).  Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[7] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into

---

[7] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

Exhibit N

question the software credibility."[8]

F. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[9]

92. The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

This bill addresses election security through grant programs and requirements for voting systems and paper ballots.

The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make

---

[8] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

[9] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

Exhibit N

a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

### E. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.

93. Dr. Eric Coomer is listed as the co-inventor for several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[10] He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion. Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia. Dr. Coomer's patented ballot adjudication technology into Dominion voting machines sold throughout

---

[10] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer. This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014); (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

34

the United States, including those used in Wisconsin. (See attached hereto Exh 6, Jo Oltmann Aff.).

94. In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[11] He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[12]

95. Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (See Id.)

96. Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity. Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW! I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. You are controlled by fear, reaction and bullsh[*]t. Get your shit together. F[**]K YOU! Seriously, this f[**]king ass-clown stands

---

[11] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[12] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

Exhibit N

against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.  *Id.* (July 21, 2016 Facebook post).[13]

97.  In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I know it is going on a lot."  This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1.  Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news…  There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach…  [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."]  *Id.* (September 14, 2017 Facebook post.] (Id.)

98.  Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool").  *Id.* (June 2, 2020 Facebook post).  Lest someone claims that these

---

[13]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

Exhibit N

are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

99.  Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1.  "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present.  In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

100.  By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***.  It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

101.  In sum, as set forth above, for a host of independent reasons, the Wisconsin election results concluding that Joe Biden received 20,608 more votes that President

Exhibit N

Donald Trump must be set aside.

## COUNT I

### Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.

102. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

103. The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, §1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

104. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932). Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

105. Defendants are not part of the Wisconsin Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Wisconsin Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

106. Section I details three separate instances where Defendants violated the Wisconsin Election Code. First, the WEC May 23, 2020 "guidance", see Ex. 16, on the treatment of "indefinitely confined" voters, who are exempt from Wisconsin's photo ID

Exhibit N

requirement for absentee ballot application, that directly contravened the express requirement in Wisconsin Election Code that clerks "shall" remove an allegedly "indefinitely confined" voter if the clerk has "reliable information" that that voter is not, or is no longer, "indefinitely confined." Second, the WEC's October 18, 2016, see Ex. 18, directed clerks to violate the express requirements of Wisconsin Statutes § 6.87(6)(d), which states "[i]f a certificate is missing the address of a witness the ballot may not be counted," when it directed clerks to fill in missing information on absentee ballot envelopes. Third, WEC and Wisconsin election officials violated Wisconsin Election Code, or acted *ultra vires*, insofar as they filled in missing witness or voter information on absentee ballots and permitted voters to cure ballots without statutory authorization. Section II provides expert witness testimony quantifying the number of illegal or ineligible ballots that were counted, and lawful ballots that were not, as a result of these and Defendants' other violations.

107. A report from Dr. William Briggs, shows that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

108. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.

109. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

Exhibit N

harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

110. Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Wisconsin should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Governor Evers and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

### Invalid Enactment of Regulations & Disparate Treatment of Absentee vs. Mail-In Ballots

111. Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

112. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude,

40

Exhibit N

necessary.").

113.  The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

114.  The disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

115.  In statewide and federal elections conducted in the State of Wisconsin, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, in having the election laws enforced fairly and uniformly.

116.  As set forth in Section I above, Defendants failed to comply with the requirements of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection. Further, Defendants enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters – Democratic absentee voters – over Republican voters. Further, all of these invalidly enacted rules by Defendant Wisconsin executive and administrative agencies, had the intent and effect of

41

eliminating protections against voter fraud, and thereby enabled and facilitated the counting of fraudulent, unlawful and ineligible votes, which were quantified in Section II. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

117. Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Wisconsin Constitution, and the Wisconsin Election Code.

118. Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

119. The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

120. In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Wisconsin Counties can be included in the final vote tally unless a challenger

Exhibit N

was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt.  Wisconsin law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

<div align="center">

**COUNT III**

**Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983**

**Denial of Due Process On The Right to Vote**

</div>

122.  Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

123.  The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution.  *Harper,* 383 U.S. at 665.  *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").  Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal

<div align="center">43</div>

Exhibit N

citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

124. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

125. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

126. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

127. The right to vote includes not just the right to cast a ballot, but also the right to have it

44

fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

128. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

129. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

130. Section I details the Defendants violations of the Wisconsin Election Code. Section II provides estimates of the number of fraudulent, illegal or ineligible votes counted, and demonstrates that this number is many times larger than Biden's margin of victory.

131. Plaintiffs seek declaratory and injunctive relief enjoining Defendants from

Exhibit N

certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Wisconsin Board of State Canvassers and the Wisconsin county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Wisconsin law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

<div align="center">

**COUNT IV**

**Wide-Spread Ballot Fraud**

</div>

132. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133. The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

134. Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

135. The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between 3 and 5.6 percentage points. Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440. *Id.*

136. The Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state

<div align="center">46</div>

Exhibit N

of Wisconsin.

137.  The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

138.  Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Wisconsin's 2020 General Election because it is fundamentally corrupted by fraud.  Defendants intentionally violated multiple provisions of the Wisconsin Election Code to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

## PRAYER FOR RELIEF

139.  Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

140.  Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

141. In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Wisconsin Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from

Exhibit N

observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Wisconsin Election Code violations set forth in Section II of this Complaint.

142. Order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Wisconsin and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Wisconsin cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Wisconsin should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Wisconsin should be directed to vote for President Donald Trump.

143.  For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results;

Exhibit N

2. An order enjoining Governor Evers from transmitting the currently certified election results the Electoral College;

3. An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b)11. related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiffs;

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

6. A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7. A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

8. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that

Exhibit N

invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3, 2020 and November 4, 2020.

12. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Exhibit N

Respectfully submitted, this 1st day of December, 2020.

LEAD COUNSEL FOR PLAINTIFFS

/s Sidney Powell**
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
sidney@federalappeals.com

Of Counsel:

Julia Z. Haller (D.C. Bar No. 466921) **
Brandon Johnson (D.C. 491730) **
Emily P. Newman (Virginia Bar No. 84265) **

2911 Turtle Creek Blvd.
Suite 300
Dallas, Texas 75219

L. Lin Wood **
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler **
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

** Applications for admission forthcoming

Exhibit N

Local Counsel for Plaintiffs

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044
miked@michaelddeanllc.com


Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
daneastman@me.com

Exhibit N

# EXHIBIT O

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN,

    Plaintiff,

             Case No. 20-cv-1771-pp

  v.

WISCONSIN ELECTIONS COMMISSION,
COMMISSIONER ANN S. JACOBS,
MARK L. THOMSEN, JULIE M. GLANCEY,
COMMISSIONER MARGE BOSTELMANN,
COMMISSIONER DEAN KNUDSON,
ROBERT F. SPINDELL, JR. and TONY EVERS,

    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS
(DKT. NOS. 51, 53), DENYING AS MOOT PLAINTIFF'S AMENDED MOTION
FOR INJUNCTIVE RELIEF (DKT. NO. 6) AND DISMISSING CASE**

---

At 8:24 a.m. on Tuesday, December 1, 2020—twenty-eight days after the

November 3, 2020 general Presidential election, thirteen days after President

Donald J. Trump petitioned for a recount in Milwaukee and Dane Counties and

one day after the Wisconsin Elections Commission and the Governor certified

that Joseph R. Biden and Kamala D. Harris had received the highest number of

votes following that recount—two plaintiffs filed this lawsuit in federal court for

the Eastern District of Wisconsin. Although state law governs the election

process, the plaintiffs brought the suit in a federal court, asking that federal

court to order state officials to decertify the election results that state officials

had certified the day before, order the Governor not to transmit to the Electoral

1

Exhibit N

College the certified results he'd transmitted the day before and order the
Governor to instead transmit election results that declared Donald Trump to be
"the winner of this election."

The election that preceded this lawsuit was emotional and often divisive.
The pleadings that have been filed over the past week are passionate and
urgent. People have strong, deep feelings about the right to vote, the freedom
and opportunity to vote and the value of their vote. They should. But the legal
question at the heart of this case is simple. Federal courts have limited
jurisdiction. Does a federal court have the jurisdiction and authority to grant
the relief this lawsuit seeks? The answer is no.

Federal judges do not appoint the president in this country. One wonders
why the plaintiffs came to federal court and asked a federal judge to do so.
After a week of sometimes odd and often harried litigation, the court is no
closer to answering the "why." But this federal court has no authority or
jurisdiction to grant the relief the remaining plaintiff seeks. The court will
dismiss the case.

I.      **Background**

According to defendant the Wisconsin Elections Commission's November
18, 2020 canvass results, 3,297,352 Wisconsin residents voted in the
November 3, 2020 general election for President. https://elections.wi.gov/
sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28pre
-Presidential%20recount%29.pdf. Of those, 49.45%—1,630,673—voted for
Biden for President and Harris for Vice-President. Id. Biden and Harris received

<div align="center">2</div>

approximately 20,600 more votes than Donald J. Trump for President and Michael R. Pence for Vice-President. Id.

Under Wis. Stat. §9.01(1)(a)(1), any candidate in an election where more than 4,000 votes were cast for the office the candidate seeks and who trails the leading candidate by no more than 1 percent of the total votes cast for that office may petition for a recount. On November 18, 2020, Donald J. Trump filed a recount petition seeking a recount of "all ballots in all wards in every City, Village, Town and other voting unit in Dane and Milwaukee Counties." https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/WEC%20-%20Final%20Recount%20Order_0.pdf. The Wisconsin Elections Commission granted that petition and ordered a recount "using the ballot count method selected per Wis. Stat. § 5.90(1) unless otherwise ordered by a court per Wis. Stat. § 5.90(2)." Id. The WEC ordered the recount to be completed by 12:00 p.m. on December 1, 2020. Id.

The partial recount was completed on November 29, 2020. https://elections.wi.gov/elections-voting/recount. On November 30, 2020, the chair of the Wisconsin Elections Commission signed the statement of canvass certifying that Joseph R. Biden and Kamala D. Harris received the greatest number of votes and certified their electors. https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Jacobs%20-%20Signed%20Canvass%20for%20President%20-%20Vice%20President.pdf. The same day—November 30, 2020—Wisconsin Governor Tony Evers announced that he had signed the Certificate of Ascertainment for the electors for Biden and Harris.

Exhibit N

https://content.govdelivery.com/accounts/WIGOV/bulletins/2aef6ff. The web

site for the National Archives contains the Certificate of Ascertainment signed

by Evers on November 30, 2020, certifying that out of 3,298,041 votes cast,

Biden and Harris and their electors received 1,630,866 votes, while Trump and

Pence and their electors received 1,610,184 votes. https://www.archives.gov/

files/electoral-college/2020/ascertainment-wisconsin.pdf.

On December 1, 2020, Donald J. Trump filed a petition for an original

action in the Wisconsin Supreme Court. <u>Trump v. Evers</u>, Case No.

2020AP001971-OA (available at https://wscca.wicourts.gov). On December 3,

2020, the court denied leave to commence an original petition because under

Wis. Stat. §9.01(6), appeals from the board of canvassers or the Wisconsin

Elections Commission must be filed in circuit court. Dkt. No. 59-7. The same

day—December 3, 2020—Donald J. Trump filed lawsuits in Milwaukee and

Dane Counties. <u>Trump v. Biden</u>, Case No. 2020CV007092 (Milwaukee County

Circuit Court; <u>Trump v. Biden</u>, Case No. 2020CV002514 (Dane County Circuit

Court) (both available at https://wcca.wicourts.gov). Those cases have been

consolidated and are scheduled for hearing on December 10, 2020 at 1:30 (or

for December 11, 2020 at 9:00 a.m. if the parties are litigating in another

court).

Meanwhile, on December 2, 2020, Donald J. Trump filed suit in federal

court for the Eastern District of Wisconsin, suing the defendants in this case

and others. <u>Trump v. Wisconsin Elections Commission, *et al.*</u>, Case No. 20-cv-

Exhibit N

1785-BHL (E.D. Wis.). There is an evidentiary hearing scheduled for December 10, 2020 at 9:00 a.m. by videoconference. Id. at Dkt. No. 45.

## II.     Procedural History of the Case

On December 1, 2020—the day after Governor Evers signed the Certificate of Ascertainment—William Feehan and Derrick Van Orden filed a complaint in the federal court for the Eastern District of Wisconsin. Dkt. No. 1. Feehan identified himself as a resident of La Crosse, Wisconsin, a registered voter and "a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin." Id. at ¶23. Van Orden was identified as a resident of Hager City, Wisconsin and the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the U.S. House of Representatives. Id. at ¶26. The complaint alleged that "Mr. Van Orden 'lost' by approximately 10,000 votes to the Democrat incumbent," and stated that "[b]ecause of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code." Id. at ¶27.

The complaint alleged "massive election fraud, multiple violations of the Wisconsin Election Code, *see e.g.,* Wis. Stat. §§5.03, *et seq.,* in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution" based on "dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses." Dkt. No. 1 at ¶1. The plaintiffs alleged four causes of action: (1) violation of the

5

Elections and Electors Clauses and 42 U.S.C. §1983; (2) violation of the Equal

Protection Clause of the Fourteenth Amendment, 42 U.S.C. §1983 and the

"invalid enactment of regulations & disparate treatment of absentee vs. mail-in

ballots"; (3) denial of the Fourteenth Amendment due process right to vote and

42 U.S.C. §1983; and (4) "wide-spread ballot fraud." Id. at ¶¶106-138.    The

plaintiffs asked for the following emergency relief:

> 1.    An order directing Governor Evers and the Wisconsin
> Elections Commission to de-certify the election results:
>
> 2.    An order enjoining Governor Evers from transmitting the
> currently certified election results [sic] the Electoral College;
>
> 3.    An order requiring Governor Evers to transmit certified
> election results that state that President Donald Trump is the
> winner of the election;
>
> 4.    An immediate emergency order to seize and impound all
> servers, software, voting machines, tabulators, printers, portable
> media, logs, ballot applications, ballot return envelopes, ballot
> images, paper ballots, and all "election materials" referenced in
> Wisconsin Statutes §9.01(1)(b)11 related to the November 3, 2020
> Wisconsin election for forensic audit and inspection by the Plaintiffs;
>
> 5.    An order that no votes received or tabulated by machines that
> were not certified as required by federal and state law be counted;
>
> 6.    A declaratory judgment declaring that Wisconsin's failed
> system of signature verification violates the Electors and Elections
> Clause by working a de facto abolition of the signature verification
> requirement;
>
> 7.    A declaratory judgment declaring that currently certified
> election results violate the Due Process Clause, U.S. Const. Amend.
> XIV;
>
> 8.    A declaratory judgment declaring that mail-in and absentee
> ballot fraud must be remedied with a Full Manual Recount or
> statistically valid sampling that properly verifies the signatures on
> absentee ballot envelopes and that invalidates the certified results if

the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.     A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10.     A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11.     Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center[1] for November 3, 2020 and November 4, 2020;

12.     Plaintiffs further request the Court grant such relief as is just and proper including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. §1988.

Id. at 50.

With the complaint, the plaintiffs filed a motion for declaratory, emergency, and permanent injunctive relief, dkt. no. 2, and memorandum in support of that motion, dkt. no. 3. The motion stated that the specific relief the plaintiff requested was set out in an attached order, dkt. no. 2 at 1, but there was no order attached. The memorandum asked the court to grant the motion and enter the proposed order, dkt. no. 3 at 10; again, no proposed order was provided.

Later that day, the plaintiffs filed a corrected motion for declaratory, emergency, and permanent injunctive relief. Dkt. No. 6. The plaintiff did not file a memorandum in support of this motion but did file a proposed order. Dkt.

---

[1] The plaintiff may be referring to the TCF convention center in Detroit, Michigan; the court is unaware of a "TCF Center" in Wisconsin.

Exhibit N

No. 1. The relief described in the proposed order was almost identical to the relief requested in the complaint, with a notable exception. Instead of the request for an order requiring production of forty-eight hours of security camera footage from the TCF Center, the plaintiffs asked for an order prohibiting "any wiping or alteration of data or other records or materials" from voting machines, tabulations machines, servers, software and printers, and any alteration or destruction of ballot applications, ballot return envelopes, ballot images, paper ballots, registration lists, poll lists or other election materials, "across the state of Wisconsin." Dkt. No. 6-1 at 7-8.

Two days later, plaintiff Freehan filed an amended complaint removing Derrick Van Orden as a plaintiff. Dkt. No. 9. It differed from the original complaint only in the removal of Van Orden as a plaintiff.

Along with the amended complaint, the plaintiff filed a motion for temporary restraining order and preliminary injunction "to be considered in an expedited manner." Dkt. No. 10. The plaintiff did not file a memorandum in support of the motion; his main purpose in filing the amended motion appears to have been to ask the court to rule on the motion quickly. The plaintiff attached a proposed briefing schedule, suggesting that the court should require the defendants to respond by 8:00 p.m. on Friday, December 4, 2020 and require him to file his reply by 8:00 p.m. on Saturday, December 5, 2020; he proposed to submit the matter on briefs without argument. Dkt. No. 10-1. The defendants objected to this severely truncated schedule. Dkt. Nos. 25

8

(defendant Evers), 26 (defendants Wisconsin Election Commission and its members).

Construing the amended motion as a Civil L.R. 7(h) expedited, non-dispositive motion for an expedited briefing schedule, the court granted the request on December 4, 2020, setting a schedule that, while not as expedited as the plaintiff requested, gave the parties a short leash. Dkt. No. 29.

Wisconsin voter James Gesbeck filed a motion to intervene, dkt. no. 14, and later an expedited motion to intervene, dkt. no. 33. The Democratic National Committee (DNC) also sought to intervene. Dkt. No. 22. The court denied both requests, dkt. nos. 41 (DNC), 74 (Gesbeck), but allowed both to file *amicus curiae* briefs by the December 7, 2020 deadline it had set for the defendants to oppose the plaintiff's motion for injunctive relief, dkt. nos. 37 (Gesbeck), 41 (DNC).

Recall that the plaintiff had not filed a memorandum in support of the December 1, 2020 corrected motion for injunctive relief or in support of the December 3, 2020 amended motion. On Sunday, December 6, 2020, the plaintiff filed an amended memorandum in support of the motion. Dkt. No. 42. In the first paragraph, the plaintiff indicated that he filed the amended memorandum to "avoid possible confusion from removal of Mr. Van Orden is [sic] plaintiff." Id. at 1. He said that the memorandum was identical to the original memorandum "except for amending references to plaintiffs to refer to Mr. Meehan [sic] only and correcting several inadvertent references to the State of Georgia." Id.

Exhibit N

On Sunday, December 6, the plaintiff also filed a motion asking the court to schedule an evidentiary hearing "on the merits" for Wednesday, December 9, 2020 at 9:00 a.m. Dkt. No. 44. Although the plaintiff had not asked for a hearing in any prior motion, and had represented in the amended motion that he was submitting the matter on the briefs without argument, the plaintiff explained that he had changed his position based on the court's December 4, 2020 order. Id. at ¶4. The court denied the motion in a telephonic hearing on December 8, 2020, explaining that before it could reach the merits of the motion for injunctive relief, it must resolve issues regarding justiciability. Dkt. Nos. 70, 71.

In opposing the plaintiff's amended motion for injunctive relief, defendants Wisconsin Election Commission and its members argued that the case has jurisdictional and procedural defects that require dismissal. Dkt. No. 52 at 5. They asserted that the plaintiff lacks Article III standing, id. at 6, that the doctrine of laches bars consideration of his claims, id. at 8 and that the Eleventh Amendment shields them from the relief he seeks, id. at 10. They asserted that the complaint fails to state a claim for relief under the Election or Electors Clauses, id. at 11, or under the Equal Protection or Due Process Clauses, id. at 13, and they contended that the plaintiff's purported evidence fails to meet basic evidentiary standards, id. at 20.

In his brief opposing injunctive relief, defendant Governor Evers argued that there is no evidence of fraud in Wisconsin's election results, dkt. no. 55 at 10, that the plaintiff's witnesses and experts lack qualifications and are

10

Exhibit N

unreliable, id. at 12, and that the plaintiff has failed to state valid claims, id. at 22. Evers also argued that an adequate remedy at law exists because the recount procedures under Wis. Stat. §9.01 unambiguously constitute the "exclusive remedy" for challenging election results. Id. at 55. With respect to the balancing of harms, Evers argued that the requested relief would prejudice the defendants and "retroactively deprive millions of Wisconsin voters of their constitutional right to vote in the 2020 presidential election." Id. at 32.

James Gesbeck, filing as friend of the court, opposed the motion for injunctive relief on the grounds that the plaintiff has not established subject matter jurisdiction and that the court should defer to the Wisconsin courts and Wisconsin's procedural mechanism for resolving disputed elections. Dkt. No. 47 at 11, 12. Gesbeck applied the balancing analysis for injunctive relief, asserting that relief in this court would moot the Wis. Stat. §9.01 challenge pending in the Wisconsin courts. Id. at 17. He argued that this, in turn, would put the "insurmountable weight of the Federal Government on the election result in Wisconsin and would be unbalancing the scale created by the system of checks and balances that have been maintained since the Constitution was adopted." Id. at 17.

Amicus DNC opposed the motion on many of the same grounds as the other defendants. Dkt. No. 57. The DNC argued that the plaintiff lacks standing, that the doctrine of laches bars the plaintiff's claims, that the defendants are immune from suit under the Eleventh Amendment, that principles of federalism and comity require abstention, and that the plaintiff

11

Exhibit N

fails to state a claim upon which relief can be granted. Dkt. No. 57. It asserted that the plaintiff cannot establish irreparable harm and has an adequate remedy of law. Id. at 36.

The defendants have filed motions to dismiss the case. The WEC and its members seek dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 53. Defendant Evers seeks dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), failure to plead fraud with particularity under Fed. R. Civ. P. 9(b) and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

The Wisconsin State Conference of the NAACP and three of its members (Dorothy Harrell, Wendell J. Harris, Jr. and Earnestine Moss) sought leave to file an *amicus* brief on the question of whether the court should dismiss the case. Dkt. No. 56. The court granted that motion. Dkt. No. 69.

## III. Procedural Posture

From the outset, the plaintiff has sought to have the claims in the complaint resolved through a motion for injunctive relief under Fed. R. Civ. P. 65. The relief he requests in the second iteration of his motion for injunctive relief is the same relief he requests in the lawsuit itself. As defendant Evers points out in his motion to dismiss, the plaintiff's December 6, 2020 motion for an evidentiary hearing (which the court has denied) "makes clear that what [the plaintiff] seeks—without any discovery or basic adversarial development of evidence—is a trial and final adjudication on the merits." Dkt. No. 51 at 2.

Evers points to Fed. R. Civ. P. 12(i), which states that "[i]f a party so moves, any defense listed in Rule 12(b)(1)-(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial." Because Evers has raised defenses under Rule 12(b)(1) and (b)(6), and because in asking for a hearing the plaintiff sought what would have been a trial on the merits of the causes of action raised in the complaint, the court must resolve the defenses before moving to the merits.

As the court stated in the hearing on December 8, that requirement is more than a procedural nicety. The defendants and the *amici* have raised questions about this federal court's authority to decide the claims alleged in the amended complaint. If this court does not have jurisdiction to hear and decide those claims, any decision it might make regarding the merits of the claims would be invalid. For that reason, the court considers the motions to dismiss before considering the plaintiff's request for injunctive relief.

## IV.  The Motions to Dismiss

### A.  Legal Standards

#### 1.  *Rule 12(b)(1)—Lack of Subject Matter Jurisdiction*

In evaluating a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the court must first determine whether a factual or facial challenge has been raised." Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015) (citing Apex Dig., Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443 (7th Cir. 2009). A *factual* challenge alleges that even if the pleadings are

13

Exhibit N

sufficient, no subject matter jurisdiction exists. A *facial* challenge alleges that the complaint is deficient—that the plaintiff has not sufficiently alleged subject matter jurisdiction. Id. The difference matters—a court reviewing a factual challenge "may look beyond the pleadings and view any evidence submitted to determine if subject matter exists," while a court reviewing a facial challenge "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id.

### 2. *Rule 12(b)(6)—Failure to State a Claim*

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of the complaint. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." W. Bend Mut. Ins. Co. v. Schumacher, 844 F.3d 670, 676 (7th Cir. 2016).

3. *42 U.S.C. § 1983*

To state a claim for a civil rights violation under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of that right was acting under the color of state law. <u>D.S. v. E. Porter Cty. Sch. Corp.</u>, 799 F.3d 793, 798 (7th Cir. 2015) (citing <u>Buchanan–Moore v. Cty. of Milwaukee</u>, 570 F.3d 824, 827 (7th Cir. 2009)).

B.   <u>Subject Matter Jurisdiction</u>

"Federal courts are courts of limited jurisdiction." <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377 (1994). Subject matter jurisdiction has to do with "the courts' statutory or constitutional *power* to adjudicate the case." <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 89 (1998) (emphasis in the original). "Article III, §2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" <u>Id.</u> at 102. The defendants raise a factual challenge to the court's subject matter jurisdiction, arguing that regardless of the pleadings, subject matter jurisdiction does not exist. The court may look outside the four corners of the complaint in considering that challenge.

1. *Standing*

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." <u>Apex Dig., Inc.</u>, 572 F.3d at 443 (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)). "[N]o principle is more fundamental to the judiciary's proper

15

role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997). "Standing to sue is part of the common understanding of what it takes to make a justiciable case." <u>Id.</u> "Standing is an element of subject-matter jurisdiction in a federal civil action . . . ." <u>Moore v. Wells Fargo Bank, N.A.</u>, 908 F.3d 1050, 1057 (7th Cir. 2018).

> The "irreducible constitutional minimum of standing contains three requirements. *Lujan v. Defenders of Wildlife*, [504 U.S. 555], at 560 [1992]]. First and foremost, there must be (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, [495 U.S. 149], at 149 [1990] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101-102 . . . (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 . . . (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.*, at 45-46 . . .; see also *Warth v. Seldin*, 422 U.S. 490, 505 . . . (1975). This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 . . . (1990).

<u>Steel Co.</u>, 523 U.S. at 102-104.

Regarding the "injury in fact" leg of the triad, the injury must be "particularized," such that it "affect[s] the plaintiff in a personal and individual way." <u>Spokeo, Inc. v. Robins</u>, ___ U.S. ___, 136 S. Ct. 1540, 1548 (2016) (citations omitted). The injury also must be "concrete"—it must be "real," not "abstract." <u>Id.</u> A plaintiff cannot show a particularized and concrete injury by showing "that he has merely a general interest common to all members of the public." <u>Ex parte Levitt</u>, 302 U.S. 633, 634 (1937). A plaintiff may not use a

16

"federal court as a forum in which to air his generalized grievances about the conduct of government . . . ." United States v. Richardson, 418 U.S. 166, 174 (1974) (quoting Flast v. Cohen, 392 U.S. 83, 106 (1942)).

As for the redressability leg of the triad, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co., 523 U.S. at 107. The plaintiff must show that it is "likely," not merely "speculative," that the injury the plaintiff alleges will be "redressed by a favorable decision." Lujan, 504 U.S. at 561 (quoting Simon, 426 U.S. at 38).

In addition to the Article III case-or-controversy requirement, there is a prudential limitation in Fed. R. Civ. P. 17(a), requiring that "[e]very action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a), and "requir[ing] that the complaint be brought in the name of the party to whom that claim 'belongs' or the party who 'according to the governing substantive law, is entitled to enforce the right.'" Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 756 (7th Cir. 2008) (quoting Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir. 2003)); see also RK Co. v. See, 622 F.3d 846, 850 (7th Cir. 2010) ("the real party in interest rule is only concerned with whether an action can be maintained in the plaintiff's name," and is "similar to, but distinct from, constitutional ... standing"). The real party in interest is "the one who by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." Act II Jewelry, LLC v. Wooten, 301 F. Supp. 3d 905, 910-911 (N.D.

Ill. 2018) (quoting <u>Checkers, Simon & Rosner v. Lurie Corp</u>., 864 F.2d 1338, 1343 (7th Cir. 1988) (internal citations omitted)). The purpose of the rule is to "protect the defendant against a subsequent action by the party actually entitled to recover." <u>RK Co.</u>, 622 F.3d at 850 (citing Fed. R. Civ. P. 17(a) advisory committee note (2009)).

The amended complaint alleges that the plaintiff has standing "as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, *et seq* (election procedures for Wisconsin electors)." Dkt. No. 9 at 8. The defendants argue that the plaintiff lacks standing in either capacity. Dkt. No. 43 at 4-5; Dkt. No. 59 at 8-9.

> a.   Standing as a voter

The amended complaint does not assert that the plaintiff voted in the 2020 general Presidential election in Wisconsin. It says that he is a registered voter, but it does not affirmatively state that he voted in the election the results of which he asks the court to decertify. His counsel asserts in the brief in opposition to the defendants' motion to dismiss—filed eight days after the original complaint and five days after the amended complaint—that the plaintiff "voted for President Trump in the 2020 General Election." Dkt. No. 72 at 17. For the first time at the motion to dismiss stage, the plaintiff provided his own declaration, in which he attests that he voted for President Donald J. Trump in the November 3, 2020 election. Dkt. No. 72-1.

The plaintiff claims that the defendants failed to comply "with the requirements of the Wisconsin Election Code and thereby diluted the lawful

18

Exhibit N

ballots of the Plaintiff and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection." Dkt. No. 9 at ¶116. He alleges that the defendants enacted regulations or issued guidance that, in intent and effect, favored Democratic absentee voters over Republican voters, and that these regulations and this guidance enable and facilitated voter fraud. Id. The plaintiff also asserts that he has a right to have his vote count and claims that a voter is injured if "the important of his vote is nullified." Id. at ¶127.

Several lower courts have addressed the plaintiff's theory that a single voter has standing to sue as a result of his vote being diluted by the possibility of unlawful or invalid ballots being counted. The district court for the Middle District of North Carolina catalogued a few of those decisions, all finding that the harm was too speculative and generalized—not sufficiently "concrete"—to bestow standing. These courts concluded that the vote dilution argument fell into the "generalized grievance" category. In Moore v. Circosta, the court wrote:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., Donald Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), __ F. Supp. 3d __, __, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, ___ F. Supp. 3d ___, ___, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F. Supp.

19

Exhibit N

3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); <u>Am. Civil Rights Union v. Martinez-Rivera</u>, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because affects all voters," <u>Martel</u>, __ F. Supp.3d at __, 2020 WL 5755289, at *4, the notion that a <u>single person's</u> vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution . . . .

<u>Moore v. Circosta</u>, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *14,

The court agrees. The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if the Wisconsin election process were, as the plaintiff alleges, "so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election." Dkt. No. 9 at ¶5. The plaintiff has not alleged that, as a voter, he has suffered a particularized, concrete injury sufficient to confer standing.

The plaintiff argues that it is incorrect to say that his standing is based on a theory of vote dilution. Dkt. No. 72 at 19. He then proceeds to opine that he has shown in great detail how his vote and the votes of others who voted for Republican candidates was diluted. <u>Id.</u> at 19-20. He says the vote dilution did not affect all Wisconsin voters equally, asserting that it had a negative impact

Exhibit N

on those who voted for Republican candidates and a positive impact on those who voted for Democratic candidates. Id. at 20. He asserts that he also has shown that the defendants sought to actively disenfranchise voters for Republican candidates. Id. These are the same arguments he made in the amended complaint and they still show no more than a generalized grievance common to any voter. Donald J. Trump carried some Wisconsin counties; the voters who voted for Joseph R. Biden in those counties could make the same complaints the plaintiff makes here.

The plaintiff says that his interests and injury are "identical to that of President Trump," and cites to Bush v. Gore, 531 U.S. 98 (2000), which he characterizes as holding that "then-candidate George W. Bush of Texas had standing to raise the equal protection rights of Florida voters that a majority of the Supreme Court deemed decisive." Id. at 21 (quoting Hawkins v. Wayne Twp. Bd. of Marion Cty., Ind, 183 F. Supp. 2d 1099, 1103 (S.D. Ind. 2002)). The court is stymied by the plaintiff's assertion that his interests and injury are identical to that of President Trump. As the court will explain in the next section, contrary to his assertions, the plaintiff is not a "candidate" in the way that President Trump was a candidate for office. President Trump's interest is in being re-elected, while the plaintiff has said that his interest is in having his vote count and not be diluted. If his interest is solely in getting President Trump re-elected, as opposed to having his vote be counted as part of a valid election process, the court is aware of no constitutional provision that gives him the right to have his candidate of choice declared the victor.

21

Nor does the decision in <u>Bush v. Gore</u> say what the plaintiff claims it says. As far as the court can tell, the word "standing" does not appear in the majority opinion. In the Indiana decision the plaintiff cites, then-district court judge David Hamilton wrote: "If candidate Hawkins did not have standing to raise equal protection rights of voters, it would be difficult to see how then-candidate George W. Bush of Texas had standing to raise equal protection rights of Florida voters . . . in *Bush v. Gore*." <u>Hawkins</u>, 183 F. Supp.2d at 1103. But the Supreme Court in <u>Bush v. Gore</u> never explained how candidate Bush had standing, and even if it had, the plaintiff is not a candidate.

Nor has the plaintiff demonstrated redressability. He complains that his vote was diluted and that he wants his vote to count. But he asks the court to order the results of the election de-certified and then to order defendant Evers to certify the election for Donald J. Trump. Even if this *federal* court had the authority to order the governor of the *state* of Wisconsin to certify the results of a national presidential election for any candidate—and the plaintiff has presented *no* case, statute or constitutional provision providing the court with that authority—doing so would further invalidate and nullify the plaintiff's vote. The plaintiff wants Donald J. Trump to be certified as the winner of the Wisconsin election *as a result of the plaintiff's vote*. But what he asks is for Donald J. Trump to be certified the winner *as a result of judicial fiat*. That remedy does not redress the plaintiff's alleged injury. Even the plaintiff concedes in his brief in opposition to dismissal that "[d]efendant Evers can . . . provide partial redress in terms of the requested injunctive relief, namely, by

22

Exhibit N

refusing to certify or transmit the election results, and providing access to voting machines, records and other 'election materials.'" Dkt. No. 72 at 21. The plaintiff is wrong in that regard, as the court will explain when it discusses the related doctrine of mootness; the point is that even from the plaintiff's perspective, the remedy he seeks will not fully redress the injury he claims.

Circling back to Article III's "case or controversy" requirement, the Supreme Court has held that "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)). In other words, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Gill v. Whitford, ___ U.S. ___, 138 S. Ct. 1916, 1934 (2018) (citing Cuno, 547 U.S. at 353). Even if the plaintiff had alleged a particularized, concrete injury and even if the relief he seeks would redress that injury, that relief is not tailored to the alleged injury. As the Michigan court explained in King v. Whitmer, Case No. 20-13134 at Dkt. No. 62, page 25 (E.D. Mich. Dec. 7, 2020), "Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote."

The plaintiff's status as a registered voter does not give him standing to sue.

23

b. Standing as a nominee for elector

The amended complaint alleges that the plaintiff has standing to bring the suit "as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq." Dkt. No. 9 at ¶26. The amended complaint cites to "Wis. Stat. §§5.10, et seq," but the court is not sure what the "*et seq.*"—"and what follows"— contributes to the plaintiff's belief that he has standing. Wis. Stat. §5.10 is followed by Wis. Stat. §5.15, which concerns the "Division of municipalities into wards," as well as other sections concerning polling places and voting machines. The court assumes the plaintiff meant to reference only Wis. Stat. §5.10.

Wis. Stat. §5.10 states:

Although the names of the electors do not appear on the ballot and no reference is made to them, a vote for the president and vice president named on the ballot is a vote for the electors of the candidates for whom an elector's vote is cast. Under chs. 5 to 12, all references to the presidential election, the casting of votes and the canvassing of votes for president, or for president and vice president, mean votes for them through their pledged presidential electors.

Relying on this section, the amended complaint directs the court's attention to <u>Carson v. Simon</u>, 978 F.3d 1051, 1057 (8th Cir. 2020).[2] In <u>Carson</u>,

---

[2] The complaint also cites two Supreme Court cases: <u>McPherson v. Blacker</u>, 146 U.S. 1, 27 (1892) and <u>Bush v. Palm Beach Cty. Canvassing Bd.</u>, 531 U.S. 70, 76 (2000) (*per curiam*). Neither address the Article III standing of an elector. In <u>McPherson</u>, the Court reviewed the Michigan supreme court's decision on the constitutionality of the Michigan statute governing selection of electors. While the parties who brought the suit in state court were nominees for presidential electors, the Court did not address their standing (or lack of it). The petitioner in <u>Bush</u> was the then-Republican candidate, George W. Bush, who was challenging the Florida supreme court's interpretation of its election statutes; again, the Court did not address (and had no need to address) the standing of an elector to sue.

24

two certified nominees of the Republican Party to be presidential electors sued the Minnesota secretary of state, challenging a consent decree that "essentially ma[de] the statutorily-mandated absentee ballot receipt deadline inoperative." Id. at 1054. As a result of the decree, the secretary of state had directed election officials "to count absentee ballots received up to a week after election day, notwithstanding Minnesota law." Id. The potential electors sought an injunction in federal court, but the district court found they lacked standing. Id.

The Eighth Circuit reversed, finding that the potential electors had standing as candidates "because the plain text of Minnesota law treats prospective presidential electors as candidates." Id. at 1057. The court found that candidates suffered particularized and concrete injury from an inaccurate vote tally. Id. at 1058.

The plaintiff urges this court to reach the same conclusion. An Eighth Circuit decision is not binding on this court, but the question is whether the reasoning in that decision is persuasive. A member of the panel in Carson dissented from the majority opinion and expressed doubt about the potential electors' standing. Circuit Judge Jane Kelley wrote:

> . . . I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as "candidates," see, e.g., Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. Id. § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote

for that party's electors.") They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals. But even if we nonetheless assume the Electors should be treated like traditional political candidates for standing purposes, I question whether these particular candidates have demonstrated the "concrete and particularized" injury necessary for Article III standing. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 . . . (1992). To the contrary, their claimed injury—a potentially "inaccurate vote tally" . . .—appears to be "precisely the kind of undifferentiated, generalized grievance about the conduct of government: that the Supreme Court has long considered inadequate for standing. <u>Lance v. Coffman</u>, 549 U.S. 437, 442 . . . (2007) (examining standing in the context of a claim under the Elections Clause). Because the Electors, should they in fact assume that office, must swear an oath to mark their Electoral College ballots for the presidential candidate who won the popular vote, Minn. Stat. § 208.43 (2015), it is difficult to discern how they have more of a "particularized stake," <u>Lance</u>, 549 U.S. at 442 . . . , in Minnesota conducting fair and transparent elections than do the rest of the state's voters.

<u>Id.</u> at 1063.

Judge Kelly's reasoning is the more persuasive. Under Wisconsin law, a vote for the candidates of president and vice president is a vote for the electors of those candidates. Wis. Stat. § 5.65(3)(a). When the electors meet, they must vote for the candidates of the party that nominated the electors. Wis. Stat. §7.75(2). Like Minnesota electors, Wisconsin electors may be referred to as "candidates" by statute but they are not traditional political candidates presented to and chosen by the voting public. Their interest in seeing that every valid vote is correctly counted and that no vote is diluted is no different than that of an ordinary voter. And the court has concluded, as did Judge Kelly, that the plaintiff's status as a voter does not give him standing.

The amended complaint does not mention the Elections Clause or the Electors Clause of the Constitution in relation to standing. In his brief in

26

opposition to the motions to dismiss, the plaintiff alleges that he has standing under "Electors and Elections Clause." Dkt. No. 72 at 17. He asserts that the Eighth Circuit found in <u>Carson</u> that electors had "both Article III and Prudential standing under the Electors and Elections Clauses." <u>Id.</u> The plaintiff reads <u>Carson</u> differently than does this court. The <u>Carson</u> majority did not mention the Electors or Elections Clause in its discussion of Article III standing. The entire discussion of Article III standing was based on Minnesota law. <u>See</u> <u>Carson</u>, 978 F.3d at 1-57-1058. In its discussion of *prudential* standing, the <u>Carson</u> majority stated that "[a]lthough the Minnesota Legislature may have been harmed by the Secretary's usurpation of its constitutional right under the Elector Clause, the Electors have been as well." <u>Id.</u> at 1058-59.

This court has found that the plaintiff does not have Article III standing, but even if had not, it disagrees that the Elector Clause[3] provides prudential standing to electors. Article II, Section 1, Clause 2 of the Constitution—known as the "Elector Clause"—states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of

---

[3] The plaintiff cites the "Elector and Elections Clause" or "Clauses" in the same breath but does not discuss the text of either. It is not clear how the plaintiff sees the Elections Clause—Article II, Sec. 1, cl. 3—as providing him with standing and the plaintiff has not developed that argument. The court notes only that in <u>Lance v. Coffman</u>, the Supreme Court found that plaintiffs whose only alleged injury was that the Elections Clause had not been followed did not have standing because they alleged "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." <u>Lance</u>, 549 U.S. at 442.

Trust or Profit under the United States, shall be appointed an Elector." The clause confers on the *state* the right to appoint electors and confers on the *legislature* the right to decide the way those electors will be appointed. It confers no right on the *electors* themselves. Just a few months ago, the Supreme Court stated as much in <u>Chiafalo v. Washington</u>, ___ U.S. ___, 140 S. Ct. 2316, 2328 (July 6, 2020), in the context of considering whether a state could penalize an elector for breaking his pledge and voting for someone other than the candidate who won his state's popular vote:[4] "Article II and the Twelfth Amendment give States broad powers over electors, and give electors themselves no rights." The Court went on to say,

> Early in our history, States decided to tie electors to the presidential choices of others, whether legislatures or citizens. Except that legislatures no longer play a role, that practice has continued for more than 200 years. Among the devices States have long used are pledge laws, designed to impress on electors their role as agents of others. A State follows in the same tradition if, like [the state of] Washington, it chooses to sanction an elector for breaching his promise. Then, too, the State instructs its electors that they have no ground for reversing the vote of millions of its citizens. That direction accords with the Constitution—as well as with the trust of a Nation that here, We the People rule.

<u>Id.</u>

The plaintiff's status as a nominee to be a Republican elector does not give him Article III or prudential standing.

---

[4] Wisconsin's "pledge law"—Wis. Stat. §7.75(1)—does not impose a penalty on a "faithless elector."

2. *Mootness*

Mootness "has sometimes been called 'the doctrine of standing set in a time frame.'" Chi. Joe's Tea Room, LLC v. Vill. of Broadview, 894 F.3d 807, 812-13 (7th Cir. 2018) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 189 (2000)). A case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)). "Mootness strips a federal court of subject-matter jurisdiction." Id. at 815 (citing DJL Farm LLC v. EPA, 813 F.3d 1048, 1050 (7th Cir. 2016). This is because "[a] case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III.'" United States v. Sanchez-Gomez, __ U.S. __, 138 S. Ct. 1532, 1537 (2018) (quoting Already, LLC, 568 U.S. at 91).

The amended complaint states that the plaintiff brought this suit "to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin . . . ." Dkt. No. 9 at ¶27. The plaintiff asks the court to prohibit from occurring an event that already has occurred—an event that occurred the day before he filed this lawsuit and nine days before the court issues this order. He asks the court to enjoin defendant Evers from transmitting the certified election results, id. at ¶142—an event that already has occurred. He asks the court to order that certain votes not be counted, id., when the vote counting has been over since November 29.

29

The plaintiff himself demonstrates the mootness problem in his brief in opposition to dismissal. He states that defendant Evers can provide partial redress for his alleged injuries "by refusing to certify or transmit the election results." Dkt. No. 72 at 21. But Evers already has certified and transmitted the elections results—he cannot refuse to do that which he already has done.

At the December 8 hearing, the plaintiff argued that there remains a live controversy because the electors have not yet voted and will not do so until Monday, December 14, 2020. Dkt. No. 70. This argument ignores the fact that several of the events that dictate which slate of nominees are certified to vote already have taken place and had taken place at the time the plaintiff filed his complaint. The votes have been counted. In two counties, they've been counted twice. The WEC chair has signed the canvass and certified electors for Biden/Harris. The governor has signed the Certificate of Ascertainment and the National Archive has that certificate.

In his brief in opposition to dismissal, the plaintiff points to this court's own order earlier in this case, determining that the plaintiff had not demonstrated why the December 8, 2020 "safe harbor" deadline under 3 U.S.C. §5 was the date by which the plaintiff needed the court to issue a decision to preserve his rights. Dkt. No. 72 at 25 (citing Dkt. No. 29 at 7). The court noted in that order that the plaintiff's brief in opposition to a motion to reassign another case erroneously referred to December 8 as the date that the College of Electors was scheduled to meet. Dkt. No. 29 at 7. The court pointed out that that was incorrect, and that December 8 was the deadline by which the state

<div align="center">30</div>

would have to make its final determination of any election dispute in order to avoid congressional challenge. Id. The court then said, "Because the electors do not meet and vote until December 14, 2020, the court will impose a less truncated briefing schedule than the one the plaintiff proposes . . . ." Dkt. No. 29.

The plaintiff says that "[i]mplicit in this Court's determination" is the assumption that "this Court can still grant some or perhaps all of the relief requested and this Plaintiff's claims are not moot." Dkt. No. 72 at 25. The plaintiff reads more into the court's language than the court intended. In the plaintiff's earliest pleadings—the first motion for injunctive relief, the "corrected" motion for injunctive relief, the "amended" motion for injunctive relief—the plaintiff failed to identify a date by which he needed the court to act. The first time he identified such a date was in his brief in opposition to a motion to reassign another case—and then, the reference was oblique. In his opposition brief, the plaintiff stated, "With the College of Electors scheduled to meet December 8, there could never be a clearer case of 'justice delayed is justice denied.'" Dkt. No. 18 at 1. From that, the court deduced that the plaintiff needed the court to act by the date the College of Electors was scheduled to meet. But the College of Electors was not scheduled to meet December 8—it was (and is) scheduled to meet December 14. So the court set a briefing schedule that would give the defendants a chance to respond, but would complete briefing ahead of the event the plaintiff deemed important—the

31

electoral meeting and vote. That was not a decision by this court—implicit or explicit—on the mootness of the plaintiff's claims.

The plaintiff also asserts that the "cutoff for election-related challenges, at least in the Seventh Circuit, appears to be the date that the electors meet, rather than the date of certification." Dkt. No. 72 at 24. He cites <u>Swaffer v. Deininger</u>, No. 08-CV-208, 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008). <u>Swaffer</u> is not a Seventh Circuit case, and the court is not aware of a Seventh Circuit case that establishes a "cutoff for election-related challenges." And the plaintiff seems to have made up the "quote" in his brief that purports to be from <u>Swaffer</u>. The plaintiff asserts that these words appear on page 4 of the <u>Swaffer</u> decision: "even though the ***election*** has passed, the meeting of electors obviously has not, so plaintiff's claim here is hardly moot." Dkt. No. 72 at 24-25. The court has read page 4 of <u>Swaffer</u>—a decision by this court's colleague, Judge J.P. Stadtmueller—three times and cannot find these words. In fact, <u>Swaffer</u> did not involve a challenge to a presidential election and it did not involve electors. Mr. Swaffer sought to challenge a Wisconsin statute requiring individuals or groups promoting or opposing a referendum to file a registration statement and take other actions. <u>Swaffer</u>, 2008 WL 5246167, at *1. The defendants argued that the election (in which the plaintiff had taken steps to oppose a referendum on whether to allow liquor sales in the Town of Whitewater) was over and that Swaffer's claims thus were moot. <u>Id.</u> at 2. Judge Stadtmueller disagreed, finding that because Swaffer alleged that he intended

Exhibit N

to violate the statutes at issue in the future, a credible threat of prosecution remained. Id. at 3.

Some of the relief the plaintiff requests may not be moot. For example, he asks for an immediate order seizing voting machines, ballots and other materials relating to the physical mechanisms of voting. And there remain five days until the electors vote—as the events of this year have shown, anything can happen. But most of the relief the plaintiff seeks is beyond this court's ability to redress absent the mythical time machine.

### 3. *Conclusion*

The plaintiff does not have Article III standing to sue in federal court for the relief he seeks.

### C. <u>Other Arguments</u>

Standing is the *sine qua non* of subject matter jurisdiction. Absent standing, the court does not have jurisdiction to consider the plaintiff's claims on the merits. Arguably, it has no jurisdiction to consider the other bases the defendants and *amici* assert for why the court should dismiss the case. At the risk of producing dicta (and spilling even more ink on a topic that has received an ocean's worth by now), the court will briefly address some of the other bases for the sake of completeness.

### 1. *Eleventh Amendment Immunity*

The defendants argue that the plaintiff's claims are barred by the Eleventh Amendment. Dkt. No. 59 at 15; Dkt. No. 54 at 10. The Eleventh Amendment "bars most claims in federal court against a state that does not

Exhibit N

consent to suit." <u>Carmody v. Bd. of Trs. of Univ. of Ill.</u>, 893 F.3d 397, 403 (7th Cir. 2018) (citations omitted). States are immune from suit in federal court "unless the State consents to the suit or Congress has abrogated their immunity." <u>Tucker v. Williams</u>, 682 F.3d 654, 658 (7th Cir. 2012) (citing <u>Seminole Tribe v. Florida</u>, 517 U.S. 44 (1996)). This includes suits brought in federal court against nonconsenting states by their own citizens. <u>See</u>, <u>e.g.</u>, <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974); <u>Hans v. Louisiana</u>, 134 U.S. 1, 15 (1890) ("Can we suppose that, when the eleventh amendment was adopted, it was understood to be left open for citizens of a state to sue their own state in the federal courts, while the idea of suits by citizens of other states, or of foreign states, was indignantly repelled?").

The plaintiff has sued the Governor of Wisconsin, Tony Evers, in his official capacity; the Wisconsin Elections Commission and each member of the WEC in his or her official capacity. Before going too much further down the Eleventh Amendment road, the court notes that the vehicle for the plaintiff to bring his constitutional claims—his claims under the Elector Clause, the Elections Clause, the Equal Protection Clause and the Due Process Clause—is 42 U.S.C. §1983. Section 1983 prohibits a "person" acting under color of state law from violating another's civil rights. The Wisconsin Elections Commission is not a "person." It is an arm of the state of Wisconsin, Wis. Stat. §5.05, and "states are not suable 'persons' under 42 U.S.C. § 1983." <u>Phillips v. Baxter</u>, 768 F. App'x 555, 559-560 (7th Cir. 2019) (citing <u>Sebesta v. Davis</u>, 878 F.3d 226, 231 (7th Cir. 2017)). <u>See also</u>, <u>Will v. Mich. Dept. of State Police</u>, 491 U.S. 58,

34

Exhibit N

64 (1989) ("a State is not a person within the meaning of § 1983"). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." <u>Will</u>, 491 U.S. at 66. The WEC is not the proper defendant for the plaintiff's constitutional claims.

The plaintiff faces the same problem with his claims against the individual defendants, all of whom are state officials whom he sues in their official capacities.[5]

> Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon v. Holt*, 469 U.S. 464, 471 . . . (1985). As such, it is no different from a suit against the State itself. See, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 . . . (1985); *Monell* [*v. New York City Dept. of Social Services*, 436 U.S. 658], at 690 [(1978)].

<u>Id.</u> at 71. Arguably, *none* of the defendants are subject to suit under 42 U.S.C. §1983, which means that even if the plaintiff had standing, the court would have to dismiss Counts I, II and III of the amended complaint.

Circling back to the defendants' Eleventh Amendment argument, "The Eleventh Amendment extends to state agencies and departments and, subject to the <u>*Ex Parte* Young</u> doctrine, to state employees acting in their official capacities." <u>Nelson v. LaCrosse Cty. Dist. Atty. (State of Wis.)</u>, 301 F.3d 820,

---

[5] Had the plaintiff sued the individual defendants in their *personal* capacities, he could have sought relief against them under 42 U.S.C. §1983, assuming he had standing.

35

827 n.7 (7th Cir. 2002) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123-24 (1984)).

There are three exceptions to Eleventh Amendment immunity: (1) congressional abrogation, Nuñez v. Ind. Dep't of Child Servs., 817 F.3d 1042, 1044 (7th Cir. 2016) (citing Alden v. Maine, 527 U.S. 706, 754-55 (1999); (2) "a state's waiver of immunity and consent to suit," id. (citing College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999)); and (3) a suit "against state officials seeking only prospective equitable relief," id. (citing Ex parte Young, 209 U.S. 123, 159-60 (1908)). None of the exceptions apply here.

Congress did not abrogate the sovereign immunity of the states when it enacted 42 U.S.C. §1983. Will, 491 U.S. at 66. Wisconsin has not waived its immunity from civil actions under §1983. See Shelton v. Wis. Dep't of Corr., 376 Wis. 2d 525, *2 (Table) (Ct. App. 2017) (citing Boldt v. State, 101 Wis. 2d 566, 584-85 (1981)). And the Ex parte Young doctrine does not apply when a plaintiff asserts a claim—regardless of the relief requested—against a state official based on state law. Pennhurst, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). "In determining whether the Ex parte Young doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward

36

inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 636 (2002) (quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 296 (1997); <u>McDonough Assocs., Inc. v. Grunloh</u>, 722 F.3d 1043, 1051 (7th Cir. 2013)).

Count IV of the amended complaint alleges "[w]ide-spread ballot fraud," a *state*-law claim. The Eleventh Amendment bars that claim against the defendants in their official capacities. The Eleventh Amendment also bars the plaintiff's federal claims to the extent that the plaintiff seeks retrospective relief. The Supreme Court has refused to extend the <u>*Ex Parte* Young</u> doctrine to claims for retrospective relief. <u>Green v. Mansour</u>, 474 U.S. 64, 68 (1985) (citing <u>Pennhurst</u>, 465 U.S. at 102-103). The amended complaint seeks (1) a "temporary restraining order instructing Defendants to de-certify the results of the General Election for the Office of President," dkt. no. 9 at 47; (2) "an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump," <u>id.</u>; (3) "a temporary restraining order" prohibiting the tabulation of unlawful votes," id.; (4) an order preserving voting equipment and data, <u>id.</u>; (5) "the elimination of the mail ballots from counting in the 2020 election," <u>id</u>. at 48; (6) the disqualification of Wisconsin's electors from participating in the 2020 election, <u>id.</u>; and (7) an order directing Wisconsin's electors to vote for President Donald Trump, <u>id.</u> As the court already has noted, with the possible exception of the

37

request for an order preserving voting equipment and data, the relief the plaintiff requests is retrospective.

The plaintiff disagrees—he characterizes the certification of the election results as "ongoing violations of federal law . . . ongoing violations of the Electors and Elections Clauses, the Equal Protection and Due Process Clauses, as well as likely violations of federal law including the Voting Rights Act and the Help America Vote Act." Dkt. No. 72 at 25-26. The plaintiff has not brought claims under the latter two statutes and saying that a completed event is an ongoing violation doesn't make it so.

### 2. *Exclusive Remedy/Exhaustion/Abstention*

Defendant Evers moves to dismiss because Wisconsin provides a remedy to address irregularities or defects during the voting or canvassing process: Wis. Stat. §9.01(11). Four days ago, the Wisconsin Supreme Court held that §9.01(6) requires that a party aggrieved after a recount must appeal by filing suit in circuit court. Trump v. Evers, No. 2020AP1971-OA, Order at *2 (Wis. Dec. 3, 2020). In a concurring opinion, Justice Hagedorn noted that Wis. Stat. §9.01(11) provides that §9.01 is the exclusive judicial remedy for an aggrieved candidate. Defendant Evers points out that President Trump has lawsuits pending in state circuit courts and argues that those cases raise many of the claims the plaintiff raises here. Dkt. No. 59 at 11. He argues that the process detailed in Wis. Stat. §9.01 is designed to allow an aggrieved candidate to resolve election challenges promptly, and that for this court to permit the

38

Exhibit N

plaintiff to circumvent that process "would eviscerate Wisconsin's careful process for properly and quickly deciding election challenges." Id. at 11-12.

Of course, the plaintiff has no redress under Wis. Stat. §9.01, because he is not a "candidate" in the sense of that statute. But Evers argues that there was a form of state-law relief available to the plaintiff. He asserts that the plaintiff should have filed a complaint with the Wisconsin Elections Commission under Wis. Stat. §5.06. Dkt. No. 59 at 13. That statute allows a voter dissatisfied with the Wisconsin election process to file a written, sworn complaint with the elections board. Wis. Stat. §5.06(1). The statute states that no voter may "commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official" without first filing a complaint under §5.06(1). Wis. Stat. §5.06(2). Evers points out that the plaintiff has not demonstrated that he followed this procedure and thus that the plaintiff did not exhaust his remedies before coming to federal court. Dkt. No. 59 at 14.

The plaintiff does not directly respond to the exhaustion argument. He simply maintains that he has a right to bring his constitutional claims in federal court, argues that there is no evidence that the statute Evers cites is an exhaustion requirement and asserts that the court has federal question jurisdiction under 28 U.S.C. §1331 and supplemental jurisdiction over any state-law claims under 28 U.S.C. §1367.[6] Dkt. No. 72 at 27-28. He neatly

---

[6] The court could exercise supplemental jurisdiction over state-law claims only if there remained federal claims to which those state-law claims related. As the court has noted, it likely would have been required to dismiss the federal

Exhibit N

sidesteps the question of why he did not follow a procedure that would have allowed him to direct his concerns to the entity in charge of enforcing the state's election laws and in a way that likely would have brought those concerns to that entity's attention long before the election results were certified.

Because the court has concluded that the plaintiff does not have standing, and because the plaintiff has sued defendants who either are not suable under §1983 or are protected by Eleventh Amendment immunity, the court will not accept the invitations of the defendants and *amici* to wade into the waters of the various types of abstention. If this court does not have subject matter jurisdiction, there is no case or controversy from which it should abstain. The court agrees with the parties, however, that the relief the plaintiff requests—asking a federal judge to order a state governor to decertify the election results for an entire state and direct that governor to certify a different outcome—constitutes "an extraordinary intrusion on state sovereignty from which a federal court should abstain under longstanding precedent." Dkt. No. 57 at 28.

> 3. *Laches*

The defendants argue that the equitable defense of laches requires dismissal, because the plaintiff "inexplicably waited until after the election, after the canvassing, after the recount, after the audit, after results were

_____

claims because the plaintiff asserted them through §1983 against state officials in their official capacities, which in turn would have required dismissal of any state claims for lack of subject matter jurisdiction.

certified, and indeed until the eve of the electoral college vote, to bring his claim of state law violations and widespread fraud . . . ." Dkt. No. 52 at 11. See also, Dkt. No 59 at 17 ("the doctrine of laches bars [the plaintiff's] claims because he has unreasonably delayed bringing his claims to the detriment not only of Defendants, but also of the nearly 3.3 million voters in Wisconsin who voted in this last election under the good-faith belief that they were following the correct procedures to have their votes counted.").

The doctrine of laches "addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820 (7th Cir. 1999). "For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." Id. (citing Cannon v. Univ. of Health Scis./The Chicago Med. Sch., 710 F.2d 351, 359 (7th Cir. 1983)). "Timeliness must be judged by the knowledge of the plaintiffs as well as the nature of the right involved." Jones v. v. Markiewicz-Qualkinbush, 842 F.3d 1053, 1061 (7th Cir. 2016).

"The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept." Id. at 1060-61. In fact, the Seventh Circuit has held that such "claims must be brought expeditiously . . . to afford the district court sufficient time in advance of an election to rule without disruption of the electoral cycle." Id. at 1061 (internal quotation marks and citations omitted).

41

Exhibit N

The amended complaint asserts that the alleged problems with the Dominion voting machine software "have been widely reported in the press and have been subject to investigation." Dkt. No. 9 at ¶12. It cites to exhibits from January and August of 2020. Dkt. No. 9 at 5 n.1. It cites to the WEC's May 13, 2020 directive to clerks that they should not reject the ballots of "indefinitely confined" absentee voters. Id. at ¶40. It cites an October 18, 2016 memorandum issued by the WEC instructing clerks on how to handle absentee envelope certifications that did not bear the address of the witness. Id. at ¶44. It cites October 19, 2020 instructions by the WEC to clerks about filling in missing ballot information. Id. at ¶45.

Defendant Evers points out that the plaintiff's own allegations demonstrate that he has known about the Dominion voting machine issues since long before the election. Dkt. No. 59 at 17-18. He argues that the WEC guidance about which the plaintiff complains came in directives issued in October 2016, May 2020 and October 2020. Id. He asserts that the plaintiff has made no effort "to offer a justifiable explanation for why he waited until weeks after the election to challenge" these issues. Id. at 18. The WEC defendants advise the court that the issue regarding "indefinitely confined" voters was litigated in state court almost eight months ago. Dkt. No. 54 at 9 (citing Pet. For Original Action dated March 27, 2020, Supreme Court of Wisconsin, No. 2020AP000557-OA). They assert that the plaintiff "waited to challenge widely-known procedures until after millions of voters cast their ballots in reliance on those procedures." Id. at 6. They state that "[i]f the doctrine of laches means

<div align="center">42</div>

Exhibit N

anything, it is that Plaintiff here cannot overturn the results of a completed and certified election through preliminary relief in this late-filed case." Id.

The plaintiff first responds that laches is a defense and shouldn't be raised on a motion to dismiss. Dkt. No. 72 at 22. He then claims that he could not have known the bases of any of these claims until after the election. Id. at 22-23. He says that because Wisconsin election officials did not "announce or publicize their misconduct," and because, he alleges, they "prevented Republican poll watchers from observing the ballot counting and handling," it took him time to gather the evidence and testimony he attached to the amended complaint. Id. at 23. Finally, he alleges that the delay post-November 3, 2020 is attributable to the defendants' failure to timely complete the election count. Id. He insists that he filed this suit at the earliest possible moment—the day after the certification. Id.

The court has determined that the plaintiff does not have standing. That means that the court does not have jurisdiction to assess the plaintiff's credibility, and it will refrain from doing so.

        4.    *Failure to state a claim upon which relief can be granted*

Both defendants asked the court to dismiss the case for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Because the court does not have subject matter jurisdiction, it will not address the sufficiency of the substantive claims in the amended complaint.

43

Exhibit N

5.    *Requests for injunctive relief*

For the same reason, the court cannot address the merits of the plaintiff's request for preliminary injunctive relief.

**V.    Conclusion**

This court's authority to grant relief is confined by the limits of the Constitution. Granting the relief the plaintiff requests would take the court far outside those limits, and outside the limits of its oath to uphold and defendant the Constitution. The court will grant the defendants' motion to dismiss.

The court **GRANTS** Defendant Governor Tony Evers's Motion to Dismiss Plaintiff's Amended Complaint. Dkt. No. 51.

The court **GRANTS** Defendant Wisconsin Elections Commission and Its Members' Motion to Dismiss. Dkt. No. 53.

The court **DENIES AS MOOT** Plaintiff's Corrected Motion for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 6.

The court **DENIES AS MOOT** Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction to be Considered in an Expedited Manner Dkt. No. 10.

The court **DISMISSES** the Amended Complaint for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 9.

44

Exhibit N

The court **ORDERS** that this case is **DISMISSED.**

Dated in Milwaukee, Wisconsin this 9th day of December, 2020.

<div style="margin-left:40%">

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

</div>

Exhibit N

# EXHIBIT P

Exhibit N

# IN THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| **CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, and BRIAN JAY VAN GUNDY,**<br><br>    **Plaintiffs.**<br><br>**v.**<br><br>**BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N.SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board,**<br><br>    **Defendants.** | **CASE NO.** |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

1

Exhibit N

## NATURE OF THE ACTION

This civil action brings to light a massive election fraud, multiple violations of Georgia laws, including O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1 and §21-2-522, and multiple Constitutional violations, as shown by fact witnesses to specific incidents, multiple expert witnesses and the sheer mathematical impossibilities found in the Georgia 2020 General Election.[1]

1.

As a civil action, the plaintiff's burden of proof is a "preponderance of the evidence" to show, as the Georgia Supreme Court has made clear that, *"[i] was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (*citing Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002).

---

[1] The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations, see expert reports, regarding Michigan, Pennsylvania, Arizona and Wisconsin. (See William M. Briggs Decl., attached here to as Exh. 1, Report with Attachment). Indeed, we believe that in Arizona at least 35,000 votes were illegally added to Mr. Biden's vote count.

Exhibit N

2.

The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to make certain the election of Joe Biden as President of the United States.

3.

The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious is the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Georgia. Especially egregious conduct arose in Forsyth, Spalding, Cherokee, Hall, and Barrow County. This scheme and artifice to defraud affected tens of thousands of votes in Georgia alone and "rigged" the election in Georgia for Joe Biden.

---

[2] 50 USC § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system.

3

Exhibit N

4.

The massive fraud begins with the election software and hardware
from Dominion Voting Systems Corporation ("Dominion") only recently
purchased and rushed into use by Defendants Governor Brian Kemp,
Secretary of State Brad Raffensperger, and the Georgia Board of Elections.
Sequoia voting machines were used in 16 states and the District of Colombia
in 2006. Smartmatic, which has revenue of about $100 million, focuses on
Venezuela and other markets outside the U.S. [3]

After selling Sequoia, Smartmatic's chief executive, Anthony Mugica.
Mr. Mugica said, he hoped Smartmatic would work with Sequoia on projects
in the U.S., though Smartmatic wouldn't take an equity stake."  Id.

5.

Smartmatic and Dominion were founded by foreign oligarchs and
dictators to ensure computerized ballot-stuffing and vote manipulation to
whatever level was needed to make certain Venezuelan dictator Hugo Chavez
never lost another election.  (*See* Redacted whistleblower affiant, *attached as
Exh*. 2)  Notably, Chavez "won" every election thereafter.

---

[3] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by
Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

4

Exhibit N

6.

As set forth in the accompanying whistleblower affidavit, the

Smartmatic software was designed to manipulate Venezuelan elections in

favor of dictator Hugo Chavez:

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system.

7.

A *core requirement* of the Smartmatic software design was the

*software's ability to hide its manipulation of votes from any audit.* As the

whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not be tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that

5

Exhibit N

accomplished that result for President Chavez. (*See Id., see also* Exh. 3, Aff. Cardozo, attached hereto).

8.

The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  (*See* Hursti August 2019 Declaration, attached hereto as Exh. 4, at pars. 45-48; and attached hereto, as Exh. 4B, October 2019 Declaration in Document 959-4, at p. 18, par. 28).

9.

Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to

6

Exhibit N

the internet in violation of professional standards and state and federal laws.

(*See Id.*)

10.

Moreover, lies and conduct of Fulton County election workers about a

delay in voting at State Farm Arena and the reasons for it evince the fraud.

11.

Specifically, video from the State Farm Arena in Fulton County shows

that on November 3rd after the polls closed, election workers falsely claimed

a water leak required the facility to close.  All poll workers and challengers

were evacuated for several hours at about 10:00 PM.  However, several

election workers remained unsupervised and unchallenged working at the

computers for the voting tabulation machines until after 1:00 AM.

12.

Defendants Kemp and Raffensperger rushed through the purchase of

Dominion voting machines and software in 2019 for the 2020 Presidential

Election[4].  A certificate from the Secretary of State was awarded to Dominion

---

[4]   Georgia Governor Inks Law to Replace Voting Machines, The Atlanta
Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press,
June 2019.   https://www.ajc.com/blog/politics/georgia-governor-inks-law-replace-
voting-machines/xNXs0ByQAOvtXhd27kJdqO/

Exhibit N

Voting Systems but is undated. (*See* attached hereto Exh. 5, copy

Certification for Dominion Voting Systems from Secretary of State).

Similarly a test report is signed by Michael Walker as Project Manager but is

also undated. (See Exh. 6, Test Report for Dominion Voting Systems,

Democracy Suite 5-4-A)

13.

Defendants Kemp and Raffensperger disregarded all the concerns that

caused Dominion software to be rejected by the Texas Board of Elections in

2018, namely that it was vulnerable to undetected and non-auditable

manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of

Computer Science and Election Security Expert has recently observed, with

reference to Dominion Voting machines: "I figured out how to make a slightly

different computer program that just before the polls were closed, it switches

some votes around from one candidate to another. I wrote that computer

program into a memory chip and now to hack a voting machine you just need

7 minutes alone with it and a screwdriver." (Attached hereto Exh. 7, Study,

Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters by

Andrew W. Appel Princeton University, Richard A. DeMillo, Georgia Tech

Philip B. Stark, for the Univ. of California, Berkeley, December 27, 2019).[5]

---

[5] Full unredacted copies of all exhibits have been filed under seal with the Court
and Plaintiffs have simultaneously moved for a protective order.

Exhibit N

14.

As explained and demonstrated in the accompanying redacted declaration of  a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems.  (See Attached hereto as Exh. 8, copy of redacted witness affidavit, 17 pages, November 23, 2020).

15.

Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states.  He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden.  (Exh. 26).

9

16.

Additionally, incontrovertible evidence Board of Elections records demonstrates that at least 96,600 absentee ballots were requested and counted but were never recorded as being returned to county election boards by the voter. *Thus, at a minimum, 96,600 votes must be disregarded.* (See Attached hereto, Exh. 9, R. Ramsland Aff.).

17.

The Dominion system used in Georgia erodes and undermines the reconciliation of the number of voters and the number of ballots cast, such that these figures are permitted to be unreconciled, opening the door to ballot stuffing and fraud. The collapse of reconciliation was seen in Georgia's primary and runoff elections this year, and in the November election, where it was discovered during the hand audit that 3,300 votes were found on memory sticks that were not uploaded on election night, plus in Floyd county, another 2,600 absentee ballots had not been scanned. These "found votes" reduced Biden's lead over Donald Trump[6].

---

[6] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20. https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

10

Exhibit N

18.

Georgia's election officials and poll workers exacerbated and helped, whether knowingly or unknowingly, the Dominion system carry out massive voter manipulation by refusing to observe statutory safeguards for absentee ballots. Election officials failed to verify signatures and check security envelopes. They barred challengers from observing the count, which also facilitated the fraud.

19.

Expert analysis of the actual vote set forth below demonstrates that at least 96,600 votes were illegally counted during the Georgia 2020 general election. All of the evidence and allegation herein is more than sufficient to place the result of the election in doubt. More evidence arrives by the day and discovery should be ordered immediately.

20.

Georgia law, (OCGA 21-5-552) provides for a contest of an election where:

> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result; . . . (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

11

Exhibit N

21.

As further set forth below, all of the above grounds have been satisfied and compel this Court to set aside the 2020 General Election results which fraudulently concluded that Mr. Biden defeated President Trump by 12,670 votes.

22.

Separately, and independently, there are sufficient Constitutional grounds to set aside the election results due to the Defendants' failure to observe statutory requirements for the processing and counting of absentee ballots which led to the tabulation of more than fifty thousand illegal ballots.

**THE PARTIES**

23.

Plaintiff Coreco Ja'Qan ("CJ") Pearson, is a registered voter who is registered to vote in Columbia County, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia. He has standing to bring this action under *Carson v. Simon*, 2020 US App Lexis 34184 (8th Cir. Oct. 29, 2020). He brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Georgia Secretary of State on November 20, 2020. The certified results showed a plurality of 12,670 votes in favor of former Vice-President Joe Biden over President Trump.

12

Exhibit N

24.

Plaintiff Vikki Townsend Consiglio, is a registered voter who resides in Henry County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

25.

Plaintiff Gloria Kay Godwin, is a registered voter who resides in Pierce County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

26.

Plaintiff James Kenneth Carroll, is a registered voter who resides in Dodge County, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

27.

Plaintiff Carolyn Hall Fisher, is a registered voter who resides in Forsyth County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

28.

Plaintiff Cathleen Alston Latham, is a registered voter who resides in Coffee County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

Exhibit N

29.

Plaintiff Brian Jay Van Gundy is registered voter in Gwinnett County, Georgia.  He is the Assistant Secretary of the Georgia Republican Party.

30.

Defendant Governor Brian Kemp (Governor of Georgia) is named herein in his official capacity as Governor of the State of Georgia.  On or about June 9, 2019, Governor Kemp bought the new Dominion Voting Systems for Georgia, budgeting 150 million dollars for the machines.  Critics are quoted, "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacey] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[7]

31.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia and

---

[7] *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019

14

Exhibit N

the Chief Election Official for the State of Georgia pursuant to Georgia's Election Code and O.C.G.A. § 21-2-50. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Secretary Raffensperger serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

32.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulating, adopting, and promulgating such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards

15

Exhibit N

concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State Election Board, personally and through the conduct of the Board's employees, officers, agents, and servants, acted under color of state law at all times relevant to this action and are sued for emergency declaratory and injunctive relief in their official capacities.

## JURISDICTION AND VENUE

33.

This Court has subject matter jurisdiction under 28 U.S.C. 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

34.

This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

35.

The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

16

Exhibit N

36.

This Court has jurisdiction over the related Georgia Constitutional claims and State law claims under 28 U.S.C. 1367.

37.

In Georgia, the "legislature" is the General Assembly. *See* Ga. Const. Art. III, § I, Para. I.

38.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to exercise that power unilaterally, much less flout existing legislation or the Constitution itself.

## STATEMENT OF FACTS

39.

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under Georgia law, O.C.G.A. § 21-2-522 to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results.

17

Exhibit N

40.

The United States Constitution sets forth the authority to regulate

federal elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and
> Representatives, shall be prescribed in each State by the Legislature
> thereof; but the Congress may at any time by Law make or alter such
> Regulations, except as to the Places of choosing Senators. U.S.
> CONST. art. I, § 4 ("Elections Clause").

41.

With respect to the appointment of presidential electors, the

Constitution provides: Each State shall appoint, in such Manner as the

Legislature thereof may direct, a Number of Electors, equal to the whole

Number of Senators and Representatives to which the State may be entitled

in the Congress: but no Senator or Representative, or Person holding an

Office of Trust or Profit under the United States, shall be appointed an

Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").

42.

Neither Defendant is a "Legislature" as required under the Elections

Clause or Electors Clause. The Legislature is "'the representative body which

ma[kes] the laws of the people.'" *Smiley* 285 U.S. 365.  Regulations of

congressional and presidential elections, thus, "must be in accordance with

the method which the state has prescribed for legislative enactments." Id. at

18

Exhibit N

367; see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

43.

While the Elections Clause "was not adopted  to  diminish  a State's authority to determine its own lawmaking processes," *Ariz.  State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

44.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

> A result of a primary or election may be contested on one or more of the following grounds:
>
> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;
>
> (2) When the defendant is ineligible for the nomination or office in dispute;
>
> (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;
>
> (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

19

Exhibit N

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

45.

Under O.C.G.A. § 21-2-10, Presidential Electors are elected.

46.

Under O.C.G.A. § 21-2-386(a)(l)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein. The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article." *See* O.C.G.A. § 21-2-380.1.

47.

The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall,*** if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the

20

Exhibit N

voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. § 21-2-386(a)(l )(B) (emphasis added).

48.

Under O.C.G.A. § 21-2-386(a)(l)(C), the Georgia Legislature also established a clear and efficient process to be used by County Officials if they determine that an elector has failed to sign the oath on the outside envelope enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot").

49.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> ***If the elector has failed to sign the oath, or if the signature does not appear to be valid***, or if the elector has failed to furnish required information ***or information so furnished does not conform with that on file in the registrar's or clerk's office***, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly ***notify the elector of such rejection***, a copy of which notification ***shall*** be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2 -386(a) (l)(C) (emphasis added).

Exhibit N

# I.  DEFENDANTS' UNAUTHORIZED ACTIONS VIOLATED THE GEORGIA ELECTION CODE AND CAUSED THE PROCESSING OF DEFECTIVE ABSENTEE BALLOTS.

50.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia[8].

51.

Under the Settlement, however, the Administrators agreed to change the statutorily prescribed manner of handling absentee ballots in a manner that is not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

---

[8] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.,* Civil Action File No. 1:l 9-cv-05028-WMR, United States District Court for the  Northern District of Georgia, Atlanta Division, Doc.  56-1.

22

Exhibit N

52.

The Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

53.

The Settlement also changed the signature requirement reducing it to a broad process with discretion, rather than enforcement of the signature requirement as statutorily required under O.C.G.A. 21-2-386(a)(l).

54.

The Georgia Legislature instructed county registers and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. S 21-2-386(a)(1)(B), 21-2-380.1. The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each absentee ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absent elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath …

23

Exhibit N

O.C.G.A. S 21-2-386(a)(1)(B).

55.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. *§* 21-2-38 l(b )(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417 ...").

56.

An Affiant testified, under oath, that "It was also of particular interest to me to see that signatures were not being verified and that there were no corresponding envelopes seen in site." (Attached hereto as Exh. 10, Mayra Romera, at par. 7).

57.

To reflect the very reason for process, it was documented that in the primary election, prior to the November 3, 2020 Presidential election, many ballots got to voters after the election. Further it was confirmed that "Untold thousands of absentee ballot requests went unfulfilled, and tens of thousands of mailed ballots were rejected for multiple reasons including arriving too late

24

Exhibit N

to be counted.  See the Associated Press, *Vote-by-Mail worries: A leaky pipeline in many states*, August 8, 2020.[9]

<div align="center">58.</div>

Pursuant to the Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith only partisan-based training - "additional guidance and training materials" drafted by the Democrat Party Agencies' representatives contradicting O.C.G.A. § 21-2-31.

### B. Unlawful Early Processing of Absentee Ballots

<div align="center">59.</div>

In April 2020, the State Election Board adopted on a purportedly "Emergency Basis" Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day. Under this rule, county election officials are authorized to begin processing absentee ballots up to three weeks befoe election day. Thus, the rule provides in part that "(1) Beginning at 8:00 AM on the third Monday prior to Election Day, the county election superintendent **shall be authorized to open the outer envelope of accepted absentee ballots** ..." (Emphasis added).

---

[9]     *https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7*

<div align="center">25</div>

<div align="right">Exhibit N</div>

60.

Rule 183-1-14-0.9-.15 is in direct and irreconcilable conflict with

O.C.G.A. § 21-2-386(a)(2), which prohibits the opening of absentee ballots

until election day:

> **After the opening of the polls** on the day of the primary, election, or runoff, the registrars or absentee ballot clerks **shall be authorized to open the outer envelope** on which is printed the oath of the elector in such a manner as not to destroy the oath printed thereon; provided, however, that the registrars or absentee ballot clerk shall not be authorized to remove the contents of such outer envelope or to open the inner envelope marked "Official Absentee Ballot," except as otherwise provided in this Code section.

(Emphasis added).

61.

In plain terms, the statute clearly prohibits opening absentee ballots

prior to election day, while the rule authorizes doing so three weeks before

election day. There is no reconciling this conflict. The State Election Board

has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and

regulations, but no authority to promulgate a regulation that is directly

contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore

plainly and indisputably unlawful.

62.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

26

Exhibit N

## C. Unlawful Audit Procedures

63.

According to Secretary Raffensperger, in the presidential general election, 2,457,880 votes were cast in Georgia for President Donald J. Trump, and 2,472,002 votes were cast for Joseph R. Biden, which narrowed in Donald Trump's favor after the most recent recount.

64.

Secretary Raffensperger declared that for the Hand Recount:

Per the instructions given to counties as they conduct their audit triggered full hand recounts, designated monitors will be given complete access to observe the process from the beginning. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely. The general public and the press will be restricted to a public viewing area. Designated monitors will be able to watch the recount while standing close to the elections' workers conducting the recount.

Political parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every ten audit boards in a county... Beyond being able to watch to ensure the recount is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted,providing monitors and the public an additional way to keep tabs on the process.[10]

---

[10] *Office of Brad Raffensperger, Monitors Closely Observing Audit-Triggered Full Hand Recount: Transparency is Built Into Process*, https://sos.ga.gov/index.php/elections/monitors_closely_observing_audit-triggered_full_hand_recount_transparency_is_built_into_process

27

Exhibit N

65.

The audit was conducted O.C.G.A. § 21-2-498. This code section
requires that audits be completed "in public view" and authorizes the State
Board of Elections to promulgate regulations to administer an audit "to
ensure that collection of validly cast ballots is complete, accurate and
trustworthy throughout the audit."

66.

Plaintiffs can show that Democrat-majority counties provided political
parties and candidates, including the Trump Campaign, no meaningful
access or actual opportunity to review and assess the validity of mail-in
ballots during the pre-canvassing meetings. While in the audit or recount,
they witnessed Trump votes being put into Biden piles.

67.

Non-parties Amanda Coleman and Maria Diedrich are two individuals
who volunteered to serve as designated monitors for the Donald J. Trump
Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the
Georgia Republican Party (the "Republican Party") at the Hand Recount.
(Attached hereto and incorporated herein as Exhibits 2 and 3), respectively,
are true and correct copies of (1) the Affidavit of Amanda Coleman in Support
of Plaintiffs' Motion for Temporary Restraining Order (the "Coleman
Affidavit"), and (2) the Affidavit of Maria Diedrich in Support of Plaintiffs'

28

Exhibit N

Motion for Temporary Restraining Order (the "Diedrich Affidavit"). (See Exh. 11, Coleman Aff.,2; Exh. 12, Diedrich Aff., 2.)

68.

The Affidavits set forth various conduct amounting to federal crimes, clear improprieties, insufficiencies, and improper handling of ballots by County Officials and their employees that Ms. Coleman and Ms. Diedrich personally observed while monitoring the Hand Recount. *(See* Exh. 11, Coleman Aff., 3-10; Exh. 12, Diedrich Aff., 4-14.)

69.

As a result of her observations of the Hand Recount as a Republican Party monitor, Ms. Diedrich declared, "There had been no meaningful way to review or audit any activity" at the Hand Recount. *(See* Exh. 12, Diedrich Aff.,14.)

70.

As a result of their observations of the Hand Recount as Republican Party monitors, Ms. Coleman likewise declared, "There was no way to tell if any counting was accurate or if the activity was proper." (See Exh. 12, Coleman Aff.,10).

71.

On Election Day, when the Republican poll watchers were, for a limited time, present and allowed to observe in various polling locations, they

29

Exhibit N

observed and reported numerous instances of election workers failing to follow the statutory mandates relating to two critical requirements, among other issues:

(1) a voter's right to spoil their mail-in ballot at their polling place on election day and to then vote in-person, and

(2) the ability for voters to vote provisionally on election day when a mail-in ballot has already been received for them, but when they did not cast those mail-in ballots, who sought to vote in person during early voting but was told she already voted; she emphasized that she had not. The clerk told her he would add her manually with no explanation as to who or how someone voted using her name. (Attached hereto as Exh. 13, Aff. Ursula Wolf)

72.

Another observer for the ballot recount testified that "*at no time did I witness any Recounter or individual participate in the recount verifying signatures [on mail-in ballots].*" (Attached hereto as Exh. 14, Nicholas Zeher Aff).

73.

In some counties, there was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees

Exhibit N

simply conducted another machine count of the *same* ballots. (See. Exh. 9, 10).  That will not reveal the massive fraud of which plaintiffs complain.

<div align="center">74.</div>

A large number of ballots were identical and likely fraudulent.  An Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

> 15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had come from, or where they had been processed. These stood out.

> 16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device.  By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden.  I only observed two of these ballots as votes for President Donald J. Trump." (See Exh. 15 Attached hereto).

<div align="center">75.</div>

The same Affiant further testified specifically to the breach of the chain of custody of the voting machines the night before the election stating:

> we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed.  **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.**

<div align="center">31</div>

<div align="right">Exhibit N</div>

The Milton precinct received its machines at 1:00 AM in the morning
on Election Day. This is unacceptable and voting machines should
[not] be out of custody prior to an Election Day. *Id.*

## II. EVIDENCE OF FRAUD

### A Pattern Showing the Absence of Mistake

76.

The stunning pattern of the nature and acts of fraud demonstrate an

absence of mistake.

77.

The same Affiant further explained, in sworn testimony, that the

breach included: "when we did receive the machines, they were not sealed or

locked, the serial numbers were not what were reflected on the related

documentation…" *See Id.*

78.

An affiant testified that "While in Henry County, I personally

witnessed ballots cast for Donald Trump being placed in the pile for Joseph

Biden, I witnessed this happen at table "A".' (See Exh. 14, par. 27).

79.

The Affiant further testified, that "when this was brought to Ms. Pitts

attention, it was met with extreme hostility. At no time did I witness any

ballot cast for Joseph Biden be placed in the pile for Donald Trump. (See

Exh. 14, par. 28).

32

Exhibit N

80.

Another Affiant in the mail-in ballot and absentee ballot recounting

process, testified in her sworn affidavit, that "on November 16, 2020 … It was

also of particular interest to me to see that signatures were not being verified

and there were no corresponding envelopes seen in sight." (See Exh. 10, at

Par. 7).

81.

Yet another Affiant, in the recount process, testified that he received

push back and a lack of any cooperation and was even threatened as if he did

something wrong, when he pointed out the failure to follow the rules with the

observers while open mail-in ballot re-counting was occurring, stating:

> "However, as an observer, I observed that the precinct had twelve
> (12) counting tables, but only one (1) monitor from the Republican
> Party. I brought it up to Erica Johnston since the recount rules
> provided for one (1) monitor from each Party per ten (10) tables or
> part thereof…"

(See Attached hereto, Exh. 16, Ibrahim Reyes Aff.)

82.

Another Affiant explains a pattern of behavior that is alarming, in his

position as an observer in the recount on absentee ballots with barcodes, he

testified:

> ***I witnessed two poll workers placing already separated paper***
> ***machine receipt ballots with barcodes in the Trump tray,***
> ***placing them in to the Biden tray.*** I also witnessed the same two
> poll workers putting the already separated paper receipt b*a*llots in

33

Exhibit N

the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet.

*(See Attached hereto, Exh.17, pars. 4-5, Aff. of Consetta Johson).*

### 83.

Another Affiant, a Democrat, testified in his sworn affidavit, that before he was forced to move back to where he could not see, he had in fact seen "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See attached hereto, Exh. 18 at Par. 12, Aff. of Carlos Silva).

### 84.

Yet another Affiant testified about the lack of process and the hostility only towards the Republican party, which is a violation of the Equal Protection Clause.   He testified:

> I also observed throughout my three days in Atlanta, not once did anyone verify these ballots.  In fact, there was no authentication process in place and no envelopes were observed or allowed to be observed.  I saw hostility towards Republican observers but never towards Democrat observers.  Both were identified by badges.

*(See Id.*, at pars. 13-14).

### 85.

Another Affiant explained that his ballot was not only not processed in accordance with Election law, but he also witnessed people reviewing his ballot to decide where to place it, which violated the privacy of his ballot, and

34

Exhibit N

when he tried to report it to a voter fraud line, he never received any contact

or cooperation stating:

> "I voted early on October 12 at the precinct at Lynwood Park …
> Because of irregularities at the polling location, I called the voter
> fraud line to ask why persons were discussing my ballot and
> reviewing it to decide where to place it. When I called the state fraud
> line, I was directed to a worker in the office of the Secretary of
> State…"

(See Attached hereto, Exh. 19, Andrea ONeal Aff, at par. 3).

86.

He further testified that when he was an Observer at the Lithonia

location, he saw many irregularities, and specifically "saw an auditor sort

Biden votes that he collected and sorted into ten ballot stacks, which [the

auditor] did not show anyone." Id. at p. 8.

87.

Another Affiant testified about the use of different paper for ballots,

that would constitute fraud stating:

> I noticed that almost all of the ballots I reviewed were for Biden.
> Many batches went 100% for Biden. I also observed that the
> watermark on at least 3 ballots were solid gray instead of
> transparent, leading me to believe the ballot was counterfeit. I
> challenged this and the Elections Director said it was a legitimate
> ballot and was due to the use of different printers. Many ballots had
> markings for Biden only, and no markings on the rest of the ballot.

(See Attached hereto, Exh. 20, Aff of Debra J. Fisher, at pars. 4, 5, 6).

35

Exhibit N

88.

An Affiant testified, that while at the Audit, '**While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden.  I witnessed this happen at table "A"**".  (*See* attached hereto as Exh. 22, Kevin Peterford, at par. 29).   Another Affiant testified, that "I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt abllots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet. (See Exh. 17, Johnson, pars. 4-5).

89.

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, he had in fact seen**, "*I also saw absentee ballots for Trump inserted***

36

Exhibit N

*into Biden's stack, and counted as Biden votes.  This occurred a few times".*  (See Exh. 18, Par. 12).

90.

A Republican National Committee monitor in Georgia's election recount, Hale Soucie, told an undercover journalist there are individuals counting ballots who have made continuous errors," writes O'Keefe. Project Veritas, Watch:  Latest Project Veritas Video reveals "Multiple Ballots Meant for Trump Went to Biden in Georgia."[11]

## B.  The Voting Machines, Secrecy Software Used By Voting Machines Throughout Georgia is Crucial

91.

These violations of federal and state laws impacted the election of November 3, 2020 and set the predicate for the evidence of deliberate fraudulent conduct, manipulation, and lack of mistake that follows. The commonality and statewide nature of these legal violations renders certification of the legal vote untenable and warrants immediate

---

[11]     https://hannity.com/media-room/watch-latest-project-veritas-video-reveals-multiple-ballots-meant-for-trump-went-to-biden-in-georgia/

37

Exhibit N

impoundment of voting machines and software used throughout Georgia for expert inspection and retrieval of the software.

92.

An Affiant, who is a network & information cyber-security expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that the information about scanned **ballots can be tracked inside the software system for Dominion**:

> (a) When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.

(*See* attached hereto Exh 22, Declaration of Ronald Watkins, at par. 11).

93.

**Affiant further explains that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "(*Id.* at par. 8).

38

Exhibit N

94.

Affiant further testifies that the Dominion/Smartmatic user manual itself makes clear that the system allows for threshold settings to be set to mark all ballots as "problem ballots" for *discretionary determinations* on where the vote goes.  It states:

> During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.

*Id*. at pars. 9-10.

95.

The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made

39

Exhibit N

to a flash memory card – and that is connected to a Windows computer

stating:

> It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. … The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and **is very vulnerable to malicious administrators**.

*Id.* at par. 11-13 (emphasis supplied).

<p style="text-align:center">96.</p>

It was announced on "Monday, [July 29, 2019], [that] Governor Kemp

awarded a contract for 30,000 new voting machines to Dominion Voting

Systems, scrapping the state's 17-year-old electronic voting equipment and

replacing it with touchscreens that print out paper ballots."[12]  Critics are

quoted: "Led by Abrams, Democrats fought the legislation and pointed to

cybersecurity experts who warned it would leave Georgia's elections

susceptible to hacking and tampering." And "Just this week, the Fair Fight

voting rights group started by [Stacey] Abrams launched a television ad

---

[12] *Georgia Buys New Voting Machines for 2020 Presidential Election, by Mark Niesse, the Atlanta Journal-Constitution, July 30, 2019,*
*https://www.ajc.com/news/state--regional-govt--politics/georgia-awards-contract-for-new-election-system-dominion-voting/tHh3V8KZnZivJoVzZRLO4O/*

Exhibit N

critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[13]

97.

It was further reported in 2019 that the new Dominion Voting Machines in Georgia "[w]ith Georgia's current voting system, there's **no way to guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results**, with it being reported that:

(a)     Recounts are meaningless on the direct-recording electronic voting machines because they simply reproduce the same numbers they originally generated.

(b)     But paper ballots alone won't protect the sanctity of elections on the new touchscreens, called ballot-marking devices.

(c)     The new election system depends on voters to verify the printed text of their choices on their ballots, a step that many voters might not take. The State Election Board hasn't yet created regulations for how recounts and audits will be conducted. And paper ballots embed selections in bar codes that are only readable by scanning machines, leaving Georgians uncertain whether the bar codes match their votes.[14]

---

[13] *Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, by Greg Bluestein and Mark Niesse, June 14, 2019; Credit: Copyright 2019 The Associated Press, June 2019*

Exhibit N

i. *As part of the scheme and artifice to defraud the plaintiffs, the candidates and the voters of undiminished and unaltered voting results in a free and legal election, the Defendants and other persons known and unknown committed the following violations of law:*

50 U.S.C. § 20701 requires the retention and preservation of records

and papers by officers of elections under penalty of fine and imprisonment:

**§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

50 U.S.C.§ 20701.

98.

In the primaries it was confirmed that, "The rapid introduction of new

technologies and processes in state voting systems heightens the risk of

42

Exhibit N

foreign interference and insider tampering. That's true even if simple human error or local maneuvering for political advantage are more likely threats."[15]

<div align="center">99.</div>

A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."[16]

<div align="center">100.</div>

As evidence of the defects or features of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[17]

---

[15] *See Threats to Georgia Elections Loom Despite New Paper Ballot Voting, By Mark Niesse, The Atlanta Journal-Constitution and (The AP, Vote-by-Mail worries: A leaky pipeline in many states, August 8, 2020).*

[16] Penn Wharton Study by Matt Caufield, The Business of Voting, July 2018.
[17] Attached hereto, Exh. 23, copy of Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

<div align="center">43</div>

<div align="right">Exhibit N</div>

101.

Plaintiffs have since learned that the "glitches" in the Dominion system–that have the uniform effect of taking votes from Trump and shifting them to Biden—have been widely reported in the press and confirmed by the analysis of independent experts.

102.

Plaintiffs can show, through expert and fact witnesses that:

**c.** **Dominion/ Smartmatic Systems Have Massive End User Vulnerabilities.**

1. Users on the ground have full admin privileges to machines and software. Having been created to "rig" elections, the Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, results in a ballot being rejected. It is then handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for purely discretionary and improper vote "adjudication."

2. Affiant witness (name redacted for security reasons[18]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation to insure Venezuelan dictator Hugo Chavez never lost an election and he saw it work. Id.

"The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against

44

Exhibit N

> persons running the Venezuelan government to votes in their
> favor in order to maintain control of the government."

(*See* Exh. 2, pars. 6, 9, 10).

103.

Smartmatic's incorporators and inventors have backgrounds evidencing

their foreign connections, including Venezuela and Serbia, specifically its

identified inventors:

> Applicant: SMARTMATIC, CORP.
>
> Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic,
> Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli,
> Gisela Goncalves, Yrem Caruso.[19]

104.

The presence of Smartmatic in the United States—owned by foreign

nationals, and Dominion, a Canadian company with its offices such as the

Office of General Counsel in Germany, would have to be approved by CFIUS.

CFIUS was created in 1988 by the Exon-Florio Amendment to the Defense

Production Act of 1950. CFIUS' authorizing statute was amended by the

Foreign Investment and National Security Act of 2007 (FINSA).

> As amended, section 721 of the DPA directs "the President, acting
> through [CFIUS]," to review a **covered transaction to determine
> the effects of the transaction on the national security of the
> United States.**" 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines

---

19 *https://patents.justia.com/assignee/smartmatic-corp*

Exhibit N

a covered transaction as "any merger, acquisition, or takeover …, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." Id. § 2170(a)(3). *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 302, 411 U.S. App. D.C. 105, 111, (2014). Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.

105.

Then-Congresswoman Carolyn Maloney wrote October 6, 2006 to the Secretary of Treasury, Henry M. Paulson, Jr., Objecting to approval of Dominion/Smartmatic by CFIUS because of its corrupt Venezuelan origination, ownership and control. (See attached hereto as Exh. 24, Carolyn Maloney Letter of October 6, 2006). Our own government has long known of this foreign interference on our most important right to vote, and it had either responded with incompetence, negligence, willful blindness, or abject corruption. In every CFIUS case, there are two TS/SCI reports generated. One by the ODNI on the threat and one by DHS on risk to critical infrastructure. Smartmatic was a known problem when it was nonetheless approved by CFIUS.

106.

The Wall Street Journal in 2006 did an investigative piece and found that, "Smartmatic came to prominence in 2004 when its machines were used

46

Exhibit N

in an election to recall President Chávez, which Mr. Chávez won handily --

and which the Venezuelan opposition said was riddled with fraud.

Smartmatic put together a consortium to conduct the recall elections,

including a company called Bizta Corp., in which Smartmatic owners had a

large stake. For a time, the Venezuelan government had a 28% stake in Bizta

in exchange for a loan.'[20] ..."Bizta paid off the loan in 2004, and Smartmatic

bought the company the following year. But accusations of Chávez

government control of Smartmatic never ended, especially since Smartmatic

scrapped a simple corporate structure, in which it was based in the U.S. with

a Venezuelan subsidiary, for a far more complex arrangement. The company

said it made the change for tax reasons, but critics, including Rep. Carolyn

Maloney (D., N.Y.) and TV journalist Lou Dobbs, pounded the company for

alleged links to the Chávez regime.  *Id.*  Since its purchase by Smartmatic,

Sequoia's sales have risen sharply to a projected $200 million in 2006, said

Smartmatic's chief executive, Anthony Mugica." *Id.*

107.

Indeed, Mr. Cobucci testified, through his sworn affidavit, that he was

born in Venezuela, is cousins with Antonio ('Anthony') Mugica, and he has

---

[20] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

47

Exhibit N

personal knowledge of the fact that Anthony Mugica incorporated Smartmatic in the U.S. in 2000 with other family members in Venezuela listed as owners. He also has personal knowledge that Anthony Mugica manipulated Smartmatic to ensure the election for Chavez in the 2004 Referendum in Venezuela. He also testified, through his sworn affidavit, that Anthony Mugica received tens of millions of dollars from 2003- 2015 from the Venezuelan government to ensure Smartmatic technology would be implemented around the world, including in the U.S. (See attached hereto, Exh. 25, Juan Carlos Cobucci Aff.)

<div align="center">108.</div>

Another Affiant witness testifies that in Venezuela, she was in an official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. Corroborating the testimony of our secret witness, and our witness Mr. Cobucci, cousin of Anthony Mugica, who began Smartmatic, and this witness explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Exh. 3, Diaz Cardozo Aff).

<div align="center">109.</div>

Specific vulnerabilities of the systems in question that have been documented or reported include:

<div align="center">48</div>

<div align="right">Exhibit N</div>

a. Barcodes can override the voters' votes: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Exh. 7). [21]

b. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

c. We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [22]

---

[21] *Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters,* Andrew W. Appel, Richard T. DeMillo, University of California, Berkeley, 12/27/2019.
[22] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

Exhibit N

d. October 6, 2006 – Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. 24)

e. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are." *Id.*

f. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire[23].

g. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software

---

[23] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions, Access Wire, August 10, 2017,* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

50

Exhibit N

inventory provided by Smartmatic is inadequate, … which brings into question the software credibility…"[24]

h. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion).[25]

i. Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election—the biggest automated election run by a private company. The international community hailed the automation of that first election in the Philippines.[26] The results' transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local election law requirements, Smartmatic and Dominion were required to provide the source code of

---

[24] *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010* https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches
[25] *The Business of Voting*, Penn Wharton, Caufield, p. 16.
[26] *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010* https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches

51

Exhibit N

the voting machines prior to elections so that it could be independently verified.[27]

j.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their *'particularized concerns that secretive & "trouble -plagued companies'" "have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."  (See attached hereto as Exh. 26, copy of Senator Warren, Klobuchar, Wyden's December 6, 2019 letter).

k.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county

---

[27] Presumably the machiens were not altered following submission of the code. LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*

Exhibit N

election offices, many of whom do not employ a single cybersecurity specialist."[28]

110.

An analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See Exh. 7).

111.

An expert witness in pending litigation in the United States District Court, Northern District Court of Georgia, Atlanta Div., 17-cv-02989 specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on October 4, 2020, (See Exh. 4B, Document 959-4

---

[28] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

Exhibit N

attached hereto, paragraph. 18 and 20 of p. 28, Exh. 4, Hursti Declaration). wherein he testified or found:

1)     The failure of the Dominion software "*to meet the methods and processes for national standards for managing voting system problems and should not be accepted for use in a public election under any circumstances*."

2)     In Hursti's declaration he explained that "There is evidence of remote access and remote troubleshooting which presents a grave security implication and certified identified vulnerabilities should be considered an "extreme security risk." *Id*. Hari Hursti also explained that USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election. *Id.* The fact that there are no controls of the USB drives was seen recently seen the lack of physical security and compliance with professional standards, " in one Georgia County, where it is reported that 3,300 votes were found on memory sticks not loaded plus in Floyd county, another 2,600 were unscanned, and the "found votes" reduced Biden's lead over Donald Trump[29].

(a)     In the prior case against Dominion, supra, further implicating the secrecy behind the software used in Dominion Systems,

---

[29] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

Exhibit N

Dr. Eric Coomer, a Vice President of Dominion Voting Systems,

testified that even he was not sure of what testing solutions were

available to test problems or how that was done, "*I have got to be*

*honest, we might be a little bit out of my bounds of understanding the*

*rules and regulations…* and in response to a question on testing for

voting systems problems in relation to issues identified in 2 counties,

he explained that "*Your Honor, I'm not sure of the complete test plan…*

*Again Pro V&V themselves determine what test plan in necessary based*

*on their analysis of the code itself.*" (*Id.* at Document 959-4, pages 53,

62 L.25- p. 63 L3).

<div align="center">112.</div>

Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system."

(See Paragraph 49 of Hursti Declaration).

<div align="center">113.</div>

Rather than engaging in an open and transparent process to give

credibility to Georgia's brand-new voting system, the election processes were

<div align="center">55</div>

Exhibit N

hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Georgia's Election Code and federal law.

<div align="center">114.</div>

The House of Representatives passed H.R. 2722 in an attempt to address these very risks identified by Hursti, on June 27, 2019:

> *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*
>
> *The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.*

<div align="center">

## ADDITIONAL SPECIFIC FRAUD

115.

</div>

On November 4, 2020, the Georgia GOP Chairman issued the following statement:

> *"Let me repeat. Fulton County elections officials told the media and our observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night to continue counting ballots in secret until 1:00 a.m. [30]*

---

<div align="right">Exhibit N</div>

116.

It was widely reported that "As of 7 p.m. on Wednesday Fulton County

Elections officials said 30,000 absentee ballots were not processed due to a

pipe burst."[31] Officials reassured voters that none of the ballots were

damaged and the water was quickly cleaned up.  But the emergency delayed

officials from processing ballots between 5:30 a.m. and 9:30 a.m.  Officials say

they continued to count beginning at 8:30 a.m. Wednesday.  The statement

from Fulton County continues:

> "Tonight, Fulton County will report results for approximately 86,000 absentee ballots, as well as Election Day and Early Voting results. These represent the vast majority of ballots cast within Fulton County.

> "As planned, Fulton County will continue to tabulate the remainder of absentee ballots over the next two days. Absentee ballot processing requires that each ballot is opened, signatures verified, and ballots scanned.  This is a labor-intensive process that takes longer to tabulate than other forms of voting. Fulton County did not anticipate having all absentee ballots processed on Election Day." Officials said they will work to ensure every vote is counted and all laws and regulations are followed.[32]

---

[31] "4,000 remaining absentee ballots being counted in Fulton County", Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing
[32] 4,000 remaining absentee ballots being counted in Fulton County, Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing

Exhibit N

117.

Plaintiffs have learned that the representation about "a water leak affecting the room where absentee ballots were counted" was not true. The only water leak that needed repairs at State Farm Arena from November 3 – November 5 was a toilet overflow that occurred earlier on November 3.  It had nothing to do with a room with ballot counting, but the false water break representation led to "everyone being sent home."  Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers.

118.

An Affiant recounts how she was present at State Farm Arena on November 3, and saw election workers remaining behind after people were told to leave.  (*See* Exh. 28, Affidavit of Mitchell Harrison; Exh. 29, Affid. of Michelle Branton)

119.

Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio, Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors.  Dominion altered its website after

58

Exhibit N

Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing: "Don't worry. Trump won't win the election, we fixed that." – as well as social media posts with violence threatened against President Trump. (See Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).[33]

120.

While the bedrock of American elections has been transparency, almost every crucial aspect of Georgia's November 3, 2020, General Election was shrouded in secrecy, rife with "errors," and permeated with anomalies so egregious as to render the results incapable of certification.

**MULTIPLE EXPERT REPORTS AND STATISTICAL ANALYSES PROVE HUNDREDS OF THOUSANDS OF VOTES WERE LOST OR SHIFTED THAT COST PRESIDENT TRUMP AND THE REPUBLICAN CANDIDATES OF CONGRESSIONAL DISTRICTS 6 AND 7 THEIR RACES.**

121.

As evidenced by numerous public reports, expert reports, and witness statements, Defendants' egregious misconduct has included ignoring legislative mandates concerning mail-in and ordinary ballots and led to

---

[33] *Malkin Live: Election Update, Interview of Joe Oltmann,* by Michelle Malkin, November 13, 2020, *available at:*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUr aAjsycM0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

Exhibit N

disenfranchisement of an enormous number of Georgia voters.  Plaintiffs experts can show that, consistent with the above specific misrepresentations, analysis of voting data reveals the following:

(a)     Regarding uncounted mail ballots, based on evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiff's expert, Williams M. Briggs, PhD, shows, based on a statistically significant sample, **that the total number of mail ballots that voters mailed in, but were never counted, have a 95% likelihood of falling between 31,559 and 38,886 total lost votes.**  This range exceeds the margin of loss of President Trump of 12,670 votes by at least 18,889 lost votes and by as many as 26,196 lost votes. (See Exh. 1, Dr. Briggs' Report, with attachments).

(b)     Plaintiff's expert also finds that **voters received tens of thousands of ballots that they never requested.**    (See Exh. 1). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request ranges from 16,938 to 22,771.  **This range exceeds the margin of loss of**

60

**President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.** *Id.*

(c)     This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. **These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud down ballot as well.**

(d)     **Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.**  (See Id., attachment to report).  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

61

Exhibit N

(e)    Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").**

122.

As seen from the **expert analysis of Eric Quinnell**, mathematical anomalies further support these findings, when in various districts within Fulton County such as vote gains that exceed reasonable expectations when compared to 2016, and a failure of gains to be normally distributed but instead shifting substantially toward the tail of the distribution in what is known as a platykurtic distribution.  Dr. Quinell identifies numerous anomalies such as votes to Biden in excess of 2016 exceed the registrations that are in excess of 2016.  Ultimately, he identifies the counties in order of their excess performance over what would have fit in a

62

normal distribution of voting gains, revealing a list of the most anomalous counties down to the least.  These various anomalies provide evidence of voting irregularities.  (See Exh.27, Declaration of Eric Quinnell, with attachments).

<div align="center">123.</div>

In sum, with the expert analysis of William M. Briggs PhD based on recorded calls and declarations, the extent of missing AND unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism.  In short, tens of thousands of votes did not count while the pattern of fraud makes clear that tens of thousands were improperly counted.  This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

<div align="center">124.</div>

Cobb County, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.  These election results must be reversed.

<div align="center">125.</div>

Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots

<div align="center">63</div>

<div align="right">Exhibit N</div>

ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").** (See Exh. 1).

<p style="text-align:center">126.</p>

Mr. Braynard also found a pattern in Georgia of voters registered at totally fraudulent residence addresses, including shopping centers, mail drop stores and other non-residential facilities[34].

<p style="text-align:center">127.</p>

In sum, with the expert analysis of William M. Briggs, PhD, based on extensive investigation, recorded calls and declarations collected by Matt Braynard, (See attachments to Exh. 1, Briggs' report) the extent of missing and unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In

---

[34] Matt Braynard, https://twitter.com/MattBraynard/status/1331324173910761476; https://twitter.com/MattBraynard/status/1331299873556086787?s=20; (a) https://twitter.com/MattBraynard/status/1331299873556086787?s=20

Exhibit N

short, tens of thousands of votes did not count while the pattern of fraud and mathematical anomalies that are impossible absent malign human agency makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

128.

Cobb County, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.

129.

**Russell Ramsland confirms that data breaches in the Dominion software permitted rogue actors to penetrate and manipulate the software during the recent general election. He further concludes that at least 96,600 mail-in ballots were illegally counted as they were not cast by legal voters.**

130.

In sum, as set forth above, for a host of independent reasons, the Georgia certified election results concluding that Joe Biden received 12,670 more votes that President Donald Trump must be set aside.

65

Exhibit N

# COUNT I

## DEFENDANTS VIOLATED THE ELECTIONS CLAUSE AND 42 U.S.C. § 1983

131.

Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

132.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1 (emphasis added).

133.

The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 193. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

Exhibit N

134.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2. Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

135.

Defendants are not the legislature, and their unilateral decision to create a "cure procedure" violates the Electors and Elections Clauses of the United States Constitution.

136.

The Secretary of State and the State Election Board are not the legislature, and their decision to permit early processing of absentee ballots in direct violation of the unambiguous requirements of O.C.G.A. § 21-2-386(a)(2) violates the Electors and Elections Clauses of the United States Constitution.

67

Exhibit N

137.

Many Affiants testified to many legal infractions in the voting process, including specifically switching absentee ballots or mail-in ballots for Trump to Biden.  Even a Democrat testified in his sworn affidavit that before he was forced to move back to where he could not see, he had in fact seen, "*I also saw absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times*".  (See Exh. 18, Par. 12).

138.

Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request one ranges from 16,938 to 22,771.   This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

139.

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not

68

Exhibit N

be in the database of unreturned ballots analyzed here. *See* O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

140.

Further, as shown by data collected by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

141.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clauses of the Constitution. Accordingly, the results for President and Congress in the November 3, 2020 election must be set aside. The results are infected with Constitutional violations.

**COUNT II**

69

Exhibit N

## THE SECRETARY OF STATE AND GEORGIA COUNTIES VIOLATED THE FOURTEENTH AMENDMENT U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF EQUAL PROTECTION

### INVALID ENACTMENT OF REGULATIONS AFFECTING OBSERVATION AND MONITORING OF THE ELECTION

142.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

143.

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

70

Exhibit N

144.

The Court has held that to ensure equal protection, a "problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Bush v. Gore*, 531 U.S. 98, 106, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000).

145.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

146.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020, General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

Exhibit N

147.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.* In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore plainly and indisputably unlawful.

Exhibit N

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

148.

A result of a primary or election may be contested on one or more of the following grounds:

149.

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

(2) When the defendant is ineligible for the nomination or office in dispute;

(3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election. O.C.G.A. § 21-2-522.

150.

Several affiants testified to the improper procedures with absentee ballots processing, with the lack of auditable procedures with the logs in the computer systems, which violates Georgia law, and federal election law.  See

73

Exhibit N

also, 50 U.S.C. § 20701 requires the retention and preservation of records and papers by officers of elections under penalty of fine and imprisonment.

151.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on November 23, 2020 for the upcoming January 2021 runoff election.

152.

A large number of ballots were identical and likely fraudulent. An Affiant explains that she observed a batch of utterly pristine ballots:

14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.

16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device. By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden. I only observed two of these ballots as votes for President Donald J. Trump." (See Exh. 15).

153.

The same Affiant further testified specifically to the breach of the chain of custody of the voting machines the night before the election stating:

74

Exhibit N

we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed. **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.** The Milton precinct received its machines at 1:00 AM in the morning on Election Day. This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id.*

154.

Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other counties in Georgia.

155.

As set forth in Count I above, Defendants failed to comply with the requirements of the Georgia Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Georgia voters and electors in violation of the United States Constitution guarantee of Equal Protection.

156.

Specifically, Defendants denied the plaintiffs equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Georgia Counties by:

(a) mandating that representatives at the pre-canvass and canvass of all absentee and mail-ballots be either Georgia barred

75

Exhibit N

attorneys or qualified registered electors of the county in which
they sought to observe and monitor;

(b) not allowing watchers and representatives to visibly see and
review all envelopes containing official absentee and mail-in
ballots either at or before they were opened and/or when such
ballots were counted and recorded; and

(c) allowing the use of Dominion Democracy Suite software and
devices, which failed to meet the Dominion Certification Report's
conditions for certification.

157.

Instead, Defendants refused to credential all of the Trump Republicans'
submitted watchers and representatives and/or kept Trump Campaign's
watchers and representatives by security and metal barricades from the
areas where the inspection, opening, and counting of absentee and mail-in
ballots were taking place. Consequently, Defendants created a system
whereby it was physically impossible for the candidates and political parties
to view the ballots and verify that illegally cast ballots were not opened and
counted

158.

Many Affiants testified to switching absentee ballots or mail-in ballots
for Trump to Biden, including a Democrat.  He testified in his sworn
affidavit, that before he was forced to move back to where he could not see, he

76

Exhibit N

had in fact seen, "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See Exh. 18, Par. 12).

159.

Other Georgia county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Republicans and the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards and without restricting representatives by any county residency or Georgia bar licensure requirements.

160.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

161.

Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.

77

Exhibit N

162.

Defendants further violated Georgia voters' rights to equal protection insofar as Defendants allowed the Georgia counties to process and count ballots in a manner that allowed ineligible ballots to be counted, and through the use of Dominion Democracy Suite, allowed eligible ballots for Trump and McCormick to be switched to Biden or lost altogether. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment and the Georgia Election Code.

163.

Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be enjoined from transmitting Georgia's certified Presidential election results to the Electoral College. Georgia law forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden, through the unlawful use of Dominion Democracy Suite software and devices.

164.

Alternatively, Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be required to recertify the results declaring that Donald

78

Exhibit N

Trump has won the election and  transmitting Georgia's certified Presidential election result in favor of President Trump.

165.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Georgia law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately. O.C.G.A. § 21-2-520 et seq.

166.

In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by: 1) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; 2) all "dead votes"; and 4) all 900 military ballots in Fulton County that supposedly were 100% for Joe Biden.

79

Exhibit N

## COUNT III

### FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS

### DISPARATE TREATMENT OF ABSENTEE/MAIL-IN VOTERS AMONG DIFFERENT COUNTIES

167.

Plaintiffs incorporate each of the prior allegations in this Complaint.

Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin*, 570 F.2d at 1077-78. "[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

168.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to executing the laws as passed by the legislature  Although the Georgia General Assembly may enact laws governing the conduct of elections, "no legislative enactment may

80

Exhibit N

contravene the requirements of the Georgia or United States Constitutions." *Shankey*, 257 A. 2d at 898.

169.

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.").

170.

Moreover, "[t]o the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, … the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature[,] . . . particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Georgia's government." *Id.*

Exhibit N

171.

The disparate treatment of Georgia voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

172.

Defendants are not the legislature, and their unilateral decision to create and implement a cure procedure for some but not all absentee and mail-in voters in this State violates the Due Process Clause of the United States Constitution. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

Exhibit N

## COUNT IV

### FOURTEENTH AMENDMENT, U.S. CONST. ART. I § 4, CL. 1; ART. II, § 1, CL. 2; AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS ON THE RIGHT TO VOTE

173.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

174.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at See also *Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell,* 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

83

Exhibit N

175.

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," Burson v. Freeman, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

176.

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

177.

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or

84

Exhibit N

fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

### 178.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

### 179.

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

### 180.

In Georgia, the signature verification requirement is a dead letter. The signature rejection rate for the most recent election announced by the Secretary of State was 0.15%. The signature rejection rate for absentee ballot applications was .00167% - only 30 statewide. Hancock County, Georgia,

85

Exhibit N

population 8,348, rejected nine absentee ballot applications for signature mismatch. Fulton County rejected eight. No other metropolitan county in Georgia rejected even a single absentee ballot application for signature mismatch. The state of Colorado, which has run voting by mail for a number of years, has a signature rejection rate of between .52% and .66%.[35] The State of Oregon had a rejection rate of 0.86% in 2016.[36] The State of Washington has a rejection rate of between 1% and 2%.[37]If Georgia rejected absentee ballots at a rate of .52% instead of the actual .15%, approximately 4,600 more absentee ballots would have been rejected.

## COUNT V

## THERE WAS WIDE-SPREAD BALLOT FRAUD.

## OCGA 21-2-522

181.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

---

[35] *See* https://duckduckgo.com/?q=colorado+signature+rejection+rate&t=osx&ia=web last visited November 25,2020

[36] *See* https://www.vox.com/21401321/oregon-vote-by-mail-2020-presidential-election, last visited November 25,2020.

[37] *See* https://www.salon.com/2020/09/08/more-than-550000-mail-ballots-rejected-so-far-heres-how-to-make-sure-your-vote-gets-counted/ last visited November 25, 2020.

86

Exhibit N

182.

Plaintiffs contest the results of Georgia's election, with Standing conferred under pursuant to O.G.C.A. 21-2-521.

183.

Therefore, pursuant to O.G.C.A. 21-2-522, for misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result. The foundational principle that Georgia law "nonetheless allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately." *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga. 193, 194, 835 S.E.2d 245, 248 (2019). The Georgia Supreme Court has made clear that Plaintiffs need not show how the voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result." See OCGA § 21-2-520 et seq., *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) the Supreme Court invalidated an election, and ordered a new election because it found that,

> Thus, [i]t was not incumbent upon [the Plaintiff] to show how the [481] voters would have voted if their [absentee] ballots had been regular. He only had to show that there were enough irregular ballots to place in doubt the result. He succeeded in that task.

87

Exhibit N

*Id.* at 271 (citing *Howell v. Fears*, 275 Ga. 627, 571 SE2d 392, (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

<div align="center">184.</div>

The "glitches" in the Dominion system—that seem to have the uniform effect of hurting Trump and helping Biden have been widely reported in the press and confirmed by the analysis of independent experts.

<div align="center">185.</div>

Prima facie evidence in multiple affidavits shows specific fraudulent acts, which directly resulted in the flipping of the race at issue:

a) votes being switched in Biden's favor away from Trump during the recount;

b) the lack of procedures in place to follow the election code, and the purchase and use of Dominion Voting System despite evidence of serious vulnerabilities;

c) a demonstration that misrepresentations were made about a pipe burst that sent everyone home, while first six, then three, unknown individuals were left alone until the morning hours working on the machines;

<div align="center">88</div>

<div align="right">Exhibit N</div>

d) further a failure to demonstrate compliance with the Georgia's Election Codes, in maintaining logs on the Voting system for a genuine and sound audit, other than voluntary editable logs that prevent genuine audits. While the bedrock of this Democratic Republic rests on citizens' confidence in the validity of our elections and a transparent process, Georgia's November 3, 2020 General Election remains under a pall of corruption and irregularity that reflects a pattern of the absence of mistake. At best, the evidence so far shows ignorance of the truth; at worst, it proves a knowing intent to defraud.

186.

Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an **absentee ballot that they did not request ranges from 16,938 to 22,771.** This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

89

187.

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here. See O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

188.

Further, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

189.

Plaintiffs" expert Russell Ramsland concludes that at least 96,600 mail-in ballots were fraudulently cast. He further concludes that up to

136,098 ballots were illegally counted as a result of improper manipulation of the Dominion software (Ramsland Aff).

190.

The very existence of absentee mail in ballots created a heightened opportunity for fraud. The population of unreturned ballots analyzed by William Briggs, PhD, reveals the probability that a far greater number of mail ballots were requested by 3rd parties or sent erroneously to persons and voted fraudulently, undetected by a failed system of signature verification. The recipients may have voted in the name of another person, may have not had the legal right to vote and voted anyway, or may have not received the ballot at the proper address and then found that they were unable to vote at the polls, except provisionally, due to a ballot outstanding in their name.

191.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin of votes between the presidential candidates in the

91

Exhibit N

state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

192.

The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

193.

Plaintiffs have no adequate remedy at law.  As seen from the expert analysis of William Higgs, PhD, based on actual voter data, tens of thousands of votes did not count, and tens of thousands of votes were unlawfully requested.

92

Exhibit N

194.

The Fourteenth Amendment Due Process Clause protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978).

195.

Separate from the Equal Protection Clause, the Fourteenth Amendment's due process clause protects the fundamental right to vote against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (*quoting Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (*citing Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir.1986))). *See also Griffin*, 570 F.2d at 1077 ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

93

Exhibit N

196.

Part of courts' justification for such a ruling is the Supreme Court's recognition that the right to vote and to free and fair elections is one that is preservative of other basic civil and political rights. *See Black*, 209 F.Supp.2d at 900 (quoting *Reynolds*, 377 U.S. at 561-62 ("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")); see also *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is regarded as a fundamental political right, because [sic] preservative of all rights.").

197.

"[T]he right to vote, the right to have one's vote counted, and the right to have one's vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the Constitution of the United States." Black, 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process). "Just as the equal protection clause of the Fourteenth Amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the Fourteenth amendment forbids state

94

Exhibit N

officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704. "Having once granted the right to vote on equal terms, [Defendants] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

<div align="center">198.</div>

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

<div align="center">199.</div>

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties, including without limitation Plaintiff, Republicans, and the Trump Campaign, shall be "present" and have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

<div align="center">95</div>

<div align="right">Exhibit N</div>

200.

Defendants have a duty to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering. Rather than heeding these mandates and duties, Defendants arbitrarily and capriciously denied the Trump Campaign and Republicans meaningful access to observe and monitor the electoral process by: (a) mandating that representatives at the pre- canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor; and (b) not allowing watchers and representatives to visibly see and review all envelopes containing official absentee and mail-in ballots either at the time or before they were opened and/or when such ballots were counted and recorded. Instead, Defendants refused to credential all of the Trump Campaign's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. The lack of meaningful access with actual access to see the ballots invited further fraud and cast doubt of the validity of the proceedings.

96

Exhibit N

201.

Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted.

202.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, and included the unlawfully not counting and including uncounted mail ballots, and that they failed to follow absentee ballot requirements when thousands of **voters received ballots that they never requested.** Defendants have acted and will continue to act under color of state law to violate the right to vote and due process as secured by the Fourteenth Amendment to the United States Constitution.

203.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

204.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these

97

unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

205.

Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the Presidential electors for the state of Georgia should be disqualified from counting toward the 2020 election.

206.

The United States Code (3 U.S.C. 5) provides that,

"[i]f any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

3 USCS § 5.

Exhibit N

## REQUEST FOR RELIEF

### 207.

Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

### 208.

In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, or (iii) are delivered in-person by third parties for non-disabled voters.

### 209.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented

Exhibit N

proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the state of Georgia should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Georgia should be directed to vote for President Donald Trump.

<div align="center">210.</div>

For these reasons,  Plaintiff asks this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Kemp, Secretary Raffensperger and the Georgia State Board of Elections to de-certify the election results;

2. An order enjoining Governor Kemp from transmitting the currently certified election results to the Electoral College;

3. An order requiring Governor Kemp to transmit certified election results that state that President Donald Trump is the winner of the election;

<div align="center">100</div>

Exhibit N

4.  An immediate order to impound all the voting machines and software in Georgia for expert inspection by the Plaintiffs.

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6.  A declaratory judgment declaring that Georgia Secretary of State Rule 183-1-14-0.9-.15 violates the Electors and Elections Clause, U.S. CONST. art. I, § 4;

7.  A declaratory judgment declaring that Georgia's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

8.  A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

9.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

<div align="center">101</div>

Exhibit N

10. An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by plaintiffs' expects;

11. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

12. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

13. Immediate production of 36 hours of security camera recording of all rooms used in the voting process at State Farm Arena in Fulton County, GA from 12:00 AM to 3:00 AM until 6:00 PM on November 3.

14. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Exhibit N

Respectfully submitted, this 25th day of November, 2020.

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile
hmacdougald@cpdlawyers.com
Counsel for Plaintiffs

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
Julia Z. Haller *
Emily P. Newman*
Virginia Bar License No. 84265
2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler*
NEW YORK BAR NO. 2657120Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
Office (917) 793-1188
Mobile (347) 840-2188

Exhibit N

howard@kleinhendler.com
www.kleinhendler.com

*Application for admission pro hac vice
Forthcoming

*Attorneys for Plaintiffs*

Exhibit N

# EXHIBIT Q

Exhibit N

Case 1:20-cv-04809-TCB Document 85-2 Filed 05/22/21 Page 13 of 17#: 1601

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

### 1:20-cv-04809-TCB
### Pearson et al v. Kemp et al
### Honorable Timothy C. Batten, Sr.

Minute Sheet for proceedings held In Open Court on 12/07/2020.

TIME COURT COMMENCED: 10:00 A.M.
TIME COURT CONCLUDED: 11:06 A.M.          COURT REPORTER: Lori Burgess
TIME IN COURT: 1:06                        DEPUTY CLERK: Uzma Wiggins
OFFICE LOCATION: Atlanta

| | |
|---|---|
| ATTORNEY(S) PRESENT: | Joshua Belinfante representing Brad Raffensperger |
| | Joshua Belinfante representing Brian Kemp |
| | Joshua Belinfante representing David J. Worley |
| | Joshua Belinfante representing Matthew Mashburn |
| | Joshua Belinfante representing Rebecca N. Sullivan |
| | Amanda Callais representing DCCC |
| | Amanda Callais representing DSCC |
| | Amanda Callais representing Democratic Party of Georgia, Inc. |
| | Julia Haller representing Brian Jay Van Gundy |
| | Julia Haller representing Carolyn Hall Fisher |
| | Julia Haller representing Cathleen Alston Latham |
| | Julia Haller representing Coreco Jaqan Pearson |
| | Julia Haller representing Gloria Kay Godwin |
| | Julia Haller representing James Kenneth Carroll |
| | Julia Haller representing Vikki Townsend Consiglio |
| | Harry MacDougald representing Brian Jay Van Gundy |
| | Harry MacDougald representing Carolyn Hall Fisher |
| | Harry MacDougald representing Cathleen Alston Latham |
| | Harry MacDougald representing Coreco Jaqan Pearson |
| | Harry MacDougald representing Gloria Kay Godwin |
| | Harry MacDougald representing James Kenneth Carroll |
| | Harry MacDougald representing Vikki Townsend Consiglio |
| | Charlene McGowan representing Anh Le |
| | Charlene McGowan representing Brad Raffensperger |
| | Charlene McGowan representing Brian Kemp |
| | Charlene McGowan representing David J. Worley |

Exhibit N

Charlene McGowan representing Matthew Mashburn
Charlene McGowan representing Rebecca N. Sullivan
Carey Miller representing Anh Le
Carey Miller representing Brad Raffensperger
Carey Miller representing Brian Kemp
Carey Miller representing David J. Worley
Carey Miller representing Matthew Mashburn
Carey Miller representing Rebecca N. Sullivan
Sidney Powell representing Brian Jay Van Gundy
Sidney Powell representing Carolyn Hall Fisher
Sidney Powell representing Cathleen Alston Latham
Sidney Powell representing Coreco Jaqan Pearson
Sidney Powell representing Gloria Kay Godwin
Sidney Powell representing James Kenneth Carroll
Sidney Powell representing Vikki Townsend Consiglio
** Abigail Frye

| | |
|---|---|
| PROCEEDING CATEGORY: | Motion Hearing(PI or TRO Hearing-Evidentiary); |
| MOTIONS RULED ON: | [43]Motion to Dismiss GRANTED<br>[63]Motion to Dismiss GRANTED |
| MINUTE TEXT: | Defendants' motions are GRANTED. TRO is DISSOLVED. Case is DISMISSED. Clerk shall close the case. |
| HEARING STATUS: | Hearing Concluded |

Exhibit N

# EXHIBIT R

Exhibit N

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRCT OF MICHIGAN

| | |
|---|---|
| **TIMOTHY KING,MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,**<br><br>    **Plaintiffs.**<br>**v.**<br><br>**GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OFSTATE CANVASSERS.**<br><br>    **Defendants.** | **CASE NO.** |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

---

Exhibit N

## NATURE OF THE ACTION

1. This civil action brings to light a massive election fraud, multiple violations of the Michigan Election Code, *see, e.g.,* MCL §§ 168.730-738, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution violations that occurred during the 2020 General Election throughout the State of Michigan,[1] as set forth in the affidavits of dozens of eye witnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2. The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States. The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. This Complaint details an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State at the direction of Michigan state election officials.

3. The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or manufacturing, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan, that

---

[1] The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona and Wisconsin. See Exh. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report").

[2] 50 U.S.C. § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide-pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system. Without an incorruptible audit log, there is no acceptable system.

Exhibit N

constitute a multiple of Biden's purported lead in the State. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to overturn and reverse the election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Michigan's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.

### Dominion Voting Systems Fraud and Manipulation

4.      The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the MichiganBoard of State Canvassers. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

5.      Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.*See* Exh. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

6.      As set forth in the DominionWhistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change theConstitution of Venezuela to end

Exhibit N

term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

7.    A core requirement of the Smartmatic software design ultimately adopted by Dominion for the Michigan's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez.*Id.* ¶15.

8.    The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  *See* Exh. 107, August 24, 2020 Declaration of HarriHursti, ¶¶45-48).

Exhibit N

9.      Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log.There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence.

10.      In deciding to award Dominion a$25 million, ten-year contract (to a Dominion project team led by Kelly Garrett, former Deputy Director of the Michigan Democratic Party), and then certifying Dominion software, Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2018 because it was deemed vulnerable to undetected and non-auditable manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it and a screwdriver."[3]

11.      Plaintiff's expert witness, Russell James Ramsland, Jr. (Exh. 101, "Ramsland Affidavit"), has concluded that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan, that must be disregarded.  This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below), and thus by itself is grounds to set aside the 2020 General Election and grant the declaratory and injunctive

---

[3]Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

Exhibit N

relief requested herein.

12.     In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud and Michigan Election Code violations, supplemented by healthy doses of harassment, intimidation, discrimination, abuse and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity or fairness from the vote counting process.  While this illegal conduct by election workers and state, county and city employees in concert with Dominion, even if considered in isolation,  the following three categories of systematic violations of the Michigan Election Code cast significant doubt on the results of the election and mandate this Court to set aside the 2020 General Election and grant the declaratory and injunctive relief requested herein.

**Fact Witness Testimony of Voting Fraud & Other Illegal Conduct**

13.     There were three broad categories of illegal conduct by election workers in collaboration with other employee state, county and/or city employees and Democratic poll watchers and activists.First, to facilitate and cover-up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.     Denied Republican election challengers access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted;

B.     Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting and lockedcredentialedchallengersoutofthe counting room so they could not observe the process, during which time tens of thousands of ballots wereprocessed;

C.     Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center;

D.     Systematically discriminated against Republican poll watchers and favored Democratic poll watchers;

E.     Ignored or refused to record Republican challenges to the violations outlined herein;

Exhibit N

F.  Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate;

G.  Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going overtothevotingboothswithvotersinorder to watch them vote and coach them for whom to vote;

H.  As a result of the above, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines); and

I.  Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.

14.  Second, election workers illegally forged, added, removed or otherwise altered

information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A.  Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden;

B.  Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had notvoted and recordedthesenewvotersashavingabirthdate of1/1/1900;

C.  Changing dates on absenteeballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline;

D.  Changing Votes for Trump and other Republican candidates; and

E.  Added votes to "undervote" ballots and removing votes from "Over-Votes".

15.  Third, election workers committed several additional categories of violations of

the Michigan Election Code to enable them to accept and count other illegal, ineligible or

duplicate ballots, or reject Trump or Republican ballots, including:

A.  Permitting illegal double voting by persons that had voted by absentee ballot and in person;

B.  Counting ineligible ballots – and in many cases – multiple times;

C.  Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants;

Exhibit N

D.    Counting "spoiled" ballots;

E.    Systematic violations of ballot secrecy requirements;

F.    Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and withoutenvelopes, after the 8:00 PM Election Day deadline, in particular, the tens of thousands of ballots that arrived on November 4, 2020; and

G.    Accepting and counting ballots from deceased voters.

**Expert Witness Testimony Regarding Voting Fraud**

16.    In addition to the above fact witnesses, this Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular: (1) a report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws); (2) a report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots; and (3) a report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes from these precincts.

17.    As explained and demonstrated in the accompanying redacted declaration of  a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including

Exhibit N

the most recent US general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

18.     Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden. (Ex. 109).

19.     These and other "irregularities" provide this Court grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

20.     This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

21.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365(1932).

22.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201

Exhibit N

and 2202 and by Rule 57, Fed. R. Civ. P.

23.     This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C.§ 1367.Venueisproperbecausea substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) &(c).

24.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existinglegislation.

## THE PARTIES

25.     Each of the following Plaintiffs are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and,John Earl Haggard, a resident of Charlevoix, Michigan;

26.     Each of these Plaintiffshas standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors).As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020.  The certified results showed a plurality of 154,188

Exhibit N

votes in favor of former Vice-President Joe Biden over President Trump.

27.     Plaintiff James Ritchard is a registered voter residing in Oceana County.  He is the Republican Party Chairman of Oceana County.

28.     Plaintiff James David Hooper is a registered voter residing in Wayne County.  He is the Republican Party Chairman for the Wayne County Eleventh District.

29.     Plaintiff Daren Wade Ribingh is a registered voter residing in Antrim County.  He is the Republican Party Chairman of Antrim County. is

30.     Defendant Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.

31.     Defendant JocelynBenson ("Secretary Benson") isnamed as adefendantinherofficial capacity as Michigan'sSecretaryofState. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. MCL § 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL § 168.31(1)(a)(the"SecretaryofStateshall…issueinstructions andpromulgaterules…fortheconduct of elections and registrations in accordance with the laws of this state"). Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL § 168.31(1)(b). *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020). Secretary Bensonis responsibleforassuringMichigan'slocalelectionofficialsconductelectionsinafair,just, and lawful manner. *See MCL* 168.21; 168.31; 168.32. *See also League of Women Voters of*

Exhibit N

*Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404(Mich.Ct.App.2018),aff'd921N.W.2d247(Mich.2018);*Fitzpatrickv.Secretaryof State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

32.     Defendant Michigan Board of State Canvassers is "responsible for approv[ing] votingequipmentforuseinthestate,certify[ing]theresultofelectionsheldstatewide…." Michigan Election Officials' Manual, p. 4. *See also* MCL 168.841, *etseq*. On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

## STATEMENT OF FACTS

33.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under MCL 168.861, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary under the Michigan Constitution.

34.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides.

35.     The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

36.     With respect to the appointment of presidential electors, the Constitution provides: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the

Exhibit N

State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").  Under the Michigan Election Code, the Electors of the President and Vice President for the State of Michigan are elected by each political party at their state convention in each Presidential election year.  *See* MCL §§ 168.42 & 168.43.

37.    Neither Defendant is a "Legislature" as required under the Elections Clause or Electors Clause. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38.    While the Elections Clause "was not adopted to  diminish  a State's authority to determine its own lawmaking processes," *Ariz.State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

39.    And Plaintiffs bring this action,to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizenshave:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

40.    TheMich.Const.,art.2,sec.4,furtherstates,"Allrightssetforthinthissubsection    shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to

Exhibit N

effectuate itspurposes."

41.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of theelection

I.     **LEGAL BACKGROUND:   RELEVANT PROVISIONS OF THE MICHIGAN ELECTION CODE AND ELECTION CANVASSING PROCEDURES.**

A.     **Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct ofelections.**

42.     Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity ofelectionsincludingthepreventionofvoterfraudandotherconduct(whethermaliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL § 168.730-738.

43.     MichiganrequiresSecretaryofStateBenson,localelectionauthorities,and stateandcountycanvassingboardstoprovidechallengerstheopportunitytomeaningfully participate in, and oversee, the conduct of Michigan elections and the counting ofballots.

44.     Michigan'selectioncodeprovidesthatchallengersshallhavethefollowing rights and responsibilities:

a.     An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applyingto vote. MCL§ 168.733(1).

b.     An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL§ 168.733(1)(a).

c.     AnelectionChallengermustbeallowedtoobservethemannerinwhichthe duties of the election inspectors are being performed. MCL§ 168.733(1)(b).

Exhibit N

    d.    An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL§ 168.733(1)(c).

    e.    An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL§ 168.733(1)(d).

    f.    An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL§168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL § 168.733(1)(e).

    g.    An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL§168.733(1)(f).

    h.    An election challenger may examine each ballot as it is being counted. MCL§ 168.733(1)(g).

    i.    An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL §168.733(1)(h).

    j.    An election challenger may observe the recording of absent voter ballots on voting machines. MCL§168.733(1)(i).

45.    The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

46.    Michigan values the important role challengers perform in assuring the transparency and integrity of elections. For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

Exhibit N

47.   The responsibilities of challengers are established by Michigan statute. MCL § 168.730 states:

> (1)   At an election, a political party or [an organization] interested in preserving          the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

> (2)   A challenger shall be a registered elector of this state . . . . . . . . . . . A   candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

> (3)   A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

48.   Secretary Benson and Wayne County violated these provisions of Michigan   law   and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

**B.   The canvassing process in Michigan.**

49.   Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

50.   The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL § 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.*   The members of the

Exhibit N

board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers." MCL § 168.809. "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required [to cast an absentee ballot] ... must be carefully preserved*." MCL § 810a and § 168.811 (emphasis added).

51.  After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election. November 5, 2020 is the date for the meeting. MCL 168.821. The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear. Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

52.  The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.

> *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the

Exhibit N

legalcustodians. The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvassersshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceip t of the records from the board of county canvassers." MCL168.822(2).

53. The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and VicePresident.

54. The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvassersshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceipt of the records from the board of county canvassers." MCL168.822(2).

55. The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited

Exhibit N

canvass of the returns for the election of electors for President and VicePresident.

56. The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. §§ 1-18, require Michigan Governor Whitmer to preparea Certificate of Ascertainment by December 14, the date the Electoral Collegemeets.

57. The United States Code (3 U.S.C. §5) provides that if election results are contestedinanystate,andifthestate,priortoelectionday,hasenactedprocedurestosettle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, thentheseresultsareconsideredtobeconclusiveandwillapplyinthecountingofthe electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. § 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

58. The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the BoardChairperson.

59. More than one hundred credentialed election challengers provided sworn affidavits.Theseaffidavitsstated,amongothermatters,thatthesecredentialedchallengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absentvoterballots, and the general conduct of the election and ballot counting. *See* Exhibit 1 (affidavits of election challengers).

Exhibit N

## II. FACTUAL ALLEGATIONS AND FACT WITNESS TESTIMONYREGARDINGMICHIGAN ELECTION CODE VIOLATIONS AND OTHER UNLAWFUL CONDUCT BY ELECTION WORKERS AND MICHIGAN STATE, WAYNE COUNTY AND/OR CITY OF DETROIT EMPLOYEES.

60.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for theCounty.TheTCFCenterwastheonlyfacilitywithinWayneCountyauthorizedtocountthe ballots.

### A.     Republican Election ChallengersWere Denied Opportunity to Meaningfully Observe the Processing and Counting of Ballots.

61.     There is a difference between a ballot and a vote. A ballot is a piece of paper. A vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a vote and has done so in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day. It is the task of Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make surethatallballotscastbylawfulvotersarecountedandtheelectionisconductedinaccord     with Michigan's Election Code uniformly throughoutMichigan.

62.     Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confidenttheoutcomeoftheelectionwashonestlyandfairlydeterminedbyeligiblevoters.

63.     WayneCountyexcludedcertifiedchallengersfrommeaningfullyobserving     the conduct of the election in violation of the Michigan Election Code. This allowed a substantial number of ineligible ballots to be counted, as outlined in Section B. below.   These systematic Michigan Election Code violations, and the disparate treatment of Republican vs. Democratic poll challengers, also violated the Equal Protection Clause and other provisions of the U.S. Constitution as detailed herein.   The following affidavits describe the specifics that were

Exhibit N

observed. This conduct was pervasive in Wayne County as attested to in the affidavits attached at **EXHIBIT3**.

### 1. Republican Observers Denied Access to TCF Center

64.     Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election. For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access. Exhibit 3 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Freyaff.¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldyaff.¶¶5,8-9(unlimitedmembersofthemediawerealsoallowedinsideregardless of COVID restrictions while Republican challengers were excluded)).

65.     Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return. *Id.* (Bomer aff.¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff.,p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5). Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced.

### 2. Disparate and Discriminatory Treatment of Republican vs. Democratic Challengers.

66.     As a result of Republican challengers not being admitted or re-admitted, while

Exhibit N

Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. *Id.* (Helminen aff. ¶12 (Democratic challengers out- numbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten timesasmanyDemocraticchallengersasRepublican);A.Seelyaff.¶19;Schneideraff.,p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff.¶4).

67.     Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. *Id.* (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6). As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process.

### 3.     Republican Challengers Not Permitted to View Ballot Handling, Processing or Counting.

68.     Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials.*Id*. (A.Seelyaff.¶15;Milleraff.¶¶13-14;Pennalaaff.¶4;Tysonaff.¶¶12- 13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23- 24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5;Shereraff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff.¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

69.     At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. *Id.* (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4). Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers. *Id.* (Sitek aff. ¶4).

Exhibit N

Sitek filed a police complaint. *Id.*

70.     Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table. *Id.* (Montie aff. ¶¶4-7). When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad." *Id.*¶8.

71.     Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process. *Id.* (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff.,p.4;Zimmermanaff.¶10;Krauseaff.¶12;Shereraff.¶22;Johnsonaff.¶7;Poschaff.¶10;Raufaff.¶23;Lukeaff.,p.1;M.Seelyaff.¶8;Zelaskoaff.¶8;Ungaraff.¶12;Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff.¶9).

### 4.     Harassment, Intimidation & Removal of Republican Challengers

72.     Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process. *Id.* (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneideraff.,p.1;Piontekaff.¶11;Steffansaff.¶26(intimidationmadeherfeeltooafraid to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooperaff.¶12;Shockaff.¶9;Schmidtaff.¶¶9-10;Duusaff.¶10;M.Seelyaff.¶4;Storm aff. ¶¶5, 7;

Exhibit N

DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13). Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers. *Id.* (Bomer aff. ¶7). Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting. *Id.* (Vaupel aff. ¶4). Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2). Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9).

73.    Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process. *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5).    Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much.    *Id.*    (Sherer    aff.    ¶24).    An    election    worker    told    challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process." *Id.* (Early aff. ¶11).

74.    Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area. *Id.* (Helminen aff. ¶9; Pennala    aff.    ¶5;    Ballew    aff.    ¶9;    Piontek    aff.    ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p.4;    Cavaliere    aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

Exhibit N

### 5. Poll Workers Ignored or Refused to Record Republican Challenges.

75. Unfortunately, this did not happen in Wayne County. Many challengers testified that their challenges to ballots were ignored and disregarded. *Id.* (A.Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettilaaff.,p.3;Valiceaff.¶2;Sawyeraff.¶7;Kerstein aff.¶3;Modlinaff.¶4;Cassin aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

76. As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded. *Id.* (A. Seely aff. ¶4). ArticiaBomer observed that ballots with votes for Trump were separated fromotherballots.*Id.*(Bomeraff.¶5).ArticiaBomerstated,"Iwitnessedelectionworkers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers. I believe some of these ballots may not have been properly counted." *Id.* ¶8. Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded. *Id.* (Giacobazzi aff. ¶10). When Christopher Schornak attempted to challenge the counting of ballots,anelectionofficialtoldhim,"Wearenottalkingtoyou,youcannotchallengethis." *Id.*(Schornakaff.¶15).WhenStephanieKrauseattemptedtochallengeballots,anelection workertoldherthatchallengeswerenolongerbeingacceptedbecausethe"rules'nolonger applied.'" *Id.* (Krause aff.¶13).

### 6. Unlawful Ballot Duplication.

77. If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot. The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicatedby *two election*

Exhibit N

*inspectors who have expressed a preference for different political parties.*" Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added). Thus, the ballot-duplicating process must be performed by bipartisan teams of election officials. It must also be performed where it can be observed bychallengers.

78.    But Wayne County prevented many challengers from observing the ballot duplicating process. *Id.* (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaumaff.¶6;Shereraff.¶¶16-

17;Burtonaff.¶7;Drzewieckiaff.¶7;Klameraff.¶9;Chopjianaff.¶10;Schmidtaff.¶7;Champagneaff.¶ 12;Shinkleaff.,p.1).Challenger John Miller said he was not allowed to observe election workers duplicating                          a                          ballot becausethe"duplicationprocesswaspersonallikevoting."*Id.*(Milleraff.¶8).Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observeaballotduplicationbecause"ifwemakeamistakethenyouwouldbealloverus."   *Id.*   (Shinkle aff.,   p. 1).Anotherchallengerobservedelectionofficialsmakingmistakeswhen  duplicating  ballots. *Id.* (Piontek aff. ¶9).

79.    Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff.,p.1;Wasilewskiaff.,p.1;Schornakaff.¶¶18-19;Dixonaff.,p.1;Kolanagireddyaff.,p.          1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

**7.    Democratic Election Challengers Frequently Outnumbered Republican Poll Watchers 2:1 or Even 2:0.**

80.    Dominon contractor Melissa Carrone testified that there were significantly more Democrats than Republicans at the TCF Center, and that as a result there were "over 20 machines [that] had two democrats judging the ballots-resulting in an unfair process." Exh. 5 ¶5.

Exhibit N

Other affiants testified to the fact that Democrats outnumbered Republicans by 2:1 or more *Id.* (Helminon aff. ¶12). Democrats also impersonated Republican poll watchers. *Id.* (Seely aff. ¶19).

### 8. Collaboration Between Election Workers, City/County Employees, and Democratic Party Challengers and Activists.

81. Affiants testified to systematic and routine collaboration between election workers, Michigan public employees and Democratic election challengers and activists present, in particular to intimidate, harass, distract or remove Republic election watchers. *See, e.g.,* Exh. 1 (Ballow aff. ¶9; Gaicobazzi aff. ¶¶12, 14; Piontek aff. ¶11).

### B. Election Workers Fraudulent Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records

82. A lawsuit recently filed by the Great Lakes Justice Center ("GLJC") raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* Exhibit 4 (copy of complaint filed in the Circuit Court of Wayne County in *Constantino, et al. v. City of Detroit, et al.*) ("GLJC Complaint"). The allegations and affidavits included in the GLJC Complaint are incorporated by reference in the body of this Complaint.

### 1. Election Workers Fraudulently Added "Tens of Thousands" of New Ballots and New Voters in the Early Morning and Evening November 4.

83. The most egregious example of election workers fraudulent and illegal behavior concerns two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline. First, at approximately 4:30 AM on November 4, 2020, poll challenger Andrew Sitto observed "tens of thousands of new ballots" being brought into the counting room, and "[u]nlike the other ballots, these boxes were brought in from the rear of the room." Exh. 4, GLJC Complaint, Exh. C at ¶ 10. Mr. Sitto heard other Republican challengers state that "several

Exhibit N

vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 a.m. and unloaded boxes of ballots." *Id.* at ¶ 11. "All ballots sampled that I heard and observed were for Joe Biden." *Id.* at ¶ 12.

84.    A second set of new boxes of ballots arrived at the TCF Center around 9:00 PM on November 4, 2020. According to poll watcher Robert Cushman, contained "several thousand new ballots." Exh. 4, GLJC Complaint, Exh. D at ¶ 5. Mr. Cushman noted that "none of the names on the new ballots were on the QVF or the Supplemental Sheets," *id.* at ¶ 7, and he observed "computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system." *Id.* at ¶ 8. Further, "[e]very ballot was being fraudulently and manually entered into the [QVF], as having been born on January 1, 1990." *Id.* at ¶ 15. When Mr. Cushman challenged the validity of the votes and the impossibility of each ballot having the same birthday, he "was told that this was the instruction that came down from the Wayne County Clerk's office." *Id.* at ¶ 16.

85.    Perhaps the most probative evidence comes from Melissa Carone, who was "contracted to do IT work at the TCF Center for the November 3, 2020 election." Exh. 5, ¶1. On November 4, Ms. Carrone testified that there were "two vans that pulled into the garage of the counting room, one on day shift and one on night shift." *Id.* ¶8. She thought that the vans were bring food, however, she "never saw any food coming out of these vans," and noted the coincidence that "Michigan had discovered over 100,000 more ballots – not even two hours after the last van left." *Id.* Ms. Carrone witnessed this of this illegal vote dump, as well as several other violations outlined below.

## 2.    Election Workers Forged and Fraudulently Added Voters to the Qualified Voter List.

86.    Many challengers reported that when a voter was not in the poll book, the election

Exhibit N

officials would enter a new record for that voter with a birth date of January 1, 1900. Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9). *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17). Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record. *Id.* (Giacobazzi aff.¶10).

87.     The GLJC Complaint alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets." Exh. 3, GLJC Complaint at 3.  The GLJC Complaint provides additional witness affidavits detailing the fraudulent conduct of election workers, in particular, that of Zachary Larsen, who served as a Michigan Assistant Attorney General from 2012 through 2020 and was a certified poll challenger at the TCF Center.  "Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted. An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen." *Id.* at ¶ 16.  Mr. Larsen observed this "practice of assigning names and numbers" to non-eligible voters who did not appear in either the poll book or the supplement poll book. *Id.* at ¶ 17.  Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned. *Id.*

### 3.     Changing Dates on Absentee Ballots.

88.     All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to

Exhibit N

have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

89.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County. **EXHIBIT 6**. Jessica Connarn's affidavit describes how an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* ¶1. Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received. *See id.* Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

90.     Plaintiffs have learned of a United States Postal Service ("USPS") worker Whistleblower, on November 4, 2020 told Project Veritas that a supervisor named Johnathan Clarke in Traverse City, Michigan potentially issued a directive to collect ballots and stamp them as received on November 3, 2020, even though there were not received timely, as required by law:  "We were issued a directive this morning to collect any ballots we find in mailboxes, collection boxes, just outgoing mail in general, separate them at the end of the day so that they could hand stamp them with the previous day's date," the whistleblower stated. "Today is November 4th for clarification."[4]  This is currently under IG Investigation at the U.S. Post Office. According to the Postal worker whistleblower, the ballots are in "express bags" so they could be sent to the USPS distribution center.  *Id.*

91.     As set forth in the GLJC Complaint and in the Affidavit of Jessy Jacob, an

---

[4] https://townhall.com/tipsheet/bethbaumann/2020/11/04/usps-whistleblower-in-michigan-claims-higher-ups-were-engaging-in-voter-fraud-n2579501

Exhibit N

employee of the City of Detroit Elections Department, "on November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they hadbeen received on or before November 3, 2020. I was told to alter the information in the QVF to falselyshowthattheabsenteeballotshadbeenreceivedintimetobevalid.Sheestimatesthatthis was done to thousands of ballots." Exh. 4, GLJC Complaint, Exh. B at ¶ 17.

### 4. Election Workers Changed Votes for Trump and Other Republican Candidates.

92.     Challenger ArticiaBomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9).  In addition to this eyewitness testimony of election workers manually changing votes for Trump to votes for Biden, there is evidence that Dominion Voting Systems did the same thing on a much larger scale with its Dominion Democracy Suite software.  *See generally infra* Section IV.D, Paragraphs 123-131.

### 5. Election Officials Added Votes and Removed Votes from "Over-Votes".

93.     Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted. Exh. 3(Zaplitny aff.¶13).    At least one challenger observedpollworkersaddingmarkstoaballotwheretherewasnomarkforanycandidate. *Id.*(Tysonaff.¶17).

### C. Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted.

#### 1. Illegal Double Voting.

94.     At                    least                    one                election                    worker "observedalargenumberofpeoplewhocametothesatellite location to vote in-person, but they had

Exhibit N

already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot." Exh. 4, GLJC Complaint (Exh. B) Jacob aff. at ¶ 10. Thiswouldpermitapersontovoteinpersonandalsosendinhis/herabsentee ballot, and thereby vote at least twice.

### 2. Ineligible Ballots Were Counted – Some Multiple Times.

95.     Challengersreportedthatbatchesofballotswererepeatedlyrunthroughthe        vote tabulation machines. Exh. 3 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). ArticiaBomer further stated thatshe witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12.   Dominion contractor Melissa Carone observed that this was a routine practice at the TCF Center, where she "witnessed countless workers rescanning the batches without discarding them first" – as required under Michigan rules and Dominion's procedures – "which resulted in ballots being counted 4-5 times" by the "countless" number of election workers.  Carone aff. ¶3.  When she observed that a computer indicated that it had "a number of over 400 ballots scanned – which means one batch [of 50] was counted over 8 times," and complained to her Dominion supervisor, she was informed that "we are here to do assist with IT work, not to run their election."  *Id.* at ¶4.

### 3. Ballots Counted with Ballot Numbers Not Matching Ballot Envelope.

96.     Many challengers stated that the ballot number on the ballot did not match thenumberontheballotenvelope,butwhentheyraisedachallenge,thosechallengeswere    disregarded and ignored by election officials, not recorded, and the ballots wereprocessed andcounted.Exh.3(A.Seelyaff.¶15;Wasilewskiaff.,p.1;Schornakaff.¶13;Brunell  aff.  ¶¶17,  19;

Exhibit N

Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5). For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting tables she was observing had "a different process than other tables." *Id.* (Helminen aff. ¶5).

### 4. Election Officials Counted Ineligible Ballots with No Signatures or with No Postmark on Ballot Envelope.

97. At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope. *Id.* (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13). Challenger Anne Vanker observed that "60% or more of [ballot] envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5). Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes. Exhibit 1 (Henderson aff. ¶8). The GLJC Complaint further alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity."

### 5. Election Officials Counted "Spoiled" Ballots.

98. At least two challengers observed spoiled ballots being counted. *Id.* (Schornak aff. ¶¶6-8; Johnson aff. ¶4). At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center. Exhibit 1 (Cizmar aff. ¶5).

### 6. Systematic Violations of Ballot Secrecy Requirements

99. Affiant Larsen identified a consistent practice whereby election officials would remove ballots from the "secrecy sleeve" or peek into the envelopes, visually inspect the ballots, and based on this visual inspection of the ballot (and thereby identify the votes cast), determine

Exhibit N

whether to "place the ballot back in its envelope and into a 'problem ballots' box that required additional attention to determine whether they would be processed and counted." Exh. 4, GLJC Complaint, Exh. A at ¶14. Mr. Larsen also observed that some ballots arriving without any secrecy sleeve at all were counted after visual inspection, whereas many ballots without a secrecy sleeve were placed in the "problem ballots" box. *Id.* at ¶¶21-22. "So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as 'problem ballots' based on who the person had voted for rather on any legitimate concern about the ability to count and process the ballot appropriately." *Id.* at ¶24.

### 7. Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline.

100.    Poll challengers observed two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline, as detailed in the GLJC Complaint and Paragraphs 79-81 above. Affiant Daniel Gustafson further observed that these batches of ballots "were delivered to the TCF Center in what appeared to be mail bins with open tops." Exh. 4, GLJC Complaint, Exh. E at¶4. Mr. Gustafson further observed that these bins and containers "did not have lids, were not sealed, and did not have the capability of having a metal seal," *id.* at ¶5, nor were they "marked or identified in any way to indicated their source of origin." *Id.* at ¶6.

101.    An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exh. 3 (Meyers aff. ¶3). This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day. *Id.*¶7.

102.    An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after

Exhibit N

8:00 p.m. on Election Day. *Id.* (Meyers aff.¶6).

103.    On November 4, 2020, Affiant Matt Ciantar came forward who, independently witnessed, while walking his dog, a young couple delivered 3-4 large plastic clear bags, that appear to be "express bags", as reflected in photographs taken contemporaneously, to a U.S. Postal vehicle waiting. *See generally* Exh. 7 Matt Ciantar Declaration. The use of clear "express bags" is consistent with the USPS whistleblower Johnathan Clarke in Traverse City, Michigan. *See infra* Paragraph 78.

### 8.    Ballots from Deceased Voters Were Counted.

104.    One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election. Exh. 3 (Chase aff.¶3).

## III.    EXPERT WITNESS TESTIMONY SUPPORTING INDICATING WIDESPREAD VOTING FRAUD AND MANIPULATION

### A.    Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

105.    The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey data of 248 Michigan Republican voters collected by Matt Braynard, which was conducted from November 15-17, 2020 and covered voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin. *See* Exh. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey"). The Braynard Survey sought to identify two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.* Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 139,190

Exhibit N

unreturned mail-in ballots for the State of Michigan.

106.    With respect to **Error #1**, Dr. Briggs analysis estimated that **29,611 to 36,529 ballots** out of the total 139,190 unreturned ballots (**21.27% - 26.24%**) were recorded for voters who had **not** requested them. *Id.* With respect to **Error #2**, the numbers are similar with **27,928 to 34,710 ballots** out of 139,190 unreturned ballots (**20.06% - 24.93%**) recorded for voters who **did return their ballots were recorded as being unreturned.** *Id.* Taking the average of the two types of errors together, **62,517 ballots, or 45% of the total, are "troublesome."**

107.    These errors are not only conclusive evidence of widespread fraud by the State of Michigan,[5] but they are fully consistent with the fact witness statements above the evidence regarding Dominion presented below insofar as **these purportedly unreturned absentee ballots provide a pool of 60,000-70,000 unassigned and blank ballots that could be filled in by Michigan election workers, Dominion or other third parties to shift the election to Joe Biden**. With respect to Error #1, Dr. Briggs' analysis, combined with the statements of the Michigan voters in the Braynard Survey, demonstrates that approximately **30,000 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.  With respect to Error #2, Dr. Briggs' analysis indicates that approximately **30,000 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.**  Accordingly, Dr. Briggs' analysis showing that almost half of purportedly "unreturned

---

[5]The only other possible explanations for the statements of 248 Michigan mail-in voters included in the Braynard Survey data is (a) that the 248 voters (who had no known pre-existing relationship apart from being listed as having unreturned absentee ballots) somehow contrived to collude together to submit false information or (b) that these 248 suffered from amnesia, dementia or some other condition that caused them to falsely claim that they had requested a mail-in ballot or returned a mail-in ballot.

Exhibit N

ballots" suffers from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 31%) – provides further support that these widespread "irregularities" or anomalies was one part of much larger interstate fraudulent scheme to rig the 2020 General Election for Joe Biden.

> **B.** **Statistical Analysis of Anomalous and Unprecedented Turnout Increases in Specific Precincts Indicate that There Were at Least 40,000 "Excess Voters" in Wayne County and At Least 46,000 in Oakland County.**

108.    The attached affidavit of Eric Quinell, Ph.D. ("Dr. Quinell Report") analyzes the extraordinary increase in turnout from 2016 to 2020 in a relatively small subset of townships and precincts outside of Detroit in Wayne County and Oakland County, and more importantly how nearly 100% or more of all "new" voters from 2016 to 2020 voted for Biden.  *See* Exh. 102. Using publicly available information from Wayne County and Oakland County, Dr. Quinell first found that for the votes received up to the 2016 turnout levels, the 2020 vote Democrat vs. Republican two-ways distributions (i.e., excluding third parties) tracked the 2016 Democrat vs. Republican distribution very closely, which was 55%-45% for Wayne County (outside Detroit) and 54%/46% for Oakland County.  *Id.* at ¶¶18 & 20.

109.    However, after the 2016 turnout levels were reached, the Democrat vs. Republican vote share shifts decisively towards Biden by approximately 15 points, resulting in a 72%/28% D/R split for Oakland County and 70%/30% D/R split for Wayne County (outside of Detroit).  What is even more anomalous – and suspicious – is the fact that nearly all of these "new" votes in excess of 2016 come from a small number of townships/precincts where the increased Biden vote share is nearly 100% or over 100% for Biden.  *Id.*  For example, in the township of Livonia in Wayne County, Biden gained 3.2 voters for every 1 new Trump voter, and Biden receive 97% of all "new" votes over 2016 and 151% of all new voter registrations. *Id.* at ¶6.  In the township of Troy in Oakland County, the vote share shifted from 51%/49% in 2016

Exhibit N

to 80%/20% in 2020 due to Biden receiving 98% of new votes above 2016 and 109% of new voter registrations. *Id.* at ¶20. Looking county-wide, Biden gained 2.32 new voters over 2016 levels to every 1 new Trump voter in Wayne County (outside Detroit) and 2.54 additional new voters per Trump voter for Oakland County. *Id.* ¶5.

110. Based on these statistically anomalous results that occurred in a handful of townships in these two counties, Dr. Quinell's model determined that there were 40,771 anomalous votes in Wayne County (outside Detroit) and 46,125 anomalous votes in Oakland County, for a total of nearly 87,000 anomalous votes or approximately 65% of Biden's purported lead in Michigan.

### C. Over 13,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Michigan.

111. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 12,120 Michigan voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynerd identified 1,170 Michigan voters in the 2020 General Election who subsequently registered to vote in another state, and were therefore ineligible to vote in the 2020 General Election. When duplicates from the two databases are eliminated, the merged number is 13,248 ineligible voters whose votes must be removed from the total for the 2020 General Election.[6]

### D. There Were At Least 289,866 More Ballots Processed in Four Michigan Counties on November 4 Than There Was Processing Capacity.

112. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit"), which is described in greater detail below, identifies an event that occurred in Michigan on November 4 that is "physically impossible" *See* Exh. 104 at ¶14. The "event"

---

[6] Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his posting as Exhibit 103.

Exhibit N

reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb ne and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount is alone **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.,* approximately 154,180).

## IV. FACTUAL ALLEGATIONS RE DOMINION VOTING SYSTEMS

### A. Evidence of Specific Fraud Wayne County used ballot tabulators that were shown to miscount votes cast for President Trump and Vice President Pence and instead count them for the Biden-Harristicket.

113. On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump. Antrim County voted 62% in favor of President Trump in 2016. The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were atfault.

114. However, Malfunctioning voting equipment or defective ballots may have affectedtheoutcomeofavoteonanofficeappearingontheballot."MichiganManualfor Boards of County Canvassers. Thesevotetabulatorfailuresareamechanicalmalfunctionthat,underMCL 168.831-168.839, requires a "special election" in the precincts affected.

115. SecretaryofStateBensonreleasedastatementblamingthecountyclerkfor notupdatingcertain"mediadrives,"butherstatementfailedtoprovideanycoherentexplanation of how

Exhibit N

the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[7]

116.    Secretary Benson continued: "*After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county.*"*Id.*What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individuallytested.

117.    Wayne County used the same Dominion voting system tabulators as did AntrimCounty,andWayneCountytestedonlyasingleoneofitsvotetabulatingmachines   before   the election. The Trump campaign asked Wayne County to have an observer physically present to witness   the   process.   *See*   Exhibit   4.   Wayne   County   denied   the   Trump campaigntheopportunitytobephysicallypresent.RepresentativesoftheTrumpcampaign   did   have opportunity to watch a portion of the test of a single machine by Zoomvideo.

**B.      The Pattern Of Incidents Shows An Absence Of Mistake - Always In The Favor Of Biden.**

118.    Rules of Evidence, 404(b), applicable to civil matters makes clear that,

(b) Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. **It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

119.    Tabulator   issues   and   election   violations   occurred   elsewhere   in   Michigan reflecting a pattern, where multiple incidents occurred. In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when

---

[7] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf (emphasis in original).

Exhibit N

120.    "A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have beensent to us as absentee votes," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[8]

121.    This Oakland County flip of votes is significant not only because it reflects a second systems error wherein both favored the Democrats, precinct votes were sent out to be counted, and they were counted twice as a result until the error was caught on a recount, but precinct votes should never be counted outside of the precinct, instead they are required to be sealed in the precinct.

### C.    Dominion Voting Machines and Forensic Evidence of Wide-Spread Fraud in Defendant Counties

122.    The State of Michigan entered into a contract with Dominion Systems' Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification:  "dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."

123.    Whereas the same Dominion software in an updated contract with Pennsylvania, unlike in Michigan's contract, sets forth the standard as requiring physical security:  *No components of the Democracy Suite 5.5A shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired network configuration in which all connected devices are certified voting system components." Id. at 41 (Condition C).*

124.    The Michigan Contract with Dominion Voting Systems Democracy packages

---

[8] Detroit Free Press,  https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/

Exhibit N

include language that describes *Safety and Security*, which in part makes the risks of potential breach clear where keys can be lost despite the fact that they provide full access to the unit, and while it is clear that the electronic access provides control to the unit, and the ability to alter results, combined with the lack of observers, creates a lack of security that becomes part of a pattern of the absence of mistake, or fraud:

> The ImageCast tabulators are unlocked by an iButton security key, which is used to:
> • Authenticate the software version (ensuring it is a certified version that has not been tampered with)
> • Decrypt election files while processing ballots during the election
> • Encrypt results files during the election
> • Provide access control to the unit
> **It is anticipated that the iButton security keys may get lost; therefore, any substitute key created for the same tabulator will allow the unit to work fully.[9]**

125.     In late December of 2019, three Senators, Warren, Klobuchar, Wyden and House Member Mark Pocanwrote about their '*particularized concerns that secretive & "trouble-plagued companies*'"""have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."

126.     As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a lack of evidence of efficiency and accuracy and

---

[9]See Exh. 8, State of Michigan Enterprise Procurement, Notice of Contract, Contract No. 071B770017 between the State of Michigan and Dominion Voting Systems Inc. at ¶2.6.2 ("Dominion Michigan Contract").

Exhibit N

identified vulnerabilities**to fraud and unauthorized manipulation**.[10]

**D.** **"Red Flags" in Dominion's Michigan Results for 2020 General Election Demonstrate Dominion Manipulated Election Results, and that the Number of Illegal Votes Is Nearly Twice As Great as Biden's Purported Margin of Victory.**

127.    The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit")[11]analyzes several "red flags" in Dominion's Michigan results for the 2020 election, and flaws in the system architecture more generally, to conclude that Dominion manipulated election results. Dominion's manipulation of election results enabled Defendants to engage in further voting fraud violations above and beyond the litany of violations recited above in Section II.A through Section II.C.

**1.** **Antrim County "Glitch" Was Not "Isolated Error" and May Have Affected Other Counties.**

128.    The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount. *See supra* Paragraph 94. The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials. This was not done." Exh. 104, Ramsland Aff. at ¶10. Mr. Ramsland is skeptical because "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system." *Id.* Further, **such a glitch would not be an**

---

[10] See Texas Analysis of February 15, 2019 from the Voting Systems Examiner to the Director of Elections (emphasis added).

[11]As detailed in the Ramsland Affidavit and the CV attached thereto, Mr. Ramsland is a member of the management team Allied Security Operations Group, LLC ("ASOG"), a firm specializing in cybersecurity, OSINT and PEN testing of networks for election security and detecting election fraud through tampering with electronic voting systems.

Exhibit N

"isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed happening in the data (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id.*

### 2. Fractional Vote Counts in Raw Data Strongly Indicate Voting Manipulation through "Ranked Choice Voting Algorithm"

129. Mr. Ramsland's analysis of the raw data , which provides **votes counts, rather than just vote shares, in decimal form** provides highly probative evidence that, in his professional opinion,  demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting"  algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[12] Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below. *Id.*

| state | timestamp | eevp | trump | biden | TV | BV |
|-------|-----------|------|-------|-------|-----|-----|
| michigan | 2020-11-04T06:54:48Z | 64 | 0.534 | 0.448 | 1925865.66 | 1615707.52 |
| michigan | 2020-11-04T06:56:47Z | 64 | 0.534 | 0.448 | 1930247.664 | 1619383.808 |
| michigan | 2020-11-04T06:58:47Z | 64 | 0.534 | 0.448 | 1931413.386 | 1620361.792 |
| michigan | 2020-11-04T07:00:37Z | 64 | 0.533 | 0.45 | 1941758.975 | 1639383.75 |
| michigan | 2020-11-04T07:01:46Z | 64 | 0.533 | 0.45 | 1945297.562 | 1642371.3 |
| michigan | 2020-11-04T07:03:17Z | 65 | 0.533 | 0.45 | 1948885.185 | 1645400.25 |

130. Mr. Ramsland describes how the RCV algorithm can be implemented, and the significance of the use of fractional vote counts, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

---

[12] *See id.* (*quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

Exhibit N

For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes. The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done. Otherwise, votes would be solely represented as whole numbers. Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals. *Id.*

### 3. Strong Evidence That Dominion Shifted Votes from Trump to Biden.

131.   A third red flag identified by Mr. Ramslund is the dramatic shift in votes between the two major party candidates as the tabulation of the turnout increased, and more importantly, the change in voting share before and after 2 AM on November 4, 2020, after Wayne County and other Michigan election officials had supposedly halted counting.

Until the tabulated voter turnout reached approximately 83%, Trump was generally winning between 55% and 60% of every turnout point. **Then, after the counting was closed at 2:00 am, the situation dramatically reversed itself, starting with a series of impossible spikes shortly after counting was supposed to have stopped.** *Id.* at ¶13.

132.   Once again the means through which Dominion appears to have implemented this scheme is through the use of blank ballots that were all, or nearly all, cast for Biden.

The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system. A few batches of blank ballots could easily produce a reversal this extreme, a reversal that is almost as statistically difficult to explain as is the impossibility of the votes cast to number of voters described in Paragraph 11 above. *Id.*

### 4. The November 4 Ballot Dumps Wayne County and Other Michigan Counties Was "Physically Impossible" Because There Were More Ballots Than Machines in Those Four Counties Could Have Counted Or Processed.

133.   Mr Ramsland and his team analyzed the sudden injection of totaling 384,733 ballots by four Michigan counties (Wayne, Oakland, Macomb, and Kent) in a 2 hour 38 minute period in the early morning of November 4 (which would have included the first ballot dump

Exhibit N

described above in Paragraph 72), and concluded that "**[t]his is an impossibility, given the equipment available at the 4 reference locations (precincts/townships)."** *Id.* at ¶14.

134.  Specifically, Mr. Ramslund calculated that "94,867 ballots as the maximum number of ballots that could be processed" in that time period, and thus that "[t]here were 289,866 more ballots processed in the time available for processing in four precincts/townships, than the capacity of the system allows." *Id.* Mr. Ramsland concludes that "[t]he documented existence of the spikes are strongly indicative of a manual adjustment either by the operator of the system (see paragraph 12 above) or an attack by outside actors." *Id.* The vote totals added for all Michigan counties, including Wayne, Oakland, Macomb and Kent counties, for the period analyzed by Mr. Ramsland are reproduced in the figure below.



Exhibit N

**5.** **The Number of Illegal Votes Attributable to Dominion Is Nearly Twice the Biden's Purported Margin in Michigan.**

135. Based on his analysis of the red flags and statistical anomalies discussed below, Mr. Ramsland concludes that:

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded.

Given that Mr. Biden's currently purported margin of victory is approximately 154,000, the number of illegal votes attributable Dominion's fraudulent and illegal conduct is by itself (without considering the tens or hundreds of thousands of illegal votes due to the unlawful conduct described in Section II), is nearly twice Mr. Biden's current purported lead in the State of Michigan. Thus Mr. Ramsland affidavit alone provides this Court more than sufficient basis to grant the relief requested herein.

**E.** **Additional Independent Findings of Dominion Flaws.**

136. Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

**1.** **Central Operator Can Remove, Discard or Manipulate Votes.**

137. Plaintiffs have also learned of the connection between Dominion Voting Systems, Smartmatic and the voting systems used in Venuezela and the Phillipines.

    a. Dominion Voting has also contradicted itself in a rush to denial a pattern of errors that lead to fraud. For example, Dominion Voting Systems machines can read all of these instruments, including Sharpies.https://www.dominionvoting.com/

    b. but Dominion Voting's Democracy Suite contract with Michigan specifically requires:

Exhibit N

*Black Inc:  Black ink (or toner) must be dense, opaques, light-fast and permanent, with a measured minimum 1.2 reflection density (log) above the paper base.*[13]

138.    An Affiant, who is a network & Information cybersecurities expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that  the information about scanned **ballots can be tracked inside the software system for Dominion:**

> (a)    When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.
> (See Exh.Aff. of Watkins __, at par.11).

139.    The **Affiant further explains that the central operator can remove or discard batches of votes.**   "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "Id. at ¶ 12.

140.    Affiantfurther testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> "*During the voting process, the voter will mark an oval on the ballot using a writing device. During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages"*

---

[13]See Exh. 8, par. 2.6.2 of contract # 071B770017.

Exhibit N

*folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id.* at ¶¶ 13-14.

141.     The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made to a flash memory card – and that is connected to a Windows computer stating:

*It is possible for an administrator of the "ImageCast Central" workstation toview and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro" operating system. ... The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and is very vulnerable to malicious administrators.*

*Id.* at par. 14 and 15.

### 2.     Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

142.     The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which was clearly requires preservation of all records requisite to voting in such an election.

F.     **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are

Exhibit N

voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

143. A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience.

144. As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[14]

### 3. Dominion Vulnerabilities To Hacking.

145. Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

146. Plaintiffs can show, through expert and fact witnesses that:

A. Massive End User Vulnerabilities.

---

[14] *See* Exh. X, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

Exhibit N

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (See Exh.____ For Affiant Watkins).

(2) Affiant witness (name redacted for security reasons[15]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

"I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 14, pars. 6, 9, 10).

147. Specific vulnerabilities of the systems in question that have been documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box

---

[15] The Affiant's name will be produced in camera to the court, with a motion for seal of the information.

Exhibit N

without the possibility of detection." (See Ex. __,) [16]

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. "We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [17]

D. October 6, 2006 – Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. __,).

E. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.

F. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire.

G. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility," ABS-CBN reported.

H. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but

---

[16]Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters, Andrew W. Appel, Richard T. DeMello, University of California, Berkeley, 12/27/2019.

[17]https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems_have-been-left-exposed-online-despite-official-denials

Exhibit N

rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. (The Business of Voting, Penn Wharton, Caufield, p. 16).

I. Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified.[18]

J. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Exh. __, attached copy of Senators' letter).

K. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist." Vice. August 2019.[19]

148. The expert witness in pending litigation in the United States District Court of Georgia, _____, Harri Hursti, specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on August 24, 2020, (See Exhibit

---

[18]LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*
[19]*https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-*

*have-been-left-exposed-online-despite-official-denials*

Exhibit N

"___" attached hereto) wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." See Paragraph 26 of Hursti Declaration.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

1. Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." (See Paragraph 49 of Hursti Declaration).

149. Rather than engaging in an open and transparent process to give credibility to Michigan's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Michigan's Election Code and Federal law.

Exhibit N

150. Finally, an analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. *See* Exh. 105, Spider Declaration.

### 4. Dominion Connections to Smartmatic and Hostile Foreign Governments and Domestic Groups Such as Antifa.

151. Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[20]

152. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Exh. __, Anna Mercedes Diaz Cardozo).

153. Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering. According to his bio,

---

*20https://patents.justia.com/assignee/smartmatic-corp*

Exhibit N

Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors after Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA< a domestic terrorist organization where he recorded Eric Coomer representing that "Don't worry Trump won't win the election, we fixed that." – as well as twitter posts with violence threatened against President Trump. (*See* Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).[21]

154.     In sum, as set forth above, for a host of independent reasons, the Michigan certified election results concluding that Joe Biden received 154,180 more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

155.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

156.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislaturethereofmaydirect,aNumberofElectors"forPresident.U.S.Const.art.  II,  §1,  cl.  2 (emphasis added).Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times,Places,andMannerofholdingElectionsforSenatorsandRepresentatives,shallbe prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, §4, cl. 1 (emphasis added).

157.     The Legislature is "'the representative body which ma[kes] the laws of the

---

*21*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

Exhibit N

people.'" *Smiley*, 285 U.S. at 193. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

158. Defendantsare not part of the Michigan Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Michigan Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation. Defendants are not the legislature, and their unilateral decision to deviate from the requirements of the Michigan Election Code violates the Electors and Elections Clause of the United States Constitution.

159. Many affiants testified to Defendants' failure to follow the requirements of the Michigan Election Code, as enacted by the Michigan Legislature, MCL §§ 168.730-738, relating to the rights of partisan election challengers to provide transparency and accountability to ensure that all, and only, lawful ballots casts be counted, and that the outcome of the election was honestly and fairly determined by eligible voters casting legal ballots. As detailed in Section II, many of these requirements were either disregarded altogether or applied in a discriminatory manner to Republican poll watchers. Specifically, election officials violated Michigan's Election Code by: (a) disregarding or violating MCL § 168.730 and § 168.733 requiring election challengers to have meaningful access to observe the counting and processing of ballots, *see supra* Paragraphs 59-75; (b) wanton and widespread forgery and alteration, addition or

Exhibit N

removal of votes, voters, or other information from ballots, the QVF or other voting records, *see supra* Paragraphs 76-86; and (c) illegal double voting, counting ineligible ballots, failure to check signatures or postmarks, and several other practices in clear violation of the Michigan Election Code (and in some cases at the express direction of supervisors or Wayne County officials). *See supra* Paragraphs 87-98.

160. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

161. Accordingly, the results for President in the November 3, 2020 election must be set aside.

## COUNT II

### Governor Whitmer, Secretary Benson and Other Defendants Violated TheFourteenth Amendment U.S. Const. Amend. XIV, 42 U.S.C. § 1983

### Denial of Equal Protection

### Invalid Enactment of Regulations Affecting Observation and Monitoring of the Election

162. Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

163. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

Exhibit N

over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

164.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

165.    In statewide and federal elections conducted in the State of Michigan, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

166.    Moreover, through its provisions involving watchers and representatives, the Michigan Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.,*MCL § 168.730 &§ 168.733(1). Further, the Michigan Election Code provides it is a felony punishable by

Exhibit N

up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other Counties in Michigan.

167. As set forth in Count I above, Defendants failed to comply with the requirements of the Michigan Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Michigan voters and electors in violation of the United States Constitution guarantee of Equal Protection.

168. Specifically, Defendants denied the Trump Campaign equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Michigan Counties by: (a) denying Republican poll challengers access to the TCF Center or physically removing them or locking them out for pretextual reasons; (b) denied Republican poll watchers meaningful access to, or even physically blocking their view of, ballot handling, processing, or counting; (c) engaged in a systematic pattern of harassment, intimidation, verbal insult, and even physical removal of Republican poll challengers; (d) systematically discriminated against Republican poll watchers and in favor of Democratic poll watchers and activists in enforcing rules (in particular, through abuse of "social distancing" requirements); (e) ignored or refused to record Republican challenges to the violations set forth herein; (f) refusing to permit Republican poll watchers to observe ballot duplication or to check if duplication was accurate; (g) unlawfully coached voters to vote for Biden and other democratic candidates, including at voting stations; and (h) colluded with other Michigan State, Wayne County and City of Detroit employees (including police) and

Exhibit N

Democratic poll watchers and activists to engage in the foregoing violations. *See generally supra* Section II.A, Paragraphs 56-75.

169. Defendants further violated Michigan voters' rights to equal protection insofar as it allowed Wayne County and City of Detroit election workers to process and count ballots in a manner that allowed ineligible ballots to be counted, including: (a) fraudulently adding tens of thousands of new ballots and/or new voters to the QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden; (b) systematically forging voter information and fraudulently adding new voters to the QVF (in particular, where a voter's name could not be found, assigning the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900); (c) fraudulently changing dates on absentee ballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline; (d) changing Votes for Trump and other Republican candidates; (e) adding votes to "undervote" ballots and removing votes from "Over-Votes"; (f) permitting illegal double voting by persons that had voted by absentee ballot and in person; (g) counting ineligible ballots – and in many cases – multiple times; (h) counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants; (i) counting "spoiled" ballots; (j) systematic violations of ballot secrecy requirements; (k) accepting unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline; (l) accepting and counting ballots from deceased voters; and (m) accepting and counting ballots collected from unattended remote drop

Exhibit N

boxes.  *See generally infra* Section II.B. and II.C, Paragraphs 76-98.

170.   Plaintiffs have obtained direct eyewitness testimony confirming that certain of these unlawful practices were at the express direction of Wayne County election officials.  With respect to (a) and (b), Affiant Cushman testified that election supervisor Miller informed him that the Wayne County Clerk's office had expressly instructed them to manually to enter thousands of ballots arriving around 9 PM on November 4, 2020, from voters not in the QVF, and to manually enter these unregistered voters in the QVF with the birthdate of 1/1/1900.   Exh. 3, GLJC Complaint, Exh. D at¶¶ 14-17. With respect to (c), fraudulently back-dating absentee ballots, City of Detroit election worker Affiant Jacob affirmed that she was instructed by supervisors to "improperly pre-date the absentee ballots receive date … to falsely show that absentee ballots had been received in time to be valid."  *Id*. Exh. B at ¶17. With respect to (h) (accepting ballots without signatures or postmarks), affiants testified that election workers did so at the express direction of Wayne County election officials. *See id.* at ¶15.

171.   Other Michigan county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards without the restrictions and discriminatory treatment outline above.Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the

Exhibit N

equal protection of those state laws enjoyed by citizens in other Counties.

172. Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Michigan Constitution, and the Michigan Election Code.

173. Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that the Michigan Counties allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

174. In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Michigan Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

175. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly

Exhibit N

established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Michigan law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

176.    In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the Wayne County and other Michigan Election Boards to invalidate ballots cast by: (1) any voter added to the QVF after the 8:00 PM Election Day deadline; (3) any absentee or mail-in ballot received without a signature or postmark; (4) any ballot cast by a voter who submitted a mail-in ballot and voted in person; (5) any ballot cast by a voter not in the QVF that was assigned the name of a voter in the QVF; (6) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; and (7) all "dead votes". *See generally supra* Section II.A-II.C.

### COUNT III

**Fourteenth Amendment, U.S. Const. Art. I § 4, cl. 1; Art. II, § 1, cl. 2; Amend. XIV, 42 U.S.C. § 1983**

**Denial of Due Process On The Right to Vote**

177.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

178.    The right of qualified citizens to vote in a state election involving federal

Exhibit N

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases,83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *SeeTwining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See alsoOregon v. Mitchell*,400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

179. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (percuriam).

180. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299,315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

Exhibit N

181.    "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

182.    The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

183.    Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

184.    Section II of this Complaint and the exhibits attached hereto describe widespread and systematic violations of the Michigan Election Code and/or the Equal Protection Clause described, namely: (A) Section II.A, Republican poll challengers were denied the opportunity to meaningfully observe the processing and counting of ballots; (B) Section II.B, election workers forged, added, removed or otherwise altered

Exhibit N

information on ballots, the QFV and other voting records; and (C) Section II.C, several other Michigan Election Code violations that caused or facilitated the counting of tens of thousands of ineligible, illegal or duplicate ballots.

185.    Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that Secretary Benson and Wayne County are enjoined from certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

<div align="center">

**COUNT IV**

**Wide-SpreadBallot Fraud**

</div>

186.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

187.    The "glitches" in the Dominion system -- that seem to have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts. *See generally supra* Section IV.

188.    And as evidenced by numerous sworn statements, Defendants egregious misconduct has included ignoring legislative mandates concerning mail-in ballots– including the mandate that mail-in ballots be post-marked on or before Election Day, and critically, preventing Plaintiff's poll watchers from observing the receipt, review, opening, and tabulation of mail-in ballots. Those mail-in ballots are evaluated on an entirely parallel track to those ballots cast in person.

<div align="center">67</div>

Exhibit N

189.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

190.     The disparate treatment of Michigan voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Rice v. McAlister, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

## COUNT V

## MICHIGAN STATUTORY ELECTION LAW VIOLATIONS

191.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein

### Violation of MCL 168.765a.

192.     Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

193.     Per eyewitness accounts described in this Complaint and its attached sworn

Exhibit N

affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were cast. *See generally supra* Section II.A., Paragraphs 56-75.

194. Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots. Defendants even physically blocked and obstructed election inspectors from the Republican party, including Plaintiff, by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

### Violation of MCL 168.733

195. MCL 168.733 requires sets forth the procedures for election challengers and the powers of election inspectors. *See generally supra* Paragraph 39.

196. Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud. *See generally supra* Section II.A., Paragraphs 56-75.

197. Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding

Exhibit N

information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birth dates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

## Violation of MCL 168.765(5) and 168.764a

198.    Michigan election law, MCL 168.765(5), requires Defendants to post the specific absentee voting information anytime an election is conducted which involves a state or federal office, in particular, the number of absentee ballots distributed to absent voters.

199.    Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

200.    Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

201.    Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

202.    Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol. *See generally supra* Section II.B.1, Paragraphs 77-78.

## Violation of MCL 168.730

203.    MCL 168.730 sets forth the rights and requirements for election challengers. MCL 168.734 provides, among other things:

Exhibit N

> Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expectedof him,shall,uponconviction,bepunishedbyafinenotexceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of thecourt.

204. WayneCounty'sandSecretaryBenson'sdenialofRepublicanchallengers' righttoparticipateandobservetheprocessingofballotsviolatesMichigan'sElectionCodeand resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

205. Further, Secretary of State Benson and the election officials in Wayne County violatedMCL168.730-168.734bydenyingRepublicanchallengers'rightstomeaningfully observe and participate in the ballot processing and countingprocess.

206. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief,including,butnotlimitedto,enjoiningthecertificationoftheelectionresultspendingafull investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy thefraud.

Exhibit N

# PRAYER FOR RELIEF

207.    Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

208.    Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

209.    In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of this Complaint.

210.    Order production of all registration data, ballots, envelopes, etc. required to be maintained by law. When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Michigan and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Michigan cannot reasonably rely on the results of the mail

Exhibit N

vote.Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Michigan should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Michigan should be directed to vote for President Donald Trump.

211.    For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.  An order directing Secretary Benson, Governor Whitmer, the Board of State Canvassers and Wayne County to de-certify the election results;

2.  An order enjoining Secretary Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College;

3.  An order requiring Governor Whitmer to transmit certified election results that state that President Donald Trump is the winner of the election;

4.  An immediate order to impound all the voting machines and software in Michigan for expert inspection by the Plaintiffs.

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6.  A declaratory judgment declaring that Michigan's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

Exhibit N

7. A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

8. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9. An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by Plaintiffs' expects;

10. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

11. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

12. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3 and November 4.

13. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Exhibit N

Respectfully submitted, this 25th day of November, 2020.

/s Sidney Powell*                                    /s/ Scott Hagerstrom
Sidney Powell PC                                     Michigan State Bar No. 57885
                                                     222 West Genesee
Texas Bar No. 16209700                               Lansing, MI 48933
                                                     (517) 763-7499
                                                     Scotthagerstrom @yahoo.com

                                                     /s/ Gregory J. Rohl P39185
                                                     The Law Offices of Gregory J. Rohl, P.C.
                                                     41850 West 11 Mile Road, Suite 110
                                                     Novi, MI 48375
                                                     248-380-9404
                                                     gregoryrohl@yahoo.com

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit N

# EXHIBIT S

Exhibit N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

          Plaintiffs,

v.

                                          Civil Case No. 20-13134
                                          Honorable Linda V. Parker

GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

          Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

          Intervenor-Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)

      The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans.  The struggle to achieve the right to vote is

1

Exhibit N

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.    Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

Exhibit N

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan.  (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id.*)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

3

December 8, 2020.  Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday.  (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan.  (ECF No. 6 at Pg ID 882.)  They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8).  In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

Exhibit N

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id*.)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.) Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

<center>5</center>

Exhibit N

In light of the limited time allotted for the Court to resolve Plaintiffs'
emergency motion for injunctive relief—which Plaintiffs assert "must be granted
in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has
disposed of oral argument with respect to their motion pursuant to Eastern District
of Michigan Local Rule 7.1(f).[1]

## II.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be
awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.
Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  The plaintiff
bears the burden of demonstrating entitlement to preliminary injunctive relief.
*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be
granted where "the movant carries his or her burden of proving that the
circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty.
Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Evidence that goes beyond the
unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not
material to the preliminary injunction sought, district courts generally need not
hold an evidentiary hearing.'"  *Nexus Gas Transmission, LLC v. City of Green,
Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration
Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007))
(citation omitted).

6

Exhibit N

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane, Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive relief: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'"  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.  Discussion

The Court begins by discussing those questions that go to matters of subject matter jurisdiction or which counsel against reaching the merits of Plaintiffs' claims.  While the Court finds that any of these issues, alone, indicate that Plaintiffs' motion should be denied, it addresses each to be thorough.

Exhibit N

## A.    Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.

U.S. Const. amend. XI.  This immunity extends to suits brought by citizens against their own states.  *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)).  It also extends to suits against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in fact a suit against the State and is barred "regardless of the nature of the relief sought."  *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted). "'The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'"  *Id.* at 101 n.11 (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

8

Exhibit N

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "The State of Michigan has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers. *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004). Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908). But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

9

Exhibit N

> limitation on a federal court's federal-question
> jurisdiction. The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading. Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997). Further, "the

theory of *Young* has not been provided an expansive interpretation." *Pennhurst*

*State Sch. & Hosp.*, 465 U.S. at 102. "'In determining whether the doctrine of *Ex*

*parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'" *Verizon*

*Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*

*Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

Ex parte Young does not apply, however, to *state law* claims against state

officials, regardless of the relief sought. *Pennhurst State Sch. & Hosp.*, 465 U.S. at

106 ("A federal court's grant of relief against state officials on the basis of state

law, whether prospective or retroactive, does not vindicate the supreme authority

of federal law. On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law."); *see also In re Ohio Execution Protocol Litig.*, 709 F.

App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

10

Exhibit N

in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against Defendants. Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law. (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the Michigan Election Code.") Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive." (ECF No. 31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not apply. As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.'"

11

Exhibit N

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)).  Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id*. at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights).  Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2]  (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist.  (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin.  *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

Exhibit N

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

## B.    Mootness

This case represents well the phrase: "this ship has sailed."  The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court.  For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'"  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted).  Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]"  *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).  This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

13

Exhibit N

Whitmer from transmitting the certified election results to the Electoral College;

(c) order Defendants "to transmit certified election results that state that President

Donald Trump is the winner of the election"; (d) impound all voting machines and

software in Michigan for expert inspection; (e) order that no votes received or

tabulated by machines not certified as required by federal and state law be counted;

and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be

remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg

ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer

available.

Before this lawsuit was filed, all 83 counties in Michigan had finished

canvassing their results for all elections and reported their results for state office

races to the Secretary of State and the Michigan Board of State Canvassers in

accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State

Board had certified the results of the 2020 General Election and Governor

Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines
and software in Michigan for expert inspection and the production of security
camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID
956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining
requests are no longer available.  In other words, the evidence Plaintiffs seek to
gather by inspecting voting machines and software and security camera footage
only would be useful if an avenue remained open for them to challenge the election
results.

Exhibit N

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.)  The time for requesting a special election based on mechanical errors or malfunctions in voting machines had expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for special election based on a defect or mechanical malfunction must be filed "no later than 10 days after the date of the election").  And so had the time for requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so.  Plaintiffs did not avail themselves of the remedies established by the Michigan legislature.  The deadline for them to do so has passed.  Any avenue for this Court to provide meaningful relief has been foreclosed.  As the Eleventh Circuit Court of Appeals recently observed in one of the many other post-election lawsuits brought to specifically overturn the results of the 2020 presidential election:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020).  And as one Justice of the Supreme Court of Pennsylvania advised in another 2020 post-election lawsuit: "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to

15

Exhibit N

the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters."  *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is moot.

### C.  Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits because they waited too long to knock on the Court's door.  (ECF No. 31 at Pg ID 2175-79; ECF No. 39 at Pg ID 2844.)  The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights."  *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) ("A constitutional claim can become time-barred just as any other claim can.").  An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay.  *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

16

Exhibit N

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d

634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a

right to the detriment of another party."). Courts apply laches in election cases.

*Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding

that the district court did not err in finding plaintiff's claims regarding deadline for

local ballot initiatives "barred by laches, considering the unreasonable delay on the

part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v.*

*Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary

injunction must generally show reasonable diligence. That is as true in election law

cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar. They

filed the instant action on November 25—more than 21 days after the 2020

General Election—and served it on Defendants some five days later on December

1. (ECF Nos. 1, 21.) If Plaintiffs had legitimate claims regarding whether the

treatment of election challengers complied with state law, they could have brought

their claims well in advance of or on Election Day—but they did not. Michigan's

83 Boards of County Canvassers finished canvassing by no later than November

17 and, on November 23, both the Michigan Board of State Canvassers and

Governor Whitmer certified the election results. Mich. Comp. Laws §§ 168.822,

168.842.0. If Plaintiffs had legitimate claims regarding the manner by which

17

ballots were processed and tabulated on or after Election Day, they could have

brought the instant action on Election Day or during the weeks of canvassing that

followed—yet they did not.  Plaintiffs base the claims related to election machines

and software on "expert and fact witness" reports discussing "glitches" and other

alleged vulnerabilities that occurred as far back as 2010.  (*See e.g.,* ECF No. 6 at

Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.)  If Plaintiffs had legitimate

concerns about the election machines and software, they could have filed this

lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to

file this suit.  Plaintiffs concede that they "would have preferred to file sooner, but

[] needed some time to gather statements from dozens of fact witnesses, retain and

engage expert witnesses, and gather other data supporting their Complaint."  (ECF

No. 49 at Pg ID 3081.)  But according to Plaintiffs themselves, "[m]anipulation of

votes was apparent *shortly after the polls closed on November 3, 2020*."  (ECF No.

7 at Pg ID 1837 (emphasis added).)  Indeed, where there is no reasonable

explanation, there can be no true justification.  *See Crookston v. Johnson*, 841 F.3d

396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a

stay of an election-related injunction is plaintiff offering "no reasonable

explanation for waiting so long to file this action").  Defendants satisfy the first

element of their laches defense.

Exhibit N

Second, Plaintiffs' delay prejudices Defendants. *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak. *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

<center>19</center>

### D. Abstention

As outlined in several filings, when the present lawsuit was filed on November 25, 2020, there already were multiple lawsuits pending in Michigan state courts raising the same or similar claims alleged in Plaintiffs' Amended Complaint. (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court lawsuits challenging President Trump's defeat in Michigan's November 3, 2020 General Election).) Defendants and the City of Detroit urge the Court to abstain from deciding Plaintiffs' claims in deference to those proceedings under various abstention doctrines. (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.) Defendants rely on the abstention doctrine outlined by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The City of Detroit relies on the abstention doctrines outlined in *Colorado River*, as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The City of Detroit maintains that abstention is particularly appropriate when resolving election disputes in light of the autonomy provided to state courts to initially settle such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings. *Colorado River*, 424 U.S. at 813, 817. The exception is found

20

Exhibit N

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel. *Id*. at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

Exhibit N

31-14), the allegations and claims in the state court proceedings and the pending

matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact

parallelism is not required; it is enough if the two proceedings are substantially

similar." (internal quotation marks and citation omitted)). A careful balancing of

the factors set forth by the Supreme Court counsel in favor of deferring to the

concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention. *Id.* (indicating that the

weight is against abstention where no property is at issue and neither forum is

more or less convenient). While the Supreme Court has stated that "'the presence

of federal law issues must always be a major consideration weighing against

surrender of federal jurisdiction in deference to state proceedings[,]'" *id.* at 342

(quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where

the federal courts' jurisdiction to enforce the statutory rights in question is

concurrent with that of the state courts.'"[4] *Id.* (quoting *Moses H. Cone*, 460 U.S. at

25). Moreover, the Michigan Election Code seems to dominate even Plaintiffs'

federal claims. Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical

issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions. *Felder v. Casey*,
487 U.S. 131, 139 (1988).

22

Exhibit N

results." *Id.* at 341.  The parallel proceedings are premised on similar factual allegations and many of the same federal and state claims.  The state court proceedings were filed well before the present matter and at least three of those matters are far more advanced than this case.  Lastly, as Congress conferred concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*, 487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the [Michigan] state courts are incapable of safeguarding [the rights protected under this statute]," *Romine*, 160 F.3d at 342.

For these reasons, abstention is appropriate under the *Colorado River* doctrine.  The Court finds it unnecessary to decide whether abstention is appropriate under other doctrines.

### E.    Standing

Under Article III of the United States Constitution, federal courts can resolve only "cases" and "controversies."  U.S. Const. art. III § 2.  The case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).  Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state in their motion for injunctive relief that Defendants violated their due process rights.  (*See* ECF No. 7 at Pg ID 1840, 1844.)  Plaintiffs do not pair either statement with anything the Court could construe as a developed argument.  (*Id*.)  The Court finds it unnecessary, therefore, to further discuss the due process claim.

Exhibit N

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A]
plaintiff must demonstrate standing separately for each form of relief sought.").
To establish standing, a plaintiff must show that:  (1) he has suffered an injury in
fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is
"fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is
"likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)
(internal quotation marks and citations omitted).

### 1.    Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among
other things, "destroy," "discard," and "switch" votes for President Trump, thereby
"devalu[ing] Republican votes" and "diluting" the influence of their individual
votes.  (ECF No. 49 at Pg ID 3079.)  Plaintiffs contend that "the vote dilution
resulting from this systemic and illegal conduct did not affect all Michigan voters
equally; it had the intent and effect of inflating the number of votes for Democratic
candidates and reducing the number of votes for President Trump and Republican
candidates."  (ECF No. 49 at Pg ID 3079.)  Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").

Exhibit N

injury-in-fact and causation under this theory,[6] their constitutional claim cannot stand because Plaintiffs fall flat when attempting to clear the hurdle of redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court.  Plaintiffs ask this Court to de-certify the results of the 2020 General Election in Michigan.  But an order de-certifying the votes of approximately 2.8 million people would not reverse the dilution of Plaintiffs' vote.  To be sure, standing is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill*, 138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote.  Accordingly, Plaintiffs have failed to show that their injury can be redressed by the relief they seek and thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of the standing inquiry.

25

Exhibit N

### 2. Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. art. I, § 4, cl. 1. "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)." *Bognet*, 2020 WL 6686120, *1. The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …." U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan … is a vote for each Republican elector[], and … illegal conduct aimed at harming candidates for President similarly injures Presidential Electors." (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

26

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims. *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do not at all distinguish the two clauses in their motion for injunctive relief or reply brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69 (characterizing Electors Clause as Elections Clauses' "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

Exhibit N

This is so because the Elections Clause grants rights to "the Legislature" of "each State." U.S. Const. art. I, § 4, cl. 1. The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673. The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority. *See id.* at 2668. Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature. *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020). Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause. (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).) In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057. This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause. Although

28

Exhibit N

Minnesota law at times refers to them as "candidates," *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id*. § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors."). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota law are similar. (See ECF No. 49 at Pg ID 3076-78.) Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

29

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

### F. The Merits of the Request for Injunctive Relief

#### 1. Likelihood of Success on the Merits

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above. Nevertheless, the Court will proceed to analyze the merits of their claims.

##### a. Violation of the Elections & Electors Clauses

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code. (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.) Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses. In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion. In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

30

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld an Arizona law that transferred redistricting power from the state legislature to an independent commission after concluding that "the Legislature," as used in the Elections Clause, includes any official body with authority to make laws for the state.  576 U.S. 787, 824 (2015).  In each of these cases, federal courts measured enacted state election laws against the federal mandates established in the clauses—they did not measure *violations* of enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review.  Plaintiffs cite to no case— and this Court found none—supporting such an expansive approach.

### b.  Violation of the Equal Protection Clause

Most election laws will "impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]."  *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

Exhibit N

debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds*, 377 U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates."[9] (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

_____

[9] Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots. But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

Exhibit N

Bomer, ECF No. 6-3 at Pg ID 1008-1010).)  But of course, "[a] belief is not

evidence" and falls far short of what is required to obtain any relief, much less the

extraordinary relief Plaintiffs request.  *United States v. O'Connor*, No. 96-2992,

1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F.

App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's

'protection' statement actually meant "protection from retaliation. . . . An

unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309

F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for

testing is not evidence that he was.").[10]  The closest Plaintiffs get to alleging that

election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and
> expects to prove some things. Now his belief and
> expectation may be in good faith; but it has been
> repeatedly held that suspicion is not proof; and it is
> equally true that belief and expectation to prove cannot
> be accepted as a substitute for fact.  The complainant
> carefully refrains from stating that he has any
> information upon which to found his belief or to justify
> his expectation; and evidently he has no such
> information.  But belief, without an allegation of fact
> either upon personal knowledge or upon information
> reasonably sufficient upon which to base the belief,
> cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir.
1901).

Exhibit N

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*. (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.) And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11]  *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at *12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently.  Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment.  And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity.  That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11.

34

## 2. Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury. Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest. As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

## IV. Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic

Exhibit N

process and their trust in our government.  Plaintiffs ask this Court to ignore the

orderly statutory scheme established to challenge elections and to ignore the will of

millions of voters.  This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for

Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 7, 2020

36

Exhibit N

# EXHIBIT T

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **L. LIN WOOD, JR.,** ) | |
| ) | |
|     **Plaintiff,** ) | **CIVIL ACTION** |
| ) | **FILE NO. _____** |
| **v.** ) | |
| ) | |
| **BRAD RAFFENSPERGER, in his official** ) | |
| **capacity as Secretary of State of the State** ) | |
| **of Georgia, REBECCA N. SULLIVAN,** ) | |
| **in her official capacity as Vice Chair of** ) | |
| **the Georgia State Election Board,** ) | |
| **DAVID J. WORLEY, in his official** ) | |
| **capacity as a Member of the Georgia** ) | |
| **State Election Board, MATTHEW** ) | |
| **MASHBURN, in his official capacity as** ) | |
| **a Member of the Georgia State Election** ) | |
| **Board, and ANH LE, in her official** ) | |
| **capacity as a Member of the Georgia** ) | |
| **State Election Board,** ) | |
| ) | |
|     **Defendants.** ) | |
| _____ ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff **L. Lin Wood, Jr.** ("Plaintiff"), by and through his undersigned counsel of record, and file this his Verified Complaint for Declaratory and Injunctive Relief (the "Complaint"), respectfully showing this honorable Court as follows:

Exhibit N

**INTRODUCTION**

1.

The citizens of the State of Georgia deserve fair elections, untainted by violations of the United States Constitution and other federal and state laws governing elections.

2.

The validity of the results of the November 3, 2020 general election in Georgia are at stake as a result of Defendants' unauthorized actions in the handling of absentee ballots within this state, actions that were contrary to the Georgia Election Code.

3.

Defendants' unilaterally, and without the approval or direction of the Georgia General Assembly, changed the process for handling absentee ballots in Georgia, including those cast in the general election.

4.

As a result, the inclusion and tabulation of absentee ballots for the general election (and potentially, for all future elections held within this state) is improper and must not be permitted. To allow otherwise would erode the sacred and basic

Exhibit N

rights of Georgia citizens under the United States Constitution to participate in and rely upon a free and fair election.

## JURISDICTION AND VENUE

5.

This action arises under 42 U.S.C. § 1983, Articles I and II of the United States Constitution, and the First and Fourteenth Amendments to the United States Constitution.

6.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution and laws of the United States and involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932). This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

7.

Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred or will occur in this District. Alternatively,

Exhibit N

venue is proper under 28 U.S.C. § 1391(b) because at least one Defendant to this action resides in this District and all Defendants reside in this State.

## PARTIES

8.

Plaintiff L. Lin Wood, Jr. is an adult individual who is a qualified registered elector residing in Fulton County, Georgia. Plaintiff constitutes an "elector" who possesses all of the qualifications for voting in the State of Georgia, as set forth in O.C.G.A. §§ 21-2-2(7) and 21-2-216(a). Plaintiff brings this suit in his capacity as a private citizen. As a qualified elector and registered voter, Plaintiff has Article III standing to bring this action. *See Meek v. Metro. Dade County*, 985 F.2d 1471, 1480 (11th Cir. 1993).

9.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Secretary Raffensperger serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and

Exhibit N

proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

10.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State Election Board, personally and through the conduct of the Board's employees, officers, agents, and servants, acted under color of state law at all times relevant to this action and are sued for declaratory and injunctive relief in their official capacities.

Exhibit N

## FACTS

I.  **Federal Constitutional Protections for Free and Fair Public Elections.**

11.

Free, fair, and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

12.

The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives *shall be prescribed in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. Art. I, § 4, cl. 1 (emphasis added).

13.

The Legislature is "the representative body which ma[kes] the laws of the people." *Smiley*, 285 U.S. at 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807-08 (2015).

Exhibit N

14.

In Georgia, the "legislature" is the General Assembly.  *See* Ga. Const. Art. III, § I, Para. I.

15.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to unilaterally exercise that power, much less flout existing legislation.

16.

Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668.  "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question."  *Bush*, 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley*, 285 U.S. at 365.

Exhibit N

## II.   The Georgia Legislature's Laws Governing the Handling of Absentee Ballots.

17.

The Georgia General Assembly (the "Georgia Legislature") provided a generous absentee ballot statute, O.C.G.A. § 21-2-380(b), which provides, in pertinent part, "An elector who votes by absentee ballot shall not be required to provide a reason in order to cast an absentee ballot in any primary, election, or runoff."

18.

The Georgia Legislature also established a clear an efficient process for handling absentee ballots.  To the extent that any change in that process could or could be expected to change the process, that change must, under Article I, Section 4 of the United States Constitution, be prescribed by the Georgia Legislature.

19.

Under O.C.G.A. § 21-2-386(a)(1)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein.  The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article."  *See* O.C.G.A. § 21-2-380.1.

Exhibit N

20.

The Georgia Election Code instructs those who handle absentee ballots to

follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk **shall** write
> the day and hour of the receipt of the ballot on its envelope. The
> registrar or clerk **shall** then compare the identifying information on
> the oath with the information on file in his or her office, **shall**
> compare the signature or make on the oath with the signature or mark
> on the absentee elector's voter card or the most recent update to such
> absentee elector's voter registration card and application for absentee
> ballot or a facsimile of said signature or maker taken from said card or
> application, and **shall**, if the information and signature appear to be
> valid and other identifying information appears to be correct, so
> certify by signing or initialing his or her name below the voter's oath.
> Each elector's name so certified shall be listed by the registrar or clerk
> on the numbered list of absentee voters prepared for his or her
> precinct.

O.C.G.A. § 21-2-386(a)(1)(B) (emphasis added).

21.

The Georgia Legislature's use of the word "shall" on three separate

occasions indicates the clear process that **must** be followed by the County Officials

in processing absentee ballots.

22.

Under O.C.G.A. § 21-2-386(a)(1)(C), the Georgia Legislature also

established a clear and efficient process to be used by County Officials if they

determine that an elector has failed to sign the oath on the outside envelope

9

Exhibit N

enclosing the ballot or that the signature does not conform with the signature on

file in the registrar's or clerk's office (a "defective absentee ballot").

<div align="center">23.</div>

The Georgia Legislature also provided for the steps to be followed by

County Officials with respect to defective absentee ballots:

> *If the elector has failed to sign the oath, or if the signature does not appear to be valid*, or if the elector has failed to furnish required information *or information so furnished does not conform with that on file in the registrar's or clerk's office*, or if the elector is otherwise found disqualified to vote, the registrar or clerk *shall* write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly *notify the elector of such rejection*, a copy of which notification *shall* be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2-386(a)(1)(C) (emphasis added).

<div align="center">24.</div>

The Georgia Legislature again used the word "shall" to indicate when a

defective absentee ballot shall be "rejected." The Georgia Legislature also

contemplated the use of a written notification to be used by the county registrar or

clerk in notifying the elector of the rejection.

<div align="center">10</div>

Exhibit N

**III.** **Defendants' Unauthorized Actions to Alter the Georgia Election Code and the Processing of Defective Absentee Ballots.**

25.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia.[1]  A true and correct copy of the Litigation Settlement is attached hereto and incorporated herein as **Exhibit A**.

26.

The Litigation Settlement sets forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia than those described above.

---

[1] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, Civil Action File No. 1:19-cv-05028-WMR, United States District Court for the Northern District of Georgia, Atlanta Division, Doc. 56-1.

11

Exhibit N

27.

Although Secretary Raffensperger, as the Secretary of State, is authorized to promulgate rules and regulations that are "conducive to the fair, legal, and orderly conduct of primaries and elections" but all such rules and regulations must be "consistent with law." O.C.G.A. § 21-2-31(2).

28.

Under the Litigation Settlement, however, the Administrators agreed to change the statutorily-prescribed manner of handling absentee ballots in a manner that was not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

29.

The Litigation Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

30.

The Litigation Settlement procedure, set forth in pertinent part below, is more cumbersome, and makes it much more difficult to follow the statute with respect to defective absentee ballots.

Exhibit N

31.

Because of the COVID-19 pandemic and the pressures created by a larger number of absentee ballots, County Officials were under great pressure to handle an historical level of absentee voting.

32.

Additionally, the County Officials were required to certify the speed with which they were handling absentee ballots on a daily basis, with the goal of processing absentee ballots faster than they had been processed in the past.

33.

Under the Litigation Settlement, the following language added to the pressures and complexity of processing defective absentee ballots, making it less likely that they would be identified or, if identified, processed for rejection:

> County registrars and absentee ballot clerks *are required*, upon receipt of each mail-in absentee ballot, to compare the signature or make of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C). When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. *If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot*

13

Exhibit N

> *application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under O.C.G.A. § 21-2-386(a)(1)(C).* Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule 183-1-14-.13.

(*See* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match" (emphasis added).)

34.

The underlined language above is not consistent with the statute adopted by the Georgia Legislature.

35.

First, the Litigation Settlement overrides the clear statutory authorities granted to County Officials individually and forces them to form a committee of three if any one official believes that an absentee ballot is a defective absentee ballot.

14

Exhibit N

36.

Such a procedure creates a cumbersome bureaucratic procedure to be followed with each defective absentee ballot – and makes it likely that such ballots will simply not be identified by the County Officials.

37.

Second, the Litigation Settlement allows a County Official to compare signatures in ways not permitted by the statutory structure created by the Georgia Legislature.

38.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. § 21-2-381(b)(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417…").

39.

Under O.C.G.A. § 21-2-220(c), the elector must present identification, but need not submit identification if the electors submit with their application

15

Exhibit N

information such that the County Officials are able to match the elector's information with the state database, generally referred to as the eNet system.

40.

The system for identifying absentee ballots was carefully constructed by the Georgia Legislature to ensure that electors were identified by acceptable identification (O.C.G.A. § 21-2-417 even permits the use of an expired driver's license), but at some point in the process, the Georgia Legislature mandated the system whereby the elector be identified for each absentee ballot.

41.

Under the Litigation Settlement, any determination of a signature mismatch would lead to the cumbersome process described in the settlement, which was not intended by the Georgia Legislature, which authorized those decisions to be made by single election officials.

42.

The Georgia Legislature also provided for the opportunity to cure (again, different from the opportunity to cure in the Litigation Settlement), but did not allocate funds for three County Officials for every mismatch decision.

16

Exhibit N

43.

In the primary preceding the November 3, 2020 election, news stories recorded that many absentee ballots did not reach voters until after the polls were closed. *See, e.g.*, F. Bajak and C. Cassidy, "Vote-by-mail worries: A 'leaky pipeline' in many states," Associated Press Aug. 8, 2020, https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7, retrieved Nov. 11, 2020).

44.

In response and to encourage confidence in absentee voting during the COVID-19 crisis, the Secretary of State launched Ballot Trax to track absentee ballots, permitting electors to track the progress of absentee ballots as they were processed.

45.

Announcing Ballot Trax further increased pressure on County Officials to process absentee ballot applications quickly, so that they would not be perceived as "falling behind" in processing ballots.

46.

County Officials were not incentivized to spend additional time to check absentee ballot applications – by increasing the number of reviewers and

17

Exhibit N

complexity of the process, the Litigation Settlement procedures created further disincentives to accurate processing of signature matches.

47.

Finally, under paragraph 4 of the Litigation Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith "additional guidance and training materials" drafted by the "handwriting and signature review expert" of the Democrat Party Agencies. (*See* Ex. A, Litigation Settlement, p. 4, ¶ 4, "Consideration of Additional Guidance for Signature Matching.")

48.

Allowing a single political party to write rules for reviewing signatures is not "conducive to the fair…conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

49.

The Litigation Settlement by itself has created confusion, misplaced incentives, and undermined the confidence of the voters of the State of Georgia in the electoral system.

Exhibit N

50.

Neither it nor any of the activities spawned by it were authorized by the Georgia Legislature, as required by the United States Constitution.

**COUNT I**
**First Amendment and Equal Protection**
**U.S. Const. amend. XIV, 42 U.S.C. § 1983**

51.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

52.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution, which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

53.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.

Exhibit N

54.

The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

55.

The Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105).

56.

That is, each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972).

57.

 "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.  Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters." *Id.* at 106-07.

Exhibit N

58.

"The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the initial allocation of the franchise as well as the manner of its exercise. Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 695 (W.D. Pa. 2003) (citations and quotations omitted).

59.

"[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

60.

Defendants are not part of the Georgia Legislature and cannot exercise legislative power to enact rules or regulations regarding the handling of defective absentee ballots that are contrary to the Georgia Election Code.

21

Exhibit N

61.

By entering the Litigation Settlement and altering the process for handling defective absentee ballots in Georgia, Defendants unilaterally, and without authority, altered the Georgia Election Code.

62.

The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code.

63.

Further, allowing a single political party to write rules for reviewing signatures, as paragraph 4 of the Litigation Settlement provides, is not "conducive to the fair…conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

64.

The rules and regulations set forth in the Litigation Settlement created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, contrary to Georgia law that was utilized in determining the results of the November 3, 2020 general election.

22

Exhibit N

65.

This disparate treatment is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

66.

The foregoing injuries, burdens, and infringements that are caused by Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment.

67.

The foregoing violations occurred as a consequence of Defendants acting under color of state law. Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

68.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

Exhibit N

69.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

70.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

71.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

### COUNT II
**Violation of the Electors & Election Clauses**
**U.S. Const. Art. I, § 4, cl. 1 & Art. II, § 1, cl. 2**

72.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

Exhibit N

73.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President. U.S. Const. art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

74.

Secretary Raffensperger is not part of the Georgia Legislature and cannot exercise legislative power.

75.

Further, because the United States Constitution reserves for the Georgia Legislature the power to set the "Times, Places, and Manner" of holding elections for President and Congress, the Administrators have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation. U.S. Const. Art. I, § 4, cl. 1.

Exhibit N

76.

By entering the Litigation Settlement, Secretary Raffensperger imposed a different procedure for handling defective absentee ballots that is contrary to the Georgia Election Code. *See* O.C.G.A. § 21-2-386.

77.

The procedure set forth in the Litigation Settlement for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions under the Litigation Settlement exceed their authority. *See* O.C.G.A. § 21-2-31(2).

78.

Defendants are not the Georgia Legislature, and their unilateral decision to implement rules and procedures regarding absentee ballots that are contrary to the Georgia Election Code constitutes a violation of the Electors and Elections Clauses of the United States Constitution.

79.

The foregoing violations occurred as a consequence of Defendants acting under color of state law. Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

Exhibit N

80.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

81.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

82.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

83.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

Exhibit N

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(a)     That, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis;

(b)     Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured;

(c)     Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement; and

Exhibit N

(d)     Any and other such further relief that this Court or the Finder of Fact

deems equitable and just.

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

Exhibit N

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

Exhibit N

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system. I also hereby certify that I caused the foregoing and all exhibits and attachments thereto in the above captioned matter to be served, via FedEx and email, with the appropriate Waiver of Service of Summons forms, upon:

Secretary of State Brad Raffensperger
214 State Capitol
Atlanta, Georgia 30334
brad@sos.ga.gov
soscontact@sos.ga.gov

Rebecca N. Sullivan
Georgia Department of Administrative Services
200 Piedmont Avenue SE
Suite 1804, West Tower
Atlanta, Georgia 30334-9010
rebecca.sullivan@doas.ga.gov

David J. Worley
Evangelista Worley LLC
500 Sugar Mill Road
Suite 245A
Atlanta, Georgia 30350
david@ewlawllc.com

Exhibit N

Matthew Mashburn
Aldridge Pite, LLP
3575 Piedmont Road, N.E.
Suite 500
Atlanta, Georgia 30305
mmashburn@aldridgepite.com

Anh Le
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

This 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

2

Exhibit N

# EXHIBIT U

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

L. LIN WOOD, JR.,

    Plaintiff,

               v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia;
REBECCA N. SULLIVAN, in her
capacity as Vice Chair of the Georgia State
Election Board; DAVID J. WORLEY, in his
official capacity as a Member of the Georgia
State Election Board; MATTHEW
MASHBURN, in his official capacity as a
Member of the Georgia State Election Board;
and ANH LE, in her official capacity as a
Member of the Georgia State Election Board,

    Defendants.

Civil Action No.
1:20-cv-04651-SDG

## OPINION AND ORDER

This matter is before the Court on a motion for temporary restraining order

filed by Plaintiff L. Lin Wood, Jr. [ECF 6]. For the following reasons, and with the

benefit of oral argument, Wood's motion is **DENIED**.

Exhibit N

## I.    BACKGROUND

On November 3, 2020, the United States conducted a general election for various federal, state, and local political offices (the General Election).[1] However, the voting process in Georgia began in earnest before that date. On September 15, 2020, local election officials began mailing absentee ballots for the General Election to eligible voters.[2] On October 12, 2020, Georgia's in-person, early voting period started.[3] This entire process played out amidst the throes of a global health pandemic caused by the novel coronavirus SARS-CoV-2—colloquially known as COVID-19. Due in large part to the threat posed by COVID-19, an overwhelming number of Georgia voters—over 1 million of the 5 million votes cast by November 3—participated in the General Election through the use of absentee ballots.[4]

Wood, a registered voter in Fulton County, Georgia, believes Defendants—the elected officials tasked with conducting elections in the state—performed their roles in an unconstitutional manner. As such, Wood initiated this action on

---

[1]    *Elections and Voter Registration Calendars*, https://sos.ga.gov/index.php/electi ons/elections_and_voter_registration_calendars (last accessed Nov. 19, 2020).

[2]    *Id*.

[3]    *Id*.

[4]    ECF 33-2; ECF 33-6; ECF 33-8.

Exhibit N

November 13, 2020, ten days after the conclusion of the General Election.[5] On November 16, Wood filed an Amended Complaint, asserting three claims against Defendants—all in their official capacities—for violation of: the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count I); the Electors and Elections Clause of the Constitution (Count II); and the Due Process Clause of the Fourteenth Amendment (Count III).[6]

Counts I and II seek extraordinary relief:

> As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

> Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Election which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

> Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and

---

[5]   ECF 1.

[6]   ECF 5.

Exhibit N

> without the taint of the procedures described in the Litigation Settlement.[7]

For Count III, Wood requests an order, declaration, and/or injunction requiring Defendants to perform a myriad of activities, including ordering a second recount prior to the certification of the election results and permitting monitors designated by the Republican Party to have special access to observe all election activity.[8]

On November 17, 2020, Wood filed an emergency motion for a temporary restraining order.[9] Two sets of parties subsequently sought permission to intervene as defendants (collectively, the Intervenors): (1) the Democratic Party of Georgia, Inc. (DPG), DSCC, and DCCC; and (2) the Georgia State Conference of the NAACP (Georgia NAACP) and Georgia Coalition for the People's Agenda (GCPA).[10] On November 19, Defendants and Intervenors filed separate responses in opposition to Wood's motion for a temporary restraining order.[11] The Court held oral argument on Wood's motion the same day. At the conclusion of the oral

---

[7]  *E.g.*, ECF 5, ¶¶ 81–83, 93–95. The Litigation Settlement—also referred to as the Settlement Agreement—is discussed *infra* in Section I.b.

[8]  ECF 5, ¶ 106.

[9]  ECF 6.

[10]  ECF 8; ECF 22.

[11]  ECF 31; ECF 34; ECF 39.

Exhibit N

argument, the Court denied Wood's request for a temporary restraining order. This Order follows and supplements this Court's oral ruling.

**a.    Georgia Statutory Law Regarding Absentee Ballots.**

Georgia law authorizes any eligible voter to cast his or her absentee ballot by mail without providing a reason. O.C.G.A. § 21-2-380(b). To initiate the absentee-voting process, a prospective voter must submit an application to the applicable registrar's or absentee ballot clerk's office. O.C.G.A. § 21-2-381(a)(1)(A). Upon receipt of a timely absentee ballot request, a registrar or absentee ballot clerk must enter the date the office received the application and compare the prospective voter's information and signature on the application with the information and signature on file in the registrar's or clerk's office. O.C.G.A. § 21-2-381(b)(1). If the prospective voter's eligibility is confirmed, the registrar or clerk must mail the voter an absentee ballot. O.C.G.A. § 21-2-381(b)(2)(A).

An absentee voter receives two envelopes along with the absentee ballot; the completed ballot is placed in the smaller envelope, which is then placed in the larger envelope, which contains the oath of the elector and a signature line. O.C.G.A. § 21-2-384(b). Upon receipt of a timely absentee ballot, a registrar or clerk is required to compare the identifying information and signature provided in the oath with the information and signature on file in the respective office.

Exhibit N

O.C.G.A. § 21-2-386(a)(1)(B). If the information and signature appear to match, the registrar or clerk signs his or her name below the voter's oath. *Id.* If the information or signature is missing or does not appear to match, the registrar or clerk is required to write "Rejected" across the envelope and provide the reason for the rejection. O.C.G.A. § 21-2-386(a)(1)(C). The board of registrars or absentee ballot clerk is required to "promptly notify" the elector of the rejection, who then has until the end of the period for verifying provisional ballots to cure the issue that resulted in the rejection. *Id.*

Secretary of State Raffensperger is "the state's chief election official." O.C.G.A. § 21-2-50(b). *See also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("Just as a matter of sheer volume and scope, it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. No other state official or entity is assigned the range of responsibilities given to the Secretary of State in the area of elections."). In this role, Raffensperger is required to, among other things, "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials" and "formulate, adopt, and promulgate such rules and

regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-3-31(1)-(2).

### b. The Settlement Agreement

Wood does not challenge the underlying constitutionality of the absentee ballot framework enacted by the Georgia General Assembly. The genesis of his claims instead derive from a lawsuit filed over one year ago by the DPG against Raffensperger, the then-Members of the Georgia State Election Board, and the then-Members of the Gwinnett County Board of Registration and Elections.[12] In that action, the DPG, DSCC, and DCCC challenged several aspects of the process for rejecting absentee ballots based on a missing or mismatched signature.[13]

On March 6, 2020, the DPG, DSCC, DCCC, Raffensperger, and the Members of the Georgia State Election Board executed—and filed on the public docket—a "Compromise Settlement Agreement and Release" (Settlement Agreement).[14] As part of the Settlement Agreement, Raffensperger agreed to issue an Official Election Bulletin containing certain procedures for the review of signatures on

---

[12] *Democratic Party of Ga., Inc. v. Raffensperger*, 1:19-cv-05028-WMR (ECF 1) (Compl.).

[13] *Id.*

[14] *Id.* at ECF 56 (Settlement Agreement).

Exhibit N

absentee ballot envelopes by county election officials for the March 24, 2020 Presidential Primary Election and subsequent General Election. In relevant part, the procedures stated:

> When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. **If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application.** If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C).[15]

---

15   *Id.* (emphasis added).

Exhibit N

No entity or individual sought permission to intervene and challenge the Settlement Agreement. United States District Judge William M. Ray closed the case on March 9.[16]

### c.    The Risk-Limiting Audit

Georgia law provides procedures for conducting a "risk-limiting audit" prior to the final certification of an election. O.C.G.A. § 21-2-498. Such an audit must be "[c]omplete[d] . . . in public view." O.C.G.A. § 21-2-498(c)(4). And the State Election Board is "authorized to promulgate rules, regulations, and procedures to implement and administer" an audit, including "security procedures to ensure that [the] collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(d). *See also* Ga. Comp. R. & Regs. 183-1-15-.04 (2020).

On November 11, 2020, Raffensperger announced a statewide risk-limiting audit (the Audit)—also referred to as a "full hand recount"—of all votes cast in the contest for President of the United States.[17] Every county in Georgia was required to begin the Audit at 9:00 am on November 13 and finish by 11:59 pm on

---

16    *Id.* at ECF 57.

17    ECF 33-1; ECF 33-2; ECF 33-3.

Exhibit N

November 18.[18] The statewide election results are set to be certified on November 20.[19] Raffensperger required the Audit to "be open to the public and the press" and required local election officials to "designate a viewing area from which members of the public and press may observe the audit for the purpose of good order and maintaining the integrity of the audit."[20] The two major political parties—Democratic and Republican—were permitted "the right to have one properly designated person as a monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted."[21] The designated monitors were not required to remain in the public viewing areas, but were required to comply with the rules promulgated by Raffensperger and the local election officials.[22] The Audit process differs from that required by Georgia law for a recount requested by a unsuccessful candidate following the official certification of votes. *See* O.C.G.A. § 21-2-524.

---

[18] *Id.*

[19] *Id.*

[20] ECF 33-4.

[21] *Id.*

[22] *Id.*

Exhibit N

## II.    LEGAL STANDARD

The standard for the issuance of a temporary restraining order and a preliminary injunction are identical. *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010). A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). To obtain the relief he seeks, Wood must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). *See also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.").

## III.   DISCUSSION

Wood's motion essentially boils down to two overarching claims: that Defendants violated the Constitution by (1) executing and enforcing the Settlement Agreement to the extent it requires different procedures than the Georgia Election Code, and (2) not permitting designated monitors to have certain

Exhibit N

live viewing privileges of the Audit at the county locations. Defendants and Intervenors posit a number of challenges to Wood's claims.

### a.   Standing

As a threshold matter, the Court finds Wood lacks standing to assert these claims. Article III limits federal courts to the consideration of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). *See also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing inquiry is threefold: "The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 561). Wood must "demonstrate standing for each claim he seeks to press and for each form of relief

Exhibit N

that is sought"—*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)—and shoulders "the burden of establishing [each] element[ ]." *Lujan*, 504 U.S. at 561.

Injury in fact is "the first and foremost of standing's three elements" and requires Wood to show that he suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547–48. To be "particularized," the alleged injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 561 n.1. Wood must demonstrate "a personal stake in the outcome of the controversy," as a federal court "is not a forum for generalized grievances." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). This requires more than a mere "keen interest in the issue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). The alleged injury must be "distinct from a generally available grievance about government." *Gill*, 138 S. Ct. at 1923. *See also id.* at 1929 (explaining that a person's "right to vote is individual and personal in nature . . . [t]hus [only] voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage") (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964); *Baker v. Carr*, 369 U.S. 186, 206 (1962)). Claims premised on allegations that "the law . . . has not been followed . . . [are] precisely the kind of undifferentiated,

Exhibit N

generalized grievance about the conduct of government . . . [and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332–33 (11th Cir. 2007) (citing *Baker*, 369 U.S. at 207–08). *See also Lance v. Coffman*, 549 U.S. 437, 440–41 (2007) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

Wood alleges he has standing because he is "a qualified registered elector residing in Fulton County, Georgia" who has "made donations to various Republican candidates on the ballot for the November 3, 2020 elections, and his interests are aligned with those of the Georgia Republican Party for the purposes of the instant lawsuit."[23] These allegations fall far short of demonstrating that Wood has standing to assert these claims.

### i. The Elections and Electors Clause

Starting with his claim asserted under the Elections and Electors Clause, Wood lacks standing as a matter of law. The law is clear: A generalized grievance regarding a state government's failure to properly follow the Elections Clause of

---

[23]  ECF 5, ¶ 8.

Exhibit N

the Constitution does not confer standing on a private citizen.[24] *Lance*, 549 U.S. at 442; *Bognet*, 2020 WL 6686120, at *6 ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. . . . Their relief would have no more directly benefitted them than the public at large."); *Dillard*, 495 F.3d at 1332–33.

### ii. Equal Protection

For his equal protection claim, Wood relies on a theory of vote dilution, *i.e.*, because Defendants allegedly did not follow the correct processes, invalid absentee votes may have been cast and tabulated, thereby diluting Wood's in-person vote. But the same prohibition against generalized grievances applies to equal protection claims. *United States v. Hays*, 515 U.S. 737, 743 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as in any other.") Wood does not differentiate his alleged injury from any

---

[24] Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerably similarity" and may be interpreted in the same manner. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020) ("As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause.").

Exhibit N

harm felt in precisely the same manner by every Georgia voter. As Wood conceded during oral argument, under his theory any one of Georgia's more than seven million registered voters would have standing to assert these claims. This is a textbook generalized grievance. *Bognet*, 2020 WL 6686120, at *12 ("Voter Plaintiffs' dilution claim is a paradigmatic generalized grievance that cannot support standing. . . . Put another way, a vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. Such an alleged dilution is suffered equally by all voters and is not particularized for standing purposes.") (internal punctuation omitted) (collecting cases); *Moore v. Circosta*, No. 1:20-cv-911, 2020 WL 6063332, a *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."). *See also Citizens for Fair Representation v. Padilla*, 815 F. App'x 120, 123 (9th Cir. 2020) (dismissing equal protection claim for lack of standing and stating "the Supreme Court has consistently held that a plaintiff raising only a generally available grievance . . . does not state an Article III case or controversy.").

Exhibit N

### iii.  Due Process

For the same reasons, Wood also does not have standing to pursue his due process claim. Wood asserts that various election monitors appointed by the Republican Party "have been denied the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[25] Yet, Wood does not allege that *he* attempted to participate as a designated monitor. Nor does he allege that, on behalf of the Republican Party, he himself designated monitors who were ultimately denied access. Wood's broad objection is that Defendants failed to conduct the Audit fairly and consistently under Georgia law. This is a generalized grievance.[26] *Lance*, 549 U.S. at 440–41. *See also Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) (voters lacked standing because substantive due process claim that delay of implementation of new statute

---

[25]  ECF 6, at 21.

[26]  To the extent Wood attempts to rely on a theory of third party standing, the Court disagrees; the doctrine is disfavored and Wood has not alleged or proven any of the required elements—that (1) he "suffered an injury-in-fact that gives [him] a sufficiently concrete interest in the dispute"; (2) he has "a close relationship to the third party"; and (3) there is "a hindrance to the third party's ability to protect its own interests." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339 (11th Cir. 2019) (internal quotation marks omitted).

Exhibit N

until after referendum election violated their right to fair election did not allege particularized injury).

### iv. Alignment with Non-Parties

Wood further points to his status as a donor to the Republican Party whose interests are aligned with that party and its political candidates to support his standing argument. But this does not sufficiently differentiate his alleged injury from that which *any* voter might have suffered—no matter the party affiliation. Ostensibly, Wood believes he suffered a particularized injury because his preferred candidates—to whom he has contributed money—did not prevail in the General Election. This argument has been squarely rejected by the Eleventh Circuit. *Jacobson*, 974 F.3d at 1247 ("A candidate's electoral loss does not, by itself, injure those who voted for the candidate. Voters have no judicially enforceable interest in the outcome of an election. Instead, they have an interest in their ability to vote and in their vote being given the same weight as any other.") (internal citation omitted).

### v. Lack of Relevant Authorities

Finally, the Court notes the futility of Wood's standing argument is particularly evident in that his sole relied-on authority—*Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471 (11th Cir. 1993)—is no longer good law. The Eleventh

Exhibit N

Circuit *expressly abrogated* its holding in that case over thirteen years ago. *Dillard*, 495 F.3d at 1331–32 ("We subsequently upheld *Meek's* reasoning against repeated challenges that it was wrongly decided in light of the Supreme Court's later decisions . . . [b]ut it is clear that we can no longer do so in light of the Supreme Court's most recent pronouncement on voter standing in *Lance*.").

During oral argument, Wood additionally pointed to *Roe v. State of Alabama by & through Evans*, 43 F.3d 574 (11th Cir. 1995), but that case does not support Wood's standing argument. For example, two plaintiffs in *Roe* were candidates for a political office decided in the challenged election. *Id*. at 579. Wood is a private citizen, not a candidate for any elected office. Moreover, the Eleventh Circuit found particularized harm in the post-election inclusion of absentee ballots that had been deemed invalid. *Id*. at 580. Wood here seeks to do the opposite—remove validly cast absentee ballots after completion of the election.

In sum, Wood lacks standing to pursue these claims in the first instance.

### b.    The Doctrine of Laches

Even if the Court found Wood possessed standing to pursue his claims regarding the Settlement Agreement (Counts I and II), such claims would nonetheless be barred by the doctrine of laches. To establish laches, Defendants must show "(1) there was a delay in asserting a right or a claim, (2) the delay was

Exhibit N

not excusable, and (3) the delay caused [them] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) ("To succeed on a laches claim, [defendant] must demonstrate that [p]laintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice."). Courts apply laches in election cases. *E.g., Sanders v. Dooly Cnty., Ga.*, 245 F.3d 1289, 1291 (11th Cir. 2001) ("[W]e conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred."). *See also, e.g., Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding district court did not err in finding that plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.") (internal citation omitted). Defendants have established each element of laches.

> ### i.   Delay

First, Wood delayed considerably in asserting these claims. On March 6, 2020, the GDP, DSCC, DCCC, and Defendants executed the Settlement

Exhibit N

Agreement, which was entered on the public docket. It has since been in effect for at least three elections. Nearly eight months later—and *after* over one million voters cast their absentee ballots in the General Election—Wood challenges the terms of the Settlement Agreement as unconstitutional. Wood could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election.

ii.     **Excuse**

Nor has Wood articulated any reasonable excuse for his prolonged delay. Wood failed to submit any evidence explaining why he waited to bring these claims until the eleventh hour. He instead relies solely on a representation from his legal counsel during oral argument, without evidence, that Wood did not vote in any election between the execution of the Settlement Agreement and the General Election. Even assuming this proffer to be true, it does not provide a reasonable justification for the delay. Wood's claims are constitutional challenges to Defendants' promulgation authority under state law. If valid, these claims should not depend on the outcome of any particular election, to wit, whether Wood's preferred candidates won or lost. Indeed, Wood's claims, even assuming his standing for bringing them could be established, were ripe the moment the parties executed the Settlement Agreement.

Exhibit N

### iii.    Prejudice

Finally, Defendants, Intervenors, and the public at large would be significantly injured if the Court were to excuse Wood's delay. A bedrock principle of election law is that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). This is because a last-minute intervention by a federal court could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. *See also Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66, 2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.").

Underscoring the exceptional nature of his requested relief, Wood's claims go much further; rather than changing the rules on the eve of an election, he wants the rules for the already concluded election declared unconstitutional and over

Exhibit N

one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process. *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.") (citation omitted); *Arkansas United v. Thurston*, No. 5:20-cv-5193, 2020 WL 6472651, at *5 (W.D. Ark. Nov. 3, 2020) ("[T]he equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

Thus, Wood is not entitled to injunctive relief on Counts I and II for the additional reason that these claims are barred by the doctrine of laches.

### c.    The Merits of the Request for Injunctive Relief

Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks. The Court addresses each required element for a temporary restraining order in turn.

Exhibit N

### i.       Substantial Likelihood of Success on the Merits

#### 1.       Equal Protection (Count I)

Wood argues the execution and enforcement of the Settlement Agreement burdens his right to vote in contravention of the Equal Protection Clause because the agreement sets forth additional voting safeguards not found in the Georgia Election Code. States retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing U.S. Const. Art. I, § 4, cl. 1). The Supreme Court has held that:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

*Burdick*, 504 U.S. at 433 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Inevitably, most election laws will "impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. But the Equal Protection Clause only becomes applicable if "a state either classifies voters in disparate ways . . . or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). As recently summarized by one federal district court:

> The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by debasement or

Exhibit N

> dilution of the weight of a citizen's vote, also referred to
> [as] vote dilution. . . . Second, the Court has found that
> the Equal Protection Clause is violated where the state,
> having once granted the right to vote on equal terms,
> through later arbitrary and disparate treatment, values
> one person's vote over that of another.

*Moore*, 2020 WL 6063332, at *12 (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000);

*Reynolds*, 377 U.S. at 554). A rationale basis standard of review applies if the

plaintiff alleges "that a state treated him or her differently than similarly situated

voters, without a corresponding burden on the fundamental right to vote."

*Obama for Am.*, 697 F.3d at 429 (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S.

802, 807–09 (1969)). If a fundamental right is implicated, the claim is governed by

the flexible *Anderson/Burdick* balancing test. *Burdick*, 504 U.S. at 433–35; *Anderson*

*v. Celebrezze*, 460 U.S. 780, 788 (1983).

Wood's equal protection claim does not fit within this framework.[27] Wood

does not articulate a cognizable harm that invokes the Equal Protection Clause.

---

[27] The Court notes that, in the Amended Complaint, Wood alludes to issues
caused by Raffensperger's adoption of Ballot Trax—an electronic interface that
permits an elector to track his or her ballot as it is being processed [ECF 5,
¶¶ 44–46]. Wood also alleges harm in that the Settlement Agreement
permitted the DPG to submit "additional guidance and training materials" for
identifying a signature mismatch, which Defendants "agree[d] to consider in
good faith" [*id.* ¶ 47; *see also* ECF 5-1, ¶ 4]. Wood did not address how these
items violated his constitutional rights—equal protection or otherwise—in
either his motion or during oral argument. Therefore, the Court need not

Exhibit N

For example, to the extent Wood relies on a theory of disparate treatment, *Bush v. Gore* is inapplicable. Defendants applied the Settlement Agreement in a wholly uniform manner across the entire state.[28] In other words, no voter—including Wood—was treated any differently than any other voter. *E.g.*, *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020); *Deutsch v. New York State Bd. of Elections*, No. 20 CIV. 8929 (LGS), 2020 WL 6384064, at *6 (S.D.N.Y. Oct. 30, 2020).

Wood fares no better with a vote dilution argument. According to Wood, his fundamental right to vote was burdened because the "rules and regulations set forth in the [Settlement Agreement] created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be 'rejected,' contrary to Georgia law."[29] At the starting gate, the additional safeguards on signature and identification match enacted by Defendants did not burden Wood's ability to cast his ballot at all. Wood, according to his legal counsel during oral argument, did not vote absentee during the

---

address them at this stage.

[28] Wood concedes as much in the Amended Complaint. *See* ECF 5, ¶ 25 (alleging the Settlement Agreement "set[ ] forth different standards to be followed by the clerks and registrars in processing absentee ballots *in the State of Georgia*.") (emphasis added).

[29] ECF 6, at 18.

Exhibit N

General Election. And the "burden that [a state's] signature-match scheme imposes on the right to vote . . . falls on vote-by-mail and provisional voters' fundamental right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019).

This leaves Wood to speculate that, because the Settlement Agreement required three ballot clerks—as opposed to just one—to review an absentee ballot before it could be rejected, fewer ballots were ultimately rejected, invalid ballots were tabulated, and his in-person vote was diluted. In support of this argument, Wood relies on *Baker v. Carr*, where the Supreme Court found vote dilution in the context of apportionment of elected representatives. 369 U.S. at 204–208. But Wood cannot transmute allegations that state officials violated state law into a claim that his vote was somehow weighted differently than others. This theory has been squarely rejected. *Bognet*, 2020 WL 6686120, at *11 ("[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every

Exhibit N

violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works.").

Even if Wood's claim were cognizable in the equal protection framework, it is not supported by the evidence at this stage. Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%).[30] This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election.[31]

In sum, there is insubstantial evidence supporting Wood's equal protection theory and he has not established a substantial likelihood of success on the merits as to Count I.

---

[30]  ECF 33-6.

[31]  *Id*.

## 2. Electors and Elections Clauses (Count II)

In relevant part, the Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision—colloquially known as the Elections Clause—vests authority in the states to regulate the mechanics of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). The "Electors Clause" of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2.

Wood argues Defendants violated the Elections and Electors Clauses because the "procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions . . . exceed their authority."[32] Put another way, Wood argues Defendants usurped the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code. In support, Wood points to Chief Justice Rehnquist's concurrence in *Bush v. Gore*,

---

[32]   ECF 5, ¶ 90.

Exhibit N

which states that "in a Presidential election the clearly expressed intent of the legislature must prevail." 531 U.S. at 120 (Rehnquist, C.J., concurring).

State legislatures—such as the Georgia General Assembly—possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands . . . it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). *See also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority."). *Cf. Bullock*, 2020 WL 5810556, at *11 ("A survey of the relevant case law makes clear that the term 'Legislature' as used in the Elections Clause is not confined to a state's legislative body.").

Recognizing that Secretary Raffensperger is "the state's chief election official,"[33] the General Assembly enacted legislation permitting him (in his official

---

[33]  O.C.G.A. § 21-2-50(b).

capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law. It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which *furthers* Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."[34]

---

[34]   ECF 5, ¶ 11.

Exhibit N

Wood has not demonstrated a substantial likelihood of success as to Count II.

### 3.  Due Process (Count III)

Under the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Due Process Clause has two components: procedural and substantive. *DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga.*, 106 F.3d 956, 959 (11th Cir. 1997). Wood alleges that Defendants have "fail[ed] . . . to ensure that the Hand Recount is conducted fairly and in compliance with the Georgia Election Code" by denying monitors "the opportunity to be present throughout the entire Hand Recount, and when allowed to be present, they were denied the opportunity to observe the Hand Recount in any meaningful way."[35] Although not articulated in his Amended Complaint or motion for temporary restraining order, Wood clarified during oral argument that he is pursing both a procedural and substantive due process claim. Each will be addressed in turn.

### a)  Procedural Due Process

A procedural due process claim raises two inquires: "(1) whether there exists a liberty or property interest which has been interfered with by the State and

---

[35]   ECF 6, at 20–21.

Exhibit N

(2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The party invoking the Due Process Clause's procedural protections bears the "burden . . . of establishing a cognizable liberty or property interest." *Richardson*, 978 F.3d at 229 (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Wood bases his procedural due process claim on "a vested interest in being present and having meaningful access to observe and monitor the electoral process."[36] But Wood does not articulate how this "vested interest" fits within a recognized, cognizable interest protected by procedural due process. The Court is not persuaded that the right to monitor an audit or vote recount is a liberty or property right secured by the Constitution. For example, the Eleventh Circuit does "assume that the right to vote is a liberty interest protected by the Due Process Clause." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). But the circuit court has expressly declined to extend the strictures of procedural due process to "a State's election procedures." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("The generalized due process argument that the plaintiffs argued for and the

---

[36]   ECF 5, ¶ 101.

district court applied would stretch concepts of due process to their breaking point.").

More specifically, federal courts have rejected the very interest Wood claims has been violated, *i.e.*, the right to observe the electoral process. *See, e.g.*, *Republican Party of Penn. v. Cortes*, 218 F. Supp. 3d 396, 408 (E.D. Pa. 2016) ("[T]here is no individual constitutional right to serve as a poll watcher . . . but rather the right is conferred by statute."); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *67 (W.D. Pa. Oct. 10, 2020) (same); *Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (finding no authority "that supports the proposition that [plaintiff] had a first amendment right to act as a pollwatcher. Indeed, we would suggest that the state is not constitutionally required to permit pollwatchers for political parties and candidates to observe the conduct of elections."). Without such an interest, Wood cannot establish a substantial likelihood of success on the merits as to his procedural due process claim.

### b) Substantive Due Process

Wood's substantive due process claim fares no better. The types of voting rights covered by the substantive due process clause are considered narrow.

Exhibit N

*Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Pursuant to the "functional structure embodied in the Constitution," a federal court must not "intervene to examine the validity of individual ballots or supervise the administrative details of a local election." *Id*. In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id. See also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("We have drawn a distinction between garden variety election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation and punctuation omitted) (collecting cases); *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981) ("[T]he due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."). It is well understood that "garden variety" election disputes, including "the ordinary dispute over the counting and marking of ballots" do not rise to the level of a constitutional deprivation.[37] *Curry*, 802 F.2d

---

[37] In contrast, as Defendants note, it would be a violation of the constitutional rights of the millions of absentee voters who relied on the absentee ballot procedures in exercising their right to vote. *See e.g. Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (finding disenfranchisement of electorate who voted by absentee ballot a violation of substantive due process).

Exhibit N

at 1314–15. *See also Serpentfoot v. Rome City Comm'n*, 426 F. App'x 884, 887 (11th Cir. 2011) ("[Plaintiff's] allegations show, at most, a single instance of vote dilution and not an election process that has reached the point of patent and fundamental unfairness indicative of a due process violation.").

Although Wood generally claims fundamental unfairness, and the declarations and testimony submitted in support of his motion speculate as to wide-spread impropriety, the actual harm alleged by Wood concerns merely a "garden variety" election dispute. Wood does not allege unfairness in counting the ballots; instead, he alleges that select non-party, partisan monitors were not permitted to observe the Audit in an ideal manner. Wood presents no authority, and the Court finds none, providing for a right to unrestrained observation or monitoring of vote counting, recounting, or auditing. Precedent militates against a finding of a due process violation regarding such an "ordinary dispute over the counting and marking of ballots." *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute."). Wood has not satisfied his burden of establishing a substantial likelihood of success on the merits as to his substantive due process claim.

Exhibit N

### ii. Irreparable Harm

Because Wood cannot show a likelihood of success on the merits, an extensive discussion of the remaining factors for the issuance of a temporary restraining order is unnecessary. *Obama for Am.*, 697 F.3d at 436 ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."). *See also Bloedorn*, 631 F.3d at 1229 ("If [plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."). Nonetheless, for the second factor, Plaintiffs must show that "irreparable injury would result if no injunction were issued." *Siegel*, 234 F.3d at 1175–76 ("A showing of irreparable injury is the *sine qua non* of injunctive relief."). This factor also weighs in Defendants' favor. As discussed above, Wood's allegations are the quintessential generalized grievance. He has not presented any evidence demonstrating how he will suffer any particularized harm as a voter or donor by the denial of this motion. The fact that Wood's preferred candidates did not prevail in the General Election—for whom he may have voted or to whom he may have contributed financially—does not create a legally cognizable harm, much less an irreparable one. *Jacobson*, 974 F.3d at 1247.

### iii. Balance of the Equities and Public Interest

The Court finds that the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on Wood. To reiterate, Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. *See Sw. Voter Registration Educ. Project*, 344 F.3d at 919; *Arkansas United*, 2020 WL 6472651, at *5. Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise of over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks.

## IV. CONCLUSION

Wood's motion for temporary restraining order [ECF 6] is **DENIED**.

**SO ORDERED** this the 20th day of November 2020.

Steven D. Grimberg
United States District Court Judge

Exhibit N

# EXHIBIT V

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>  Plaintiffs,<br><br> v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>  Defendants<br>  and<br><br>CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY,<br><br>  Intervenor-Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO STATE BAR DISCIPLINARY BODIES

Intervenor-Defendant City of Detroit (the "City"), by and through counsel,

respectfully moves for sanctions against Plaintiffs and their counsel pursuant to

Exhibit N

Federal Rule of Civil Procedure 11. The City further moves for disciplinary action and referrals to be initiated against counsel.

The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter denied concurrence. Such concurrence was sought on December 15, 2020 and January 5, 2021.

The City also served Plaintiffs with a Motion for Sanctions under Fed. R. Civ. P. 11 on December 15, 2020. Plaintiffs did not withdraw or correct any of the false factual allegations and frivolous legal theories in their pleadings during the 21 day "safe harbor" period.[1] Thus, this Motion is timely.

---

[1] No lawyer for the Plaintiffs responded to the email message forwarding the Rule 11 motion. Instead, at least two of their attorneys made public statements, with military analogies and references to opposing counsel as "the enemy." According to the news website Law and Crime, Plaintiffs' counsel, Sidney Powell, when asked about the proposed Rule 11 motion, "replied cryptically: 'We are clearly over the target.'" Ex. 1. Similarly, Plaintiffs' counsel, L. Lin Wood, posted the following on his Twitter account on December 17, 2020:

> When you get falsely accused by the likes of David Fink & Marc Elias of Perkins Coie (The Hillary Clinton Firm) in a propaganda rag like Law & Crime, you smile because you know you are over the target & the enemy is running scared!

L. Lin Wood (@llinwood), Twitter (Dec. 17, 2020). Perhaps the lack of civility is related to counsels' failure to apply for admission to the Eastern District of Michigan's bar. at least they would have been compelled to review and affirm their commitment to our court's Civility Principles.

Exhibit N

This Motion is supported by the accompanying Brief.

**Sanctions Pursuant to Fed. R. Civ. P. 11(b)(1)**

1.      Sanctions should be imposed under Fed. R. Civ. P. 11(b)(1) when a pleading or other filing is presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

2.      Sanctions pursuant to the sub-rule should be imposed against Plaintiffs and their counsel because they initiated the instant suit for improper purposes, including harassing the City and frivolously undermining "People's faith in the democratic process and their trust in our government." Opinion and Order Denying Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief," ECF No. 62, PageID.3329-30.

3.      Plaintiffs and their counsel understood that the mere filing of a suit (no matter how frivolous) could, without any evidence, raise doubts in the minds of millions of Americans about the legitimacy of the 2020 presidential election. As this Court noted, "Plaintiffs ask th[e] Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters." *Id.* PageID.3330.

4.      The Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in

Exhibit N

Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were devoid of merit and thus could only have been filed for improper purposes.

## Sanctions Pursuant to Fed. R. Civ. P. 11(b)(2)

5. Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriately entered where the claims, defenses, and other legal contentions are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

6. Sanctions pursuant to Rule 11(b)(2) should be imposed against counsel for Plaintiffs because the causes of action asserted in the Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were frivolous and legally deficient under existing law and because Plaintiffs failed to present any non-frivolous arguments to extend, modify, or reverse existing law.

7. The majority of Plaintiffs' claims were moot. As this Court noted, "[t]he time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court. For these reasons, this matter is moot." ECF No. 62, PageID.3307.

8. Plaintiffs' claims were also barred by laches because "they waited too long to knock on the Court's door." *Id.* at PageID.3310. Indeed, "Plaintiffs showed

Exhibit N

no diligence in asserting the claims at bar." *Id.* at PageID.3311. This delay prejudiced the City. *Id.* at PageID.3313.

9.  Plaintiffs lacked standing to pursue their claims. *Id.* at PageID.3317-3324.

10.  Plaintiffs' claim for violation of the Elections and Electors Clauses is frivolous. As this Court held, "Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review. Plaintiffs cite to no case – and this Court found none – supporting such an expansive approach." *Id.* at PageID.3325.

11.  Plaintiffs' due process and equal protection clause claims are also baseless. With regard to the due process claim, this Court held that "Plaintiffs do not pair [the due process claim] with anything the Court could construe as a developed argument. The Court finds it unnecessary, therefore, to further discuss the due process claim." *Id.* at PageID.3317. As to the equal protection claim, this Court stated that "[w]ith nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.* at PageID.3328.

12.  For each of Plaintiffs' claims, Plaintiffs did not identify valid legal theories and the controlling law contradicted the claims. The claims were not

Exhibit N

warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

13.    Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7) was without any legal basis because, as described above, the underlying claims are baseless, and the requests for relief were frivolous.

14.    Plaintiffs' Emergency Motion to Seal (ECF No. 8) was without any legal basis because Plaintiffs seek to anonymously file supposed evidence of a broad conspiracy to steal the 2020 presidential election without providing any authority whatsoever to attempt to meet their heavy burden to justify the sealed filing of these documents.

### Sanctions Pursuant to Fed. R. Civ. P. 11(b)(3)

15.    Sanctions can be imposed under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.

16.    Sanctions should be entered against Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11(b)(3) because the factual contentions raised in the complaints and motions were false.

17.    The key "factual" allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been

Exhibit N

debunked. The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center have been rejected by every court which has considered them. If any of the claims in this lawsuit had merit, that would have been demonstrated in those cases. The City refers the Court to its Response to Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief for a detailed debunking of Plaintiffs' baseless factual contentions. ECF No. 39, PageID.2808-2933.

### Disciplinary Proceedings

18.　　E. D. Mich. LR 83.22 authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court."

19.　　The Rule also authorizes the Court to refer counsel to the Chief Judge of this District for disbarment or suspension proceedings.

20.　　And, the Rule authorizes the Court to refer counsel to the Michigan Attorney Discipline Board and to the disciplinary authorities of counsels' home jurisdictions for purposes of disciplinary proceedings.

Exhibit N

WHEREFORE, for the foregoing reasons and the reason stated in the accompanying brief, the City of Detroit respectfully requests that this Court enter an Order:

(a) Imposing monetary sanctions against Plaintiffs and their counsel in an amount determined by this Court to be sufficient to deter future misconduct (such amount should be, at the least, the amount that Plaintiffs' counsel have collected in their fundraising campaigns, directly or through entities they own or control, for their challenges to the 2020 election);

(b) Requiring Plaintiffs and their counsel to pay all costs and attorney fees incurred by the City in relation to this matter (as well as costs and fees incurred by all other Defendants);

(c) Requiring Plaintiffs and/or their counsel to post a bond of $100,000 prior to the filing of any appeal of this action (and to maintain their present appeal);

(d) Requiring Plaintiffs and their counsel to post a bond of $100,000 prior to filing, in any court, an action against the City, or any other governmental entity or their employees, relating to or arising from the facts alleged in this matter;

(e) Requiring Plaintiffs to post a substantial bond, in an amount determined by the Court, prior to filing an action in the Eastern District of Michigan;

(f) Requiring Plaintiffs and their counsel to obtain certification from a magistrate judge that the proposed claims are not frivolous or asserted for an

Exhibit N

improper purpose, before filing an action in the Eastern District of Michigan (and, if the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, requiring the plaintiff[s] to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]);

(g) Requiring Plaintiffs and their counsel to certify, via affidavit, under penalty of perjury, that they have paid all amounts required to fully satisfy any non-appealable orders for sanctions entered by any court, prior to filing an action in the Eastern District of Michigan;

(h) Barring Plaintiffs' counsel from practicing law in the Eastern District of Michigan (after the issuance of a show cause order);

(i) Referring Plaintiffs' counsel to the Chief Judge of this District for initiation of disbarment proceedings;

(j) Referring all Plaintiffs' counsel to the Michigan Attorney Grievance Commission (and also to the disciplinary authorities of their home jurisdictions, including: Sidney Powell to the Michigan Bar and to the Texas bar; L. Lin Wood to the Michigan Bar and to the Georgia bar; Greg Rohl to the Michigan bar; Emily Newman to the Michigan Bar and to the Virginia bar; Julia Haller to the Michigan Bar and to the Washington D.C. bar; Brandon Johnson to the Michigan Bar and to

Exhibit N

the Washington D.C. bar; Scott Hagerstrom to the Michigan bar; Howard

Kleinhendler to the Michigan Bar and to the New York bar); and,

(k) Granting any other relief that the Court deems just or equitable.

January 5, 2021                    Respectfully submitted,

**FINK BRESSACK**

By:    /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
nosej@detroitmi.gov

x

Exhibit N

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>        Plaintiffs,<br><br> v.<br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>        Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## BRIEF IN SUPPORT OF
## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR <u>REFERRAL TO STATE BAR DISCIPLINARY BODIES</u>

Exhibit N

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES...........................................................................II

STATEMENT OF THE ISSUES PRESENTED....................................... IV

CONTROLLING OR MOST APPROPRIATE AUTHORITIES...........................V

INTRODUCTION .........................................................................................1

ARGUMENT ................................................................................................4

I.  Rule 11 Standards................................................................................4

II.  The Complaint was Filed for an Improper Purpose .........................5

III. The Factual Assertions in the Complaint Were Frivolous and Based on Assertions Which Had Been Rejected by Michigan Courts................................13

    A.    Allegations Regarding Republican Challengers .....................13

    B.    Allegations of "Pre-Dating"...................................................14

    C.    Allegations Regarding Ballots Supposedly Counted More than Once...15

    D.    Allegations Regarding Tabulating Machines..........................16

    E.    The Declarations and Analyses "Supporting" the Complaint Were Full of Intentional Lies ..................................................................18

IV. Plaintiffs' Legal Theories Were Frivolous....................................27

V.  The Sanctions Which Should be Imposed Pursuant to Rule 11 ....................31

VI. Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief Judge for Disbarment.......................................................................35

CONCLUSION ...........................................................................................38

Exhibit N

# INDEX OF AUTHORITIES

**Cases**

*Bognet v. Secy Commonwealth of Pennsylvania*,
    980 F.3d 336 (3rd Cir. Nov. 13, 2020).................................................................28

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261
    (D. Ariz. Dec. 9, 2020) ......................................................................... 2, 3, 18, 19

*Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020) ......13

*Costantino v. Detroit*, Opinion and Order,
    Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)...........13

*DeGeorge v. Warheit*, 276 Mich. App. 587, 741 N.W.2d 384 (2007) ...................37

*Ex parte Young*, 209 U.S. 123 (1908).....................................................................29

*Feathers v Chevron U.S.A., Inc.*, 141 F.3d 26 (6th Cir. 1998)...............................33

*Feehan v. Wisconsin Elections Comm'n*,
    No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)..........................2

*Georgia Republican Party v. Secy of State of Georgia*,
    No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) ..............................28

*Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996)............................................36

*INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*,
    815 F.2d 391 (6th Cir. 1987) .......................................................................... 5, 31

*Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020)...24

*King v. Whitmer*,
    No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020).......................1

*Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)................................... 5, 31

*Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992).....................31

*Ortman v. Thomas*, 99 F.3d 807 (6th Cir. 1996) ...................................................33

*Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020)................................2

Exhibit N

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) .........................29

*Roberson v. Norfolk Southern Railway Co.*,
   2020 WL 4726937 (E.D. Mich. Aug. 14, 2020) ..................................32

*SLS v. Detroit Public Schools*,
   No. 08-14615, 2012 WL 3489653 (E.D. Mich. Aug. 15, 2012) ........................32

*Stephenson v. Central Michigan University*,
   No. 12-10261, 2013 WL 306514 (E.D. Mich. Jan. 25, 2013) ...........................32

*Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11, 2020) ..9

*Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) ........................36

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) .........6

**Statutes and Rules**

E. D. Mich. LR 83.20 ...............................................................35

E. D. Mich. LR 83.22 ...............................................................36

Fed. R. Civ. P. 11(b)(1) ....................................................... Passim

Fed. R. Civ. P. 11(b)(2) ....................................................... Passim

Fed. R. Civ. P. 11(b)(3) ....................................................... Passim

Fed. R. Civ. P. 11(c)(5) ...........................................................4

Exhibit N

## STATEMENT OF THE ISSUES PRESENTED

I.      Should the Court sanction Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11?

    The City answers: "Yes."


II.      Should the Court discipline Plaintiffs' counsel, refer them to the Chief Judge of this District for disbarment proceedings and refer them to the Michigan Attorney Grievance Commission and their home state bars for disciplinary proceedings?

    The City answers: "Yes."

Exhibit N

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 11(b)(1)

Fed. R. Civ. P. 11(b)(2)

Fed. R. Civ. P. 11(b)(3)

E. D. Mich. LR 83.22

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020)

*Constantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)

*Ex parte Young*, 209 U.S. 123 (1908)

*King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)

v

Exhibit N

## **INTRODUCTION**

This Court has already concluded that Plaintiffs present "nothing but speculation and conjecture" and that "this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government." *King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198, at *13 (E.D. Mich. Dec. 7, 2020). Now, it is time for Plaintiffs and their counsel to answer for that misconduct.

It is indelibly clear that this lawsuit was filed for an improper purpose, and the failure to dismiss or amend the Complaint after service of a Rule 11 motion warrants the strongest possible sanctions. There are so many objectively false allegations in the Complaint that it is not possible to address all of them in a single brief. This brief will address some of the more extreme examples.

For instance, Plaintiffs claim that their self-proclaimed experts include a military intelligence analyst, but when they accidentally disclosed his name, the "expert" was revealed to have washed out of the training course for military intelligence. Plaintiffs' counsel did not redact the information to "protect" the "informant," they did so to hide their fraud on the court.[2]

---

[2] In addition to this case, Plaintiffs' attorneys filed three other remarkably similar, and similarly frivolous, "release the kraken" lawsuits. The requested relief

1

Exhibit N

Plaintiffs' "expert" reports are rife with misstatements of Michigan law and election procedures. Those reports lack the simplest foundation of technical expertise, fail to use even elementary statistical methods and reach conclusions that lack any persuasive value. But, those unscientific conclusions, based upon false premises and faulty techniques are presented here as though they embody the uncontroverted truth.

Plaintiffs have no apparent interest in the accuracy of their allegations and there is no innocent explanation for the numerous misrepresentations. They claim that turnout in some jurisdictions in the State exceeded 100%, even up to 781.91%, with turnout for Detroit at 139.29%. *See* Ramsland Aff., ECF No. 6-24, PageID.1574. But they had to know that claim was false; the actual results were readily available at the time Plaintiffs and their "experts" made the claim, and show turnout well below 100%, including in Detroit at 50.88%. Ex. 2.[3]

---

was quickly denied or the case was dismissed for each. *See Feehan v. Wisconsin Elections Comm'n*, No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020); and *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020) (Ex. 3).

[3] Plaintiffs made the same claim about Michigan in the lawsuit they filed in Georgia, but apparently because the "expert" confused the postal code abbreviation for Minnesota with that of Michigan, used Minnesota jurisdictions to make the argument that turnout exceeded 100%. Ex. 4. The fact that Plaintiffs' counsel discovered the error regarding postal abbreviations (after it was widely mocked in the media), but then proceeded to make the same false claim here, substituting Michigan jurisdictions, shows that the point was to make the claim, not to present the truth. As stated by the district court in the Arizona "kraken" lawsuit when

2

Exhibit N

Meanwhile, President Trump continues to use these lawsuits in his desperate campaign to thwart the will of the voters. On January 2, 2021, during a call with Georgia's Secretary of State, Brad Raffensperger, in which the President is heard attempting to extort Secretary Raffensperger into committing election fraud, Trump trotted out the same hoary canards as the Plaintiffs falsely argue to this Court:

> I mean there's turmoil in Georgia and other places. You're not the only one, I mean, we have other states that I believe will be flipping to us very shortly. And this is something that — you know, as an example, I think it in Detroit, I think there's a section, a good section of your state actually, which we're not sure so we're not going to report it yet. But in Detroit, we had, I think it was, 139 percent of the people voted. That's not too good.

*See* Ex. 5, pp. 3-4 (Transcript of January 2, 2021 Telephone Call, as transcribed for the Washington Post).[4]

The City gave Plaintiffs and their counsel the opportunity to retract their lies and baseless legal claims, and they have refused. The extent of the factual and legal errors in this Complaint would warrant sanctions under any circumstances, but here the Court's processes are being perverted to undermine our democracy and to upset

---

dismissing the claims, and as equally applicable here, "[t]he various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *13 (D. Ariz. Dec. 9, 2020).

[4] President Trump also continues to use this lawsuit (and the suits filed in other swing states which voted for President-Elect Biden) to fundraise. As of early December 2020, Trump had reportedly raised $207.5 million in post-election fundraising. Ex. 6.

Exhibit N

the peaceful transition of power. The Plaintiffs and all of their attorneys deserve the harshest sanctions this Court is empowered to order.

## ARGUMENT

### I. Rule 11 Standards

Sanctions under Fed. R. Civ. P. 11(b)(1) are appropriate when a pleading or other filing is presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriate where the claims, defenses, and other legal contentions of the offending party are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law. Fed. R. Civ. P. 11(b)(2). Sanctions are appropriate under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.[5]

To determine whether a party's pleading is frivolous or was filed for an improper purpose, courts use an objective standard of reasonableness under the circumstances and then weigh the evidence to determine if the pleadings, motions or

---

[5] Monetary sanctions cannot be imposed against a represented party for violation of Fed. R. Civ. P. 11(b)(2). *See* Fed. R. Civ. P. 11(c)(5). Thus, the City requests non-monetary sanctions, as identified below, against Plaintiffs for violation of 11(b)(2) and monetary and non-monetary sanctions against counsel.

Exhibit N

papers are well-grounded in facts or warranted by existing law. *Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990).[6]

## II. The Complaint was Filed for an Improper Purpose

It is clear that this lawsuit was not filed for any purpose consistent with the Federal Rules of Civil Procedure. This Court has already addressed many of the reasons that the Plaintiffs "are far from likely to succeed in this matter." *King*, 2020 WL 7134198, at *13. The claims are barred by Eleventh Amendment Immunity; the claims are barred by mootness and laches; Plaintiffs lack standing; and, even if Plaintiffs could show a violation of state law, they have not offered a colorable claim under federal statutory or constitutional law. To make matters worse, Plaintiffs were always aware that their Complaint was deficient; no other inference can be drawn from their failure to serve the Defendants before this Court issued its December 1, 2020, text-only order.[7]

---

[6] Moreover, for the purposes of Rule 11 sanctions, a showing of "good faith," is not sufficient to avoid sanctions. *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391 (6th Cir. 1987).

[7] A similar circumstance was noted on January 4, 2021, in a ruling by the United States District Court for the District of Columbia, addressing another groundless Trump election lawsuit:

[Plaintiffs'] failure to make any effort to serve or formally notify any Defendant — even after a reminder by the Court in its Minute Order — renders it difficult to believe that the suit is meant seriously. Courts are not instruments through which parties engage in such gamesmanship or symbolic political gestures. As a result, at the conclusion of this litigation, the Court will determine whether to issue an order to show

Exhibit N

This lawsuit is the quintessential example of a case filed for an improper purpose. As this Court concluded, in denying preliminary relief:

> this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.

*King*, at *13. Plaintiffs' counsel have not hidden their contempt for our courts and for our democracy. Plaintiffs' counsel Sidney Powell claims that courts have rejected the election lawsuits, "because the corruption goes deep and wide."[8] She re-tweets calls to impose martial law, to "suspend the December Electoral College vote," and to "set up Military Tribunals immediately." @sidneypowell1, Twitter (Nov. 30, 2020). Her co-counsel, L. Lin Wood, unabashedly expresses his contempt for our democratic processes and openly promotes a military coup:

> Georgia, Michigan, Arizona, Nevada, Wisconsin, Minnesota & Pennsylvania are states in which martial law should be imposed & machines/ballots seized. 7 states under martial law. 43 states not under martial law. I like those numbers. Do it @realDonaldTrump! Nation supports you. (@llinwood, Twitter (Dec. 20, 2020)).

> Patriots are praying tonight that @realDonaldTrump will impose martial law in disputed states, seize voting machines for forensic

---

cause why this matter should not be referred to its Committee on Grievances for potential discipline of Plaintiffs' counsel.

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) (Ex. 7).
    [8] Quote from video interview of Sidney Powell, promoted on her twitter account at https://twitter.com/AKA_RealDirty/status/1338401580299681793.

Exhibit N

examination, & appoint @SidneyPowell as special counsel to investigate election fraud. (Dec. 19, 2020).

When arrests for treason begin, put Chief Justice John Roberts, VP Mike Pence @VP @Mike_Pence, & Mitch McConnell @senatemajldr at top of list. (Jan. 1, 2021).

If Pence is arrested, @SecPompeo will save the election. Pence will be in jail awaiting trial for treason. He will face execution by firing squad. He is a coward & will sing like a bird & confess ALL. (Jan. 1, 2021).[9]

These are the lawyers who are trying to use this Court's processes to validate their conspiracy theories and to support their goal of overturning the will of the people in a free and fair election. They were given an opportunity to dismiss or amend their Complaint, but they chose to continue to use this case to spread their false messages.

Those false messages are not the result of occasional errors or careless editing. Those false messages are deliberately advanced by these attorneys to support their goals of undermining our democracy. Like Sidney Powell, L. Lin Wood, is a QAnon disciple.[10] He recently stated:

This country's going to be shocked when they find the truth about who's been occupying the Oval Office for some periods of years. They're going to be shocked at the level of pedophilia. They are going

_____

[9] While Mr. Wood's wrath was initially focused on Democrats, he has shifted to attacking Republican officials (and judges and justices who he views as Republican) for their perceived disloyalty to Trump and refusal to abuse the Constitution.

[10] A judge in Delaware is currently considering revoking Mr. Wood's right to practice in Delaware, where he is currently representing former Trump adviser Carter Page, based on his conduct in suits challenging the results of the general election as a plaintiff in Georgia and as counsel in Wisconsin. Ex. 8.

Exhibit N

to be shocked at what I believe is going to be a revelation in terms of people who are engaged in Satanic worship."[11]

A review of Mr. Wood's Twitter account reveals a dark strain of paranoia—the same strain which infects this lawsuit.

Mr. Wood repeatedly makes false allegations about the 2020 election, the most secure in our country's history.[12] The following is a sampling of his tweets:

> There should be NO Electoral College vote in any state today. Fraud is rampant in all state elections. If U.S. Supreme Court does not have courage to act, I believe our President @realDonaldTrump has the courage. (Dec. 14, 2020).

> We The People must now launch massive campaign to prevent our state electors from EVER casting vote in Electoral College for Joe Biden & Kamala Harris. Unless you want them to vote for Communism. In that event, get out of our country & go enjoy your life in Communist China. (Dec. 20, 2020).

> Joe Biden & Kamala Harris are Communists by either ideology, corruptness or extortion. Still want your state electors to vote for Biden on 1/6? Want Communism & tyranny or a free America where you can enjoy life, liberty & pursuit of happiness? (Dec. 20, 2020).

---

[11]  https://welovetrump.com/2020/11/23/lin-wood-americans-will-be-shocked-at-level-of-pedophilia-satanic-worship-occupying-oval-office-for-years-before-trump/.

[12]  The November 2020 general election was declared by the federal government to be the most secure in the nation's history. *See* Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees ("CISA"), issued Nov 12, 2020 ("The November 3rd election was the most secure in American history.") (Ex. 9). The CISA statement further concluded "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." *Id.* Five days after this statement was released, Chris Krebs, director of CISA, was terminated by presidential tweet.

Exhibit N

When courts refuse to accept his invitation to disregard the fundamental tenets of

our democracy, he blames corruption and communism in the judiciary:

> Attempted theft of Presidential election will NOT stand. Not on our
> watch, Patriots. Communists & Communist sympathizers have
> infiltrated our judicial system, including lawyers & judges in Georgia.
> (Dec. 23, 2020).

> Communism has infiltrated ALL levels of our government, including
> our judiciary. Communism infiltrates by ideology, by
> corruption/money & by extortion. (Dec. 20, 2020).

> Too many of us have been asleep at switch in the past. … We believed
> too many of our judges. Many are corrupt & traitors. (Dec. 19, 2020).

> Some state & federal lower court rulings to date are troubling. Courage
> lacking in some members of judiciary. (Dec. 10, 2020).

> We CANNOT trust courts to save our freedom. They are IGNORING
> massive evidence of fraud & unlawful election procedures. (Dec. 13,
> 2020).

> We have had reports of judges & their families being threatened. This
> would certainly explain some of the bizarre rulings by lower courts that
> have refused to even mention the overwhelming evidence of fraud in
> cases filed by @SidneyPowell. (Dec. 14, 2020).

When, the Supreme Court denied *certiorari* in Texas's lawsuit against the "swing

states" which voted for Joe Biden,[13] and when the Supreme Court took no action on

the nonsensical direct appeal in this case, Mr. Wood displayed his utter contempt for

that institution:

> It is time for Chief Justice John Roberts to resign, admit his corruption
> & ask for forgiveness. Roberts has betrayed his sacred oath office. He

---

[13] *Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11,
2020).

9

has betrayed his country. He has betrayed We The People. (Dec. 19, 2020).

I think many are today learning why SCOTUS is rejecting petitions seeking FAIR review. Roberts & Breyer are "anti-Trumpers" They should resign immediately. CJ Roberts has other reasons to resign. He is a disgrace to office & to country. (Dec. 17, 2020).

Corruption & deceit have reached most powerful office in our country - the Chief Justice of U.S. Supreme Court. This is a sad day for our country but a day on which we must wake up & face the truth. Roberts is reason that SCOTUS has not acted on election cases. (Dec. 17, 2020).

Justice John Roberts is corrupt & should resign immediately. Justice Stephen Breyer should also resign immediately. (Dec. 17, 2020).

I am disappointed. I thought Justices Roberts & Breyer would avoid public scandal & simply resign. Only a fool wants their dirty laundry aired in public. Maybe I should consider filing a formal motion for recusal & hang their laundry on the clothesline to be exposed to sunlight? (Jan. 2, 2021).

This is the same L. Lin Wood who appears on the pleadings of this case, but who has apparently chosen not to be sworn into the bar for the Eastern District of Michigan and to affirm our Civility Principles.

Sidney Powell—who President Trump has reportedly considered appointing as "special counsel," who apparently has the ear of the President and who has advocated for martial law—is less prolific on Twitter but shares Mr. Wood's perspective. She has tweeted that "[t]his 'election' was stolen from the voters in a massive fraud." @sidneypowell1, Twitter (Jan. 2, 2021). And, like Mr. Wood, she channels 19502 McCarthy paranoia, seeing communists around every electoral

10

Exhibit N

corner, stating "[i]t is impossible not to see the fraud here unless one is a communist or part of it or part of the coup." @sidneypowell1, Twitter (Jan. 2, 2021).[14]

As poorly presented as their pleadings were, as careless as they were in vetting their allegations and expert reports, and as detached as their claims are from the law and reality, the Plaintiffs and their counsel were provided 21 days to take corrective action. So, 21 days before filing this motion, the City gave Plaintiffs an opportunity to withdraw or amend their contemptuous pleadings. Rather than withdraw or amend their Complaint, they chose to stand firm with their objectively false claims, ridiculously incompetent expert reports and patently unsupportable arguments.

Why was this Complaint not dismissed or amended? Surely, in light of this Court's December 7, 2020, Opinion and Order, Plaintiffs cannot be expecting to obtain judicial relief. Then, what purpose can this lawsuit serve? The answer to that question goes to the heart of Rule 11. Much can be inferred from Plaintiffs' actions. Initially, this was one of several lawsuits used to support calls for state legislatures to reject the will of the voters, to ignore the statutory process for selecting presidential electors, and to instead elect a slate of Trump electors (six of whom are Plaintiffs in this case). When the Michigan Legislature did not attempt to select a

---

[14] Perhaps her motivation is less paranoid and more venal. The front page of her website, "defendingtherepublic.org," has a prominently placed "contribute here" form, soliciting donations for her "Legal Defense Fund for Defending the American Republic."

Exhibit N

slate of electors inconsistent with the will of the voters, despite the personal demands of the President of the United States, who summoned their leaders to the White House, this lawsuit took on a different meaning. It was then used to support arguments for the United States Congress to reject the Michigan electors on January 6, 2021. On Saturday, January 2, 2021, false claims made by "experts" in this case were cited by Donald Trump in his apparent attempt to extort Georgia Secretary of State Brad Raffensperger. And, most ominously, these claims are referenced and repeated by L. Lin Wood and others in support of martial law.

Irrespective of these attempts to overturn our democratic processes, the continued pendency of this lawsuit accomplishes exactly the harm addressed by this Court in its December 7, 2021, Opinion and Order. By undermining "People's faith in the democratic process and their trust in our government," this lawsuit is being used to delegitimize the presidency of Joe Biden.

While the First Amendment may protect the right of political fanatics to spew their lies and unhinged conspiracy theories, it does not grant anyone a license to abuse our courts for purposes which are antithetical to our democracy and to our judicial system. Plaintiffs and their counsel cannot be allowed to use the court system to undermine the constitutional and statutory process by which we select our leaders.

Exhibit N

### III.  The Factual Assertions in the Complaint Were Frivolous and Based on Assertions Which Had Been Rejected by Michigan Courts

The Complaint in this matter relies heavily on affidavits submitted in *Costantino v. Detroit*, Wayne County Circuit Court Case No. 20-014780-AW. The Plaintiffs here either incorporate the affidavits into their allegations or attach them as exhibits to their Complaint.

#### A. Allegations Regarding Republican Challengers

The Complaint repeatedly asserts that Republican challengers were not given "meaningful" access to the ballot processing and tabulation at the Absent Voter Counting Board located in Hall E of the TCF Center. First Amended Complaint ("Compl.") at ¶¶ 13, 42, 47, 57, 59-61. This claim was disproven long before Plaintiffs raised it here. As Judge Kenny concluded in *Costantino*, while six feet of separation was necessary for health reasons, "a large monitor was at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed." *Costantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020) (Ex. 10). This had been proven with photographic evidence. *See*, *e.g.*, Ex. 11 (Nov. 11, 2020 Affidavit of Christopher Thomas at last page). And, prior to the filing of this case, the Michigan Supreme Court had already rejected the application for appeal from the trial court's ruling, deeming the same claims unworthy of injunctive relief. *See Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020).

13

Exhibit N

Similarly, the Complaint repeats the false claim that Republican challengers were exclusively barred from entering the TCF Center. Compl. ¶¶ 62-63. Judge Kenny rejected this claim, finding that there was a short period of time, where Republican *and* Democratic challengers were "prohibited from reentering the room because the maximum occupancy of the room had taken place." *Costantino* Opinion, at *8. As stated by the court, "[g]iven the COVID-19 concerns, no additional individuals could be allowed into the counting area ... Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding." *Id.*

## B. Allegations of "Pre-Dating"

Plaintiffs' allegations of "pre-dating" were also based on claims initially submitted and rejected in *Costantino*. Compl. ¶¶ 88 and 90.

The claims come from Jessy Jacob, a furloughed City employee, with no known prior election experience, who was assigned to the Department of Elections on a short-term basis. Ex. 12 (Affidavit of Daniel Baxter, ¶ 7). Her claim regarding pre-dating is demonstrably false because all absentee ballots she handled at the TCF Center had been received by 8:00 p.m. on November 3, 2020. For a small number of ballots, election workers at the TCF Center were directed to enter the date the

14

ballots were received into the computer system, as stamped on the envelope. Ex. 11. Ms. Jacob was simply marking the date the ballot had been received. *Id*. Thus, as explained by the court in Costantino, "[a]s to the allegation of 'pre-dating' ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process." *Costantino* Opinion, *4. As the court noted, "[t]he entries reflected the date the City received the absentee ballot." *Id.*

## C. Allegations Regarding Ballots Supposedly Counted More than Once

Plaintiffs claim challengers observed ballots repeatedly run through tabulation machines, including "a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine." Compl. ¶ 94. This allegation primarily comes from Melissa Carone, a contractor working for Dominion, who claimed that stacks of 50 ballots were fed through tabulators as many as eight times. Exh. 5 to Compl., ¶¶ 4-5.[15] The allegation was obviously false when it was first raised by Carone in *Costantino*. Whatever Carone and other challengers think they saw, ballots cannot be counted in that manner. If they were correct, hundreds of extra votes would show up in numerous precinct (or absent voter counting boards). This would obviously be

---

[15] The Complaint states that "[p]erhaps the most probative evidence comes from Melissa Carone …." Compl. ¶ 84.

15

caught very quickly on site during the tabulation process or soon thereafter during the County and State canvasses. Ex. 13 (Thomas Dec. 10, 2020 Aff. ¶¶ 18-20).

But, by the time the Plaintiffs here latched onto the absurd allegation, it had already been conclusively disproven by the Wayne County canvass. Detroit had 501 precincts and 134 absent voter counting boards. Less than 36% of the total were out of balance. *Id*. ¶ 12. A counting board is out of balance if there are: (1) more ballots than voters or (2) more voters than ballots. In total 591 voters and ballots account for the imbalances. *Id.* When voters and ballots are separated in Detroit there are 148 more names than ballots—out of 174,384 votes there are 148 more names in the poll books than there are ballots. *Id.* The fact that there were more names than ballots shows that ballots were not counted more than once. The total imbalance was .0008 (eight ten-thousandths of a 1%). *Id.* Of the 94 Detroit out of balance counting boards, there were 87 with an imbalance of 11 or fewer voters/ballots; within those 87 counting boards, 48 were imbalanced by 3 or fewer voters/ballots. *Id.* There were seven counting boards with higher imbalances that range from 13 more ballots to 71 fewer voters. *Id.* This minimal level of imbalance conclusively demonstrated that the allegation was false, weeks before Plaintiffs filed this case.

### D. Allegations Regarding Tabulating Machines

Perhaps the most baseless of Plaintiffs' allegations is a conspiracy theory about Dominion vote tabulators. Plaintiffs in the first election cases initially cited

Exhibit N

two instances of errors—one in Antrim County and one in Oakland County (Rochester Hills) to insinuate that the tabulating system used in many counties was flawed. Certainly understanding the weakness of the initial theory, Plaintiffs here wove in a nonsensical tale that a theoretical software weakness upended Michigan's election results. This Court readily recognized that the claims could not hold up.

The Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States," explaining what happened in Antrim County. Ex. 14. The statement explains that the "error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier." *Id*. Essentially, the County installed an update on certain tabulators, but not others. *Id*. The tabulators worked correctly, but when they communicated back to the County, the discrepancy in the software versions led to a discrepancy in the reporting. *Id*. This was quickly discovered and would certainly have been uncovered in the post-election canvass. *Id*. In fact, the integrity of the vote in Antrim County was conclusively proven by the recent audit of the paper ballots.

The Republican clerk of Rochester County, Tina Barton, discredited the allegations of fraud in that City. Officials realized they had mistakenly counted votes

Exhibit N

from Rochester Hills twice, according to the Michigan Department of State. Oakland County used software from a company called Hart InterCivic, not Dominion, though the software was not at fault. Ms. Barton stated in a video she posted online: "As a Republican, I am disturbed that this is intentionally being mischaracterized to undermine the election process …. This was an isolated mistake that was quickly rectified." Ex. 15.[16] Plaintiffs knew all of this before they filed this lawsuit.[17]

### E. The Declarations and Analyses "Supporting" the Complaint Were Full of Intentional Lies

The Complaint also relies heavily on "expert" declarations and affidavits, many heavily redacted. As the district court held in *Bowyer*, "the 'expert reports'

---

[16] An audit of the paper ballots in Antrim County conclusively demonstrated that the claim was false. The official tally was only off by 11 net votes. Ex. 16.

[17] The Plaintiffs here added in a string of falsehoods about Dominion software. The district court in Bowyer addressed those claims head on: "The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. […] These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020). Just like here, "what is present is a lengthy collection of phrases beginning with the words 'could have, possibly, might,' and 'may have.'" *Id.* Ramsland, similar to his claims here, "asserts there was 'an improbable, and *possibly impossible* spike in processed votes' in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020 … [however, the defendant] points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed." *Id.* "Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards." *Id.*

reach implausible conclusions, often because they are derived from wholly unreliable sources." *See Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020).

From the outset, the "Michigan 2020 Voting Analysis Report" appended to the Amended Complaint departs from any rational statistical analysis. PageID.1771-1801. Stanley Young identifies nine counties as "outliers," because those counties reported larger increases in Democratic votes for President. PageID.1776. His analysis, however, is based entirely on raw vote totals with no consideration of percentage changes. Not surprisingly, eight of the nine counties he identifies are among the nine counties with the largest voting age population. Much of the remaining analysis by Young and the other experts focuses on these counties, which are allegedly "outliers."

This sloppy analysis is followed by "another anomaly that indicates suspicious results." His "anomaly" is nothing more than the fact that President Trump did not do as well with "mail-in votes" as he did with election day votes. PageID.1777. Of course, that was widely expected and understood, for an election in which President Trump discouraged absentee voting and Democrats promoted it.

Revealing an almost incomprehensible ignorance of Michigan election law for supposed "experts," Dr. Quinnell, together with Dr. Young, offer the finding that in two Michigan counties (Wayne and Oakland) demonstrate "excessive vote in

Exhibit N

favor of Biden often in excess of new Democrat registrations." PageID.1778. Apparently, none of the experts, none of the Plaintiffs and none of the Plaintiffs' attorneys are aware that Michigan does not have party registration.

### 1. Spyder/Spider

Plaintiffs' "experts" rely on the partially redacted declaration of "Spider" or "Spyder," who Plaintiffs identify as "a former US Military Intelligence expert" and a "former electronic intelligence analyst with 305th Military Intelligence" Compl. ¶¶ 17, 161. But this was a lie *by Plaintiffs' counsel*. Plaintiffs did not properly redact the declarant's name when they filed the same affidavit in a different court, and it was publicly disclosed that the declarant's name was Joshua Merritt. While in the Army, Merritt enrolled in a training program at the 305th Military Intelligence Battalion, the unit he cites in his declaration, but he never completed the entry-level training course. A spokeswoman for the U.S. Army Intelligence Center of Excellence, which includes the battalion, stated "[h]e kept washing out of courses … [h]e's not an intelligence analyst." Ex. 17. According to the Washington Post, "Merritt blamed 'clerks' for Powell's legal team, who he said wrote the sentence [and] said he had not read it carefully before he signed his name swearing it was true. *Id.* He stated that "My original paperwork that I sent in didn't say that." *Id.* He later stated that "he had decided to remove himself from the legal effort altogether" (which has not happened). *Id.*

Exhibit N

It is a near certainty that if Plaintiffs are compelled to publicly file unredacted declarations and affidavits, as they should be, numerous other redacted names and assertions will reveal that the redactions were made to keep the public from discovering more fraud perpetrated on this Court.

### 2. Russell James Ramsland, Jr.

Plaintiffs' "expert" Russell James Ramsland Jr. extrapolates large vote discrepancies from the Antrim County error in reporting early *unofficial* results. In doing so, he intentionally ignores the Secretary of State's report or simply does not do his homework. Ramsland reports "In Michigan we have seen reports of 6,000 votes in Antrim County that were switched from Donald Trump to Joe Biden *and were only discoverable through a hand counted manual recount*." Ramsland Affidavit ¶10; emphasis added. But, there were no hand recounts in Michigan as of that date.[18] The Secretary of State report is not even discussed. Incredibly, Ramsland has since doubled down on his perjury, after gaining access to a voting machine in Antrim County. He now claims, in support for the request for Certiorari to the Supreme Court in this action, that "[w]e observed an error rate of 68.05%" which

---

[18] Plaintiffs, who include six nominees to be Trump electors, including the Republican County Chair for Antrim County, the Republican County Chair of Oceana County and the Chair of the Wayne County Eleventh Congressional District, as well as their attorneys, should also know that when the expert report was prepared there had been no hand recount in Antrim County. An actual hand recount did occur at a later time, and that recount confirmed the accuracy of the official results, within 11 votes.

Exhibit N

"demonstrated a significant and fatal error in security and election integrity." Although the basis for the percentage is unclear, the Antrim County clerk stated that "the 68% error rate reported by Ramsland may be related to [the] original error updating the ballot information." Ex. 18. The clerk of the Republican-heavy County said: "[t]he equipment is great — it's good equipment … [i]t's just that we didn't know what we needed to do (to properly update ballot information) … [w]e needed to be trained on the equipment that we have." *Id.* The claim was also proven to be false by the hand recount audit of the paper ballots in Antrim County, which added 11 net votes to the tally, not the 15,000 predicted by Ramsland. Ex. 16.

Ramsland makes the claim that turnout throughout the state was statistically improbable; but as discussed above, he bases this on fabricated statistics. He claims turnout of 781.91% in North Muskegon, where the publicly-available official results were known, as of election night, to be approximately 78%. Ex. 2. He claims turnout of 460.51% (or, elsewhere on the same chart, 90.59%) in Zeeland Charter Township, where it was already known to be 80%. *Id.* The *only* result out of 19 (not including the duplicates) that Ramsland got right was for Grand Island Township, with a turnout of 96.77%, comprised of 30 out of the township's 31 registered voters. *Id.*[19]

---

[19] Ramsland also claims it was "suspicious" that Biden's share of the vote increased as absentee ballots were tabulated. But, that suspicion require Ramsland to close his eyes to the incontrovertible fact that for the 2020 general election, absentee ballots favored Biden throughout the country, even in the deep red state of

Exhibit N

President Trump repeated this blatantly false claim in his tape-recorded January 2, 2021 telephone conversation with Brad Raffensperger. Ex. 5.

Similarly, Ramsland relies upon the affidavit of Mellissa Carone in support of his claim that "ballots can be run through again effectively duplicating them." Ramsland Affidavit; Compl. Exh. 24 at ¶13. It is understandable that inexperienced challengers and Ms. Carone (who was a service contractor with no election experience) with conspiratorial mindsets might not understand that there are safeguards in place to prevent double counting of ballots in this way, but that does not excuse Plaintiffs' "experts," who choose to rely on these false claims, even after the official canvass had conclusively disproven the allegations.[20]

### 3. William Briggs/Matt Braynard

Plaintiffs rely on an "analysis" by William M. Briggs of "survey" results apparently posted in a tweet by Matt Braynard. Braynard's survey was submitted in

---

Tennessee. https://tennesseestar.com/2020/11/05/republicans-dominate-the-2020-tennessee-election-cycle/.

[20] Emblematic of Plaintiffs' contempt for facts is another "expert" report that was filed with the original Complaint in this case, but not submitted with the Amended Complaint. Paragraph 18 of the original Complaint introduced "Expert Navid Kashaverez-Nia" and alleged that "[h]e concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden." Notably, the "expert" relied on a finding that in "Edison County, MI, Vice President Biden received more than 100% of the votes.…" There is no Edison County in Michigan (or anywhere in the United States). The fabrication was only removed after it was discovered and reported by the news media.

Exhibit N

a different case (*Johnson v. Secy of State*, Michigan Supreme Court Original Case No. 162286),[21] so its underlying falsehoods have been exposed. Braynard misrepresents Michigan election laws, and completely disregards standard analytical procedures to reach his contrived conclusions. He refers to voters who have "indefinitely confined status," something which has never existed in our state. He refers to individuals "who the State's database identifies as applying for *and the State sending an absentee ballot*," when, in Michigan, absentee ballots are never sent by the State. He refers repeatedly to "early voters," when Michigan has absentee voters, but, unlike some other states, has never allowed "early voting." He apparently believes (incorrectly) that every time a voter's residence changes before election day that voter is disenfranchised. Mr. Thomas addresses these factual and legal errors in the attached Affidavit. Ex. 13.

The disturbing inadequacy of Braynard's survey is also explained in the affidavit of Dr. Charles Stewart III, the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology. Dr. Stewart's credentials are impeccable and directly applicable to the subject matter. Ex. 20

---

[21] The "survey" as submitted in *Johnson* is attached here as Ex. 19. The request for relief was denied by the Supreme Court *Johnson*. *See Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020).

Exhibit N

(Affidavit of Charles Stewart II) (originally submitted in *Johnson*).[22] At the request of the City of Detroit, Dr. Stewart reviewed the Braynard survey and came to the unqualified opinion that "Mr. Braynard's conclusions are without merit." (*Id.* ¶10). He explains the basis for his opinion in clear and understandable detail.

Briggs' analysis of Braynard's report estimate that "29,611 to 36,529 ballots out of the total 139,190 unreturned ballots (21.27% - 26.24%) were recorded for voters who had not requested them." Braynard says 834 people agreed to answer the question of whether they requested an absentee ballot. But he does not report how many respondents did not answer. More to the point, he does not explain how he confirms that these respondents understood what it meant for them to "request" an absentee ballot. Some might have gone to their local clerk's office to vote, where they signed a form, received a ballot and voted, without realizing that that form is an absentee ballot "request." Braynard concludes that certain people who failed to return a ballot never requested that ballot. But he does not address the possibility that the very people (139,190 out of more than 3.5 million) who would neglect to return a ballot would likely be those who might forget that they had requested one.

Braynard offers a baffling array of inconsistent numbers. On Page 8 of his report, he refers to "96,771 individuals who the State's database identifies as having

---

[22] Dr. Stewart is uniquely suited to address these issues. He is a member of the Caltech/MIT Voting Technology Project and the founding director of the MIT Election Data and Science Lab.

Exhibit N

not returned an absentee ballot," when for his first two opinions that number is 139,190. On page 8, he reports a percentage of 15.37% not having mailed back their ballots, but on page 5 he identifies that percentage as 22.95%. Then, the actual numbers of individuals answering the question in that manner, described on page 8 (241 out of 740), would establish a percentage of 32.56%. If this were not sloppy enough, at the top of page 9, he reports, with no explanation "Based on these results, 47.52% of our sample of these absentee voters in the State did not request an absentee ballot." Even if his percentages were completely off and inconsistent, the data would be meaningless. Braynard ignores Michigan election procedures when he declares that there is evidence of illegal activity because some voters are identified in the State's database as having not returned an absentee ballot when those voters "did in fact mail back an absentee ballot...." But, when millions of citizens voted absentee, some of those mailed ballots were not received by election day. He also does not consider the possibility of a voter either not remembering accurately or not reporting accurately whether a ballot was mailed.[23]

Braynards' analysis of address changes is equally invalid. He misrepresents how change of address notifications work. It is not at all uncommon for one person

---

[23] A slightly modified version of the Briggs/Braynard analysis was rejected by the *Bowyer* court. *Bowyer*, 2020 WL 7238261, at *14 ("The sheer unreliability of the information underlying Mr. Briggs' 'analysis' of Mr. Braynard's 'data' cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.").

Exhibit N

to move and file a change of address that appears to affect more household members, or a person might file a change of address for convenience during a temporary period away from home, without changing their legal residence. Stewart Aff ¶ 21. Every year, tens of thousands of Michigan voters spend long periods of time in other states (e.g., Florida or Arizona) without changing their permanent residence or voting address. Clerks have procedures in place to address these issues. Even voters who do make a permanent move can vote at their prior residence for sixty days if they do not register to vote at their new address.[24]

## IV.  Plaintiffs' Legal Theories Were Frivolous

Rule 11 places the failure to plead colorable legal theories squarely on the attorney making the claim. In addition to pleading false allegations, this lawsuit has always been legally dubious.

---

[24] It is not possible that these experts were simply negligent. They consistently ignore the obvious explanations for their so-called anomalies. For instance, Bouchard intentionally ignores the fact that unofficial results are released on a rolling basis, i.e. in "data dumps" accounting for hours of tabulation, to claim it was somehow anomalous for there to be large increases in the number of votes between data releases. Quinnell ignores the fact that voter turnout and preferences will change between elections based on the identities of the candidates, when he claims it was somehow anomalous for turnout to have increased for the 2020 election and for Biden to have picked up votes in suburban areas (a phenomenon seen throughout the country). He also ignores the well-known fact that urban core precincts in this country are strongholds for the Democratic Party, when he claims there was something anomalous about the fact that such precincts in Detroit strongly favored Biden. Many of these issues are addressed in the responses, and supporting exhibits, to Plaintiffs' Motion for Temporary Restraining Order. ECF Nos. 31, 36 and 39.

Exhibit N

First, even if there had been a semblance of truth to any of Plaintiffs' allegations, the lawsuit would still have been frivolous because the relief requested could, in no way, be supported by the claims. As this Court stated, the relief Plaintiffs seek is to "disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election." *King*, 2020 WL 7134198, at *1. Nothing Plaintiffs allege—or could allege—could lead to the "stunning" and "breathtaking" relief sought. *See*, *e.g.*, *Id.* (Stating Plaintiffs "seek relief that is stunning in its scope and breathtaking in its reach.")

Second, there has never been a colorable basis for Plaintiffs' attorneys to assert that the Plaintiffs had standing. The Complaint does not allege that Plaintiffs were denied the right to vote—an injury which would be particularized to the individual Plaintiffs—it alleges Plaintiffs' votes were diluted. As numerous courts have concluded, a dilution theory does not satisfy the Article III requirements of causation and "injury in fact." *See*, *e.g.*, *Georgia Republican Party v. Secy of State of Georgia*, No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020); *Bognet v. Secy Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. Nov. 13, 2020).

Importantly, as this Court concluded, even if Plaintiffs had met those two elements, the Plaintiffs would still not meet the redressability element, because "an order de-certifying the votes of approximately 2.8 million people would not reverse

Exhibit N

the dilution of Plaintiffs' vote." *King*, 2020 WL 7134198, at *9. Counsel for Plaintiffs knew, or should have known, that their clients did not have Article III standing.

Third, there was never a legitimate basis to believe the lawsuit could proceed in the face Eleventh Amendment immunity. The one possibly applicable exception, *Ex Parte Young*, "does not apply, however, to *state law* claims against state officials, regardless of the relief sought." *King*, at *4 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) and *Ex Parte Young*, 209 U.S. 123 (1908)). As this Court noted, the issue has been long settled by the Supreme Court. *See Pennhurst*, at 106. And, with respect to the § 1983 claim, before this lawsuit was filed "the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist … [therefore] [t]here is no continuing violation to enjoin." *King*, at *5.

Fourth, there was never a basis to believe this case was not moot as of the date it was filed. As this Court stated, "[t]he Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so … Plaintiffs did not avail themselves of the remedies established by the Michigan legislature." *Id.*, at *6. The deadline to pursue any such remedies had passed by the time the Complaint was filed, therefore, "[a]ny avenue for this Court to provide meaningful relief" was foreclosed from the start. *Id.*

Exhibit N

Fifth, there was no reason for Plaintiffs' counsel to believe the case would not be barred by laches. As this Court concluded, the relief sought was barred by laches because "Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes." *Id.*, at *7.

Sixth, there was no reason to believe that alleging violations of the Michigan Election Code could support a claim for violation of the Elections & Electors Clauses. As this Court concluded, "Plaintiffs cite to no case—and this Court found none—supporting such an expansive approach." *Id.*, at *12.

Seventh, there was no basis to believe that the allegations could support an equal protection claim. The equal protection claim "is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden" with "the closest Plaintiffs get" being a statement by one affiant stating "I *believe* some of these workers were changing votes that had been cast for Donald Trump ..." *Id.* (citing to record). Similarly, "[t]he closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible.*" *Id.* (citing to record). It was patently obvious from the day this lawsuit was filed, that "[w]ith nothing but speculation and conjecture that votes for President Trump were

30

Exhibit N

destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.*, at *13 (citation omitted).

## V. The Sanctions Which Should be Imposed Pursuant to Rule 11

This lawsuit, and the lawsuits filed in the other states, are not just damaging to our democratic experiment, they are also deeply corrosive to the judicial process itself. When determining what sanctions are appropriate, the Court should consider the nature of each violation, the circumstances in which it was committed, the circumstances of the individuals to be sanctioned, the circumstances of the parties who were adversely affected by the sanctionable conduct, and those sanctioning measures that would suffice to deter that individual from similar violations in the future. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992). Moreover, when considering the type of sanctions to impose, the Court should be mindful that the primary purpose of Rule 11 is to deter future, similar actions by the sanctioned party. *Mann,* 900 F.2d at 962.

Accordingly, this Court should impose monetary sanctions against Plaintiffs and their counsel in an amount sufficient to deter future misconduct. *See*, *e.g.*, *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir. 1987) (courts have wide discretion in determining amount of monetary sanctions necessary to deter future conduct). Here, an appropriate sanction amount is, at the least, the amount that Plaintiffs' counsel have collected in their fundraising

Exhibit N

campaign, directly or through entities they own or control, for their challenges to the 2020 election. They should not be allowed to profit from their misconduct.

It is also appropriate for Plaintiffs and their counsel to pay all costs and attorney fees incurred by Defendants. *See*, *e.g.*, *id.*; *see also Roberson v. Norfolk Southern Railway Co.*, 2020 WL 4726937, at *7 (E.D. Mich. Aug. 14, 2020) (awarding costs incurred by Defendant as a sanction against Plaintiff and Plaintiff's counsel for filing frivolous claims unsupported by law). In *Stephenson v. Central Michigan University*, No. 12-10261, 2013 WL 306514, at *14 (E.D. Mich. Jan. 25, 2013), attorney fees and costs were awarded as sanctions after the plaintiff's refusal to withdraw her frivolous claims during the 21-day safe harbor period provided by Rule 11. Sanctions were warranted because the plaintiff "brought a frivolous lawsuit which lacked evidentiary support, and continued to pursue her claims once the lack of support was evident …." *Id*. The same applies here. Plaintiffs' claims were frivolous from the start, yet they refused to withdraw them when provided the opportunity. As a result, Defendants should be reimbursed for their attorney fees and costs.

Plaintiffs should also be required to post a bond of $100,000 to maintain their present (frivolous) appeal and for each additional appeal in this action. *See*, *e.g.*, *SLS v. Detroit Public Schools*, No. 08-14615, 2012 WL 3489653, at *1 (E.D. Mich. Aug. 15, 2012) (requiring the plaintiff to file $300,000.00 security bond).

Exhibit N

To protect against their future filing of frivolous lawsuits in this District, Plaintiffs and their counsel should be required to obtain pre-clearance by a magistrate judge of any proposed lawsuit. If the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, the plaintiff[s] would be required to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]. *See, e.g.*, *Feathers v Chevron U.S.A., Inc.*, 141 F.3d 26, 269 (6th Cir. 1998) ("There is nothing unusual about imposing prefiling restrictions in matters with a history of repetitive or vexatious litigation."); *see also*, *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996) (permanently enjoining plaintiff from filing action based on particular factual or legal claims without first obtaining certification from a United States Magistrate that the claim is not frivolous).

Much of this brief addresses attorney misconduct, but this is the rare case where the Plaintiffs themselves deserve severe sanctions. Each plaintiff in this case is an experienced Michigan politician; each plaintiff was selected as a candidate to serve as a Trump elector; and, each plaintiff had to know that the Complaint is rife with false allegations. None of the Plaintiffs had any legitimate basis to believe any of the factual assertions in the Complaint, yet they signed on. And, indeed, they signed on to claims they had to know were false, including the numerous claims by their supposed experts.

Exhibit N

The Plaintiffs know that Michigan does not have party registration. They know that Michigan does not have "early voting." They know that the nine counties identified as "outliers" because of larger raw vote shifts are simply some of the largest counties in the State. They know that the State does not mail ballots to voters. They know that it is common in Michigan for voters to vote absentee by appearing at the clerk's office, signing an application, receiving a ballot and returning it, all on the same day. They know that some absentee ballots are mailed by voters but received too late to be counted. They know that counting fifty ballots eight or ten times (as alleged by Mellissa Carone) would be found and corrected at multiple stages of the tabulation and canvassing process. They know that there could not have been a hand recount in Antrim County before the lawsuit was filed. They know that absentee ballots took longer to tabulate than in-person ballots and that Biden supporters were more likely to vote absentee than Trump supporters. And, these experienced Michigan politicians know that their "experts" based their findings on disregarding all of these facts.

In a case of this magnitude, intended to upend the election of the President of the United States, the Plaintiffs owed this Court the highest degree of due diligence before filing suit. Instead, there are only two possibilities—these six Plaintiffs did not read the Complaint and the expert reports supporting it; or, they did read the Complaint and the faulty expert reports and did not care that false representations

Exhibit N

were being made to this Court. Either way, this case cries out for sanctions to deter this behavior in the future.

## VI. Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief Judge for Disbarment

In addressing attorney misconduct, the most important sanction here is not a Rule 11 sanction, but a disciplinary action pursuant to the Local Rules. The message must be sent that the Eastern District of Michigan does not tolerate frivolous lawsuits. The out of state attorneys appearing on the pleadings for the Plaintiffs never sought admission to the Eastern District of Michigan and never affirmed their acceptance of our Civility Principles. They have demonstrated their unwillingness to be guided by those principles, and they should be barred from returning to our courts.

E. D. Mich. LR 83.20(a)(1) defines "practice in this court," to include: "appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court."[25]

"When misconduct or allegations of misconduct that, if substantiated, would warrant

---

[25] The Rule requires that a "person practicing in this court must know these rules, including the provisions for sanctions for violating the rules." Under 83.20(j) an attorney "who practices in this court" is subject to the Michigan Rules of Professional Conduct, "and consents to the jurisdiction of this court and the Michigan Attorney Grievance Commission and Michigan Attorney Discipline Board for purposes of disciplinary proceedings."

Exhibit N

discipline of an attorney" who is a member of the bar or has "practiced in this court" come to the attention of a judicial officer by complaint or otherwise, the judicial officer may refer the matter to: (1) the Michigan Attorney Grievance Commission, (2) another disciplinary authority that has jurisdiction over the attorney, or (3) the chief district judge for institution of disciplinary proceedings ..." LR 83.22.

This case clearly warrants the full imposition of each disciplinary option in the Local Rules. This Court should enter an Order requiring Plaintiffs' to show cause why they should not be disciplined. LR 83.22(d) authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court." In *Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996), this Court levied monetary sanctions and a formal reprimand against counsel for raising frivolous arguments. "Enforcing Rule 11 is the judge's duty, albeit unpleasant. A judge would do a disservice by shying away from administering criticism … where called for." *Id.*, at 253 n. 6 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988)). The conduct of Plaintiffs' counsel in knowingly asserting false and frivolous claims while seeking relief with massive implications for our democracy warrants the strongest possible disciplinary action.

Exhibit N

The Court should refer Plaintiffs' counsel to the Chief Judge of this District for disbarment proceedings and to their state bars for disciplinary actions. It appears that only one of the Plaintiffs' attorneys in the case—Greg Rohl—is admitted to practice in this District; he should be barred from further practice in the District.[26] The other attorneys should be prohibited from obtaining admission to this District or practicing in it in any manner, including, where, as here, they do not seek formal admission, but sign the pleadings.

All Plaintiffs' attorneys should also be referred for disciplinary proceedings to the Michigan Attorney Grievance Commission as well as to the disciplinary authorities in their home states (Sidney Powell, Texas; L. Lin Wood, Georgia; Emily

---

[26] Greg Rohl is the one attorney for Plaintiffs currently admitted to the Eastern District of Michigan. He has previously been sanctioned for filing a case which was deemed "frivolous from its inception" and ordered to pay over $200,000 in costs and attorney fees. *See DeGeorge v. Warheit*, 276 Mich. App. 587, 589, 741 N.W.2d 384 (2007). He was then held in criminal contempt and sentenced to jail—affirmed by the Court of Appeals—for attempting to transfer assets to evade payment. *Id.* The Court of Appeals noted that a bankruptcy court had concluded that Rohl "intended to hinder, delay and defraud … and create a sham transaction to prevent [a creditor] from reaching Rohl's interest in his law firm through the appointment of a receiver." *Id.* at 590. Rohl was also suspended by the Michigan Attorney Discipline Board in 2016 based on his convictions for disorderly conduct, in violation of M.C.L. § 750.1671F, "telecommunications service - malicious use, in violation of M.C.L. § 750.540E" and based on his admissions to at least two additional allegations of professional misconduct. Ex. 21. Those prior sanctions and disciplines were insufficient to discourage Mr. Rohl from filing the case at bar, leaving this Court with only one way to stop his behavior—he should be barred from practice in the Eastern District of Michigan.

Exhibit N

Newman, Virginia; Julia Haller, D.C.; Brandon Johnson, D.C.; Howard Kleinhendler, New York). Those authorities can determine the appropriate response.

It is only by responding with the harshest possible discipline that these attorneys and those who would follow in their footsteps will learn to respect the integrity of the court system.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the City of Detroit respectfully requests that this Court enter an Order sanctioning Plaintiffs and their counsel and initiating disciplinary proceedings in the manner identified in the Motion.

January 5, 2021                         Respectfully submitted,

**FINK BRESSACK**

By:    /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor

38

Exhibit N

Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
nosej@detroitmi.gov

Exhibit N

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

**FINK BRESSACK**

By:   */s/* Nathan J. Fink
Nathan J. Fink (P75185)
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel.: (248) 971-2500
nfink@finkbressack.com

# EXHIBIT W

Exhibit N

**EFiled: Dec 18 2020 03:11PM EST**
**Transaction ID 66198695**
**Case No. S20C-07-030 CAK**

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| CARTER PAGE, an individual, | : |
| Plaintiff, | : C.A. No. S20C-07-030 CAK |
| v. | : |
| OATH INC., a corporation, | : |
| Defendant. | : |

## RULE TO SHOW CAUSE

Pursuant to Delaware Superior Court Civil Rule 90.1, the Court *sua sponte* is issuing this Rule to Show Cause why the permission to practice in this case issued to L. Lin Wood, Jr., Esquire should not be revoked. The following appears to the Court:

1) In this case alleging Defendant defamed Plaintiff, the Court gave Mr. Wood permission pursuant to Delaware Superior Court Civil Rule 90.1 to appear as attorney for Plaintiff, *pro hac vice* by order dated August 18, 2020. The order granted Mr. Wood's motion, which contained the typical agreement to abide by all State and local rules, the Delaware Lawyers' Rules of Professional Conduct[1] and the Principles of Professionalism for Delaware Lawyers.[2]

2) It appears to the Court that, since the granting of Mr. Wood's motion he, has engaged in conduct in other jurisdictions, which, had it occurred in Delaware, would violate the Delaware Lawyers' Rules of Professional Conduct ("DRPC")..

---

[1] Prof. Cond. R. (Jan. 1, 2019).

[2] Prim. Prof. (Nov. 1, 2003).

Exhibit N

3) The Georgia Litigation

    a. Mr. Wood is Plaintiff in the case of *L. Lin Wood, Jr. v. Brad*

*Rattensperger, et al.*, 2020 WL 6817513 (U.S. Dist. Ct., N. D. Georgia, Atlanta Division Nov.

20, 2020. In that case, Mr. Wood sought, *inter alia*, to prevent Georgia's certification of the

votes in the general election for President of the United States. In its opinion denying the relief

sought by Plaintiff, the Court said:

> Viewed in comparison to the lack of any demonstrable harm to
> Wood, this Court finds no basis in fact or law to grant him
> the relief he seeks. (Emphasis supplied).

    b. Mr. Wood's conduct in filing this suit which the Court found had no basis in

"fact or law" may violate DRPC Rule 3.1:

> "A lawyer shall not bring or defend a proceeding, or assert
> or controvert an issue therein, unless there is a basis in law and
> fact for doing so..."

    c. The False Affidavit

    Mr. Wood filed or caused to be filed the affidavit of Russell James

Ramsland, Jr. in the Georgia litigation which contained materially false information,

misidentifying the counties as to which claimed fraudulent voting information occurred.

    d. Mr. Wood's conduct in filing this false affidavit violates DRPC 1.1

(Competence), 3.1 (Meritorious Claims and Contentions), 3.3 (Candor to the Tribunal), 4.1(a)

(Truthfulness in Statements/False Statement of Material Fact), and Misconduct (Dishonesty and

Deceit).

4) The Wisconsin Litigation

    Mr. Wood is one of several counsel for plaintiffs in the case of *William*

<div align="center">2</div>

<div align="right">Exhibit N</div>

*Feehan and Derrick Van Orden v. Wisconsin Elections Commission, et al*.[3] In that case it

appears:

      a.     The suit was filed on behalf of a person who had not authorized it.

      b.     The Complaint and related papers had multiple deficiencies as

outlined in an order dated December 20, 2020 issued by The Honorable Pamela Pepper:

      (i)     The Order indicated the filings had been forwarded to
defense counsel "...at the following address..." with no
addresses listed.

      (ii)     Documents were allegedly filed under seal, but were not.

      (iii)     The Complaint requesting a temporary restraining order
was not verified or supported by an appropriate affidavit, as
required by Court Rules.

      (iv)     The Complaint contained no certification of efforts to
notify the adverse parties, as required by Court Rules.

      (v)     Apparently, a motion for declaratory relief was filed in draft
form.

      (vi)     The papers filed in Wisconsin asked for various injunctive
remedies, but did not ask for a hearing.

      (vii)     While the pleadings, including a proposed order, asks for
emergency relief and an "expedited" injunction, nothing
indicates whether the plaintiffs were asking the Court to act
more quickly than normal, or why.

      c.     In a response to defendants' Motion to Dismiss, which was not

signed by Mr. Wood, but which was filed while he was one of the counsel of record, a citation

for a case, including a quotation was found by the Court to be fictitious. The citation was to a

point of law critical to the case.

---

[3] 2020 WL 7250219 (U.S. Dist. Ct., E.D. Wisc. (Dec. 9, 2020).

3

Exhibit N

d.      The foregoing conduct in the Wisconsin case appears to violate
DRPC 1.1 (Competence), 3.1 (Meritorious Claims and Contentions), 3.3 (Candor to the
Tribunal), 4.1(a) (Truthfulness), and 8.4(c) (Misconduct).

5)      All of the foregoing gives the Court concerns as to the appropriateness of
continuing the order granting Mr. Wood authorization to appear in this Court *pro hac vice*.

6)      Mr. Wood and local counsel shall have until January 6, 2021 to respond to
this Rule to Show Cause. If defendant has a position on the Rule, defendant shall file it in
writing by the same date.

7)      Currently in this case oral argument on Defendant's Motion to Dismiss
is scheduled for Wednesday, January 13, 2021 at 9:30 a.m. The Court will hear counsel on that
date in response to this Rule to Show Cause.

**IT IS SO ORDERED.**

Craig A. Karsnitz

cc:     Prothonotary
        All Counsel of Record

FILED PROTHONOTARY
2020 DEC 18 PM 3:03

ED PROTHONOTARY
SUSSEX COUNTY
0 DEC 18 PM 2:20

4

Exhibit N

# EXHIBIT X

Exhibit N

**EFiled: Jan 11 2021 01:29PM EST**
**Transaction ID 66242606**
**Case No. S20C-07-030 CAK**

# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| CARTER PAGE, an individual, | : |
| | : |
| Plaintiff, | : C.A. No. S20C-07-030 CAK |
| | : |
| v. | : |
| | : |
| OATH INC., a corporation, | : |
| | : |
| Defendant. | : |

Date Submitted: January 6, 2021
Date Decided: January 11, 2021

## MEMORANDUM OPINION AND ORDER

*Opinion following the Issuance of a Rule to Show Cause*

**Sean J. Bellew, Esquire, BELLEW LLC, 2961 Centerville Road, Suite 302, Wilmington, DE 19808. Attorney for Plaintiff.**

**John M. Pierce, Esquire, PIERCE BAINBRIDGE P.C., 355 S. Grand Ave., 44th Floor, Los Angeles, CA 90071. Attorney for Plaintiff. *Pro Hac Vice***

**K. Lawson Pedigo, Esquire, MILLER KEFFER & PEDIGO PLLC, 3400 Carlisle Street, Suite 550, Dallas, TX 75204. Attorney for Plaintiff. *Pro Hac Vice***

**L. Lin Wood, Esquire, L. Lin Wood, P.C., P.O. Box 52584, Atlanta, GA 30355. Attorney for Plaintiff. *Pro Hac Vice***

Exhibit N

T. Brad Davey, Esquire and Jonathan A. Choa, Esquire, Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, DE 19899. Attorney for Defendant

Elbert Lin, Esquire and David M. Parker, Equire, Hunton Andrews Kurth LLP, 951 E. Byrd Street, Richmond, VA 23219. Attorney for Defendant. *Pro Hac Vice*

Jonathan D. Reichman, Esquire and Jennifer Bloom, Esquire, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166. Attorney for Defendant. *Pro Hac Vice.*

2

Several weeks ago, and pursuant to Superior Court Civil Rule 90.1, I issued a Rule to Show Cause why the approval I had given to L. Lin Wood, Esquire to practice before this Court in this case should not be revoked. Mr. Wood is not licensed to practice law in Delaware. Practicing *pro hac vice* is a privilege and not a right. I respect the desire of litigants to select counsel of their choice. When out of state counsel is selected, however, I am required to ensure the appropriate level of integrity and competence.

During the course of this litigation, a number of high profile cases have been filed around the country challenging the Presidential election. The cases included, *inter alia*, suits in Georgia, Wisconsin and Michigan. Opinions were delivered in all of the States which were critical in various ways of the lawyering by the proponents of the lawsuits. In the Rule to Show Cause, I raised concerns I had after reviewing written decisions from Georgia and Wisconsin. Specifically, in Georgia, a lawsuit filed by Mr. Wood resulted in a determination that the suit was without basis in law or fact. The initial pleadings in the Wisconsin case were riddled with errors. I had concerns as listed in the Rule to Show Cause.

I gave Mr. Wood until January 6, 2021 to file a response. He did so at 10:09 p.m., January 6. The response focused primarily upon the fact that none

3

Exhibit N

of the conduct I questioned occurred in my Court. The claim is factually correct.
In his response, Mr. Wood writes:

> Absent conduct that prejudicially disrupts the proceedings,
> trial judges have no independent jurisdiction to enforce
> the Rules of Professional Conduct.

Mr. Wood also tells me it is the province of the Delaware Supreme

Court to supervise the practice of law in Delaware and enforce our Rules of

Professional Conduct. With that proposition I have no disagreement. In my view

it misses the point and ignores the clear language of Rule 90.1. The response also

contains the declaration of Charles Slanina, Esquire. I know Mr. Slanina and have

the highest respect for him, especially for his work and expertise in the area of

legal ethics. His declaration here focused on my lack of a role in lawyer discipline

and was not helpful regarding the issue of the appropriateness and advisability of

continuing *pro hac vice* permission.

> Rule 90.1(e) reads in full:

> Withdrawal of attorneys admitted *pro hac vice* shall
> be governed by the provisions of Rule 90(b). The
> Court may revoke a *pro hac vice* admission *sua sponte*
> or upon the motion of a party, if it determines, after
> a hearing or other meaningful opportunity to respond,
> the continued admission *pro hac vice* to be inappropriate
> or inadvisable.

The standard then I am to apply is if the continued admission would

4

Exhibit N

be inappropriate or inadvisable.

I have no intention to litigate here, or make any findings, as to whether or not Mr. Wood violated other States' Rules of Professional Conduct. I agree that is outside my authority. It is the province of the Delaware Office of Disciplinary Counsel, and ultimately the Delaware Supreme Court, or their counterparts in other jurisdictions, to make a factual determination as to whether Mr. Wood violated the Rules of Professional Conduct. Thus, the cases cited by Mr. Wood are inapposite and of no avail. In *Lendus, LLC v. Goode*, 2018 WL 6498674 (Del. Ch. Dec. 10, 2018) and *Crumpler v. Superior Court, ex. rel New Castle County*, Del. Supr., 56 A.3d 1000 (Del. 2012), the courts allowed the foreign lawyer to withdraw as *pro hac vice* counsel and referred alleged ethical violations to the Office of Disciplinary Counsel. Neither of those is happening here. Similarly, in *Kaplan v. Wyatt*, 1984 WL 8274 (Del. Ch. Jan. 18, 1984), Chancellor Brown, on very different facts, allowed *pro hac vice* counsel to continue his representation but stressed that this did not constitute approval of his conduct and that ethical violations could be addressed elsewhere.

What I am always required to do is ensure that those practicing before me are of sufficient character, and conduct themselves with sufficient civility and truthfulness. Violations of Rules of Professional Conduct are for other entities to

5

Exhibit N

judge based upon an appropriate record following guidelines of due process. My role here is much more limited.

In response to my inquiry regarding the Georgia litigation Mr. Wood tells me he was (only) a party, and the case is on appeal. He also tells me that the affidavit filed in support of the case only contained errors. Neither defense holds merit with me. As an attorney, Mr. Wood has an obligation, whether on his own or for clients, to file only cases which have a good faith basis in fact or law. The Court's finding in Georgia otherwise indicates that the Georgia case was textbook frivolous litigation.

I am also troubled that an error-ridden affidavit of an expert witness would be filed in support of Mr. Wood's case. An attorney as experienced as Mr. Wood knows expert affidavits must be reviewed in detail to ensure accuracy before filing. Failure to do so is either mendacious or incompetent.

The response to the Rule with regard to the Wisconsin complaint calls the failings "proof reading errors". Failure to certify a complaint for

Exhibit N

injunction or even serve the Defendants are not proof reading errors. The
Complaint would not survive a law school civil procedure class.[1]

        Prior to the pandemic, I watched daily counsel practice before me in a
civil, ethical way to tirelessly advance the interests of their clients. It would
dishonor them were I to allow this *pro hac vice* order to stand. The conduct of Mr.
Wood, albeit not in my jurisdiction, exhibited a toxic stew of mendacity,
prevarication and surprising incompetence. What has been shown in Court
decisions of our sister States satisfies me that it would be inappropriate and
inadvisable to continue Mr. Wood's permission to practice before this Court. I
acknowledge that I preside over a small part of the legal world in a small state.
However, we take pride in our bar.

        One final matter. A number of events have occurred since the filing
of the Rule to Show Cause. I have seen reports of "tweets" attributable to Mr.
Wood. At least one tweet called for the arrest and execution of our Vice-
President. Another alleged claims against the Chief Justice of the Supreme Court
of the United States which are too disgusting and outrageous to repeat. Following

---

[1] Mr. Wood in his response tells me he is not responsible, as he is listed as "Counsel for Notice". My
reading of the docket is he was one of the counsel of record for the Plaintiffs, and thus fully responsible for the filing.
Moreover, since I am not addressing choice of law issues with respect to professional misconduct, Delaware Rule of
Professional Conduct 8.5 need not be discussed. Nor am I imposing any sanctions under Delaware Superior Court
Civil Rule 11.

7

Exhibit N

on top of these are the events of January 6, 2021 in our Nation's Capitol. No
doubt these tweets, and many other things, incited these riots.

I am not here to litigate if Mr. Wood was ultimately the source of the
incitement. I make no finding with regard to this conduct, and it does not form
any part of the basis for my ruling. I reaffirm my limited role.

I am revoking my order granting Lin Wood, Esquire the privilege of
representing the Plaintiff in this case. Given my ruling, here the hearing scheduled
for January 13, 2021 is cancelled.[2] My staff will contact the parties to schedule as
soon as possible a date for argument on the Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**

Craig A. Karsnitz

cc:    Prothonotary

FILED PROTHONOTARY
SUSSEX COUNTY
2021 JAN 11 D 1: 16

---

[2] Rule 90.1 requires either a hearing on the issue or other meaningful opportunity to respond. Mr. Wood
was afforded the latter.

Exhibit N

# EXHIBIT Y

Trumpist Lawyer Lin Wood Goes on Unhinged Rant Suggesting Justice John Roberts Is a Murderous Pedophile

TRUMPLAND →

# *Trumpist Lawyer Lin Wood Goes on Unhinged Rant Suggesting Justice John Roberts Is a Murderous Pedophile*

| QANON GONE WILD |

**Wood has recently been in touch with President Trump, who has encouraged his election-stealing lawsuits and behavior.**

**Justin Baragona**
Contributing Editor

Updated Dec. 31, 2020 10:22AM ET
Published Dec. 30, 2020 10:19PM ET

   

Exhibit N



Elijah Nouvelage/Reuters

Pro-Trump lawyer Lin Wood ramped up the crazy on Wednesday night by suggesting Supreme Court Chief Justice John Roberts was somehow involved in Justice Antonin Scalia's death and part of a child-sex cult.

Wood, alongside on-again-off-again Trump campaign lawyer Sidney Powell, has been at the forefront of President Donald Trump's hopeless attempt to overturn President-elect Joe Biden's decisive victory in the Nov. 3 election. Besides filing a slew of conspiratorial lawsuits alleging election fraud that have been laughed out of court, Wood has urged Georgian Republicans not to vote in next week's pivotal Senate runoffs because of his belief that the election will be "rigged" and has filed an emergency petition with the Supreme Court to halt the Jan. 5 election.

The QAnon-peddling attorney took things to a whole new level on Wednesday night, however,

Exhibit N

when he decided to take to Twitter and toss out a
series of dangerously unhinged accusations.

A couple of more questions for Chief
Justice John Roberts:

(1) You are recorded discussing Justice
Scalia's successor before date of his
sudden death. How did you know
Scalia was going to die?

(2) Are you a member of any club or
cabal requiring minor children as
initiation
fee? pic.twitter.com/jGxfgLCk4D
— Lin Wood (@LLinWood) December 31,
2020

"You are recorded discussing Justice Scalia's
successor before date of his sudden death. How
did you know Scalia was going to die?" Wood
asked Roberts in one tweet, casually adding: "Are
you a member of any club or cabal requiring
minor children as initiation fee?"

After painting Roberts as a murderous pedophile,
the far-right attorney went further down the
QAnon rabbit hole by bringing up deceased sex
trafficker Jeffrey Epstein, suggesting the chief
justice was mixed up in trafficking children and
apparently hinting that he may have had Epstein
killed.

Exhibit N

"My information from reliable source is that Roberts arranged an illegal adoption of two young children from Wales through Jeffrey Epstein," Wood tweeted. "I think we can all agree that Epstein knows pedophilia."

"If only Jeffrey Epstein was still alive . . . Wouldn't that be something?" he wrote.

Not done, he finished by arguing that the lack of a defamation suit from Roberts meant his unfounded accusations were on the mark.

A bit more on CJ John Roberts.

I have publicly accused him & Justice Breyer of being profane anti-Trumpers.

I have linked Roberts to illegal adoption, Jeffrey Epstein, pedophilia & prior knowledge of Scalia's death.

Did Roberts skip class on defamation?

Maybe not . . .
— Lin Wood (@LLinWood) December 31, 2020

Wood did not immediately respond to a request for comment on his allegations.

The following morning, however, things only got weirder as Wood went further down the rabbit

Exhibit N

hole, this time claiming Epstein "is alive" and
could reveal the "truth" about Roberts.

> I am fully aware of the onslaught of
> attacks being made against me based
> on my revelations about Chief Justice
> John Roberts. Before attacking me,
> maybe fair-minded people would first
> ask Roberts to tell the truth.
>
> Or ask Jeffrey Epstein. He is alive.
> — Lin Wood (@LLinWood) December 31,
> 2020

Despite many in Trump's orbit declaring war on
Wood after he pushed for a boycott of the Georgia
Senate races, the president himself has personally
kept in touch with the firebrand. Trump has not
only encouraged Wood and Powell to continue
with their "Kraken" lawsuits, but he also hasn't
told them to tone down their rhetoric, much to the
dismay of many of Trump's advisers.

In recent weeks, with Trump's election loss
becoming harder to ignore for the MAGA
faithful, Wood has also taken to encouraging
apocalypse-minded conservatives to stock up on
supplies in preparation for an impending civil
war.

Exhibit N

Case 1:21-cv-00169-TCB Document 25-2 Filed 05/03/21 Page 1576 of 1677

"Remember we only have 1 President at a time,"

he tweeted while calling on his followers to prep.

"Our leader is @realDonaldTrump, not Biden."

Exhibit N

# EXHIBIT Z

Exhibit N



CNN politics

● **LIVE TV**

**All**　　**Biden**　　**Confirmation Hearings**　　**Inauguration**　　**Security**　　**Trump**

**72 Posts**　　　　　　　　　　　　　　　　　SORT BY　Latest ⌄

3:56 p.m. ET, January 19, 2021

## Federal prosecutors have charged over 100 people in Capitol Hill riot

From CNN's Paul Murphy and Katelyn Polantz

According to the Justice Department and unsealed court records, CNN has identified over 100 federal defendants that have been charged in the Capitol Hill riot.

Most charges are for unlawful or violent entry to restricted grounds of the Capitol, some charges have revealed more serious allegations including heavily armed rioters and paramilitary

Exhibit N

 politics

● LIVE TV

On Tuesday, the dragnet brought in several new arrestees, including three people charged in the first major conspiracy case related to Oath Keepers who allegedly coordinated an effort for the siege in advance.

3:55 p.m. ET, January 19, 2021

## Biden's Defense secretary pick pledges to fight "to rid our ranks of racists and extremists"

From CNN's Michael Conte



35 New Updates

Jim Lo Scalzo/Pool via AP

In his opening remarks for his confirmation hearing, retired Gen. Lloyd Austin, President-elect Joe Biden's nominee to be Defense Secretary, pledged to "fight hard... to rid our ranks of racists and extremists."

Exhibit N

# EXHIBIT K

Exhibit O

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X
                            :
ROSLYN LA LIBERTE,          :
                            :      18-CV-5398 (DLI)(VMS)
              Plaintiff,    :
                            :      January 11, 2021
                            :
         V.                 :      Brooklyn, New York
                            :
JOY REID,                   :
                            :
              Defendant.    :
----------------------------X


   TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
        BEFORE THE HONORABLE VERA M. SCANLON
           UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          DAVID OLASOV, ESQ.
                            LUCIEN L. WOOD, ESQ.


For the Defendant:          JOHN REICHMAN, ESQ.
                            DAVID YEGER, ESQ.
                            THEODORE BOUTROUS, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

Exhibit O

```
1                THE COURT:  La Liberte v. Reid, 18-CV-5398.

2                Let's start with plaintiff's counsel's

3    appearance.

4                MR. OLASOV:  David Olasov for Roslyn La

5    Liberte and Lin Wood for Roslyn La Liberte.

6                MR. WOOD:  Yes, good morning, your Honor,

7    this is Lin Wood.

8                THE COURT:  Hello.

9                All right, for the defendant?

10               MR. REICHMAN:  Good morning, your Honor.

11   This is John Reichman from John Reichman Law, and I am

12   joined by my colleague, David Yeger.  We also have our

13   co-counsel from Gibson Dunn, who will introduce

14   themselves.

15               MR. BOUTROUS:  Yes, your Honor.  This is

16   Theodore Boutrous from Gibson Dunn & Crutcher for Ms.

17   Reid, and I'm joined by my colleagues, Marissa Moshell

18   and Marcellus McRea.

19               THE COURT:  All right.  So we're here for

20   the discovery issues since you're back from the

21   circuit.  So we have at 57 your proposed order and then

22   at 58, the letter complaining about the initial

23   disclosures.  I've read the letter.  I think it's

24   premature.  We don't have a scheduling order and so you

25   can complain that there wasn't a need to have these
```

Exhibit O

```
1    initial disclosures done.  I know you submitted your
2    initial -- proposed initial scheduling order having
3    some earlier dates on there but they're not the
4    effective dates from a court order, so I'm just going
5    to reset it.
6             Plaintiff, you should look at the criticism
7    that the defendant is offering as to the alleged
8    incompleteness of your initial disclosures and you
9    should both have a conversation.  Then if you still
10   can't work it out, you can let me know.
11            Obviously, there's a fairly extensive record
12   already in this case on that legal issue.  Is there
13   anything anybody wants to say with regard to the merits
14   that you think I should know.  Mostly, does it affect
15   discovery, and then we'll talk about the particulars of
16   the discovery schedule.  So for plaintiff?
17            MR. OLASOV:  This is David Olasov.  Mr.
18   Reichman and I have had a conversation in which I
19   pointed out to him that the answer to the amended
20   complaint that was filed after the Second Circuit's
21   decision in our view pleaded matters that we believe
22   are foreclosed by the decision.  I've agreed to -- for
23   plaintiff to provide them with a letter that indicates
24   which defenses that they've raised we believe are
25   foreclosed by this decision.  Of course, that has some
```

1    bearing on the scope of discovery since there's no

2    point in having discovery on matters that are

3    foreclosed by the decision.

4              THE COURT:  All right.  Defendants, your

5    view?

6              MR. REICHMAN:  Well, we await the letter but

7    I don't think it's really going to have an impact

8    whatsoever on discovery.  In our view, I think the only

9    defense that is arguably precluded is the legal defense

10   with respect to whether the posts were opinion or not,

11   but that wouldn't be the subject of discovery in any

12   event.

13             THE COURT:  All right.  And before we dive

14   into the discovery, is there any possibility of having

15   settlement discussions?  You've been at this for a

16   while now.  Has there been anything?  I mean, you could

17   have discussions with each other, you could have a

18   mediator try to bridge whatever gap there is because

19   you obviously having been doing this, what, since 2018?

20             MR. WOOD:  Your Honor, this is Lin Wood.  I

21   think it's standard handling, from my experience at

22   least, that from the plaintiff's perspective, the

23   plaintiff is always willing to listen to any reasonable

24   offer that a defendant makes.  But if the defendant has

25   no interest, then obviously, our hands our tied.  So I

1   would kind of throw the ball over to the defense to say

2   if there's an interest and, if so, if there are any

3   suggestions on how a discussion could take place.  If

4   there's no interest, then we obviously can just

5   continue to move forward.

6          MR. REICHMAN:  This is John Reichman, your

7   Honor.  I think for reasons that we set out already to

8   the Court with respect to the initial disclosures, we

9   don't know of any real damages that the plaintiff has

10  sustained.  And before even considering any kind of

11  settlement, we need to know at least what the

12  plaintiff's damages are and the basis for them, and we

13  could then take it from there.

14         THE COURT:  All right, so I'll take that as

15  a maybe and say that we're going to set the dates --

16         MR. WOOD:  I like -- Judge, I appreciate

17  someone who is always on the optimistic side.

18         THE COURT:  I try.  All right, what --

19         MR. REICHMAN:  Your Honor -- I'm sorry.

20  There is another matter that we'd like to bring to the

21  Court's attention, and it involves Mr. Wood,

22  plaintiff's lead counsel.  Over the weekend, we have

23  come across some very disturbing information about the

24  conduct of Mr. Wood.  I'm sure you're aware that since

25  the election, Mr. Wood has been actively engaged in

```
 1   attempting to overturn the election results.  All of

 2   those cases have been dismissed.  There have also been

 3   sanctions and disqualification motions filed.

 4              MR. WOOD:  I have not been sanctioned.

 5              MR. REICHMAN:  Now Mr. Wood --

 6              THE COURT:  One at a time.

 7              MR. REICHMAN:  -- has taken an even far

 8   darker turn.  He is actively and has actively supported

 9   the insurrection against our government and called for

10   the execution of the Vice President.

11              MR. WOOD:  Oh, nonsense.

12              MR. REICHMAN:  He's been permanently barred

13   from Twitter and his recent attempt to submit a post on

14   Parler calling for the Vice President's execution was

15   not permitted.  In fact, the posting of his tweet on

16   Parler was one of the reasons cited by Apple and Google

17   to ban Parler from their platforms.  The right to

18   appear pro hac vice in this District is a privilege and

19   not a right, and we believe there are at least three

20   reasons why that privilege should be revoked by the

21   Court.

22              First, in New York, every attorney pledges

23   to solemnly swear that he or she will support the

24   Constitution of the United States.  Mr. Wood is seeking

25   to undermine, not support the U.S. Constitution.  His
```

Exhibit O

1  call for violence in the streets and his tweets and

2  public utterances have been an impetus of the

3  insurrections to seize the Capitol.  It's noteworthy

4  that the last tweet of the woman shot at the Capitol,

5  Ashley Babbitt, was a re-posting of one of Mr. Wood's

6  posts.

7         Second, in violation of the disciplinary

8  rules, Mr. Wood has gone around the country filing

9  utterly frivolous lawsuits based on outright lies and

10  nonexistent legal theories.  In Delaware, a court has

11  issued a show-cause order, citing his conduct in

12  Wisconsin and Georgia actions, asking him to show cause

13  why he should not be disqualified from practicing law

14  in Delaware.  In Michigan, after the dismissal of the

15  lawsuit he filed there, a motion has been filed seeking

16  sanctions and disqualification and disbarment.

17         Third, Mr. Wood is actively threatening the

18  well-being of the judiciary, especially Justice

19  Roberts.  He has painted Justice Roberts as a murderous

20  pedofile.  He suggested that the Chief Justice was

21  mixed up in the death of Justice Scalia, was

22  trafficking in children, and apparently hinting that he

23  may have had Epstein killed if he was killed at all.

24  He recently tweeted, "My information from reliable

25  sources is that Roberts arranged an illegal adoption of

Exhibit O

```
 1   two children from Wales through Jeffrey Epstein."

 2           Now, as we all now clearly and sadly know,

 3   words can and will lead to violence.  So under the

 4   Disciplinary Rules at Section 8.3, we believe we have

 5   an ethical duty to report this matter to the Court and

 6   we would --

 7           MR. OLASOV:  Who is speaking now?

 8           MR. REICHMAN:  Please.

 9           MR. OLASOV:  Who is speaking?

10           MR. REICHMAN:  John Reichman.

11           THE COURT:  Please stop, stop interrupting.

12           MR. REICHMAN:  And we welcome --

13           THE COURT:  All right, continue.

14           MR. REICHMAN:  So we welcome the Court's

15   guidance with respect to whether and how to further

16   this issue.  You know, we are prepared to provide more

17   information about Mr. Wood's activity.  I would add

18   that all of these are matters of public record.  It

19   seems to us there are at least two options with respect

20   to how to proceed.  We could submit a letter brief

21   under your Honor's rules directly seeking the

22   revocation of the pro hac vice order.  The other way

23   would be to present the information and ask the Court

24   whether it could issue a show-cause order such as was

25   done in Delaware.  That's a procedure that some judges
```

Exhibit O

1   have used in considering the revocation of the right to

2   practice.

3           THE COURT:  All right, let's first hear from

4   Mr. Wood.  Then we'll talk about the procedure.

5           Go ahead, Mr. Wood.

6           MR. WOOD:  Thank you, your Honor.  It's kind

7   of hard to respond to such serious accusations when I

8   am not at all sure about the accuracy of some of the

9   things that have been said to the Court.  In fact, I

10  know some of them are inaccurate.  And I have not been

11  sanctioned by any court in 43 and a half years, not any

12  court over the course of my career, nor any court now.

13          It's almost like I'm being -- trying to make

14  me into a scapegoat.  I've had nothing to do, number

15  one, with what happened in Washington D.C.  I didn't

16  call for the people to go up there and meet, I didn't

17  call for anybody to go to the Capitol.  I certainly

18  didn't call for anybody to create a scene of what

19  appeared to be some type of violence.  So whether this

20  lady that died had re-tweeted me, I have no control

21  over that.

22          What I can say to the Court and, if

23  necessary, at the appropriate time, present to the

24  Court is that what I have said publicly, I have

25  reliable information to support the truth of it.  What

Exhibit O

1    I have done with Sidney Powell is, she asked me to sign

2    on to two or three lawsuits where she was the lead

3    counsel, in anticipation that there may be a need for a

4    trial lawyer.  I didn't draft the lawsuits.  There were

5    some typographical errors and things done in some of

6    them that upset a judge in Wisconsin, I believe, maybe

7    Michigan.  But if you had a full hearing on what

8    happened there, I didn't have anything to do with that,

9    other than I did agree to sign on to help Sidney.

10          I know for a matter of fact that all of the

11   information that Sidney Powell has presented in the

12   litigation with respect to the fraud in the election,

13   there is a mountain of admissible evidence in the form

14   of affidavits, authenticated videos, expert evidence

15   from reliable and credible experts.  So the lawsuits

16   were filed as they are allowed to be filed.

17          The only other lawsuits that I've been

18   involved in, I filed for myself as it related to the

19   Georgia election, where I contended that the election

20   was conducted illegally and in violation of precedent

21   of the Supreme Court that requires that the election

22   rules be set by the state legislature.  In Georgia,

23   they conducted the election with absentee ballots and

24   mail-in ballots based on a procedure that came up --

25   that came up from a settlement agreement by the

Exhibit O

1    Secretary of State with the Democratic Party.  It was

2    never adopted by the legislature, so that any

3    allegation that I filed a frivolous lawsuit is in fact

4    frivolous.

5           The lawsuit that I have presently have is

6    pending before the United States Supreme Court in a

7    writ of certiorari.  It has not yet been ruled on but

8    yet it's been pending for some almost three weeks.

9    They may still accept it.  So the Georgia litigation

10   I'm involved in is certainly within the rules and the

11   laws of this country.  The litigation that Sidney

12   Powell has filed, where I've been asked to sign on to,

13   is also based on legitimate causes of action, and I

14   know for a fact based on a wealth of material and

15   admissible evidence to support the allegations.

16          No court in any of the rulings -- no court

17   for some reason has mentioned the evidence of the

18   election fraud.  So there's been no finding by any

19   court that the evidence of election fraud is lacking.

20   In fact, if they discussed it, they would have to say

21   it was literally conclusive that there was fraud.  So

22   now I'm being attacked for taking legitimate actions as

23   a lawyer, legitimate actions as a plaintiff in Georgia.

24   They're trying to pin on me the sad tragedy of what

25   happened in Washington D.C., and now they're even

Exhibit O

1  saying that my tweet brought down Parler.  I've never

2  heard of where one man -- I know the pen is mightier

3  than the sword but what I tweeted about the Vice

4  President was rhetorical hyperbole.  I did not call for

5  any violence against any individual that would result

6  in immanent harm or a serious threat of harm to that

7  person.

8          I've seen tweets and posts where people have

9  asked protestors to be shot.  I didn't do that.  I've

10  seen tweets where they hold the President's head up

11  where it's been beheaded.  I didn't do that.  So this

12  is a matter of what's in the eye of the beholder.  What

13  I did was, I posted a photograph of where a Capitol

14  police officer had opened the doors to let people in

15  that appear to be, and the evidence seems to be

16  suggesting, were members of either Antifa or Black

17  Lives Matter.  I posted the photograph of that and I

18  said, they let them in.  They're all traitors, get the

19  firing squads ready, tense first.

20          Now, I don't control firing squads.  I

21  couldn't run out and put together a firing squad and go

22  shoot the Vice President.  But the law is that if you

23  are guilty of treason, one of the penalties available,

24  as publicly ratified recently in the last month by the

25  Department of Justice is the death penalty by firing

Exhibit O

1   squad, even by hanging.

2          If you look over and say that the doctor who

3   commits an abortion is a murderer, that's rhetorical

4   hyperbole.  So what I said, because I know the law of

5   defamation, my statement was rhetorical hyperbole.  It

6   was not intended, nor did anybody seriously think that

7   that was a call to run out and put the Vice President

8   in front of a firing squad.  But for some reason, my

9   voice has reached a level, not because I wanted it to

10  -- I've never sought recognition in my life as a

11  lawyer.  I just do my job.  But for some reason, my

12  voice has reached a level where many people listen to

13  me.  That's their choice.  But I talk about facts and

14  truth, I don't make things up.

15         But what I do differently than most I guess

16  people that are voices to be heard is I relate almost

17  all of what I say to people to my belief in God, so

18  that my voice is one both of truth and a voice that

19  talks about things from a faith basis.  So I'm entitled

20  to those opinions and I don't think I ought to be

21  chastised and called upon to be put on trial in effect

22  for doing what the law allows me to do and saying

23  things that I believe are consistent with what I know

24  to be the teachings of Jesus Christ.

25         So I've been accused of being crazy, nuts.

Exhibit O

1  I've never read such things about me. If you went back

2  a few months ago, people would have told you I was the

3  greatest, smartest defamation lawyer in the world.

4  I've fought for truth and I've handled some big cases,

5  starting with Richard Jewell in 1996, where I went up

6  against the FBI and the media through representing a

7  number of other people in high-profile cases.

8         I've had cases of success against CNN,

9  Washington Post, a number of media outlets. I

10  represent Nicholas Sandman (ph) and we've had very good

11  success in Kentucky. Nobody has complained about my

12  conduct in Kentucky. I just won a motion to dismiss

13  against Gannett newspapers, and then I did some work

14  when I formed a 501(c)(4) foundation this summer,

15  #fightback. The foundation's purpose was, I thought

16  and still believe that the country is undergoing a

17  color revolution. So I said our constitutional rights

18  are going to be at risk and I formed that foundation

19  to, in the future, be an advocate for maintaining and

20  protecting our constitutional rights.

21         Right after I formed it, people asked me to

22  help a young man named Kyle Rittenhouse. I did. I

23  went out and I took the time and made the effort to

24  raise two million dollars to make the boy's cash bond

25  in Kenosha. Actually -- yeah, in Kenosha. Then since

Exhibit O

1   that time, I'm not doing anything with respect to

2   raising any more money for Kyle, but I was trying to

3   help the young boy because I believe, based on the

4   video evidence, that the young man was exercising his

5   right of self defense and he was in effect a political

6   prisoner and he ought to be let out.  I was worried

7   about them hurting him when he was in jail.

8           So if you want to, your Honor, look at these

9   recent accusations against me, I would question why are

10  they being made, who's behind it?  But I would also

11  urge the Court to take the time to look at the body of

12  my life's work for 43 years.  I love this country.  I

13  love the rule of law.  I have never advocated that

14  anyone should break the law.  I've advocated for people

15  to follow the law.

16          I've been upset with what I've seen from the

17  evidence about how this election was conducted.  I

18  believe it was a fraud.  Now, I'm not going to be the

19  ultimate arbiter of that but I have the right to serve

20  as a lawyer for people that do litigate it, and I have

21  the right, in the case of Georgia, to be a plaintiff

22  because I believe my constitutional right to vote has

23  been diminished and it's in violation of equal

24  protection.

25          So how Lin Wood, the lawyer, has become now

Exhibit O

1   Lin Wood, the guy that this man would sit there and

2   represent to you is advocating the overthrow of our

3   government, the death of our Vice President, and

4   violence in the streets, you know, I can only say this:

5   It's errant nonsense.  I believe it's part of a

6   political agenda to harm me because of my message.  If

7   you can't shoot the message because it's solid, shoot

8   the messenger.  That's what they're trying to do,

9   Judge.  They're trying to attack the messenger because

10  they can't attack the message.

11          THE COURT:  So --

12          MR. WOOD:  So I would ask for at least -- if

13  the Court is interested in hearing all of this stuff, I

14  believe I'm entitled to due process and an opportunity

15  to respond to, with evidence and other information, any

16  type of accusation that's made against me before your

17  Honor does something that has never been done to me.

18  I've practiced law in 27 states.  Even in Michigan, the

19  City of Detroit is trying to get me disbarred.  Why?

20  I'm not a member of the Michigan Bar.  They're taking

21  action -- they're saying that I ought to be sanctioned

22  in Delaware for what I did in Wisconsin.  Well,

23  Wisconsin hasn't taken any action against me.  So

24  something is not right about this, your Honor, and I

25  hope that you'll treat me fairly because I've spent my

Exhibit O

1  life working for the law, representing people that

2  needed help, putting them first and myself second.

3          MR. McRAE:  Your Honor --

4          MR. WOOD:  So I would -- I would simply end

5  by saying I'm entitled to respond with due process to

6  any of these accusations being made against because

7  they're false.  I reject the idea that I'm a scapegoat

8  in all of this.  I think it's an effort to hurt the

9  messenger because the message frightens them.  I don't

10  know.  That's up to them to decide.

11          THE COURT:  So the question --

12          MR. McREA:  Your Honor, Mr. Boutrous got

13  dropped from the call.  I'm sorry to interrupt.  This

14  is Mr. McRea.

15          THE COURT:  Okay.

16          MR. McREA:  I wouldn't interrupt, except my

17  partner got dropped from the call and the host has to

18  let him back in.  He got dropped a while ago but I

19  didn't want to interrupt.

20          THE CLERK:  I can do that.  The only problem

21  is, the other conference will be let in as well, Judge.

22          THE COURT:  That's fine.  If you do that,

23  then I'll ask them to --

24          THE CLERK:  Okay.

25          THE COURT:  -- not to speak.

Exhibit O

```
 1              MR. McREA:  Thank you, your Honor.

 2              THE CLERK:  It takes a few minutes.

 3              MR. REICHMAN:  Your Honor, if I may --

 4              THE COURT:  Hold on, just wait until

 5   everybody is back.

 6              MR. BOUTROUS:  I'm back.  Thank you, your

 7   Honor.

 8              THE COURT:  We only heard one person come

 9   in.  If anyone is on --

10              MR. BRAND:  Your Honor, Ian Brand (ph) for

11   plaintiff in the Hargrave/State Farm litigation.

12              THE COURT:  If you're on for Hargrave, just

13   mute yourself.  We're not on the Hargrave case yet.

14              MR. BRAND:  Okay.

15              THE COURT:  We have probably another five or

16   ten minutes on what we're talking about now.  It's up

17   to you.  You can stay on or you can call back in a

18   couple of minutes, whatever you like.

19              MR. BRAND:  I'll mute.

20              THE COURT:  So on this point about whether

21   plaintiff's counsel should continue as counsel in this

22   case, I think the cleanest posture of this would be, if

23   the defendants want to make a motion to disqualify or

24   revoke the pro hac grant, then you can do that.  Let's

25   then have a schedule for your papers and counsel's
```

Exhibit O

1  papers, and a brief reply if that's what you want.  I

2  think it's a serious set of allegations so if you're

3  pursuing it, I think -- yes, I agree, I normally do

4  things by letter motion but this probably should have

5  some more formality.

6          So on the defendant's side, if you're going

7  to do this motion, what do you think, two weeks?

8          MR. REICHMAN:  That would be fine.

9          THE COURT:  All right.  So you will serve

10 your papers by the 25th of January.

11         And then, plaintiff's counsel, if you want

12 to respond, can you do that by the 8th?

13         MR. WOOD:  The date for the defense's papers

14 would be when?

15         THE COURT:  The 25th.

16         MR. WOOD:  The 25th?  And then two weeks for

17 us to respond on the 8th?  Is that what I understood?

18         THE COURT:  Yes.  And then a reply by -- is

19 the 15th a holiday weekend that weekend?

20         MR. REICHMAN:  Yes, the 15th if Presidents'

21 Day.

22         THE COURT:  So the 16th for your reply.

23         MR. REICHMAN:  Okay.  Thank you, your Honor,

24 that works for us.

25         THE COURT:  All right.  Now let's talk about

Exhibit O

1  the discovery schedule.  In terms of the initial

2  disclosures, they should both -- both of your sets of

3  papers should be exchanged by the same date.  Except

4  for this motion practice, I would say two weeks is

5  enough time given the length of time that this case has

6  been pending, so you can tell me.  What I want

7  obviously is that before you raise anything with me,

8  that you speak with each other about it.

9            MR. REICHMAN:  Yes, your Honor.  This is

10  John Reichman again.  We did -- each side has already

11  served the initial disclosures.

12            THE COURT:  Yes.

13            MR. REICHMAN:  I don't think the plaintiff

14  has any problem with our disclosures and our problem is

15  limited to the disclosure with respect to damages, as

16  we've laid out.  So I'm not sure if -- so I'm not sure

17  where that puts us in terms of what you are suggesting.

18            THE COURT:  So let's say you try to work out

19  your concerns about the damages and have a date --

20  today is the 11th.  By the 29th of January, a revised,

21  complete set of the initial disclosures.  And then if

22  you still have your concerns about the damages issues

23  or any other issues, you can raise it as you go.

24            Then initial document requests and

25  interrogatories -- defendants, you've said you've done

Exhibit O

1   it, and plaintiff, you're going to.  You can start

2   obviously responding as you like but the time line for

3   when those responses are due -- we'll count off.  So

4   I'm going to put you down as the same date.  So by

5   February 8th, thirty days from there.  Is there any

6   possibility of joinder or amendment at this stage,

7   given again how long this has been around for?

8           MR. OLASOV:  We don't think so.

9           MR. REICHMAN:  I don't think either side --

10  we don't, either.

11          THE COURT:  Okay, all right, so we'll just

12  leave that as it is.  All right, the fact discovery

13  date is fine.  I'm going to change some of the dates

14  for the expert disclosures.  So the expert disclosure

15  should be provided with the close of fact discovery,

16  and I'll just tell you how I look at it.  I don't know

17  if this is going to match with what you have as a

18  general matter.

19          The way I would see it is, whoever is

20  carrying the burden of proof or raising an issue

21  uniquely -- so for example, if one of those defenses

22  that was mentioned required the burden of proof and you

23  were offering an expert with regard to that, that's the

24  moving report, the initial report.  So if you fall into

25  that category, your initial report disclosures would be

Exhibit O

1 due May 31ˢᵗ, and then we'll put the June 30ᵗʰ date for

2 the initial report, so that's 7(b) on this list.  Then

3 I will for now leave 8/6 as the rebuttal.  I think it

4 depends on what the topics are, whether a month is a

5 reasonable turnaround time or not.  I don't know yet

6 and we don't need to figure it out on this call.  We'll

7 have a status conference before you get to that.  Then

8 the other dates you have are largely -- they're all

9 fine.

10          So with the text order that comes out of

11 this conference, we'll have a status conference set

12 sometime in April.  And then a week or a little more

13 than a week before that, I'll ask you for -- submit a

14 letter letting me know what you've covered, what you

15 still have to cover.  And then particular at that

16 point, I would like to know, are you going to have

17 expert discovery or not?  If you're not, then many of

18 these dates will be moved up.  You won't need the

19 couple of months that are indicated on the schedule for

20 that.

21          A pretrial conference, that will be with the

22 district judge.  You have dates here that you put in

23 for having a demand and a response, and I see that

24 you're not asking for ADR at this point.  If you change

25 your mind and you want a referral to ADR, we could give

Exhibit O

1  you that.

2         A couple of other things.  Let me just pull

3  up the docket here.  So you do have a jury demand.

4  Again, this is something we can talk about more in the

5  future.  But as you can imagine, the trial calendar is

6  quite backed up.  Just so you know, there haven't been

7  many trials here since March of last year and the

8  general preference will be given to criminal trials

9  over civil trials.  The (ui) that was taken in the fall

10  when we were having trials was to have a criminal trial

11  calendar and a backup civil trial-ready calendar.  So

12  basically, if the criminal cases pled out, we would

13  bring the civil cases in because the jurors have been

14  summoned and we could move along that way.

15         I imagine in this case, there will be some

16  motion practice.  So this issue of when you're having a

17  jury trial, if you're having a jury trial, may be a

18  ways out.  To the extent you're thinking about how long

19  you're going to be litigating this, if you're

20  envisioning a trial at the end or almost the end, it's

21  going to be a while.  So just take that into account

22  when you're thinking about whether you want to have

23  settlement discussions or not.

24         All right, anything else?  Let me just say,

25  if you have (ui) on the way, for example if you don't

Exhibit O

1  resolve your question of what damages information needs

2  to be turned over, you can raise it, preferably by a

3  joint letter.  Other issues we should talk about?

4         MR. WOOD:  Your Honor, this is Mr. Wood.

5  Because I'm not the best note taker in the world --

6         THE COURT:  There will be an order.

7         MR. WOOD:  Could I ask the Court to also

8  have, and we'll certainly pay whatever cost, an

9  expedited transcript of this hearing prepared and filed

10  with the record of the Court?

11        THE COURT:  So we'll do two things:  There

12  will be a text order coming out of this and on the text

13  order, it will have the time stamp for the recording.

14  If you look on our court's website, there's a number

15  for ESR, which is our transcription service, and you

16  order the transcript there.  They give different rates

17  for the speed at which they do it, so I think you have

18  a couple of options with regard to the turnaround time.

19        MR. WOOD:  I bet the sooner you ask for it,

20  the more it costs, as it should.

21        THE COURT:  Yeah.  It's quite a difference

22  and you can decide what you need.

23        Okay, anything else?

24        MR. REICHMAN:  No, your Honor.

25        THE COURT:  All right, take care, Happy New

```
 1   Year.
 2              MR. OLASOV:  Thank you very much, your
 3   Honor.
 4              MR. WOOD:  Thank you very much, your Honor.
 5                       * * * * * * *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit O

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18        I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                    January 12, 2021
```

Exhibit O

Fulton County Superior Court
***EFILED***LW
Date: 8/31/2020 2:09 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:___**2020CV339937**

 JURY TRIAL DEMANDED

### VERIFIED COMPLAINT

COME NOW Nicole Wade, Jonathan Grunberg, Taylor Wilson, and Wade, Grunberg &
Wilson, LLC (collectively, "Plaintiffs"), and file this their Verified Complaint against
Defendants L. Lin Wood and L. Lin Wood, P.C. (collectively, "Defendants"), showing the Court
as follows:

### INTRODUCTION

1.

This lawsuit arises out of the breach of a Settlement Agreement and General Release
executed by the Parties on March 17, 2020 (the "Settlement Agreement").  A true and correct
copy of the Settlement Agreement is attached hereto as *Exhibit A.*[1]

---

[1] Certain portions of the Settlement Agreement have been redacted for client confidentiality
purposes, including the liquidated sum owed to Plaintiffs under the Settlement Agreement.
Contemporaneous with serving this Complaint, Plaintiffs are serving discovery upon Defendants
and third parties to allow for the disclosure of the liquidated sum.  Plaintiffs will promptly amend
the Complaint to provide the liquidated sum as soon as permitted.

2.

The parties to the Settlement Agreement are all attorneys who practiced law successfully together in the firm of L. Lin Wood P.C. (hereinafter "LLW PC") for a number of years, working on many cases together, including each of the cases identified in the Settlement Agreement.

3.

In early 2020, due to the erratic, abusive, and unprofessional behavior of Defendant L. Lin Wood (hereinafter "Wood") as described herein, Plaintiffs sought to leave Defendant LLW PC and entered into the Settlement Agreement rather than litigate – and despite – the issues described herein. Indeed, Plaintiffs Wade, Grunberg, and Wilson made significant financial concessions in the Settlement Agreement, despite having no legal obligation to do so, specifically to avoid filing this lawsuit in favor of protecting the privacy of Defendant Wood and various third parties.

4.

Pursuant to the Settlement Agreement, Defendants owe Plaintiffs a liquidated sum arising from the fees for certain cases and eventual resolution of other business disputes as set forth in the Settlement Agreement.

5.

The amount owed to Plaintiffs is owed by Defendants out of fees they have already collected from clients for work performed by Plaintiffs when they were lawyers at LLW PC; thus, enforcement of Defendants' payment obligations under the Settlement Agreement does not require clients to pay fees beyond those paid to Defendants. And, indeed, it does not involve clients at all.

6.

Defendants have failed to honor the terms of the Settlement Agreement and further advised Plaintiffs that they will not make the payment required by the Settlement Agreement.

7.

Defendants' stated position for breaching the Settlement Agreement is that the individual Plaintiffs "were not in Lin's firm [LLW PC] at any time relevant" to the cases addressed in the Settlement Agreement but only "*shared office space and worked on cases with LLW PC*" and, thus, client consent is required to split fees with said Plaintiffs, pursuant to Georgia Rule of Professional Conduct 1.5.

8.

Defendants' position that Plaintiffs Wade, Grunberg, and Wilson were never associated with Defendant LLW PC is apparently based solely on the fact that each Plaintiff received his or her compensation from Defendant LLW PC via separate LLCs, each owned only by the individual Plaintiffs, for which Defendants issued 1099s rather than W-2s, which is not only irrelevant to the issue, but also was an act taken by Defendants solely in their own discretion for the apparent purpose of not having to account for taxes on compensation paid to Plaintiffs Wade, Grunberg, and Wilson, who were required to account for their own income taxes via separate LLCs.

9.

Defendants have taken this position to avoid payment of the largest fee identified in the Settlement Agreement – the one case which, because of the size of its fee, was the primary motivation for the parties to enter into the Settlement Agreement (the "Disputed Case"). Defendants were at the time of the Settlement Agreement and remain to this day lead counsel on

this case.  Defendants now contend that this client has refused consent for Plaintiffs Wade, Grunberg, and Wilson to be paid the fee split Defendants agreed to in the Settlement Agreement – even though the entire fee has already been paid to Defendant LLW PC, and the division of compensation between the former lawyers of LLW PC should not involve clients in any way.

10.

The bad faith of Defendants' position is plain from every fact attendant to the parties' relationship and practice of law.  For instance, Defendants acknowledged Wade's, Grunberg's, and Wilson's status as lawyers and partners of Defendant LLW PC by:

(a) Creating, or causing to be created, Defendant LLW PC's website, which identified Wade, Grunberg, and Wilson as partners of LLW PC;

(b) Making public announcements via the Fulton County Daily Report, the State Bar Journal, and other publications regarding each individual Plaintiff's hiring and/or promotion to partners of Defendant LLW PC;

(c) Allowing and directing countless representations to be made to many courts, both federal and state, that each individual Plaintiff was a member of Defendant LLW PC by virtue of every filing by any of the individual Plaintiffs and every hearing, trial, deposition, mediation, and/or arbitration attended by any individual Plaintiff;

(d) Drafting, or causing to be drafted, countless engagement agreements entered into by Defendant LLW PC wherein one or more of the individual Plaintiffs were identified as lawyers of LLW PC who would be working on that client's matter;

(e) Providing to the individual Plaintiffs business cards identifying each individual Plaintiff as an attorney of LLW PC;

(f)  Providing each of the individual Plaintiffs with email addresses at LLW PC's domain "linwoodlaw.com";

(g)  Making countless introductions in court, in depositions, to clients, and to third parties of each of the individual Plaintiffs as "Partners" of LLW PC;

(h)  Drafting countless emails, texts, tweets, and conversations over a period of years acknowledging and holding out the individual Plaintiffs as "Partners" of Wood and LLW PC; and

(i)  Expressly acknowledging in the Settlement Agreement that Plaintiffs Wade, Grunberg, and Wilson "never held any ownership interest in L. Lin Wood, P.C. (hereinafter "LLW PC") but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018."

11.

Thus, despite the avalanche of evidence to the contrary and their agreement in the Settlement Agreement, Defendants now apparently contend that Plaintiffs Wade, Grunberg, and Wilson were not "associated in a law firm" with Defendant Wood.

12.

It is now clear that Defendants committed fraud because they never intended to pay the majority of the money they owe to Plaintiffs under the Settlement Agreement. Defendants' fraudulent intent is evidenced in their first draft of the Settlement Agreement which contained a false recital that was a poison pill, as it mirrors Defendants' now-stated reason for breaching the contract: "Nicole Wade, Jonathan Grunberg, and Taylor Wilson and L. Lin Wood, P.C. are lawyers who practiced law, *co-counseled cases, and shared office space together*."

13.

The Parties heavily negotiated Defendants' false recital about Plaintiffs Wade, Grunberg, and Wilson working as partners of Defendant LLW PC, ultimately resulting in the statement that Plaintiffs "*have worked as lawyers of L. Lin Wood, P.C.* on cases since 2018." (Ex. A emphasis added). The attention Defendants cast on this detail reveals their fraudulent intent.

14.

Defendants' breach of contract was premeditated; Defendant Wood never intended to make the payment required by the Settlement Agreement as he has repeatedly sworn since February 10, 2020 and as quoted herein.

15.

Defendants' bad faith in entering into a contract under which they never intended to perform, as shown herein, demonstrates that they fraudulently induced Plaintiffs to enter into the Settlement Agreement so that they could exact financial concessions from Plaintiffs for which Plaintiffs had no legal liability in exchange for finally obtaining Defendants' false promise to pay to Plaintiffs a larger sum, to which they were entitled, which Defendants never ultimately intended to pay.

**PARTIES, JURISDICTION AND VENUE**

16.

Plaintiff Nicole Wade ("Wade") is a citizen and resident of the State of Georgia.

17.

Plaintiff Jonathan Grunberg ("Grunberg") is a citizen and resident of the State of Georgia.

6

18.

Plaintiff Taylor Wilson ("Wilson") is a citizen and resident of the State of Georgia.

19.

Plaintiff Wade, Grunberg & Wilson, LLC ("WGW LLC") is a limited liability company registered to transact business in the State of Georgia. Its principal place of business is located in Fulton County, Georgia 30309. Its only members are Plaintiffs' individual LLCs: Wade Law, LLC, J.D. Grunberg, LLC, and G. Taylor Wilson, LLC, each a single member Georgia limited liability company, owned solely by the individual Plaintiff identified in the LLC name.

20.

Defendant L. Lin Wood ("Wood") is a citizen of the State of Georgia and a resident of Fulton County, Georgia and may be served at his residence at ███████████████████████ ████████████

21.

Defendant L. Lin Wood P.C. ("LLW PC") is a professional corporation registered to transact business in Georgia. L. Lin Wood, P.C. may be served through its Registered Agent, L. Lin Wood, 1180 West Peachtree Street, Suite 2040, Atlanta, Fulton County, Georgia 30309. Its only shareholder is individual Defendant Lin Wood.

22.

Pursuant to O.C.G.A. § 15-6-8 and GA. CONST. art. VI, § 4, ¶ I, this Court has jurisdiction over this action and over Defendant Wood, a resident in Fulton County, Georgia, and Defendant LLW PC, a corporation operating in Fulton County and whose registered agent is located in Fulton County, Georgia.   All actions giving rise to the basis of this Complaint

occurred in Fulton County, Georgia, and pursuant to O.C.G.A. §14-2-510(b)(4), venue is proper in this Court.

## STATEMENT OF FACTS

### Detailed Facts Pertinent to Breach of Contract

### Background of Plaintiffs' Association with Defendant LLW PC

23.

Plaintiffs Wade, Grunberg, Wilson, and Defendant Wood are lawyers who are licensed to practice law in the State of Georgia.

24.

In or around September 2014, Plaintiff Grunberg was hired as an associate – a W-2 employee – by Defendant LLW PC when Wood's former firm, Wood, Hernacki & Evans, LLC disbanded.

25.

In May 2015, Plaintiff Wade joined LLW PC as a Partner.

26.

Effective May 2015, Plaintiff Wade and Defendant LLW PC entered into an agreement titled "Agreement for Nicole Jennings Wade to Join L. Lin Wood, P.C." with a term sheet providing, in material part, that "Nicole will join L. Lin Wood, P.C. between May 11, 2015 and June 15, 2015," that "Nicole will agree to work full-time and exclusively for L. Lin Wood, P.C.," that she will join "L. Lin Wood, P.C. as a 'Partner,'" and that "[t]he structure, and Nicole's partnership, will be re-evaluated, and potentially re-negotiated, after one year."

27.

Defendants' hiring of Wade as a partner was announced in the Fulton County Daily Report (the "Daily Report"), stating as follows: "Trial law firm L. Lin Wood, P.C. has added Nicole Jennings Wade as a partner from Bryan Cave—the fourth lawyer for the firm.  Wade handles fiduciary, trust and estate, and general business litigation.  Until now, she had practiced at Bryan Cave and predecessor firm Powell Goldstein for her 20-year legal career."

28.

Defendants also arranged for an email blast from the Daily Report as follows:



29.

Plaintiff Wilson was hired as an associate – a W-2 employee – by Defendant LLW PC in November of 2015.

9

30.

Following Wilson's arrival in November 2015, LLW PC operated as a law firm with 4 lawyers – Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson – until January/February 2020.

31.

In early 2018, Defendant Wood indicated his intent to begin practicing law alone as the sole lawyer of Defendant LLW PC.

32.

At that time, Defendant Wood began looking for office space for himself and one non-attorney employee.

33.

In light of Defendant Wood's stated intention, Plaintiffs Wade, Grunberg, and Wilson formed WGW LLC.

34.

WGW LLC agreed to hire the other non-attorney employee of LLW PC who Defendant Wood did not plan to keep at LLW PC.

35.

Plaintiffs Wade, Grunberg, and Wilson also began searching for office space, and with Defendant Wood's knowledge and approval, they employed Defendants' own real estate brokers to canvas for space.

36.

During this time, Plaintiffs Wade, Grunberg, and Wilson had numerous discussions with Defendant Wood in which they sought his advice about the formation and structure of WGW LLC.

37.

For example, Plaintiff Wade specifically discussed with Defendant Wood the anticipated compensation structure of WGW LLC, and he provided his opinion on that issue.

38.

Defendant Wood indicated that he planned to continue to work with Plaintiffs' new firm as he anticipated that the individual Plaintiffs would continue doing the same work for Defendants' clients that they had been doing.

39.

Indeed, the individual Plaintiffs had lengthy written and oral discussions about Defendant Wood potentially serving as "of counsel" at Plaintiff WGW LLC, and Plaintiff Wilson undertook research regarding whether Defendant Wood could ethically practice with two different law firms, and determined that he could by express authority of the Georgia Bar via advisory opinion.

40.

In or around April 2018, Defendant Wood changed his mind and elected to keep Defendant LLW PC together with Plaintiffs Wade, Grunberg, and Wilson continuing as attorneys of Defendant LLW PC.

41.

Effective May 1, 2018, Defendants promoted Plaintiffs Grunberg and Wilson to non-equity partners of Defendant LLW PC and announced their promotions to partner via the Daily Report and the Georgia Bar Journal as follows:





L. Lin Wood, P.C., announced that Jonathan D. Grunberg and G. Taylor Wilson were promoted to partners. Grunberg focuses his practice on complex civil litigation in federal court. Wilson focuses on complex civil litigation in both federal and state court. His principal areas of representation include business and commercial litigation in both contract and tort, false claims act cases and actions for defamation and related first amendment issues. The firm is located at 1180 W. Peachtree St., Suite 2400, Atlanta, GA 30309; 404-891-1402; Fax 404-506-9111; www.linwoodlaw.com.

42.

Plaintiffs Wade, Grunberg, and Wilson then abandoned Plaintiff WGW LLC, which never operated prior to their departure from Defendant LLW PC in February 2020.

43.

Defendant Wood changed his office space search to find space sufficient for Defendant LLW PC to continue operating with four lawyers and two assistants, and in July 2018, Defendant LLW PC ultimately signed a lease at 1180 W. Peachtree St. NE, Suite 2040, Atlanta, GA 30309 (the "Lease").

12

44.

At Defendant Wood's instruction, Plaintiffs Wade, Grunberg, and Wilson executed the Lease on July 17, 2018, only as "Partners" of Defendant LLW PC. The Lease makes no mention of any of the Plaintiffs' LLCs, and Plaintiffs did not execute personal guarantees.

45.

Defendant LLW PC moved into the new office space at Suite 2040 in September of 2018—along with its attorneys Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson.

46.

By the middle of 2019, Defendant Wood indicated that he planned to enter into semi-retirement at the beginning of 2020.

47.

As part of his anticipated transition out of the practice of law, in late January 2020, Wood decided to re-brand Defendant LLW PC as a partnership named Wood, Wilson, Grunberg & Wade ("WWG&W").

48.

Defendants publicly announced the formation of WWG&W on or about January 24, 2020 in the Daily Report as follows:



49.

Pursuant to Defendant Wood's instruction, the receptionist began answering the office phone with "Wood, Wilson, Grunberg & Wade" on the morning of Monday, January 27, 2020.

50.

No written documentation was ever prepared or executed setting forth the relationships between the partners of WWG&W, and no paperwork regarding the entity was ever filed with the Georgia Secretary of State.

51.

Neither Defendants nor Plaintiffs ever filed any document in any court under the name and or firm WWG&W; and thus for *every* case that Plaintiffs Wade, Grunberg, and Wilson were actively litigating as of February 14, 2020, they were listed on the docket as attorneys of Defendant LLW PC.

52.

For reasons more fully described below, Plaintiffs Wade, Grunberg, and Wilson determined that they could no longer practice law with Defendant Wood and terminated their association with Defendants on Friday, February 14, 2020.

14

**Individual Plaintiffs Were Non-Equity "Partners" of LLW PC After May 1, 2018**

53.

Upon information and belief, Defendant Wood always has been the sole member of LLW PC.

54.

At all times from May 1, 2018, until their departure on February 14, 2020 (hereinafter, the "relevant time period"), Plaintiffs Wade, Grunberg, and Wilson were held out as "Partners" of Defendant Wood, whether in the entity LLW PC or the rebranded WWG&W.

55.

Throughout the relevant time period, the individual Plaintiffs received compensation for their work as lawyers and partners of LLW PC through their individual LLCs.

56.

Irrespective of their titles, at all times during the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were lawyers of LLW PC, including the rebranded firm WWG&W.

57.

Throughout the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were "associated with" Defendant LLW PC and Defendant Wood, including for the few weeks when the firm was rebranded as WWG&W..

58.

Throughout the relevant time period, Defendant Wood referred to Plaintiffs Wade, Grunberg, and Wilson as his partners and as partners of LLW PC in court appearances, in depositions, to clients, to third parties, and in countless emails, texts, and tweets.

59.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson were identified

on the website of LLW PC, at linwoodlaw.com, as "Partners."

60.

Screenshots of pages on linwoodlaw.com as of January 2020, show each of the individual

Plaintiffs represented as Partners of LLW PC:









61.

During the relevant time period, Defendants provided to the individual Plaintiffs e-mail addresses at Defendants' domain www.linwoodlaw.com.

62.

During the relevant time period, Plaintiffs Wade's, Grunberg's, and Wilson's @linwoodlaw.com e-mail addresses were their only professional e-mail addresses for corresponding with clients or any other purpose.

63.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson each sent hundreds of emails to Defendant Wood with a signature block identifying themselves as "Partner" of "L. Lin Wood, P.C."

64.

During the relevant time period, Defendant Wood never told Plaintiffs Wade, Grunberg, or Wilson that identifying themselves as "Partner" of "L. Lin Wood, P.C." was incorrect.

65.

During the relevant time period, Defendants provided to the individual Plaintiffs business cards evidencing their association in the law firm of LLW PC, for example:







66.

During the relevant time period, Defendants filed countless court documents identifying the individual Plaintiffs as attorneys of LLW PC in the block identifying counsel.  For example, in a pleading signed by Defendant Wood in December of 2019, the block stated:

Case 2:18-cv-08048-SVW-JC   Document 143   Filed 12/02/19   Page 1 of 6   Page ID #:5639

```
1   L. LIN WOOD, P.C.
2   L. Lin Wood (pro hac vice)
    lwood@linwoodlaw.com
3   Nicole J. Wade (pro hac vice)
4   nwade@linwoodlaw.com
    Jonathan D. Grunberg (pro hac vice)
5   jgrunberg@linwoodlaw.com
6   G. Taylor Wilson (pro hac vice)
    twilson@linwoodlaw.com
7   1180 West Peachtree Street, Ste. 2040
8   Atlanta, Georgia 30309
    404-891-1402
9   404-506-9111 (fax)
```

67.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson and Defendant Wood maintained equal access to all current client files of Defendant LLW PC.

19

68.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson and Defendant Wood shared operating expenses, 25% each, including for, *inter alia,* office space lease, salary of a non-lawyer employee, file maintenance, website hosting, telephones, internet, cable, Westlaw, malpractice insurance for Defendant LLW PC, office supplies, copier/scanner, technical support, file storage and archiving, and other miscellaneous overhead expenses.

**Plaintiffs Wade, Grunberg, and Wilson Practiced Law Only for LLW PC**

69.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson practiced law as attorneys acting solely on behalf of Defendant LLW PC.

70.

During the relevant time period, Defendant Wood originated the majority of the clients and business at Defendant LLW PC.

71.

Any client originated by Plaintiffs Wade, Grunberg, or Wilson during the relevant time period executed an engagement agreement with Defendant LLW PC, was billed by LLW PC, and made payments to LLW PC.

72.

At no time did WGW LLC, Wade LLC, Grunberg LLC, Wilson LLC, or Grunberg & Wilson LLC ever enter into an engagement agreement with a client, bill a client, collect fees from a client, or take any actions to represent a client during the relevant time period.

73.

For example, while paragraph 1.A of the Settlement Agreement says of each of the clients in subparagraphs iv, v, and vi that he, she, or it "was and is the client of WGW," (Ex. A.), this simply referred to who originated the client and/or would manage the client's on-going matter. During the relevant time period: (1) each of those clients had an engagement agreement with Defendant LLW PC; (2) none of those clients had an engagement agreement with WGW LLC, Wade LLC, Grunberg LLC, Wilson LLC, or Grunberg & Wilson LLC; (3) Defendants were counsel of record for each of those clients; and (4) at least one of Wade, Grunberg, or Wilson were also counsel of record for those clients as attorneys of Defendant LLW PC.

74.

During the relevant time period, every correspondence or court filing made by Plaintiffs Wade, Grunberg, and/or Wilson on behalf of a client was made in their capacities as attorneys of LLW PC—with the exception of several letters that may have been sent after January 24, 2020, bearing the letter head of the rebranded firm, WWG&W.

75.

At all times during the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never represented a client through any law firm other than Defendant LLW PC (or possibly its rebranded name WWG&W after January 24, 2020).

76.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never entered into an attorney engagement agreement to represent a client under a firm other than Defendant LLW PC (or possibly its rebranded name WWG&W after January 24, 2020).

77.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson never made an appearance in any case on behalf of any client under any firm name other than Defendant LLW PC.

**Individual Plaintiffs Performed Significant Work for All LLW PC Clients**

78.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson generated nearly all of the work product for the clients of Defendant LLW PC.

79.

During the relevant time period, one or more of the individual Plaintiffs made an appearance on behalf of LLW PC in every proceeding in which Defendant LLW PC was counsel of record, in at least eight different states.

80.

Indeed, as of February 14, 2020, Plaintiffs Wade, Grunberg, and/or Wilson originally authored every pleading, substantive motion, and brief prepared by LLW PC and filed with the court for the cases subject of the Settlement Agreement for which a lawsuit had been filed, all pursuant to Defendant Wood's instruction and supervision, some of which were edited by Defendant Wood.

81.

During the relevant time period, every hourly fee engagement entered into by and between Defendant LLW PC and any client specifically listed one or more of Plaintiffs Wade, Grunberg, or Wilson as attorneys of Defendant LLW PC who were expected to perform work on behalf of the client.

82.

During the relevant time period, Plaintiffs Wade, Grunberg, and Wilson communicated extensively with clients of LLW PC on whose cases they were working.

83.

Specifically, the individual Plaintiffs communicated and worked with the clients for every case addressed in the Settlement Agreement, in some of those cases acting as the primary client contact.

**The Settlement Agreement**

84.

Within 48 hours of Plaintiffs' departure from LLW PC, and before the individual Plaintiffs had even discussed re-activating WGW LLC, the Parties began negotiating a resolution of the issues arising from Plaintiffs' separation from LLW PC.

85.

On February 17, 2020, the Parties reached an agreement with respect to compensation to be paid on past and pending cases, which Defendant Wood subsequently reneged on – only to agree to the same fee split one month later when represented by counsel.

86.

On March 17, 2020, Plaintiffs and Defendants entered into the global Settlement Agreement, which provided that Plaintiffs and Defendants would separate and practice law separately, which resolved issues regarding compensation to the individual Plaintiffs for their work on certain of Defendant LLW PC's pending cases, and which allocated expenses related to the Lease.

87.

In the Settlement Agreement, the Parties resolved fee disputes: (1) regarding compensation already earned by Defendant LLW PC on cases for which Plaintiffs Wade, Grunberg, and Wilson had performed substantial work; (2) regarding compensation to be earned by Defendant LLW PC for cases on which Plaintiffs Wade, Grunberg, and Wilson had performed substantial work; (3) regarding compensation to be earned by Plaintiff WGW LLC on cases originating with Defendant LLW PC; and (4) regarding Defendants' claim that Plaintiffs owed to Defendant LLW PC rent due under the Lease for LLW PC's office space after they departed, even though Plaintiffs Wade, Grunberg and Wilson signed the Lease only as partners of Defendant LLW PC, the Lease does not contain any personal guaranty, and Defendants evicted Plaintiffs from the space on February 14, 2020.

88.

Specifically, the Settlement Agreement provided that Plaintiffs would pay to Defendant LLW PC a percentage of fees eventually recovered in three cases that they would take and continue to work on, and that Defendant LLW PC would pay Plaintiffs a specific dollar amount of its fees collected on three separate cases that had either officially or functionally been resolved but for which Defendant LLW PC had not yet been paid its attorneys' fees, as well as fees to be collected in connection with several other cases that had not yet resolved.

89.

Plaintiffs Wade, Grunberg, and Wilson performed substantial work—if not the majority of the work—during the relevant time period on behalf of LLW PC on each of the cases for which Defendants agreed to compensate Plaintiffs in the Settlement Agreement.

24

90.

Plaintiffs were not compensated for any of their substantial work on the cases included in the Settlement Agreement, but Plaintiffs reasonably expected compensation from Defendant LLW PC based on the firm's practice and procedure and assurances by Defendant Wood.

91.

During the relevant time period, Plaintiffs Wade, Grunberg, and/or Wilson had communicated and worked with each client whose cases were included in the Settlement Agreement, such that each client was familiar with the fact that one of more of the individual Plaintiffs was working on his, her, or their case.

92.

In regard to the three cases that were already settled or functionally settled, Defendant LLW PC agreed to pay Plaintiffs a specific dollar amount, with payment to be made within seventy-two hours of LLW PC's receipt of its portion of the fees in the Disputed Case, less payment for a portion of the Lease.

93.

Thus, as drafted by Defendants, the Settlement Agreement provided that all payments from Defendant LLW PC would become due and owing only upon receipt of the proceeds for its attorneys' fees from the Disputed Case.

94.

At all times during the relevant time period, including at the time the Settlement Agreement was executed, Defendants were counsel for the clients in the Disputed Case.

95.

Following execution of the Settlement Agreement, Defendants reported to Plaintiffs on multiple occasions regarding the status of the trigger for payment under the Settlement Agreement.

96.

Subsequently, however, Defendants advised Plaintiffs (through counsel) of their purported belief that client consent was required for the payments to Plaintiffs agreed to in the Settlement Agreement pursuant to Georgia Rule of Professional Conduct 1.5(e), that the client in the Disputed Case refused consent, and that after off-setting the fees to be paid to Plaintiffs from the other cases that had already been resolved, Plaintiffs owed Defendant LLW PC a significant sum pursuant to Paragraph 2 of the Settlement Agreement concerning the Lease.

97.

With respect to the Lease, the Settlement Agreement provides as follows:  "WGW shall pay to LLW PC the amount of [redacted] in full satisfaction of any obligations WGW may have, or be alleged to have, under the lease agreement …" which "amount shall be deducted from the payment by LLW PC to WGW referenced in Section 1(B) above."

98.

Thus, there is no provision in the Settlement Agreement requiring Plaintiffs to affirmatively pay to Defendants any amount of money, nor any time frame by which Plaintiffs would have to do so.  Instead, the Settlement Agreement explicitly provides for a net lump sum payment to Plaintiffs.

99.

Despite Defendants' counsel expressly intertwining the payments to Plaintiffs with the Lease payment, and despite Defendants' receipt and retention of all fees in the resolved cases subject of the Settlement Agreement, Defendant LLW PC stated its intent to hold Plaintiffs liable for the Lease payment.

100.

Thereafter, Plaintiffs notified Defendants that Georgia Rule of Professional Conduct 1.5(e) does not apply to this situation because the rule governs only "lawyers who are not in the same firm" and that it does not "regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm." *See* Rule 1.5, cmt. 8.

101.

Prior to the execution of the Settlement Agreement, Defendants did not seek client consent for the purpose of paying compensation to Plaintiffs Wade, Grunberg, and Wilson as a matter of practice, both for hourly and contingency arrangements, and only Defendant LLW PC was listed as receiving fees in the settlement statement sent to clients following settlement of a contingency fee case.

102.

Upon information and belief, over seventy-hours (72) have passed since Defendant LLW PC received funds identified in the Settlement Agreement as the trigger for Defendants' payment to Plaintiffs.

103.

Thus, Defendants are obliged to pay to Plaintiffs the liquidated sum due under the Settlement Agreement, as well as additional funds due to Plaintiffs.

27

104.

Plaintiffs have repeatedly demanded that Defendants honor their obligation to pay Plaintiffs the liquidated sum for fees required by the Settlement Agreement, as well as additional funds due to Plaintiffs, and have reminded Defendants' counsel of the facts and allegations contained herein.

105.

Defendants have continued in bad faith to refuse to pay the amount they agreed to pay Plaintiffs under the Settlement Agreement.

**Detailed Facts Pertinent to Fraud Claims**

**Deterioration of the Law Firm**

106.

Beginning in the fall of 2019 and continuing through 2020, Defendant Wood's behavior became increasingly erratic, hostile, abusive, and threatening toward Plaintiffs Wade, Grunberg, and Wilson, as well as many other individuals.

107.

While in the years before the Fall of 2019, Defendant Wood could at times be abusive, his bad behavior became far more serious and persistent than in years past.

108.

Plaintiffs Wade, Grunberg, and Wilson nevertheless remained in Defendant LLW PC because they were committed to serving as attorneys for a trial scheduled for early-December 2020, and Defendant Wood repeatedly assured them he would be stepping away from the practice of law after the trial ended.

109.

Although relevant, Plaintiffs will avoid pleading the specifics of Defendant Wood's erratic behavior prior to February 14, 2020—except as to facts specifically and demonstrably related to Defendants' fraudulent and malicious intent to induce Plaintiffs to enter into the Settlement Agreement that Defendants would ultimately refuse to honor.

110.

The vast majority of the alleged communications below were made by Defendant Wood, and there is a noticeable void of responses by Plaintiffs Wade, Grunberg, and Wilson—who refused to respond in kind to Defendant Wood's behavior.

111.

Throughout late 2019 and January and February 2020, abusive, incoherent phone calls, voicemails, texts, and emails by Defendant Wood to Plaintiffs Wade, Grunberg, and Wilson sent in the middle of the night were the norm. All of these erratic communications have a few things in common:   most of these emails profess that God or the Almighty was commanding his actions; many were stating his refusal to pay the Plaintiffs "one thin dime;" and virtually all were abusive.

112.

Defendant Wood's behavior continued to deteriorate, including assault and battery on Wilson in Defendant Wood's home after he had traveled there to check on Wood. In the Fall of 2019, Defendant Wood also committed assault and battery on Grunberg in an elevator of a hotel during an out of town deposition.   In both assaults, there was essentially no reason whatsoever for the attack, and Defendant Wood later acknowledged and apologized for this violence.

113.

Defendant Wood, himself, acknowledged during late 2019 that his behavior was abusive on October 2, 2019, when he e-mailed Plaintiffs Wade, Grunberg, and Wilson, stating, in relevant part, "The Boss, Pops, Lin, Asshole – whatever you wish to call me – knows that I have allowed a combination of pressures over the past many weeks, if not months, to become justifications for treatment of each of you, to varying degrees and at various times, that can only be described as rude, overly demanding, and at times abusive."

114.

Unfortunately, that acknowledgement changed nothing and his behavior toward Plaintiffs Wade, Grunberg, and Wilson continued to worsen.

115.

On February 10, 2020, Defendant Wood contacted Plaintiffs and begged for them to come to his house around 1:00 am, which Plaintiff Grunberg and Wade did.  Once there, Defendant Wood urged them to stay with him until morning, with Plaintiff Grunberg leaving at approximately 4:30 am and Plaintiff Wade leaving after sunrise.  This experience unnerved the Plaintiffs.

116.

That day, Plaintiffs Grunberg and Wilson confronted Defendant Wood about his behavior.

117.

Even at that early juncture, Defendant Wood immediately threatened Plaintiff Wilson that leaving his firm was "professional suicide" and threatened not to pay Wilson the money he was owed for his work in the Disputed Case, stating as follows:  "let me tell you what's gonna

happen to you … watch what happens with the [Disputed Case] fee.  I'll show you what I think of what you've done to me."

118.

That evening, Defendant Wood called Plaintiff Wade and, during a call that lasted approximately two hours, Wood advised Wade that he was going to destroy Plaintiffs Grunberg and Wilson.  During this conversation, Defendant Wood could not help but revisit his obsession with Plaintiff Wilson's wife, stating:  "by the time I am through with Taylor Wilson, he's going to wish all I had done was fuck his wife."

119.

On February 11, 2020, at 1:03 a.m., Defendant Wood e-mailed Plaintiffs Wade, Grunberg, and Wilson, firing the Plaintiffs and changing the firm, while insisting that Plaintiffs had the "fiduciary duties" of partners, stating, in material part, as follows[2]:

Taylor, Jonathan, and Nicole,

**Effectively immediately**, the law firm of **L. Lin Wood, P.C.** hereby withdraws from any and all law partnerships with your law firms and you, including, but not limited to the partnership of Wood, Wilson, Grunberg & Wade….

I want Taylor and Jonathan physically out of my office space as soon as possible. I am willing to be more lenient with Nicole but I want the physical separate of the lawyers from 1180 West Peachtree St., Suite 2040 executed with no delay....

I request that each of you provide me with a list of outstanding cases of LLW PC on which you are presently working…. I would like from each of you the number of hours (with description) you each have expended on the [Disputed Case]. Hours on the pending [redacted] can be submitted separately by end of week.  If you have any other [redacted] hours … please include them with some reasonable detail by the end of the week….

---

[2]  To protect the privacy of many third-parties, Plaintiffs will not be tendering copies of Defendant Wood's e-mail correspondence and other communications with this Complaint but provide as much context as is appropriate in each quote.

31

In meantime, I remind you of **the fiduciary duty of non-disparagement** which shall be strictly enforced.  You are hereby prohibited from contacting any of my clients, referring attorneys or co-counsel without my specific written authorization….

(Emphasis in original).

120.

Plaintiffs Wade, Grunberg, and Wilson began moving out of Defendant LLW PC's office space on February 11, 2020.

121.

By the afternoon of that same day, February 11, 2020, Defendant Wood had completely changed his mind and left voicemails for each of Plaintiffs Wade, Grunberg, and Wilson, rescinding his withdrawal from their partnership and their eviction from his office space.   For example, Defendant Wood stated in part in a voicemail to Plaintiff Wade:

. . . This law firm is going to go forward as Wood, Wilson, Grunberg & Wade.  Business as usual is back now being business as usual.  Keep doing what you're doing on the cases you're doing.  I don't need your hours in the [Disputed] case – I never have. No reason to do it now except in billable cases.  . . . We are going to continue as a partnership.  A partnership under that name that is going to be one of the great partnerships in the history of the law. . . .  I'm going to ask you to do the big word "T."  Trust me.  . . . I'm going to let God's will be done for our law firm. . .  Everything I said in that letter last night is rescinded.

122.

Plaintiffs Wade, Grunberg, and Wilson decided to give it one more shot in the hopes of helping Defendant Wood and in the hopes that the work environment would return to status quo.

123.

On February 13, 2020, the day before all 5 people who worked for Defendant Wood at Defendant LLW PC terminated their employment, Defendant Wood hosted an approximately 3.5 hour teleconference with Plaintiffs Grunberg and Wilson in which he spoke almost non-stop.

32

124.

During the 3.5-hour teleconference, Defendant Wood referred to himself as Almighty; offered to fight the individual Plaintiffs to the death; demanded the Plaintiffs' undying loyalty; threatened to "hurt" the Plaintiffs; offered to have the Plaintiffs stay in the firm; and called Plaintiff Grunberg a "Chilean Jew" and demanded that he admit he does not look like the other lawyers in the firm.   Unfortunately, the list goes on, as reflected by the following pertinent portion of the transcript of the call (except as indicated by brackets and double quotation marks, the words are Defendant Wood's):

> … I own that office.  Y'all know that now.  I showed you who had power, didn't I?  But I didn't exercise it.  Cause I right now would never do anything in the exercise of my power do anything to hurt any of y'all or your families.  Do you believe me?  Cause if you don't believe that, this conversation is over. It will not be a problem solved. If you tell me you believe that, and I just showed you that, by not hurting you, by **showing you who had the power to hurt ya, to hurt your families, to hurt your law careers**, and didn't exercise it, yes or no, let's get a vote. Taylor, does everyone in that room believe, believe, choose to believe, that Lin Wood would never exercise his power in a fashion that he knew would hurt any one of you, personally or professionally, including your families, and your legacy as a lawyer.  Yes or no, guys, gal?   [Said by Wilson] "Lin, I certainly."  I just wanted a yes or no, I didn't ask for a discussion, and I own that office and if you don't do what I say this time, you're gonna pack your bags, that's how much power I have, I don't wanna exercise that power, it would hurt you, don't force me, that's the point.

> I'm telling you I have the power to hurt you and would never do so, and if you don't believe I have the power to hurt you, you are wrong. I can hurt you the minute I take you off that name [Wood, Wilson, Grunberg & Wade].  That will be a bad stain on your life, and if you try to hurt me back, you will be laughed at.  Anybody in this law office that attacks Lin Wood may be right, but everybody's gonna disrespect you for doing it. There's a time to speak.  There's a time to be silent.  You people don't know the difference….

> Now, would you accept this kind and loving admonishment.  I could have thrown by my own free will every damn one of you out of my law office, off of the damn

letterhead with my name on it, and Nicole is included, by doing one of two things, I could have pulled my name off that door in a heartbeat if I wanted to … I could have pulled all three of your names off of that damn thing and it would just be me, if I wanted to I'd have the power to do it, right? …

. . . If you keep showing me disrespect, Jonathan, there's gonna be a man come up there in your office … but if you ever don't give me respect in that office, knowingly … but if I ever discern that I think you are disrespecting me in that law office, that little man or woman is gonna come up in ten minutes and they're gonna throw your ass out. Do you understand, whether you agree with it or not, you concede that I have the power to do it.  Do you understand what's gonna happen to ya if you ever, if I ever discern that you show me an act of disrespect again? … if you [interrupt me] in a disrespectful way, in my judgment alone, any one of the three of you is gonna be escorted out of my law office within ten minutes … they're gonna take you out and throw you on the street if they want to … do you understand what I'm telling you?  Cause if you don't we got a problem.  You hear me?  Does everybody hear me?  Now I'm gonna tell you something very surprising, y'all just heard from the Almighty Lin and it sounds powerful and you believe it don't ya? … Almighty Lin just told you what would happen if he thinks you ever, in his opinion, discerns that you're being disrespectful to me by anything other than an accident or mistake, he's gonna throw you out. Ya hear me? … Now Almighty Lin's gonna tell you this … the power that I just had can change your life if I ever decide … even if it's good or bad, I can change your life with the exercise of that power, right? …

I'll commit sins.  I'll [physically] push you when you piss me off. Maybe you deserve it and I'm the only one that will inflict it upon you because I'm the only one that has the courage to tell you the lesson you fucked up don't do it again.  Swear I'll never do it again to either one of you, although interestingly I've done it to both of you at once. I'll never do it to you again. Don't ever do anything that would even make me think about doing it again.  Cause I might make the same mistake then that I made then, I might push you and I wouldn't mean to hurt you.  I wouldn't mean to push you around, especially cause either one of you would whip my ass *or maybe you wouldn't cause you don't have the courage I have. Maybe I would fight you till you damn die. Or both of us died*. Cause I got courage inside of every bone in my body that you'll never know. I wish you had it. I wish everybody had it. Everybody doesn't have it guys.  You're practicing law with a man that has courage, to take on the big ones….

The best man you'll ever see in life won't be your daddy, Taylor.  It won't be your daddy, Jonathan.  It won't be your daddy, [redacted]. The best damn man

34

you've ever met in life is Lin Wood. Don't you forget it…. ***Or just plain member of one damn law firm, like we all are….***

One nation, one law firm, one law firm, under law, all members are created equal. ***All members of this one law firm are the same….***

<div align="center">125.</div>

By the date of the 3.5-hour teleconference on February 13, 2020, Defendant Wood had effectively not been in the office for weeks since a December 2019 trial—with the exception of several brief appearances at the office.  And from the time that Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson traveled to and attended a hearing out-of-state in mid-January, the only time any of the Plaintiffs had seen Wood was when he assaulted Plaintiff Wilson on January 27th and when Plaintiffs Grunberg and Wade were called to his home in the early morning hours of February 10th when Defendant Wood called them over saying it was a matter of life or death. Defendant Wood spent most of this period outside of Atlanta.

<div align="center">126.</div>

All of LLW PC's cases were being handled primarily by one or more of the individual Plaintiffs, who coordinated with third party co-counsel.  And LLW PC had active co-counsel outside the firm in every active case as of February 14, 2020, all of whom were on notice when Wade, Grunberg, and Wilson left the firm.

<div align="center">127.</div>

Defendant Wood called for an in-person meeting on the morning of February 14, 2020.

<div align="center">128.</div>

In the hours preceding this February 14 meeting, Defendant Wood repeatedly called Plaintiffs Wade, Grunberg, and Wilson, berating them, and also threatening them with alleged

<div align="center">35</div>

civil claims arising from their purported fiduciary duty *as his law partners* not to disparage him, although he failed to specify what words or actions he felt were disrespectful.

129.

Plaintiffs Wade, Grunberg, and Wilson – together with the only other two employees of Defendant LLW PC – all walked out of the LLW PC offices prior to Defendant Wood arriving out of fear for their physical safety.

130.

All five were forced to terminate their employment and association with Defendants on February 14, 2020.

131.

Immediately thereafter, Defendant Wood asked building security to escort all five out of the office, and he then changed the locks to the Leased space.

132.

At this point, Defendant Wood began a series of irrational and incomprehensible email, text, and voicemail threats.  All of these emails, most of which are sent in the middle of the night, have a few common themes:  False and manufactured accusations that Plaintiffs did some heinous federal crimes that he has chosen not to identify, Defendant is doing God's will, and Defendant will never pay the Plaintiffs anything, while reiterating nonetheless that the individual Plaintiffs were his law partners.

133.

On February 15, 2020, at 1:42 am, Defendant Wood e-mailed Plaintiff Wilson and 13 others, stating again that he felt he had somehow been victimized by some unspecified action

which required him bringing down the "wrath of God" and referencing punishment "at the discretion of Almighty God."

<div align="center">134.</div>

Two hours later, at 3:45 a.m., Defendant Wood e-mailed Plaintiffs Wade, Grunberg, and Wilson, as well as 9 others, to continue his incoherent allegations and his belief that God was somehow commanding him or directing him to accuse the Plaintiffs and repeating his threat never to pay the Plaintiffs anything for their services. He began the email by stating "God has given me permission to be profane in this email, which is my last email of the night," and additionally stating, in material part, as follows:

> You damn dumb motherfuckers.
>
> You have now subjected yourselves and your families to the fact that you are all guilty of federal crimes. And you are going to be ruined financially, if necessary, in civil and criminal lawsuit. You committed computer fraud today and possibly bank fraud. Your lies and fraud upon law firms and your employers are going to come back quickly to haunt you for the rest of your lives.
>
> You fucked with the wrong guy. You fucked with Lin Wood. Bad fucking choice.
>
> Here are the findings of your final judgment day on earth for today, the day after my Valentine's Day massacre:
>
> Taylor, ***you're not going to get one thin d[i]me from me on any case***. That includes [cases subject of the Settlement Agreement, including the Disputed Case]. Sue me. You will lose. You can tell your co-conspirators, Nicole, Jon[a]tha[n], [redacted] and [redacted]. All the damn criminal conspirator wars who deleted emails and Word documents related to the [redacted] and [redacted] cases are in fucking serious criminal and civil exposure.... You are all dumb as hell. I am not. I will be setting up a meeting next week with the US Attorney for the Northern District of Georgia. He will meet with me. He knows who I am. You apparently never did.... Nobody fucks with me and [redacted]. You have been all been playing your Bullshit games of lies for too long. Too long is too

<div align="center">37</div>

long.  Always has been.  Always shall be.  *God Almighty told me to get you back to where you belong. Broke and essentially homeless….*

The fact that you, Taylor, involved innocent people like [redacted] and maybe even [redacted], *is going to haunt you and your wife and your children for the rest of your lives on earth*.  Shame on you.  You are disgusting….

You all better get on your knees and pray to Almighty God that He now asks me to show you mercy.  If he does, I will show it, if he does not, *I will deliver a fiery judgment against you on earth*.  Who the fuck did you think you were dealing with?  You were screwing around me with, but I was someone else in disguise.  You in fact have been screwing around with God Almighty.  I am not God.  You lied when you told others that I thought I was…. I am L. Lin Wood – the sole member of L. Lin Wood, P.C. The architect of the most masterful and powerful Valentine's Day massacre known in American history.  *The last one **killed** seven. Mine will **ruin** many more before it is over*.  Deservedly so.

You are the ones who are crazy, not me.  You are all the fools, not me.  You are all driven by fame and fortune, not me…. You are going to have to spend every day for the rest of your lives on earth by your every act and deed proving to God that you are genuinely sorry for the sins you have committed against HIM.  I'm not going to waste anymore time listing your sins.  You know them.  God knows them….

Buckle up your damn seatbelts.  Unless I change my mind under the instructions of God, you are in for the roughest ride of your lives.  *I'm going to teach you all a lesson that you are going to learn*….

I shall sleep well tonight even though I'm writing a bunch of crazy people at a crazy person's hour.  I live on God's time clock.  This sane man had a lot of business to conduct tonight.  Business that God Almighty exposed to him and told him to expose to others.

I bet it's going to be a long, long time before any of you ever sleep well again.  Taylor, you are a damn pussy.  You didn't even have the balls to show up for your little meeting that I already knew you were going to try to have before you had it….

Good night.  I know you will not sleep well.

PS:  Taylor, tell all of you damn co-conspirators that their asses are in criminal and civil liability trouble.  Be sure to tell Jonathan and Nicole.  I listened to that damn blowhard Jonathan run his mouth.  At midday, silently.  Because I knew that I was getting ready to slam his ass deep into the ground with [when] my time came.  My time came.  His ass in trouble and this time, *he will not land on his 2 feet* [a reference to Plaintiff Grunberg's handicap after he had a rock climbing incident falling from more than 40 feet in the air resulting in several surgeries and permanent disabilities].  He will be on his damn two knees begging me and Almighty God for mercy.  ***They will never get a dime from me.*** *I dare you to sue me for it.*  You don't have the balls to do it and if you do it, you shall lose and in the process, lose more of your damn asses if there's anything left of your assess after I finish with your assess tomorrow if you don't call [redacted] and beg for mercy like damn dogs begging for a damn piece of meat after not eating for 3 months.  I think my message is clear.  God has now asked me to refrain for the rest of this night and tomorrow from further profanity.  I shall always follow my God's's will and never anyone's on earth, including mine.

Last word, if any of you get within missile range of my office or home, I will have you arrested.  You make one more threat, at false accusation or attempt to interrupt me and as far as I'm concerned, you can all rot to hell in jail.

You know me, always one more last word…. It's not going to be pretty for you.  Fraud is never pretty.  Ask Michael Avenatti. Never has been. Never shall.

Good night.

L. Lin Wood

(Emphasis added).

135.

Plaintiff Wilson responded respectfully on February 15, 2020 at 8:15 a.m., denying Defendant Wood's fantastical accusations and conspiracy theories.

136.

Defendant Wood responded, again copying the 9 additional individuals, stating, in material part, as follows:

Keep lying.  USDOJ shall be checking ALL computers.  I know liars.  You been lying ever since your yelled at me and accused me of being insane.  Liar.

You miserably lying sack of shit.  You low life lying snake….

You are ALL in trouble.  Big trouble.  Computer fraud.  Conspiracy to commit computer fraud.  Violation of fiduciary duties.  Conspiracy to violate fiduciary duties.  Slander and defamation.  Conspiracy to slander and defame.  Conspiracy to interfere with my business relations, including clients and co-counsel.  I think you are in more criminal and civil trouble than the former big mouth, Michael Avenatti.

Your time would best be served on your knees telling me you are sorry….

Best outcome for you in eternity Is Hell for repeatedly interfering with God's commandment to children to honor their father.

*I will make sure that you never practice law again ever if you do not admit your sins*, all of them by 10:30 am.  Extensions grants each quarter hour thereafter depending on the amount of truth you tell me with each email.  Start with admitting your lies.

Tell the truth or suffer through full pains thereafter….

I want those facts by 10:30 AM.  *If you want to have a chance to save your future for your career, yourself and your family*.  You better come clean and tell the truthgiver the truth starting NOW.

I am going to learn that information in a criminal case involving you if necessary.  I am going to learn that information from you in a civil case involving you that is an almost certainty.  Your best chance for mercy from L. Lin Wood is for you to start pouring the truth on me regarding information on [redacted]/[redacted] by 10:30 AM this morning.  *Save your child.  Save your wife.  Save your life*….

Your are doing to want a major dose of mercy from me.  The sooner you come clean, the better.  The longer it takes, the worse….

(Emphasis added).

137.

On February 15, 2020, at 2:18 pm, Defendant Wood left a voicemail for Plaintiff Wilson

stating, in material part, as follows:

> Taylor Wilson, your *former partner*…  You're lucky you and I share something in
> common:  I care about and love your wife, I care about and love your little
> boy.  Right now, I don't give a damn about you.  But if I hurt you bad enough, it's
> gonna hurt them.  I don't wanna hurt you, Taylor….  I want you to tell me in an
> email in 15 minutes who in the hell asked for those computer files to be deleted.  I
> think it was Jonathan Grunberg.  I think he did it because [redacted] wanted it
> done…  I'm going after [redacted]. I've already gone after [redacted]. . . .  I'm
> going to get [redacted].  I don't want to get you cause it will hurt your wife and
> your child.  Send me an email and just tell me the truth without getting a lawyer,
> without trying to cover your ass …

138.

After leaving voicemails for Plaintiff Wilson and Grunberg stating that he felt that

Plaintiff Grunberg was the chief force behind these unspecified criminal acts, on February 17,

2020 at 12:17 a.m., Defendant Wood left a voicemail for Plaintiff Wilson stating, in material

part, as follows:

> Taylor, I hate to call you at 12:14 am because it's the act of a crazy man, but it's
> not son.  You need to watch out for Nicole Wade.  She would be the person that
> would go in and get this information.  She's evil…. [Redacted] was sent here by
> [redacted]....  The FBI is going to be involved tomorrow.  There's going to be
> some serious stuff going down.  Watch your ass. I'm telling you. Watch out for
> Nicole Wade…  You don't want to be unwittingly involved in a federal
> crime.  [Redacted] could go to jail for the rest of his life….  If I'm right about
> Nicole, she's gonna come crashing down.  She'll try to take everybody down that
> she can.  I know Nicole Wade…  He's gonna be in federal trouble because the FBI
> is on it.  I don't want you to get hurt, Taylor…  I love you.  This is the time to
> understand that Lin Wood really loves you.  Cause I'm trying to give you
> information to protect you and your family.  You got some thieves and criminals
> around you.  Don't get involved it in OK...

41

139.

That same day at 6:16 a.m., Defendant Wood sent to Plaintiff Wilson and 8 other individuals an e-mail stating, in material part, as follows:

All,

Attached is the IC3 Complaint Referral Form I filed with the FBI this morning related to [redacted] and his co-conspirators this morning….

140.

In Defendant Wood's FBI complaint alleging federal crimes, Defendant Wood refers to Plaintiffs Wade, Grunberg, and Wilson as "*one or more former members of my law firm of L. Lin Wood, P.C.*"  (Emphasis added).

141.

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 17, 2020, at 7:18 a.m., stating, in material part, as follows:

. . . You have damn fucked up your life.  Shame on you.  Your wife, your kid.  I take back everything I said nice about you.  You better get the word, that somebody better call me, and somebody better get over to my damn house, and tell me what the hell the truth is about what y'all did…. You people gotta get a criminal lawyer…. I'm gonna burn your asses.  Y'all fucked up.  Shame on you…. You're a son of a bitch, Taylor Wilson.  And you gonna rot in hell when I'm done with you, buddy, you got that?  Pass that message to every damn one of them…. *All of y'all are going down*…. Goodbye sir.  Get me the name of the person that's gonna get me the damn truth about this and they better call me in 30 fucking minutes.  You hear the rage?  *You ain't seen nothing yet, buddy.*  Goodbye.

142.

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 17, 2020 at 7:23 a.m., stating as follows:

Let me tell you something you little snotty ass son of a bitch.  Don't write me back and tell me you're taking care of your son.  Your son's looking into the eyes of a damn low life, cheating, lying, probably criminal defendant.  How could you

42

do this to your family, Taylor?  The FBI's not gonna play around.  You've all engaged in computer fraud.  I don't give a damn whether you did it or if Nicole did it.  I know who did it, and you got [redacted] involved in it.  You've ruined everybody's life.  ***You're not gonna get one thin dime from me***.  Sue me.  I don't think they allow you to file lawsuits like that when you're behind bars.  Somebody better call me, put their baby down, and give me the damn truth if there's gonna be any mercy shown by anybody for you, including the FBI, cause I'm one of their number one witnesses.  [Redacted] is going to jail.  Don't go with him.  Quit playing your games ya snotty ass little bastard, you came in here and ran your damn mouth in my office and yelled at me.  ***You're lucky I'm not with you right now, Taylor, cause I'd do to you what I'd do to* [redacted] *and I'd beat your ass with a switch till you couldn't sit down for 20 fucking years.***

143.

Also on February 17, 2020, Defendant Wood left a voicemail for Plaintiff Grunberg stating, in material part, as follows:

I'm gonna be a little calmer with you than I have been with Taylor and [redacted] on their voicemail messages, Jonathan Grunberg, you sorry slimy piece of shit.  How do you look at those babies?  I've got it all, I know what y'all been doing.  But here's your problem, you teamed up with [redacted], he's going to federal penitentiary, I'm afraid y'all need criminal defense attorneys, in fact I know, I've been up all night dealing with this, I've locked it all down….  The FBI's gonna be knocking on your door, Jonathan.  You need to go get a criminal defense lawyer.  Somebody *in that damn former piece of shit firm I had* better get on the phone and tell me the damn truth so I can tell the FBI that at least somebody's gonna be good to them and cooperate.   You got in bed with [redacted] and you manufactured shit from [redacted]….  In the process, you look at those two little babies, you hurt them.  You look at your wife, you hurt her.  ***You're not gonna get one thin dime from me about anything***.  You might even get sued by me.  What the hell were you thinking.  Man oh man, ***you're glad you're not with me in an elevator with me right now buddy*** [referring to his prior battery of Grunberg], cause you're damn lucky, I'm that mad….  That's how serious it is you little fucker.  You look in the mirror and you're gonna see **a Chilean Jewish fucking crook**.  Goodbye, Jonathan … you sorry bastard.

144.

Then on February 18, 2020, at 8:20 a.m., Defendant Wood recanted every one of his accusations in an e-mail to Plaintiffs Wade, Grunberg, and Wilson, along with 18 other individuals, subject "Correction and Retraction of False Accusations," stating, in material part, as follows:

> I know that I am generally recognized as an experienced and skilled lawyer in the area of First Amendment defamation law.  I am also by my own admission, fully capable of being a dumb ass or worse.  Given some of my recent emails and the filing of a IC3 Complaint Referral Form [with the FBI], the latter description may be more applicable to me than the former….
>
> *The primary purpose of this email is [sic] correct and retract some very hurtful and false accusations that I recently made against [redacted], [redacted], [redacted], [redacted], and* **my current law partners** *and employees.*   In the worse example of a defamer, I published accusatory statements with incomplete information and out of anger, coupled with a tried brain and body….
>
> ***Allow me to make clear that in all of the recipients of this email, there is not a dishonest or criminal bone in any of their bodies***.  I say this unequivocally and in direct contradiction to any suggestions or accusations or statements that I may have made against anyone on this email.  In recent days.  My legal career has been one of pursuing for truth and achieving justice which I define as providing fairness and respect to all within our legal system.  The recent emails to which I refer are the worst examples of the failure by an individual – ME – to pursue truth and achieve justice.  My statements against the identified individuals were not true and inflicted an injustice upon them, and all of the recipients[.]  In addition to asking for your forgiveness, I want to make it very clear that ***the individuals who were falsely accused are innocent of any wrongdoing*** and are encouraged to seek any further remedies against me for my wrongdoing, which they feel are appropriate or necessary.
>
> With the help of [redacted], [redacted], [redacted], and individuals identified by [redacted], I have now completed an examination of my office computer system, and while my office computer system was hacked, ***no accused individual was involved in any manner in that improper and illegal activity***.  After careful examination, no office emails have been deleted or otherwise altered in a manner that was not intended by authorized users of my system.  If I had bothered to

44

undertake the complete examination prior to making my unfounded accusations, I would never have made the accusations against the individuals….

For the past several months, particularly since Thanksgiving, I have been besieged by a variety of individuals, all of whom I love dearly with their own concerns about my mental health and my relationship with [redacted]….  Sadly, I did not serve well the best interest of my [redacted] and making my false statements and accusations against others.  I can only hope and pray that my stupidity serves as a shining example to them of why statements should always be investigated before published and should never be made out of a state of mind that might alter reality.  I have assessed my mental health and spent some time with [redacted] discussing it.  I am a little crazy, but I'm also mainly sane and possess a healthy mind….

I love each and every one of individuals on this email and I love and respect [redacted] as a law firm.  I hope and pray ***that my own law partners*** at the present time and all of the individuals who serve me so well at my firm will be willing to forgive me and continue to practice with me in the profession I love dearly and have loved for 43 years…..

(Emphasis added).

<div align="center">145.</div>

Unfortunately, three hours later, Defendant Wood changed his mind again.  On February 18, 2020 at 11:38 a.m., Defendant Wood e-mailed co-counsel in the Disputed Case stating, in material part, as follows:

[Redacted],

Please inform your firm members that Taylor is NOT to be copied on any other emails on any [Disputed Case] matters.  ***He and the former members of my firm*** will not be working on any of the other [Disputed Case] in the future.  We have reached a binding agreement on other cases ***so their transfer out of L. Lin Wood, P.C.*** will be smooth going forward despite the recent bumps….

***The former members of my firm*** are now off to a new and exciting adventure of their own….

(Emphasis added).

146.

The very next day, at midnight, Defendant Wood changed his mind yet again. Following this e-mail, on February 18 and 19, 2020, Defendant Wood made multiple requests to Plaintiff Wilson for the individual Plaintiffs to return to work.  Wilson, continuing to try to avoid Wood's wrath, politely declined to return to work at Defendant LLW PC.

147.

After Plaintiff Wilson again refused to return to work at Defendant LLW PC with Defendant Wood, Wood left Wilson another voicemail on February 19, 2020 at 6:29 p.m., in contradiction to all other prior statements he had made, contrary to the Lease for the LLW PC office space, and contrary to the Parties' February 17 agreement, stating as follows:

> Taylor, hey buddy, give me one call back tonight, cause I'm close to making a decision.  [Redacted] is not coming back, and I that's a good thing, I think that I need a clean break.  And, I don't want to stay in that space and I don't need to cause I don't need the space as much as y'all do, and that means y'all gotta pick it up or pay three quarters of the lease.  Y'all are indemnitors on that, each one of ya individually.  I'm the, the L. Lin Wood, P.C., is the leaseholder, and then our liability is a fourth, a fourth, a fourth, y'all signed it, so you've got three quarters of the liability for that space.  I figured under that scenario, y'all would wanna come up and take the space, strike a deal with me, I'll pay my quarter but I'm not gonna pay it up front, I'm not gonna pay it over the months, we'd have to kind of present cash dollar it down. Or, if you don't do that, Taylor, and I'm stuck with that lease*, **I'm gonna have to hold every dime of your [Disputed Case] money against your liability until the end of that lease**.  So, it's easier for me to move out, which I'd like to do, candidly, Taylor, and for y'all to stay in there.  That may be the win-win.  So, give me a call and let me know what you think.  Bye bye.

148.

Defendant Wood left a similar voicemail on February 19, 2020, for Plaintiff Grunberg, threatening that he would hold Plaintiffs liable on the Lease for which they are not, and never

were, liable, and that he would withhold the money he agreed to pay in the February 17 agreement until the Lease was satisfied.

<div align="center">149.</div>

Defendant Wood then e-mailed Plaintiffs Wade, Grunberg, and Wilson on February 19, 2020, at 8:01 p.m., along with four other individuals, stating, in material part, as follows:

> Nicole, Jonathan, and Taylor:
>
> … As Nicole has heard me say before, ***I do not intend to pay you "one thin dime" in satisfaction of your legal obligations***….
>
> *Until the matter is resolved between us and the building, I do not intend to make any payments to you on fees owed to you in any case.*  I will escrow the amount that I agreed to pay you until I am satisfied that my escrow account has covered me for your amount of the entire remaining lease obligation and other legal liabilities you owe to me for your misconduct….

(Emphasis added).

<div align="center">150.</div>

Even after recanting all of his false and malicious accusations against Plaintiffs Wade, Grunberg, and Wilson, one day later on February 19, 2020, at 8:01 p.m., Wood again accused Plaintiffs of unspecified acts, referring to himself as "their partner" and threatening to hurt them "in the court of public opinion."

<div align="center">151.</div>

The next morning, Defendant Wood had changed his mind again and wanted to profess his love for Plaintiffs.  On February 20, 2020, Defendant Wood left a voicemail for Plaintiff Grunberg stating, in material part, as follows:

> Jonathan … I want y'all to come over to my house tonight.  I don't want another night of this nonsense that y'all have created.  If ya wanna go to war and you think you're gonna beat me, you're gonna lose.  I got ya every which way, coming and going….  The last thing you wanna do is start off your law firm,

<div align="center">47</div>

before you even get started ***getting crushed by me, and I got the power to do it***….
I've been two steps ahead of you at every damn…. I love you, I love your family,
I love your babies….

<div align="center">152.</div>

That same day, Defendant Wood emailed again to profess his love, and this time to make

a variety of threats, all based upon his desire to get Plaintiffs to help him pay for his Lease.

<div align="center">153.</div>

Defendant Wood followed up with another voicemail to Plaintiff Wilson on February 20,

2020 at 6:59 p.m., stating, in material part, that Plaintiffs had to pay for the Lease and he

threatened to drag out any claims or suits for any amounts that he owed Plaintiffs:

> Taylor Wilson, man oh man, it's your old boss, the guy you love one minute, test
> one minute, love one minute, test one minute.  Taylor, you're in a damn mess, and
> you know it, and if you don't, you're gonna talk to a lawyer and you're gonna
> know it then.
>
> This is not the way to start your law firm, Taylor.  Here's what we're gonna
> do.  You're gonna get off your ass and put your pride aside, and you're gonna
> come over here and you're gonna talk to me. And I'm gonna tell you exactly what
> I'm willing to do to get y'all out of the mess you got yourselves in with your
> damn foolishness.  ***You're playing with fire when you come after Lin Wood***.
>
> [talking to himself] "Now stop being mad, Lin.  Okay, God."
>
> ***Taylor, I don't want to hurt you guys, but you've set it up where I could destroy
> you before you even got your foot off the ground.***  You can't pay for a
> lawyer.  You can't afford to litigate with me and you're gonna lose, cause you
> owe 75% of that lease to me.  Not a guarantor, you signed on that for me.  I'll pay
> the building, and then I'll hold your money until I litigate it with you….
>
> If you wanna sit down, Taylor, with me, I'll be humble, you'll be humbler.  We'll
> talk about what you did wrong, we'll talk about how you're gonna fix it.  And I'm
> gonna fix it, cause you did just about what I thought you were gonna do.  I'm
> always one step, two steps ahead of everybody.  I see around corners, Taylor.

<div align="center">48</div>

Now why don't you come over and talk to me, it won't take an hour, and we'll settle this mess that y'all created? … *But if you wanna go to war, you wanna bash egos with me, you wanna do your free will versus mine, you're gonna lose and it's gonna affect your family and your baby boy,* and I'm not gonna let that happen if I can avoid it.  If it happens, it's gonna be on your watch, not mine.

So, please, Taylor, stop the foolishness.  Come talk to a man that loves you, that wants you to succeed, that's taken a lot of abuse from you but at every turn has reached out and tried to get you to do the right thing.  You're gonna be able to practice law with your people, you're not gonna have me around much to worry about, I'm gonna get out, I wanted to get out, I wanted to be by myself … everything's together, everything in your life is not.  Call me, bye.

<div align="center">154.</div>

On  February  22,  2020,  at  5:07  a.m.,  Defendant  Wood  e-mailed  Plaintiffs  Wade,

Grunberg, and Wilson, and their counsel, stating, in material part, as follows:

[Disputed case] – As you were informed by [redacted], he will deposit … the [Disputed Case compensation] into his firm's escrow account.  [The client], not me, control the amount of fees to be paid to WGW, and the clients ***will only agree at best to pay to WGW quantum meruit for services*** strictly related to the [Disputed Case] *which will be very difficult for WGW to calculate*….

(Emphasis added).

<div align="center">155.</div>

On February 22, 2020 at 7:29 p.m., Defendant Wood e-mailed Plaintiffs' counsel and a

third party stating, in material part, as follows:

… If I am right, and I and others believe I am, further discord, disagreement, or even God forbid, litigation *will destroy the chances your clients have if [sic] building a successful and financially viable law firm*….  With respect to the [Disputed Case], your client will have to submit to me their actual hours worked on the [Disputed Case] and Their proposed hourly rate.  Taylor can include any hours that he feels were reasonably dedicated to [the Disputed Case] when he began his initial [work].  ***To be clear, I will not pay Nicole Wade any money on the [Disputed Case].***  So only Jonathan and Taylor need to bother will [sic] compiling and submitting to you to provide to me their actual hours worked or their best estimate of them….

<div align="center">49</div>

(Emphasis added).

<div align="center">156.</div>

On February 25, 2020 at 4:51 a.m., Defendant Wood e-mailed Plaintiffs' counsel copying five third parties, referring to Plaintiffs' counsel's first name on 66 separate occasions and otherwise stating, in material part, as follows:

> … Take whatever action you and your clients believe is necessary, Drew.  I will be prepared to respond with the full legal wrath and vengeance like an angry God, Drew….
>
> **One last matter, Drew.  I shall not voluntarily pay you or your clients one thin damn dime, Drew.**

(Emphasis added).

<div align="center">157.</div>

Shortly thereafter, Defendants engaged their current counsel.

<div align="center">158.</div>

Hiring new counsel did not stop Defendant Wood from contacting Plaintiffs in a threatening and abusive manner.

<div align="center">159.</div>

On March 3, 2020, at approximately 10:30 p.m., Defendant Wood called and left a voicemail for Plaintiff Wilson's wife professing his love for her and her family in a manner she found terrifying and stating, in material part, as follows:

> [Redacted] Wilson.  You've got a handsome little baby boy, I need to see him soon, I know I will.  Listen, I know I'm calling you, I'm not calling Taylor, I'm not supposed to.  You're gonna learn some things, Taylor's gonna learn some things in the next day or two, involving Taylor, Nicole, and Jonathan, and me and the lease.  It's gonna sound bad for him at first.  Bad for you.  I want you to know something, [redacted].  I told you I loved you.  I told you I loved your son, I love your husband, Taylor.  *I'm not gonna let anybody get hurt too badly*….  I think

<div align="center">50</div>

Taylor Wilson's one of the best damn young lawyers I've ever seen. A lot of things about Taylor remind me of me. I meant it every time I told you I love you, I meant it then I mean it now. I meant every time I told Taylor I loved him, I meant it then I mean it now. Just relax, hang loose, it's all gonna be good, it's not gonna be good as everybody wants it to be on your side, his side, but it will be good in the long run…. We'll talk one day soon. It'll be when you decide to call me or maybe we'll run into each other, but we'll talk again and we'll be friends, cause I love you and you love me. That answers every dispute that we have in life, doesn't it? We don't have disputes, we're different. We're different but we're alike, we love each other…. I love you and you love me. I love Taylor, he loves me. We'll talk soon…. When you listen to this in the next day or two, you'll understand why. I see around corners before I cross the corner. Buh-bye, talk soon.

<div align="center">160.</div>

Throughout this entire ordeal, Defendant Wood has continued to text Plaintiff Wilson's wife, despite being instructed to stop by Plaintiffs' counsel multiple times.

<div align="center">161.</div>

On March 4, 2020 at 3:40 a.m., Defendant Wood made clear his intentions not to pay any amounts on the fee distribution agreement he had previously made with Plaintiffs on February 17 when he e-mailed Plaintiffs Wade, Grunberg, and Wilson, their counsel, and a third-party, alleging a series of unspecified criminal conduct in violation of their "fiduciary duties" and stating, in material part, as follows:

> ***In any event, you may rest assured that I shall never voluntarily pay your clients one thin damn dime***. Your clients shall be required to pay their 75% of the lease obligations even if they find themselves prohibited from engaging in the practice of law in the State of Georgia in the future….

(Emphasis added).

<div align="center">162.</div>

Two days after Defendants stated they would not honor the terms of the Settlement Agreement for the reasons stated herein, Defendant Wood texted Plaintiff Grunberg, again

<div align="center">51</div>

threatening criminal liability based upon his admittedly blatantly false and recanted conspiracy theory that Grunberg, along with Defendants' former law partners, somehow committed some unspecified criminal act involving tampering with his computers:



**Defendants' Conduct During Negotiations of Settlement Agreement**

163.

Defendants' fraudulent and malicious intent is also revealed by and through their drafts of the Settlement Agreement.

164.

Upon information and belief, when they entered in the Settlement Agreement, Defendants were intent on forestalling a lawsuit by Plaintiffs Wade, Grunberg, and Wilson that would reveal Defendant Wood's indisputable pattern of violent, abusive, and erratic behavior supporting claims for assault, battery, intentional infliction of emotional distress, and defamation. Defendant Wood had repeatedly voiced his concerns about his misconduct being disclosed as he feared it would interfere with his imminent receipt of the Presidential Medal of Freedom and appointment as Chief Justice of United States Supreme Court.  The latter belief was based, in part, on (1) a decade-plus old "prophecy" Defendant Wood heard in a YouTube video, and (2) a conspiracy theory that Chief Justice Roberts would be revealed to be part of Jeffrey Epstein's sex trafficking ring and was being blackmailed by liberals to rule in their favor.

165.

More specifically, in reviewing Defendants' drafts of the Settlement Agreement, it is apparent that Defendants were always planning to find a way to "never pay one thin dime" and attempted to have Plaintiffs agree to a Settlement Agreement that would allow Defendants to renege on their covenant to pay Plaintiffs fee splits when the time came for performance, on the purported basis that client consent was required, by setting forth a false recital of their relationship as lawyers, fully cognizant of Georgia Rule of Professional Conduct 1.5(e) and its application.

166.

Defendants' first draft of the Settlement Agreement stated:  "Nicole Wade, Jonathan Grunberg, and Taylor Wilson have never been law partners in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked **with** L. Lin Wood, P.C. ***by agreement on a case-by-case basis*** while sharing office space since 2018." (Emphasis added).

167.

Plaintiffs objected to the above false description of their indisputable association with Defendant LLW PC.  Plaintiffs Wade, Grunberg, and Wilson did not work with Defendant LLW PC by agreement on a case-by-case basis.  Defendant Wood *never* handled any litigation solely by himself.  Since 2018, if not earlier, every case for which Defendant LLW PC entered into an engagement was worked on by Plaintiffs Wade, Grunberg, and/or Wilson, all as lawyers ***of*** Defendant LLW PC.  While Defendant Wood and Plaintiffs Wade, Grunberg, and Wilson would discuss which attorneys should work on which matters, Defendant Wood would direct Plaintiffs Wade, Grunberg, and Wilson what work to handle for what case, because he was their "boss."

168.

When Plaintiffs objected, Defendants claimed that this language was there "for insurance purposes."

169.

Defendants then edited this recital to state:   "Nicole Wade, Jonathan Grunberg, and Taylor Wilson have never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but, through Wade Law, LLC and Grunberg & Wilson, LLC, have worked **with** L. Lin Wood, P.C. **by general agreement on hourly fee cases** and **by agreement on a case-by-case basis on contingency fee cases** while sharing office space since 2018." (Emphasis added)

170.

Plaintiffs again objected to the above false language.  The distinction between hourly cases and contingency cases was a complete farce, plainly intended by Defendants as a material representation of the agreement, a false representation of the parties' relationship, and plainly designed to allow Defendants to renege on their promises to pay fee splits.

171.

Defendants edited this recital again to state:  "WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but worked **with** L. Lin Wood, P.C. on cases and were held out as partners since 2018." (Emphasis added).

172.

Plaintiffs again objected to the above false language, questioning why – if Defendants insisted on a recital setting forth the facts and nature of their relationship with Defendant LLW PC – Defendants insisted on falsely stating Plaintiffs were anything but lawyers of Defendant LLW PC.

54

173.

Defendants finally edited this recital a fourth time, arriving at the agreed upon language, which is the truth: "WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked as lawyers *of* L. Lin Wood, P.C. on cases since 2018." (Emphasis added).

174.

As demonstrated by the number of negotiations on this point, Defendants' agreement to this fact was a material representation inducing Plaintiffs to enter into the Settlement Agreement, as both parties knew this representation was integral to payment of fees under Rule 1.5 and liability for the Lease.

175.

Georgia Rule of Professional Conduct 1.5(e) "does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm." Rule 1.5(e), cmt. 8.

176.

Because Plaintiffs Wade, Grunberg, and Wilson acted as lawyers of Defendant LLW PC at the time they performed work in the Disputed Case (and all cases subject of the Settlement Agreement), Georgia Rule of Professional Conduct 1.5(e) is inapplicable with respect to Plaintiffs' claim for breach of contract.

177.

Defendants always intended to take the position that Plaintiffs were not lawyers of Defendant LLW PC, including prior to, at the time of, and after executing the Settlement Agreement.

55

178.

Defendants always intended to take the position that client consent was required and knew as counsel for the clients in the Disputed Case, that such consent would not be given, including prior to, at the time of, and after executing the Settlement Agreement.

179.

Defendants' intent prior to, at the time of, and after executing the Settlement Agreement was as they had repeatedly stated:  never to pay to Plaintiffs "one thin dime."

180.

As set forth herein, Defendants thereafter and prior to executing the Settlement Agreement, including as early as their February 11, 2020 e-mail, repeatedly threatened that they would pay to Plaintiffs only quantum meruit for their work on the Disputed Case even though Defendant Wood had already agreed to pay Plaintiffs a fee comparable to his previous practice and procedure with respect to distribution of attorneys' fees in cases.

181.

After multiple settlement offers of quantum meruit were rejected by Plaintiffs, Defendants agreed to the terms of the Settlement Agreement, which required payment to Plaintiffs on a lump sum basis rather than a quantum meruit basis.

182.

However, Defendants attempted to draft the agreement in a manner that would allow Defendants to do exactly what they always intended to do despite their express agreements to the contrary in the Settlement Agreement that (1) Plaintiffs were acting as lawyers of Defendant LLW PC and (2) Defendant LLW PC would pay to Plaintiffs the agreed sum:  never pay to

Plaintiffs "one thin dime," except possibly as quantum meruit as Defendants, or purportedly their clients, determine is appropriate in their sole authority.

<div align="center">183.</div>

Moreover, despite the Settlement Agreement not containing a single provision requiring the payment of any money by Plaintiffs to Defendants – providing instead that Defendants would pay a lump sum to Plaintiffs after withholding the Lease payment (stating, "LLW PC shall pay the stated portion of said fees … to WGW, minus the lease amount referenced in Section 2 below," which itself provides that "[t]his amount [for the Lease] shall be deducted from the payment by LLW PC to WGW referenced" above) – Defendants took the position that they both get to keep the fees they were supposed to pay to Plaintiffs *and* Plaintiffs had to pay to Defendants the Lease payment, i.e., Defendants would not be paying Plaintiffs "one thin dime."

<div align="center">184.</div>

In summary: (1) after months of repeatedly reiterating that Plaintiffs were partners and otherwise associated in Defendants' law firm LLW PC, falsely accusing Plaintiffs of various crimes, threatening them with various fantastical civil liabilities, making up various acts allegedly committed by Plaintiffs, assaulting and battering Plaintiffs Grunberg and Wilson, repeatedly reiterating that Defendants would never pay Plaintiffs "one thin dime" on the cases subject of the Settlement Agreement, repeatedly claiming Defendant Wood would destroy Plaintiffs' careers, and making repeated threats of physical harm against Plaintiffs Grunberg and Wilson, Defendants executed a Settlement Agreement promising to pay them a lump sum on various cases in return for which Plaintiffs made financial concessions totaling hundreds of thousands of dollars and giving Defendants a release for their conduct *specifically in order to avoid filing this lawsuit*; and (2) after executing the Settlement Agreement, Defendants made

<div align="center">57</div>

good on their repeated statements that they would never pay Plaintiffs "one thin dime" by claiming that the client in the Disputed Case, for whom Defendants were and remain counsel, refused his consent to the compensation required by the Settlement Agreement, which Defendants claimed was required because, despite the conduct described herein, it is Defendants' position that Plaintiffs were never associated with Defendants' law firm.

**COUNT I:**
**BREACH OF CONTRACT**

185.

Plaintiffs hereby incorporate by reference paragraphs 1 through 184 of their Complaint, as if specifically set forth herein.

186.

The parties entered into the Settlement Agreement on or around March 17, 2020, whereby Defendant LLW PC would pay Plaintiffs a portion of its fees for their work on certain cases, including the Disputed Case.

187.

The portion of Defendant LLW PC's fees in the Disputed Case is a liquidated sum.

188.

All conditions precedent under the Settlement Agreement have been satisfied to trigger the payment by Defendant LLW PC of a portion of its fees for the cases to Plaintiffs, including the Disputed Case.

189.

Defendants breached the terms of the Settlement Agreement by failing and refusing to pay to Plaintiffs the agreed amounts within 72 hours of Defendant LLW PC's receipt of its portion of its fees in the Disputed Case, as required in the Settlement Agreement.

190.

Defendants' refusal to pay Plaintiffs the agreed-upon amounts was in bad faith as it was purportedly based upon a Georgia Rule of Professional Conduct which Defendants knew was inapplicable, especially since Defendants had personal knowledge that Plaintiffs Wade, Grunberg, and Wilson had acted as lawyers of Defendant LLW PC in all matters related to the Disputed Case, and no such consent was required for the fee sharing set forth in the Settlement Agreement because, inter alia, Plaintiffs Wade, Grunberg and Wilson were lawyers of Defendant LLW PC—i.e., they were associated in the law firm with Defendant Wood.

191.

The Settlement Agreement, itself, recites as follows: "WHEREAS, Nicole Wade, Jonathan Grunberg, and Taylor Wilson and Wood are lawyers who practiced law and shared office space together for several years."

192.

The Settlement Agreement, itself, recites as follows: "WHEREAS, WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter 'LLW PC') but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018."

193.

In addition to the many indisputable facts contained herein establishing that Plaintiffs Wade, Grunberg, and Wilson have at all times acted as lawyers of Defendant LLW PC, the above recital is conclusive proof of that fact.

194.

The amounts owed by Defendants are owed for the substantial work that Plaintiffs performed for the clients of LLW PC and for which they have not yet been paid.  The clients for

the cases in question have already paid the fees to LLW PC, and the issue resolved in the Settlement Agreement was how those fees would be distributed among the lawyers who worked on the cases.

195.

In addition, Defendants executed the Settlement Agreement representing that clients in the Disputed Case were specifically clients of Defendant LLW PC and that Defendant Wood was their attorney.  As such, Defendant Wood had the apparent authority to bind the clients in the Disputed Case to the terms of the Agreement, and in fact, did so bind these clients.

196.

Defendants further breached the Settlement Agreement by breaching the implied covenant of good faith and fair dealing, and by failing "to use [their] best efforts to bring about the happening of the condition to his promise," to the extent client consent can be said to have been a condition to performance.  Cf. *Turner Broadcasting System, Inc. v. McDavid*, 303 Ga. App. 593, 602 (2010).

197.

Defendants' breach of the Settlement Agreement proximately caused Plaintiffs to suffer damages for the liquidated sum set forth in the Settlement Agreement, as well as other amounts owed under the Settlement Agreement.

198.

Defendant LLW PC is liable to Plaintiffs in the amount of the fees set forth in the Settlement Agreement owed to Plaintiffs for their work on those cases, together with attorney's fees for Defendants' bad faith refusal to pay and with interest pursuant to O.C.G.A. § 7-4-12.

## COUNT II:
## FRAUDULENT INDUCEMENT

199.

Plaintiffs hereby incorporate by reference paragraphs 1 through 184 of their Complaint, as if specifically set forth herein.

200.

Defendants fraudulently induced Plaintiffs to enter into the Settlement Agreement.

201.

At the time they entered into the Settlement Agreement, Defendants did not intend to perform their obligations under the Settlement Agreement, including to pay a portion of the fees for the Disputed Case and to honor the non-disparagement provision, which was a misrepresentation of a material fact.

202.

Plaintiffs reasonably relied on Defendants' affirmative but fraudulent representation that they would perform their obligations under the Settlement Agreement, including to pay the promised fees for the Disputed Case and the other cases and to honor the non-disparagement provision.

203.

At the time they entered into the Settlement Agreement, Plaintiffs reasonably relied on Defendants' statement and representation in the Settlement Agreement that, *inter alia*, Plaintiffs Wade, Grunberg, and Wilson "worked as lawyers of L. Lin Wood, P.C. on cases since 2018"—a clause that was heavily negotiated, as Defendants initially drafted it to falsely convey that Plaintiffs Wade, Grunberg, and Wilson were not attorneys of Defendant LLW PC.

204.

As Defendants have themselves proven, they never intended to abide by this true statement of fact that Plaintiffs Wade, Grunberg, and Wilson "worked as lawyers of L. Lin Wood, P.C. on cases since 2018".

205.

Defendants always intended to take the position that client consent to the fee splits in the Settlement Agreement was required, and they knew at the time they entered into the Settlement Agreement that such consent from the clients in the Disputed Case had been withheld or would be withheld, and/or that Defendants would ensure that it was withheld; i.e., that the future event would not take place.

206.

Defendants' fraud is proven by additional substantial and irrefutable circumstantial evidence concerning their fraudulent intent – prior to and at the time of executing the Settlement Agreement – to induce Plaintiffs to enter into the Settlement Agreement with false promises.

207.

Defendants represented as early as February 10, 2020, and on multiple occasions thereafter and prior to the Settlement Agreement, that the clients in the Disputed Case would only agree to compensate Plaintiffs in quantum meruit.

208.

To induce Plaintiffs to sign the Settlement Agreement, Defendant drafted the Settlement Agreement to state that Defendants were indeed counsel for the clients in all of the cases referenced therein, including the Disputed Case, and therefore, as their counsel, that Defendant Wood had all requisite authority to enter into the Settlement Agreement.  Defendants further

induced Plaintiffs to enter into the Settlement Agreement by drafting language that asserted that Plaintiffs at all times acted as lawyers of Defendant LLW PC, thereby eliminating any purported need for client consent.

<div align="center">209.</div>

Defendants further expressly instructed and demanded under threats of civil liability, criminal liability, and repercussions with the State Bar, that Plaintiffs were not permitted to contact Defendant LLW PC's clients or co-counsel, including the clients in the Disputed Case.

<div align="center">210.</div>

Defendants at all times relevant hereto acted as counsel to the clients in the Disputed Case, allowing Plaintiffs to reasonably rely on Defendants' apparent authority (1) to bind the clients in the Disputed Case and/or (2) rely on Defendants' implicit representation that said clients knew of and agreed to the terms of the Settlement Agreement.

<div align="center">211.</div>

Defendants' fraudulent intention to never pay to Plaintiffs "one thin dime" is further evidenced by the manner in which they drafted the terms triggering Defendant LLW PC's payment obligations to Plaintiffs.  For instance, at the time the Settlement Agreement was entered into, Defendants had already received the compensation necessary to pay Plaintiffs fees in multiple cases subject of the Settlement Agreement, but they drafted the Agreement only to trigger payment to Plaintiffs upon receipt of compensation in the Disputed Case at a later date. Meanwhile, the Lease obligation Plaintiffs agreed to in the Settlement Agreement (but were not otherwise responsible for) was larger than the fees owed in cases other than the Disputed Case and would only be paid out of the fees in the Settlement Agreement.  Thus, Defendants have

<div align="center">63</div>

attempted to make good on the "one thin dime" statements by withholding for months fees owed so that they could later claim the Lease obligation swallowed all fees owed to Plaintiffs.

212.

Defendants attempted to make good on their repeated statements they would never pay to Plaintiffs "one thin dime" by attempting (and failing) to build into the Settlement Agreement the very fraudulent defense on which they now rely:   that Plaintiffs were not lawyers of Defendant LLW PC in the years preceding this dispute.

213.

All of Defendant Wood's prior conduct leads to one inescapable conclusion – that he never intended to pay Plaintiffs.   That conduct includes his assault and battery of Plaintiffs Grunberg and Wilson; additional threats of physical harm against Plaintiffs Grunberg and Wilson, including that he would fight them to the death; repeatedly reiterating that he would never pay to Plaintiffs "one thin dime" prior to executing the Settlement Agreement; making repeated threats to destroy Plaintiffs' careers prior to executing the Settlement Agreement; making repeated false, fantastical, and malicious accusations of criminal conduct against Plaintiffs prior to executing the Settlement Agreement; making repeated fantastical threats that Plaintiffs would spend many years or the rest of their lives in prison for Defendant Wood's fantastical conspiracy theories about their alleged and false criminal acts; repeatedly threatening the families, including Plaintiffs Grunberg and Wilson's wives and young children aged between 3 months and approximately 2 years; and making numerous false, fantastical, and defamatory statements against Plaintiffs in addition to those relating to criminal acts, including that Plaintiffs were extortionists attempting to extort money from him to which they were not entitled (it appears based solely on Plaintiffs' request that Defendants honor his previous promises

regarding their compensation), including the payment of the compensation owed to them in the Disputed Case.

<div align="center">214.</div>

Plaintiffs reasonably relied upon Defendant Wood's status as counsel to the clients in the Disputed Case and his implicit representations that he had all requisite authority and consent to enter into the Settlement Agreement and would otherwise employ best efforts to ensure his compliance with the Settlement Agreement.

<div align="center">215.</div>

Defendants' fraudulent inducement of Plaintiffs to enter into the Settlement Agreement proximately caused damage to Plaintiffs, including but not limited to by inducing them to enter into the Settlement Agreement and to give up their valuable claims for  fees  as well as tort claims and to agree  to allow LLW PC to retain certain sums as payment on the Lease, all in the promise of payment on the Disputed Case, which Defendants never intended to pay.  As such, Defendant Wood's fraudulent inducement bars Defendants from raising the defense they fraudulently attempted to build into the Settlement Agreement.

<div align="center">216.</div>

Plaintiffs are entitled to a verdict against Defendant Wood individually and against Defendant LLW PC for compensatory damages consisting of the full value of the Settlement Agreement, punitive damages, and attorneys' fees in an amount to be proven at trial.

<div align="center">

**COUNT III:**
**PUNITIVE DAMAGES**

217.
</div>

Plaintiffs hereby incorporate by reference paragraphs 1-216 of their Complaint, as if specifically set forth herein.

218.

Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences as to entitle Plaintiffs to punitive damages against Defendants in accordance with O.C.G.A. § 51-12-5.1.

## COUNT IV:
## ATTORNEY'S FEES

219.

Plaintiffs hereby incorporate by reference paragraphs 1 – 216 of their Complaint, as if specifically set forth herein.

220.

Plaintiffs are entitled to the recovery of the costs of litigation and their attorney's fees under O.C.G.A. § 13-6-11 as Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense. Accordingly, Plaintiffs are entitled to expenses of litigation, including attorney's fees, under O.C.G.A. § 13-6-11.

221.

Further, Plaintiffs are entitled to the recovery of attorneys' fees and the costs of litigation from Defendants for the fraud they engaged in, including by fraudulently inducing Plaintiffs to enter into the Settlement Agreement. Defendants' behavior in negotiating, entering into, and carrying out the Settlement Agreement evidences that species of bad faith sufficient to justify an award of attorney's fee and the expenses of litigation under Georgia law.

**WHEREFORE**, Plaintiffs respectfully pray of this Court as follows:

A. Enter judgment in favor of Plaintiffs against Defendants as set forth in each count of this

Complaint;

B. Award Plaintiffs actual, special, and compensatory damages as set forth above in an amount

to be determined at trial, plus interest pursuant to O.C.G.A. § 7-4-12;

C. Award Plaintiffs punitive damages pursuant to O.C.G.A. § 51-12-5.1;

D. Award Plaintiffs their reasonable attorneys' fees and expenses of litigation;

E. For an award of Plaintiffs' costs of this action against Defendants; and

F. For such other and further relief as this Court deems just, proper and equitable under the

circumstances.

Respectfully submitted this 31st day of August, 2020.

/s/Andrew M. Beal
Andrew M. Beal
abeal@buckleybeal.com
Georgia Bar No. 043842
Milinda Brown
mbrown@buckleybeal.com
Georgia Bar No. 363307

BUCKLEY BEAL LLP
600 Peachtree Street, NE
Suite 3900
Atlanta, Georgia 30308
T: (404) 781-1100
F: (404) 688-2988
*Counsel for Plaintiffs*

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No: __2020CV339937__

JURY TRIAL DEMANDED

### VERIFICATION

I, NICOLE WADE,  Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This 25th day of August, 2020.

By: Nicole Wade

Sworn and subscribed before me
this 25th day of August, 2020.

NOTARY PUBLIC



CHELSEA HANEY
MY COMMISSION EXPIRES
NOTARY
PUBLIC
MARCH 07, 2023
COBB COUNTY, GEORGIA

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

## VERIFICATION

I, Jonathan Grunberg, member of WADE, GRUNBERG & WILSON, LLC, Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Verified Complaint* is true and correct to the best of my knowledge, information, and belief.

This 25th day of August , 2020.

By: Jonathan Grunberg, Member,
Wade, Grunberg & Wilson, LLC

Sworn and subscribed before me
this 25th day of August , 2020.

_____
NOTARY PUBLIC

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

## **VERIFICATION**

I, TAYLOR WILSON,  Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This __25__ day of __August__, 2020.

By: Taylor Wilson

Sworn and subscribed before me
this __25__ day of __August__, 2020.

_____
NOTARY PUBLIC

My Commission Expires July 9, 2022



## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

NICOLE WADE; JONATHAN GRUNBERG;
TAYLOR WILSON;
WADE, GRUNBERG & WILSON, LLC;

Plaintiffs,

v.

L. LIN WOOD and L. LIN WOOD, P.C.,

Defendants.

Civil Action File No:_____

JURY TRIAL DEMANDED

### VERIFICATION

I, JONATHAN GRUNBERG,  Plaintiff in the above-styled matter, hereby certify under penalty of perjury, before the undersigned officer authorized to administer oaths, that the information contained in the foregoing *Complaint* is true and correct to the best of my knowledge, information, and belief.

This ⎯⎯ day of _August_____, 2020.

_____
By: Jonathan Grunberg

Sworn and subscribed before me
this 25th day of _August_, 2020.

_____
NOTARY PUBLIC

